IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., and DELAWARE        )
AUDUBON SOCIETY,                   )
                                   )       Civil Action No.
    Plaintiffs,                )        88-263-SLR
                                   )
    v.                         )
                                   )
TEXACO REFINING AND MARKETING,     )
INC.,                              )
                                   )
    Defendant.                 )


PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
<u>MOTION TO ENFORCE JUDGMENT</u>

Mitchell S. Bernard
Nancy S. Marks
Amelia Toledo
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
New York, New York 10011
(212) 727-2700

C. Scott Reese (2036)
COOCH & TAYLOR
824 Market Street
Suite 1000
Wilmington, Delaware 19899
(302) 984-3811

Attorneys for Plaintiffs

July 18, 2005

TABLE OF CONTENTS

INTRODUCTION   . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . .   1

NATURE AND STAGE OF PROCEEDING . . . . . . . . . . . . . . . . . . . . . . .   2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    I.    The Court Has Inherent Authority to Enforce the 1998
          Judgment and the Stipulated Order . . . . . . . . . . . . . . . . . .   13

    II.   Texaco Violated the 1998 Judgment by Misinterpreting
          Scientific Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    III.  Texaco Violated the 1998 Judgment by Failing to Carry
          Out Essential Elements of the Court-Ordered Study
          Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

    IV.   The Court Should Seek Scientific Advice From Dr.
          Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

TABLE OF AUTHORITIES

CASES

*Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572
(9th Cir. 2000)…………………………………………………………………  21

*Crawford v. Greater Cleveland Reg'l Transit Auth.*, No. C86-2490,
1991 WL 328037 (N.D. Ohio July 26, 1991)...……………………………...  22

*Eash v. Riggins Trucking Inc.*, 757 F.2d 557 (3d Cir. 1985)……..………..  10,21

*Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8 (D.D.C. 2004) ………..  14

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)………………...  13

*La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957)………………………  23

*Leesona Corp. v. Varta Batteries Inc.*, 522 F. Supp. 1304
(S.D.N.Y. 1981)......................................................................................  23

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
800 F. Supp. 1 (D. Del. 1992)…... ……………………………………...  2,10

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
2 F.3d 493 (3d. Cir 1993) …………………………………………………  3

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
20 F. Supp. 2d 700 (D. Del. 1998) ..………………………………………...  5,8-9,13,
15-18,22

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
182 F.3d 904 (3d. Cir 1999) ...……………………………………………  5

*Peter Bay Homeowners Ass'n Inc. v. Stillman*, 294 F.3d 524
(3d Cir. 2002)...……………………………………………………………...  8,13

*In Re Peterson*, 253 U.S. 300 (1920) ……………………………………  10,21

*Reed v. Cleveland Bd. Of Educ.*, 607 F.2d 737 (6th Cir. 1979) ………….  21

*United States v. Michigan*, 680 F. Supp. 928 (W.D. Mich. 1987) ………..  21

*United States v. Washington*, 459 F. Supp. 1020 (W.D. Wash. 1978),
aff'd, 645 F.2d 749 (9th Cir. 1981) ………………………………………  14

STATUTES AND RULES

33 U.S.C. § 1251(a) …………………………………………………..  15

33 U.S.C. § 1365 ………………………………………………....  2

Fed. R. Evid. 706 ………………………………………………..  10,21,22

OTHER AUTHORITY

Ellen E. Deason, *Court-Appointed Expert Witnesses:  Scientific Positivism Meets Bias and Deference*, 77 Or. L. Rev. 59, 75 (1998) . . . .  21,23

## INTRODUCTION

Plaintiffs Natural Resources Defense Council, Inc. and Delaware Audubon Society ("plaintiffs") respectfully submit this Opening Brief in support of their motion to enforce this Court's judgment of September 1, 1998 (the "1998 Judgment") and Stipulated Order of February 23, 2000 ("Stipulated Order").

In November 1993, the Court directed defendant Texaco Refining and Marketing, Inc. ("Texaco") to determine the adverse environmental effects of unlawful pollutant discharges to the Delaware River from Texaco's Delaware City oil refinery (the "refinery").[1]  In 1995, plaintiffs filed a motion to enforce that judgment, asserting that the monitoring program Texaco had designed failed to satisfy the requirements of the Court's 1993 Order.  The Court granted plaintiffs' motion, and, after extensive fact-finding, entered the 1998 Judgment, in which it directed Texaco to implement a detailed, specific monitoring program prescribed by a Court-appointed expert, Dr. Jay C. Means.

In 1999, after reviewing Texaco's plan to study the refinery's effects on the River, plaintiffs filed a second motion to enforce, asserting that the new plan failed in material ways to carry out the Means-prescribed study the Court had ordered.  After more than a day of testimony in January 2000, and at the Court's urging, the parties entered into the Stipulated Order, which mandated certain

---

[1] Texaco subsequently conveyed the refinery to Star Enterprises, which then sold it to Motiva Enterprises LLC.  Texaco was a partner in both Star and Motiva.  For purposes of this motion, we refer to all these entities as "Texaco," which remains responsible for compliance with the portions of the 1998 Judgment and Stipulated Order that plaintiffs now seek to enforce.  In 2004, Motiva sold the refinery to The Premcor Refining Group Inc.

enhancements in Texaco's study plan.  Texaco then conducted a study, and produced a final report on its findings.

