IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 88-263-SLR |
| v. | ) ) ) | |
| TEXACO REFINING AND MARKETING, INC., | ) ) ) | |
| Defendant. | ) ) | |

DECLARATION OF MITCHELL S. BERNARD IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

I, Mitchell S. Bernard, declare as follows:

Introduction

1. I am lead counsel for plaintiffs in this case. I have been plaintiffs' counsel since 1990, and am fully familiar with the relevant facts and prior proceedings. I submit this declaration in support of plaintiffs' motion to enforce this Court's Order of September 1, 1998 (the "1998 Judgment") and its Stipulated Order of February 23, 2000 ("Stipulated Order").

2. At issue is the requirement that Texaco (or its successor entity, Motiva) determine the adverse environmental effects of repeated unlawful pollutant discharges from its oil refinery in Delaware City.

Initial Trial

3.  This motion represents the fourth time plaintiffs have asked the Court to require Texaco to meet its legal obligations under the Clean Water Act. After an initial trial, the Court (Judge Roth) found that Texaco had violated its pollutant discharge limits on thousands of days. *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 800 F. Supp. 1, 21, 22 (D. Del. 1992). Moreover, Judge Roth ruled that Texaco had "ignored its responsibility to" determine the adverse effects of its unlawful releases to the Delaware River. *Id.* at 25. The Court directed Texaco to perform "additional monitoring as necessary to determine the nature and impact of" its noncomplying discharges. *Id.* at 24.

First Motion to Enforce

4.  When plaintiffs reviewed Texaco's initial plan to comply with the Court's monitoring directive, they believed it was inadequate, and filed their first motion to enforce the judgment. Judge Longobardi, to whom the case had been reassigned after Judge Roth was appointed to the Third Circuit, granted plaintiffs' motion. Based on trial testimony, and on the advice of a Court-appointed expert, Dr. Jay Means, whom Texaco had nominated, the Court directed Texaco to undertake a comprehensive set of studies outlined by Dr. Means. *Natural Resources Defense Council, Inc., v. Texaco Refining and Marketing, Inc.*, 20 F. Supp. 2d 700, 703-07, 715 (D. Del. 1998) (*"NRDC v.Texaco II"*).

Second Motion to Enforce

5. The following year, plaintiffs reviewed a scope of work prepared by Texaco's consultants, Mr. Lenwood Hall and Dr. Dennis Burton. Plaintiffs believed the Texaco plan did not satisfy the requirements of the Court's directive. They filed a second motion to enforce. After hearing testimony on two days during January 2000, D.I. 291-293, the Court urged the parties to settle the matter, making clear that Texaco would have to revise its planned monitoring effort. The parties entered into the Stipulated Order, in which Texaco agreed to modify in various ways its proposed study. D.I. 296.

6. Pursuant to the Stipulated Order, plaintiffs agreed to make their expert ecologist, Dr. Robert J. Livingston, available to confer with Mr. Hall and Dr. Burton on certain aspects of the study, such as the location of sampling sites. Texaco explicitly retained exclusive authority and responsibility to plan and implement the study. D.I. 296 ¶ 2. Plaintiffs expressly reserved "the right to raise or litigate in this Court any appropriate claim regarding [d]efendant's conduct of the Court-ordered studies." *Id.* ¶ 3.

Texaco Study Report

7. During the middle of 2000, Mr. Hall and Dr. Livingston had a number of communications concerning aspects of the study plan. Dr. Livingston visited the study site during August. Texaco's consultants prepared a scope of work dated November 2000. There were some limited further communications between Mr. Hall and Dr. Livingston during 2001.

8. In December 2003, Texaco published a final report of the study, which it conveyed to plaintiffs in January 2004. App.I & II. In essence, Texaco's consultants found that depositional areas downriver of the refinery were contaminated with polynucleated aromatic hydrocarbons ("PAHs") and other pollutants, and that sediment contamination in those areas adversely affected animals feeding in the sediments. However, the consultants concluded that the PAHs responsible for the biological harm originated from sources other than the Texaco refinery.

Livingston Review

9. Plaintiffs asked Dr. Livingston to review the study report. He prepared a detailed review (App.III), with stunning results. He found that the Texaco consultants had obfuscated and misinterpreted study data. His questions were serious and fundamental enough to prompt Dr. Livingston to obtain raw study data and run an independent set of analyses. These analyses showed a strong correlation between refinery-released PAHs and PAHs in the depositional areas downstream where adverse ecological effects were evident.

