IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY,<br><br>  Plaintiffs,<br><br>  v.<br><br>TEXACO REFINING AND MARKETING, INC.,<br><br>  Defendant. | Civil Action No.<br>88-263-SLR |

DECLARATION OF ROBERT J. LIVINGSTON IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

I, Robert J. Livingston, declare as follows:

Introduction and Qualifications

1. I am Professor Emeritus of Biological Science at Florida State University, in Tallahassee, Florida. I hold an A.B. from Princeton University (1959) and an M.S. and Ph.D from the Institute of Marine and Atmospheric Sciences at the University of Miami (1970).

2. My research interests include aquatic ecology, pollution biology, field and laboratory experimentation, and ecosystem-level research in freshwater, estuarine, and marine systems. For the past 35 years, I have conducted long-term, multidisciplinary ecosystem analyses in a series of rivers, lakes, and bays.

3. As part of my work, I have monitored toxic pollutants such as polynucleated aromatic hydrocarbons ("PAHs") in water, sediments, plants, and animals to evaluate the impact of such compounds on ecosystems and biota. A copy of my curriculum vitae appears in an Appendix to plaintiffs' motion. App.IV-A1.

Involvement in this Case

4. I have served as a consultant and expert witness for plaintiffs in this case since 1990. During the 1991 trial, I testified to the threat of environmental harm to the Delaware River stemming from Texaco's unlawful pollutant discharges. At that time, I also outlined a monitoring program that I believed would be required to determine the nature and impact of Texaco's noncomplying discharges.

5. In 1993, after trial, I advised plaintiffs on the adequacy of the monitoring plan prepared by Texaco's consultant (ENTRIX) in response to the Court's injunction. I submitted an affidavit on this matter in 1995, in support of plaintiffs' motion to enforce the 1993 judgment, and I testified at the 1998 trial on that motion.

6. In 1999, I reviewed the scope of work prepared by Texaco consultants Lenwood Hall and Dennis Burton. I testified at the trial in January 2000 concerning the adequacy of that scope of work.

7. At plaintiffs' request, I reviewed the December 2003 final report prepared by Texaco's consultants. App.I & II. (In my review, I refer to the

2

document as the "Motiva Report," which is the name used by the study authors.) I wrote an extensive review of that report, App.III.

8. I am fully familiar with the report submitted to the Court by Dr. Jay Means in November 1997, with the Court's 1998 Opinion and Order, and with other documents pertaining to the scientific and research issues in the case.

9. I submit this declaration in support of plaintiffs' motion to enforce the Court's September 1, 1998 Judgment and February 23, 2000 Stipulated Order. In my expert opinion, for reasons I explain in detail in my review and summarize below, the Texaco study report is scientifically unsound and its conclusions are incorrect. In addition, Texaco failed to carry out essential elements of the research Dr. Means and the Court prescribed.

Flaws in Texaco's Final Report

10. The Texaco study report is fundamentally flawed. The reasons for this are detailed in my written review. To summarize briefly a few significant examples:

PAH Loading

11. The study emphasized concentrations of PAHs rather than actual loadings of individual PAH compounds by the refinery to the River. Loading, calculated by PAH concentration times flow rate, represents the actual amount of PAHs delivered to the River at a given time. The emphasis on concentrations rather than loadings displays a basic misunderstanding of the processes involved in determining PAH impacts on the receiving system. As the Court itself

pointed out, explaining a distinction drawn by Dr. Means: "Put in simple terms, although a pollutant can be diluted to reduce its concentrations, a significant amount of that pollutant is still being discharged into the River." *NRDC v. Texaco Refining and Marketing, Inc.*, 20 F. Supp. 2d 700, 714 (D. Del. 1998) ("*NRDC v. Texaco II*"). The study authors largely ignored this salient point.

