IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., and DELAWARE        )
AUDUBON SOCIETY,                   )
                                   )        Civil Action No.
     Plaintiffs,                 )         88-263-SLR
                                   )
     v.                          )
                                   )
TEXACO REFINING AND MARKETING,     )
INC.,                              )
                                   )
     Defendant.                  )


Appendix to Plaintiffs' Motion to Enforce Judgment

<u>VOLUME III</u>

Mitchell S. Bernard
Nancy S. Marks
Amelia Toledo
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
New York, New York 10011
(212) 727-2700

C. Scott Reese (2036)
COOCH & TAYLOR
824 Market Street
Suite 1000
Wilmington, Delaware 19899
(302) 984-3811

Attorneys for Plaintiffs

July 18, 2005

## TABLE OF CONTENTS

## VOLUME III

Page

Robert J. Livingston, <u>Review of Motiva Study and Independent</u>          A00001
<u>Analysis of Study Data</u>, July 2005

# REVIEW OF MOTIVA STUDY AND INDEPENDENT ANALYSIS OF STUDY DATA

Robert J. Livingston

July 2005

A00001

# I. <u>INTRODUCTION</u>

This is my review of the report entitled "A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach," dated December 2003 ("Motiva Report"). The Motiva Report, prepared by Lenwood W. Hall, Jr. and Dennis T. Burton, concluded that refinery PAHs were not responsible for adverse effects in receiving areas of the Delaware River. However, by essentially ignoring PAH loading by the refinery and the high concentrations of refinery-based PAHs in depositional areas where there was an unmistakable pattern of biological deterioration, the Report did not reflect an unbiased approach to data analysis. Instead, it depended on a series of unsubstantiated assumptions regarding PAH fingerprints, wholly inadequate bivalve bioavailability data, and long-core information from outside the Triad-based areas of PAH deposition. By oddly grouping the data to perform elaborate statistical analyses, the authors further obfuscated results. For example, instead of determining what was actually loaded by the refinery, the authors restricted their interpretation of refinery loadings to what should have been loaded based on assumptions concerning pyrogenic vs. petrogenic PAH sources. In this way, the Report represents a dissembling array of data interpretations in direct contradiction to what a straightforward analysis of the data revealed: that PAHs loaded into the river by the refinery accumulated in depositional areas where various forms of biological damage occurred.

The Motiva Report did not fulfill several of the stated research aims prescribed by Dr. Jay Means, the Court-appointed expert. Bioavailability data were not taken. Bivalve data were taken during only one year (2001), at stations distant from the Triad depositional areas. The authors mistook bioconcentration data for bioavailability information; by not taking such data in depositional areas, it was not possible to determine conclusively the effects of refinery-loaded PAHs. The lack of chemical analyses of toxics in Triad organisms precluded the determination of which toxic agents in the sediments were responsible for noted toxic effects in depositional areas. Results of the long-core work were based on two stations that were non-depositional and low in PAH concentrations.

A00002

The Motiva Report relied on a number of dubious premises and ignored pertinent results.  The authors' conclusions were clouded by assumptions concerning how PAHs are carried into the river system and deposited over time in areas distant from the refinery outfall. The Report's fingerprinting analyses assumed that water-borne PAHs in areas around the effluent discharge area were indicative of refinery effluent signatures, when it is likely that specific refinery-associated PAHs were attached to particulates that were transported to depositional areas distant from the refinery outfall where they accumulated over time.  The Triad results indicated sediment toxicity in depositional areas, but were discounted by the Report's authors as insignificant.

An independent statistical review of Motiva data indicated a close association of refinery-derived PAHs with high sediment concentrations in depositional areas distant from the effluent canal. Combinations of river-derived and refinery-derived sediment PAHs were significantly correlated with adverse biological effects.  Highly significant correlations of sediment PAH concentrations with various indices of biological degradation cast doubt on the principal findings of the Motiva Report that chronic sediment toxicity is attributable to river-derived PAHs, PCBs, and metals (Cu, Zn, As, Pb, Hg) and not to the PAHs in the Motiva effluent.

Contrary to the conclusions reached by the authors of the Motiva Report, the "weight of evidence" indicates that the Motiva refinery is responsible for adverse impacts in depositional areas of the receiving Delaware River system.

## II.  SUMMARY OF CONCLUSIONS

The following summarizes my (A) review of the Motiva Report and (B) independent analysis of the data collected during the Motiva study.

### A.    Review of Motiva Report

These are the major findings of my review of the Motiva Report:

1.      PAH concentrations in water are not equivalent to PAH loadings, and analyses such as those used in the Motiva Report that emphasize water concentrations to the exclusion of loadings represent a basic misunderstanding of the processes involved in PAH impacts.

2.      The limited sediment trap data indicated that PAHs at the three sediment trap stations (effluent canal, upper river, lower river) were extremely high above and below the discharge canal.  However, there were a number of problems with this analysis. The use of only one sampling of three stations for the sediment trap analyses was inadequate both in space and time.  There were simply too few data points to support any real conclusions.   Reduction of the original six-station estimate to three stations weakened definitive statements concerning the Motiva effluent distribution in receiving areas of the Delaware system.  The fact that there was no deposition of refinery effluents in the outfall area did not preclude loading to other areas of deposition.  As indicated by the dye studies and the sediment PAH analyses, it is likely that refinery effluents were deposited in downstream areas.  The sediment trap stations should have included stations in areas that were most affected by the refinery effluents.  The same is true for the long-core work.  The study authors thus made conclusions based on data that they themselves considered to be "uncertain at best."

3.      There was virtually no analysis of the spatial distribution of the ERL and ERM results, and the time-dependent relationships of these indicators. The actual effects of other stressors such as pesticides could not be evaluated due to the lack of tissue analyses for contaminants in the Triad experimental subjects. The lack of bioavailability information precluded direct analysis of the impact of PAHs on the biota of the effluent receiving area.  Accordingly, the authors could not evaluate the impact of PAHs on the biota, and any reference to impacts by metals and pesticides was both unsupported by the data and not directly applicable to the primary study questions.

A00004

4.      Without tissue analyses of toxic agents in the experimental subjects of the Triad study, we cannot trace the contaminants involved to an adverse reaction by the benthic organisms. The bioavailability question was thus compromised when tissue analyses were eliminated from the Motiva Study. The result was a complete dependence on the caged bivalve studies for bioavailability information. To this end, Motiva needed to ensure that the caging studies were carried out in the most complete way possible so that the bioavailability issue could be resolved.  Motiva's failure to do this renders academic (and misleading) the authors' statement concerning "highly likely" toxicity due to metals.  The lack of actual tissue samples of metals in test organisms precluded attribution of a direct relationship between sediment metals (and pesticides) and toxicity.

5.      The particulate phase was the primary means of PAH transport. Napthalenes dominated the dissolved phase. The colloid phase had the two- and three-ring PAHs. The particulate phase contained the highest concentrations of PAHs with a wide range of two- to six-ring PAHs. This result indicates the importance of depositional areas where particulates settle with respect to the distribution of refinery-loaded PAHs to the area.

6.      The overall distribution of PAHs in the study area showed consistently high sediment concentrations at stations DR56, DR53, DR55, DR67, DR68, and DR83 (six of the 15 stations). The assignment of a refinery PAH signature at stations DR1 and DR2 is misleading as there were no data indicating that sediment PAHs in this area were representative of PAH loading from the refinery. This problem goes directly to the issue of depositional areas as the final repository for refinery effluents. The assumptions concerning stations DR1 and DR2 were not adequately discussed or documented by the authors. The high sand concentrations in the effluent canal indicate that PAHs could be blown out of the canal when attached to particulates, and deposited in downstream reaches of the river.

7.      When the total sediment PAHs were standardized by total organic carbon (TOC), consistently high ratios were noted at stations DR53, DR55, DR67, DR68, DR83,

and DR56, with moderately high ratios at DR52 and DR51. Stations designated as having refinery signatures (DR1, DR2, DR23, DR26) had relatively low PAH/TOC ratios, which indicated that sediment characteristics (in particular, organic carbon concentrations) were associated with PAH sediment concentrations. The key to defining the distribution of PAHs loaded by the refinery resided in the identification and analysis of depositional areas where such PAHs would be expected to be deposited. The flawed designation concerning signature stations led to misinterpretations of the distribution of refinery-loaded PAH compounds in receiving areas.

