Case 1:07-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 1 of 41

Dr. Jay C. Means                          NRDC and Audubon Society vs.
                                          Texaco Refining and Marketing

6. An NPDES Exceedance Response Plan must be developed which takes
into account a more detailed characterization of the causes of the
exceedance, the fate and transport consequences of the exceedance, the
relative bioavailability of the components involved in the exceedance, and
both the chronic and acute toxicity of the components involved in the
exceedance as discussed in Part II of this report.

7. A sampling plan and analytical strategy should be carried out to establish
the effects of past exceedances using the best analytical and toxicological
tools available as discussed in Part III of this report.

A00078

**References:**

Adamson, A.W. 1976. Physical Chemistry Of Surfaces. Wiley, New York, NY.

Bailey, G.W. And J.L. White. 1970. Factors Influencing The Adsorption, Desorption And Movement Of Pesticides In Soil. Res. Rev. 32:29-92.

Brownawell, B.J. And J.W. Farrington. 1985. Partitioning Of PCBs In Marine Sediments. Pp. 97-120 In Sigleo, A.C. And A. Hattori (Eds.) Marine And Estuarine Geochemistry. Lewis Publisher, Chelsea, MI.

Brownawell, B.J. And J.W. Farrington. 1986. Biogeochemistry Of PCBs In Interstitial Waters Of A Coastal Marine Sediment. Geochim. Cosmochim. Acta 50:157-169.

Burgess, R.M., R.A. Mckinney, W.A. Brown And J.G. Quinn. 1996. Isolation Of Marine Sediment Colloids And Associated Polychlorinated Biphenyls: An Evaluation Of Ultrafiltration And Reverse-Phase Chromatography. Environ. Sci. Technol. 30:1923-1932.

Carman, K.R., Fleeger, J.W., Means, J.C., Pomarico, S.M., And Mcmillin, D.J. 1995. Experimental Investigation Of The Effects Of Polynuclear Aromatic Hydrocarbons On An Estuarine Sediment Foodweb. Mar. Environ. Res. 40:289-318.

Carman, K.R., Means, J.C.and Pomarico, S.M. 1996. Responses of sedimentary bacteria in a Louisiana salt marsh to contamination by diesel fuel. Aquat. Micro. Ecol. 10:231-241.

Carter, C.W. And I.H. Suffet, 1982. Binding Of DDT To Dissolved Humic Material. Environ. Sci. Technol. 16:735-740.

Caron, G. And I.H. Suffet. 1989. Binding Of Non-polar Pollutants To Dissolved Organic Carbon: Environmental Fate Modeling. pp 117-130. In I.H. Suffet And P. MacCarthy, Ed. Aquatic Humic Substances American Chemical Society, Washington, D.C.

Chiou, C.T. 1985. Partition Coefficients of Organic Compounds in Lipid-Water Systems and Correlation with Fish Bioconcentration Factors. Environ. Sci. Technol. 19: 57-62.

Connell, D.W. 1988. Bioaccumulation Behavior Of Persistent Organic Chemicals With Aquatic Organisms. Rev. Envir. Contam. Toxicol. 101:118-154.

A00079

Davis, W.R. And J.C. Means. 1989. Benthic-Water Contaminant Exchange
    Processes In Bioturbated Cohesive Sediment. pp 216-224. In. Proceedings.
    21st European Marine Biology Symposium, Gdansk, Poland, Sept. 14-19,
    1986,

DiToro, D.M. And L.M. Horzempa. 1982. Reversible And Resistant Components Of
    PCB Adsorption-Desorption Isotherms. Environ. Sci. Technol. 16:594-602

Farrington, J.W. (1991) Biogeochemcial Processes Governing Exposure And
    Uptake Of Organic Pollutant Compounds In Aquatic Organisms. Environ.
    Health Persp., 90,75-84.

Ferraro, S.P, H. Lee II, R.J Ozretich and D. T Specht. 1990. Predicting
    bioaccumulation Potential: A Test of a fugacity-based Model. Arch. Contam.
    Toxicol. 19: 386-394.

Foster, G.D., S.M. Baksi, And J.C. Means. 1987. Bioaccumulation Of A Mixture Of
    Sediment-Associated Organic Contaminants By The Baltic Clam (Macoma
    balthica) And Soft Shell Clam (Mya arenaria) J, Envir. Toxicol. Chem. 6:969-
    976.

Freeman, D.H. And L.S. Cheung. A Gel Permeation Model For Organic Desorption
    From Pond Sediment. Science 214:790-792.

Gschwend, P.M. And S.-C. Wu. 1985. On The Constancy Of Sediment-Water
    Partition Coefficients Of Hydrophobic Organic Pollutants. Environ. Sci.
    Technol. 19:90-96.

Hassett, J.P. and M.A. Anderson. 1979. Association Of Hydrophobic Organic
    Compounds With Dissolved Organic Matter In Aquatic Systems. Environ.
    Sci. Technol. 13:1526-1529.

Hassett, J.P.; Milicic, E. 1985. Determination Of Equilibrium And Rate Constants For
    Binding Of A Polychlorinatedbiphenyl Congener By Dissolved Humic
    Substances. Environ, Sci. Technol. 19:643-645.

Horvath, C. And W. Melander. 1978. Reverse-Phase Chromatography And The
    Hydrophobic Effect. Am. Lab. 10:17-36.

Hawker, D.W. And Connell, D.W. 1985. Relationships Between Partition
    Coefficients, Uptake Rate Constants, Clearance Rate Constant, And Time To
    Equilibrium For Bioaccumulation. Chemosphere 14:1205-1219.

A00080

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 4 of 41
11/3/97                              NRDC and Audubon Society vs.
Dr. Jay C. Means                     Texaco Refining and Marketing

Hawker, D.W. And D.W. Connell. 1986. Predicting The Distribution Of Persistent Organic Chemicals In The Environment. Chem. Australia. 53:428-43.

Israelachvili, J. And R. Pashley. 1982. The Hydrophobic Interaction Is Long Range, Decaying Exponentially With Distance. Nature 300: 341-2.

Karickhoff, S.W. 1984. Organic Sorption In Aquatic Systems. J. Hydraulic Eng. 110:707-735.

Karickhoff, S.W., D.S. Brown, And T.A. Scott. 1979. Sorption Of Hydrophobic Pollutants On Natural Sediments. Water Res. 13:241-8.

Kile, And C.T. Chiou. 1989. Water Solubility Enhancement of non-ionic organic contaminants. pp 137-157. In I.H. Suffet And P. MacCarthy, Ed. Aquatic Humic Substances American Chemical Society, Washington, D.C.

Mackay, D. 1979. Finding Fugacity Feasible. Environ. Sci. Technol. 13:1218-1223.

Mackay, D. 1982. Correlation of bioconcentration factors. Environ. Sci. Technol. 16: 274-278.

Mackay, D. and S. Patterson. 1981. Calculating Fugacity. Environ. Sci. Technol. 15:1006-1014.

Mackay, D. and W.Y. Shiu. 1977. Aqueous Solubility of Polynuclear Aromatic Hydrocarbons. J. Chem. Eng. Data 22: 399-402.

McElroy, A.E. And J.C. Means. 1988. Factors Influencing The Bioavailability Of Hexachlorobiphenyl To Benthic Organisms. Pp 149-158 In Aquatic Toxicology And Hazard Assessment, Vol. 10, ASTM STP 971 Philadelphia, PA. 1988.

McFarland, V.A. 1995. Evaluation of Field-Generated Accumulation Factors for Predicting the Bioaccumulation Potential of Sediment Associated PAH Compounds. US Army Corp of Engineers Vicksburg, MS. pp139.

McMillin, D.J. And Means, J.C. 1996. Spatial And Temporal Trends Of Pesticide Residues In Water And Particulates In The Mississippi River Plume And The Northwestern Gulf Of Mexico. J. Chromatog. A 754:169-185.

Means, J.C. 1995. Influence Of Salinity Upon Sediment-Water Partitioning Of Aromatic Hydrocarbons. Marine Chem. 51:3-16.

A00081

Case 1:09-cv-00263-SLR    Document 305-3    NRDC and Audubon Society vs.
Dr. Jay C. Means                                    Texaco Refining and Marketing

Filed 08/23/2005    Page 5 of 41

Means, J.C. 1997. Compound-Specific Analysis Of 63 Parent, Alkylated And
    Heterocyclic Polynuclear Aromatic Hydrocarbons In Water, Sediments And
    Tissues. J. Assoc. Off. Analyt. Chem. **In Press**

Means, J. C. And R. D. Wijayaratne. 1984. Chemical Composition Of Estuarine
    Colloidal Organic Matter: Implications For Sorptive Processes. Bull. Mar.
    Sci. 35:449-46l.

Means, J. C. And R. Wijayaratne. 1982. Role Of Natural Colloids In Transport Of
    Hydrophobic Pollutants. Science 215:968-970.

Means, J. C., J. J. Hassett, S. Wood, And W. Banwart. 1979. Sorption Properties Of
    Energy-Related Pollutants And Sediments. Pages 327-340 In P. W. Jones
    And P. Leber, Eds. Polynuclear Aromatic Hydrocarbons. Ann Arbor
    Science, Ann Arbor, Mich.

Means, J. C., R. Wijayaratne And W. R. Boynton. 1983. Fate And Transport Of
    Selected Herbicides In An Estuarine Environment. Can. J. Fish Aquat. Sci.
    40 (Supp. 2):337-345.

Means, J. C., S. G. Wood, J. J. Hassett, And W. L. Banwart. 1980. Sorption
    Properties Of Polynuclear Aromatic Hydrocarbons By Sediments And Soils.
    Envir. Sci. Tech. 14:1524-1528.

Means, J. C., S. G. Wood, J. J. Hassett And W. L. Banwart. 1982. Sorption Of
    Amino-And Carboxy-Substituted Polynuclear Aromatic Hydrocarbons On
    Sediments And Soils. Envir. Sci. Tech. 16:93-98.

Means, J.C. And A.E. McElroy. 1997. Bioaccumulation Of Tetra- And
    Hexachlorobiphenyl By *Yoldia Limatula* And *Nepthys Incisa* From Bedded
    Sediments: Effects Of Sediment And Animal Related Parameters. J. Env.
    Toxicol. Chem. 16:1277-1294.

Means, J.C. And D.J. McMillin . 1993. Fate And Transport Of Particle-Reactive
    Normal, Alkylated And Heterocyclic Aromatic Hydrocarbons In A Sediment-
    Water-Colloid System. (Referred Monograph) USMMS OCS Study MMS-
    93-0018. 153pp July, 1993.

Means, J.C. And D.J. McMillin . 1995. Pollutant Transport. In Murrey, S.P. Ed.
    Mississippi River Plume Study. (Referred Monograph) USMMS OCS Study
    MMS-95-0033. 224pp July, 1995.

A00082

Case 1:99-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 6 of 41

Dr. Jay C. Means                                    NRDC and Audubon Society vs.
                                                    Texaco Refining and Marketing

Means, J.C. And D.J. McMillin . 1997. Fate And Transport Of Selected Organic And
        Trace Element Pollutants In The Louisiana-Texas (LATEX) Coastal Shelf In
        Murrey, S.P. Ed. Mississippi River Plume Study. (Referred Monograph)
        USMMS OCS Study MMS-97-XXXX. 780pp 1997.

Means, J.C. And McMillin, D.J. 1997. Evaluation Of The Bioconcentration Potential
        Of Genotoxic Contaminants In Sediments Using Co-Solvent Mobilization.
        pp456-473 In Environmental Toxicology And Risk Assessment, ASTM,
        Conshohocken, PA.

Neely, W.B., D.R. Branson and G.E. Blau. 1974. Partition Coefficient to Measure
        Potential of Organic Chemicals in Fish. Environ. Sci. Technol. 13:1113-
        1115.

