Case 1:88-cv-00263-SLR    Document 305-4    Filed 07/18/2005    Page 1 of 40
Natural Resources Defense Council, et al.  v.                    Lenwood W. Hall, Jr., pp. 1-183
Texaco Refining and Marketing, Inc.                              November 2, 1999

Page 89

[1] I didn't mean to presume that you're going to do
[2] it because I don't know, frankly, whether you are
[3] or not. That's what I want to ask you. Okay?
[4] So what are you doing in relation to
[5] bioavailability?
[6]    A: What we're doing is, as I mentioned to
[7] you before, we're measuring a complete set or
[8] sweep of contaminants at all of our ten study
[9] sites including PAHs, PCBs, metals. You've read
[10] all of that. You know the chemical component.
[11]    We're also doing concurrent toxicity
[12] tests at these sites along with the assessment of
[13] benthic communities.
[14]    The issue of bioavailability means what
[15] constituent of a particular contaminant is
[16] available to an organism. The reason you care
[17] about that is because you want to know if the
[18] organism is being exposed to that contaminant and
[19] if in fact it's causing an effect. So what we're
[20] going to do to deal with bioavailability is to
     directly measure whether we see an impact on the

Page 90

[1] organisms that we test from the toxicity work
[2] that we're doing with the amphipod and the
[3] polychaete. So what this does is it gives you a
[4] direct way to know if you've seen a response
[5] based on the existence of certain contaminants in
[6] the media, which in this case is sediment.
[7]    Q: And in your view does that cover the
[8] bioavailability question?
[9]    A: Yes.
[10]    Q: Does it depart from what you understand
[11] Means to be proposing in his report by way of
[12] bioavailability studies?
[13]    A: Somewhat.
[14]    Q: Please tell me how.
[15]    A: Well, he is proposing that you need to
[16] measure a concentration of the contaminants in
[17] the tissue of organisms perhaps, if you set
[18] organisms out in the field, to look at
     concentrations over time.
[20]    The problem that I have with that is
[21] just because you see a concentration of a

Page 91

[1] contaminant in a tissue does not necessarily
[2] relate to an effect on that organism. This is
[3] certainly a well-proven science. So you really
[4] need to measure the actual response of the
[5] organism; did it die, did it have reduced growth,
[6] that sort of thing.
[7]    Q: Do you know Dr. Means?
[8]    A: I don't know him personally. I know
[9] who he is.
[10]    Q: And did you know who he was prior to
[11] this episode?
[12]    A: Yes.
[13]    Q: How did you know who he was?
[14]    A: He used to work at the University of
[15] Maryland Chesapeake Biological Lab.
[16]    Q: And let's take the period of time prior
[17] to August 26th, 1999, which happens to be the
[18] date of his written Review of your Scope of
[19] Work.
[20]    Did you have an opinion of him as a
[21] scientist prior to that date?

Page 92

[1]    A: I knew that Dr. Means is a scientist
[2] that's worked in the area — is an environmental
[3] chemist, and he's worked in the area of PAH
[4] chemistry. He's one of many that do that kind of
[5] work.
[6]    Q: Did you have an opinion about the
[7] quality of his scientific work prior to August
[8] 26th?
[9]    A: I relied on chemists that I knew
[10] personally to provide guidance for me on the
[11] capabilities of PAH chemists. I called a
[12] colleague of mine at VIOMS, Virginia Institute of
[13] Marine Science, and I asked him just to list some
[14] names of people that he would consider to be good
[15] PAH chemists, and Means' name was not on that
[16] particular list.
[17]    Q: Other than what you just said, what do
[18] you know of his reputation in the scientific
[19] community, if anything?
[20]    A: Can you be more specific? I'm not a
[21] chemist, so you're asking me questions about a

A00115

Case 1:88-cv-00263-SLR    Document 305-4    Filed 07/18/2005    Page 2 of 40

enwood W. Hall, Jr., pp. 1-183                          Natural Resources Defense Council, et al.    v.
November 2, 1999                                              Texaco Refining and Marketing, Inc.

Page 117

[1] f      rily impacted by PAHs simply because PAHs
[2] a     , or the most part, a sediment issue. So our
[3] goal is to look at the organisms that would be
[4] most effective.
[5]    **Q:** Do you think there's any value in
[6] looking at, say, bivalves?
[7]    **A:** That's just another test species, and I
[8] think that the two that we've selected, we have
[9] very strong rationale for doing it.
[10]    **Q:** Would you say there is no value to
[11] doing the work on bivalves that Dr. Means is
[12] suggesting or there's greater than no value?
[13]    **A:** I wouldn't say there is no value.
[14] There certainly could be value in doing other
[15] species.
[16]    **Q:** Well, he's suggesting something quite
[17] concrete. He's not just saying go out and test
[18] other species, is he?
[19]    **A:** He's using bivalves as an example.
[20]    **Q:** Right. And he's saying that you ought
[21] f      sampling higher up the food chain, you

Page 118

[1] ought to be testing organisms higher up the food
[2] chain, right?
[3]    **A:** That's what he's alluding to.
[4]    **Q:** Now, is that, from your point of view,
[5] a cost constraint issue, why you're not doing
[6] that, or is there some other reason you're not
[7] doing that?
[8]    **A:** That was partially it. Obviously we
[9] could do many, many species and many, many kinds
[10] of tests. We prioritized the tests that we
[11] thought were important for the goals of this
[12] study, and that's why we selected the polychaete
[13] and the amphipod.
[14]    **Q:** Dr. Means calls for a rigorous
[15] demonstration of a connection between sediment
[16] concentrations and tissue concentrations in terms
[17] of the toxicity work.
[18]    Do you remember that?
[19]    Uh-huh.
[20]    **Q:** Are you going to do that?
[21]    **A:** I don't feel it's necessary. As I said

Page 119

[1] before, just because you have a concentration of
[2] a contaminant in tissue does not relate to an
[3] effect.
[4]    **Q:** So you just think that's unnecessary?
[5]    **A:** Correct.
[6]    **Q:** Toward the end of Dr. Means' comments
[7] he says that —
[8]    **A:** Could you give me the page, please.
[9]    **Q:** I'm not sure you'll need it, but it's
[10] on page 13. There's a section on summary
[11] comments. I'm calling them summary comments.
[12] It's Section 3 of his review.
[13]    Do you see that? It begins on the top
[14] of page 13.
[15]    **A:** Yes.
[16]    **Q:** One of the things he says is that the
[17] study fails to investigate the fate and transport
[18] issues outlined — I assume in his report — as
[19] critical components of an exposure assessment at
[20] the site. Now, I just want you to take that
[21] statement that the Scope of Work fails to

Page 120

[1] investigate the fate and transport issues
[2] outlined in his report.
[3]    Is that a true statement?
[4]    **A:** We address the fate and transport
[5] issues by directly measuring PAHs in sediment and
[6] by combining that with sediment toxicity and
[7] benthic community assessments.
[8]    **Q:** Does that, in your view, measure fate
[9] and transport or does it characterize impacts by
[10] a different study route?
[11]    **A:** The latter.
[12]    **Q:** It characterizes impacts by a different
[13] study route?
[14]    **A:** Correct. It doesn't explain the
[15] mechanism, which is really not critical here. We
[16] want to know if we have an effect or not.
[17]    **Q:** I want to just, for the moment — and
[18] then we'll pin this down and move on — put aside
[19] your explanation, which I think you've
[20] articulated in response to my questions.
[21]    But do you agree with his statement

A00116

Case 1:88-cv-00263-SLR    Document 305-4    Filed 07/18/2005    Page 3 of 40

Natural Resources Defense Council, et al. v.
Texaco Refining and Marketing, Inc.

Lenwood W. Hall, Jr., pp. 1-183
November 2, 1999

Page 121

[1] that the Scope of Work fails to investigate the
[2] fate and transport issues outlined in his
[3] November 1997 report?

[4]    A: It doesn't do it in the way he's
[5] suggesting that it be done.

[6]    Q: Well, now you're confusing me. I
[7] understand you to have testified that you are
[8] pursuing a course of study that, in your view,
[9] will get you to the end point that Motiva has in
[10] mind.

[11]    Am I right so far?

[12]    A: To address the goals of the study.

[13]    Q: Right. He proposed in his report a set
[14] of fate and transport studies; is that correct?

[15]    A: Yes.

[16]    Q: And we've discussed some of the
[17] elements of that here this morning; is that
[18] correct?

[19]    A: Correct.

[20]    Q: And part of that is the three-phase
[21] movement of contaminants; is that right?

Page 122

[1]    A: Correct.

[2]    Q: Now, my understanding from your
[3] testimony — and let's just get this clear — is
[4] that you have decided not to go that route, that
[5] is, not to study fate and transport in the way he
[6] outlined it, but rather, to take a different
[7] approach to accomplish what you view as the
[8] objective of this study; is that correct?

[9]    A: Correct.

[10]    Q: So now I'm asking you whether his
[11] statement is correct that your study fails to
[12] investigate the fate and transport issues that
[13] Dr. Means outlined.

[14]    A: As he outlined them, yes.

[15]    Q: That is correct?

