David S. Page
Chemistry Department
Bowdoin College
6600 College Station
Brunswick, Maine 04011-8466 USA
December 7, 2000

Phone: (207) 725-3602                                         Fax: (207) 725-3017

Email: dpage@polar.bowdoin.edu

Dr. Lenwood W. Hall
University of Maryland System
Agricultural Experiment Station
Wye Research and Education Center
PO Box 169
Queenstown, MD 21658

RE:  Expert Opinion on Proposed Hydrocarbon Analysis Methodology for:

"A Baseline Study for Assessing the Potential Aquatic Ecological Effects from
Motiva Enterprises LLC Delaware City refinery Effluent Using a Sediment triad
Approach."

Dear Dr. Hall:

This is a response to your request for an opinion on the suitability of the analytical
proposed method proposed by the Court appointed expert, Dr. Jay Means, for the analysis
of polycyclic aromatic hydrocarbons (PAH) in amphipod test species. I have reviewed
the material you sent to me in your letter of October 5, 2000. These materials included
the following:

1.    A court order settlement agreement between Motiva and the National Resources
Defense Council (see section h on tissue analysis on page A-4 and section n on
dispute resolution on page A-6)

2.    Sections from your scope of work entitled Triad sampling (Section 3.4 on pages 24
- 34) and Tissue Analysis of PAHs and metals from sediment toxicity tests (Section
3.8 on pages 41-45).

3.    Methods of Tissue Analysis for Semi-volatile Aromatic Hydrocarbons by Jay
Means

In addition, I have examined the peer-reviewed literature as well as other documents
relevant to this question. I have had no prior connection with this project, nor have I had
any relationship with the principals in this case; Motiva Enterprises LLC, the Natural
Resources Defense Council, Inc. and the Delaware Audubon Society.

I will provide a summary of my opinion and then a more detailed discussion in
support of my overall opinion.

A00319

## SUMMARY OF OPINION

The method for the analysis of amphipod tissue samples in the range of ~0.1-0.2 g dry weight (approximately equal to 0.5-1.0 g wet weight) for PAH proposed by Dr. Means is not appropriate to the current project and carries the risk of yielding misleading data because:

1. Monitoring programs carried out under Court order must use standard, tested analytical methods consistent with standard Federal EPA and NOAA methodologies in order to produce reliable, credible and defensible data. Research analytical methods, as proposed by Dr. Means, have not been subjected to the rigorous testing and validation that standard Federal EPA and NOAA methods have been subjected to. Employing non-standard methodologies in litigation-related studies carries a very real risk of producing data that cannot survive intense scientific/legal scrutiny.

2. Analyses of very small, sub-gram wet-weight, sample sizes generally yield poor method detection limits (MDL), thus limiting the ability to discriminate different PAH sources by failing to detect minor PAH components. In small analytical samples, the effects of lab and field contaminants are amplified, thus leading to errors and in extreme cases, mis-attribution of PAH sources.

3. The proposed amphipod tissue analyses are unnecessary because of the triad-based study design adopted in this project. The dose-response relationships between PAH and the test species in the standard bioassays used in this project are well-documented. Sediment bioassays are employed as part of any triad-based study to obviate the need to analyze the small amphipod test organisms for PAH. The known response of the test organism reflects the PAH concentration in the tissues, thus making separate tissue analyses superfluous.

## DISCUSSION

### Proposed Method of Means:

The material provided for review had two documents describing test methods for PAH authored by Dr. Means and others. Both were in manuscript form. In one document: "Compound-Specific GC/MS Analysis of Alkylated and Parent PAH's in Waters, Sediments, and Aquatic Organisms," By D.J. McMillin and J.C. Means (undated – but most recent reference is 1996), a sensitive analytical method is described for various sample types including tissues. This reference is not relevant to the present case because the tissue sample size employed in this reference is 20 grams – one hundred times larger than the analytical samples proposed in the present case by Means.

The second reference is titled "Method of Tissue Analysis for Semi-Volatile Aromatic hydrocarbons," J. Means dated Wed. Feb 09 11:49:10 2000. It is a printout of what appears to be a draft method summary. This is not an EPA or NOAA standard method for analyzing PAH in tissue samples. As a research-based method, it gives no detailed information on method detection limits, precision and accuracy. To be appropriate for forensic/litigation-related studies, this method must undergo the same

rigorous validation procedures applied to established standard analytical methodologies. This method employs small tissue sample sizes of ~0.1-0.2 g dry weight. Using a conversion factor of 5 times dry weight = wet weight appropriate for bivalve soft tissue, this is ~ 0.5-1.0 g on a wet weight basis. For organisms like amphipods, the wet weight/dry weight ratio is likely to be much larger because the mass of the inert exoskeleton means that there is a smaller proportion of soft tissue. Therefore, the actual soft tissue dry weight of a 0.5-1.0 gram wet weight amphipod sample could be much smaller than predicted by the relationship above. The use of such a small sample size carries a major risk of insufficiently sensitive method detection limits and of field and lab contamination (see below). Poor detection limits and sample contamination will compromise any attempt to interpret the data.

General Comments:

Analytical methods used for research purposes can provide useful information, but lack the rigorous verification, validation and evaluation undergone by EPA, NOAA and ASTM – standard methods. Employing non-standard methodologies in formal risk assessment and compliance monitoring carries a major element of risk associated with the possibility of rebuttal of the results obtained due to unforeseen deficiencies in the data.

Non-standard analytical methods often run into trouble due to poor method detection limits (MDL), poor discrimination of either high- or low-molecular weight analytes  and interferences by contaminants either in the lab or in the field.

The MDL for a given analyte in an analytical procedure is normally determined by an EPA standard method (40 CFR 136, Appendix B, 7/1/89). There is no information given that this has been done by Means for the proposed analytical method. The key is that low (sensitive) MDL's are essential to risk assessment, monitoring and PAH source identification. Since PAH concentrations in an environmental sample can vary by as much as 2-3 orders of magnitude, analytical methods with high (insensitive) MDL's may only provide the PAH signature of the most abundant analytes, and thus be misleading. MDL's are very sensitive to the size of an analytical sample and the volume of the sample extract prior to quantification by some gas chromatographic method (pre-injection volume = PIV). Reporting limits for a given analyte are often 3 to 5 times greater than the analyte MDL to ensure high confidence in the numerical value reported. Analyte concentrations below the reporting limit are often reported with an accompanying qualifier code to indicate lower confidence in the result.

In the present case, the small sample sizes proposed for analysis by Means raises a major question of reliability of results. Sample size is a key determiner of MDL. For example, a rigorous analytical method using a 50 g tissue or sediment sample with a 200 μL PIV will yield an MDL for a given analyte of ~0.10 ppb. A 0.2 – 0.5 g dry weight analytical sample will yield a MDL of > 25 ppb. In practice, the MDL would be much larger due to sample loss, particularly if plastic were in contact with the sample extracts as in the procedure proposed by Means.

A risk of employing chemical analysis methods with high MDL's is that it is often standard practice in ecological risk assessment to assign concentration values to analytes that are determined to be < their MDL as some fraction (i.e. 50%). If a full suite of PAH

A00321

analytes are analyzed, these < MDL values can add up to 100's of ppb, where the actual PAH concentration may be very low, < 1 ppb. The adverse effects of contaminants and of high MDL on the reliability of analytical results can be particularly severe with analytical samples of small size.

The environmental analysis of very small analytical samples has been done in various research studies. For example Weston and Mayer (1998) were able to measure the uptake of parent PAH in individual polychaete worms using radio-labelled (tritium) PAH in a lab study. Meador, et al., (1995) report PAH exposure studies of field-contaminated sediments to 2 infaunal invertebrates, an amphipod and a polychaete. In this study, an analytical sample of 75 amphipods gave a sample dry weight of 0.2-0.5 g and a dry weight MDL of 5-50 ppb for 2-3 ring PAH and 0.5-3.5 ppb for 4-6 ring PAH. For total PAH this would yield an MDL of 100- 1200 ppb for parent and alkyl homologue 2-6 ring PAH. The Meador, et al. (1995) study design provided test animals in sufficient number (75) to give a sufficiently large analytical sample for PAH analysis by a standard method and sample wet weights several times larger than proposed by Means. It is not likely that the present study can provide a sufficient number of the small test animals to provide an analytical sample of sufficient size to provide reliable analytical results. With analyte MDL values that would certainly be greater than those reported by Meador, et al. (1995), the method proposed by Means could fail to reliably quantify minor PAH components in contaminated samples or PAH components generally in lightly contaminated samples. The importance of sufficiently low MDL is stated well by Sauer and Boehm (1991):

"Detection limits.

Analytical methods for oil spill natural resource damage assessment must have meaningful detection limits of target analytes in sample matrices. Detection limits objectives must be derived from study objectives, not from analytical expedience. These objectives have a profound influence on which methods of analysis are selected for chemical characterization of oil-impacted environmental samples. Environmental samples impacted by oil require analytical techniques that can achieve method detection limits at significantly lower concentrations than those limits that can be attained by the EPA methods for matrices of interest (especially water samples).

For oil spill assessments, the desired method detection limits for the essential target analytes vary depending on the sample matrix (such as water, sediment, and tissue). Recommended water sample detection limits are 10 ng/L for individual VAH and PAH compounds, 0.2 µg/L for individual saturated hydrocarbons, and 50 µg/L for total hydrocarbons. The desired detection limits in sediment and tissue samples are 10 ng/g for individual VAH (sediment only) and PAH compounds, 0. 1 µg/g for individual saturated hydrocarbons, and 10 µg/g for total hydrocarbons, These goals are based on those concentrations that would be of environmental concern to the biologist and toxicologist and are needed to evaluate control or prespill conditions."