Having reviewed the study report, plaintiffs find two fundamental flaws. First, Texaco has misinterpreted the data it generated during the study, exonerating itself of responsibility for acknowledged adverse impacts downriver. Plaintiffs' independent analysis of study data reveals Texaco to be the responsible party.  Second, Texaco has failed to carry out or complete critical elements of the Court-ordered study.  These omissions compromise the scientific integrity of the study, in defiance of the Court's commands.

In this Opening Brief, plaintiffs will summarize the long procedural history of the case, set forth the pertinent facts, and urge the Court to rule that Texaco has again violated the Court's directives.[2]

## NATURE AND STAGE OF PROCEEDING

<u>The 1991 Trial</u>

Plaintiffs filed their complaint on May 19, 1988, Docket Item ("D.I.") 1, alleging that Texaco had violated the terms of its Clean Water Act permit governing discharges from the refinery.  Plaintiffs sought civil penalties and injunctive relief pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365.  After a three-week trial in 1991, the Court (Roth, J.) found that, between 1983 and 1991, Texaco had violated the discharge limits 365 times, or on a total of 3,360 days.  *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 800 F. Supp. 1, 21, 22 (D. Del. 1992) ("*NRDC v. Texaco I*").  For these

---

[2]  In further support of their motion, plaintiffs submit the declarations of Mitchell S. Bernard, dated July 14, 2005 ("Bernard Decl.") and Dr. Robert J. Livingston, dated July 7, 2005 ("Livingston Decl."), as well as a four-volume appendix of relevant documents (cited as "App.___").

violations the Court assessed civil penalties in the amount of $1.68 million. *Id.* at 27.

The Court further found that Texaco had failed to comply with the permit's command to undertake "additional monitoring as necessary to determine the nature and impact of" the noncomplying pollutant discharges. *NRDC v. Texaco* I, 800 F. Supp. at 24. Judge Roth found that Texaco had "ignored its responsibility to monitor the impact of its violations." *Id.* at 25. *See also id.* at 27 ("Texaco . . . has never evaluated the impact of its violations on the receiving waters."). The Court found that Texaco had benefited in the amount of $900,000 from this failure. *Id.* at 25. In an Order entered on August 13, 1992, Judge Roth directed Texaco to comply with the permit's monitoring requirement. D.I. 164 ¶ 3.

<u>The 1993 Appeal</u>

In August 1993, the Third Circuit affirmed this Court's injunction relating to the monitoring requirement. *See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 507 n.12 (3d Cir. 1993) ("We also reject Texaco's half-hearted argument that the judgment ordering it to comply with the monitoring provisions of the permit is impermissibly vague.")

In September 1993, as a result of Judge Roth's appointment to the Third Circuit, the Court reassigned the case to Judge Longobardi. D.I. 183. On November 6, 1993, Judge Longobardi issued a revised order reflecting minor revisions required by the Third Circuit's decision. The injunction's monitoring provision remained intact. D.I. 195 ¶ 3.

Plaintiffs' First Motion to Enforce

Through a consultant, ENTRIX, Inc., Texaco prepared an "Exceedance Response Plan" (the "ENTRIX Plan") purporting to comply with the requirements of the Court's injunction.  After reviewing the plan, in September 1993, plaintiffs objected to it.  Following extensive letter submissions and discussions between the parties, the Court granted plaintiffs permission to serve a formal motion to enforce, which was fully briefed by June 1995.  D.I. 212-220.  On March 1, 1996, after hearing oral argument, the Court granted plaintiffs' motion, reserving for a later time "the precise relief" to be ordered.  D.I. 222 (Order dated March 5, 1996).

In January 1997, following further efforts by the parties to resolve or narrow their differences, the Court appointed an independent expert, Dr. Means, who had been nominated by Texaco.  D.I. 228.  The Court asked Dr. Means to submit a report setting forth (1) the scientific steps required to determine the adverse impact of past and any future noncomplying pollutant discharges from the refinery, and (2) his review of the ENTRIX Plan.  On November 3, 1997, Dr. Means submitted a detailed report to the Court, finding that, through standard scientific study techniques, Texaco could determine the adverse effects of past and any future excessive pollutant discharges.  App.IV-A75.[3]  Dr. Means found the ENTRIX Plan to be incapable of accomplishing the assigned tasks.  *Id.* at A73.

For two days during April 1998, the Court heard live testimony from Dr. Means, plaintiffs' expert biologist Dr. Robert J. Livingston, and the Texaco

---

[3] "App.IV-A75" refers to Plaintiffs' Appendix Volume IV, page A75.

consultant, Dr. Ralph Markarian, who had authored the ENTRIX Plan.  Dr. Means

elaborated on the substance of his written report.  Dr. Livingston essentially

concurred in the study approach outlined by Dr. Means.  Both Dr. Means and Dr.