10. In Dr. Livingston's words, "a straightforward analysis of the data revealed that PAHs loaded into the river by the refinery accumulated in depositional areas where various forms of biological damage occurred." This directly contradicts the conclusion of Texaco's consultants on the seminal issue in the study.

11. Moreover, Dr. Livingston found that Texaco had failed to carry out faithfully certain experiments and field analyses essential to the Court-ordered study plan.

12. In support of plaintiffs' motion, Dr. Livingston is submitting a declaration of his own, as well as his written report critiquing the Texaco study and detailing the results of his independent analyses of available data.

<u>Discussions with Texaco</u>

13. Based on Dr. Livingston's critique, which took a number of months to complete, plaintiffs began a lengthy set of discussions with Texaco. Plaintiffs raised a series of technical questions in a letter dated June 15, 2004 (App.IV-A330), to which Texaco responded at length on September 1, 2004 (App.IV-A334). Texaco's responses did not allay plaintiffs' concerns. Rather, Texaco repeated various conclusions plaintiffs believe the study data contradict.

14. In response to plaintiffs' questions concerning why certain elements of the Court-ordered study had not been carried out, Texaco either cited to its own November 2000 scope of work, as if that document supplanted the Court's 1998 Judgment, the underlying Means Report, and the Stipulated Order, or said that exigent circumstances prevented certain experiments from being completed. When plaintiffs asked for documents to support the exigent circumstances excuse, Texaco produced remarkably little, and nothing that supports abandonment of critical elements of the Court-ordered program.

15. Texaco's apparent departures from the research protocols prescribed by the Court are particularly disturbing in light of evidence that came to light prior

to the 2000 trial on plaintiffs' second motion to enforce. While they did not testify at trial (the parties settled before they were called to the witness stand), their deposition testimony revealed that Mr. Hall and Dr. Burton disagreed with important aspects of the Means study plan, and felt free to disregard them, *see* App.IV-104-109, 112-119, notwithstanding the Court Order adopting the Means approach as the "*only* valid measurement of impacts." *NRDC v. Texaco II*, 700 F. Supp. 2d at 712 (emphasis added). Indeed, at the time of his deposition on November 2, 1999, Mr. Hall testified, under oath, that he had not read Judge Longobardi's 1998 decision. App.IV-A111. Dr. Burton read it just before his deposition, also on November 2, 1999. App.IV-103. This was long after Mr. Hall and Dr. Burton, in Texaco's behalf, had prepared a scope of work for the Court-ordered study.

16. There is evidence that the consultants' disregard of the Court's commands persisted after the 2000 trial, during the study itself. As one example, a major flaw Dr. Livingston found in the Texaco effort is the failure to study bioavailability. Bioavailability is a measure of the uptake of pollutants by organisms, and can be determined by placing caged bivalves in appropriate places in the River, then analyzing tissue to see whether the bivalves are absorbing local contaminants from sediment or water. It is a critical experiment in the Court-prescribed program, but Texaco did not carry it out.

17. When we asked Texaco to explain, it said that it had proposed to bring in bivalves from Louisiana, but the State of Delaware would not allow it. However, a September 13, 2000 letter from Delaware authorities (App.IV-A296),

produced by Texaco at plaintiffs' request, does not foreclose the mandated experiments. Even assuming there were regulatory complications, there is nothing in the written record of which plaintiffs are aware indicating that Texaco or its consultants took the requisite steps to address the State's concerns, to figure out an alternative way to conduct this crucial experiment, or to seek an amendment to the 1998 Judgment or the Stipulated Order.

18. In their initial (1999) scope of work, prepared for Texaco, Mr. Hall and Dr. Burton did not propose to carry out bioavailability experiments at all, notwithstanding Dr. Means's (and the Court's) emphasis on the need for such research. App.IV-A109. This fact underscores our suspicion that Texaco and its consultants were too willing to disregard the Court's directions, and intensifies the need for judicial review.

19. After the exchange of letters in mid-2004, the parties commenced detailed negotiations aimed at arbitrating their differences. In the Stipulated Order, the parties had agreed to confer and try to resolve disputes, and to explore the possibility of arbitration. D.I. 296 ¶ 1n. After many attempts (in person, by telephone, and through correspondence) that lasted into the week of June 27, 2005, plaintiffs determined that arbitration is not a viable option.