### PAH Fingerprinting

12. To determine the refinery PAH "fingerprint," Texaco's consultants used sampling stations proximate to the refinery's effluent canal. But there were no data indicating that sediment PAHs in this part of the River represented PAH loading from the refinery. In fact, refinery-loaded PAHs were more likely to attach to particles and drift downstream, settling in depositional areas more distant from the refinery. The dye studies and other analyses Texaco carried out, as well as what we know about PAH transport in river systems, confirm this.

13. The study authors then used their faulty PAH fingerprint to conclude that PAHs loaded by the refinery did not cause adverse ecological and biological effects downstream. When I conducted my own analyses of raw study data, I found a strong correlation between refinery-loaded PAH compounds and the PAHs in downstream depositional areas where adverse biological effects were noted.

### Bioavailability

14. The Means program required Texaco to determine the bioavailability of PAHs through both water and sediments. The Court expressly identified these

4

studies as principal components of the research it ordered Texaco to undertake. *NRDC v. Texaco II*, 700 F. Supp.2d at 704, 715. Bioavailability experiments determine the routes by which pollutants enter the tissues of living organisms. Proper bioavailability studies relate concentrations of pollutants in the water or sediments to resulting concentrations in experimental organisms.

15. The bioavailability experiments Dr. Means prescribed are essential to the overall research program. When the Texaco consultants abandoned tissue analyses of toxic agents in experimental subjects in the Triad study, caged bivalve experiments became the only scientific way to link contaminants in the sediments to contaminants in organisms. Without such analysis, we cannot attribute to any particular contaminant the adverse effects on benthic (bottom-dwelling) organisms. Notwithstanding this, Texaco did not conduct caged bivalve experiments. Instead, it analyzed resident clams collected from reaches of the River distant from known depositional areas where refinery-loaded PAHs were concentrated. In fact, the clams Texaco collected (near the refinery) were not found in downstream depositional areas with high sediment PAHs, a relevant fact that Texaco ignored.

16. Texaco's failure to carry out the Means-prescribed bioavailability work constitutes a serious flaw in the study.

Long Cores

17. Texaco was supposed to carry out long core experiments to determine whether historical releases from the refinery cause ongoing adverse

5

effects in the receiving system. This portion of the study was wholly inadequate: Texaco used only two cores, both in non-depositional reaches of the river. This precludes any substantive conclusion regarding the effects of past excessive refinery loading of PAHs. Nonetheless, Texaco's consultants drew scientifically invalid conclusions from these limited data.

Independent Analysis of Data

18. When I reviewed the Texaco study report, I found the treatment of data so skewed that I conducted an independent analysis of the data. I found that: (1) the evidence indicates that refinery-loaded PAHs attach to particulates and drift downstream to depositional areas up to seven miles south of the refinery; (2) areas around the refinery outfall are not necessarily where refinery-loaded PAHs accumulate; (3) the refinery loaded certain specific PAH compounds to the River; (4) sediment PAH concentrations in downstream depositional areas appear to correspond temporally to discharges from the refinery; (5) resident bivalves Texaco collected contained a combination of refinery PAHs and PAHs from other sources; (6) we do not know whether these concentrations are representative of PAH tissue concentrations in bivalves in depositional areas downstream, because Texaco did not carry out caged bivalve experiments in downstream depositional areas characterized by high sediment PAHs; (7) applicable sediment toxicity effects levels were exceeded in the depositional areas downriver; (8) around half of the PAHs noted in the sediments in downstream depositional areas were associated with PAH loadings from the

6

refinery; and (9) statistical analyses of the Texaco data indicated highly significant correlations of adverse biological effects with individual refinery-loaded PAHs.

19. My analysis leads to the conclusion that PAHs loaded to the River by the refinery accumulated in depositional areas where various forms of biological damage occurred. This contradicts Texaco's conclusion that refinery-loaded PAHs do not adversely influence the environment downriver. As a matter of science, I believe Texaco's conclusion is wrong.