8.    Significant effects concerning survival, growth, and reproduction of amphipods were most consistent at station DR53, with other effects noted at stations DR56, DR67, DR68, and DR83. These results coincided with depositional stations having high PAH concentrations. No significant effects were noted at stations surrounding the Motiva outfall. The actual distribution of the results of these tests (other than the restrictive statistical analyses) was not addressed. Report results were limited to statistically significant effects. The test results were thus used in a very restrictive way. The actual data from these tests should have been compared, statistically, to the distribution of sediment PAHs. When this was done, there were high correlations between PAHs that were loaded from the refinery (and found in depositional areas) and specific adverse effects on Triad organisms.

9.    The Triad analysis was inadequate in terms of relating the distributions of the results of the experimental data and community analyses with the distribution of sediment PAHs in the subject area through time.

10.    Assumptions concerning what characterized the refinery effluent were not based on loadings from outfall 601 and outfall 001. These loadings should have been the principal basis for conclusions concerning the distribution and effects of PAHs released by the refinery.

11.    The use of only two cores in non-depositional areas for the long-core work precludes any substantive conclusions regarding the effects of past refinery PAH loading. Conclusions drawn by the authors of the Motiva Report concerning the long-core work were based on inadequate data and were not valid.

12.    Bioavailability was eliminated from the study. The bivalve studies were carried out with organisms taken at stations that were totally different from the Triad stations (especially in the most polluted areas of the lower system), and therefore could not be related to possible questions of bioavailability in the experimental portions of the Triad analysis. Also, the bivalve data were taken for only one year, and at times that differed from the sampling in the Triad analyses. The bioavailability work represented a basic misunderstanding of the importance of bioavailability relative to the overall study plan and the objectives of the study.

13.    The fact that bivalves were not found in depositional areas with high sediment PAHs was ignored completely in the community analyses. This information would have been important in the determination of sampling sites in the bivalve (bioavailability) tests.

14.    The lack of tissue data for the Triad work, together with the failure of the bivalve studies, means that we have no way of testing which of the toxic agents found in the sediments were responsible for noted toxicity effects. This cannot be done with statistics. Bioavailability is an experimental question and cannot be determined using descriptive field data.

15.    The final analysis that brought together the various elements of the study was based on false assumptions and unusual methods of reorganization of the various databases for statistical analyses. Statistics should be used to test hypotheses, not to provide proof of suppositions, and are dependent on the organization of analyzed data. The assumptions on which file organization was based were not addressed in the Motiva Report.

16.     Instead of using loading of individual PAHs, the PAH data were reorganized into various groups, which compounded problems associated with identification of actual PAH sources to the river. Triad data were grouped in ways that masked identification of causative effects. The experimental results were then analyzed in only the most restrictive of ways (ANOVA analyses). As was true of most of the analyses, the actual distribution of the Triad results in space and time was almost completely ignored in favor of artificial grouping of the data that then formed the basis for a series of statistical applications.

17.     A basic fallacy of the Motiva Report is a primary emphasis on PAH water concentrations rather than loading. This led to the conclusion that dilution of the 001 outfall reduced the loading of PAHs to the river by the refinery, which is not true. Loading is calculated by multiplying concentration by flow rate, and is not affected by dilution.

18.     Chronic sediment toxicity was attributed to PAHs, PCBs, and metals (Cu, Zn, As, Pb, Hg), and not to Motiva effluent, based on statistical analyses of the data. In the absence of bioavailability data, such conclusions are unscientific and misleading.

19.     The "weight of evidence" analyses, based on the flawed approach used by the study authors, found that there was no evidence that exceedances of Motiva effluent limits contributed to contamination of river sediments, and that there was no evidence of geographic contaminant patterns related to Motiva exceedances even though there were definite exceedances noted during the early part of the four-year study. The lack of temporal analyses of loading together with the faulty conclusions regarding the long-core work made such conclusions untenable.

20.     Dr. Means, the Court-appointed expert, prescribed a number of studies necessary to determine the impact of the Motiva refinery on receiving areas of the Delaware River.   In its 1998 Opinion and Order, the Court adopted Dr. Means's

prescriptions.  In a number of material respects, the authors of the Motiva Report departed from or did not carry out the study elements that Dr. Means prescribed:

a.     Dr. Means wrote of " . . . the need to establish a connection between the presumed exposure concentrations (sediment concentrations) and actual extent of bioaccumulation."  This was lacking in the Motiva Study. No studies were carried out concerning bioconcentration levels of toxic agents in the Triad test organisms.  When the authors decided not to analyze tissue samples for PAHs, they agreed not to then attribute the cause of toxicity to pollutants that did not emanate from the refinery.  Nevertheless, in their Report the authors made statements concerning causation without collecting or having the field data to back them up.

b.     Bioavailability studies were a key element in the Means study program. However, no real bioavailability studies were carried out.  Bioavailability of PAHs to organisms in the study area was not determined.  The bivalve studies were not carried out in depositional areas where sediments were known to be contaminated with PAHs loaded by the refinery.  These depositional areas were also characterized by a notable absence of the bivalves used in the Motiva study.  Bivalve analyses that were carried out in non-depositional areas, distant from the Triad stations and at different times from the Triad sampling, revealed that two-thirds of the PAHs that were loaded into the river by the refinery were found in relatively high concentrations in the bivalves.

c.     The nearly complete lack of analysis of PAH loading from the refinery in the Motiva Report compromised Dr. Means's objective to develop "a detailed characterization of the fate and transport processes which control the impacts of the effluent on the receiving waters, sediments and biota of the Delaware River estuary." The initial determination of PAH loading was largely ignored in the Motiva Report, despite the fact that such loading from the refinery is a major consideration in determining the refinery's contribution to any PAH effects in the receiving area.

d.     The long core component of the project was comprised of only two samples that were taken in non-depositional areas of the Delaware system. This limited sampling does not provide an accurate representation of PAHs associated with refinery loadings to the system. Report conclusions that refinery effluents were not in the long cores were compromised by the inadequate and misguided sampling effort.  The long core analyses were not carried out in the areas that were representative of possible historical accumulations of refinery PAHs. Consequently, characterization of the effects of the refinery's historical and unlawful pollutant releases, a central element of the Means study program, was not carried out.

e.     The analyses of the database set forth in the Motiva Report are misleading. The authors largely ignored depositional areas with high concentrations of PAHs.  The lack of concentration on depositional areas nullified the original effort to set up a representative set of study sites, thus undermining another key element in the Means study approach.  In addition, the experimental Triad results were over-generalized and poorly integrated in the authors' final analyses.  The authors ignored the relationships of Triad results to PAH contamination of sediments in depositional areas that could be traced to loading from the refinery.  In addition, the authors' conclusion that PAHs associated with the refinery fingerprints were not discernible in the downstream depositional environment were based on faulty assumptions and are erroneous.

Overall, the conclusions presented in the Motiva Report that PAHs associated with the refinery are not responsible for adverse effects in the receiving area are not based on information Dr. Means deemed to be critical, and relied on misleading analyses of available data.

## B.     Analysis of Motiva Database

These are the major findings of my independent analysis of the Motiva database:

1.     Based on dye studies, the expected distribution of the refinery effluent plume was located on the Delaware side of the river, with maximum coverage of about three miles upstream and seven miles downstream depending on the tidal stage (stations

DR53, DR55, DR67, DR68, DR83, and DR56).  Low currents (depositional areas) were noted at Hamburg Cove and the Reedy Island Bar; these were the most likely places to find settlement of particulate-bound PAHs loaded from the refinery into the river.  The distribution of % TOC indicated the most consistent area of accumulation was in the Reedy Island Bar part of the river. The distribution of sand in the area supported the above determination, with less sand and higher silt-clay fractions in depositional areas associated with the Reedy Island Bar area. The highest sand deposition was in the effluent canal's immediate receiving area. This indicated that areas around the outfall were not necessarily depositional areas where PAH concentrations would most likely be accumulated.

2.      The distribution of sediment PAHs was generally consistent with the results of the dye and water current studies and the distributions of % TOC and % sand. The PAH distributions were consistent through time, showing relatively similar patterns during the four Triad sampling periods. The highest concentrations were in the effluent canal, off the effluent canal at station 56, behind Pea Patch Island, and around the Reedy Island Bar. Since total PAHs occurred largely in the particulate phase, this form of PAH transport should be considered when determining the distribution of refinery-based PAHs.