Periera, W.E. and C.E. Rostad. 1990. Occurrence, Distribution and Transport of
        Herbicides and Their Degradation Products in the Lower Mississippi River
        and Its Tributaries. Environ. Sci. Technol. 24: 1400-1406.

Rubinstein, N.I., E. Lores And N.R. Gregory. 1983. Accumulation Of PCBs, Mercury
        And Cadmium By Nereis Virens, Mercenaria Mercenaria, And Palaomontes
        Pugio From Contaminated Sediments. Aquat. Toxicol. 3:249-260.

Sabljic, A. 1984. Prediction Of The Nature And Strength Of Soil Sorption Of
        Organic Pollutants By Molecular Topology. J. Agric. Food Sci. 32:243-246.

Sigleo, A.C. And J.C. Means. 1990. Organic And Inorganic Components Of
        Estuarine Colloids: Implications For Transport Of Pollutants. Rev. Envir.
        Toxicol. Contam. 112:123-147.

Whitehouse, B.G. 1984. The effects of temperature and salinity on the aqueous
        solubility of Polynuclear aromatic hydrocarbons. Mar. Chem. 14: 319-332.

Wijayaratne, R.D. 1982. Sorption Of Organic Pollutants On Natural Estuarine
        Colloids. Dissertation, Univ. of Maryland, pp124, Univ. Microfilms, Ann Arbor,
        MI.

Wijayaratne, R.D. And J.C. Means. 1984. Affinity Of Natural Estuarine Colloids For
        Hydrophobic Pollutants In Aquatic Environments. Envir. Sci. Tech. 18:121-
        123.

Wijayaratne, R.D. And J.C. Means. 1984. Sorption Of Polycyclic Aromatic
        Hydrocarbons (PAHs) By Natural Colloids. Marine Environ. Res. 11:77-89.

A00083

11/3/97

Dr. Jay C. Means

NRDC and Audubon Society vs.
Texaco Refining and Marketing

Wu, S.-C. And P.M. Gschwend. 1986. Sorption Kinetics Of Hydrophobic Organic Compounds To Natural Sediments And Soils. Environ. Sci. Technol. 20:717-725.

Young, D.R., A.J. Mearns and R.W. Gossett 1984. Bioaccumulation And Biomagnification Of P,P'-DDE And PCB 1254 By A Flatfish Bioindicator From Highly Contaminated Marine Sediments Of Southern California. pp159-169. In. R.A. Baker (Ed.) Organic Substances And Sediments In Water: Biological Processes. American Chemical Soc., Washington, DC.

A00084



A00085

08/30/1999
Dr. Jay C. Means

NRDC and Audubon Society vs.
Texaco Refining and Marketing
(Motiva, Inc.)

## REVIEW OF SUBJECT PROPOSALS

## TO

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

## FOR

## CHIEF JUDGE JOSEPH LONGOBARDI

## IN THE MATTER OF:

## NATURAL RESOURCES DEFENSE COUNCIL and DELAWARE AUDUBON SOCIETY

## VS.

## TEXACO REFINING AND MARKETING, INC.

## (MOTIVA Enterprises, LLC, Inc.)

## BY

## DR. JAY C. MEANS, Ph. D.
## PROFESSOR OF TOXICOLOGY AND
## ENVIRONMENTAL CHEMISTRY

## AUGUST 26, 1999

A00086

08/30/1999                          NRDC and Audubon Society vs.
Dr. Jay C. Means                    Texaco Refining and Marketing
                                              (Motiva, Inc.)

## SUMMARY

        This report details the review of the proposal submitted to Motiva (Texaco
Refining and Marketing, Inc.) for the performance of certain technical, scientific
research tasks related to the order of the District Court issued by the Honorable
Judge Joseph Longobardi, Chief Judge of the United States District Court, District of
Delaware September 3, 1998 and upheld upon appeal by the Third Circuit Court of
Appeals, May 20, 1999. in the above mentioned case.

        The report is divided into three main sections dealing with: 1) the
qualifications and experience of the investigators, 2) the completeness and scientific
rigor of the proposed scopes of work, and 3) the degree to which these proposed
scopes of work address the scientific issues and studies outlined in my report to the
Court dated Nov. 3, 1997, which was used by the Court to stipulate the conduct of
several investigations of the impact of past, present and future discharges from the
refinery during normal operation and past or potential permit exceedances.

A00087                    2

08/30/1999                                  NRDC and Audubon Society vs.
Dr. Jay C. Means                         Texaco Refining and Marketing
                                                        (Motiva, Inc.)

## DISCLOSURE

The subject proposal was submitted by the University of Maryland, Wye Research and Education Center, by Dr. Lenwood Hall and Dr. Dennis Burton, with several subcontractors from other agencies public and private. As is disclosed in my curriculum vita, I was an employee of the University of Maryland in both the Center for Environmental and Estuarine Studies, Chesapeake Biological Laboratory, Solomons and the Department of Chemistry, College Park campus from July, 1979 until July, 1987. During that period of time, the Wye Center was not part of the University of Maryland System.

I am personally acquainted with both Drs. Hall and Burton, primarily though scientific societies, but have not been involved with either of them on any research grant or project. I was chairman of a search committee at the Chesapeake Biological Laboratory (CBL) in 1983-4, which considered the application of Dr. Burton for a faculty position at CBL, however, another candidate was hired for the position.

I do not know Dr. Najarian (Najarian Associates, Inc.) or Dr. Winfield (Old Dominion University), Dr. Perry (statistical consultant) nor have I had any association with Versar, Inc. or Battelle Institute, Duxbury.

Dr. Allen Uhler, currently of the Battelle Institute, Duxbury, MA, was a former post-doctoral student in my laboratory at the Chesapeake Biological Laboratory from 1982 until 1984. I have not had any association with him since that time.

A00088

08/30/1999                                    NRDC and Audubon Society vs.
Dr. Jay C. Means                              Texaco Refining and Marketing
                                                              (Motiva, Inc.)

## PART I

## BACKGROUND:

My former report to the Court (Nov. 3, 1997), outlined the reasons for and the scientific basis underlying five studies which needed to be performed to adequately assess the impact of the refinery discharge upon the receiving environment of the Delaware River estuary. These studies included investigations of: 1) the detailed characterization of the composition of refinery effluents using modern analytical methods and an appropriate scope of analytes; 2) the interactions of petroleum hydrocarbons with receiving waters, natural particulates and biota as related to the fate and transport of discharged materials; 3) the quantification of the distribution of sediment-bound PAHs at sites associated with refinery discharges or related petroleum discharges with depth and spatial area; 4) the bioavailability of discharged hydrocarbons in the solution phase; 5) the bioavailability of sediment bound PAH in the sediments near the discharge both in terms of present discharges as well as an estimation of past impacts of exceedances based upon analysis of sediment cores and a site-specific model of bioavailability for Delaware River sediments. Concomitant study of the potential toxicity of bioaccumulated contaminants would be integrated into studies 4 and 5, using relevant endpoints and test species. The Court ordered that such studies be performed in a manner consistent with the scientific rationale presented in my report and subsequent court testimony.

The present proposal states that it is limited to addressing studies 2, 3 and 4 as a primary design criterion. Potential problems with the proposed approach are outlined below.

08/30/1999                          NRDC and Audubon Society vs.
Dr. Jay C. Means                    Texaco Refining and Marketing
                                                    (Motiva, Inc.)

## Section 1-
## Qualifications of the Principal Investigators and Sub-contractors

Experience and qualifications of the principal investigators is high and they are well qualified to perform the work outlined in the published scope of work. The qualifications of some of the sub-contractors is less familiar to me and as curriculum vitae were not provided, a critical evaluation of their qualifications and experience is not possible. Many of the references cited in the proposal are the work of some of the involved investigators, however, many of the citations refer to publications in non-peer reviewed and agency report documents not readily accessible to this reviewer.

## Section 2-
## Completeness and Scientific Rigor of the Proposed Scopes of Work

The proposed scope of work outlines and presents methods for six (6) research tasks which the PIs acknowledge only focus on studies 2,3 and 4 as outlined in the court order. Reference is made to an investigations being conducted to define the detailed chemical composition and variability of that composition in the refinery effluent being conducted by the Battelle Duxbury laboratory designed to address study 1 in my report. Reference is also made to a planned investigation by Dr. Richard Lee (Skidaway Institute of Oceanography) of the impacts of past discharges on the receiving environment (Study 5). No reference is made in the proposal to how the characterization study and/or the study of impacts of past exceedances are or will be coordinated with the present proposed investigation.

The following is a discussion of the six proposed research tasks individually.

## Task 1-Delaware River Plume Dilution/Hydrodynamic Transport Model

This portion of the proposal discusses the use of an existing near-field model CORMIX-3 (times scales of second to minutes and distances of meters to tens of meters) which will be adapted to the Motiva effluent. This model is intended to

A00090

08/30/1999                              NRDC and Audubon Society vs.
Dr. Jay C. Means                    Texaco Refining and Marketing
                                                    (Motiva, Inc.)

describe the zone of initial dilution, which in the case of the Motive discharge is likely to be restricted to the discharge canal itself depending upon discharge flow volume and seasonal flow and tidal characteristic of the receiving estuary. This model is proposed to be interfaced with an existing far-field hydrodynamic model (RMA-10) which has apparently been calibrated on bulk parameters (salinity, total flow) for the Delaware estuary.

Both of these models, while potentially valid for describing the behavior of conservative constituents (e.g. salt) fail to address the issue of the interaction of non-conservative constituents (in this case, the contaminants of concern PAHs and selected trace metals) with particulates and colloidal phases, the transport of those particles, the highly probable case that flow, weather and tidal driven sediment transport may control contaminant behavior in the local region of the refinery effluent canal. Solution phase modeling of the effluent plume without regard to partitioning processes and sedimentation rates and related processes of sediment resuspension and transport represent a seriously flawed approach to the proper characterization of the receiving environment and potential impacts upon that environment. There is no mention of field-validation of the model predictions in this or the other tasks. A field-verification effort should be proposed.

In the study approach section of their proposal, some consideration of potential confounding variables such as the rejected heat of the refinery ($\Delta T$) in the discharge were raised as an issue. The proposed research tasks, and in particular this one, which could shed some insights into such a confounding variable as potential heat effects on biological communities (these or similar models are used to examine potential thermal impacts), fail to address the deconvolution of such potential effects.

The proposed application of these models as described in the proposal are likely to overestimate the dilution potential of the receiving environment, underestimate accumulation of discharge-related contaminants in local sediments, overestimate the import of contaminants (identified as being associated with the discharge) from external sources in the receiving environment, all of which will confound the final evaluation of the data for impacts.

A00091                              6

08/30/1999
Dr. Jay C. Means

NRDC and Audubon Society vs.
Texaco Refining and Marketing
(Motiva, Inc.)

The rationale for and the scientific basis for a detailed site specific fate and transport study in and near the discharge canal at the Motiva refinery site. Neither this task nor any of the following tasks directly address the fate and transport question.

## Task 2- Select Sampling sites in the Delaware River in the Vicinity of the Refinery

The proposal states that 10 sites will be selected for assessment of exposure, effects, and assessment biological community health. These sites will be sampled and analyzed for parameters once each summer for two years. The sites will focus appropriately on fine grain sediments as opposed to sandy sediments. The Task refers to consideration of existing NOAA Status and Trends sites, other NPDES permitted discharges and land use patterns in the region in the site selection process. Exactly how such data are to be used was not stated.

The presumption that 10 sites will adequately characterize the area of potential impact of the refinery effluent is premature. The number of sites, the number of replicates per site and the frequency of sampling are critical to the success of this investigation process. Among the variables that must be considered are: the area defined by plume modeling (WITH consideration of partitioning and sediment transport processes); the results of an initial field survey conducted to validate the model predictions; the hydrologic cycle of the receiving estuary (interannual cycles of flow, tidal ranges and extremes , weather driven cycles of sediment transport [seasonal storms], etc.); plant operation cycles which may influence the amount and chemical content of the discharge; the normal cycles of the target biological communities in the receiving estuary; an examination of the degree of hydrologic interaction between the waters in the discharge region (area of restricted flow behind Pea Patch Island and a breakwater structure) and the main channel of the river/estuary; the identification and inclusion of a reference site within the Delaware estuary; etc. Only when such variables are defined and considered can a valid number of stations be defined in this task.