[16]    A: Yes.

[17]    Q: Now, he says — this is further down on
[18] page 13 — that the lack of a toxic response
[19] can't be used to infer the absence of impact
[20] without a defined understanding of
[21] bioavailability.

Page 123

[1]    Q: Is that your understanding of what he
[2] says?

[3]    A: That's my understanding of what he's
[4] saying, yes.

[5]    Q: Now, putting to one side whether you
[6] need that defined understanding or not — we'll
[7] get to that in a moment — will there be a
[8] defined understanding of bioavailability from
[9] your study?

[10]    A: The tests that we will be conducting
[11] with the two species will enable us to determine
[12] if the sediment is toxic to the organisms that
[13] we're testing. That's the major issue that we're
[14] trying to deal with here. So our study will
[15] allow us to determine if that occurs.

[16]    Q: What is bioavailability?

[17]    A: Bioavailability really means, in the
[18] case of PAHs, are PAHs available to the
[19] organism? Can they take them up? Will they
[20] cause mortality?

[21]    Q: Is your study going to address that

Page 124

[1] issue?

[2]    A: Our study is going to be able to look
[3] at the response of a species — either reduced
[4] survival, growth, whatever — and tie that in
[5] with the existence of the PAHs in the media from
[6] which they were tested, along with these other
[7] factors. There's a lot of other factors that
[8] could influence toxicity.

[9]    Q: And is it your view that if you do
[10] those two generic things, recognizing that there
[11] are multiple tasks that may be embedded in each
[12] of them, but if you look at, through toxicity
[13] testing, what happens to the organisms and you
[14] look at what's in the sediments, that you do not
[15] need to define bioavailability?

[16]    A: You can use those two sets of
[17] information to infer if there may be an effect
[18] caused by, in this case PAHs, or other
[19] contaminants.

[20]    Q: You've reviewed Dr. Livingston's
[21] comments on the Scope of Work, right?

A00117

Case 1:88-cv-00263-SLR    Document 305-4    Filed 07/18/2005    Page 4 of 40

.enwood W. Hall, Jr., pp. 1-183                    Natural Resources Defense Council, et al.   v.
November 2, 1999                                              Texaco Refining and Marketing, Inc.

Page 141

[1] And there's been no decision, as far as
[2] know, to incorporated either of the other two
[3] pieces?

[4] A: As of now, no final decision has been
[5] made.

[6] Q: And how much of the 4- to $500,000
[7] increment is eaten up by project management, if
[8] you know?

[9] A: I wish I had those figures. I can only
[10] guess 100 to 150 K, somewhere in there.

[11] Q: I want to mark a few more exhibits and
[12] ask you some questions.

[13] MR. ALLEN: Why don't we take a break.
[14] We've been going for awhile.

[15] MR. BERNARD: Okay.

[16] (Whereupon, recess taken — 11:25 a.m.)

[17] (Whereupon, after recess — 11:30 a.m.)

[18] MR. BERNARD: Let's mark as Hall
[19] Exhibit 7 an April 14th, 1999 memorandum from
[20] Lenwood Hall and Dennis Burton to Motiva, and I
[21] e it appends comments made by West Hollow

Page 142

[1] on a draft Scope of Work.

[2] (Whereupon, Hall Deposition Exhibit
[3] Number 7 was marked for identification.)

[4] BY MR. BERNARD:

[5] Q: Are you familiar with this document,
[6] Mr. Hall?

[7] A: Yes.

[8] Q: And these, I take it, are responses by
[9] you and Dr. Burton to comments from West Hollow
[10] on a draft Scope of Work?

[11] A: Correct.

[12] Q: Okay. I want to just focus on a few
[13] items here and ask you about them.

[14] Have you decided whether to conduct a
[15] dye study?

[16] A: Some of the work that would be related
[17] to a dye study is being done by another group at
[18] Motiva. A dye study is not really part of our
[19] e of Work.

[20] Q: Is there a dye study that is being done
[21] related to the work on this project, whether it's

Page 143

[1] done by you or others?

[2] A: I'm going to defer that question to
[3] Dennis Burton. He can give you a better answer
[4] because I've gotten up and down answers if it's
[5] going to be done or if it's not going to be done.

[6] Q: Is it fair to say you don't know
[7] whether it's going to be done?

[8] A: I'm not sure.

[9] Q: Please look at page 2, comment 7.
[10] Start in the middle there. You say that the
[11] proposed modeling will not be capable of
[12] estimating the sorptive interactions of PAHs with
[13] various particulate materials, thus the
[14] partitioning that may occur in the dissolved,
[15] particulate and colloidal phases cannot be
[16] determined.

[17] Is that an accurate statement?

[18] A: From the model, yes.

[19] Q: Well, can it be determined by any other
[20] efforts that you're undertaking as part of this
[21] study?

Page 144

[1] A: No.

[2] Q: You go on and say thus, the modeling of
[3] effluent bioavailability as proposed by Dr. Means
[4] is not possible using the proposed plume
[5] dilution/hydrodynamic transport modeling.

[6] Is that an accurate statement?

[7] A: Yes.

[8] Q: And finally, because we do not
[9] understand the partitioning processes occurring
[10] between dissolved and particle-sorbed
[11] contaminants, it is not possible to model the
[12] spacial distribution and fate which are necessary
[13] to predict bioavailability.

[14] Is that accurate?

[15] A: To my knowledge, yes.

[16] MR. BERNARD: Let's mark as Exhibit 8
[17] a June 25 memorandum from Hall and Burton to
[18] Motiva. It also has some handwritten notes which
[19] are my own. I apologize for those.

[20] (Whereupon, Hall Deposition Exhibit
[21] Number 8 was marked for identification.)

A00118

enwood W. Hall, Jr., pp. 1-185
November 2, 1999

Case 1:88-cv-00263-SLR    Document 305-4    Filed 07/18/2005    Page 5 of 40

Natural Resources Defense Council, et al.    v.
Texaco Refining and Marketing, Inc.

Page 157

[1] onment, and I stop him right there and just
[2] say, no, those are not the only studies because we
[3] are using benthic communities.

[4] Q. Okay. Lower right-hand corner, please,
[5] page 9.

[6] A. Concentrations of chemicals in tissues
[7] don't equate to effects.

[8] Q. And the effects is what you're going to
[9] study through your toxicity testing?

[10] A. Correct.

[11] Q. Top of page 10, please.

[12] A. Measure PAHs in tissues does not
[13] translate into effects. That's the spirit of
[14] what I said. I can't read the exact words. The
[15] Xerox is too cloudy.

[16] Q. What's in the middle on the left,
[17] please?

[18] A. This is talking about the coring work.
[19] In the Means document he even said that there was
[20] uncertainty with doing the coring work.

[21]       What do you mean by the tall order you

Page 158

[1] refer to down on the left?

[2] A. He's talking about finding a control
[3] sediment that has all the exact characteristics
[4] of TOC, salinity, porewater chemistry, et cetera.
[5] And the problem with doing that in an exact sense
[6] is that we know that from the upstream to the
[7] downstream station salinity is going to differ.
[8] So it's very hard to have all of those exactly
[9] the same.

[10] Q. In the lower right could you read that
[11] to me? This is below the Virginia control site
[12] reference. They will use our —

[13] A. I can't read it either.

[14] Q. They will use our stations, but there
[15] is no way to infer toxicity of past discharges,
[16] dah, dah, dah?

[17] A. Okay. This is talking about the
[18] Skidaway work. The spirit of this is that we're
[19] g to be meeting with Dick Lee from Skidaway
[20] so that he can look at the stations that we
[21] selected and so we can coordinate with his

Page 159

[1] effort.

[2] Q. Page 11 I just want to ask you about
[3] one. It's the circled sentence in the middle and
[4] your note on the right. We need to address this
[5] better. Concentration in the tissue is not an
[6] effect?

[7] A. Yes. That's just a clarification point
[8] that we would want to put in our report. For
[9] example, we probably didn't get into as much
[10] detail on that as we should have in the Scope of
[11] Work.

[12] Q. Do you agree with this sentence that
[13] Means has written, beginning as discussed
[14] earlier, the presence of a quantifiable level of
[15] a contaminant of concern does not equate to an
[16] expected effect unless bioavailability
[17] relationships are established?

[18] A. You don't necessarily have to always
[19] establish bioavailability relationships because
[20] it could be bioavailable to the organism, and you
[21] could have it in the tissue, and it still not

Page 160

[1] could be related to the effect. So it's a fairly
[2] complicated issue.

[3] Q. On page 13 you have a little
[4] highlighter rectangle around the phrase beginning
[5] aqueous phase transport, and you say okay, we
[6] agree.

[7]       What is it you're agreeing with?

[8] A. This is talking about the fact that
[9] although PAHs are predominantly found in
[10] sediment, they can be found in the water column
[11] for short periods of time. And we know, from
[12] looking at some of the effluent PAH data, that in
[13] fact they are.

[14] Q. Page 14. Please read what's in the
[15] lower right.

[16] A. Even Means stated this would be
[17] difficult. Pull the Court records on this. This
[18] deals with this issue of using coring to get at
[19] past noncompliant discharges. That's going to be
[20] a very difficult thing to do.