Sample contamination is another major problem with small analytical samples. In the Exxon Valdez Trustee studies of oil exposure to biological resources, many samples that were originally thought to have been contaminated by the oil spill, were later shown to have been contaminated by Diesel fuel hydrocarbons (Bence and Burns, 1995). The contamination problem was particularly great for samples with low total sample weights, such as egg shells, where a small degree of contamination in a <1 g sample can result in a large total ppb value. This is the "denominator effect" where a small sample weight in the denominator increases the contributions from source material, contaminants and noise in equal measure in the final ppb value reported. Misattribution of petroleum sources in the Exxon Valdez Trustee database was a major problem and has been discussed in detail by Bence and Burn (1995). In a Court-ordered scientific monitoring study, sound, defensible analytical data obtained using proven standard methodologies is essential.

The triad approach taken in the Motiva environmental assessment study is a sound, robust study design where the goal is to detect adverse environmental effects if they are present at a reasonable level of statistical confidence. The triad approach relies on biological measures, standard sediment bioassays using organisms whose response to toxicants is known and chemical analyses of sediment and water (e.g. see Page, et al, 1995). The relationships between sediment PAH concentrations and organism response in standard bioassays has been well worked out (e.g. see DiToro and McGrath, 2000; Swartz, 1999). The use of sediment bioassays as the 3rd arm of the triad is normally done to eliminate the need to chemically analyze the test organisms. The dose-response characteristics for the various toxicants, already analyzed in the sediment samples that the test animals are exposed to, is known. This means that the need for the analysis of PAH is test organisms in the present study, while academically interesting, would be superfluous and likely to lead to data that were misleading due to the problems associated with the analysis of small analytical samples as discussed above.

## REFERENCES

Bence, A. E. and W. A. Burns (1995). Fingerprinting Hydrocarbons in the Biological Resources of the Exxon Valdez Spill Area. "*Exxon Valdez Oil Spill: Fate and Effects in Alaskan Waters ASTM Special Technical Publication # 1219*". P. G. Wells, J. N. Butler and J. S. Hughes. Philadelphia, PA., American Society for Testing and Materials: 84-140.

Di Toro, D.M. and McGrath, J.A. (2000). Technical basis for narcotic chemicals and polycyclic aromatic hydrocarbon criteria. II. Mixtures and sediments. *Environmental Toxicology and Chemistry*, **19**,: 1971–1982.

Meador, J. P., E. Casillas, C. A. Sloan and U. Varanasi (1995). Comparative bioaccumulation of polycyclic aromatic hydrocarbons from sediment by two infaunal invertebrates. *Marine Ecology Progress Series* **123**: 107-124.

Page, D. S., Boehm, P. D., Douglas, G. S. & Bence, A. E. (1995a). Identification of hydrocarbon sources in the benthic sediments of Prince William Sound and the Gulf of Alaska following the *Exxon Valdez* oil spill. In: *Exxon Valdez Oil Spill: Fate and Effects in Alaskan Waters ASTM Special Technical Publication # 1219*. P. G. Wells, J. N. Butler and J. S. Hughes, eds. American Society for Testing and Materials, Philadelphia, PA. 41-83.

Page, D. S., E. S. Gilfillan, P. D. Boehm and E. J. Harner. (1995b). Shoreline ecology program for Prince William Sound, Alaska, following the *Exxon Valdez* oil spill. Part I: Methodology. In: *Exxon Valdez Oil Spill: Fate and Effects in Alaskan Waters ASTM Special Technical Publication # 1219*. P. G. Wells, J. N. Butler and J. S. Hughes, eds. American Society for Testing and Materials, Philadelphia, PA. 263-296.

Sauer, T. C. and Boehm, P. D. (1991). The use of defensible analytical chemical measurements for oil spill natural resource damage assessment. *Proceedings of the 1991 Oil Spill Conference*, Washington, D.C., American Petroleum Institute, 363-369

Swartz, R. C. (1999). Consensus Sediment Quality guidelines for polycyclic aromatic hydrocarbon mixtures. *Environmental Toxicology and Chemistry* **18,** 780–787.

Weston, D. P. and L. M. Mayer (1998). Comparison of in vitro digestive fluid extraction and traditional in vivo approaches as measures of polycylcic aromatic hydrocarbon bioavailability from sediments. *Environmental Toxicology and Chemistry* **17**: 830-840.

This is my professional opinion.

Signed:

David S. Page
Charles Weston Pickard Professor of Chemistry and Biochemistry

A00324

| | |
|---|---|
| Fr ͡  ͡: | Lenwood Hall [lh43@umail.umd.edu] |
| S. | Wednesday, May 16, 2001 9:52 AM |
| To: | Skip Livingston |
| Cc: | Dennis Burton |
| Subject: | update on Motiva tasks |

h43.vcf (411
B)

Hi Skip:
How are things with you? I suspect you are swamped as usual. I thought you might be interested in a brief update on Motiva activities since January.

1. Monthly PAH and metals analysis is on schedule as proposed. I will send you quarterly summaries using the same format previously used.

2. The three phase study (colloidal, particulate and dissolved) was initiated a few months ago. Final results are expected in a few weeks.

3. A Rangia tissue depuration study was initiated this spring with tissue samples collected on day 0, 2, 4, 7, 15 and 28. The goal of this experiment is to determine the loss of PAHs in tissues over time for Rangia collected in the Delaware River and placed in a relatively clean creek in Delaware. Results will be available by the end of the month. Mike Salazar has been involved with the design of this experiment.

4. Resident Rangia (not caged Rangia) have been collected from various sites in the Delaware River this spring and tissue is presently being analyzed for PAHs, pesticides, PC⁻ ͡ and metals. Tissue results are expected within a month.
M. ʃ Salazar has
also been involved with this experiment. Mike recommends using resident species collected from the area of interest if these species can be collected on an adequate spatial scale.

5. Sediment samples for toxicity testing and chemical analysis were collected from the triad sites (sites we agreed on last winter) during the last week of April. Toxicity tests have been initiated and sediment samples have been sent to the various laboratories for chemical analysis. Sampling for benthic communities will be conducted at all triad sites next week by ODU (Dan Dauer's group) and our field crew.

6. The sediment trap study has been initiated. Results will be available in the next 2 months.

7. Based on conversations with Dick Lee, Skidaway is on schedule with their coring analysis and chemical measurements.

Please confirm that you received this e-mail. Don't hesitate to call or e-mail if you have any questions.

Lenwood

A00325

# MORRIS, NICHOLS, ARSHT & TUNNELL

JOHN R. KRAHMER
LEWIS S. BLACK, JR.
WILLIAM O. LAMOTTE, III
DOUGLAS E. WHITNEY
MARTIN P. TULLY
WILLIAM H. SUDELL, JR.
THOMAS R. HUNT, JR.
A. GILCHRIST SPARKS, III
RICHARD D. ALLEN
DAVID LEV HAMILTON
JOHN F. JOHNSTON
WALTER C. TUTHILL
DONALD F. PARSONS, JR.
JACK B. BLUMENFELD
DONALD NELSON ISKEN
DONALD E. REID
DENISON H. HATCH, JR.
THOMAS C. GRIMM
KENNETH J. NACHBAR
ANDREW M. JOHNSTON

MARY B. GRAHAM
MICHAEL HOUGHTON
THOMAS R. PULSIFER
JON E. ABRAMCZYK
ALAN J. STONE
LOUIS G. HERING
FREDERICK H. ALEXANDER
R. JUDSON SCAGGS, JR.
WILLIAM M. LAFFERTY
KAREN JACOBS LOUDEN
DONNA L. CULVER
JULIA HEANEY
JONATHAN I. LESSNER
ROBERT J. DEHNEY
COLM F. CONNOLLY
JEFFREY R. WOLTERS
MARYELLEN NOREIKA
DAVID J. TEKLITS
S. MARK HURD

RACHEL A. DWARES
SPECIAL COUNSEL

RODGER D. SMITH
ERIC D. SCHWARTZ
MONA A. LEE
STANFORD L. STEVENSON, III
DEREK C. ABBOTT
JESSICA ZELDIN
DAVID A. HARRIS
PATRICIA O'NEILL VELLA
GREGORY W. WERKHEISER
WENDY L. WALTER
CHRISTOPHER F. CARLTON
GARFIELD B. SIMMS*
MICHAEL BUSENKELL
MICHAEL J. CONALLEN, JR.
RICHARD W. ELLIS
JOHN D. PIRNOT

MEGAN E. WARD
MELISSA STONE MYERS
JASON W. STAIB
DONNA L. HARRIS
TODD A. FLUBACHER
CHRISTIAN J. HENRICH
YVETTE C. FITZGERALD
JAMES G. McMILLAN, III
MATT NEIDERMAN
SCOTT SALERNO
PATRICIA R. UHLENBROCK
MICHAEL G. WILSON

OF COUNSEL
ANDREW B. KIRKPATRICK, JR.
RICHARD L. SUTTON
DAVID A. DREXLER
O. FRANCIS BIONDI
WALTER L. PEPPERMAN, II

* ADMITTED IN MA ONLY

1201 NORTH MARKET STREET
P.O. Box 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

Direct Dial
(302) 575-7279

August 24, 2001

Mitchell S. Bernard, Esquire
Natural Resources Defense Council
40 West 20th Street
New York, New York  10011

        Re:  *Natural Resources Defense Council, et al. v.
        Texaco Refining and Marketing Inc.*, Civil Action
        No. 88-263-SLR

Dear Mitchell:

        In response to your request earlier this week, Lenwood
Hall prepared the enclosed memo summarizing the status of the work
to date.  If you have any questions, please give me a call.