Livingston testified that the ENTRIX Plan could not determine adverse impacts.

Dr. Markarian conceded on cross-examination that the ENTRIX Plan he had

prepared for Texaco was not designed to measure the impacts of the refinery's

noncomplying pollutant discharges.

<u>The Court's 1998 Opinion and Order</u>

On September 1, 1998, the Court issued a lengthy Opinion and Order.

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 20 F. Supp. 2d 700

(D. Del. 1998) ("*NRDC v. Texaco II*").  In pertinent part, this Court held:

- Texaco's ENTRIX Plan "was neither designed to measure impacts [of
  Texaco's noncomplying pollutant discharges] nor equipped to do so," *id.*
  at 706, and thus failed to satisfy the requirements of the Court Order.

- "[T]he only valid measurement of impacts is a program like that proposed
  by Dr. Means."  *Id.* at 712.

The Court ordered Texaco to "develop and implement a program to adequately

measure the adverse impact of" discharge violations since March 1993, using the

methods discussed in Part II of its Opinion.  *Id.* at 715.  In Part II of its Opinion,

the Court discussed and adopted the program Dr. Means had recommended in

his written report and trial testimony.  *Id.* at 703-07.

<u>The 1999 Appeal</u>

Rejecting Texaco's appeal, the Third Circuit affirmed in all respects this

Court's September 1, 1998 Opinion and Order.  *Natural Res. Def. Council, Inc. v.*

*Texaco Ref. & Mktg., Inc.*, 182 F.3d 904 (3d Cir. 1999).

Texaco's 1999 Scope of Work

In late June 1999, Texaco conveyed to plaintiffs a copy of a scope of work prepared by Mr. Lenwood Hall and Dr. Dennis Burton, whom Texaco had selected as its new consultants. The scope of work outlined the specific steps Texaco planned to take to implement the Court-ordered study. Plaintiffs' expert, Dr. Livingston, found serious flaws in the effort proposed. He prepared written comments, to which Mr. Hall and Dr. Burton responded in writing in July 1999. The parties then sent plaintiffs' comments and Texaco's response, along with the scope of work itself, to Dr. Means for his review. In written comments dated August 26, 1999, Dr. Means, too, found significant deficiencies in the Texaco work plan. App.IV-A98.

Plaintiffs' Second Motion to Enforce

After reviewing Dr. Means's critique of the Hall/Burton scope of work, plaintiffs filed a motion to enforce the Court's 1998 Judgment.[4] On January 26 and 27, 2000, the Court heard testimony from Dr. Means, Dr. Livingston, and a Texaco expert. Before the trial was completed, the Court urged the parties to resolve their differences. The parties then drafted the Stipulated Order, which the Court endorsed on February 23, 2000. D.I. 296. The Stipulated Order resolved plaintiffs' motion to enforce.

Pursuant to the terms of the Stipulated Order, Texaco agreed to revise its study plan in various ways. For example, defendant agreed to carry out "a caged bivalve study" to determine whether contaminants in water and sediment are available to biota. D.I. 296 ¶ 1d. Such a study had been part of the Means-

---

[4] When Judge Longobardi retired, the case was assigned to Judge Robinson.

prescribed research program, but had not been included in Texaco's initial scope of work. While plaintiffs agreed to make Dr. Livingston available to confer with Mr. Hall and Dr. Burton on certain questions, Texaco did "not relinquish its primary authority or responsibility to carry out the terms of the Court Order, and make decisions on all aspects of the studies." *Id.* ¶ 2. Plaintiffs reserved "their right to raise or to litigate in this Court any appropriate claim regarding [d]efendant's conduct of the Court-ordered studies." *Id.* ¶ 3. The Court explicitly retained "jurisdiction to enforce th[e] Stipulated Order and its prior Opinion and Order of September 1, 1998." *Id.* ¶ 5.

<u>The Texaco Study</u>

In January 2004, Texaco provided plaintiffs with a copy of the Hall/Burton study report. Bernard Decl. ¶ 8. Texaco's consultants reached two basic conclusions. First, sediments downriver of the refinery are contaminated with polynucleated aromatic hydrocarbons ("PAHs") and other pollutants that are causing adverse effects on biota. Second, the PAHs causing the damage downriver come from sources other than the refinery. App.I-A14.

Plaintiffs reviewed the report in detail. On June 15, 2004, they wrote to Texaco's counsel, raising a number of questions concerning the consultants' study methods and data interpretation. App.IV-A330. In addition, plaintiffs noted that Texaco had not carried out or completed certain experiments mandated in the Court-ordered research program. On September 1, 2004, Texaco responded in writing to plaintiffs' concerns. App.IV-A334. Thereafter, Dr. Livingston conducted a further in-depth review of the Hall/Burton data. His independent

7

analysis led Dr. Livingston to the opposite conclusion Texaco's consultants had

reached:  Dr. Livingston found that PAHs loaded by the refinery are a major

contributor to the contamination of downriver areas where ecological and

biological damage are evident.  Livingston Decl. ¶¶ 13,19.