<u>Instant Motion to Enforce</u>

20. For decades, Texaco committed innumerable violations of applicable pollutant discharge limits, loading toxic pollutants into the Delaware River beyond what the law allows. Despite the dictates of law, as embodied in rulings by Judge Roth in 1992 and Judge Longobardi in 1998, both affirmed on appeal,

7

Texaco has apparently still not determined in a straightforward and scientific fashion the ecological and biological impacts of its violations.

21. The lone remaining issue in the case is whether Texaco has complied fully with the terms of the 1998 Judgment and the Stipulated Order; specifically, whether Texaco has satisfied its obligation to determine, in the required manner, the adverse environmental effects of the pollutants it discharged in violation of the Clean Water Act.

22. In plaintiffs' view, the two essential questions presented by the instant motion are as follows:

a. **Do existing data demonstrate or suggest that PAHs emanating from the refinery are causing adverse environmental effects downriver?** The Court, the plaintiffs, and the public have a right to know the continuing consequences of Texaco's unlawful conduct. Texaco's consultants and Dr. Livingston hold opposing views of what existing data show.

b. **Has Texaco faithfully carried out all essential elements of the study program the Court directed it to undertake?** Judge Longobardi ruled as follows: "Texaco shall determine the impact of its noncomplying discharges since March 1993 using the protocol discussed in Part II of this Opinion." *NRDC v. Texaco II*, 700 F. Supp. 2d at 715. In Part II of its Opinion, the Court described and adopted the studies prescribed by Dr. Means. *Id.* at 703-07. Texaco and its consultants were thus not free to devise or carry out their own study; while they had to flesh out aspects of the program Dr. Means outlined, they were required to include its fundamental elements and methods. Plaintiffs believe Texaco failed to

carry out crucial parts of the research the Court prescribed, and that those failures seriously compromised the scientific validity and force of the study.

Proposed Referral to Dr. Means

23. The questions plaintiffs raise in this motion involve highly technical subject matter. Even a cursory look at the final report of Mr. Hall and Dr. Burton, and the extensive critique by Dr. Livingston, demonstrates this. Due to the nature of the subject matter, and the procedural history of the case, plaintiffs propose that the Court refer the matter in the first instance to Dr. Means. Assuming he is willing and available, he appears to be the logical choice to provide scientific advice. He was previously appointed by the Court to advise it on precisely these matters, after having been nominated by Texaco. He is well acquainted with the relevant subject matter, having prescribed the study the Court adopted in its 1998 Opinion and Order.

24. Plaintiffs did not know Dr. Means before Texaco nominated him, and have had no dealings with him beyond this case.

25. There is precedent for calling on Dr. Means's expertise. In considering each of plaintiffs' first two motions to enforce the monitoring requirement, the Court turned to Dr. Means for objective advice.

26. While the Court must make any final determination concerning the merits of plaintiffs' motion, we believe the expert assistance of Dr. Means will foster judicial economy and shed useful light on complex scientific issues.

Appendices

27. Accompanying their Opening Brief and two supporting declarations (this one and one from Dr. Livingston), plaintiffs are submitting appendices containing the following documents: Texaco's final study report (App.I & II); Dr. Livingston's critique of the report (App.III); and, in App.IV, Dr. Livingston's curriculum vitae; Dr. Means's initial report to the Court (November 1997); Dr. Means's critique of the 1999 Hall/Burton scope of work; brief excerpts from the November 1999 depositions of Mr. Hall and Dr. Burton; Texaco's November 2000 scope of work; correspondence between Mr. Hall and Dr. Livingston during the study period; plaintiffs' June 15, 2004 letter to Texaco; and Texaco's September 1, 2004 response to that letter.  We have tried to include all documents (other than those already in the Court record) pertinent to the disposition of plaintiffs' motion.

Conclusion

28. Plaintiffs are moving to enforce the judgment because they believe Texaco, again, has violated the clear commands of law.  If the Court determines that Texaco has gathered the appropriate data and interpreted them correctly, then the case will terminate.  If, on the other hand, the Court determines that Texaco has misinterpreted existing data and/or has failed unjustifiably to gather information the Court directed it to collect, then plaintiffs will seek further relief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
July 14, 2005

_____
Mitchell S. Bernard