Texaco's Departures from the Means Study Program

20. I am familiar with the monitoring program proposed by Dr. Means and adopted by the Court. I derive my understanding from my review of Dr. Means's November 1997 report to the Court, my hearing of Dr. Means's testimony at the April 1998 trial, my review of Dr. Means's critique of the first (1999) Hall/Burton scope of work, my hearing of Dr. Means's testimony during the January 2000 trial, and my own long experience in the design and execution of monitoring programs similar to that prescribed by Dr. Means.

21. In various ways, Texaco failed to carry out or complete essential elements of the Means study program, including bioavailability and long core experiments. In addition, Dr. Means emphasized the need to connect sediment concentrations to actual bioaccumulation of contaminants. But Texaco failed to analyze bioconcentration levels of toxic agents in Triad test organisms. (Once it abandoned such analysis, the caged bivalve experiments became even more

7

critical, but Texaco did not carry out these experiments either.) In addition, Texaco's failure to analyze individual PAH loadings from the refinery compromised Dr. Means's objective to develop a detailed characterization of fate and transport processes that control the impacts of refinery effluent on Delaware River water, sediments, and biota. Such loading is a major consideration in determining the refinery's contribution to PAH effects in the receiving environment. Texaco failed to characterize properly the fate and effects of refinery-loaded PAHs in the Delaware system.

  22. In specific respects and overall, Texaco failed to implement faithfully the Means study program that the Court adopted.

Communications with Texaco During Study Period

  23. After the January 2000 trial was suspended, I had a number of contacts with Mr. Hall, a principal investigator in the Texaco study. We discussed some of the technical terms of the Stipulated Order. In the Stipulation, the parties agreed that Texaco's consultants would confer with me on certain issues, though Texaco retained exclusive responsibility to carry out the Court-ordered study and plaintiffs reserved the right to object in Court to any aspect of the study they believed was inadequate.

  24. I had a series of communications with Mr. Hall during the middle of 2000, concerning a number of issues. I visited the study site in August of 2000, and reviewed some preliminary data. My communications with Mr. Hall became more limited and infrequent as the study proceeded.

25. Beyond the fact that the Court required Texaco to implement it, I deem the Means study program to be a scientifically sound approach to determining the impact of the refinery's excess pollutant discharges. I have testified to this effect. However, I do not believe my comments to Mr. Hall during 2000 and 2001 influenced Texaco to follow the Means program.

26. One glaring example is bioavailability, which I described above. Texaco simply did not perform bioavailability experiments, despite the fact that, for good scientific reasons, it is a central element in the Means program. In my communications with Mr. Hall in June and September 2000, I stressed the importance of caged bivalve studies. On June 8, 2000, for example, I wrote of the "need to make sure that the caging studies are carried out in the most complete way that is possible so that the bioavailability issue can be resolved . . . ." App.IV-A288.

27. When Texaco abandoned the tissue analysis of organisms captured in the Triad studies, Mr. Hall (in December 2000) assured me that caged bivalve experiments would address the bioavailability issue. App.IV-A318. This was not done. The decision to collect resident clams in the vicinity of the refinery, rather than to conduct caged bivalve experiments in depositional areas downstream, was made without my involvement or knowledge, notwithstanding Mr. Hall's written assurance to the contrary. App.IV-A367 ("You will be in the loop."). Nor did Mr. Hall inform me that the long cores Texaco would use in its analysis did

not come from the downriver depositional areas where one would expect refinery-loaded PAHs to accumulate.

Conclusion

28. In my opinion, the Texaco study does not meet the requirements the Court set forth in 1998 and 2000. The data the study generated contradict the conclusions the study authors reached. My independent analysis of those data reveals that PAHs loaded by the refinery have accumulated in depositional areas downstream, where they are associated with biological harm. In addition, Texaco failed to carry out or complete various critical elements of the research program the Court prescribed, and that failure compromised the scientific validity and force of the study.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Tallahassee, Florida
July 7, 2005

_____
Robert J. Livingston, Ph.D