3.      The data indicated that PAHs attached to particulates are blown out of the effluent canal, and, due to the current structure and the nature of the downward drift of river-borne particulates, were concentrated in depositional areas south of the discharge area. The major emphasis of the Motiva Study on stations around the effluent canal for PAH fingerprinting based on water concentrations and sediment distributions was thus erroneous, and was not consistent with the early findings of the study.

4.      Contrary to the Motiva Report, average PAH loading from outfall 001 was comparable to that of 601.  001 PAH loadings were dominated by compounds known to be related to refinery loadings (not river contaminants).  These loadings were dominated by a series of excessive pollutant discharges in the early months of the study.  Over the

entire study period, top PAHs that were loaded by both outfalls were refinery-associated C3 and C2 Fluoranthenes/Pyrenes compounds. The loading data demonstrate that the Motiva Report oversimplified its definition of refinery-based PAH types.

5.      If the individual periods of Triad analyses are evaluated for loading trends, the loading of the refinery effluent from outfall 601 to the river was characterized by the Naphthalene series, with increased loadings of individual compounds noted during summer 2001 and spring 2002. The Fluoranthene/Pyrene group (C1, C2, C3) comprised another important component of the 601 PAH loading, with high initial loadings (summer 2000) that decreased from spring 2001 through spring 2002. There was an increase in the loading of these compounds during summer 2002. The Chrysenes (C1, C2, C3, C4) were also a consistent component of the 601 PAH loading; there was no definitive temporal trend of the loading of this PAH group. Temporal patterns of PAH loading were an important part of the study that was largely ignored by Motiva.

6.      Peak loading of the Napthalenes from outfall 001 occurred during the same increased loading of this group from outfall 601. This would indicate that the Napthalenes were part of the refinery PAH loading regardless of the fact that the exact origin of these PAHs remains unknown. The loading of the Chrysenes from 001 was less definitive than such loading from the 601 outfall.  There was a substantial loading of the Fluoranthenes/Pyrenes (C1, C2, C3) from the 001 outfall, although such loading decreased during the 2002 period.

7.      Specific Napthalenes in the sediments (Naphthalene, C1, C2) were associated with refinery loadings. This was also noted for specific Chrysenes (Chrysene, C1, C2, C3) and the Fluoranthenes/Pyrenes (C1, C2). The Phenanthrenes/Anthracnenes in the sediments were not associated with the 601 PAH loadings. The periodic association of Perylene in the sediments with the 601 loadings remains unexplained. These data show clear associations of higher sediment concentrations at the depositional stations for all three major groups (Napthalenes, Chrysenes, Fluoranthenes/Pyrenes). The sediment PAH concentrations were somewhat different when compared to the 001 PAH loadings.  There

were concentrations of Perylene, the Napthalenes, and the Fluoranthenes/Pyrenes (C1, C2), but the Chrysenes were not represented in the 001 loadings. The 001 loadings of the Phenanthrenes/Anthracnenes, with periodic exceptions, reinforced the observation that this group of PAHs was not associated with refinery effluents. However, the relatively high concentrations of the Napthalenes, Chrysenes, and Fluoranthenes/Pyrenes in sediments of depositional areas were closely associated with loadings from outfall 601, and, with the exception of the Chrysenes, outfall 001. This analysis indicated a mixture of refinery-derived and river-derived PAHs in the sediments, but the high concentrations of refinery-derived PAHs in sediments of depositional areas differs from the overall observations and conclusions in the Motiva Report.

8.      Temporal changes of PAH loading patterns from the refinery were not addressed in the Motiva Report, even though such changes could have affected the biological response of the system. There was no resolution of the time factor in the loading of PAHs from the refinery relative to the sediment concentrations of such compounds. This problem, together with the simplistic way the authors dealt with the individual PAH compounds, contributed to their erroneous conclusions concerning the relationship of riverine PAH distributions to PAHs associated with the refinery.

9.      The overall trend of sediment PAHs in the study area followed the downward trend of the PAH loadings. This temporal trend of loadings from the refinery and sediment PAH concentrations indicated that there was a connection between refinery loading and sediment PAH concentrations. These trends were largely ignored in the Motiva Report. Thus, contrary to the conclusions of the Report, sediment PAH concentrations in areas expected to be affected by the refinery followed discharges from the refinery.

10.     The authors of the Motiva Report continuously made the error of equating bioconcentration with bioavailability. Bioavailability has to do with which compounds in the sediments eventually get into associated food webs, and this can only be found through experiments and tissue concentrations of experimental organisms.

A00013

Bioavailability is important in considering whether or not contaminated sediments should be removed during restoration activities. Bioconcentration refers to concentrations found in animals in the study area. A comparison of bivalve tissue PAH concentrations and mean PAH loading at outfalls 001 and 601 indicates that various compounds loaded from the refinery were in the bivalve tissues. Bivalve tissue PAHs were represented by a combination of refinery PAHs and PAHs from other sources. We do not know whether these numbers are representative of PAH tissue concentrations in depositional areas downstream, because caged bivalve experiments were not carried out in downstream depositional areas characterized by high sediment PAHs.

11.    The primary PAH effects projected by the NOAA guidelines corresponded closely to depositional areas as denoted by % TOC and sand distributions. There were general trends noted in the experiments carried out with *Hyalella* and *Leptocheirus*. Areas that were depositional, with high concentrations of PAHs in the sediments, were often associated with adverse impacts on the experimental subjects.  Statistical analyses of the Motiva data indicated highly significant associations of these adverse biological effects with individual refinery-loaded PAHs.  Low numbers of *Rangia cuneata* were noted in depositional areas where refinery-loaded PAHs were found.  These data represent further evidence that the sediment PAHs in areas where the bivalve tests were carried out were not as toxic as sediments in depositional areas.

12.    There was no real trend in the various infaunal community indices. The dominant *Rangia cuneata* was located mainly in areas associated with the refinery outfall and areas north of the outfall. There were virtually no *Rangia* in the depositional areas south of the outfall. The Triad data were consistent with a possible adverse effect on this species in areas characterized by high sediment PAHs. *Rangia* distribution trends were followed generally by the distribution of *Tubificoides heterochaetus*. However, other dominant species such as *Boccardia ligerica* and *Corophium lacustre* were found in increased numbers in areas denoted by high PAHs.  Depositional areas characterized by high concentrations of PAHs were thus associated with distributions of organisms that were sensitive or resistant to PAH effects.  Such patterns were not detected by the authors

A00014

of the Motiva Report, and the authors did not compare these relationships with the Triad results.

13.     One key to the conclusion that the refinery effluents were not implicated in adverse impacts in the study area is related to the PAH fingerprint analyses carried out in the Motiva Study. The lack of attention to PAH loading in favor of concentrations represented a basic mistake due to the relative importance of loading to the distribution of refinery-released PAHs in sediments of the receiving system. In addition, the characterization of fingerprints of sediments close to the outfall as characteristic of refinery effluents ignores the fact that particulates carrying PAHs could distribute such refinery products to depositional areas distant from the outfall.  My analysis of the data negated the Motiva Report's various conclusions based on fingerprinting.

14.     A review of the distribution of PAH/TOC ratios in the study area indicated relatively high ratios at stations DR53, DR55, DR56, DR67, DR68, and DR83. These areas have already been identified as depositional areas with relatively high PAH concentrations. It is noteworthy that station DR1 (the effluent canal) had high sediment PAHs but relatively low PAH/TOC ratios.   The relationships of the relative concentrations of PAHs and organic carbon in sediments of the study area indicate that depositional areas represented major concentrations of PAHs, many of which were associated with loading from the refinery.  Both as a group and individually, low molecular weight PAHs were uniformly distributed in depositional areas during all four Triad samplings. These concentrations were directly related to refinery loadings, and were not associated with river-derived PAHs.

15.     *Rangia* distributions and various toxicity results were negatively correlated with refinery-loaded PAHs. The emphasis throughout the Motiva Report was on the lack of importance of biological effects of refinery-based PAHs in the sediments of the receiving system. However, when a calculation was made concerning the relative contribution of Motiva-loaded PAHs to the total PAH concentrations in the sediments (expressed as percentages in depositional areas), around half of the PAHs noted in the

sediments were derived from refinery-loaded PAHs (as defined by the authors and as noted in the loading from outfalls 001 and 601). The premise of the stated unimportance of such PAHs was based largely on the fingerprinting data.  However, this analysis ignored the actual loading rates of PAHs from the refinery, and the contribution of the refinery to stations that were identified as depositional and as strongly contaminated with PAHs. Statistical analyses confirmed the significance of the above findings.