The apparent disconnect between the studies being performed now by Battelle Institute, Duxbury (Study 1) on the effluent characterization and the

7                          A00092

08/30/1999                              NRDC and Audubon Society vs.
Dr. Jay C. Means                        Texaco Refining and Marketing
                                                            (Motiva, Inc.)

proposed study are a concern. For example, if trace metals are an area of concern in the region and included in the potential interpretation of the sediment toxicity data sets, then why is there no data being collected on trace metals in the effluent testing? Also, is the current effluent testing limited to the discharge into the canal discharge and does the characterization consider both dissolved and particulate associated contaminants? There must be coordination and communication between these activities if an adequate site selection plan is to be implemented and an appropriate scope of analysis for these tasks defined.

   The number of stations and the frequency of sampling are justified in the reply from the U of Maryland team based upon their previous application in the Chesapeake Bay system and fiscal restraints. The Chesapeake estuary and the Delaware estuary are very different systems. The Chesapeake is a river-dominated estuary with a tidal range of less than 0.5 M, while the Delaware is a marine-dominated estuary with a tidal range of over a meter. The selection of ten sites in the Chesapeake to attempt to define the relative contributions of several tributary rivers to the mainstem of the bay is not the same research question as defining the zone of potential impact of a specific refinery effluent and therefore the site selection process must be tailored to address the proper question and the spatial scale of that question. If site the selection process is not carried out in a rigorous, statistically defensible manner, the entire study is doomed to failure before it begins.


**Task 3-Contaminant Exposure Characterization at Study Sites**

   This task along with referenced appendices A and B, describe the characterization effort and methodologies to be applied for exposure to benthic organisms and communities. The data collected here are intended to contribute one component to the application of the Sediments Triad approach to impact assessment.

   The intended use of the Traid approach in this study is appropriate to the task of examining benthic impacts of the refinery discharge. As with any risk assessment process, the key to an accurate assessment is minimizing sources of error which contribute to overall uncertainty of the final assessment interpretation and conclusions. In such multi-endpoint assessment paradigms as the Triad approach,

A00093                              8

NRDC and Audubon Society vs.
Texaco Refining and Marketing
(Motiva, Inc.)

chemical analyses usually represent the most precise measurements that can be made since biological variability typically far exceeds that observed in quality assured chemical measurements. For this reason, the pooling of sediment samples prior to analysis is inappropriate. Such pooling reduces the overall power of the Triad approach by averaging out differences in chemical data that may result in and explain different toxicity results thus confounding the interpretation of the biological data. There is an apparent flaw in the logic of analyzing all five replicates for grain size, TOC, porewater constituents, AVS and SEM while pooling them for organic analyses. All five sediment replicates should be analyzed chemically for all constituents.

Extensive analysis of parameters which may not be discharge related is a prudent approach, however, care must be exercised in the interpretation of such data in the absence of a demonstrated linkage to a toxicological response. The authors seem to assume that the presence of a substance may be equated with exposure. This is not always the case. A more rigorous consideration of the bioavailability of contaminants needs to be included in the overall research design. If contaminants other than PAHs which are measured in sediments are to be used in the final interpretation of the Traid results then a reasonable effort must be expended to establish their presence or absence in the effluent discharge.

The present research plan focuses exclusively upon the potential impacts of sediment bound contaminants upon benthic community structure and toxicity to two common species of invertebrate. While I agree with the species of organisms selected (*Leptocheirus plumulosus* and *Steblospio benedicti*-both have been used successfully in monitoring and toxicity assays) for this targeted set of studies, they represent only one potential exposure-impact route in the receiving environment. In my original report, I presented specific examples of the relationships which were documented in the field and laboratory of the bioavailability of PAHs, PCBs, etc. to biomonitoring organisms such as bivalves. If the proposed experiments are the only ones which are to be relied upon to establish the presence or absence of an impact of the discharge upon the receiving environment, then a rigorous demonstration of a connection between sediment concentrations and tissue concentrations must be demonstrated. Such measurements are possible in spite of the small size of the

A00094

08/30/1999
Dr. Jay C. Means

NRDC and Audubon Society vs.
Texaco Refining and Marketing
(Motiva, Inc.)

organisms. We have been able to obtain detailed hydrocarbon analyses and trace metal profiles on as little at 0.5g wet weight of these and other species of benthic invertebrate organisms.

Since one of the primary potential effects of aromatic hydrocarbons are effects on higher organisms, a study which addresses the exposure potential of the discharge to fish or bivalves used as a food supply for humans should also be conducted.

In appendix A Table 1, compound specific detection limits have been determined and published (see Means, 1998).

The analysis of sediment cores is not referred to in this task. This was part of Study 3 as outlined in my report. This will apparently be done as part of Study 5.

## Task 4-Characterization of Sediment Toxicity at Study Sites

The use of the sediment toxicity assays using *Leptocheirus plumulosus* and *Steblospio benedicti* survival and growth assays to assess potential sediment benthic impacts are reasonable and appropriate for use in the Triad approach. However, the need to establish a connection between the presumed exposure concentrations (sediment concentrations) and actual extent of bioaccumulation as discussed above must be incorporated into the overall research design. A control site within the Delaware system which has been demonstrated to meet certain physical, chemical and toxicological criteria needs to be identified and used in addition to the source (reference site in Virginia) sediment proposed. This control sediment should have similar sediment texture, TOC, salinity, and porewater chemistry to the majority of assessment sites near the discharge. Further, the control sediment should consistently demonstrate the Appropriate toxicological control criteria of an assay mortality of <10%(zero mortality is ideal) and a growth assay effect (change) less than the variance of the change observed at the source (reference) site. Without establishing these controls on biological variation, the validity of all bioassay data will be compromised.

There must be communication and agreement among the investigators for Study 5 (assessment of past impacts) with these investigations if the assay methods

A00095                    10

08/30/1999                            NRDC and Audubon Society vs.
Dr. Jay C. Means                      Texaco Refining and Marketing
                                                          (Motiva, Inc.)

used here are to have utility for the interpretation of the Study 5 data. There is no
indication that such consideration and agreement has been reached.


### Task 5-Benthic Community Assessments

    The proposed studies of benthic community health are appropriate for the
receiving environment and have been used successfully at other petroleum
discharges sites. The measures of species number, biomass and diversity using the
B-IBI indices should yield the data necessary to fulfill the requirements of the Triad
assessment approach. Here again the selection of a Delaware River reference site
or sites is key to the final interpretation of the results.


### Task 6-Analysis of Triad Data

    The data collected in the previous five tasks will be incorporated into the
Traid assessment model and a îweight-of evidenceî approach to the interpretation of
the data applied. Extreme care must be exercised in the interpretation of data at
this step. Because the Triad assessment relies upon three very different sets of
data with three different sources and magnitudes of uncertainty, inconsistencies
between data sets are not only likely but highly probable. As discussed earlier, the
presence of a quantifiable level of a contaminant of concern does not equate to an
expected effect unless bioavailability relationships are established. Negative acute
or sub-acute toxicity (survival and growth) results do not preclude the possibility that
chronic effects manifested in a change in community structure and health may be
observed and real. Depending upon the bioaccumulation potential, exposure routes
(water, food, etc.) and mode of action of a particular contaminant, low sediment
concentrations may not preclude a significant toxicological response in a bioassay.
For these and numerous other reasons, positive responses in the Triad assessment
should be taken seriously. There is often the tendency to discount inconsistent
results in such a paradigm as invalid. It is equally possible to underinterpret data as
well as overinterpret it in this context. A positive result in this context should lead to
further study rather than the presumption of error or no-effect.


### General Comment on Overall Design

11

A00096

08/30/1999
Dr. Jay C. Means

NRDC and Audubon Society vs.
Texaco Refining and Marketing
(Motiva, Inc.)

The proposed set of tasks represent a large body of effort and considerable expense. The scope of the study necessitates the inclusion of expertise in multiple disciplines. No less than five organizations are participating in this proposal alone. There must also be coordination and communication with the participating organizations in Studies 1 and 5. My concern is that there is no discussion or plan for overall coordination, integration and quality control of the sampling, data acquisition, statistical analysis and interpretation of the data. What data do the investigators need from Study 1 to design their studies? What data do these investigators need to provide to the investigator intending to conduct Study 5? What contingency plans will be followed if a particular experiment breaks down or is invalidated? If such plans are not made ahead of time, my experience is that the study may experience major failures which could invalidate the entire study given the interconnectedness of the data and the requirements of the Traid approach.

08/30/1999                          NRDC and Audubon Society vs.
Dr. Jay C. Means                    Texaco Refining and Marketing
                                              (Motiva, Inc.)

## Section 3-

## The Degree To Which These Proposed Scopes Of Work Address The Scientific Issues And Studies as Mandated by the Court

The subject proposal outlines a series of studies divided into six tasks which are stated to address Study issues 2,3 and 4 as outlined in my report to the court. My assessment of the study as currently proposed is that is fails to investigate the fate and transport issues outlined as critical components of an exposure assessment at the site. The lack of consideration of sediment transport processes in the proposed effluent plume dilution/hydrodynamic modeling effort is a major shortcoming of the proposal. This coupled with the apparent lack of connection between the effluent characterization effort (Study 1) and the proposed work may lead to a flawed site selection plan in terms on the number and spatial distribution of sites which ultimately are to be included in the Traid assessment process. As discussed earlier, errors in scientific judgment made at this stage of the study could invalidate the entire process. Consideration of the potential impacts of the discharge upon pelagic communities is lacking in the present design. This was and remains a key potential impact of the discharge, particularly if a fate and transport study revealed that aqueous phase transport processes dominate over shorter time spans (there was some evidence of this in data from the refinery reviewed in the preparation of my report).

The incorporation of the Traid assessment approach which includes sediment chemistry, toxicity and benthic community health measures is a positive approach to the research questions relevant here, however, as pointed out earlier, a specific link must be established between sediment concentrations and bioavailability for the test species in order to calibrate and validate the toxicity data and benthic community data. While a positive toxicity result may allow some inferences concerning bioavailability to be made, the lack of a toxic response may not be used to infer a lack of impact without a defined understanding of bioavailability. Therefore, while the scope of work proposed addresses many aspects of the study issues defined in my report, it does not completely cover them with respect to fate and transport and bioavailability, which are key components of exposure assessment.

A00098

08/30/1999                              NRDC and Audubon Society vs.
Dr. Jay C. Means                        Texaco Refining and Marketing
                                                        (Motiva, Inc.)

     Three primary justifications of and needs for the studies outlined in my report are to: 1) provide a clear assessment of potential impacts, if any, on the receiving environment of compliant vs. non-compliant discharges and 2) to assist in the development of an appropriate scientific context and background such that a plan to assess impacts of past non-compliant discharges could be developed and conducted; and 3) to assist in the development of an appropriate response plan and methods to assess any impacts of future exceedances. Each of the studies needs to be focused upon these overall goals. If the Motiva refinery intends to utilize invertebrate benthic toxicity assays in the assessment of past and/or future exceedance impacts, then the proposed studies must provide the necessary framework for that to be scientifically justified and defensible. The key to success, utility, and fiscal efficiency would be to integrate and coordinate all aspects of the process in terms of the final mandated outcomes. That is currently lacking in my estimation.

A00099                          14

08/30/1999                          NRDC and Audubon Society vs.
Dr. Jay C. Means                 Texaco Refining and Marketing
                                            (Motiva, Inc.)