[21] Q. Is that for the retrospective or

A00119

# SCOPE OF WORK

## November 6, 2000

SUBMITTED TO:
Mr. F. R. Wheeler - Refinery Manager
Motiva Enterprises LLC
Delaware City Refinery
2000 Wrangle Hill Road
Delaware City, Delaware 19706

PROJECT TITLE:
A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach

AMOUNT REQUESTED:
$1,216,931

STARTING DATE:
January 1, 2001

DURATION:
4 years

PRINCIPAL INVESTIGATORS:
Lenwood W. Hall, Jr and Dennis T. Burton
University of Maryland System
Agricultural Experiment Station
Wye Research and Education Center
P. O. Box 169
Queenstown, Maryland 21658

A00120

# 1. INTRODUCTION

The following information was provided to us by Motiva Enterprises LLC or resulted from our review of the Means report (Means, 1997). The Natural Resources Defense Council (NRDC) filed an action in 1988 under the Clean Water Act, alleging that since 1983 there had been numerous violations of NPDES permit limits by the Motiva Enterprises LLC (Motiva) Delaware City Refinery (Refinery) (formerly the Star Enterprises Delaware City Refinery) located on the Delaware River, Delaware City, Delaware. Those violations were largely admitted by the refinery, since they all had been reported on monthly Discharge Monitoring Reports submitted to the Delaware Department of Natural Resources and Environmental Control. The Court found that more than 400 permit violations (totaling more than 3000 "days of violations" under the Act) had occurred between 1983 and 1991. A trial was held to determine the appropriate remedy for those violations.

The trial in 1991 focused primarily on the Refinery's overall performance, including the causes of the violations, the corrective actions taken and the potential for environmental injury and other factors relevant to the penalty calculation. Based on the evidence, the Court imposed a penalty calculation. This resulted in a penalty of $500 per day for violations (versus the statutory maximum at that time of $25,000 per day). The Court also entered an injunction directing the Refinery to comply in the future with all provisions of its NPDES permit. Motiva (formerly Texaco) appealed certain aspects of the Court's decision and the Court of Appeals reduced the overall penalty by roughly $100,000 and substantially narrowed the injunction.

One of the reasons why the plaintiff (NRDC) recommended such a large penalty was because the Refinery had failed to make any attempt to determine the impact of the permit violations by conducting monitoring under the provision of the permit which specified:

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of the State or the United States resulting from noncompliance with this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge.

While the Refinery on a few occasions had taken additional grab samples, the Court agreed that this permit provision for the most part had been ignored. Following the Court's decision, the plaintiffs took the position that the Refinery was obligated to develop a formal monitoring plan to be implemented in the event of future noncomplying discharges. Entrix, Inc. (Entrix) (1993) was retained to develop the plan for the Refinery.

After the Entrix plan was developed, the plaintiffs then asserted that the plan was inadequate and did not satisfy the requirements of the permit. They filed a motion asking the Court to direct the Refinery to develop an adequate monitoring plan, and also asked the Court to direct Motiva to determine the impact, if any, of past noncomplying discharges. In subsequent, unsuccessful settlement discussions, the plaintiffs agreed that it was not possible now to determine the impact of excess discharges prior to March 1993, but continued to argue that the Refinery could determine the impact of excess discharges since that period.

When the parties were unable to reach a settlement agreement, the court retained its own expert, Dr. Jay C. Means (Western Michigan University), to address these issues (Means, 1997). Means (1997) wrote a report in which he concluded that: (1) the Entrix plan was inadequate; (2) a scientifically defensible plan to determine the impact of future noncomplying discharges required five types of river studies, on the basis of which a response monitoring plan could then be developed; and (3) it was possible now to determine the impact of past noncomplying discharges since March 9, 1993 (or at least certain noncomplying discharges). A two-day trial was then held on the issues raised. At the trial, Dr. Means defended his report, but did

A00122

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of the State or the United States resulting from noncompliance with this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge.

While the Refinery on a few occasions had taken additional grab samples, the Court agreed that this permit provision for the most part had been ignored. Following the Court's decision, the plaintiffs took the position that the Refinery was obligated to develop a formal monitoring plan to be implemented in the event of future noncomplying discharges. Entrix, Inc. (Entrix) (1993) was retained to develop the plan for the Refinery.

After the Entrix plan was developed, the plaintiffs then asserted that the plan was inadequate and did not satisfy the requirements of the permit. They filed a motion asking the Court to direct the Refinery to develop an adequate monitoring plan, and also asked the Court to direct Motiva to determine the impact, if any, of past noncomplying discharges. In subsequent, unsuccessful settlement discussions, the plaintiffs agreed that it was not possible now to determine the impact of excess discharges prior to March 1993, but continued to argue that the Refinery could determine the impact of excess discharges since that period.

When the parties were unable to reach a settlement agreement, the court retained its own expert, Dr. Jay C. Means (Western Michigan University), to address these issues (Means, 1997). Means (1997) wrote a report in which he concluded that: (1) the Entrix plan was inadequate; (2) a scientifically defensible plan to determine the impact of future noncomplying discharges required five types of river studies, on the basis of which a response monitoring plan could then be developed; and (3) it was possible now to determine the impact of past noncomplying discharges since March 9, 1993 (or at least certain noncomplying discharges). A two-day trial was then held on the issues raised. At the trial, Dr. Means defended his report, but did

2

A00123

acknowledge that all of the details of his proposed studies needed to be developed and that his report was essentially an outline of the types of studies that should be conducted. The court ultimately directed the Refinery to implement the recommendations of Dr. Means set forth in his report. Specifically, the Court ordered that the Refinery undertake the following studies:

1. A characterization of the chemical properties of the effluent stream from the Refinery [quantify polynuclear aromatic hydrocarbons (PAHs)].

2. A fate and transport study of the effluent in the receiving water, sediment and biota.

3. A study to determine how the material discharged may impact aquatic life in the Delaware River.

4. A study to establish the Refinery-associated PAHs in sediment on an adequate spatial scale outside the Refinery's discharge point.

5. Long core sampling to determine the impacts of noncomplying discharges from March 1993 to the present.

This Scope of Work (SOW), prepared by the University of Maryland's Wye Research and Education Center (WREC) has been designed to address all of the above studies in this four-year effort. A pilot study conducted by WREC during the summer of 1999 provided useful information from Triad sampling (chemical characterizations, sediment toxicity data and benthic community assessments) for the development of this study design (Hall and Burton, personal communication). At the present time, some of the chemical characterization data are available and presented in this scope of work. Analysis has not been completed for the sediment toxicity and benthic community data.

This scope of work is based on the Means 1997 report and a recent court settlement agreement between Motiva and NRDC (February 2000; see Appendix A) which implies that

3

A00124

PAHs present in Motiva's effluent are the major chemical components that could potentially impact aquatic resources in the Delaware River during exceedences of the permitted discharge (Means, 1997). PAHs are ubiquitous in aquatic sediments (Strobel et al., 1995). These compounds are widespread because of the large number and variety of PAH sources including oil spills, natural oil seeps, forest fires, automobile exhaust, domestic heating, power plants, and other industrial combustion processes including point source discharges. PAH contamination generally correlates with the degree of urbanization or industrialization; therefore, these compounds are often considered to be indicators of anthropogenic activity. PAHs have been reported in sediment at various locations in the Delaware River [Michelle Harmon, personal communication, National Oceanic and Atmospheric Administration (NOAA) Status and Trends Program]. In addition, other contaminants that may be unrelated to refinery operation, such as elevated concentrations of polychlorinated biphenyls (PCBs), have also been reported in fish and shellfish in the Delaware River (U.S. EPA, 1998).

4

A00125

## 2. STUDY APPROACH

The proposed study is designed to meet the Court-ordered studies recommended in the Means (1997) report and the recent settlement agreement between Motiva and NRDC in February 2000 (Appendix A). The first step in our study approach is to characterize PAHs present in Motiva's effluent that may be impacting aquatic life in the Delaware River. To address this issue, characterization of PAHs in Motiva's effluent was initiated in March of 1999 during our pilot study. These characterizations will continue throughout this four-year investigation. The Means report (1997) also recommended a detailed characterization of the various interactions which influence the fate and transport of PAHs in the receiving waters, sediments, and biota of the Delaware River.

PAH transport and deposition studies are included in this scope of work; a mass balance chemical fate study will not be conducted. The transport and deposition studies will include a plume dye study, hydrodynamic transport model, sediment transport model, particle settling determinations and a bottom features map. These studies plus additional mid-field sampling for PAHs, grain size distributions and TOC in sediment near the Refinery will be used to select study sites for the Triad sampling described below. These study sites will be located both within Motiva's physical mixing zone (or area of influence) and outside of Motiva's influence (reference areas). We also propose to quantify potential impact to the aquatic ecosystem by directly measuring the potential toxicity of ambient river sediments in concert with benthic community assessments both within and outside the Refinery's physical mixing zone. We propose to address the Court's concern using a sediment quality triad (Triad) approach described below to address potential biological impact.