                        Sincerely,

                        Richard D. Allen

lef
Enclosure

cc:  C. Scott Reese, Esquire (w/Enc.)

bc:  Humberto Molina, Jr., Esquire (w/Enc.; By Telecopy)
     Mr. Hank Lloyd (w/Enc.; By Telecopy)
     Mr. Lenwood W. Hall, Jr. (w/Enc.; By Telecopy)

A00326

August 23, 2001

MEMORANDUM

TO: Rick Allen and Hank Lloyd

FROM: Lenwood Hall

SUBJECT: Status of various tasks for the Motiva study

All tasks are generally on schedule as stipulated in the February 22, 2000 court order (District Court for the District of Delaware Civil Action No. 88-263-SLR) and described in our scope of work entitled "A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using a Sediment Triad Approach" (Table 1). The draft scope of work (defined as a written program management plan in the court order) was submitted prior to May 1, 2000 as stipulated in the court order. A brief status update on the various tasks is described below:

**Monthly Effluent Chemical Characterizations** - Monthly PAH and metals analyses for effluent and intake water samples are on schedule. Quarterly summaries of these data have been submitted to Dr. Livingston for his comments.

**Fate and Transport Studies** - A dye study was completed in the spring of 2000 to aid in the selection of study sites. Najarian Associates is preparing a report on the plume dilution/hydrodynamic transport and sediment transport models. This report should be completed within the next 2 months. The three phase water study was conducted in January of 2001 using protocols provided by Dr. Livingston. PAH concentrations have been measured and data are currently being analyzed. The sediment trap study was conducted in the spring of 2001. Data analysis has been initiated.

**Midfield Sampling for Selection of Triad Sites** - During August of 2000, PAHs, total organic carbon, and grain size distributions were measured from 53 sites in Motiva's discharge canal, near-field, mid-field and far-field areas. Data collected from these sites were used to select the final 15 sites for triad sampling in the spring and summer of 2001 and 2002. Dr. Livingston was involved in the selection of all study sites.

**Triad Sampling** - Triad sampling for the spring (April) and summer (August) of 2001 has been completed. Data analysis has been initiated.

**PAH Fingerprinting** - PAH fingerprinting has been initiated by Battelle.

**Bivalve Study** - Dr. Michael Salazar has been hired to conduct the bivalve studies to address bioavailability. Rather than using caged bivalves, resident clams (*Rangia cuneata*) were collected at various sites near the Motiva refinery during March of 2001. PAHs, pesticides, PCBs and metals have been measured in the tissues of these resident clams. Data are currently being analyzed. A *Rangia* depuration study was also conducted in February of 2001 in a tidal freshwater creek in Delaware to determine the rate at which resident *Rangia* can depurate PAHs from their tissue.

**Long Term Coring** - Skidaway Institute of Oceanography has completed the field sampling for the high resolution coring component of this study. Analysis of cores from sites with adequate accumulation rates (to provide a long term record) is progressing on schedule. Dr. Livingston was involved with the sampling of candidate coring sites in August of 2000.

**Statistical Analysis of Study Components** - Dr. Raymond Alden of University of Nevada Las Vegas has been hired as a statistical consultant for data analysis. During the spring of 2000, Dr. Alden was involved with the statistical design described in detail in the scope of work  Statistical analysis of triad data will begin this fall on data collected during the spring of 2001.

**Tissue Analysis of PAHs in Sediment Toxicity Test Species** - The stipulated order provided that PAHs should be measured in the amphipod species used for toxicity tests if such analysis is feasible. Techniques developed by Dr. Jay Means and provided by Dr. Livingston were proposed for the tissue analysis. We explored the feasibility and scientific validity of this task and determined that it was inappropriate and has a high level of scientific uncertainty. We elected to use the dispute resolution clause in the court order and hire an outside expert to render an opinion on this issue. Dr. David Page of Bowdoin College, an expert in the area of PAH tissue burdens, was selected for this task.  Dr. Page concluded that the analysis of amphipod tissue samples in the range of ~ 0.1-0.2 g dry weight (approximately equal to 0.5 to 1.0 g wet weight) for PAHs proposed by Dr. Means is not appropriate for this study and carries the risk of yielding misleading data. A written opinion from Dr. Page dated December 7, 2000 provides details on his opinion. Dr. Livingston was involved with this dispute resolution issue and has a copy of Dr. Page's opinion.

If you have any questions, don't hesitate to call.

cc: D. T. Burton

**Table 1. Schedule of Tasks for Motiva Study.**

| Task | Completion Date |
|---|---|
| Monthly effluent chemical characterizations | March, 1999 - March, 2004 |
| Fate and transport studies (dye study, sedimentation study, 3 phase PAH analysis) | May, 2000 - December, 2001[a] |
| Midfield sampling (PAHs, TOC , grain size) | August - September, 2000 |
| Triad sampling | April - May, 2001; July - September, 2001; April - May, 2002; July - September, 2002 |
| PAH fingerprinting | June, 2000 - December, 2004 |
| Bivalve study | March - May, 2002[b] |
| Long-term coring | September, 2000 - October, 2001 |
| Statistical analysis | June, 2000 - March, 2004 |
| Annual progress updates | June, 2001; June, 2002; June, 2003 |
| Final report | December, 2004 |

[a]Completion date changed from May 2001 in the original scope of work to December 2001.
[b]Completion date changed from May 2001 in the original scope of work to May 2002.

A00329



**NRDC**

THE EARTH'S BEST DEFENSE

June 15, 2004

NATURAL RESOURCES DEFENSE COUNCIL

<u>By Telecopy and Mail</u>

Richard D. Allen, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, Delaware 19899

Re:  <u>NRDC, et al. v. Texaco, 88-263-SLR</u>

Dear Rick:

Plaintiffs have reviewed the Final Report for the Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach, dated December 2003 (the "Study").  Through Mr. Hall and Dr. Burton (the "investigators"), defendant Texaco (now Motiva) carried out the Study pursuant to the Stipulated Order Resolving Plaintiffs' Motion to Enforce Judgment, which was endorsed by the Court on February 23, 2000 ("Stipulated Order"), as well as the prior opinions and orders of Judges Roth and Longobardi.

We have found significant deficiencies in the Study, in the omission and conduct of certain experiments, and in the interpretation of data.  We also seek clarification of some salient subject matter covered in the Final Report. Adhering to the substance of paragraph 1(n) of the Stipulated Order, we wish to confer with you concerning these questions and perceived deficiencies, to explore whether we can resolve or narrow our differences before approaching the Court.

Below we describe some major issues and questions we have identified thus far, concerning (A) fingerprinting, (B) bioavailability, (C) long core sampling, and (D) data interpretation.

A.  <u>Fingerprinting</u>

1.  <u>Use of PAH Concentrations Instead of Loadings.</u>  In its fingerprinting analysis, the investigators appear to have used refinery pollutant concentrations rather than loadings.  Did the investigators (or one of their consultants or agents) calculate the loadings of individual PAHs emanating from refinery outfall 601 or 001?  If not, why not?  Do the investigators believe dilution reduces refinery PAH loadings to the river?  Please explain.

www.nrdc.org    40 West 20 Street
New York, NY 10011
TEL 212 727-2700  FAX 212 727-1773

100% Postconsumer Recycled Paper

WASHINGTON, DC · LOS ANGELES · SAN FRANCISCO

A00330

2. <u>Clumping Together Compounds</u>. The investigators appear to have transformed individual PAH compounds into diagnostic composites for purposes of analysis. For what reason(s)? What is the basis for the groupings the investigators used? In their Triad analyses, why didn't the investigators use the distributions of individual PAHs known to emanate from the refinery?

3. <u>Omitting Napthalenes</u>. As we read it, in characterizing refinery effluent, the investigators omitted Napthalenes and other PAHs that were loaded by the refinery into the river. What is the justification for these omissions in the fingerprinting and other analyses associated with interpretation of the Triad results? Please explain.

4. <u>Use of Sandy Areas</u>. For identifying the refinery's effluent signature, the investigators appear to have used sandy areas around the refinery outfall. Is that where the investigators expect to find PAHs released by the refinery? Please explain.

B.  <u>Bioavailability</u>

1. <u>Sampling Locations</u>. The investigators appear to have taken clams from sandy, inshore areas that are not depositional, and that did not correspond to Triad sampling locations. Why? Was there an attempt to find clams or other bivalves in the depositional, PAH-contaminated areas downriver of the refinery? If so, what was the result? Why weren't clams placed in depositional areas known to have high concentrations of PAHs?

2. <u>Omission of Caged Studies</u>. Was any caged bivalve (or fish) experiment conducted as part of the Study? If not, why not? Was there an effort made to cage any animal in or above the Triad sampling stations, including the PAH-contaminated depositional areas downriver?

3. <u>Sampling Dates/Duration</u>. The clam work appears to have been carried out only in 2001 (spring and fall), and at different times from the Triad sampling. Why? Why weren't the clam studies coordinated with the Triad work, both in placement of stations and timing of analyses?