Plaintiffs' Instant Motion to Enforce

Late in the fall of 2004, plaintiffs and defendant began to discuss

arbitrating their differences concerning the validity of the Hall/Burton conclusions.

The Stipulated Order contemplated that "[t]he parties will explore the possibility of

arbitrating such disputes before individuals with expertise in the relevant scientific

subject matter area."  D.I. 296 ¶ 1n.  After a months-long attempt that included

correspondence, telephone conferences, and an in-person meeting, the parties

could not agree on an arbitration process to resolve the central issues plaintiffs

wish to raise.  Bernard Decl. ¶ 19.

This motion follows.

## SUMMARY OF ARGUMENT

1.  The Court has inherent authority to enforce its orders.  *Peter Bay*

*Homeowners Ass'n Inc. v. Stillman*, 294 F.3d 524, 533 (3d Cir. 2002).  This Court

explicitly retained jurisdiction to enforce the terms of its injunction against

Texaco, both in the 1998 Opinion and Order, *NRDC v. Texaco II*, 20 F.Supp. 2d

at 715 ("The Court retains jurisdiction to insure compliance with the terms of this

Order.") and in the Stipulated Order, D.I. 296 at ¶ 5 ("The Court retains

jurisdiction to enforce this Stipulated Order and its prior Opinion and Order of

September 1, 1998.").

2. In 1998, the Court ordered Texaco to "develop and implement a program to adequately measure the adverse impact of its . . . nonconforming discharges since March 1993." *NRDC v. Texaco II*, 20 F. Supp. 2d at 715. The purpose of the order was to compel Texaco to determine in a scientific manner whether its unlawful pollutant discharges cause any ongoing environmental harm. The consultants Texaco engaged to carry out the study concluded that adverse ecological and biological effects downriver were not attributable to pollutants released by the refinery. App.I-A751-753. Plaintiffs' expert reviewed the data independently and found the opposite: "that PAHs loaded into the river by the refinery accumulated [downriver] in depositional areas where various forms of biological damage occurred." App.III-A2; Livingston Decl. ¶ 19. This contradicts the central conclusion of the Texaco team on the basic issue of concern. Plaintiffs assert that Texaco misinterpreted study data, wrongly exonerating itself, and in so doing violated an essential requirement of this Court's 1998 Judgment.

3. In its 1998 Judgment, the Court expressly directed Texaco to measure any adverse impact of its unlawful discharges "using the protocol discussed in Part II of th[e September 1, 1998] Opinion." *NRDC v. Texaco II*, 20 F. Supp. 2d at 715. The "protocol" referred to by the Court, and discussed in Part II of the 1998 Opinion, is embodied in the report and testimony of Dr. Means. *See id.* at 703-07. Thus, Texaco was required to carry out the Means study program, as adopted by the Court. It was not free to abandon study elements with which it disagreed, or because of purported exigent circumstances. Texaco did not carry

out or complete various study tasks prescribed by the Court and Dr. Means, thus compromising the scientific validity of the study. Livingston Decl. ¶¶ 14-17, 21-22. Accordingly, it violated this Court's Order.

4. Plaintiffs' motion raises a series of complex scientific questions. In order to assist the Court in adjudicating the motion, plaintiffs suggest that the Court refer the technical issues first to Dr. Means, to obtain his advice concerning two key questions: (1) whether available data support Texaco's conclusions or Dr. Livingston's opposing conclusions, and (2) whether Texaco carried out faithfully the study the Court prescribed. While the Court must ultimately rule on these questions, an initial referral to Dr. Means will promote judicial economy and inform the Court's deliberations. The Court has ample authority to seek assistance from Dr. Means, either pursuant to its inherent powers or, should he ultimately testify, pursuant to Federal Rule of Evidence 706. *See, e.g., In Re Peterson*, 253 U.S. 300, 312 (1920); *Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 563 (3d Cir. 1985)*; see also Fed. R. Evid. 706.*

## STATEMENT OF FACTS

This Court has twice found that Texaco failed to comply with its legal obligation to determine the adverse impact of its unlawful pollutant discharges to the Delaware River. First, in 1992, the Court ruled that Texaco had "ignored its responsibility to" determine such impacts. *NRDC v. Texaco I*, 800 F. Supp. at 25. In 1998, the Court ruled that a monitoring plan prepared by a Texaco consultant was "neither designed to measure impacts nor equipped to do so." *NRDC v. Texaco II*, 20 F. Supp. 2d at 706.

Pursuant to the Court's 1998 judgment, Texaco, through paid consultants, prepared a scope of work that omitted various elements of the study the Court had prescribed.  Plaintiffs brought on another motion to enforce.  D.I. 279. During discovery in anticipation of trial on the motion, Texaco's consultants, Mr. Hall and Dr. Burton, each testified that he disagreed with some parts of the Means study program and did not feel compelled to follow it precisely.  Bernard Decl. ¶ 15.  Neither of the witnesses had read the Court's Opinion prior to preparing a scope of work for the Court-mandated study.  *Id.*; App.IV-A111 (excerpt from Hall deposition transcript); App.IV-A103 (excerpt from Burton deposition transcript).