16.    In two of the three parts of the Triad studies, there were indications that depositional areas characterized by high concentrations of PAHs were associated with exceedances of NOAA ERL and ERM guidelines.

17.    Statistical analyses of the Motiva data indicated highly significant correlations of adverse biological effects (amphipod experiments in the Triad analyses) with individual refinery-loaded PAHs. Low numbers of *Rangia cuneata* in depositional areas were also correlated with individual refinery-loaded PAHs.  These results showed that the conclusions of the Motiva Report concerning the lack of influence of refinery-loaded PAHs are incorrect.

## III.  <u>REVIEW OF MOTIVA REPORT</u>

The following is my review of the Motiva Report.  Headings correspond to the headings used in the Report.

A.    <u>Introduction</u>

This section was a review of the history of Court actions and elements of the study plan prescribed by Dr. Means.

B.    <u>Study Approach and Objectives</u>

This was to be a four-year study that included the following components:

- Four-year effluent characterization

- Fate and Transport studies of PAHs, to be used to select sampling sites

- Triad studies: sediment chemistry, infaunal community analyses, and toxicity tests. Results and conclusions were to be based on a "weight of evidence" approach

- Long-core sampling to determine potential ecological impacts from March 1993-present

- Water column measurements of PAHs and metals in the Motiva effluent, intake canal, and other Delaware River sites; this included fingerprinting of PAHs in effluents to differentiate Motiva-related PAHs in sediment and biota from other sources

- Assessment of bioavailability of PAHs, PCBs, and metals (reduced to bivalve studies)

A total of 15 stations were chosen for the final studies. This determination was made cooperatively, and appeared to be a satisfactory conclusion to the preliminary chemical analyses.   The stations chosen for the study provided a representative distribution of areas characterized by high sediment PAHs.  Reference sites (stations 9B, 10) were chosen in areas that were considered outside the influence of the Motiva effluents.  The high concentrations of PAHs at stations 61 and 62 (across the river) were not understood, but were probably not related to the Motiva effluent discharges.  Overall, station selection was satisfactory with regard to establishing a fair and accurate test of sediment PAH concentrations that could be related to past and present discharges of Motiva effluents. The weak point of the program was the relatively low frequency of sampling events.

C.    Chemical Analyses

The original ten-site sampling results (Motiva Report, Figure 3.2) were not useful; an adequate first effort with more sites would have advanced the study without the delay engendered by the initial inadequate sampling.  This problem was corrected later in the study.

According to the Motiva Report, the compositional differences of PAHs between outfalls 001 and 601 were attributed to mixing of the wastewater treatment effluents with cooling water from the Delaware River.   Outfall 601 was refinery effluent whereas

A00017

station 001 had less than 5% of 601 effluent plus 95% non-contact cooling water from the river. Consequently, in the authors' view, 001 "only possessed a small minority of the hydrocarbon signatures from the Refinery." However, the dilution of refinery effluent at 001 does not reduce loading of PAHs to the river. This fact was not presented in the Motiva Report, and the omission led to major mistakes in data interpretation as outlined below. The distinctions between the PAH composition of 001 and 601 are analyzed in the next section (IV) of this review. The loading data refuted fundamental findings in the Motiva Report.

The authors of the Report transformed the original PAH data (individual PAH compounds) into diagnostic composites that included the following: selected cyclic hydrocarbons (Decalins through Benzo(b)thiophenes), total PAHs with alkyl homologues (including both low molecular weight [LMW] PAHs with two and three aromatic rings, and high molecular weight [HMW] PAHs with four-six aromatic rings), PAH isomers, and total analytes. There was no review of the assumptions on which these transformations were based. Reasons given for such transformations were based on identification of sources (pyrogenic vs. petrogenic). The authors' use of contrived diagnostic composites instead of the actual compounds found in the refinery loadings represented a serious problem in the interpretation of the data. This was particularly true in the cursory determinations of PAH loading from the refinery. Throughout the Report, various analyses were based on pyrogenic vs. petrogenic sources rather than a detailed analysis of the actual loading of PAH compounds from the refinery and the distribution of such compounds in the river sediments.

According to the Report,

"Forty-three PAH analytes measured in approximately 320 water monitoring samples served as the basis for the PCA water model." Motiva Report, p. 7-28. In addition, the model included the average and maximum PAH composition of water samples collected at outfalls 601 and 001. ...Once in the near field (stations 02 and 07), the petrogenic 4-ring PAH signature of the Refinery largely disappeared...Less than 1 mile down river, the average PAH composition at the cooling water intake (CWIN) canal (Figure 7.11g) match well the average up river background station 10 (Figure 7.11i). ...While the exact origin of the

napthalenes was unknown, possible sources included weathered automotive fuel, marine fuel or bilge releases from large tankers." Motiva Report, p. 7-27.

This statement ignored the periodically heavy loading of Napthalenes from the refinery. The fingerprinting analyses depended primarily on water concentrations. Based on what we know about PAHs, the movement of such compounds in water changes rapidly due to the attachment of such compounds to particulates. Such movement is also episodic and may vary due to temporal changes in loading. This was shown by the fact that "the tight grouping of the dissolved and colloidal fractions revealed little PAH source information, especially since the 4-ring PAHs possessed the most significant component of the Refinery signature," whereas the particulate fraction indicated "enriched levels of heavier PAHs on the loading plot." Motiva Report, p. 7-31.

The PAH concentration and loading data were taken from 3/99 through 10/00 and 1/01-8/02. However, data analyses were broken down in time as follows: March 1999-November 2000; January 2001-August 2002. The authors did not explain the basis for the above (time-based) grouping of the PAH concentration and loading data. Analyses of the monthly concentration data indicated higher PAHs in the particulate phase when compared to the dissolved phase. There were no oil and grease exceedances (i.e., excess pollutant discharges) after 1/00 at the 601 outfall. The written analyses of the concentration data were limited to recitations of the data tables. Metals loadings were generally low at the outfalls.

The importance of the loading of PAH compounds from outfalls 601 and 001 should have been a focal point for the analyses of sources of PAHs to the river. The loading of PAHs from the refinery through time was a very important factor in the potential impacts of such compounds on the river-estuary. Loading (concentration x flow rates) of pollutants is the key component in an evaluation of the distribution of PAHs in the sediments and animals of the river and the potential effects of relatively long-lasting toxic agents on a given receiving system. This is particularly true of compounds, like PAHs, that mainly attach to particulates. Distribution and settlement of PAH-bearing particulates leads to patterns of PAH sediment concentrations that provide the main

A00019

reservoir of this form of pollutant in the river. Such sediment concentrations are the product of long-term patterns of loading and the depositional characteristics of the receiving system. PAH concentrations in sediments constitute the primary source to associated aquatic food webs in affected areas of the Delaware River-estuary. The concentrations of PAHs in water are not equivalent to loadings, and analyses such as those used in the Motiva Report that emphasize water concentrations to the exclusion of loadings represent a basic misunderstanding of the processes involved in PAH impacts.

There was a general lack of analyses of PAH loading data in the Report. PAH water concentrations were used for fingerprinting. Sedimentary PAHs used to characterize refinery fingerprints ignored the fact that areas associated with the outfall were not depositional, and refinery-loaded PAHs attached to particulates could travel relatively far from the outfall. None of this was evident in the Report. The fact that loading calculations of individual PAH compounds were not even calculated represents a real deficiency in the Motiva analyses. This topic will be addressed below and in the discussion of my re-analysis of the Motiva data.