**References:**

Means, J.C. 1998. Compound-Specific Gas Chromatographic/Mass Spectrometric

    Analysis Of Alkylated And Parent Polynuclear Aromatic Hydrocarbons In

    Water, Sediments And Aquatic Organisms.  J. Assoc. Off. Analyt. Chem., 81:

    657-672.

A00100

## In The Matter Of:

*Natural Resources Defense Council, et al.   v.*
*Texaco Refining and Marketing, Inc.*

---

*Dennis Burton, Ph.D., pp. 1-128*
*November 2, 1999*

---

*Salomon Reporting Service, Inc.*
*Leadership in Litigation Innovation*
*1700 Court Square Building*
*200 East Lexington Street*
*Baltimore, MD  21202-3517*
*(410) 539-6760    FAX: (410) 539-8696*

Original File 17062BUR.V01, 128 Pages
Min-U-Script® File ID: 1672470405

**Word Index included with this Min-U-Script®**

A00101

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 25 of 41

Natural Resources Defense Council, et al.  v.
Texaco Refining and Marketing, Inc.

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

**Page 1**

[1]    IN THE UNITED STATES DISTRICT COURT

[2]    FOR THE DISTRICT OF DELAWARE

[3]

[4] NATURAL RESOURCES DEFENSE    * Civil Action No.

[5] COUNCIL, INC. and DELAWARE   *  88-263-SLR

[6] AUDOBON SOCIETY,             *

[7]    Plaintiffs

[8] v.                           *

[9] TEXACO REFINING and          *

[10] MARKETING, INC.,            *

[11]    Defendant

[12]

[13]

[14]    Deposition of DENNIS BURTON, Ph.D.,

[15] taken on Tuesday, November 2, 1999, commencing at

[16] 12:45 p.m., at the University of Maryland Wye

[17] Research and Education Center, Houghton Lab Lane,

[18] Queenstown, Maryland 21658.

[19]

[20]

    Reported By:  SHARON D. LIVINGSTON, CSR-RPR

**Page 2**

[1] APPEARANCES:

[2]

[3] On behalf of the Plaintiffs:

[4]    MITCHELL S. BERNARD, ESQUIRE

[5]    NANCY S. MARKS, ESQUIRE

[6]    Natural Resources Defense Council

[7]    40 West 20th Street

[8]    New York, New York 10011

[9]    212-727-4414 (Voice)

[10]   212-727-1773 (Fax)

[11]

[12] On behalf of the Defendant:

[13]    RICHARD D. ALLEN, ESQUIRE

[14]    Morris, Nichols, Arsht & Tunnell

[15]    1201 North Market Street

[16]    Wilmington, Delaware 19801

[17]    302-658-9200 (Voice)

[18]    302-658-3989 (Fax)

[19]

[20]

[21]

**Page 3**

[1]    **REALTIME PROCEEDINGS:**

[2] Whereupon,

[3] DENNIS BURTON, Ph.D.,

[4] the witness herein, being first duly sworn to

[5] testify the truth, the whole truth, and nothing

[6] but the truth, was examined and testified as

[7] follows:

[8]    **EXAMINATION BY MR. BERNARD:**

[9]    Q: Let's mark as Burton Deposition Exhibit

[10] 1 a copy of a November 3, 1997 report to the

[11] United States District Court by Dr. Means with

[12] handwritten comments.

[13]    (Whereupon, Burton Deposition Exhibit

[14] Number 1 was marked for identification.)

[15]    **BY MR. BERNARD:**

[16]    Q: Dr. Burton, do you recognize that

[17] document?

[18]    A: Yes, I do.

[19]    Q: Is this handwriting yours?

[20]    A: That's correct.

[21]    Q: And when do you recall having written

**Page 4**

[1] these comments on the document?

[2]    A: Back in December when I first got it.

[3]    Q: Now, is this the first document or was

[4] this among the first documents you reviewed on

[5] this assignment?

[6]    A: That's correct.

[7]    Q: Other than scientific literature that

[8] you may have reviewed, what did you review in the

[9] early phase to get yourself ready to work on the

[10] project?

[11]    A: Primarily scientific literature and

[12] numbers telephone calls of various associates.

[13]    Q: And did you read the trial testimony

[14] from the April 1998 proceeding?

[15]    A: I read, I think it was, the conclusion

[16] that was sent to me or the Court's decision or

[17] something I read. If you have it, I can show you

[18] which one I've read.

[19]    Q: This is Hall Exhibit 2.

[20] Are you familiar with that?

[21]    A: I have not read this one. I can go get

A00102

Dennis Burton, Ph.D., et al. v.
Texaco Refining and Marketing, Inc.

Case 1:99-cv-00263-SLR     Document 305-3     Filed 05/18/2005     Page 26 of 41

November 2, 1999

---

**Page 5**

[1] what I have and show you exactly what I've read.

[2] not it.

[3]     Q: Have you read any judicial decision?

[4]     A: I read something that I thought was the

[5] decision of the Court.

[6]     Q: How long would it take you to go get

[7] it?

[8]     A: One minute.

[9]     Q: All right. Why don't you do that.

[10]     (Whereupon, discussion off the record.)

[11]     MR. BERNARD: Let's go back on the

[12] record. Why don't we mark this now as Burton

[13] Exhibit 2.

[14]     MR. ALLEN: Is that your only copy?

[15]     THE WITNESS: That is my only copy.

[16]     MR. BERNARD: It's about to become a

[17] deposition exhibit. Are you attached to it?

[18]     THE WITNESS: I'd like to have it back

[19] because I've made some notes on it.

[20]     MR. BERNARD: It's only going to have a

[21] little —

---

**Page 6**

[1]     THE WITNESS: That's fine, as long as I

[2] can get it back.

[3]     MR. BERNARD: You can also Xerox it

[4] without that.

[5]     MR. ALLEN: Typically the original

[6] exhibit stays with the original transcript.

[7] That's why I raised the question.

[8]     MR. BERNARD: Right. But if he could

[9] just get it copied after or during a break.

[10]     MR. ALLEN: Let's agree that we will

[11] have it marked now, but we will substitute a

[12] Xerox as the original exhibit.

[13]     MR. BERNARD: Agreed. Let's mark it as

[14] Burton 2, please.

[15]     (Whereupon, Burton Deposition Exhibit

[16] Number 2 was marked for identification.)

[17]             BY MR. BERNARD:

[18]     Q: This is the Opinion and Order of the

[19]     t Court dated September 1, 1998, which,

[20] Dr. Burton, I will represent to you is merely a

[21] different form of Hall Exhibit 2, which I showed

---

**Page 7**

[1] you. One appears in a law book, and the other

[2] that appeared before appears in a law book. Is

[3] this from your file?

[4]     A: That is correct.

[5]     Q: And you've read this?

[6]     A: Yes.

[7]     Q: And you understand it to be the

[8] decision of the District Court in September of

[9] 1998?

[10]     A: That's correct.

[11]     Q: Okay. When did you first read this?

[12]     A: October 29th, 1999.

[13]     Q: Would that have been last week?

[14]     A: That's correct.

[15]     Q: And what caused to you read it last

[16] week? Were you just looking for a little reading

[17] material?

[18]     A: Because I knew this deposition was

[19] coming, and I said I'd better take a look at this

[20] thing and become familiar with it. But my study

[21] design was not based on that at all. It was

---

**Page 8**

[1] based on that (indicating).

[2]     Q: And the that, just because it's being

[3] taken down, your study design was based on

[4] Exhibit 1, not on Exhibit 2?

[5]     A: That's correct.

[6]     Q: Now, what was your response to Exhibit

[7] 2 when you read it last week?

[8]     A: My response to it?

[9]     Q: Yeah. What did you think of it?

[10]     A: Looked like Entrix got eaten alive in

[11] there. But I read the thing, and it sounded very

[12] much like this document right here except for the

[13] part about Entrix in there.

[14]     Q: What was the thing about eaten alive?

[15] I'm sorry. I just didn't hear it.

[16]     A: I should probably rephrase that. I'll

[17] just say these guys didn't appear to have

[18] designed a study that you folks thought they

[19] should have.

[20]     Q: And you're referring to Entrix?

[21]     A: That's right. And I have never read

---

A00103

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 27 of 41

Natural Resources Defense Council, et al.  v.
Texaco Refining and Marketing, Inc.

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Page 9

the Entrix proposal, so before you even ask me,
I'll tell you.

[3]    **Q:** I think you can safely avoid reading

[4] that.

[5]    Had you ever seen a summary of this or

[6] kind of a rendering of the substance of this

[7] decision —

[8]    **A:** I have.

[9]    **Q:** — in some other form?

[10]    **A:** Uh-huh.

[11]    **Q:** And when did you see it?

[12]    **A:** Back when this whole thing started,

[13] from Bert Molina, I guess, from Shell

[14] Development, which is now Equilon or whatever

[15] they call the place. He sent us a two- or

[16] three-page summary of that when this whole

[17] process started, and that should be in the

[18] records we sent to you I think.

[19]    **Q:** Well, I can tell you I don't have it,

[20] along with a host of other things. But it was

not provided to me.

Page 10

[1]    Did you provide it to Mr. Allen?

[2]    **A:** I assume that we did. It was a two- to

[3] three-page letter.

[4]    **MR. ALLEN:** You did, and I identified

[5] it in my cover letter as one of the documents

[6] withdrawn on grounds of privilege.

[7]    **MR. BERNARD:** Right. But the only

[8] documents you withheld on the grounds of

[9] privilege —

[10]    **THE WITNESS:** That could have been one

[11] of them actually.

[12]    **MR. BERNARD:** You identified three

[13] documents, Rick. Two are dated September 1999.

[14] The third is undated, which may be the document

[15] that Dr. Burton is referring to.

[16]    **MR. ALLEN:** It is.

[17]    **BY MR. BERNARD:**

[18]    **Q:** There's a section in this that

describes the Means plan; is that correct?

[20]    **A:** That's correct.

[21]    **Q:** And I think it's Section 2 of the

Page 11

[1] Opinion. Did you read that part?

[2]    **A:** Uh-huh.

[3]    **Q:** Did anything about it surprise you in

[4] terms of what you had —

[5]    **A:** It's very much like this.

[6]    **Q:** It read like Exhibit 1?

[7]    **A:** Uh-huh.

[8]    **Q:** So it didn't surprise you?

[9]    **A:** Huh-uh.

[10]    **Q:** Do you have an understanding now of how

[11] faithfully to the letter — what's in Exhibit 2

[12] and Exhibit 1, which you've described as

[13] similar — how faithful the implementation of

[14] that plan has to be in this effort that you're

[15] involved in now?

[16]    **A:** I don't know how faithful it is. I

[17] think it is recommended studies. I didn't get

[18] the sense that thou shalt do those, although they

[19] implied that. But no.

[20]    **Q:** What sense did you get?

[21]    **A:** I think these are recommendations,

Page 12

[1] particularly in the back section where he says I

[2] recommend Texaco do the following things.

[3] Doesn't say thou shalt do them. Says I

[4] recommend.

[5]    **Q:** And did you treat them as

[6] recommendations?

[7]    **A:** Uh-huh.

[8]    **Q:** And do I infer correctly from that that

[9] you believe that they're recommendations that

[10] you're free to accept or reject?

[11]    **A:** We tried to follow them as best we

[12] could. Some could not be implemented, like the

[13] fate and transport modeling in part. So we took

[14] an alternative path to try to get the same

[15] answers.

[16]    **Q:** And do you think you've succeeded in

[17] doing that —

[18]    **A:** Yes.

[19]    **Q:** — in other words, that your

[20] alternative path will lead to the same answers?

[21]    **A:** Uh-huh.

A00104

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 28 of 41

Natural Resources Defense Council, et al., v.
Texaco Refining and Marketing, Inc.

**Page 13**

[1] MR. ALLEN: Let me just caution the

[2] witness that you need to verbalize your answer

[3] yes or no.