5

A00126

We propose to use the Triad approach to develop an exceedence monitoring plan that will be used to determine potential impact to resident biological communities. Exceedence of the permit may result in potential adverse effects on aquatic biota in the Delaware River. If adverse effects are reported from the Triad approach (sediment toxicity or impaired benthic communities) in the vicinity of the Refinery and Motiva-associated contaminants (PAHs) are implicated by using fingerprinting methods described later in this scope of work, then effects could be related to exceedances. The Triad approach will provide an overall spatial assessment of the Refinery's potential impact to the Delaware River ecosystem.

The sediment quality triad approach will be used to address potential impacts of PAH contamination on aquatic biota in the Delaware River resulting from exceedences of Motiva's discharges. The Triad is a widely accepted approach which integrates environmental chemistry, instream sediment toxicity and assessments of resident biological communities to determine pollution-induced degradation (Chapman et al. 1987; Chapman, 1996; Chapman et al. 1997; Long, 1989). The Triad approach has been, and continues to be used, in a long term ambient toxicity testing program in the Chesapeake Bay watershed (Alden, 1992; Hall et al., 1998; Hall et al., 2000). The U. S. Environmental Protection Agency (EPA) and NOAA have used this approach in evaluating long term status and trends of ecological condition in estuarine environments (Strobel et al., 1995; Michelle Harmon, personal communication, NOAA). Leppanen et al. (1998) recently used this approach for assessing impacts of a hazardous waste site on instream biological communities.

Interpretation of the integrated Triad components is a "weight of evidence" approach which can be defined as drawing conclusions based on all available information, including the interrelationships of the various types of data. This approach involves collecting three types of

6

A00127

data to determine potential impacts of Motiva's effluent on aquatic life in the Delaware River:

(1) chemical characterization of PAHs, other contaminants possibly related to Motiva and

contaminants not related to Motiva both within and outside the Refinery's physical mixing zone;

(2) concurrent chronic toxicological effects characterization of representative benthic species

exposed to river sediment; and (3) assessment of resident benthic biological communities in the

study area (preferred in this study design because they are sessile biological assemblages that

can integrate potential effects over time from both aqueous phase and sediment bound

contaminants such as PAHs).

The three components of the Triad results will be used in a "weight of evidence" type

analysis described in detail in Section 3.4.4 and Appendix B. It is anticipated that the three lines

of evidence (chemical characterization, sediment toxicity, and benthic community status) may

not always agree at all study sites. However, in order for Motiva's effluent to be implicated in

possible sediment toxicity or impaired benthic communities, concurrent PAH exposure must be

documented (potentially toxic concentrations measured in sediment). It is also possible that

exposure to potentially toxic PAHs (based on guidance thresholds reported in the literature)

occurs but benthic communities or sediment toxicity is not reported because these contaminants

are not bioavailable. The Triad approach will combine all three lines of evidence in a

retrospective evaluation of Motiva's effluent on the Delaware River ecosystem.

A major concern of the Court is the number of Motiva's past permit violations.

Specifically, the Court ordered the Refinery to determine the impacts of noncomplying

discharges from March 1993 to the present time (Study #5 on page 3). The use of long core

sampling as recommended by Means (1977) to determine potential ecological impacts of the

exceedences from March 1993 to the present will be conducted by Skidaway Institute of

7

A00128

Oceanography under the direction of Dr. Richard Lee. These data will be integrated with the other components of this study in the final analysis of all the data.

The specific objectives of this four year study are to:

1. Measure PAHs routinely and other contaminants (metals, pesticides and PCBs) periodically in Motiva's effluent and intake canal.

2. Assess fate and transport issues.

3. Characterize sediment PAHs, total organic carbon (TOC) and grain size distributions in the discharge canal, near- and mid-field areas of the Refinery to aid in the selection of Triad sample sites (including additional reference areas).

4. Conduct Triad sampling (chemical characterizations, sediment toxicity assessments and benthic community characterizations) at selected study sites during the spring and summer of 2001 and 2002.

5. Perform fingerprinting of PAHs in Motiva's effluent to differentiate Motiva-related PAHs in sediment and biota from other sources.

6. Assess bioavailability of PAHs, PCBs and metals by using caged bivalve studies.

7. Determine the toxicity of Motiva's effluent to pelegic species via water column toxicity tests.

8. Assess the feasibility of determining bioavailability of PAHs and metals in the Triad sediment toxicity test species.

9. Conduct long term coring to determine impact of past non-complying discharges.

10. Integrate and analyze all study components to address research goals.

The results from the above 10 tasks will be used to develop an exceedence monitoring plan for determining the potential impacts of future non-complying discharges on aquatic life in the Delaware River. Methods for the above objectives are described in detail in Section 3.

A00129

# 3. STUDY TASKS

## 3.1 Chemical Characterizations of Motiva's Effluent

Characterization of PAHs in Motiva's effluent is critical for the fingerprinting analysis described in Section 3.5 in order to determine the potential contribution of Motiva-related PAHs to the sediment and biota in the Delaware River study area. The characterization of PAHs in Motiva's effluent (601 and 001 outfalls) was initiated in March 1999 (see Appendix C for list of PAHs). This sampling has continued on a monthly basis through 1999 and into 2000.

We plan to continue measuring PAHs monthly through the summer of 2001 in the two effluent outfalls, the intake canal and various ambient sites in the Delaware River. It is anticipated that bi-monthly sampling may be sufficient after the summer of 2001. Loading rates for Motiva PAHs will also be determined at the two outfalls. Total PAHs will be measured on all samples and particulate/dissolved PAHs will also be measured concurrently on selected samples. A suite of metals will be measured in the two outfalls and intake canal monthly starting in the spring of 2000 (see Appendix C). In addition, selected effluent and intake canal samples will also be measured for the suite of PCBs and pesticides listed in Appendix C. If concentrations of metals, PCBs or pesticides are consistently below biological thresholds, analysis for these contaminants will be discontinued.

The PAHs and other contaminants data will be summarized using a spread sheet, tabular format or summary figures. These data will be provided to Dr. Allen Uhler for the fingerprinting analysis described in Section 3.5.

## 3.2 Fate and Transport Studies

9

A00130

Preliminary near-field (CORMIX3 plume dilution model) and far-field (RMA-10 hydrodynamic transport model) models were used during the 1999 pilot study to simulate the transport of conservative dissolved phase constituents (Hall and Burton, 1999). The model predictions were used in conjunction with other historical data to locate the initial sampling stations for the Triad analyses. The following tasks will be conducted as part of the current fate and transport studies defined in the settlement agreement between Motiva and NRDC (Appendix A). The major emphasis will be to determine the transport and distribution of PAHs in the Delaware River. A mass balance chemical fate and sediment flux transport model of PAHs will not be conducted because mass balance closure cannot be determined for the Delaware River or the local study area (via a simplified input/output box model).

A dye study will be conducted in May 2000 by Ocean Surveys, Inc. (Old Claybrook, Connecticut) under the direction Dr. Joseph DiLorenzo (Najarian Associates, Inc., Eatontown, New Jersey) to complete the modeling of the spatial extent of the Refinery's discharge plume. The plume dilution and hydrodynamic transport models will be used to predict the transport of dissolved phase PAHs. A sediment transport model (SED2D model) will be coupled to the hydrodynamic transport model to estimate the areas of deposition for various size particles (i.e., particulate-sorbed PAHs) discharged from the Refinery. A side scan sonar profile will be conducted by Ocean Surveys, Inc., under the direction of Dr. Joseph DiLorenzo to map the location of various bottom features (e.g., silt, clay, sand, etc.) in order to identify potential depositional areas. Grain size distribution, sorbed PAHs (as well as fingerprinting of the PAHs as described in Section 3.5), and TOC of the sediments in the discharge canal, near-, mid-, and far-field will be determined in 2000 as described in Section 3.3. The above studies will be used to determine the final sampling stations for the Triad studies (Section 3.4) and assist in the sitir

10

of the long-term coring stations (Section 3.9). Colloidal phase PAH analysis, in addition to dissolved and particulate phase analysis, will be determined at selected stations. A sedimentation trap study will also be considered for determination of particulate sedimentation rates if sediment resuspension bias can adequately be resolved.

### 3.2.1 Dye-Tracer and Transport Model Calibration Studies

The spatial extent of the Refinery's discharge plume will be further characterized by a dye study. Accordingly, plume transport and dilution will be monitored by: (1) continuously injecting a fluorescent dye tracer into the Refinery's discharge at a controlled rate; (2) monitoring the resultant dye concentrations within the discharged waters; and (3) mapping the horizontal and vertical distribution of the resultant dye plume. The following procedures will be used.

### 3.2.1.1 Dye Tracer Procedures

The dye tracer selected for the survey is Rhodamine WT, a biodegradable, fluorescent tracer, that is extremely soluble in water and detectable at very low concentrations (typically 0.05 $\mu$g/L, or less). A 20% aqueous solution of Rhodamine WT will be injected at a rate of 13.9 lbs/h of dye into the Refinery effluent flow at a location that is sufficiently far upstream to ensure complete mixing of the dye with the resident flow. For the average Refinery flow of 400 mgd, this injection rate corresponds to a fully mixed concentration of 20 $\mu$g/L. Assuming a practical dye detection limit of 0.1 $\mu$g/L above background, this specified concentration should allow detection and mapping of the discharge water to a point where it will be diluted by a ratio of about 200:1. The resulting dye plume will be mapped a total of four times (and at two depths), coincident with maximum-flood, high-slack, maximum-ebb and low-slack tidal currents.