4. <u>Purpose</u>. We understood that the primary purpose of the bioavailability experiments was to shed light on what contaminants generate any adverse effects in organisms associated with the Triad studies, thus illuminating and building on the Triad work. Do the investigators have a different understanding? If so, what is their understanding? Having abandoned the analysis of tissues of test

A00331

organisms, bioavailability data are the only way, so far as we can see,
to connect PAH sediment contamination to tissue concentrations. Do
the investigators disagree? Did any element of the Study address the
relationship between sediment and tissue concentrations of PAHs? In
the investigators' view, is there an alternative, scientific way to attribute
causes to the effects observed in the Triad experiments? Please
explain.

5. <u>Consultation</u>. Did the investigators consult with Dr. Livingston about
the changes made in the bioavailability (clam) studies? If not, why
not? If they did, please provide evidence of such consultations.

C. <u>Long Core Sampling</u>

1. <u>Number of Samples Analyzed</u>. Only two long core samples appear to
have been analyzed. Why not more? How were these sites selected?

2. <u>Location of Samples</u>. Of the two long cores that were analyzed, one
was taken near the refinery, and the second was taken downstream in
a nearshore area. Why were cores not taken from depositional areas
downriver where PAHs associated with the refinery are located? Do
the investigators believe the long cores its subcontractor analyzed
were taken from sites at which refinery releases are likely to have an
impact? Please explain.

3. <u>Consultation</u>. With whom did the investigators consult concerning sites
for long core sampling? With Dr. Livingston? Please provide pertinent
details, including evidence of consultations with Dr. Livingston.

D. <u>Data Interpretation</u>

1. <u>Refinery Contribution of PAHs</u>. Did the investigators look, by individual
compound, for the percentage refinery contribution to PAHs in
downriver depositional areas where the Triad experiments showed
sediment contamination and toxicity to test organisms? If not, why
not?

2. <u>Sediment Types</u>. In their spatial analysis of PAH distributions, the
investigators appear to have assumed that sediment types were
uniform throughout the receiving area. Is that true? What, if any,
consideration was given to differences in TOC or sand/silt/clay
distributions as determinants of sediment PAH concentrations?
Please explain.

3. <u>ERMs</u>. The Final Report states that ERMs were not exceeded for low
molecular weight PAHs, but Tables 6.1, 6.9, 6.17, and 6.25 appear to

A00332

show otherwise. If the investigators refer only to the 13 analytes used by NOAA, did they assume that PAHs beyond those analytes had no effect? If so, on what basis? Do the 13 analytes used by NOAA include any of the PAHs loaded by the refinery to the river? If so, how many? In the investigators' view, could the total PAHs (43 analytes) have been responsible for exceedances of the NOAA criteria? Please explain.

4.  <u>Grouping Data</u>. The investigators appear to have grouped community data for the two summers of Triad sampling. For what reason(s)? In addition, PAH data were broken down for analysis into time groups (March 1999-November 2000, January 2001-August 2002). For what reason(s)?

5.  <u>Statistics</u>. Do the investigators consider the reference sites to be true controls that justify the statistical comparisons they (or their subcontractors) made? What significance, if any, do the investigators place on the fact that the reference sites used for statistical comparisons were contaminated with PAHs? Why weren't the experimental data themselves used in the statistical analyses? In the investigators' view, would this have avoided any problems associated with the contaminated reference areas? Please explain.

6.  <u>Metals</u>. Do the investigators attribute any observed effects to the presence of metals in river water or sediment? If so, how do the investigators reconcile such interpretation with the parties' prior agreement not to attribute any effects to metals if the Study omitted the tissue analyses prescribed by Dr. Means? Please explain.

7.  <u>Monitoring Plan</u>. The investigators refer to a long-term exceedance monitoring plan, to be based on Study data as interpreted by the investigators. Is there such a plan? Please provide available details.

These are not all our questions or concerns, and plaintiffs reserve their rights to raise additional issues. However, having reviewed the Final Report, we want immediately to raise basic, significant problems we now discern, that in our view cut to the core of the Study's scientific validity, and to its faithfulness to the requirements of the applicable Court orders. Thank you in advance for Texaco's prompt responses and clarifications.

Sincerely,

Mitchell S. Bernard

4                                        A00333

**Wallace**
**King**
**Marraro**
**Branson**

WALLACE KING MARRARO & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

JOHN W. KAMPMAN
Direct Dial 202.204.3722
jkampman@wallaceking.com

September 1, 2004

Mitchell Bernard, Esq.
Natural Resources Defense Council
40 West 20th Street
New York, New York 10011

Re: *NRDC et al. v. Texaco*, 88-263-SLR

Dear Mr. Bernard:

Thank you for your June 15, 2004 comments and questions ("Comments") regarding the draft report ("Draft Report") of the studies Motiva Enterprises completed in response to the February 2000 stipulated order ("Court Order") in the above referenced matter. The Draft Report, entitled "A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach," was prepared by a team of research investigators ("Investigators") assembled by the University of Maryland, and distributed for review in December 2003. At Motiva's request, the Investigators, who include expert scientists from a number of different academic institutions and consulting companies, have reviewed the Comments, and provided the responses summarized in this letter.

Motiva believes that the responses set forth in this letter thoroughly address all questions or concerns presented in the Comments, and demonstrate that the Motiva studies comport fully with the Court Order. However, some of the comments suggest that the Draft Report may contain text that is ambiguous or otherwise not clearly written. Motiva has directed the Investigators to revise the Draft Report where necessary for clarity. Toward that end, the Investigators noted that the Comments state that the plaintiffs have questions and concerns not included in the Comments. Because Motiva believes that it is in the best interest of all parties to finalize the Draft Report, we request plaintiffs provide all questions and concerns not discussed in the Comments by October 8, 2004. Please also advise whether additional information might be helpful.

A00334.


Wallace
King
Marraro
&
Branson

The questions and concerns discussed in the Comments address four subject areas: fingerprinting, bioavailability, long core sampling, and data interpretation. For your convenience, the questions and concerns presented in the Comments are included with Motiva's responses in each of the four subject areas.

## A. **Fingerprinting**

1. *Use of PAH concentrations instead of loadings. In its fingerprinting analysis, the investigators appear to have used refinery pollutant concentrations rather than loadings. Did the investigators (or one of their consultants or agents) calculate the loading of individual PAHs emanating from the refinery outfall 601 or 001? If not, why not? Do the investigators believe dilution reduces refinery PAH loadings to the river? Please explain.*

For purposes of fingerprinting analysis, the Investigators did not calculate the loading of individual PAHs. As explained below, the Investigators followed the fingerprinting analysis techniques set forth in the Written Program Management Plan ("Management Plan" or "Scope of Work") that Motiva developed in accordance with paragraph "K" of the Court Order. The Management Plan was provided to Dr. Livingston prior to initiation of the study.

An important goal of the "chemical fingerprinting" component of the investigation was to identify PAH chemical signatures attributable to effluent from Motiva's refinery ("Refinery") in Delaware River waters and sediments. To do this, the Investigators had to select chemical forensic and numerical analysis techniques that would enable the Investigators to determine the nature of the PAHs in the samples, *i.e.,* the relative concentrations of the many PAH compounds that were detected. This would then allow the Investigators to identify PAHs attributable to Refinery and non-Refinery sources, including the ubiquitous, low-level PAHs that arise from anthropogenic or urban background.

The forensic and numerical analysis techniques that the Investigators used in the study were described in some detail in the Management Plan. The Management Plan explains that a chemical fingerprint is a depiction of the "relative distributions" of parent PAH compounds and their alkyl homologues, as well as individual PAH isomers. The Management Plan explains that certain "diagnostic indices" would be determined by inspecting PAH assemblages, and by using a data analysis method called Principal Component Analysis ("PCA"). By comparing the diagnostic indices for compositional similarity or dissimilarity, the Investigators could identify environmental samples that suggest an impact of PAHs arising from Refinery effluent versus those simply

A00335



Wallace
King
Maauro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 3

representative of ambient PAH burdens from other sources. The qualitative and quantitative techniques described in the Management Plan are exactly the techniques used by the Investigators to develop the fingerprinting results presented in the Draft Report.

The fundamental basis for chemical fingerprinting is the measured concentrations of the chemical constituents of interest (in this case, PAH compounds). Using measured concentrations is a well established approach used for chemical fingerprinting with abundant precedent in the published literature. *See* Attachment A: Urdal et al., 1986; Sauer and Uhler, 1994/95, Henry et al., 1997. Thus, the Investigators relied upon measured concentrations of PAHs in water and sediment to determine the makeup and likely sources of PAHs to the Delaware River.

Paragraph "I" of the Court Order required a comparison of the PAH fingerprint in the Refinery effluent, to the PAH fingerprint in sediments. The study of loading of PAHs to an aquatic system such as the Delaware River, with multiple sources of PAHs would have been an entirely different line of investigation. A loading study requires the development of a quantitative model of the mass inputs of contaminants to a receiving system (such as a river) from known discharge points, as well as non-point sources (*e.g.*, urban, runoff, atmospheric deposition). To be of value to environmental investigators, loading studies have to measure and reconcile input, retention, residence time, and throughput of contaminants. However, the Management Plan stated clearly that such a "mass balance chemical fate study," as suggested by the Comments, would not be conducted.

Further, a multitude of PAH sources, natural and man made, contribute dozens of different types of PAH compounds to the Delaware River, including the types of PAH compounds that were found in the effluent from the Refinery. Even if all of the (likely thousands) point and non-point sources were identified in an elaborate river loading study, and each source chemically fingerprinted, that information would not have allowed the Investigators to identify *sources* of the PAHs found in sediments in the River. Thus, even if mass balance information were available, the chemical fingerprinting (based on concentrations) as described in the Draft Report would still be necessary to address the fundamental objective of the fingerprinting study, *i.e.*, differentiate PAHs from Motiva's discharges, from PAHs from other sources.