After more than a day of testimony in January 2000, Texaco agreed to make various changes in its study plan.  Then Texaco carried out a study and issued a final report dated December 2003.  In the report, Texaco's consultants concluded that, while there is contamination causing adverse biological effects in depositional reaches of the River south of the refinery, such effects are not attributable to Texaco.  App.I-A751-752.

Through their expert, Dr. Robert Livingston, plaintiffs reviewed the Texaco study report.  In a detailed written critique, Dr. Livingston found that Texaco had obfuscated and manipulated study data.  Livingston Decl. ¶¶ 9, 18.  He found the Texaco report so problematic that he obtained raw study data and performed an independent set of analyses.  *Id.* ¶ 18.  Based on these analyses, he concluded that the refinery had loaded PAHs that deposited downriver in areas where

Texaco found serious and adverse biological effects. *Id.* ¶ 19. This directly contradicts the principal conclusion of Texaco's consultants. *Id.*

Dr. Livingston found fundamental flaws in Texaco's study methods. To determine the refinery PAH "fingerprint," Texaco used sampling stations near the refinery's effluent canal. However, refinery-loaded PAHs were more likely to attach to particles, drift downriver, and settle in depositional areas more distant from the refinery. *Id.* ¶ 12. Texaco then used the misguided fingerprint to conclude that the refinery was not responsible for adverse environmental effects downstream. When Dr. Livingston conducted his own analysis of raw study data, he found a strong correlation between PAHs loaded by the refinery and PAHs in contaminated sediments downstream. *Id.* ¶ 18.

Dr. Livingston's analysis revealed, *inter alia*, that (1) refinery-loaded PAHs drift downstream on particulates, and deposit in areas up to seven miles from the refinery; (2) contaminated downstream sediments exceed recognized toxicity effects levels; (3) around half of the specific PAH compounds found in the contaminated downstream sediments originated from the refinery; and (4) there were highly significant statistical correlations of adverse biological effects with individual refinery-loaded PAHs. *Id.* ¶ 18. These findings prompted Dr. Livingston to conclude, as a matter of science, that Texaco's principal conclusion is incorrect. *Id.* ¶ 19.

In addition, Dr. Livingston found that Texaco had failed to conduct or complete various experiments central to the Court-mandated study plan. Livingston Decl. ¶ 21. For example, Texaco did not carry out caged bivalve

experiments, although the 1998 Judgment and underlying Means Report expressly required them. *Id.* ¶ 15. Such experiments were the only scientific way to link contaminants in the sediment to contaminants in organisms. This was an essential element of the Court-ordered study. *Id.* Texaco's failure to conduct required bioavailability experiments undermined the capacity to draw sound scientific conclusions from study data. *Id.* ¶¶ 16, 28.

For nearly the past year, plaintiffs and defendant have been exchanging views and information concerning the Texaco study. Bernard Decl. ¶ 19. During the week of June 27, 2005, attempts at arbitration finally failed. *Id.* Plaintiffs filed the instant motion promptly thereafter.

## ARGUMENT

### I.    The Court Has Inherent Authority to Enforce The 1998 Judgment and the Stipulated Order.

The Court has the "inherent power to interpret, and thereby effect, [its] own decrees." *Peter Bay Homeowners, Ass'n Inc. v. Stillman*, 294 F.3d at 533 (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379 (1994) (federal courts have ancillary jurisdiction "to enable a court to function successfully, that is to manage its proceedings, vindicate its authority, and effectuate its decrees")). The 1998 Judgment explicitly states that "[t]he Court retains jurisdiction to insure compliance with the terms of this Order," *NRDC v. Texaco* II, 20 F. Supp. 2d at 715. This alone is sufficient to provide ancillary jurisdiction. *See Kokkonen*, 511 U.S. at 381 (where a "provision 'retaining jurisdiction'" is present "ancillary jurisdiction to enforce the agreement . . .exist[s]."). In the February 2000

Stipulated Order the Court endorsed, it also explicitly retained jurisdiction to enforce its prior rulings.  D.I. 296 at ¶ 5.

Where, as here, "the parties have reached an impasse in interpreting the meaning of the Court's prior order, a motion to enforce the judgment is an appropriate procedural vehicle" to seek the Court's assistance.  *NRDC v. Texaco II*, 20 F. Supp. 2d at 707.  *See also Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004) ("Courts grant motions to enforce judgments when a prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it, even if the noncompliance was due to misinterpretation of the judgment.").