D.    Fate and Transport Studies

Semi-diurnal tides (unequal, 5.1-6') were noted. Side scan sediment mapping was carried out. Sediments in the study area were mainly aqueous silt with trace amounts of sand. Hydrodynamic models were run. The river was tidally dominated and well mixed. The Delaware and Schuylkill Rivers were the primary fresh water sources for the estuary. Total PAHs occurred largely in the particulate phase. PAH distribution across all stations was 57% particulate, 14% colloidal, and 37% dissolved phase. High molecular weight PAHs were 96% particulate and low molecular weight (two- and three-ring) PAHs were 47% particulate. Colloidal PAHs contributed significantly to the three-ring groups. The accumulation of PAHs was most likely in areas of weak circulation (Hamburg Cove, Goose Island Flats, Salem Cove, Reedy Island Bar). Sediment PAH distributions showed heterogeneous distribution with "hot spots"; the main concentrations were outside the near field but within one tidal excursion of the refinery and in regions of high TOC. High PAHs were also noted in Hamburg Cove, Salem Cove, Goose Island Flats, and Reedy

Island Bar. Hamburg Cove and Reedy Island Bar (within the likely depositional areas of refinery PAHs as determined by the dye studies) should have been targeted as specific areas of concern regarding the deposition of sediment PAHs. This was not done.

Models suggested that these areas were affected by outside sources. However, actual distributions of PAHs were not mapped, and there was no justification for the suggestion that refinery effluents were not represented in depositional areas. The lack of adequate documentation of the actual data was characteristic of the entire Motiva Report. This subject will be addressed below and in my independent analysis of data gathered during the study.

One of the areas not adequately addressed in the Motiva Study was the dynamics of PAH accumulation in depositional areas. According to an email from Mr. Hall:

> "Sediment trap studies - As stated in detail in our scope of work, we believe that the data collected from sediment traps in shallow water areas of the Delaware river will contain a high degree of uncertainty because short term sedimentation rates will likely overestimate the movement of PAH-sorbed particles to the river floor and the sediment collected in the traps will contain re-suspended unconsolidated bottom sediment. Every expert in this area that we have talked with agrees with the above statement. Despite our reservations and to adhere to the court order, we will conduct the sediment trap study for 2 to 3 weeks at ~ 6 sites in the near-field and mid-field area of the effluent canal. Dissolved, Particulate and Colloidal Phase Analysis - These experiments will be conducted as described in our scope of work. I will also add a literature review component to address the colloidal phase importance to PAH transport and fate."

Due to holding time problems, only one sampling was used for the sediment trap analysis. The limited sediment trap data indicated that PAHs at the three sediment trap stations (effluent canal, upper river, lower river) were extremely high above and below the discharge canal. The authors attributed this to high rates of resuspension of particulates, and grossly overestimated net sedimentation. However, silt-clay percentages were higher in the effluent canal than at the river stations, which would indicate that resuspension and river flows transported PAH-laden particulates to depositional areas farther downstream. The Report indicated that the effluent canal had a mix of refinery

A00021

effluent (four-ring) and background (five and six-ring) PAHs. Sediment trap data showed minimal refinery influence beyond the effluent canal and near field according to the study. The fact that particulates were redistributed to depositional areas farther downstream was not considered by the authors. The presence of refinery-loaded PAHs that occurred in sediments in depositional areas was thus ignored in the way the sediment trap sampling effort was designed and interpreted, even though the early sediment PAH data indicated that refinery effluents affected such depositional areas.

There were a number of problems with the sediment trap analysis. The use of only one sampling of three stations was inadequate both in space and time. There were simply too few data points to support any real conclusions. Reduction of the original six-station estimate to three stations undermined definitive statements concerning the Motiva effluent distribution in the receiving areas of the Delaware system. The fact that there was no deposition of refinery effluents in the offshore outfall area did not preclude loading to other areas of deposition. As indicated by the dye studies and the sediment PAH analyses, it was indeed likely that refinery effluents were being deposited in downstream areas. The sediment trap stations should have included stations in areas that were most affected by the refinery effluents. The same is true for the long-core work and the bivalve studies. The study authors thus made conclusions based on data that they themselves considered to be "uncertain at best."

During August 2000, 53 sites were sampled in the midfield area off the refinery for total PAHs, grain size, and TOC. In addition to PAH analyses of the preliminary ten-station analysis conducted during summer 1999, these new data were used for study site selection. This process was evaluated in conjunction with chemical characterization of the refinery's effluent. Several factors of importance were noted in an analysis of these sediment PAH data. A comparison of the 1999 and 2000 results showed general trends, although there were differences in PAH concentrations at given stations between 1999 and 2000. While there were moderately high concentrations of PAHs off the discharge canal that were considered as possibly bioavailable, the highest PAH concentrations were found near Pea Patch Island (stations DR3, 53) and in the so-called "southern field"

(stations DR5, 71, 67, 5B, 72, 68, 73, 83). These concentrations were probably due to the dynamics of the deposition of PAH-contaminated particulates.  These findings were not included in the sediment trap analyses and were not considered when conclusions concerning the distribution of refinery effluents were made.

E.     Midfield Sampling for the Triad Site Selection

 This was a review of the data taken from 53 stations in 1999 and the establishment of the 15 stations for the Triad analyses.  Average concentrations of various toxic agents were discussed in general terms.  However, this section was the beginning of a diffuse and confusing presentation of the field data.  Figures were composed of simple listings of actual data by station and section of the sampling area; the use of this approach to data presentation made it almost impossible to visualize the overall distribution of key environmental factors in the study area.  There was virtually no primary analysis of the distribution of important variables in the impact analyses. Data were not mapped in terms of spatial distribution of sediment characteristics and PAH loads.  There was little examination of the temporal aspects of the distribution of such factors.  There was no spread-sheet analysis of the preliminary data to determine possible directions of inquiry regarding the various other parts of the study.

F.     Triad Samples

     1.   NOAA ERL and ERM Determinations

     The lowest PAH totals occurred at station DR10, the reference site, whereas the highest sediment PAH concentrations were noted at station DR67.  Sediment grain size affected the PAH distribution. Using NOAA ERL and ERM toxicity benchmarks, the most consistent exceedances of such indicators and the highest overall averages for PAHs were noted at stations DR1, DR56, DR53, DR55, DR67, DR68, and DR83. The statement on pp. 6-7 of the Report that "[t]here were no exceedances of ERM values for total, LMW or HMW PAHs" is contradicted by Tables 6.1, 6.9, 6.17, and 6.25.  There were consistent exceedances of the NOAA ERM values for LMW at stations DR52, DR55, DR67, DR68, and DR83. This apparent contradiction was evidently based on the fact that PAH benchmarks were exceeded when all 43 PAH compounds were considered, but

A00023

were not exceeded when only 13 PAHs (that were used by NOAA to establish the benchmarks) were utilized for such analyses. Regardless of the problems associated with the lack of information concerning the toxicity of the refinery-loaded PAHs, the spatial and temporal patterns of ERL and ERM data as calculated by the 43 PAH compounds should have been considered in the overall investigation. Negating such information without any attempt to weigh the fact that there were high PAH concentrations in depositional areas was not reasonable, and represents a disturbing trend in the body of the Motiva Report.

This section of the Report contained inadequate analysis. There was virtually no analysis of the spatial distribution of the ERL and ERM estimates, and the time-dependent relationships of these indicators. The actual effects of other stressors such as pesticides could not be evaluated due to the lack of tissue analyses for contaminants in the Triad experimental subjects. The lack of bioavailability information precluded direct analysis of the impact of PAHs on the biota of the effluent receiving area. Accordingly, it is unreasonable to dismiss the impact of refinery-loaded PAHs on the biota, and any cause/effect attribution to metals and pesticides was both unsupported by the data taken and not directly applicable to the primary study questions.

## 2. Tissue Analyses for PAHs

Dr. Means prescribed tissue analyses of test organisms. The underlying need for these analyses was to determine the effective PAH concentrations leading to potential adverse biological effects in the sediment toxicity tests. I provided the Motiva researchers with protocols that had been prepared by Dr. Means. Tissue testing was reviewed in a series of discussions. The authors objected to performing these experiments on the grounds that (1) there were conflicting protocols for the chemical analysis of the tissues and the methods of analysis of the test species, and (2) there might not be enough tissue to carry out a relatively rigorous chemical analysis.

The rationale for not doing the tissue analyses was that the methods used would conflict with protocols established by NOAA and EPA that were based on round-robin tests and other quality assurance programs. The use of low tissue weights would yield

detection limits of around 200 ng/g (dry weight) per individual. Battelle (the subcontractor/consultant in charge of such tests for this project) claimed that its chemists would need 20 g wet weight for tissue contaminant analysis. They claimed that the weight of the subject test organisms would not be sufficient for either the NOAA NS&T/EPA EMAP PAH analysis or the Means analyses. Consequently, the tissue analyses for metals and PAHs remained a matter of contention.