[4] THE REPORTER: And wait for him,

[5] please, to finish his question before you answer.

[6] THE WITNESS: Okay.

[7] BY MR. BERNARD:

[8] Q: Where have you departed from Dr. Means'

[9] recommendations, as you call them?

[10] A: Probably the most substantial would be

[11] the fate and transport modeling of the three

[12] phases; dissolve, particulate, colloidal phase

[13] modeling.

[14] Q: Let's just take that as the most

[15] substantial.

[16] What is your understanding of what he

[17] recommends in terms of the three-phase modeling

[18] for fate and transport?

[19] A: I think it's an interesting academic

[20] exercise but not ready achievable in the Delaware

[21] River.

**Page 14**

[1] Q: What is he proposing be done?

[2] A: He intimates that if you understand

[3] these processes, you can predict where impact may

[4] be occurring or has occurred.

[5] Q: And how does he recommend that you go

[6] about doing that?

[7] A: He just says Texaco shalt do that or

[8] should go about doing it. I can give you the

[9] exact language in there.

[10] Q: I can read the report.

[11] A: He dictates Texaco to do it, and I

[12] don't think he thought about how you would

[13] implement that. Seriously I don't think he

[14] thought about that.

[15] Q: And do you have a view about whether

[16] what he is recommending can be done?

[17] A: I certainly do.

[18] Q: And what is that view?

[19] A: It cannot be done within the time, the

[20] scope and this sort of thing, some of the things,

[21] like the fate and transport modeling, for

**Page 15**

[1] example.

[2] New Jersey/New York Harbor is doing a

[3] sediment transport modeling effort now, $9.7

[4] million, five years. The modeling part is $2.7

[5] million. The validation is 9.7. That's the

[6] harbor only.

[7] And you go to the Delaware River, it's

[8] a very dynamic system. C and D canal comes in

[9] there. You'd be kidding yourself. If I wrote a

[10] report and said we'll do that, I'd be run out by

[11] my peers. You can't do it. It would be nice if

[12] we understood it well enough to do it, but I

[13] don't think it can be done.

[14] Q: Now, you've said a number of things. I

[15] want to break them down so I understand your

[16] testimony.

[17] Put aside cost and duration. Forget

[18] about it. You're an expert witness, and I'm

[19] asking you to hypothesize the situation with me.

[20] Okay? Cost is not an issue. Length of time for

[21] the study is not an issue.

**Page 16**

[1] A: Okay. I've died and gone to heaven

[2] then.

[3] Q: For the moment I'm giving you what you

[4] want.

[5] A: I've been blessed.

[6] Q: Now, is it your view that what Means is

[7] proposing cannot be done if you set aside cost

[8] and duration constraints?

[9] A: It is my view that it cannot be done

[10] because of the number of variables involved, yes,

[11] at the present state of knowledge in 1999.

[12] Q: And can you explain as specifically as

[13] you can why, irrespective of cost and duration,

[14] it can't be done?

[15] A: Well, may I ask you if I can use some

[16] of his information that he's provided as a basis

[17] for that?

[18] Q: You may.

[19] A: Let me give you an example. Is that

[20] appropriate to do that?

[21] Q: Go ahead.

A00104a

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 29 of 41

Natural Resources Defense Council, et al.  v.                Dennis Burton, Ph.D., pp. 1-128
Texaco Refining and Marketing, Inc.                          November 2, 1999

Page 17

[1] **A:** Let me see if I can find it. Let me
[2] look. There are several examples. To make my
[3] point best of all, while I'm looking through this
[4] thing, there are three phases involved with this
[5] process he's talking about; dissolved phase,
[6] particulate phase and colloidal phase. Colloidal
[7] phase is not well-understood at this time. Jay's
[8] an expert in that area.
[9]      But what I'm searching for, there are a
[10] number of variables that affect each phase. He
[11] states them in here. For example, this is the
[12] fate and transport process. This is Figure 4.
[13] **Q:** Give us the page.
[14] **A:** Page 28. There are probably ten
[15] processes that go on here simultaneously. Once
[16] you have a PAH discharge from the station itself,
[17] the following things can occur in the dissolution
[18] phase. Full chemical reactions can degrade
[19] compounds, hydrolysis reactions which can change
[20] a structure. You have advection and mixing in
[21] the water column itself. This is plume dilution

Page 18

[1] modeling, hydrodynamic effects. You have
[2] sorption of the PAH compounds onto particular
[3] material or sediment. Particle sizes range from
[4] very, very small to very, very large. So the
[5] sorption varies depending on the size of the
[6] particle. These things can be sedimented to the
[7] bed sediment. That's one part of the process.
[8]      That's the colloidal interaction that
[9] he talks about in here where you have the same
[10] sort of mechanisms going on. We have coagulation
[11] occurring, sorption. We have desorption off
[12] these particles. As a molecule sorbs on, it can
[13] also desorb off depending on what's going on.
[14] These are sedimented to the bed. Once it gets in
[15] the bed, you have processes like resuspension.
[16] You have transport from the bed out. You have
[17] critters in there that throw stuff up in the air,
[18] and it gets transported away as it goes in
[19] sediment.
[20]      All of these things are very, very
[21] complex. You don't just sit down and write an

Page 19

[1] equation to model these things. All of these
[2] things are going on simultaneously. And to
[3] propose to do this, a lot of things we don't even
[4] understand.
[5]      I think there are three theories being
[6] proposed right now for just the sorption/
[7] desorption model itself. And Means's one that
[8] has one of the three theories. So given these
[9] things, it's very, very difficult to do that.
[10] And it would take a number of Ph.D. theses and
[11] several years to do it. And that's not to even
[12] mention sedimentation rates occurring, storm
[13] events, hurricanes, resuspending things. So when
[14] you look at all of these variables, it becomes a
[15] very, very complex problem.
[16] **Q:** Now, I take it that was your reaction
[17] when you first read this report?
[18] **A:** Still is. I'm even more dubious now
[19] because I've read it two or three times.
[20] **Q:** And what if anything did you say to
[21] Motiva about your view that it was impossible to

Page 20

[1] carry this out?
[2] **A:** Tell me again what you just said. What
[3] did I say to them?
[4] **Q:** Yeah.
[5] **A:** In the meetings I said some of this is
[6] going to be very difficult to do. They said
[7] well, then tell us how to do it. And that's how
[8] we put our proposal together.
[9] **Q:** Did you say to them I can't do what's
[10] in the report in words or substance?
[11] **A:** I don't think I said that. I said
[12] well, we'll consider everything that we can do
[13] because that was our very first charge. You've
[14] got several things that Jay Means mentioned that
[15] the Court says you have to do them. We said let
[16] us take a look at them. When we looked at them,
[17] the more we realized they could not be done in a
[18] reasonable time period and at a reasonable cost.
[19] We said hey, we've got to do something to deliver
[20] the question directly.
[21] **Q:** Did you sit down and figure out, if you

A00104b

Natural Resources Defense Council, et al. v.
Texaco Refining and Marketing, Inc.

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Page 49

[1] A: I'm an ecotoxicologist. He's more of a
[2] field biologist type. I'm more an
[3] ecotoxicological, toxicity, toxicological
[4] mechanisms and these sorts of things and some of
[5] the modeling stuff.
[6] Q: Do you think that the homogenizing of
[7] the samples for analysis that you have in your
[8] Scope of Work is good scientific practice?
[9] A: Yes.
[10] Q: Could you tell me why?
[11] A: Let me say that we have a number of
[12] programs that we're doing at Chesapeake Bay. I'm
[13] doing work at Aberdeen Proving Ground. Most of
[14] the time we do this usually for cost. You can
[15] get a very good average feeling for what's going
[16] on when you homogenize your replicates, and it
[17] works out. On a limited budget, then it's better
[18] to do each sample by itself. But the
[19] homogenization will not bias the data to any
[20] significant degree. We've done it time and time
[21] again, and it works out on the average.

Page 50

[1] Q: Will the toxicity studies you perform
[2] determine bioavailability?
[3] A: The studies being done at Old Dominion
[4] University for us?
[5] Q: As part of your overall study that
[6] you're overseeing, yeah.
[7] A: Yes, they will.
[8] Q: Can you explain how that works?
[9] A: How bioavailability works?
[10] Q: No. Explain how your studies are going
[11] to determine bioavailability. By your, I'm not
[12] distinguishing between you and Old Dominion.
[13] A: If you see an impact or toxicity or
[14] reduction in growth, one may assume that the
[15] compounds are bioavailable and causing some
[16] toxicological response. It's a cause and effect
[17] thing generally speaking.
[18] Q: How do you know, when you do it that
[19] way, that what's causing the effect are the
[20] contaminants that could be attributed to the
[21] refinery?

Page 51

[1] A: You don't always know that. Could be
[2] due to other things as well in the system.
[3] Q: And is your study going to tease out
[4] one from the other or is it going to make an
[5] assumption?
[6] A: We're going to look at the various
[7] compounds, PCBs, metals and what have you, in the
[8] sediments, yes, as part of it. We have
[9] toxicological benchmarks from NOAA and EPA that
[10] tell us at what levels these things are toxic,
[11] singular and in combination with each other. So
[12] it's not like we're doing this thing blind. We
[13] know that metals may do this, and PCBs may do
[14] that, and certain PAHs may cause this effect. So
[15] yes, that's established. So we look at these
[16] benchmarks.
[17] Q: Now, what did Means propose be done in
[18] terms of bioavailability?
[19] A: He proposed you look at the mechanism
[20] of bioavailability. That's neat science, but a
[21] many number of things factor into this

Page 52

[1] bioavailability.
[2] Q: That's where you have a lot of
[3] variables?
[4] A: That's correct.
[5] Q: I'm trying to get a sense of what you
[6] think of his proposal.
[7] Do you think it's kind of a spiffy
[8] proposal, but it's a little on the impractical
[9] side, or do you think he's a fruitcake for
[10] proposing it?
[11] A: I think what he's proposing is
[12] interesting academically, and some of the
[13] theories are very interesting, and we'd love to
[14] have the answers to that, but to propose it and
[15] say it's up to Texaco to go out and figure how to
[16] do it I think is asking a bit much.
[17] Q: You were talking about the fate and
[18] transport in terms of you can do it or you can't
[19] do it and duration and cost. I mean there were
[20] different factors there, and I want to just focus
[21] your attention on bioavailability.

A00105

Page 53

[1] ...e the bioavailability studies that
[2] ...is is proposing things, irrespective of cost
[3] and duration of the study, that you can do?
[4] **A:** Oh, yes, we can do some of those right
[5] now. Sure. There are other factors that affect
[6] this that we don't have answers to yet.
[7] **Q:** But some of the work that he's
[8] proposing you can do?
[9] **A:** Sure.
[10] **Q:** Now, are you doing that? In other
[11] words, the parts of his bioavailability approach
[12] that are possible to do, are you doing those
[13] things?
[14] **A:** Not the theoretical side, no.
[15] **Q:** And as best you can, tell me what he's
[16] proposing that you're not doing that is in this
[17] category. He's proposing it, it can be done, and
[18] you're not doing it.
[19] **A:** Parts of it can be done.
[20] **Q:** Okay.
[21] Let's make that real clear.