11

A00132

The initial concentration of the discharge will be monitored in real time using a Turner Designs Model 10 Fluorometer system and a digital recorder. The instrument will be installed adjacent to the discharge canal, with an intake hose positioned at mid-depth in the center of the canal. *In situ* dye concentrations within the receiving waters will be monitored and recorded in real time by a two-man field team equipped with a specially rigged survey vessel, an electronic positioning system, and two on-board Turner Designs Model 10 Fluorometer systems. The systems will be rigged to sample in two modes: (1) in a horizontal mode where water is pumped continuously from hoses positioned both 1.5 ft and 5 ft below the water surface while the boat runs along a series of horizontal transects; and (2) in a vertical mode where water is pumped continuously through the fluorometer via a long intake hose which is lowered and raised in the water column to monitor the dye concentration at selected vertical profiling stations.

Concurrent with the dye profiles, conductivity-temperature-depth (CTD) profiles using a SeaBird Electronics SBE-19 SeaCat CTD Profiler will also be conducted. Hence, the density, conductivity, and temperature of the discharge, the Delaware River, and their mixing area will be documented. Fluorometer data will be processed and corrected for instrumentation calibration, adjusted to a standard temperature, and converted to dye concentrations in $\mu g/L$ by weight. The initial concentration data will be presented as time series plots of dye concentrations as measured at the mouth of the discharge canal. The receiving stream mapping data will be processed and presented as contoured plan-view charts of dye concentrations at the selected tidal phases (maximum-flood, high-slack, maximum-ebb and low-slack tide).

In addition to the dye mapping operations, one tide monitoring station and one current monitoring station in the vicinity of the Refinery discharge will be established. At the tide monitoring station, two Coastal MiniTide recording tide gauges (a primary and backup) will be

12

A00133

deployed. The instruments will be installed either on fixed mounts (attached to bulkheads, pilings or other fixed structures) or on specially designed in-bottom moorings. At the current monitoring station, a bottom-mounted, upward-looking RD Instruments Workhorse Sentinel Acoustic Doppler Current Profiler will be deployed. The Workhorse ADCP will be set to record the current velocity structure of the water column above the instrument with a 1-meter vertical resolution. Both the tide and current data will be recorded at 10-min intervals. The tide and current monitoring instrumentation will be deployed for the duration of the dye dilution study, estimated to take approximately 5 days for completion.

### 3.2.1.2 Hydrodynamic Transport Model

The plume-mapping survey will characterize the transport and dilution of the Refinery's discharge plume under environmental conditions that prevailed during the field survey. To evaluate plume characteristics under other relevant conditions, Dr. DiLorenzo of Najarian Associates, Inc. (Najarian) will modify and apply Najarian's existing RMA-2 hydrodynamic model of the Delaware Estuary. Najarian previously utilized the RMA-2 model in an EPA/DRBC-sponsored study of the Delaware Estuary (DiLorenzo et al., 1992 and 1993).

RMA-2 is a two-dimensional, time-varying, finite-element, hydrodynamic and constituent transport model. Earlier versions of the model were developed during the early 1970s by Dr. Ian King of the University of California, Davis with support from the U.S. Army Corps of Engineers' (COEs) Waterways Experiment Station. Subsequently, the model was updated to incorporate curved, isoparametric elements (both triangular and quadrilateral). This new version of the model became the basis for the COEs TABS-2 modeling system.

The two-dimensional RMA-2 model is well-suited to applications in shallow tidal waterways such as the local Delaware River. In such waterways, vertical mixing is enhanced

13

A00134

and vertical variations are often negligible. Accordingly, both vertically averaged (two-dimensional) models and one-layer three-dimensional models are appropriate for this study. Unlike finite-difference models, RMA-2's quadratic, finite-element formulation accurately simulates the River's irregular shoreline configuration and channel bathymetry using a moderately spaced mesh, and any section of the model's finite-element mesh may be modified locally without changing other areas of the mesh. Also, the model's implicit solution scheme allows for use of long time steps (e.g., 15-30 min).

To adapt the RMA-2 model to the present study, Najarian will refine the model's horizontal mesh in the vicinity of the Refinery. The refinement will allow for the simulation of small-scale features in the study area (i.e., local shoreline features, local gradients, secondary circulation patterns, etc.). The tidal component of the existing RMA-2 hydrodynamic model was previously calibrated with observed Delaware Estuary tidal data. In the present study, Najarian will refine the calibration using the tidal elevation and current data that will be collected near the Refinery (Section 3.2.1.1). In addition, Najarian will verify the model's hydrodynamic transport component using the observed dye-tracer data. To this end, Najarian will simulate a dye discharge as conducted in the field survey, and simulate the resultant dye distributions under four tidal stages: maximum-flood tide, maximum-ebb tide, slack-before-flood tide, and slack-before-ebb tide. Favorable comparisons of observed and simulated dye concentrations will verify the model's ability to reproduce the short-term transport of Refinery effluent.

Najarian will also conduct model sensitivity analyses to assess effects of variations in the following factors: (1) effluent flows; (2) freshwater inflows; and (3) spring-neap variations in ambient current speeds. For each analysis, the simulated dilution levels will be mapped and tabulated. Results will allow for a more comprehensive delineation of the Refinery's discharge

14

A00135

plume over a range of natural conditions and Refinery operations.

### 3.2.2 Sediment Transport Model

Many of the contaminants of concern that are discharged from the Refinery bind preferentially to sediment particles (~90% of the PAHs are particle-sorbed at the head of the canal). While many of the coarser particles that are discharged may settle out rapidly, the fine particles may be transported greater distances by the ambient currents. To account for particle transport in our selection of Triad monitoring stations, we will conduct limited sediment transport modeling using SED2D, which is a companion two-dimensional, finite-element sediment transport model from the RMA suite.

SED2D solves the time-varying constituent transport equations for suspended sediments using RMA-2's output of computed currents and elevations at each nodal point (Letter et al., 1998). Najarian's calibrated and verified RMA-2 model will provide a useful platform for these additional simulations. SED2D's transport formulation is essentially the same as the hydrodynamic transport component of RMA-2, with additional degrees of freedom associated with sediment deposition and erosion processes. The dye-tracer validations of RMA-2 (Sections 3.2.1.1 and 3.2.1.2) will partially verify our application of this model.

The coupled RMA-2/SED2D models will be used to simulate the initial transport and settling of particles that are discharged from the Refinery's canal. The analyses will not address the subsequent resuspension and transport of the particles after they are deposited, or interact with other particles in the Delaware River. Our sole intent here is to simulate likely initial deposition sites for particles of varying size that are discharged from the canal.

As an initial condition, the suspended sediment concentration will be set to zero everywhere at the start of the simulation. Next, the Refinery's discharge will be simulated as a

15

A00136

steady mass loading of particles from a point source located at the canal mouth. These conditions will isolate the transport and initial deposition of the discharged particles. A very high critical shear stress for erosion will be prescribed so that re-suspension of these (and other) particles will not be simulated. Hence, whatever sediment accumulates in the model domain will be associated solely with the Refinery's discharge.

Separate model runs will be conducted for particles of different sizes (i.e., different settling velocities) and for a range of representative effluent flows. Particle size settling rate data will be taken from the literature and from particle settling velocity determinations to be made on surficial sediment taken from two stations in the discharge canal (midway and mouth of canal), two stations in the near-field, and two stations in the mid-field regions. For each simulated particle size, the simulated volume of accumulated bed material will be mapped and contoured throughout the study area. In this way, the model will determine the likely initial destinations of various particles discharged from the canal. This information in conjunction with side-scan sonar delineation of mobile bedforms (see Section 3.2.3) will aid in the selection of the Triad monitoring stations.

### 3.2.3 Bottom Features Mapping

A side-scan sonar (SSS) survey of the study area will be conducted to establish the sediment characteristics in the vicinity of the Refinery. For many years, SSS has proved to be a valuable tool for the initial exploration of bottom sediments in estuaries (e.g., Dyer, 1979). It provides detailed images of acoustic reflections from the estuarine bed, analogous to aerial photographs. The SSS images may be used to characterize both bed composition (e.g., fine-, medium- and coarse-grained materials) and bed morphology (bedforms). Because it is towed from a boat, the SSS may be used to map broad distributions of sediment types in a relatively

16

short period of time. In addition, a SSS survey may be used to delimit areas of the bed that may be mobile, such as ripples and sand waves. However, it is always necessary to carry out a coordinated bed-sampling program to "ground truth" the SSS remotely sensed data.