In response to the question concerning dilution, the dye study results presented in detail in Section 4.1 of the Draft Report clearly show that significant dilution of the Refinery effluent occurs. The loadings of a contaminant, however, describe the total mass a source is discharging to the River. Dilution, of course does not reduce the total mass, and, therefore, dilution does not reduce loadings to the River.

A00336

Wallace 
King
Marzaro &
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 4

2. ___Clumping together compounds.___  *The investigators appear to have transformed individual PAH compounds into diagnostic composites for purposes of analysis. For what reason(s)?  What is the basis for the groupings the investigators used? In their Triad analysis, why didn't the investigators use the distributions of individual PAHs known to emanate from the refinery?*

PAHs exist in nature as assemblages of many different 2- through 6-ring PAH compounds, including alkyl homologues and their respective isomers.  Further, the PAHs found in such materials, whether natural products such as petroleum, or urban derived wastes such as soot from the combustion of fossil fuels, are composed of dozens of individual PAH compounds.  While the relative concentrations of various PAH compounds, *i.e.* the chemical fingerprint, vary greatly among the many natural and man-made sources of PAH compounds, the relative concentrations from specific sources often show distinctive patterns, and, therefore, provide an excellent means of identifying sources of PAH compounds found in the environment.

The chemical analyses presented in the Draft Report demonstrate clearly that natural and anthropogenic PAHs found in the Delaware River system are simply not generated as single compounds.  While chemists measure individual PAH compounds, *e.g.,* benzo(a)pyrene, as part of the chemical analysis of environmental media, the goal of a chemical fingerprinting investigation is to identify the *type* of PAHs found in the environment, *e.g.,* pyrogenic vs. petrogenic.  Reconciling the source patterns of PAHs found in a sample of environmental media can only be accomplished by examining the distributions of the PAH assemblages measured in such samples.  This approach is well documented in the published literature. *See* Attachment A: Bates, 1987; Eganhouse et al., 1982; Laflamme and Hites, 1978; Mitra et al., 1999; Stout et al., 2001; Stout et al., 2004.

It is precisely for this reason that the Management Plan called for chemical fingerprinting based upon an analysis of assemblages of well known PAHs and PAH isomers.  As explained above, the Investigators followed the fingerprinting analysis techniques set forth in the Management Plan as the basis for identifying the source signatures of PAHs, including the Refinery effluent.

Contrary to the above comment, there were no "diagnostic composites" or "*a priori* grouping" of the PAH assemblages used as indicators for Refinery-related, urban background, or other potential point sources.  Rather, numerical analysis techniques largely relying upon PCA, as described in Section 7 of the Draft Report, were used to identify the PAH assemblages characteristic of each source.  The resulting information allowed the Investigators to reconcile the PAH patterns observed in the samples with the possible sources.

A00337


Wallace
King
Marzaro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 5

3. *Omitting napthalenes. As we read it, in characterizing refinery effluent, the investigators omitted napthalenes and other PAHs that were loaded by the refinery into the river. What is the justification for these omissions in the fingerprinting and other analyses associated with interpretation of the Triad results? Please explain.*

Naphthalene and its isomers (collectively "naphthalenes") were definitely not omitted in the analyses. Naphthalenes are 2-ring PAH compounds and the Investigators measured a large number of 2- through 6-ring PAHs and related alkyl homologues in various environmental media, including water, sediment, and biological tissues. The resulting data were used in many elements of the study, including the fingerprinting investigation.

In fact, naphthalenes data were used throughout the fingerprinting investigation to determine the nature and source signatures of PAHs in Refinery effluent, as well as River water and sediments. For example, naphthalenes are displayed in all the graphical representations of PAH distributions in water and sediment samples from this study. *See* Section 7 of the Draft Report.

Further, the concentrations of naphthalenes were used in the PCA to identify groupings of PAHs with similar compositional character. The results of the PCA analysis indicates that the concentrations of napthalenes were key factors in distinguishing among the various types of PAH signatures found in waters and sediments from the River system. For example, sampling data indicated that the Refinery wastewater treatment plant sharply reduced the naphthalenes, phenanthrenes, and anthracenes in the Refinery wastewater stream (Figure 7-11a). By contrast, high levels of naphthalenes frequently occurred at sampling locations furthest from the Refinery (Figures 7-11h and 7-11j). Consequently, naphthalenes were most closely associated with background signatures attributed to runoff and boat traffic, but not the Refinery.

In Section 7, the Draft Report noted that (consistent with the literature) naphthalenes (and other lower molecular weight 2- and 3-ring PAHs) are susceptible to environmental weathering and that some of the differences in PAH composition are a reflection of weathering phenomena. Ultimately, the most useful fingerprinting information for discerning the nature and source signatures of PAH residues in both water and sediment necessarily focused on the more environmentally recalcitrant 4-, 5- and 6-ring PAHs. However, this focus did not diminish the role of naphthalenes and other lower molecular weight PAHs in the fingerprinting investigation.



Mitchell Bernard, Esq.
September 1, 2004
Page 6

4. *Use of sandy areas. For identifying the refinery's effluent signature, the investigators appear to have used sandy areas around the refinery outfall. Is that where the investigators expect to find PAHs released by the refinery? Please explain?*

As explained in Section 7 of the Draft Report, the Investigators identified the Refinery effluent signature, *i.e.,* the effluent fingerprint, by examining PAH concentrations in water samples of the effluent. Analyses of sediment samples were not used in the identification process.

However, as part of the Triad Study, 15 sites were selected for detailed chemical analysis of sediments. As explained in Section 10 of the Draft Report, the resulting analyses were thoroughly evaluated to determine if PAH contaminants found in the sediments exhibited the signature of the Refinery effluent. The Investigators recognized that PAHs adsorb more readily to silt and clay than to sand. However, the locations of the Triad sites were selected in accordance with the Management Plan, which required selection of sites where PAHs from the Refinery had the potential to be adsorbed onto sediments. The results of the dye and other transport studies were used to identify such locations.

The dye and other transport studies identified areas near the Refinery (*see* Figure 6.1) that included stations DR26, DR2 and DR23 (considered "nearfield sites" for purposes of the Draft Report). Sites DR26 and DR23 were approximately 31% sand, and DR2 was predominately sand. These sites were then carefully selected for Triad sampling based on the rationale provided in Section 5 of the Draft Report, *i.e.,* total PAHs exceeding certain benchmarks, and a degraded benthic condition. While chemical analysis of locations with lower sand content might have found higher concentrations of PAHs, finding the highest concentrations of PAHs was not the objective of the analyses, Rather, the objective was to identify sites where potential impacts from PAHs attributable to the Refinery may occur.

Moreover, the results of the analyses demonstrate that the stations were properly selected. For example, the 31% sand reported for Stations DR26 and DR23 was actually slightly *below* the mean sand content of approximately 34%, for the 53 sites sampled during the August 2000 reconnaissance sampling. *See* Section 5. Similarly, the TOC content (a primary factor for predicting PAH adsorption to sediments) of stations DR23 and DR26 were slightly *above* the mean TOC content of approximately 2.41% of the 53 sites. Clearly, stations DR23 and DR26 were representative of the sampling area.

Finally, and most importantly, the results demonstrate that regardless of sand content, all three sites contained total PAH concentrations that exceeded benchmarks indicative of possible ecological concern. All three sites were in the areas where dye and other transport studies indicated PAHs from the Refinery might accumulate. Therefore,



Mitchell Bernard, Esq.
September 1, 2004
Page 7

the three sites were locations where Triad analyses had the greatest potential to find impacts from PAHs attributable to the Refinery. Dr. Livingston appears to have recognized the importance of the stations selected when he approved the 15 Triad sites following the August 2000 field reconnaissance work, after extensive discussions with the Investigators.

## B. Bioavailability

1. *Sampling Locations. The investigators appear to have taken clams from sandy, inshore areas that are not depositional, and that did not correspond to Triad sampling locations. Why? Was there an attempt to find clams or other bivalves in the depositional, PAH-contaminated areas downriver of the refinery? If so, what was the result? Why weren't clams placed in depositional areas known to have high concentrations of PAHs?*

The Investigators attempted to find clam beds at, or as close as possible, to each of the 15 Triad sites. However, sufficient densities of clams were not available at six of the 15 sites. Thus, resident *(in situ) Rangia cuneata* beds were used as study areas for nine Triad sites. The nine clam study areas included three near-field stations, three north far-field stations and three south far-field stations. *See Section 8 of Draft Report.*

The Investigators studied clams in the nine clam study areas as a necessary alternative to the caged bivalve studies. This modification was necessary because, as explained below in response to question B2, *Rangia* could not be located in the Delaware Estuary that did not have the potential for pre-existing significant PAH concentrations in tissue. Less contaminated clams, from sources other than from the State of Delaware, could not be used because they did not meet disease certification requirements of the State of Delaware. The nine clam stations were selected where the density of clams permitted, in accordance with the selection criteria set forth in the Management Plan for the Triad sites. The Management Plan did not call for the study of clams in other areas, or the placement of clams in areas known to have high concentrations of PAHs, or in any other special areas in the Delaware Estuary.