Once it determines the meaning of the order, this Court has "the duty to protect and effectuate its prior judgments."  *United States v. Washington*, 459 F. Supp. 1020, 1115 (W.D. Wash. 1978), *aff'd,* 645 F.2d 749 (9th Cir. 1981).  The Court "has broad discretion to fashion remedies which will protect and effectuate its earlier rulings, the more so when the public interest and the rights of a large group of people are involved."  *Id.* at 1115 (citations omitted).  The Court certainly has broad discretion here, where nonprofit plaintiff citizen groups attempt to enforce a basic requirement of the Clean Water Act and good corporate citizenship:  that Texaco straightforwardly confront the impact of its unlawful pollutant discharges to the Delaware River.  *See NRDC v. Texaco II*, 20 F. Supp. 2d at 714 ("Texaco must carry out this responsibility with care to determine the impact of its noncomplying discharge on the River, the lifeblood of the region."); *see also id.* at 701 (citing "esthetic, recreational and environmental interests

espoused by federal law and guarded by plaintiffs.").  Given the Clean Water

Act's fundamental purpose to "'restore and maintain the chemical, physical, and

biological integrity of the Nation's waters,'" 33 U.S.C. § 1251(a), *NRDC v. Texaco*

*II*, 20 F. Supp. 2d at 708, enforcing rigorously the terms of the 1998 Judgment

and the Stipulated Order will serve the public interest.

II.     **Texaco Violated the 1998 Judgment
        By Misinterpreting Scientific Data.**

        In its 1998 Judgment, the Court directed Texaco to determine any adverse

environmental effects of its unlawful pollutant discharges by conducting a sound

scientific study.  *See NRDC v. Texaco II*, 20 F. Supp. 2d at 714 (Texaco must

"study[] the environment using well-grounded scientific principles").  One

fundamental dictate of scientific study is to interpret data objectively, reaching

conclusions the data support.  Texaco has violated this basic tenet of science,

incorrectly attributing downstream contamination to sources other than the

refinery.  The result of Texaco's incorrect conclusion is to relieve the refinery, and

thus Texaco itself, of responsibility for the noxious effects of its unlawful pollutant

releases.  This violates the core of the 1998 Judgment.

        According to Dr. Livingston, Texaco committed a number of serious errors

in collecting, organizing, and interpreting data.  For example, Texaco

emphasized concentrations of PAHs rather than actual loadings of PAH

compounds to the River.  Livingston Decl. ¶ 11.  This reveals a basic

misunderstanding of how to determine the impacts of PAHs on the receiving

system.  *Id.*  In its 1998 Opinion, the Court itself remarked on the distinction

between concentration and loading: "Put in simple terms, although a pollutant can be diluted to reduce its concentrations, a significant amount of that pollutant is still being discharged into the River." *NRDC v. Texaco II*, 20 F. Supp. 2d at 714. Texaco relied on dilution of PAHs to downplay their significance. But as Dr. Livingston points out, echoing the Court's own prior observation, pollutant loadings are the only true basis for measuring environmental effects. Livingston Decl. ¶ 11; App.III-A4, 20, 39.

Texaco also wrongly used sampling stations near the refinery's effluent canal to identify the PAH fingerprint it would later use to downplay Texaco's contribution to downriver contamination. Texaco's own dye studies, as well as common scientific knowledge concerning the behavior of PAHs, indicate that refinery-loaded PAHs were more likely to attach to particles and drift downstream, to depositional reaches of the River more distant from the refinery. Livingston Decl. ¶ 12. Dr. Livingston's analysis shows that individual PAH compounds loaded by the refinery appear in downstream sediments where Texaco itself found significant ecological and biological degradation. *Id.* ¶¶ 18-19.

The purpose of the Court's directives is to determine the impact on the Delaware River of Texaco's unlawful pollutant discharges. In Texaco's view, the data show that the refinery is not responsible for adverse impacts downstream. In plaintiffs' view, the data show the opposite. These warring interpretations of study data go to the heart of the 1998 Judgment and the Stipulated Order. If plaintiffs are correct, then Texaco's incorrect interpretation, regardless of its

source or motivation, violates both sound science and this Court's clear commands.

Resolving this dispute is necessary to assure the integrity of the Court's prior orders. In addition, if ongoing adverse effects in the River are attributable to Texaco's prior unlawful acts, then Texaco must mitigate those effects. *See NRDC v. Texaco II*, 20 F. Supp. 2d at 715 ("If the impact of the noncomplying discharge from January and February 1994 is persistent in the environment then Texaco must take steps now to mitigate its effect.").

### III.  Texaco Violated the 1998 Judgment By Failing To Carry Out Essential Elements of the Court-Ordered Study Program.

In 1998, the Court prescribed a particular program of scientific study. Texaco was bound to carry out that study in all its particulars. *NRDC v. Texaco II*, 20 F. Supp. 2d at 715 (Texaco must "develop and implement a program to adequately measure the adverse impact of its . . . noncomplying discharges since March 1993 using the protocol discussed in Part II of this Opinion."). The protocol, detailed in Part II of the Court's 1998 Opinion, is based on the research prescribed by Dr. Means, the Court-appointed expert nominated by Texaco. The Court did not blindly adopt Dr. Means's recommendations. Rather, it reviewed his report, and heard live testimony from Dr. Means, Dr. Livingston, and an expert proffered by Texaco. After reviewing the evidence, the Court ruled that "only" a study such as that outlined by Dr. Means would suffice. *Id.* at 712.