It was agreed that the issue of tissue analyses from the Triad tests for PAHs would be reviewed by an outside consultant. The authors selected Dr. David S. Page, (Chemistry Department, Bowdoin College) for this evaluation. Dr. Page came to the following conclusions:

- The methods proposed by Dr. Means for analysis of the PAHs in the amphipod tissues (range of 0.1-0.2 g dry weight) were not appropriate and could lead to misleading data.

- The Means tests could not be validated and were generally based on "non-standard methodologies."

- The proposed amphipod tissue analyses were not necessary because of the general design of the Triad Study.

- The response of the test organisms should reflect the PAH concentrations in the tissues, thus making separate tissue analyses superfluous.

The Report authors accepted Dr. Page's view, which comported with their own.

When the Means-prescribed tissue analyses were jettisoned, the parties' experts agreed that any adverse effects found in the Triad tests would be attributed to PAHs directly associated with past and ongoing refinery discharges. There would be no rationalizations of test data based on confounding data associated with the presence of metals and/or pesticides in the sediments. If organisms had a toxic response to sediments, and the toxicants causing the response were not identified, then Motiva's researchers could not attribute the response to metals or pesticides.

A00025

Notwithstanding this, in their Report the authors stated it was "highly likely" there was toxicity due to metals. This statement is both curious and improper, since the lack of actual tissue samples of metals in test organisms precludes a direct relationship between sediment metals (and pesticides) and toxicity.

The abandonment of tissue analysis was important because, without such analysis of toxic agents in the experimental subjects of the Triad Study, we would not be able to trace the contaminants causing an adverse reaction by the benthic organisms. The bioavailability research would be compromised. We would then be completely dependent on the caged bivalve studies for bioavailability information. To this end, the Motiva researchers needed to make sure that the caging studies were carried out in the most complete way possible so that the bioavailability issue could be resolved. As I will later describe, this was not done.

3.  Temporal and Spatial Patterns of Sediment Chemistry

The overall distribution of PAHs in the study area showed consistently high sediment concentrations at stations DR56, DR53, DR55, DR67, DR68, and DR83 (six of the 15 stations). The assignment of a PAH signature at stations DR1 and DR2 (Motiva Report, Table 6.33) is misleading as there were no data indicating that sediment PAHs in this area were representative of PAH loading from the refinery. This problem goes directly to the issue of depositional areas as the final repository for refinery effluents. The assumptions concerning stations DR1 and DR2 were not adequately discussed or documented by the authors. When the total PAHs were standardized by TOC, a different pattern prevailed whereby consistently high ratios were noted at stations DR53, DR55, DR67, DR68, DR83, and DR56, with moderately high ratios at DR52 and DR51. Stations designated as having refinery signatures (DR1, DR2, DR23, DR26) had relatively low PAH/TOC ratios, which indicated that, when standardized for organic carbon, sediment in such areas had less PAH accumulation than sediment in depositional stations. This flawed designation concerning signature stations led to misinterpretation of the distribution of refinery-loaded PAH compounds in receiving areas.

Consistently high PCB concentrations were noted at stations DR52 and DR53. Pesticide concentrations were highest at station DR45. The SEM/AVS ratios showed a high ratio at station DR51 during spring 2002, with secondary, periodic high concentrations at stations DR2 and DR55. There was no consistent pattern of overlap among the PCB, pesticide and SEM/AVS indices relative to the high PAH distributions. The highest overall % sand was noted at stations DR2, DR51, DR9B, DR1, and DR55. The high sand concentrations in the effluent canal indicate that PAHs could be blown out of the canal when attached to particulates.

4. <u>Sediment Toxicity Tests</u>

A series of 28-day tests were run with epifaunal (*Hyalella azteca*) and infaunal (*Leptocheirus plumulosus)* amphipods during the spring and summer of 2001 and 2002. Sediments from established stations were used for the tests. Chemistry and community samples were also taken at the same time. Survival, growth, and reproduction were tested. Significance tests using reference sediment (DR9b, DR 10) as "controls" were used to establish toxicity. Significant effects concerning survival, growth, and reproduction were most consistent at station DR53, with other effects noted at stations DR56, DR67, DR68 and DR83. These results coincided with depositional stations having high PAH concentrations. According to the Report, no significant effects were noted at stations surrounding the Motiva outfall. The actual distribution of the results of these tests (other than the restrictive statistical analyses) was not addressed. Report results were limited to statistically significant effects. The test results were thus used in a very restrictive way, and the actual test results were not used in summary statistical analyses. There was no effort to analyze the test results in terms of spatial and temporal trends and distributions. The test data could have been used in relation to various other factors such as sediment PAH concentrations. This was not done.

The use of bioassay statistics for these toxicity tests is problematic, as there was no true "control." Reference stations DR10 and DR9B were compared with other contaminated stations. However, these stations were not true controls as a control is considered to be representative of all factors (save one: the contaminant) that influence

A00027

the various contaminated stations. According to the Motiva Report, river-borne PAHs were the dominant factor in the causation of adverse biological effects, and stations DR10 and DR9B were not free of these pollutants, much less characteristic of the ecological factors that characterize the other stations. These stations were characterized by ERL designations for the NOAA tests of potential sediment toxicity. Consequently, a broader comparison of the results is necessary in addition to the relatively restricted ANOVA tests that were used. This approach will be outlined in my re-evaluation of the Motiva data.

### 5. Community Characterizations

Samples were collected in May and August of 2001 and 2002. Summer results were emphasized because the benthic community condition was characterized with a summer index of biotic integrity. The summer period was considered most stressed due to low dissolved oxygen, even though such an effect could mask or confuse the toxic effects of PAHs. Cluster analyses, **MANOVA** tests, and descriptive discriminant analyses were used to examine the data. Shannon diversity, Margalef's species richness index, and Pielou's evenness index were used. Community abundance and biomass were used as biotic indices. A MAIA index was also used (index of biotic integrity [IBI]). For some reason, species richness, one of the most reliable infaunal indices, was not used.

Data presentation in the Report was confusing. There were no preliminary analyses of the data (spread-sheet analyses, spatial distributions, etc.). As was true in previous analyses, spatial and temporal distributions of the data were not adequately considered. The basic community data were not given, and only summer analyses were used for various interpretations of the data. The use of summer data as a basis for reorganization of the data into groups was not adequately explained. Associated assumptions were not addressed or qualified. The grouping of the two years of data in the dendograms was also unusual. The entire analysis (Motiva Report, Figure 6.2) was based on questionable methods of data organization (i.e., restricted use of only summer data, grouping of results of two summer samplings). Clustering was used for various data analyses using site groups (i.e., determinations of "degraded" or "undegraded" conditions

A00028

[Motiva Report, Table 6.62]). The final analyses were restricted, in the authors' words, to comparisons with "PAHs affected by Motiva related PAHs." These determinations had not been established previously in the Report. The emphasis on site groups that were established using only selected data sets is problematic.

The same general criticism that applies to the statistical analyses of the field toxicity tests applies to the relatively few community (four months out of 24 months with no seasonal data) analyses that were made. There was no comparison with an area that was free of PAHs. Since the entire study site was affected by river-borne PAHs, the whole area could have been subjected to adverse effects of PAHs; thus, only modest confidence could be given to the results of the community analyses. The various NOAA tests indicated that the study area as a whole was affected by PAHs from various sources, and the refinery-loaded PAHs had effects that were superimposed on background impacts in depositional areas of increased sediment PAHs.

The "Discussion" was difficult to follow since the actual data were never really presented. The entire discussion concerning the 'site groups' was convoluted and based on assumptions that were not adequately explained.

### 6. Summary of Triad Data

The Triad analysis was limited in terms of relating the distributions of the results of the experimental data and community analyses with the distribution of PAHs in the subject area through time. The analysis was also carried out using flawed assumptions concerning the effects of pesticides and metals in the sediments. Since bioavailability of such substances was never established, these assumptions disqualify the conclusions made by the authors concerning the effects of metals and pesticides. Data presentation for the Triad summary analyses (Motiva Report, Tables 6.63, 6.65) was based on combined spring and summer data for 2001 and 2002. No explanation was given for such an analysis. The data should have been analyzed by sampling period, at least for the preliminary determinations. Final conclusions included major dependence on the fingerprinting data identifying so-called Motiva-related PAHs and the lack of quantification of exact sources of the various PAHs. The conclusion that "therefore, the

possible impact of Motiva's effluent cannot be eliminated as a source for impairment at these stations (i.e., DR1, DR2, DR23, DR26)" was not adequately analyzed. Based on the convoluted selection of indices and data used for these analyses, a complete re-evaluation of the community data should be carried out. There should be a determination of the distribution in space and time of important populations. The assumptions on which Motiva Report Tables 6.63 and 6.65 were based for all three parts of the Triad require a complete review of the data and analyses that went into these Tables.