Page 54

[1] **Q:** I amend the question to reflect that.
[2] I appreciate the clarification. But I'm trying
[3] to zero in now on what parts of the
[4] bioavailability work he proposes that you're not
[5] doing.
[6] **A:** I think Jay is talking about
[7] bioavailability from a toxicological standpoint.
[8] Is the PAH toxic to the critter? And it may be
[9] toxic if it's bioavailable. If it's not
[10] bioavailable, it will not be toxic.
[11] **Q:** And is it your view that given your
[12] approach, the Means bioavailability
[13] recommendations or studies are simply
[14] unnecessary?
[15] **A:** Not at all. We will answer the
[16] bioavailability question by looking at the
[17] response of the benthic communities that are
[18] receiving these contaminants as they move into
[19] ...ystem and are sedimented to the biota.
[20] **Q:** Are you going to look at routes of
[21] exposure or just the fact of the presence of a

Page 55

[1] contaminant in the —
[2] **A:** We'll look at the response of the
[3] community and the toxicological responses of
[4] animals. We don't perceive to understand the
[5] sorption/desorption kinetics — Jay doesn't know
[6] all of those either — but we can tell you if
[7] there's a problem there. If there's not a
[8] problem, it's probably not bioavailable. And
[9] it's not bioavailable when it's sorbed onto a
[10] particle which is sedimented out.
[11] **Q:** Let me try to get you to help me with
[12] something on this because there's something that
[13] I don't understand that I want to understand, and
[14] we'll ask Dr. Means and Dr. Livingston similar
[15] questions. Or Mr. Allen will.
[16] As I understand it, he's recommending a
[17] whole bunch of work — let's just take
[18] bioavailability — a whole bunch of work in his
[19] report to determine or to define
[20] bioavailability.
[21] Am I right so far?

Page 56

[1] **A:** Correct.
[2] **Q:** Which he views as critical or very
[3] important to his study approach; is that right?
[4] **A:** Yes.
[5] **Q:** You're not taking that approach?
[6] **A:** Correct.
[7] **Q:** You're taking a different approach
[8] which you believe will answer the question about
[9] impact?
[10] **A:** Correct.
[11] **Q:** Now, what I want you to try to help me
[12] with — I'm not asking you to advocate one point
[13] of view or another. I'm asking you to just
[14] explain, as an expert, as best you can, why would
[15] a reasonable scientist pursue his approach? In
[16] other words, do you see any benefit in his
[17] approach in terms of generating information or
[18] analysis that would assist in, give greater
[19] confidence in, the data that emerge from those
[20] studies?
[21] **A:** What Dr. Means has proposed is pretty

A00106

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Natural Resources Defense Council, et al. v.
Texaco Refining and Marketing, Inc.

Page 61

[1]   : why that's better than doing just Means or

[2] just what you're doing.

[3]   **A:** If you did just Means, you would still

[4] have to go out in the field, get wet and look at

[5] the critters. You have to verify it.

[6]   **Q:** Understood.

[7]   **A:** So we're going out in the field now.

[8] We don't know all the mechanisms going on, but

[9] our field sampling program will tell us whether

[10] or not there's an impact from that refinery. So

[11] we're short-circuiting a whole lot of that to get

[12] an answer in a reasonable period of time.

[13]   **Q:** Is there a reason other than duration

[14] and cost why you're short-circuiting?

[15]   **A:** Yeah. There are kinetic mechanisms

[16] that are theoretical that we don't understand

[17] yet. All of those will have to be explored.

[18] These take time. Like I said, we don't have the

[19] luxury or the years to do all of these things.

[20] This could take me 30 years to do that.

[21]   **Q:** But you know what? You're jumping

Page 62

[1] ahead. I'm going to ask you that. And whatever

[2] your answer is it is. That's what I want to

[3] know. That's why you're here.

[4]   I asked you whether there was a reason

[5] other than duration and other than cost why you

[6] would short-circuit either of the approaches, in

[7] other words, why you wouldn't combine them.

[8]   **A:** A lot of these things are done on a

[9] clean benchtop. The Delaware River is a very

[10] dirty river, a lot of particulates and a lot of

[11] these things. It's very different out in that

[12] field where tidal exchange is going on, freshet

[13] effects, fresh water coming down in the spring,

[14] hurricanes, ships, crews turning the sea up. A

[15] lot of things that are going on in that river

[16] would take an enormous amount of time to model in

[17] a laboratory. Most of the things that Means does

[18] are usually in the laboratory. The theoretical

[19]   e is done in a laboratory with a well-defined

[20] system. You may bring sediment from a site, but

[21] you characterize it, and you study it. And I can

Page 63

[1] find several different situations out there which

[2] are all different, sanded horizon, sediment

[3] horizon, what have you. So you have all of these

[4] going on, which makes it a very difficult thing

[5] to do.

[6]   **Q:** As a scientist, understanding that it's

[7] difficult to do, putting aside duration and cost,

[8] is it a useful thing to do, what Means is

[9] proposing?

[10]   **A:** Of course.

[11]   **Q:** Now just tell me why.

[12] What's useful about it?

[13]   **A:** We always like to understand the

[14] theory. We'd like to know how the cosmos is

[15] formed, but we don't yet. We'd like to know

[16] whether the Big Bang is true or not. We always

[17] would like to know the underlying mechanism for

[18] something.

[19]   **Q:** If you were to do the Means proposal on

[20] fate and transport and bioavailability — and I

[21] understand that at least with respect to fate and

Page 64

[1] transport, you think there might be problems even

[2] trying to do it, but let's assume you implemented

[3] his plan as written.

[4]   How long would it take you to do that?

[5]   **A:** Let me state this. I wouldn't look you

[6] in the eye and say I'm going to do the Means plan

[7] with a straight face because it can't be done.

[8] So I wouldn't propose to do it because my

[9] credibility would be on the line. Some of the

[10] things he wants to do in the fate and transport

[11] cannot be done. So I wouldn't promise it.

[12]   **Q:** Fair enough. There are some elements

[13] of the fate and transport studies he's

[14] recommending that can be done; is that right?

[15] I'm not suggesting that you think they should be

[16] done, but they can be done?

[17]   **A:** Some things can be done, yes.

[18]   **Q:** And some of his bioavailability

[19] proposals can be carried out; is that correct?

[20]   **A:** That is correct.

[21]   **Q:** Now, just assume that you took those

A00106a

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 33 of 41

Natural Resources Defense Council, et al. v.
Texaco Refining and Marketing, Inc.

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Page 89

price quote for the work.

[2]    What that refers to in the plume
[3] dilution model, which is the near-field modeling
[4] of the effluent itself, is you can do initial cut
[5] with a CORMIX3 model to get an estimate of how
[6] far this plume goes with the tides and various
[7] factors that affect this thing. And there's an
[8] ongoing study of sedimentation up there being
[9] done by another person. Because of the intake
[10] canal filling in, they have to drudge this thing
[11] out every year or two to do it.

[12]    My purpose of this is let's wait and
[13] see what they find, if they're going to do the
[14] dye study or not. There's no reason to pay for
[15] it twice. If the dye study has to be done, which
[16] is part of the field-verification process, this
[17] is anywhere from 60- to $120,000, but if it's
[18] being done right now or will be done as a result
[19] of an ongoing study, there's no reason for us to
[20] repeat it. That's what I mentioned.

[21]    Q: Do you know what the status of the dye

Page 90

[1] study is now?

[2]    A: They're not doing the dye study to my
[3] knowledge. You don't have to do a dye study to
[4] feel better. Right now we have a preliminary
[5] plume model for the near-field. And usually if
[6] you're trying to define a zone of initial
[7] dilution, ID, and there's a regulatory problem
[8] with this, you go ahead and do a dye study to
[9] more closely define it. In this case we're
[10] trying to get what is a magnitude where the
[11] spacial extent of this plume is. So we can
[12] verify it if we need to, but we don't know that
[13] we need to yet. We know we have stations in the
[14] maximum influence of this plume because there are
[15] only a 100 meters outside of the canal above and
[16] below the discharge. So rather than spend 120 K
[17] to do this, we think we probably know where that
[18] plume is, at least in the near-field now anyway,
[19] so we've held off on that part of it because we
[20] don't think it's necessary.

[21]    Q: What's written below your B.S. notation

Page 91

[1] on the right?

[2]    A: Need to counter.

[3]    Q: What do you mean by that?

[4]    A: The proposed application of these
[5] models as described in the proposal are likely to
[6] overestimate the dilution potential of the
[7] receiving stream. B.S.! If anything, it will
[8] underestimate it. This man doesn't know what
[9] he's talking about right here, and I can get Dr.
[10] DiLorenzo to testify to this. He's absolutely
[11] wrong about that.

[12]    Q: Is that the extent of what your need to
[13] counter and B.S. comments refer to?

[14]    A: Yeah. The second statement says
[15] underestimate accumulation of discharge-related
[16] contaminants in local sediments.

[17]    We're not proposing to predict where
[18] these particles are going to sediment. We never
[19] have proposed that. So I don't know that he can
[20] say they can be overestimated or underestimated
[21] because we never proposed to do that. I don't

Page 92

[1] know if we're going to do that or not because we
[2] haven't modeled that and don't plan to.

[3]    Overestimate the impact of contaminants
[4] (identified as being associated with the
[5] discharge) from external sources in the receiving
[6] environment, all of which will confound the final
[7] evaluation.

[8]    I don't know what he really means by
[9] that, to be honest. I think I probably did at
[10] one time.

[11]    Q: Let's go to the next page. The last
[12] sentence of the first paragraph, not the first
[13] complete paragraph, reads neither this task nor
[14] any of the following tasks directly address the
[15] fate and transport question.

[16]    And your note to the right is?

[17]    A: This is correct.

[18]    Q: And I take it that means you agree with
[19] that statement?

[20]    A: That's correct.

[21]    Q: Did you ever say, in words or

A00107

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 34 of 41

Dennis Burton, Ph.D., pp. 1-128
November 2, 1999

Natural Resources Defense Council, et al. v.
Texaco Refining and Marketing, Inc.

---

Page 93

[1] ...nce, to Motiva or any of its

[2] representatives, during this whole process from

[3] the first contact with Dr. Dorn to the present

[4] time, we're not going to do fate and transport

[5] even though it's in the Means report? What do we

[6] do?

[7]    A: I probably said something like this.

[8] It would be impossible to do fate and transport

[9] like Means proposes, hence we're going to

[10] directly do measurements. That's probably what I

[11] said. We didn't say we're not going to do it.

[12] We said we can't do it.

[13]    Q: To whom did you say that?

[14]    A: Probably anybody that was listening to

[15] me. Phil Dorn, anybody else that was listening

[16] to me.

[17]    Q: I'd like to know the names of the

[18] people who were listening to you.

[19]    A: I guess I said that to Phil Dorn, most

[20] likely. I'm certain I said it to counsel.

[21]    ...bly to Hank Lloyd at Motiva.

---

Page 94

[1]    Q: What did Dr. Dorn say to you?

[2]    A: Design the best thing you can to get an

[3] answer about impact.

[4]    Q: And is what Mr. Lloyd said consistent

[5] with that?

[6]    A: Yes.

[7]    Q: Further down on page 7 what is the

[8] comment on the right?

[9]    A: This model will cover this.

[10]    Q: And what are you referring to?

[11]    A: Among the variables that must be

[12] considered are: the area defined by plume

[13] modeling (with consideration of partitioning and

[14] sediment transport processes; the results of an

[15] initial field survey conducted to validate the

[16] model predictions.

[17]    I'm referring here to the hydrologic

[18] ...le of the receiving estuary interannual cycles

[19] ...ow, tidal ranges and extremes. These will

[20] be in the near- and far-field model.

[21]    Q: All of those factors that you just

---

Page 95

[1] mentioned?

[2]    A: The hydrologic cycle of the receiving

[3] estuary, i.e., interannual cycles of flow, tidal

[4] ranges and extremes, will be in the model as

[5] proposed.

[6]    Q: Will the other elements in that

[7] sentence be covered by the model?

[8]    A: No. Partitioning and sediment

[9] transport processes will not be covered in the

[10] model specifically.

[11]    Q: On page 8 please read the comment on

[12] the upper right.

[13]    A: Consider running dissolved and

[14] particulates in both influent and effluent. And

[15] there I'm referring to the influent coming to the

[16] plant — dilution water coming in — and the

[17] discharge coming out of the plant.

[18]    Q: Is that something you're now

[19] considering?

[20]    A: We could do that, yes.