In the present study, a Marine Sonic Technology – Sea Scan PC Digital Side Scan System will be used by Ocean Surveys, Inc., to document sediment type and character. The Sea Scan PC is a high resolution SSS system that integrates a digital geographical positioning system and real-time navigation plotter in a PC environment. It is designed to analyze reflected acoustical energy, process the resulting images, and provide map data in a Geographical Information System (GIS) format.

Approximately 20 grab samples of surficial sediments will be collected in the study area to confirm the remotely sensed data and to further delineate sediment characterization. Both grain-size distribution and TOC analyses will be performed on each of these samples. Based on these surveys, GIS-ready maps will be prepared that classify the area's bottom sediments and delineate regions of accumulated soft sediment.

### 3.2.4 Colloidal Phase PAHs

In aqueous systems, PAHs exist in a near equilibrium state between the true dissolved state, and those adsorbed with solid-phase substrates in the water column. In the latter case, the solid phases of interest are operationally defined as particulate matter (generally particles larger than 0.4 μm) and colloidal material (generally, particles less than 0.4 μm and larger than 0.001 μm). During the 1999 pilot study, we determined that approximately 90% of the PAHs discharged from the Refinery were in the particulate phase at the NPDES Permit 001 sampling point in the effluent canal; approximately 10% were in the dissolved phase. Under the recent

17

A00138

court settlement agreement between Motiva and NRDC (February 2000; Appendix A), it was agreed that an estimate also be made of the colloidal phase PAHs as well. A colloidal phase study will be conducted this year under the direction of Dr. Allen Uhler (Battelle). The percentage of PAHs in the dissolved and particulate phase will also be determined in the same samples.

### 3.2.4.1 General Objectives

The objectives of the dissolved, particulate, and colloidal phase study in the Delaware River study are as follows:

1. Collect water samples from 6 locations proximal to, upstream from, and downstream from the discharge canal to ascertain the proportional amounts of PAH associated with the dissolved, particulate, and colloidal phases.

2. Collect duplicate samples at each sampling location, in order to determine the range (variability) in the measured concentrations of PAH in each phase at each sampling location. Six locations, sampled in duplicate, will yield a total of 12 field samples.

3. Process the 12 samples through a filtering system such that the PAH compounds of interest are separated into dissolved, particulate, and colloidal fractions. Each of those fractions will then be analyzed by GC/MS to quantify their PAH content.

4. Examine the concentrations of PAH in each phase, and compare those concentrations among the 6 sampling locations. The principle objective of this comparison will be to ascertain (a) which phase contains the preponderance of PAH and (b) to determine if there is a phase- or concentration–difference among the sampling locations that can be attributable to sampling location (as opposed to differences due simply to sample heterogeneity).

5. The PAH data will be run through the fingerprinting analyses described in Section 3.5 to

18

A00139

differentiate Motiva-related PAH patterns from those arising from other sources (e.g., ambient background levels, other point sources, etc.)

### 3.2.4.2 Field Sampling

Duplicate 20-L water samples will be collected at 6 stations. One set of samples will be collected in the discharge canal near the mouth of the canal; one set will be taken in the near-field plume upstream of the discharge sample; and one set will taken in the near-field plume downstream of the discharge. The remaining three sample stations will be selected after the above modeling and mid-field sampling discussed in Section 3.3 are conducted this year.

### 3.2.4.3 Sample Processing

Twenty-liter water samples will be collected directly into stainless steel tanks. The tanks will be refrigerated until filtration is initiated. All filtration will be assisted by the use of pressurized nitrogen. The stainless steel tanks will be pressurized with high purity $N_2$ gas (140 kPa) and the 20 L of water forced through two stainless steel filter holders in series. The first filterhead will contain a 90 mm diameter, Whatman graded density glass microfibre (GFF)™ pre-filter (1 μm pore size), and the second filterhead will contain a 149 mm Nucleopore® membrane filter (0.4 mm pore size). The filtrate will be collected directly into a pre-cleaned stainless steel pressurizable tank. The filters (GFF and membrane) containing the "particulate phase" will be folded to protect particles and wrapped in solvent-rinsed aluminum foil, put into precleaned glass jars, and stored frozen (-20°C) until extraction.

The entire filtrate (20-L) will then be forced (using pressurized high purity $N_2$ gas) through a stainless steel filter holder containing an Amicon UM05™ ultrafilter membrane. The ultrafilter membranes containing the "colloidal phase" will then be folded, wrapped in solvent-

19

A00140

rinsed aluminum foil, put into precleaned glass jars, and stored frozen (-20°C) until extraction.

Four of the 20 L of ultrafiltrate ("dissolved phase") will be used for extraction. The 4-L aliquot

of water will be spiked with surrogate internal standards (SIS - selected dueterated PAH

compounds) and mixed well. Two of the 4 L of SIS spiked water will then be pumped through a

solid phase extraction (SPE) disk (EmporeÔ, C18) housed in a Teflon filter holder attached in

line with a MasterFlex pump set for a flow rate of ~25 mL/min. The SPE disk will be retained

and stored at -20°C in a glass vial containing 10 mL of methanol until analyzed. "Dissolved

phase" PAH concentrations will be obtained from analysis of the SPE extract and will be

reported in ng/L.

　　　All samples will be analyzed by gas chromatography/mass spectrometry (GC/MS) to

determine the concentration of target PAH compounds (Appendix C). The filters containing the

"particulate phase" and "colloidal phase" PAH will be spiked with deuterated surrogate internal

standards and serially extracted with dichloromethane. The resulting extracts will be dried over

sodium sulfate, spiked with recovery internal standards, concentrated to a pre-injection volume

of 250 mL and analyzed by GC/MS. Empore disks will be spiked with deuterated internal

standards, and eluted with organic solvent. The resulting eluate will be dried over sodium

sulfate, spiked with recovery internal standards, concentrated to a pre-injection volume of 250

mL and analyzed by GC/MS.

### 3.2.5 Sediment Trap Study

　　　The recent court settlement agreement between Motiva and NRDC (February 2000;

Appendix A) stated that a sedimentation study (via sediment traps) must be conducted in the

near-field and mid-field receiving areas, with total PAH measurement of sediment collected

from the traps. The sediment trap study should be a short-term study of 1-2 weeks in duration as

A00141

outlined by Livingston and Means (Livingston, 2000). The study as outlined by Livingston and Means stated that sediment deposition rates should be determined by the sediment trap study. Sedimentation rates are typically derived from sedimentation trap data (Clark Alexander, personal communication, Skidaway Institute of Oceanography). For clarity sake, deposition is the process by which material moves to the river floor but does not necessarily become incorporated into the bottom sediments. Deposited material is frequently re-suspended and transported away from the initial site of deposition. Accumulation is the process by which suspended material moves to the river floor and becomes incorporated into the bottom sediments. The coring study discussed in Section 3.9 will provide accumulation data.

The short-term sedimentation study will provide short-term sedimentation rates of PAH-sorbed particles. However, it should be pointed out that the short-term sedimentation rates obtained in such a study will most likely overestimate the movement of PAH-sorbed particles to the river floor. Significant error will most likely occur, particularly in the shallow waters (<10-15 feet deep) that occur in the near- and mid-field areas of the Refinery plume, because of resuspension of deposited, unconsolidated bottom sediments. Because of the potential error, short-term sedimentation rates will not be used in the sediment transport model. Longer-term seasonal and/or annual net sedimentation rates can be obtained from estimates given in the literature (for ex., see Farley et al., 1999).

An experimental protocol has not been completed at the writing of this Scope of Work because it is not clear what type of sedimentation trap(s) will provide the most accurate sedimentation rate data in the study area. Both cylindrical and noncylindrical ("trays") sediment traps have biases which affect their particle collection efficiency. For example, it has been shown in offshore oceanic waters where resuspension is not important, that collection efficiency

21

A00142

will decrease over some range of increasing trap Reynolds number, decrease over some range of decreasing particle fall velocity and increase over some range of increasing trap aspect ratio (Butman et al., 1986). Cylindrical traps can be undercollectors or overcollectors depending on the physical mechanisms causing the biased collections (Butman, 1986); predicting biased collections for noncylindrical traps is more complex (Butman et al., 1986). Because of the various issues involved, and in particular the resuspension issue in shallow waters, we propose to complete the development of a sedimentation trap study protocol in consultation with Dr. Livingston.

### 3.3 Mid-field Sampling For Sample Site Selection

Triad sampling consisting of chemical characterizations, sediment toxicity tests and benthic community assessments was conducted in the summer of 1999 at 10 stations covering approximately 15 miles of the Delaware River near the Motiva Refinery (Figure 1). The total sediment PAH concentrations presented in Figure 1 ranged from 1,770 to 2,960 ng/g dry weight at the upstream and downstream reference sites (Stations DR-10 and DR-6 ) to 15,500 ng/g at Station DR-5 below the C and D Canal. PAH concentrations near the Refinery (Stations DR-1, DR-2 and DR- 7) ranged from 3,160 to 5,450 ng/g. These PAH data from the 1999 sampling show that the spatial area potentially impacted by the Motiva Refinery was well bounded up and down river. However, additional PAH characterizations in sediment are still needed in the mid-field area between stations DR-2 and DR-3 downstream and between stations DR-7 and DR-8 upstream. PAH characterizations on the mud flat below the discharge canal and extending beyond the discharge canal across the river to Pea Patch Island and beyond are also needed.