2. *Omission of Caged Studies. Was any caged bivalve (or fish) experiment conducted as part of the study? If not, why not? Was there an effort made to cage any animal in or above the Triad sampling stations, including the PAH-contaminated depositional areas downriver?*

In accordance with the Management Plan, caged fish experiments were not conducted as part of the study. The Management Plan did not call for such studies because the Investigators recognized that fish can readily metabolize PAHs, and, therefore, fish would have been a poor choice for a bioavailability study.

A00340



Wallace
King
Marraro
Branson

With the exception of the caged PAH depuration study discussed in Section 8.1 of
the Draft Report, no caged bivalve experiment was conducted as part of the study. The
caged study could not be conducted because *Rangia* could not be located in the State of
Delaware drainage that did not have the potential for pre-existing significant PAH
concentrations in tissue. Less contaminated clams, from sources other than from the
State of Delaware, could not be used because they did not meet disease certification
requirements of the State of Delaware. After consultation with Dr. Mike Salazar,
recognized by the Court as an expert, the Investigators decided to use *in situ Rangia* for
the study. The basis for selecting local beds used in the study is explained above in the
Management Plan and in the response to comment B1.

3.   *Sampling Dates/Duration.   The clam work appears to have been carried out
     only in 2001 (spring and fall), and at different times from the Triad sampling.
     Why?  Why weren't the clam studies coordinated with the Triad work, both in
     placement of stations and timing of analyses?*

As explained in Section 8.2.1 of the Draft Report, the clams were studied in the
spring and fall to evaluate seasonal variations that may occur during the reproductive
cycle. In his review of the scope of work (June 8, 2000), Dr. Livingston suggested that
the study of a low salinity species such as *Rangia* be conducted to coincide with
spawning when the organism is most susceptible to "bioconcentration of lipid-seeking
PAHs." Spring (before *Rangia* spawning) and late fall (after *Rangia* spawning), the
seasons sampled in this study, are the most important seasons to understand uptake and
depuration for *Rangia* in the Delaware Estuary.

The clam stations were coordinated with the Triad stations. As discussed above
in response to comment B2, nine *in situ Rangia* beds were established as study areas as
close as possible to nine of the existing 15 Triad stations (sufficient densities of clams
were not available at six of the 15 Triad sites). With regard to coordinating the timing of
the clam sampling with that of the Triad sampling, clams were evaluated at the same time
that the spring (April) Triad samples were taken. The coordination was possible because
the spring reproductive cycle for the clams coincided with the spring Triad sampling.
However the Investigators could not coordinate the August Triad sampling with clam
sampling because the reproductive cycle of the organism required sampling in the fall
(November 2001), after *Rangia* spawning.

A00341


Wallace
King
Marraro
Branson

4. *Purpose. We understood that the primary purpose of the bioavailability experiments was to shed light on what contaminants generate any adverse effects in organisms associated with the Triad studies, thus illuminating and building on the Triad work. Do the investigators have a different understanding? If so, what is their understanding? Having abandoned the analysis of tissues of test organisms, bioavailability data are the only way, so far as we can see, to connect PAH sediment contamination to tissue concentrations. Do the investigators disagree? Did any element of the Study address the relationship between sediment and tissue concentrations of PAHs? In the investigators' view, is there an alternative, scientific way to attribute causes to the effects observed in the Triad experiments? Please explain.*

The bioavailability study described in the Draft Report was consistent with the Management Plan and completed under the direction of Dr. Mike Salazar. The study determined which PAHs, PCBs and persistent pesticides in the surrounding environment were bioavailable and taken up by *Rangia* as a function of their reproductive cycle. As explained in the Management Plan. the clam bioavailability study was independent of the Triad Study, and *was not* intended to shed light on what contaminants generate adverse effects in organisms associated with the Triad Studies. Moreover, the Investigators concluded that the clam study could not be used for such purposes: 1) bioaccumulation of PAHs can vary between taxa such as amphipods (sediment test species) or bivalves (clams used in bioavailability study); and 2) the uptake of PAHs, PCBs, and other persistent contaminants does not mean that adverse effects necessarily occur to the organism. Thus, extrapolating tissue burden data from bivalves to amphipods would not have provided meaningful data.

The results of the study clearly support the Investigator's conclusion. The tissues of *Rangia* were analyzed for PAHs, PCBs, pesticides and metals. As discussed in Sections 8.2.3.1, 8.2.3.2, and 8.2.3.3, PAHs, several persistent pesticides, and PCBs were shown to bioaccumulate above sediment concentrations in the *Rangia* tissue. In most cases, the compounds were bioaccumulated in higher concentrations in the spring than in the fall. However, as explained in Section 8.2.5, the bivalve study demonstrated that: 1) the clams from all stations were of similar condition and health; and 2) the estimated clam density in the field showed that *Rangia* are apparently able to survive, grow and reproduce in areas where the animals have been exposed to PAHs and other chemicals of concern. Thus, the results of the clam study. including reported concentrations of contaminants in tissue, could not be used to interpret the results of the Triad Studies.

With regard to the Triad Study, the Investigators accepted the opinion of Dr. David Page, as set forth in his letter of December 7, 2000. The letter explains that tissue analysis of PAHs in the sediment test organisms (*i.e.,* amphipods) would have been inappropriate. *See* Attachment B. Thus, amphipod tissue was not subjected to chemical analysis.



Wallace
King
Marzaro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 10

However, the Triad-based study design, utilizing chemical characterizations, sediment toxicity tests, and benthic community analysis, allowed the Investigators to determine the relationship between effects related to toxicity observed in the studies, and sediment concentrations of PAHs.

When evaluated together, the results of the three types of Triad analyses allowed the Investigators to assess the responses of the test organisms, *i.e.*, amphipods, with PAH concentrations in the sediment, and determine dose-response relationships. In other words, the responses of the test organisms reflected the PAH concentrations in sediments, making separate chemical analysis or tissue unnecessary. Using Triad-based design studies to link concentrations of PAHs to the responses of a test species, as was done in this study, is well documented in the published literature, and eliminates the need to analyze small test organisms, *i.e.*, amphipods, for PAHs.

To summarize, the Investigators utilized an appropriate, well accepted scientific method to attribute the effects observed in the test organism used in the Triad experiments, to contaminant concentrations in sediments. However, the method was not an "alternative" as suggested in the above comment; it was an inherent fundamental part of the Triad Study described in the Management Plan.

5. *Consultation. Did the investigators consult with Dr. Livingston about the changes made in the bioavailability (clam) studies? If not, why not? If they did, please provide evidence of such consultations.*

In accordance with paragraph 1d of the Court Order, the Investigators consulted with Dr. Mike Salazar. Dr. Salazar was involved with all aspects of the study including: 1) the design of the 28-day depuration study once it became clear that Delaware officials would not allow out of state clams to be used; 2) the decision to use resident *Rangia* (not caged clams); and 3) the design of the resident clam study. In May 2001, the Investigators also corresponded with Dr. Livingston regarding the changes that Dr. Salazar had suggested and which were being implementing.

## C. *Long Core Sampling*

1. *Number of samples analyzed. Only two long core samples appear to have been analyzed. Why not more? How were these sites selected?*

The Investigators undertook an extensive effort to find sites suitable for long coring studies that included sampling 53 site locations in the study area. As called for by the Management Plan, and as explained in Section 9 of the Draft Report, criteria for selecting locations for long cores from the 53 sites that were sampled included sediment type, surficial sediment radionuclide activities, and the site's location relative to the Refinery. Sites with extensive mixing, and areas with coarse sandy sediment or hard packed clay, were excluded because such sites could not provide the necessary historic


Wallace
King
Marro
Branson

sediment profiles. Further, to provide useful dating information, cores must contain steady-state profiles of a naturally occurring lead isotope, *i.e.*, $^{210}$Pb.

The results of the surficial analysis indicated that of the 53 sites, only seven were potentially suitable for long core studies. However, further laboratory analysis showed that samples from five of the seven sites did not contain the necessary steady-state profiles of $^{210}$Pb. Therefore, only two stations, DR50 and DR66, could be used for the long coring analysis.

2.  *Location of Samples. Of the two long cores that were analyzed one was taken near the refinery, and the second was taken downstream in a nearshore area. Why were cores not taken from depositional areas downriver where PAHs from the refinery were located? Do the investigators believe that the long cores its subcontractor analyzed were taken from sites at which the refinery releases are likely to have an impact? Please explain.*

As explained in the Management Plan, and Section 9 of the Draft Report, chronological information can only be determined from long cores that met certain criteria. As discussed above, of the 53 sites sampled only two stations, DR50 and DR66, met those criteria.

The Investigators do not believe that the two long cores analyzed were taken at sites where "Refinery releases are likely" to have had an impact. In fact, analysis of the cores demonstrates that no such impact occurred at those locations. However, the results of analysis of samples from 53 sites demonstrates that sediments in the study area cannot provide the necessary historic sediment profiles because the general area is subject to extensive mixing, comprised of coarse sandy sediment or hard packed clay, or lacks a steady state profile of $^{210}$Pb.

3.  *Consultation. With whom did the investigators consult concerning sites for long core sampling? With Dr. Livingston? Please provide pertinent details, including evidence of consultation with Dr. Livingston.*

The Court Order required the Investigators to conduct a long core study that was proposed by Dr. Richard Lee and Dr. Clark Alexander from the Skidaway Institute of Oceanography ("Skidaway"). In accordance with the Court Order, and as described by the Management Plan, Motiva retained Skidaway to complete the study.