Texaco did not carry out or complete all essential elements of the Court-ordered study. Livingston Decl. ¶ 21. Two glaring deficiencies concern

bioavailability and long core analysis. Dr. Means had prescribed bioavailability experiments as a critical part of the overall study. *See NRDC v. Texaco II,* 20 F. Supp. 2d at 704 (discussing need for bioavailability studies regarding both sediment and water). The purpose of the experiments was to connect contaminants in sediment and water to contaminants in biota. Livingston Decl. ¶ 15. This is essential because sediment or water contamination does not automatically mean that there is adverse biological impact. Such impact only occurs if the contaminants are available for uptake by organisms. Tissue concentrations of PAHs can exceed by many times such concentrations in the surrounding environment. *See NRDC v. Texaco II*, 20 F. Supp. 2d at 704.

Initially, Texaco's consultants did not propose any bioavailability study, notwithstanding the Court's explicit instruction to the contrary. App.IV-A109. Indeed, when they were deposed before the 2000 trial (at which neither of them testified because the parties resolved the pending issues before they were called), both Mr. Hall and Dr. Burton stated that they had prepared a scope of work for the Court-ordered study before they had even read the Court's 1998 Opinion. Bernard Decl. ¶ 15; App.IV-A111, IV-A103. In the Stipulated Order resolving plaintiffs' second motion to enforce, Texaco agreed explicitly to conduct the caged bivalve experiments the Court had prescribed. D.I. 296 ¶ 1d. Despite this, Texaco did not carry out any such experiment. Livingston Decl. ¶¶ 15, 27.

When plaintiffs raised this issue with Texaco in 2004, Texaco explained that the State of Delaware had erected regulatory hurdles to such experiments. However, the written record plaintiffs have reviewed does not reveal any

substantial effort by Texaco to overcome such obstacles, or to devise an alternative way to conduct the mandated experiments. Nor did Texaco approach the Court to seek an amendment to its obligations. Bernard Decl. ¶ 17. Texaco's consultants' historical reluctance to carry out bioavailability experiments casts doubt on whether Texaco did all it could to comply with the Court's commands. *Id.* ¶ 18. Moreover, Texaco's purported substitute for the bioavailability studies – a survey of uncaged clams in areas other than the downstream depositional areas where refinery-loaded PAHs deposited – was no substitute at all. Livingston Decl. ¶ 15. In fact, Texaco could not find such clams in the contaminated downriver reaches of the River, a relevant fact Texaco ignored in its interpretation of study data. *Id.*

Texaco also failed to complete successfully the long core experiments the Court prescribed. These experiments, in which cores of sediments are analyzed and dated to determine the history of contaminant deposition, were intended to shed light on whether historical releases from the refinery could be traced in downstream sediment. Livingston Decl. ¶ 17. While Texaco gathered long cores at a number of stations, it analyzed only two, neither of which was in a depositional area where one would expect to find a historical record of refinery releases. *Id.* This precluded definitive conclusions regarding the effects of the refinery's historical unlawful pollutant discharges. Nonetheless, Texaco's consultants drew scientifically invalid conclusions from the limited data they collected. *Id.*

In addition to the failure to conduct bioavailability experiments and complete long core work, Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured. Livingston Decl. ¶ 15; App.III-A9. Further, Texaco's failure to analyze PAH loading from the refinery compromised the detailed characterization of fate and transport processes that were a central feature of the Court-mandated research program. Loading is a major factor in such processes, which can control the impacts of refinery effluent on River water, sediments, and biota. Livingston Decl. ¶ 21.

By failing to carry out faithfully the Means research plan, as adopted by the Court, Texaco violated the 1998 Judgment and the Stipulated Order.

**IV.    The Court Should Seek Scientific Advice From Dr. Means.**

Plaintiffs' motion raises a series of scientific questions. The Texaco study, as well as Dr. Livingston's critique and independent analysis, contain a numbing number of technical charts and tables, and are replete with language familiar only to scientists. While the questions the Court must decide are straightforward (*i.e.*, Do the data support the conclusions of Texaco or of Dr. Livingston? Did Texaco carry out all elements of the Court-ordered study?), the answers to those questions may turn on fine scientific detail. As a result, plaintiffs suggest that the Court refer salient scientific questions in the first instance to Dr. Means. His advice will promote judicial economy, and inform the Court's consideration of the merits of plaintiffs' motion.

Referring technical questions to Dr. Means is consistent with both the case law and the law of this case. The Court has inherent power to retain an expert to assist it in adjudicating plaintiffs' motion. *See In re Peterson*, 253 U.S. at 312 ("Courts have . . . inherent power to provide themselves with appropriate instruments required for the performance of their duties," including the power to "appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause."); *see also Eash v. Rigins Trucking Co.*, 757 F.2d at 563 (same); *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 591 (9th Cir. 2000) (court has power to appoint technical advisers); *Reed v. Cleveland Bd. Of Educ.*, 607 F.2d 737, 746 (6th Cir. 1979) (court has inherent power to appoint expert advisers); *United States v. Michigan*, 680 F. Supp. 928, 987, 995 (W.D. Mich. 1987) (court has "broad discretion" to appoint experts "to provide the Court with an independent and informed view of defendants' compliance" with a consent decree).