G.    PAH Fingerprinting

Diagenic sources of PAHs are natural, and such compounds are usually without impact. Petrogenic sources are anthropogenic and are derived from crude oil or refined petroleum products. Pyrogenic sources are anthropogenic and are derived from fires and combustion of petroleum products (coal processing). Petrogenic PAH source signatures are comprised of lower molecular weight (two- and three-ring PAHs). Pyrogenic sources are complex mixtures dominated by four, five and six-ring PAHs with dominance by unalkylated (parent) compounds. Urban storm water is the biggest PAH source to waterways. Petroleum products, waste oil, urban dust/soot, etc. are the biggest components of urban runoff and are dominated by pyrogenic sources (two-three ring, more water soluble types). These compounds are usually more biodegradable. The most abundant urban PAHs are dominated by high molecular weight compounds (four-six rings; Fluoranthene and Pyrene). The lower molecular weight types (two-three ring PAHs) include the Anthracene and Phenanthrene isomers).

Unweathered crude oil has low molecular weight (two-ring PAHs, C0-C4 Naphthalenes). According to the Report, the refinery effluent (outfall 601) was dominated by petrogenic four-ring PAHs (Fluoranthenes/Pyrenes with 2 [FP2] and 3 [FP3] alkyl groups and Benz(a)anthracene/Chrysenes with 2 [BC3], 3 [BC3] and 4 [BC4] alkyl groups). This characterization was an oversimplification and was not consistent with the PAH loading data from outfall 601. This topic will be addressed in my analysis of the Motiva data. Delaware River water was characterized by Fluoranthene, Benz(a)anthracene, and Perylene according to the Report. Outfall 001 was mixed with

A00030

(95%) cooling water.  The petrogenic group was diluted rather rapidly by river water. However, this did not necessarily affect the loading of these compounds. The origin of the Naphthalenes was unknown according to the authors, who evidently excluded this group of PAHs from the characterization of the refinery discharges despite the fact that Napthalenes dominated 601 loading during certain periods.  Assumptions concerning what characterized the refinery effluent were not based on loadings from outfalls 601 and 001; these loadings remain the principal basis for conclusions concerning the distribution and effects of PAHs released by the refinery.

## 1. Monthly Water Monitoring

The fingerprinting of water-borne PAHs included stations from refinery outfalls 601 and 001, two remote river stations (06=downriver, 10=upriver), 01 (Motiva effluent canal), and two near-field stations (02, 07).  The authors used averaged and maximum concentration values.  PAH loadings from the refinery were not used.

Refinery signatures had high levels of Fluoranthenes/Pyrenes (2 (FP2) and 3 (FP3) alkyl groups and Benz(a)anthracene/Chrysenes with 2 (BC2) and 3 (BC3) and 4 (BC4) alkyl groups).  Fluoranthene, Benz(a) anthracene and Perylene were not in the Wastewater Treatment Plant effluent and were used to differentiate river background water.  Low-level five- and six-ring PAHs were not usually found in petroleum at such concentrations and were attributed to "low-level soot from atmospheric deposition or other background PAH sources."  According to the authors, these compounds remained "undegraded" in the effluent.  These conclusions will be addressed in my independent analyis of the data.

Compositional differences in PAHs between 001 and 601 were attributed to mixing of the wastewater treatment effluents with cooling water from the Delaware River.  Station 601 was refinery effluent, whereas 001 had less than 5% of 601 effluent plus 95% non-contact cooling water from the river.  Consequently, 001 "only possessed a small minority of the hydrocarbon signatures from the Refinery."  This finding was contradicted by the loading data.  Outfall 601 had high levels of petrogenic four-ring PAHs, with the inclusion of two-three-ring PAHs and higher levels of Perylene and five-

to six-ring PAHs that were attributed to river contributions (urban sources).  It is unclear how urban PAHs got into the 601 discharges.   Whatever the rationalization, such compounds were loaded into the river from the refinery.  Assumptions leading to the restriction of refinery effluents to four-ring PAHs were thus not adequately documented; deductions based on concentrations were not consistent with the loading data.

In an analysis of the water-borne PAHs, the four-ring Motiva PAHs "disappeared" at the near-field stations (02, 07).  Less than one mile downriver, the average PAH composition at the cooling water intake matched the upriver background station 10 (two-three ring PAHs and four-six-ring PAHs). Episodic movements of particle-bound PAHs at the sediment surface were not even discussed.  The authors concluded that pyrogenic (Fluoranthene and Benz(a)anthracene) and diagenic (Perylene) PAHs were high relative to the Motiva effluent.  Once again, this conclusion was contradicted by the loading data.  The origin of the Naphthalenes remained unknown, but were attributed to river background PAHs.  This attribution was, again, unsubstantiated by the loading data, and was based on unexplained assumptions.

The authors used 43 PAH analytes in the PCA analysis of the 601 and 001 data.  This information was re-organized into 3 groupings: four-ring PAHs, four-six-ring parents, and two-three-ring PAHs.  The results indicated very little effect of refinery effluent on the PAH signatures in near-field river areas.

2.  Three-Phase Study

The particulate phase dominated transport of PAHs.  Napthalenes dominated the dissolved phase. The colloid phase had the two- and three-ring PAHs.  The particulate phase contained the highest concentrations of PAHs with a wide range of two- to six-ring PAHs.  This result indicates the importance of depositional areas with respect to the distribution of refinery-loaded PAHs to the area.

3.  Sediment Survey

The Motiva Report listed various findings with respect to the sediments in receiving areas.  Such sediments were dominated by naturally occurring PAH compounds

such as Perylene and plant waxes (normal alkanes). Here, contrary to the statement that the enriched PAHs from the refinery were defined as the four-ring types (FP2, FP3, BC2, BC3, BC4), it was stated (Motiva Report, p. 7-35) that the refinery signature consisted of two-four-ring petrogenic PAHs. The background types were the two- and three-ring PAHs plus pyrogenic four- through six-ring PAHs, according to study personnel. According to the authors, PAH loading from the effluent channel failed to exceed local background and was an unlikely source of regional PAH enrichment. Urban PAHs were noted as the primary sources of pollution to the sediments in the study area. Once again, episodic loading was not even considered as a contributing factor to the observed high concentrations of PAHs in river sediments, even though the authors noted that "low PAH loading from the effluent channel failed to exceed local background conditions. Consequently, the effluent channel and near-field sediments constituted an unlikely source of regional PAH enrichment." It should be pointed out that the authors did not calculate loading of the individual PAH compounds, and analyses of PAH loading were minimal. The major exceedances at the beginning of the study were not taken into consideration.

The data analysis on which the above conclusions were based tended to ignore the relative importance of TOC and sand-silt-clay distributions as determinants of sediment concentrations of PAHs. The fact that the particulates could carry PAHs from the refinery to areas within the dye-indicated areas affected by the refinery was not considered in these conclusions. The observation that sediments in the near-field areas did not have high concentrations of PAHs could have been due to the nature of the effluent discharge with respect to attachment of PAHs to particulates and particulate distribution in the river. The spatial analyses of the PAH distributions assumed that sediment types were uniform throughout the receiving area, an assumption that was proved false by the data generated in the Report. The various statistical analyses followed the basic assumptions listed above, and therefore were not relevant.

The shortcomings of the authors' heavy dependence on PCA analyses to determine the source of PAH contamination to the Delaware system were not reviewed, and assumptions as to data organization and how the PCA analysis was carried out were not

mentioned. However, the PCA approach, on which the authors depended so heavily for their conclusions, has been shown to be deficient as a conclusive method for determining pollution sources of complex chemical arrays. A good example of why dependence on statistics rather than the primary data can be misleading is evident in studies of dioxin contamination of Newark Bay in New Jersey.