[21]    Q: And has there been a decision made to

---

Page 96

[1] do it or not to do it?

[2]    A: Not yet.

[3]    Q: Page 9, please. There's a statement

[4] saying the pooling of sediment samples prior to

[5] analysis is inappropriate.

[6]    Do you see that?

[7]    A: Yes.

[8]    Q: And you say we agree?

[9]    A: I agree on pooling of sediment samples.

[10] A better way to do it, if you had plenty of money

[11] and plenty of time, is to do each individual

[12] replicate. That's the intent of that. What

[13] we're doing is not inappropriate because it's

[14] commonly done for many, many studies. In fact, I

[15] can't find one where they actually did all the

[16] replicates. I would love to do this one time in

[17] my life.

[18]    Q: If it's not inappropriate, then why did

[19] you write we agree?

[20]    A: I agree that it would be nice to do

[21] that.

A00108

Dennis Burton, Ph.D., pp. 117-128
November 2, 1999

Case 1:88-cv-00263-SLR    Document 305-3    Filed 07/18/2005    Page 35 of 41

Natural Resources Defense Council, et al.    v.
Texaco Refining and Marketing, Inc.

Page 117

[1]    Q: It says that you will issue a final

[2]    after receiving review comments.

[3]    Do you remember that in the Scope of

[4] Work?

[5]    A: Uh-huh.

[6]    Q: From whom?

[7]    A: From all interested parties. It's my

[8] understanding they're to be circulated to Motiva

[9] and all interested parties. Probably you'll see

[10] it. Means will see it as well. That typically

[11] happens when you write a report. Which Means

[12] will come back and say nah, nah. So we'll never

[13] get through writing it, but we know that now.

[14]    Q: Does West Hollow have a continuing role

[15] in the performance of the study?

[16]    A: Phil Dorn is still involved. Bert

[17] Molina is still involved. Their biggest

[18] involvement is just to get it off the ground and

[19] get it started to date.

[20]    Q: Is your study going to define

[21] b‑ availability?

Page 118

[1]    A: No.

[2]    Q: Is it going to predict bioavailability?

[3]    A: No. It will tell us if bioavailability

[4] has an impact on us or is not having an impact. It

[5] will tell us that. It will not provide a

[6] predicted regression equation to predict

[7] anything.

[8]    Q: Would you prefer to be sampling at more

[9] than ten sites?

[10]    A: Not necessarily. We think that's

[11] adequate to get out there and get started and

[12] take a first cut. We may have to adjust that

[13] after we analyze the data after the first year.

[14]    Q: Two documents that you testified to are

[15] Burton Exhibit 1, which is the Means November

[16] 1997 report, and Burton Exhibit 2, which is the

[17] Opinion and Order of the District Court. And as

[18] I recall, you said that Exhibit 2 essentially

[19]    ‑ed Exhibit 1 in terms of the discussion of

[20] the studies?

[21]    A: That is correct.

Page 119

[1]    Q: Now, what I'd like to ask you as a

[2] scientist, not as a consultant to any particular

[3] person at the moment, is if you were writing on a

[4] clean slate right now and you were given these

[5] two documents, Exhibits 1 and 2, the Means report

[6] and the Court's Opinion and Order, and you were

[7] told go out and implement these studies, would

[8] you do anything different from what's in your

[9] Scope of Work?

[10]    A: Probably not.

[11]    Q: You qualified the not with a probably.

[12] Could you explain that?

[13]    A: We would probably say let's do all five

[14] replicates rather than composites because it

[15] would take exceptions to, and we'd agree that you

[16] could look at those, so we'd say let's do all the

[17] replicates themselves now that we know there's

[18] comments coming back. We have wisdom of that

[19] now. We need to do them all. Another 50 K.

[20] Don't worry about it. Put that in there.

[21]    Q: That's one, the replicates.

Page 120

[1] Anything else?

[2]    A: At the first cut, probably no. And

[3] that's not absolutely. Like I said, the

[4] composite is going to give you pretty much a good

[5] time average in there. And I would still say we

[6] could go ahead and do what we're doing there,

[7] take a look at the data and then come back to the

[8] table and say we've got missing data here or hold

[9] here, we need to do this or that. But as a first

[10] cut I think what we have is adequate.

[11]    Q: I don't know whether you're just

[12] changing your testimony or what, so I'm going to

[13] try to ask you again because I don't understand

[14] the two answers you just gave.

[15]    A: All right.

[16]    Q: If you were given these documents and

[17] you were writing on a completely clean slate —

[18]    A: These two only.

[19]    Q: Right. 1 and 2, the Means report and

[20] Court Opinion.

[21]    —and you were told go out and

A00109

## In The Matter Of:

*Natural Resources Defense Council, et al.  v.*
*Texaco Refining and Marketing, Inc.*

---

*Lenwood W. Hall, Jr., pp. 1-183*
*November 2, 1999*

---

*Salomon Reporting Service, Inc.*
*Leadership in Litigation Innovation*
*1700 Court Square Building*
*200 East Lexington Street*
*Baltimore, MD  21202-3517*
*(410) 539-6760    FAX: (410) 539-8696*

Original File 17062HAL.V01, 183 Pages
Min-U-Script® File ID: 1627692310

**Word Index included with this Min-U-Script®**

A00110

Case 1:88-cv-00263-SLR   Document 305-3   Filed 07/18/2005   Page 37 of 41

Natural Resources Defense Council, et al.,   v.   Lenwood W. Hall, Jr., pp. 1-183
Texaco Refining and Marketing, Inc.                                    November 2, 1999

Page 1

[1]          IN THE UNITED STATES DISTRICT COURT

[2]          FOR THE DISTRICT OF DELAWARE

[3]

[4]   NATURAL RESOURCES DEFENSE     * Civil Actbn No.

[5]   COUNCIL, INC. and DELAWARE    *  88-263-SLR

[6]   AUWBON SOCIETY.

[7]       Plaintiffs

[8]   v.

[9]   TEXACO REFINING and          *

[10]  MARKETING. INC..

[11]      Defendant

[12]

[13]

[14]      Deposition of LENWOOD W. HALL, JR.,

[15]   taken on Tuesday, November 2, 1999. commencing at

[16]   9:00 a.m.,  at the University of Maryland Wye

[17]   Research and Education Center. Houghton Lab Lane,

[18]   Queenstown. Maryland 21658.

[19]

[20]

[21]   Reported By:   SHARON D. LIVINGSTON. CSR-RPR

Page 2

[1]  APPEARANCES:

[2]

[3]  On behalf of the Plaintiffs:

[4]        MITCHELL S. BERNARD, ESQUIRE

[5]        NANCY S. MARKS, ESQUIRE

[6]        Natural Resources Defense Council

[7]        40 West 20th Street

[8]        New York. New York 10011

[9]        212-727-4414 (Voice)

[10]       212-727-1773 (Fax)

[11]

[12]  On behalf of the Defendant:

[13]       RICHARD D. ALLEN. ESQUIRE

[14]       Morris, Nichols. Arsht & Tunnell

[15]       1201 North Market Street

[16]       Wilmington, Delaware 19801

[17]       302-658-9200 (Voice)

[18]       302-658-3989 (Fax)

[19]

[20]

[21]

Page 3

[1]          **REALTIME PROCEEDINGS:**

[2]  Whereupon,

[3]  LENWOOD W. HALL, JR.,

[4]  the witness herein, being first duly sworn to

[5]  testify the truth, the whole truth, and nothing

[6]  but the truth, was examined and testified as

[7]  follows:

[8]          **EXAMINATION BY MR. BERNARD:**

[9]      **Q:** Is it Mr. Hall?

[10]     **A:** Yes, sir.

[11]     **Q:** And what is your current employment?

[12]     **A:** I work here at the University of

[13]  Maryland Wye Research and Education Center. I am

[14]  a program manager in the area of aquatic

[15]  toxicology.

[16]     **Q:** And for how long have you been here at

[17]  Wye?

[18]     **A:** I've been working here since 1989.

[19]     **Q:** When were you first contacted with

[20]  regard to this matter?

[21]     **A:** It was approximately a year ago,

Page 4

[1]  October, November, 1998, somewhere in that time

[2]  frame.

[3]     **Q:** And with whom was your first contact?

[4]     **A:** The sequence of events is that a

[5]  telephone conversation took place between Phil

[6]  Dorn, who works for Motiva, called my colleague

[7]  Dennis Burton, who you'll depose later, and

[8]  informed him of this particular case in the

[9]  interest of having the University of Maryland

[10]  become involved with it. After Dennis received

[11]  this phone call, he came to my office, and

[12]  discussed it with me, and he asked me if I would

[13]  be interested in working with him on a project

[14]  simply because I had some expertise in some areas

[15]  that were required to do this study.

[16]     **Q:** So you first heard about it from Dr.

[17]  Burton?

[18]     **A:** Yes.

[19]     **Q:** Now, did you have any relationship with

[20]  Dr. Dorn prior to this project?

[21]     **A:** I knew who Dr. Dorn was because he's a

A00110a

Natural Resources Defense Council, et al.    v.
Texaco Refining and Marketing, Inc.

Lenwood W. Hall, Jr., pp. 1-183
November 2, 1999

---

Page 17

[1] background checks on different kinds of stressors
[2] in the system. I used different data sets that
[3] were generated by NOAA. I did a lot of
[4] background checking to make sure that I could put
[5] a good plan in place.
[6]    **Q:** Did you read any of the testimony from
[7] the April 1998 trial in the case?
[8]    **A:** I think that's the one I read. Yes, I
[9] believe I did.
[10]    **Q:** And do you remember which witnesses'
[11] testimony you reviewed?
[12]    **A:** I think I read the whole transcript.
[13] Was that the last trial that you had?
[14]    **Q:** Yes.
[15]    **A:** Yes.
[16]    **Q:** So Dr. Means testified. Do you
[17] remember reading his testimony? And Dr.
[18] Livingston testified.
[19]    **A:** Yes.
[20]    **Q:** Did you read the Court's opinion dated
September 1, 1998?

Page 18

[1]    **A:** Yes, I guess. Was that part of the
[2] document?
[3]    **Q:** What document?
[4]    **A:** The document that you're referring to
[5] with the transcript.
[6]    **Q:** No.
[7]    **A:** I'm a little unclear. I'm not sure
[8] that I read the final verdict. Is that what
[9] you're talking about?
[10]    **Q:** Let me show it to you.
[11]    **A:** Let's be clear because I'm not quite
[12] sure what you're talking about.
[13]    **MR. BERNARD:** Let's just mark it as
[14] Hall Exhibit 2.
[15]    (Whereupon, Hall Deposition Exhibit
[16] Number 2 was marked for identification.)
[17]    **BY MR. BERNARD:**
[18]    **Q:** Let me just represent to you, Mr. Hall,
[19] that this is a judicial decision by Judge
[20] Longobardi dated September 1 of 1998 in this
[21] case. And I just want you to take a look at that

Page 19

[1] and tell me whether you recognize it.
[2]    **A:** Actually I don't think I've read this
[3] document.
[4]    **Q:** Do you remember ever having seen this
[5] before this morning?
[6]    **A:** I've seen a transcript of that trial.
[7] I think we're talking about the same one in 1998,
[8] but this is not what I saw. I mean what I saw
[9] had questions that were being asked to Entrix,
[10] and I don't think this is the same thing I saw.
[11]    **Q:** Let me just try to be helpful. A trial
[12] transcript, such as the one the reporter is
[13] making now, is questions and answers between
[14] lawyers and witnesses. This is actually a
[15] decision, an opinion, which is a narrative
[16] written by a judge, which normally follows a
[17] trial. So it's really an entirely different
[18] document.
[19]    I'm just asking whether, either in this
[20] form of Exhibit 2 or in some other form, you
[21] recall reading the judicial decision that

Page 20

[1] discusses the monitoring program.
[2]    **A:** I read what was the transcript, I
[3] think, of the trial, but I don't believe I've
[4] looked at this in the final opinion and that sort
[5] of thing.
[6]    **Q:** Do you remember ever having been
[7] provided a copy of this by Motiva or anybody else
[8] prior to this morning?
[9]    **A:** Of that particular document, no.
[10]    **Q:** Did anyone other than Dr. Dorn talk
[11] with you about what Motiva needed to be done in
[12] the studies that you eventually undertook? And
[13] this is again the period between your first
[14] contact with Motiva and the preparation of the
[15] initial Scope of Work in February or so of this
[16] year.
[17]    **A:** Well, we had discussions with Hank
[18] Lloyd, you know, about — basically we were
[19] asking him questions about — or making requests
[20] for various types of information to allow us to
[21] put the Scope of Work together, but I mean, we

A00111

---

**Natural Resources Defense Council, et al. v.**
**Texaco Refining and Marketing, Inc.**

**Lenwood W. Hall, Jr., pp. 1-183**
**November 2, 1999**

---

Page 33

[1] report, and I have scribbled some handwritten

[2] notes on various parts of it, but that's pretty

[3] much the only level of detail I went into.