In order to fill these data gaps, approximately 30 to 50 stations will be sampled in the

22

A00143

mid-field area during the summer of 2000 ( approximately 1.5 mile radius of the Refinery's confluence with the river). The transport and deposition studies described in Section 3.2 will be used for selecting the sample sites. All samples will be analyzed for PAHs, total organic carbon (TOC) and grain size distribution (Appendix C). In addition, the PAH data will be fingerprinted as described in Section 3.5 to identify PAH assemblages possibly associated with Motiva and non-Motiva sources. Targeted sampling will be conducted to select sites that are predominately silt/clay sediment to maximize PAH concentrations. However, a few samples will be collected to measure PAHs in moderate to high sand areas. The results from this analysis will be used to select the final list of stations to be sampled during the spring and summer of 2001 and 2002. In addition to the stated purpose of the mid-field sampling, we will also sample tidal creeks upstream from the effluent canal and across the River to determine if appropriate reference sites can be identified for Triad sampling described in detail in Section 3.4. Factors such as salinity and comparable habitat will be considered when selecting reference sites. In the absence of finding adequate reference sites in tidal creeks or locations on the east side of the River, stations DR-6 and DR-10 appear to be adequate reference sites based on initial chemical characterizations conducted in 1999 (Figure 1). It is anticipated that 5 to 10 more stations may be added to the original sites previously sampled for a total of 15 to 20 sites. Some of the sites previously sampled may also be eliminated depending on analysis of all triad data collected in 1999.

In addition to the above stations, 3 stations in the discharge canal (1999 station plus a new mid and head station) and the 9 river stations established in 1999, will be sampled for PAHs (including fingerprinting), TOC and grain size distributions. These data plus the data obtained in the 30-50 additional samples will be used to qualitatively verify the sediment depositional areas

23

A00144

established in the fate and transport analysis (Section 3.2).

The PAH, TOC and grain size distribution data will be presented on a map of the study area using GIS methods. PAHs will also be analyzed as a distribution of exposure data using methods described in Hall et al 1999. A 90th percentile value (a standard exposure benchmark) will be determined for the data set. Total PAH concentrations by station and the 90th percentile value for the entire data set will be compared with established benchmarks for PAH biological effects (ER-Ls, ER-Ms, TELs and TEC; see Buchman, 1998; Swartz, 1999).

### 3.4 Triad Sampling

Triad sampling that includes contaminant exposure characterizations in sediment, sediment toxicity tests and benthic community assessments will be conducted at all sites during the spring and summer of 2001 and 2002 after the sample site selection process is completed. A description of each component of the Triad is presented below.

#### 3.4.1 Contaminant Exposure Characterizations at Study Sites

A 100 m x 100 m grid will be established at each station. Five random locations within each grid will be selected for collecting 5 replicate sediment samples with a petite Ponar grab sampler (volume of 2.4 L). For the discharge canal, the grid configuration will be modified to include a rectangle of the same area ($10,000 \text{ m}^2$) since the discharge canal is not 100 m wide. The full suite of chemical analysis described in Appendix C will be conducted on each replicate sample collected from each site. Each replicate will be retained in separate containers for the chemical analysis and sediment toxicity tests (Section 3.4.2). Benthic communities will also be evaluated on each replicate as described in Section 3.4.3. The contaminants will be evaluated concurrently with the toxicity tests. Quantification of the contaminants in the sediment provides

24

A00145

valuable insights if high concentrations of potentially toxic contaminants are observed in

conjunction with biological effects or impaired benthic communities. The PAHs, chlorinated

pesticides, PCBs, metals, and various pore water parameters listed in Appendix C will be

analyzed from sediment at all sites during the spring of 2001. Depending on results from this

analysis, some of these non-PAH contaminants may be eliminated from future analysis (summer

of 2001; spring and summer of 2002) if concentrations at all sites are consistently below

biological thresholds.

Battelle Duxbury Laboratory (Battelle), Duxbury, Massachusetts, will measure the

Western States Petroleum Association list of PAHs for parent and isomer-specific 2 through 6

ring compounds (Appendix C). To aid in confident identification of the nature and source of

PAH assemblages in sediment (petrogenic versus pyrogenic), the distribution of parent and alkyl

homologue PAHs listed in Appendix C will also be analyzed. Analysis of the parent and alkyl

homologue PAHs provides a useful way to represent the broad distribution of unsubstituted and

$C_1$ to $C_4$ alkyl homologues of PAHs in the environment. This representation can be more

diagnostic than selected isomers because it provides a wider spectrum of compositional

information than the compound-specific target analytes. Battelle proposes to measure these

compounds in sediment using gas chromatography/mass spectrometry (GC/MS) techniques

following Battelle SOP 5-157 *Identification and Quantification of Polynuclear Aromatic*

*Hydrocarbons by Gas Chromatography/Mass Spectrometry* (Modified SW 846 Method 8270;

see Appendix C for description of method).

Chlorinated pesticides and PCBs identified as priority pollutants by EPA and target

compounds by the NOAA Status and Trends Program will also be measured by Battelle

(Appendix C). Samples will be measured for the organics using a GC equipped with electron

25

A00145a

capture detector (ECD) following procedures described in Battelle SOP 5-128 *Identification and Quantification of Polychlorinated Biphenyls (by Conger and Aroclor) and Chlorinated Pesticides by Gas Chromatography/Electron Capture Detection* (Modified SW846 Method 8081; see Appendix C for description of method).

Bulk metals analyses will be performed by Battelle, on all sediment samples using ICP/MS and cold vapor for mercury (Appendix C). Specific methods and detection limits are presented in Appendix C. In addition, acid volatile sulfides (AVS) and simultaneously extractable metals (SEM) will also be measured by Battelle on all sediment samples as described in Appendix C using the method described by Allen et al. (1991). The concentrations of the SEMs will be determined by the same analytical methods as bulk metals (see Appendix C). The concentrations will then be converted to $\mu$moles/g dry sediment and summed to yield total SEM. SEM results will be used in conjunction with the AVS data to estimate the potential toxicity of the sediment due to metals.

Sediment samples will also be analyzed by Battelle for total organic carbon (TOC), ammonia-N, nitrite-N, and sulfides occurring in sediment pore water (Appendix C). Pore water samples will be extracted from sediment using a nitrogen press. All pore water samples will be filtered and frozen until the analyses are conducted. Grain size and distribution (between 0.4 and 2,000 $\mu$m) will be determined on all five replicates at each site (Appendix C).

### 3.4.2 Characterization of Sediment Toxicity at Study Sites

### 3.4.2.1 General Description of Toxicity Tests

All sediment toxicity tests will be conducted by the University of Maryland using procedures described in detail in McGee and Fisher 1998 (see Appendix D). Twenty-eight day chronic survival, growth and reproduction tests will be conducted with the infaunal and

26

epifaunal amphipods, *Leptocheirus plumulosus* and *Hyalella azteca,* using test conditions described in Appendix D. Both of these species have been reported to be sensitive to contaminants such as PAHs (Hall et al., 1991; Hall et al., 2000). These species have been tested extensively by the University of Maryland in low salinity areas of the Chesapeake Bay similar to the Delaware River habitat of concern in this study.

### 3.4.2.2 Sample Collection, Handling, and Storage

Sediment samples will be collected by University of Maryland personnel from all sites in the Delaware River during the spring and summer of 2001 and 2002. After sediment collection, samples will be returned to the laboratory for testing. General sediment collection, handling, and storage procedures described in Hall et al. (1991) will be used in this study. Sediment samples will be collected using a petite Ponar grab sampler; only the first 2 to 5 cm of surficial sediment material will be retained for testing. Ponar grab sampling used for the sediment test protocols does not allow exact temporal analysis of surficial sediment possible with coring techniques (see Section 3.9).

True field replicate samples will be maintained separately for the laboratory toxicity tests and chemical analysis. Sediment will be collected at each station by first randomly identifying 5 grab sample (replicate) locations within a 100 m x 100 m square grid. At each location, a discrete field replicate will be collected for toxicity tests, chemical analysis and benthic community assessments (Section 3.4.3). All 5 replicates will be predominately silt/clay because PAHs do not normally accumulate in sands and the response by test organisms may reflect a response to particle size alone (Joe Winfield, personal communication, Old Dominion University). All samples will be maintained out of direct sunlight and transported on ice in coolers. Samples for toxicity tests will be held at 4 °C until initiation of the toxicity tests within

27

A00147

14 d of collecting sediment. Samples for contaminant analysis will be stored in accordance with the requirements of the respective analytical methods to be used (see Appendix C). QA/QC for all components of the study from field collection through data analysis will follow the EPA guidance reported in McGee and Fisher (1998).

Various biological endpoints from negative control sediment as described in McGee and Fisher (1998) and sediment collected from local Delaware River reference stations (Stations DR-6, DR-10 or tidal creeks above the refinery or sites on the east side of the river as previously described) will be compared with the ambient stations.