In August 2000, Dr. Livingston accompanied the University of Maryland field crew and Dr. Alexander on a trip to the Delaware River. At that time, 53 sites were sampled to find sites suitable for long coring studies. While samples were being collected, Dr. Alexander explained to Dr. Livingston that because of extensive biological activity or very dense, non-accumulating sediments being present, the samples collected demonstrated that many of the sites could not be used for long coring. At that time, Dr.

Wallace
King

Macuro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 12

Livingston acknowledged that Dr. Alexander was qualified in the long coring area. Therefore, Dr. Alexander decided which sites were appropriate for coring studies, using the criteria explained in the Management Plan and in Section 9 of the Draft Report.

### D. *Data Interpretation*

1. *Refinery Contributions of PAHs. Did the investigators look, by individual compound, for the percentage refinery contribution to PAHs in downriver depositional areas where the Triad experiments showed sediment contamination and toxicity to test organisms? If not, why not?*

The Investigators did not look, by individual PAH compounds, for the percentage of Refinery contribution in downriver depositional areas. As discussed in response A-1 above, the Investigators followed the fingerprinting analysis techniques set forth in the Management Plan that Motiva developed in accordance with paragraph "K" of the Court Order. The Management Plan called for the chemical fingerprinting study to focus on identifying PAH assemblages, and not on the occurrence of individual PAH compounds.

The Management Plan also required the Investigators to use multivariate analyses to determine if the data indicated whether contaminants related to the Refinery effluent had been found in sediments. It is generally accepted that multivariate statistics provide Investigators with a powerful and objective method to identify significant patterns in complex data. Identifying such patterns provide a "weight of evidence" regarding the relative degree of input from any given source of pollution.

For purposes of the Draft Report, and as focused on by the Court Order, the principle Refinery contaminants of concern were PAHs, a large family that includes dozens of individual chemicals. However, the individual PAH chemicals have many potential sources in the Delaware River system other than the Refinery, including oil spills, smoke/soot, transportation, stormwater runoff, sewage discharges, coal dust, creosote on pilings, and numerous other natural and man-made sources. Each of these sources produces a different mixture of PAHs. Thus, the multivariate analyses enabled the Investigators to first identify, and then track, the relative combination of PAHs (not single PAHs) that are characteristic of the Refinery effluents, a pattern that was termed the Motiva fingerprint.

For sediments, the analysis identified a clear Refinery influence on certain sediments in the River, *e.g.*, at Stations DR1, DR2, DR23, and DR26. At the same time, the analysis identified sediment stations that had no discernable refinery-related PAH signature, *i.e.*, the remaining nearfield, farfield, down river and upriver Triad stations; sediments at these stations contained PAH signatures consistent with Urban Background.

A00345

Wallace
King
Marraro
Branson

If one were to attempt to separately determine the source of each of the dozens of individual PAH compounds that might be found in a sediment sample, the number of statistical tests that would be required would be numerous, the interpretation of the findings would be quite subjective, and the potential for spurious results would be high. Multivariate analyses provide a much more objective approach that directly identifies the relationship between the hydrocarbon signatures detected, and the likely sources of PAHs, i.e., Refinery effluent as identified by the "fingerprint," or Urban Background.

By identifying likely sources, multivariate analyses also allows the Investigators to detect the geographic patterns of PAHs in the River sediments that are indicative of the Refinery effluent. See Section 7. However, every multivariate test, e.g., PCA, and discriminant analyses, for each variable produces a multitude of what are called univariate tests, e.g.; correlation matrices, means and measures of variance, significance tests. Each such univariate test can often result in an output of 100 pages or more, making it impractical to summarize the results from each PAH isomer in any meaningful way. Moreover, a more fundamental problem is created by the fact PAH isomers are not unique to the Refinery effluent. There may be numerous potential sources for the PAH isomers detected, and, therefore, one cannot simply assume that the presence of individual PAH isomers can be quantitatively associated with the Refinery effluent in any given sample. Rather, it is the relative combinations of specific PAHs that form the Motiva fingerprint, and it is this fingerprint that allowed the Investigators to identify PAHs indicative of the Refinery effluent. See Section 7. Multivariate statistical analyses then allowed the Investigators to detect the geographic patterns of specific combinations of PAHs in the study area that indicated a relationship to Refinery.

In addition to the PCA and univariate analyses, the Investigators also completed a series of supplementary regression analyses on the multivariate data. The additional analyses address the question shown above regarding the "percentage refinery contribution to PAHs in downriver depositional areas." For each sample, the total PAH concentration was normalized to the fraction of total organic carbon ("TOC") (total PAH divided by TOC), and then regressed against the principal component scores used in the "PAH site group" geographic analyses from the study. The PAHs that were characteristic of Urban Background were loaded on the first principal component (PC1), while the second principal component (PC2) represented PAHs characteristic of the Motiva fingerprint.

As shown in the attached table (Table 1), when the data from all sites were analyzed, both principal component scores were significantly predictive of the PAH/TOC in sediments. While quite a bit of the variance in PAH/TOC in sediments was related to PC1 ($R^2 = 0.58$; prob.<0.0001, representing non-Refinery sources), the relationship to PC2 (representing the PAHs that were characteristic of Motiva's fingerprint) was much weaker ($R^2 = 0.03$; prob. = 0.003). See Table 1. Likewise, when the analyses were run by site, the PAH/TOC in sediment concentrations were strongly related to PC1, but not PC2. Except for sites DR51, DR67, and DR68, which displayed no significant


Wallace
King
Marraro
Branson

relationships to PAH/TOC, the PC1 scores were shown to be highly predictive of the total PAH/TOC in the sediment (most with $R^2$'s exceeding 0.5). On the other hand, only DR1, the Refinery discharge canal site, displayed a strong positive relationship between the PAH/TOC concentrations and PC2 scores. Sites DR45 and DR2 displayed weak relationships ($R^2 \leq 0.10$) for which PAH/TOC was negatively related to the PC2 scores.

Thus, while at most sites in the study area the PAH/TOC concentrations were closely related to the combinations of PAHs in PC1, those comprising the Motiva fingerprint in PC2 were not, particularly at the downstream sites displaying the highest levels of sediment contamination. The results are consistent with the PCA analyses, and show that the PAHs characteristic of the Refinery effluent were not associated with accumulation of PAHs in the sediments in the River system.

2. *Sediment types. In their spatial analysis of PAH distributions, the investigators appear to have assumed that sediment types were uniform throughout the receiving area. Is that true? What, if any, consideration was given to differences in TOC or sand/silt/clay distributions as determinants of sediment PAH concentrations? Please explain.*

The Investigators did not assume sediment types were uniform throughout the study area. In Section 5 (mid-field sampling) and Section 6 (Triad sampling), TOC and grain size data are presented for all stations and discussed. However, the Investigators used the multivariate analyses required by the Management Plan to assess the spatial analysis of PAH distributions in the study area, and answer the key research question, "Are patterns of sediment contamination inferentially related to Motiva exceedences?" The results of the multivariate analyses are presented in Section 10 of the Draft Report.

To complete the multivariate analyses, the Investigators had to first normalize and standardize the data so that samples reporting significantly different concentrations, or variables with different "scales" (different units of measurement), did not overly influence the results and thus diminish the Investigators' ability to detect significant patterns. For example, without these "scaling" procedures, samples with high overall PAH concentrations, or variables representing PAH isomers with the greatest concentrations in some or all of the samples, might completely dominate the results. In other words, the results could be confounded by patterns associated with a few samples, and the Investigators would lose the ability to detect patterns of PAH isomers, including combinations representing the Motiva "fingerprint."

The use of normalization and standardization techniques does not mean that the Investigators assumed that sediment types were uniform. The Investigators fully agree that PAH concentrations in sediments are significantly affected by sediment characteristics. PAHs tend to accumulate in sediments with high silt/clay but low sand

A00347


Wallace
King
Mazzaro
Branson

content, and with high TOC concentrations. In fact, the statistical relationships between these sediment characteristics (TOC, sand and silt/clay) and the PAH isomers analyzed in this study were almost always significant ($R^2$ values generally ranging from 0.25 to 0.40).

However, multivariate analyses demonstrate that these sediment characteristics become significantly less important in aiding in the identification/separation of geographic patterns of the PAHs. For example, when these sediment characteristics are added to the discriminant analysis of the PAH data using the site groups defined by PCA (*see* Figure 10.11 and Table 10.6), the classification error rate improved only slightly (from 7% to 5%), and other statistical test remained virtually unchanged (the squared canonical correlation values and the average explained variance). Sand was negatively correlated with the first canonical function (*see* Figure 10.11), while silt and clay were positively loaded on this function (*i.e.*, site groups 2 and 4 have sandier sediments and 1 has finer sediments). TOC was positively loaded on canonical function 2 (*i.e.*, site group 2, the discharge canal site, had high TOC levels, despite having sandier sediments).

Similarly, the addition of sediment characteristics to the discriminant analysis of the *a priori* site groups with PAH data also provides relatively little to the statistical separation of the groups: the overall classification error rate improved only slightly from 7% to 3.3%; other statistical tests remained virtually unchanged (squared canonical correlation values and the average explained variance). As with the previous example, sand was negatively correlated with the first canonical function, while silt and clay were positively loaded on it. *See* Figure 10.16. TOC was positively loaded on canonical function 2.

As can be seen from these examples, including sediment characteristics in the analysis, PAHs tend to accumulate in finer sediments and/or those with high TOC. However, the analysis doesn't help determine whether there are any sites or site groups that have combinations of PAHs that are indicative of Motiva's "fingerprint." Therefore, in analyzing and presenting the data, the Investigators focused on the PAH patterns rather than on the patterns of sediment characteristics.