Should Dr. Means be called to testify at an evidentiary hearing on plaintiffs' motion, then Federal Rule of Evidence 706 provides authority for his appointment by the Court. Pursuant to that Rule, "[t]he court . . . may appoint expert witnesses." Fed. R. Evid. 706; *see also* Ellen E. Deason, *Court-Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference*, 77 Or. L. Rev. 59, 75 (1998) (*"Deason Article")* ("Today, judges usually appoint experts to testify under the authority and guidelines of FRE 706," however "if an expert's function is to advise, not testify . . . judges may . . . appoint an expert outside the limits set by FRE 706.").

21

If the Court decides to appoint Dr. Means pursuant to Federal Rule of Evidence 706, then the various procedural requirements of that Rule would have to be met. These include, *inter alia,* the parties' right to depose the Court-appointed expert and to cross-examine him. Fed. R. Evid. 706. These requirements apply only to testifying experts, and not to experts retained solely to advise the Court. At the time it appoints an expert, the Court need not decide whether the expert will serve as a Rule 706 witness or as an inherent-powers adviser. A court may reserve that determination until it decides whether the expert will be required to testify. *See Crawford v. Greater Cleveland Reg'l Transit Auth.*, No. C86-2490, 1991 WL 328037 at *1 n.1 (N.D. Ohio July 26, 1991) (Where "it is unclear whether the Court's expert will be required to testify in any enforcement proceedings . . . the Court [may] rel[y] on both Rule 706 and it [sic] inherent authority in making an appointment.").

When faced with the complex technical issues concerning the contours of an appropriate study, Judge Longobardi sought the advice of Dr. Means, who was nominated by Texaco, to determine whether Texaco's (ENTRIX) study plan was adequate. *NRDC v. Texaco II*, 20 F. Supp. 2d. at 703, 714 ("The Court appointed Jay C. Means, Ph.D. an expert" and "order[ed] Texaco to execute the studies proposed by Dr. Means"). The issues before the Court on the instant motion are even more complex, as they involve not only the proper contours of the study, but also a detailed analysis of years of field and laboratory data. The experts relied on by plaintiffs and defendant hold sharply competing views on the appropriate analysis of those data. "Perhaps the most helpful contribution a

court-appointed expert can make . . . is to analyze the conflicts between the party experts." *Deason Article* at 93. Providing informed opinions on complex, contested technical questions is the appropriate role for a Court-appointed expert, and plaintiffs believe such an appointment would be helpful here.

Given his prior involvement in the case, and the fact that the Court has relied before on his judgment, Dr. Means appears to be the logical choice to play this role. However, if he is unavailable or unwilling to do so, then the Court could find and appoint another suitable scientist to provide helpful advice.

Of course, the Court itself must adjudicate the merits of plaintiffs' motion. *See La Buy v. Howes Leather Co., Inc.*, 352 U.S. 249, 256 (1957) (appointed experts "aid judges in the performance of specific judicial duties … and [do] not … displace the court.") (internal quotations omitted); *Leesona Corp. v. Varta Batteries, Inc.*, 522 F. Supp. 1304, 1312 (S.D.N.Y. 1981) ("The court expert serves to enhance the trial court's understanding, but it is the court, and not its expert, that decides the case."). Thus, the role of Dr. Means or another expert, should the Court appoint one, would be to provide scientific insight to assist the Court in considering the factual issues plaintiffs' motion presents. Specifically, Dr. Means or another suitable scientist could help the Court resolve the competing conclusions of the parties' experts on the key issue: whether the data indicate that Texaco's unlawful pollutant discharges cause ongoing damage downriver. In addition, the expert could provide insight on the scientific implications of Texaco's failure to undertake or successfully complete certain experiments. Only the Court can answer the legal question whether Texaco

complied with the specific terms of the 1998 Judgment and the Stipulated Order, but the Court's decision may turn, in part, on its view of the importance of defendant's omissions.  Dr. Means is particularly well qualified to provide guidance, as he himself designed the study the Court directed Texaco to conduct.

## CONCLUSION

For the reasons set forth above, plaintiffs urge the Court to rule that Texaco has violated the 1998 Judgment and the Stipulated Order.  Plaintiffs further suggest that, as an initial matter, the Court refer to Dr. Means the scientific questions raised by this motion, to obtain his expert advice.

Dated:  July 18, 2005

Respectfully submitted,

Mitchell S. Bernard
Nancy S. Marks
Amelia Toledo
NATURAL RESOURCES
DEFENSE COUNCIL
40 West 20th Street
New York, New York 10011
(212) 727-4469

C. Scott Reese (2036)
COOCH & TAYLOR
824 Market Street
Suite 1000
Wilmington, Delaware 19899
(302) 984-3811

Attorneys for Plaintiffs