According to the New Jersey Department of Environmental Protection (NJDEP, 2002), dioxin-contaminated sediments from the Passaic River have been "transported and continue to migrate to Newark Bay and other areas of the estuary." Such transport and deposition of dioxins (2,3,7,8-substituted PCDD) and dibenzofurans from a site in the Passaic River were found to "impact the ecological health and economic viability of the port of NY/NJ." Zongwei et al. (1994), in a study of the p-dioxins and dibenzofurans in Newark Bay blue crabs, found that concentration levels of these compounds were highest at the site closest to the Diamond Shamrock facility, and that the continuity of 2,3,7,8-TCDD from the plant and Newark Bay implicated the plant as the origin of this contaminant in the Bay. The evidence suggested a trophic process, rather than concentration from water, was implicated by the high concentrations of dioxin in blue crabs. Bopp et al. (1991) noted that 2,3,7,8-TCDD deposition in Newark Bay sediments since the late 1940s approximated 4-9 kg, which represented the largest such releases noted in coastal areas that had been tested for dioxin. The dominant source of this contamination was thought to be the Diamond-Alkali site. The persistence of anaerobic sediment deposits of 2,3,7,8-TCDD was noted on a time scale of several decades. Bopp et al. (1991) considered the lower Passaic River-Newark Bay system to be among the worst in the world with respect to sediment concentrations of 2,3,7,8-TCDD.

Wening et al. (1993) used a PCA analysis of fingerprints of dioxin and furan compounds in Newark Bay to determine if the Diamond Shamrock plant was the source of the dioxins. These authors found several different sources of these compounds to Newark Bay. There were five major fingerprint patterns in surficial sediments in the Bay, and, according to Wening et al., none was related to the Passaic River plant. Their

results thus did not support the idea that the Diamond-Alkali plant was the main source of dioxin to Newark Bay. Wening analyzed the relevant data using the PCA approach.

However, Chaky (2003), using sediment core analyses to identify indicators of sources of the polychlorinated dibenzo-P-dioxins in the lower Hudson River (New York urban environment) region, found that the ratio of 2,3,7,8-TeCDD/$\sum$TeCDD was indicative of sediments influenced by 2,4,5-T production (i.e., the Passaic River plant). He found that this ratio was particularly high in Western Harbor (Newark Bay) sediments that were affected by the former 2,4,5-T manufacturing site (Diamond-Alkali) on the Passaic River. Other areas in the lower Hudson drainage were also affected by this source, but to a lesser degree. Chaky (2003) noted that a generalized PCA (statistical) approach was not recommended for determination of sources as a PCDD/F pattern abundance. This method was discredited by field studies of the distribution of dioxin compounds in the sediments of the receiving area. The analysis of primary data thus disqualified the results of Wening et al. (1993), who used statistical methods for source determinations. Historical data indicated that Newark Bay sediments had high levels of 2,3,7,8-TeCDD in the 1950s and 1960s, with the Passaic River plant as the source. Similar comparisons of recent samples indicated that the Passaic River plant is still responsible for 50% of the 2,3,7,8-TeCDD deposition in Newark Bay (down from the 1960s but still strong).

The statistical manipulations of data in the Motiva Report supplanted sound scientific analyses o the available field data. The use of statistics to come to conclusions that were inconsistent with the primary data is not reasonable. My analysis of the actual data will underscore the many problems associated with the fingerprint analyses and conclusions based on the PCA method.

4. Triad Study

The same geographic distribution of PAHs noted in the above section was determined using the results of the Triad sediment analyses. No refinery PAHs were noted outside the effluent channel and the near-field stations (01, 02, 06).

A00035

5.  Sediment Trap Study

The results from this part of the study reinforced the analyses described above. The relative paucity of data from a limited number of stations precluded any real conclusions from this part of the study.

6.  Dated Core Study

Only two cores were selected for detailed analyses of vertical PAH composition in non-depositional areas. The long core analysis ignored the proven depositional areas that were the subject of the Triad analyses. This was inconsistent with the original agreements concerning the study, and with sound scientific practice. PAH ratios indicated "significant input of petroleum and/or petroleum products into the sediments at stations 50 and 66 for the past 20 years." The fingerprint analysis indicated that core PAHs were consistent with Delaware River background. It was possible that peaks in alkylated Naphthalenes found during 1993 and 1994 were derived from refinery discharges. This finding was discounted on the basis of the fingerprinting results. The low concentrations of PAHs in the two cores used for this analysis invite questions concerning whether these cores were representative of depositional areas characterized by high concentrations of PAHs.

The use of only two cores in non-depositional areas for the long-core work precludes any substantive conclusions regarding the impacts of excessive refinery PAH loading. At best, the analysis was inadequate to provide definitive conclusions. The authors should not have drawn, but did draw, conclusions from this inadequate inquiry.

H.     Bivalve Bioavailability Study

There was no real bioavailability study carried out in the Motiva analyses. The bivalve studies were conducted with organisms taken at stations that were totally different from the Triad stations (especially in the most polluted areas of the lower system), and therefore could not be related to results from the experimental portions of the Triad analysis. Also, the bivalve data were taken for only one year, and at times that

differed from the Triad sampling. These divergences from an experimental study of uncontaminated organisms taken from areas distant from the primary depositional areas represented a basic misunderstanding with regard to the overall study plan and the objectives of the study. Even though the authors asserted that such uncontaminated organisms could not be used in these experiments, alternative methods could have been devised based on studies carried out in the depositional areas of the river with high sediment PAHs.

No clams could be found in the Delaware River that did not have "substantial concentrations of PAHs." The method used to evaluate potential "toxicity" was not really an experimental test. There were no significant differences in the PAH burdens for the pooled (both samplings) data. Near-field bivalves had significantly higher concentrations of PAHs than north and south far-field samples. Near-field stations, some of which were near the Triad stations, showed a mix of refinery and river background PAHs. Since the clams used in this survey live in the sediments, the relationships of sediment PAHs in areas most contaminated by these chemicals remained unknown. Bivalves from near-field sites and one upriver site showed refinery PAH concentrations, whereas the remaining two upriver and three downriver sites did not accumulate refinery PAHs. The fact that bivalves taken in the field could have represented survivors rather than a natural population was not taken into consideration. The experimental aspects of the original plan for the bioavailability were simply ignored. The bivalve experiments should have been carried out at PAH-contaminated depositional stations used for the Triad experiments, so that potential bioconcentration effects could be examined relative to the results of the Triad tests. Instead, the tests were carried out in areas distant from the depositional stations.

Clam density was station-specific. The similarity of PAHs in clams and sediments was not necessarily significant in the evaluation of PAH origin. Fall clams had higher refinery-type PAHs than spring clams. The mix of petrogenic and pyrogenic PAHs in the near-field clams was also not decisive in determining causation. The "weight of evidence" conclusions regarding PAH effects were without scientific merit. With no reference area to evaluate density questions, there was no basis for a determination of

cause-and-effect relationships of PAH concentrations and clam biology.  If there were adverse effects, affected clams would not be present.  This is a common fallacy when descriptive field data are substituted for experimental data.  Since the clams were taken at different sites and in different time periods, there was no way to relate the results of this part of the study to the Triad results.  In addition, the distribution of this species taken in the community analysis was not considered in this part of the study.  The fact that clams were not found in depositional areas of high PAHs was ignored completely.  This omission will be remedied in the re-evaluation of the Motiva data.

The bivalve data were to be the sole part of the study to determine bioavailability of PAHs and other pollutants to Triad organisms.  The need for bioavailability analyses has been stated above.  The lack of tissue data for the Triad work, together with the failure of the bivalve studies means that we have no way of testing which of the toxic agents found in the sediments was responsible for noted toxicity effects.  This cannot be done with statistics.   Bioavailability is an experimental question and cannot be determined using descriptive field data.

I.    Integration and Analysis of Study Components

The final analysis that brought together various elements of the study was based on false assumptions and unusual methods of re-organization of the various databases used for statistical analyses.   Statistics should be used to test hypotheses, not to manipulate data for a given purpose.  The results of statistical analyses are dependent on data organization, which in this instance the authors never explained.  The rationale for how statistical files were organized should be clearly outlined in any such study.  In the Motiva Report, the assumptions on which file organization was based were not addressed.

J.    Closing Comments on Review

The final conclusion of the Motiva study was that acknowledged sediment contamination and toxicity/benthic health impacts were not due to Motiva's excess pollutant discharges; observed pollution was due to "diverse and diffuse" sources of an urbanized/industrialized estuary.  According to the Report, the monthly water column data