[4]    **Q:** Now, let me just be clear. What I'm

[5] referring to is the Means November 1997 report to

[6] the Court. I did see your handwritten scribbles

[7] on the Means August 1999 Review of your Scope of

[8] Work.

[9]    **A:** Correct.

[10]    **Q:** Is that what you were referring to?

[11]    **A:** No. I was referring to something

[12] different.

[13]    **MR. BERNARD:** Is this what you said

[14] would be available today, Rick?

[15]    **MR. ALLEN:** It is, Mitchell.

[16]    **THE WITNESS:** Yes, that's available.

[17]    **MR. BERNARD:** Why don't we mark this as

[18] Hall Exhibit 3, and it is Dr. Means' report of

[19] November 3, 1997 with some handwritten notes.

[20]    (Whereupon, Hall Deposition Exhibit

      Number 3 was marked for identification.)

---

Page 34

[1]            **BY MR. BERNARD:**

[2]    **Q:** Mr. Hall, can you tell me what Exhibit

[3] 3 is?

[4]    **A:** This is the 1997 Means report prepared

[5] for the Court.

[6]    **Q:** And there are handwritten notes.

[7] Do you recognize them?

[8]    **A:** Yes.

[9]    **Q:** Are they your own?

[10]    **A:** Yes, they are.

[11]    **Q:** And when, as best you recall, did you

[12] make these marginal notes?

[13]    **A:** Okay. It was probably the November,

[14] December, January time frame, somewhere in

[15] there. I don't remember the specific day.

[16]    **Q:** And that would be November or December

[17] of 1998 and January of 1999?

[18]    **A:** Yeah, somewhere in that period.

[19]    **Q:** I may question you on this later, but I

[20] think if we take a brief break, I'll just look at

[21] the notes.

---

Page 35

[1]    Did you provide a copy of the marked-up

[2] Means report to anyone at Motiva at any time,

[3] that is, before you gave it to Mr. Allen

[4] recently?

[5]    **A:** I don't believe I did.

[6]    **Q:** Do you remember having a discussion

[7] with Dr. Dorn or anyone else from Motiva during

[8] the preparation of the Scope of Work concerning

[9] your views of the Means report?

[10]    **A:** Yes, I'm sure that we did have some

[11] discussions about some of the various parts of

[12] this particular report.

[13]    **Q:** Now, do you recall telling Dr. Dorn or

[14] anyone else from Motiva that there was anything

[15] in the Means 1997 report that you viewed as wrong

[16] or misplaced in terms of its scientific basis?

[17]    **A:** I think the appropriate word would be

[18] feasible to conduct in a realistic realm.

[19]    **Q:** And was there a category of effort that

[20] is articulated in the Means 1997 report that you

[21] viewed when you read it as infeasible?

---

Page 36

[1]    **A:** Yes.

[2]    **Q:** And what precisely is in the Means

[3] report that you viewed as not feasible?

[4]    **A:** Some of the work that he wants to do

[5] with sedimentation and some of the fate and

[6] transport issues with PAHs.

[7]    **Q:** Anything else?

[8]    **A:** The way he wants to address

[9] bioavailability. We will address

[10] bioavailability, but in a different way than

[11] Means portrayed it in his report.

[12]    **Q:** Anything else?

[13]    **A:** Those are the major issues. The coring

[14] issue is not something that's part of our Scope

[15] of Work, so someone else needs to address that.

[16]    **Q:** That's a Skidaway issue?

[17]    **A:** That's a Skidaway issue.

[18]    **Q:** But you also have some question about

[19] whether his coring is feasible; is that right?

[20]    **A:** Yes, I do.

[21]    **Q:** What about sedimentation in the Means

A00112

Case 1:88-cv-00263-SLR   Document 305-3   Filed 07/18/2005   Page 40 of 41

enwood W. Hall, Jr., pp. 1-183   Natural Resources Defense Council, et al.   v.
Jovember 2, 1999   Texaco Refining and Marketing, Inc.

Page 37

[1] r    · do you view as not being feasible?

[2]  A. Well, to try to develop a sedimentation

[3] model for this part of the river would be

[4] extremely difficult because of all the different

[5] factors that are involved in doing that. I feel

[6] like that in lieu of trying to do any kind of a

[7] sedimentation-type model, I'd much rather measure

[8] effects directly in the environment by using

[9] toxicity tests by collecting sediment at various

[10] stations in determining the toxicity of the

[11] sediment to representative organisms, in

[12] coordination with looking at benthic communities,

[13] along with the exposure assessment of the various

[14] chemicals in the sediment. I think there's a

[15] much more direct way to do that than to model it.

[16]   Q: What about the fate and transport of

[17] PAHs do you find not feasible?

[18]   A: That fits in sort of the same realm.

[19] It's a very complicated issue because of the

[20] hydrodynamics in that part of the river, and I

[21]   at, there again, it was a much better

Page 38

[1] course of action to measure effects directly than

[2] to try to do any kind of a modeling approach.

[3]   Q: What about bioavailability?

[4]   A: Bioavailability is an issue that

[5] certainly comes up with different types of

[6] toxicity testing. I felt that the best way to

[7] measure bioavailability is not by measuring

[8] concentrations in tissues of organisms because

[9] that does not always relate to an effect. I felt

[10] it was better to, there again, measure direct

[11] effects on our test organisms in our sediment

[12] toxicity tests and look at the status of the

[13] benthic communities.

[14]   Q: Now, did you present these issues —

[15] that is, what you viewed not to be feasible in

[16] the Means report — to Motiva prior to preparing

[17] your Scope of Work?

[18]   A: We discussed some of the issues, but

[19]   rily we just went ahead with sort of the

[20] spirit of the report and revised it in a way that

[21] we thought was feasible.

Page 39

[1]   Q: And was there any resistance from

[2] Motiva to your following that approach?

[3]   A: They looked at it very hard, obviously

[4] because they wanted to be sure that we were at

[5] least following the guidelines that the Court set

[6] in place with this plan, but they gave us the

[7] flexibility as scientists to do what we thought

[8] was the best approach, and that's what we did.

[9]   Q: Now, do you know Dr. Robert J.

[10] Livingston?

[11]   A: I have talked with him on the phone at

[12] least three times prior to this Motiva project.

[13] I did not personally know Dr. Livingston, but I

[14] knew of him.

[15]   Q: Let me just understand. You had

[16] contact with him prior to this whole episode?

[17]   A: Which episode?

[18]   Q: This project.

[19]   A: No, I have not had any contact with

[20] him.

[21]   Q: So the conversations you were referring

Page 40

[1] to were conversations you had as part of this

[2] cooperative process between the plaintiffs and

[3] the defendant?

[4]   A: Correct.

[5]   Q: Prior to that you had no contact with

[6] him?

[7]   A: No, I don't think I've ever — I

[8] wouldn't recognize him if I saw him in a crowd.

[9]   Q: But you knew of him?

[10]   A: I knew of him.

[11]   Q: Did you know of his reputation in the

[12] scientific community?

[13]   A: I knew that he's been working in

[14] Florida for a number of years. He's done a lot

[15] of very solid science in his area in Florida.

[16] He's a benthic ecologist, systems-ecologist-type

[17] person, as I understand it.

[18]   Q: Now, there came a time when he wrote

[19] some comments on your Scope of Work; is that

[20] right?

[21]   A: The initial Scope of Work.

A00113

Page 85

[1]  Q. By how much?

[2]      Probably a factor of 4- or 5- from the

[3] initial cost of the sample.

[4]  Q: But the study now costs roughly

[5] $400,000 without your consulting fees; is that

[6] correct?

[7]  A: Correct.

[8]  Q: What I would like to know, as best you

[9] can tell me, is if you eliminated the

[10] homogenization of the analysis, what increment

[11] over $400,000 would the study then cost?

[12]  A: Are you asking me what would it cost to

[13] do the complete set of chemistry on each

[14] replicate at each of the sites, which would

[15] actually be 50 samples as opposed to 10 samples

[16] in a year? Is that what you're asking me? I'm

[17] not sure I'm clear.

[18]  Q: I don't know whether that's what I'm

[19] asking you, and I'll need your help. I'll tell

[20] you what I'm asking you as clearly as I can say

[21] it    we'll just work it out so we can

Page 86

[1] understand each other.

[2]  A: All right.

[3]  Q: I'm looking for the difference between

[4] the cost of what you've proposed, which involves

[5] this homogenized analysis, and the cost of not

[6] homogenizing the analysis, which is what

[7] Livingston and Means, as I understand them, are

[8] saying should be done.

[9]      Do you follow me?

[10]  A: Yes.

[11]  Q: Now, I don't know the numbers. I'll

[12] accept your numbers on whether that is the

[13] difference between 5 and 25 or 10 and 50. You've

[14] identified budget constraint as a reason for

[15] doing it that way. I recognize that you've also

[16] attempted to justify it by reference to the

[17] Chesapeake studies. I'm not giving that short

[18] shrift, but I'm focusing now on the budget

[19] constraint. And I want to know what the budget

[20] constraint is, in other words, what it means in

[21] terms of budget to do it, not the way you've

Page 87

[1] proposed, but the alternative way that Livingston

[2] and Means have proposed.

[3]      Are you with me on that?

[4]  A: I think I am. On an annual basis

[5] approximately how much more would it cost to do

[6] all the replicates as opposed to just doing the

[7] homogenized?

[8]  Q: Precisely.

[9]  A: I'm just going to give you an

[10] approximation.

[11]  Q: Fine.

[12]  A: Somewhere in the hundred thousand

[13] dollar range per year, I think, is what we would

[14] estimate.

[15]  Q: So do you think that you would estimate

[16] that it would add roughly 50 percent of the cost

[17] of the study, in other words, over two years it

[18] might cost $200,000 more, which would make it a

[19] $600,000 study as opposed to $400,000?

[20]  A: That's approximately correct.

[21]  Q: Okay. Did you originally propose doing

Page 88

[1] this or did you propose, either in your initial

[2] draft Scope of Work or in initial talks with Dorn

[3] or others at Motiva, doing it a different way?

[4] In other words, did this idea of homogenizing the

[5] samples for analysis come from you in the first

[6] instance?

[7]  A: It came from me in the first instance

[8] because that, as I said, was a precedent that

[9] we've used for the EPA and Chesapeake Bay program

[10] office for many years in Chesapeake Bay.

[11]  Q: Let's turn to bioavailability. I just

[12] need some help from you here. You propose a

[13] number of toxicity studies, right?

[14]  A: Correct.

[15]  Q: How are you going to determine

[16] bioavailability in your program?

[17]  A: Well, what we're going to do is —

[18]  Q: Excuse me one second. I should

[19] rephrase that.

[20]      How, if you are going to determine

[21] bioavailability, are you going to determine it?

A00114