### 3.4.2.3 Statistical Analysis of Sediment Toxicity Data

The objective of the sediment toxicity tests is to evaluate the potential toxicity of ambient sediments by comparing the test endpoints of each species to the endpoints observed in control (University of Maryland rearing sediment) and Delaware River reference sediments. Statistically significant differences between the endpoints for each species (survival, growth and/or reproduction) in control and reference stations versus ambient sediments will be evaluated via analysis of variance (ANOVA). *A priori* tests of each endpoint in a given treatment will be contrasted to control/reference responses to discern which sediments differ from control or reference endpoints. Endpoint data will be subjected to appropriate statistical transformation (e.g., arcsine transformation) prior to statistical analyses. *Leptocheirus* growth will be determined by calculating growth rate (mg/d) via drying to a constant weight at 100 C. The reproductive endpoint will be the number of neonates released during the test. *Hyalella* growth will be measured by changes in length (taken from the second antenna to the base of the urosome along the dorsal surface). Reproduction will be determined by the proportion of gravid females. Toxicity will be inferred in test sediments with endpoints that are significantly lower

28

A00148

than those observed for control or reference sediments. A complete description of statistical methods proposed for the three components of the Triad data is presented in Section 3.4.4 and 3.10.

### 3.4.3 Benthic Community Assessments

### 3.4.3.1 Background

Macrobenthic communities are used extensively as indicators of estuarine environmental status and trends because numerous studies have demonstrated that benthos respond predictably to many kinds of natural and anthropogenic stress (Pearson and Rosenberg, 1978; Dauer, 1993; Tapp et al., 1993; Wilson and Jeffrey, 1994). Many characteristics of benthic communities make them useful indicators (Bilyard, 1987), the most important of which are related to their exposure to stress and the diversity of their response. Benthic organisms generally have limited mobility and cannot avoid adverse contaminated sediment conditions (Wass, 1967). This immobility is advantageous in environmental assessments because, unlike most pelagic fauna, benthic assemblages reflect local environmental conditions (Gray, 1979). The structure of benthic communities responds to many kinds of stress because these assemblages typically include organisms with a wide range of physiological tolerances, feeding modes, and trophic interactions (Pearson and Rosenberg, 1978; Rhoads et al., 1978; Boesch and Rosenberg, 1981). Benthic macroinvertebrates were selected as the instream biological assemblage to use in the sediment quality Triad approach. The benthic community assessments will be conducted by Dr. Dan Dauer of Old Dominion University (ODU).

### 3.4.3.2 Methods

Benthic communities will be sampled during the spring and summer of 2001 and 2002 using a 0.04 m$^2$, Young grab at each sample site. Five replicates will be collected at the same

29

locations where toxicity and chemical characterizations will also be conducted (see previous sections). All replicates will be handled and processed separately both in the field and in the laboratory using ODU Quality Control procedures. The quality assurance/quality control (QA/QC) program at the Benthic Ecology Laboratory of Old Dominion University is designed to ensure that data of the highest quality possible are generated. The QA/QC program is designed to manage sample handling, documentation and custody, proper data generation, and quality control actions. The QA/QC program tracks and monitors the fate of a sample from collection to data submission and analysis assuring that the proper samples have been analyzed by the appropriate methods and that necessary QC measures have been taken to ensure that data of definable quality have been produced. For all parameters measured, a discrepancy of less than 5% from re-analyzed samples is considered acceptable, except for estimates of weight, where a discrepancy of less than 0.1% from re-analyzed samples is considered acceptable.

### 3.4.3.3 Benthic Community Metrics

Benthic community condition will be characterized using structural parameters that will include: a variety of indices of species diversity, species richness and species evenness; community abundance and community biomass (ash free dry weight biomass); and proportional abundance and biomass of a variety of functional groups (pollution indicative species, pollution sensitive species, carnivores and deposit feeders (see Ranasinghe et al., 1994 and Weisberg et al., 1997 for further information). In addition, two multi-metric summer indices will be used: (1) the benthic community condition index of the Environmental Monitoring and Assessment Program-Virginia Province (EMAP-VP) (Paul et al. 1999) and (2) the benthic community index of the Mid Atlantic Integrated Assessment Program (MAIA) (Robero Llansó, personal communication, Versar Inc.).

30

A00150

The EMAP-VP index was developed for estuaries within the Virginian Province (Cape Henry to Cape Cod). The index is based upon a step-wise discriminant analysis approach and is intended to characterize benthic community condition across all habitat types. The EMAP-VP index is standardized such that positive values indicate unimpacted conditions and negative values indicate impacted conditions. The formula is:

EMAP-VP Index = [1.389 * (salinity normalized Gleason's D - 51.5)/28.4]- [0.651* (salinity normalized tubificid abundance - 28.2)119.5] - [0.375*(spionid abundance - 20.0)/45.4]

The MAIA index is presently being finalized for Delaware Bay, Chesapeake Bay and Pamlico Sound. This index is a multi-metric index of biotic condition, frequently referred to as an index of biotic integrity (IBI). IBIs are widely used in freshwater environments and define habitat-specific reference conditions that integrate biotic responses and account for natural habitat variations (Karr, 1991; Kerans and Karr, 1994; DeShon, 1995). This approach defines expected conditions at sites free of anthropogenic stress and then assigns categorical values for various descriptive metrics by comparison with observations at reference sites. Benthic estuarine IBIs have been successfully developed for Chesapeake Bay (Weisberg et al., 1997) and the estuaries of the southeastern Unites States (Van Dolah et al., 1999). The Chesapeake Bay benthic IBI (B-IBI) has been used successfully to determine relationships between benthic community condition, water quality, sediment quality, nutrient loads and land use patterns in Chesapeake Bay (Dauer et al., 2000). The MAIA B-IBI index includes seven metrics for the low mesohaline, high mesohaline, and polyhaline habitats (abundance, number of taxa, percent dominance, percent bivalves, percent pollution sensitive taxa, biomass, and Shannon-Wiener); five metrics for oligohaline habitats (percent deep-deposit feeders, Tanypodini/Chironomidae ratio, percent Tubificidae, percent pollution-indicative oligohaline taxa, and percent pollution-

31

A00151

sensitive taxa); and two metrics for tidal freshwater habitats (abundance and percent deep-deposit feeders). In contrast to the discriminant analysis approach, the IBI approach selects metrics and metric threshold by habitat and scales all scores for across habitat comparisons.

### 3.4.3.4 Data Analysis Approach

Data analysis of the benthic communities will include three primary types of assessments of benthic condition: (1) effects on recruitment, (2) effects on survivorship and (3) integrated community condition. Both a local reference site (or sites) and a regional reference condition will be used in the analysis.

Potential effects on recruitment will be tested by examining spatial variation within spring samples for the Delaware River sites. By developing *a priori* criteria for contaminant-impacted versus unimpacted areas (see discussions and criteria in Weisberg et al., 1997; Paul et al., 1999; Van Dolan et al., 1999) differences in recruitment as indicated by juveniles of residence species can be tested with an ANOVA approach. For temperate estuaries the major recruitment time for larvae and juveniles is during the spring. The working null hypothesis is no difference in recruitment between contaminated and uncontaminated areas. The primary alternative hypothesis is that recruits will avoid sediments with contaminants.

Potential effects on survivorship will be tested by examining spatial, temporal and spatial-temporal interactions within and between spring and summer sampling. Using the same *a priori* classifications as used above, changes in abundance between spring and summer would indicate differential survivorship as a function of sediment contamination. The working null hypothesis is no difference in survivorship between contaminated and uncontaminated areas. Primary alternative hypotheses would include (1) *less absolute survivorship* in contaminated areas due to mortality (as individuals grow, their activities take them to greater depths in the

32

A00152

sediment where they may encounter higher contaminant levels) and (2) *greater relative survivorship* in contaminated areas due to less mortality from predation. The latter alternative hypothesis indicates that demersal predators utilize less food resources from contaminated areas indicating reduced ecological value to higher trophic levels in contaminated areas.

Integrated community condition effects will be tested by examining the summer benthic indices developed for estuaries including the Delaware Estuary (EMAP-VP and MAIA-IBI). In addition, a variety of ANOVA, MANOVA and canonical discriminant analyses approaches will be used on both the indices and their component metrics to define relationships between contaminant levels and benthic community responses.

### 3.4.4 Analysis of the Triad Data

The three components of the Triad (chemical exposure, toxicological effects and biological community assessment) will be evaluated, organized, and presented in an organized context so that a "weight of evidence" approach can be used to interpret the data. Chapman's (1996) method of Triad analysis/presentation will be used as a framework for evaluating and integrating the results of the three components of the Triad. It is anticipated that cases of contradictory or competing lines of evidence will occur on a spatial scale for this study. For example, at a specific station potentially toxic concentrations of contaminants may be found in sediment, sediment toxicity may be reported, but the benthic community may not be degraded. The eight possible scenarios, including six cases of conflicting data, that could occur by station for the three components of the Triad are presented in Appendix B (Table taken from Chapman, 1996).

The three possible approaches for evaluating the Triad data in a "weight of evidence" context are: (1) summary indices plotted on triangular axes; (2) tabular decision matrices

33

A00153