However, as described in the Management Plan, sediment TOC data was used in a model generally called the "Swartz ΣPAH-TU," that was developed to predict levels of contaminants that are of ecological significance. The results are presented in Section 10-2 of the Draft Report.

A00348



Wallace
King
Marraro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 16

3. **_ERMs._** *The final draft report states that ERMs were not exceeded for low molecular weight PAHs, but Tables 6.1, 6.9, 6.17, and 6.25 appear to show otherwise. If the investigators refer to only the 13 analytes used by NOAA, did they assume that PAHs beyond those analytes had no effect? If so, on what basis? Do the 13 analytes used by NOAA include any of the PAHs loaded by the refinery to the river? If so, how many? In the investigators view, could the total PAHs (43 analytes) have been responsible for exceedences of the NOAA criteria? Please explain.*

As explained in Section 6-2, the Investigators compared the results of PAH sediment analyses with certain guidelines used by NOAA as a means of predicting concentrations of potential ecological concern. The NOAA guidelines include benchmark levels that predict a 10% probability of effects, *i.e.,* Effects Range Low ("ERL"), and the level that predict a 50% probability of effects, *i.e.,* Effects Range Median ("ERM"). However, NOAA benchmarks have been established for only 13 of the 43 PAH compounds for which the investigators reported the results of chemical analysis.

The Draft Report accurately states for the four sampling periods, for the low molecular weight ("LMW") PAHs for which there are NOAA benchmarks, the ERMs were not exceeded for mean or individual replicates (depending on the sampling period). However, the Investigators also developed a "worst case" comparison by including available results for 43 PAH compounds. Such a "worst case" comparison is very conservative and often used as a preliminary tool in risk assessments to eliminate contaminants as possible causes of ecological effects and thereby help focus the assessment process.

Using the worst case comparison to NOAA benchmarks, Section 6.2 reports for the Spring of 2001 that: 1) mean total PAHs exceeded the ERL at 9 sites; 2) mean total LMW PAHs exceeded the ERL at 13 sites and the ERM at 5 sites; and 3) mean total HMW PAHS exceeded the ERL at 11 sites. PAHs are exceeded for selected sites when all 43 analytes are used. Thus, it was not assumed that analytes beyond the 13 used by NOAA had no effect. However, although the effect thresholds (ERLs and ERMs) for the other analytes are unknown, including these analytes did not affect the conclusions regarding the effects potentially associated with the Refinery effluent.

For example, as stated in Section 7 of the Draft Report, the five petrogenic 4-ring PAHs that are clearly a Refinery effluent signature are: 1) C2-Fluoranthenes/Pyrenes; 2) C3-Fluoranthenes/Pyrenes; 3) C2-Chrysenes; 4) C3-Chrysenes; and 5) C4-Chrysenes. There are no NOAA effects benchmarks for any of these 5 homologues. However, there are NOAA effects benchmarks (ERLs and ERMs) for the parent compounds fluoranthene, pyrene and chrysene. If Motiva related homologue concentrations are added to the parent compound concentration and compared with ERLs for sites showing



Wallace
King
Marzaro
Branson

the Motiva signature and effects (toxicity or benthic impairment) as described in Table 6.64, all values for the three nearfield sites (DR2, DR23, and DR26) are still much less than the ERLs for the parent compounds.

4. *Grouping Data. The investigators appear to have grouped community data for two summers of Triad sampling. For what reason (s)? In addition, PAH data were broken down for analysis into two time groups (March 1999-November 2000; January 2001-August 2002). For what reason(s)?*

As part of the Triad Study, the Investigators assessed benthic biological impacts utilizing scores of the Mid-Atlantic Integrated Assessment ("MAIA") Index of Biological Integrity ("MAIA IBI"). The MAIA IBI data from 2001 and 2002 were combined for certain analyses, but not before the temporal effects (variance) due to sampling season and year were taken into account. For example, as explained in Section 10.6, in the comparison of MAIA IBI scores between sites, the effects of sampling season (spring versus summer) and year (2001 versus 2002) were taken into account statistically *prior* to the site analyses. Likewise, as explained in Section 10.7, in the comparison of MAIA IBI data among *a priori* site groups, the effects of sampling season, year, *a priori* site groups, and all interactions of these factors were assessed. Thus, the temporal effects were statistically taken into account when the spatial effects of the site groups were determined.

Further, as explained in Section 10.7, the multivariate analyses examining the relationship between the geographic patterns of benthic community structure and PAHs considered significant spatiotemporal patterns, including season-specific or year-specific data, in the creation of the site groups describing the benthic biological communities. For example, the benthic biological site groups 3, 4, and 5 contained samples specific to certain site-season-year combinations, while significant temporal effects were not observed for the other site groups, so the data for the sites were combined for all seasons and years. Therefore, in each of these analyses, benthic data were combined across both years of the study period to examine geographic patterns only after significant temporal effects were taken into account statistically.

As explained in Section 3 of the Draft Report, PAHs from effluent, intake and selected Delaware River sites were presented separately from March 1999 through November 2000 because these are considered data collected before the study was initiated in January of 2001. The data obtained from January 2001 through August 2002 cover the period of the study and, therefore, were reported separately.



Mitchell Bernard, Esq.
September 1, 2004
Page 18

5. _Statistics._ *Do the investigators consider the reference sites to be true controls that justify the statistical comparisons they (or their contractors) made? What significance, if any, do the investigators place on the fact that reference sites used for statistical comparisons were contaminated with PAHs? Why weren't the experimental data themselves used in the statistical analyses? In the investigators' view, would this have avoided any problems associated with the contaminated reference area? Please explain.*

The concept of "reference sites" is key to the interpretation of sediment quality triad data. *See* papers by Peter Chapman considered authoritative by environmental scientists. Reference sites should be within the same watershed as the study sites, but remote from source(s) of contamination under investigation (in this case, the Refinery effluent). Thus, data from reference sites provide a mechanism to "control" for (*i.e.*, to "benchmark" quantitatively through statistics or "ratio to reference" techniques) background levels of sediment contaminants, sediment toxicity and benthic community effects in the region.

The reference sites were selected in accordance with the Management Plan, and are clearly the best attainable or least impacted sites for the study area. Due to the widespread PAH contamination in the Delaware River, and numerous other stressors, it is not possible to locate pristine areas (without PAHs). The use of "best attainable or least impacted sites" is a common approach for selecting reference sites in contaminated aquatic systems. The rationale for selecting both reference sites (DR10 and DR9B) is explained on page 5-5 of the Draft Report (*i.e.*, Refinery PAHs not present, PAHs below ERLs). As mentioned previously in this response, Dr. Livingston approved all of the Triad sample sites (including the reference sites) before the study was initiated.

Discussions of how experimental data were used in all facets of the statistical analyses are presented throughout the Draft Report. Thus, it is not clear why the above question suggests that experimental data were not used in the statistical analysis. The Investigators suspect that the question is referring to the laboratory control data used in the sediment toxicity tests. The laboratory controls employed in the toxicity experiments serve only as controls for the relative health of the toxicity test organisms, as well as for any incidental effects that may be introduced in the laboratory during the tests. High quality control sediments are typically taken from a different watershed(s) from the study sites and are selected for their relatively low levels of contaminants. These sediments are not used to rear test organisms, thus they would not represent credible reference sites for sediment quality triad assessments.

A00351



Mitchell Bernard, Esq.
September 1, 2004
Page 19

6. *Metals.* *Do the investigators attribute any observed effects to the presence of metals in river water or sediment? If so, how do the investigators reconcile such interpretation with the parties' prior agreement not to attribute any effects to metals if the study omitted the tissue analysis prescribed by Dr. Means? Please explain.*

Recognizing the Court Order, the Investigators did not intend that the Draft Report attribute observed effects to the presence of metals in River water or sediment. However, the Investigators do not believe that the Court Order prohibited including in the Draft Report the results of analytical chemistry, use of environmental thresholds, various statistical analyses, or other data representing the results of objective tests conducted during the study. As explained above, the Triad Studies were not dependent upon tissue burden data. Thus, the results presented in the Draft Report could not have been objective or scientifically credible if all potential stressors had not been recognized.

7. *Monitoring Plan.* *The investigators refer to a long-term exceedence monitoring plan, to be based on Study data as interpreted by the investigators. Is there such a plan? Please provide available details.*

A long term exceedence monitoring plan has not been developed. Such a plan can only be developed after the Draft Report is finalized. Motiva hopes to finalize the Draft Report after all comments have been received.

**Summary**

Certain conditions encountered during the course of the study required modifications to some of the tasks set forth in the Management Plan. These modifications were consistent with the Court Order and did not prevent the Investigators from achieving the fundamental objectives of the study, *i.e.*, answer the research questions set forth in the Management Plan. Those questions have been thoroughly and accurately answered.

The Investigators believe that this letter addresses the questions and concerns presented in the Comments. At the same time, the Investigators also recognize certain revisions may have to be made to a number of sections of the text to avoid ambiguities that appear to have been the basis for several of the Comments. In that regard, please



Wallace
King
Marrâro
Branson

Mitchell Bernard, Esq.
September 1, 2004
Page 20

advise us if you detect statements or supporting materials in the Draft Report that you believe are inconsistent with the responses set forth in this letter.

Finally, please send all of your future correspondence concerning this matter and the above referenced litigation, to the undersigned.

Very truly yours,

John W. Kampman

cc:     Bert Molina, Esq.
        Lenwood Hall
        Dennis Burton
        Richard Allen, Esq.