IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE      )
COUNCIL, INC. and DELAWARE      )
AUDUBON SOCIETY,      )
                     )
               Plaintiff,      )
                     )
        v.      )     Civ. Action No. 88-263-SLR
                     )
TEXACO REFINING AND      )
MARKETING, INC.,      )
                     )
               Defendants.      )

**DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION TO ENFORCE JUDGMENT AND
IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL
Richard D. Allen (#469)
Megan Ward Cascio (#3785)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
 *Attorneys for Defendant*

OF COUNSEL:

Anthony F. King
Julie M. Domike
John W. Kampman
Wallace King Marraro
 & Branson, PLLC
1050 Thomas Jefferson St., N.W.
Washington, DC 20007
(202) 204-1000

September 9, 2005

TABLE OF CONTENTS

                                                                Page

TABLE OF CITATIONS                                              iii

INTRODUCTION                                                    1

THE NATURE AND STAGE OF THE PROCEEDING                         3

SUMMARY OF ARGUMENT                                             5

STATEMENT OF FACTS                                             8

    A.    The 2000 Stipulated Order                        8

    B.    The Scope Of Work                                9

    C.    The Studies                                     11

    D.    The Study Report                                13

ARGUMENT                                                       14

I.    NRDC HAS FAILED TO MEET ITS BURDEN TO PROVE ANY VIOLATION OF THE INJUNCTION REGARDING FUTURE NONCOMPLYING DISCHARGES                            15

    A.    NRDC Has Not Met Its Burden Of Proving That Texaco Violated the Injunction       15

        1.    The 2000 Order Required The Fingerprinting Study Texaco Performed, Not A Loadings Study       16

        2.    The 2000 Order Required Taking Samples From The Refinery Effluent       18

    B.    NRDC Has Not Met Its Burden Of Proving That Texaco Violated The Injunction With Regard To The Bioavailability Study       18

        1.    Dr. Burton Confirms That Texaco Did Everything Reasonably Possible to Use Caged Bivalves       19

        2.    Mr. Salazar Confirms That Texaco's Decision To Use Resident Clams Was Reasonable And Scientifically Valid       23

        3.    NRDC Knew Years Ago That Texaco Was Using Resident Clams And Stood Silent Until Now       25

    C.    NRDC Has Not Met Its Burden Of Proving That Texaco Violated The Injunction With Regard To Analyzing

TABLE OF CONTENTS (continued)

Page

     Bioconcentration Levels Of Toxic Agents In Bottom-Dwelling Organisms ... 25

II.   THE PORTION OF THE INJUNCTION MANDATING A STUDY OF FUTURE NONCOMPLYING DISCHARGES SHOULD BE TERMINATED AS SATISFIED ... 28

III.  NRDC HAS FAILED TO SHOW ANY VIOLATION OF THE INJUNCTION ORDER AS TO STUDYING THE IMPACT OF PAST NONCOMFORMING DISCHARGES ... 32

    A.    Texaco's Performance Of The Long Core Study Fully Satisfied The Injunction As To Past Noncomplying Discharges ... 32

    B.    NRDC Cannot Prove Any Injunction Violation By Texaco With Regard to the Long Core Study ... 34

    C.    The Portion Of The Injunction Mandating A Study Of Past Noncomplying Discharges Should Be Terminated As Satisfied ... 38

IV.   NRDC'S REQUEST TO REFER THIS MATTER TO DR. MEANS "IN THE FIRST INSTANCE" IS UNNECESSARY AND INAPPROPRIATE ... 39

CONCLUSION ... 40

iii.

# TABLE OF CITATIONS

Page(s)

Cases

*Board of Educ. of Oklahoma City Pub. Schools v. Dowell*,
    498 U.S. 237 (1991)                                  29

*Building and Constr. Trades Council of Phila. and Vicinity*
    *v. National Labor Relations Bd.*,
    64 F.3d 880 (3d Cir. 1995)            28, 29, 30, 38

*Davis v. School Dist. of The City of Pontiac,*
    95 F. Supp. 2d 688 (E.D.Mich. 2000)        29

*Heartland Hosp. v. Thompson*,
    328 F. Supp. 2d 8 (D.D.C. 2004), *aff'd Heartland Reg'l Med.*
    *Ctr. v. Leavitt*, No. 04-5366, 2005 WL 1630814
    (D.C. Cir. July 13, 2005)             5, 14, 39

*Manning v. School Bd. Of Hillsborough County*,
    No. 58-3554-CIV-T-17C, 1997 WL 33479029 (M.D. Fla. Aug.
    26, 1997), *modified in part on other grounds*, 24 F. Supp. 2d
    1277 (M.D.Fla. 1998), *rev'd on other grounds*, 244 F.3d 927
    (11th Cir. 2001)                   14

*NRDC v. Texaco Refining and Marketing Inc*.,
    20 F. Supp. 700 (D. Del. 1998); *aff'd*, 182 F.3d 904 (3d Cir.
    1999)                      2, 3, 8, 9, 29, 33

*NRDC v. Texaco Refining and Marketing, Inc*,,
    2 F.3d 493 (3d Cir. 1993)                 3

*NRDC v. Texaco Refining and Marketing, Inc.*,
    800 F. Supp. 1 (D. Del. 1992)            3

*Philadelphia Welfare Rights Org. v. Shapp*,
    602 F.2d 1114 (3rd Cir. 1979)           28

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992)                28

*Youngblood v. Dalzell*
    777 F. Supp. 1382 (S.D. Ohio 1991)        14

Rules

Fed. R. Civ. P. 60(b)(5)                5, 28, 29, 38

Defendant Texaco Refining and Marketing, Inc. submits this opposition to plaintiffs' Motion to Enforce Judgment and cross-moves, where appropriate, for an order for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(5) that Texaco has satisfied the requirements of this Court's November 6, 1993 Injunction Order insofar as it required Texaco to (1) study the possible impact of future noncomplying discharges at its former Delaware Refinery under its NPDES permit, and (2) study the possible effect of past noncomplying discharges at the Refinery.

## **INTRODUCTION**

The issue before the Court is whether plaintiffs NRDC and Delaware Audubon Society ("NRDC") have met their burden of proving that defendant Texaco did not comply with the requirements of this Court's November 6, 1993 Injunction. As explained below, Texaco was required to perform five studies regarding the possible impact of *future* noncomplying discharges at its former Delaware Refinery under its NPDES permit, and one study regarding the possible effect of past noncomplying discharges at the Refinery. Texaco did just that. Unless NRDC can meet its burden of proving otherwise, the motion should be denied.

It is worth noting that much has changed since the Injunction was entered in this case in 1993. In 1998, Texaco entered into a joint venture known as Motiva Enterprises LLC, a limited liability company partly owned by Texaco. In 2002, Texaco was purchased by Chevron Corporation and, pursuant to an order by the Federal Trade Commission allowing the Chevron transaction to proceed, Texaco divested all interest in Motiva, including any interest in the Delaware City Refinery. Thus, as of 2002, Texaco, the named party in this litigation, no longer had any ownership interest in the Refinery at issue. Motiva took responsibility for the work required by the Injunction, and since 2002 has been the sole entity involved in carrying out the studies. In 2004, Motiva sold the Refinery to The Premcor Refining Group Inc. in an arms-length transaction. More recently, on September 1, 2005, Valero Energy Corporation purchased the refinery and all other assets of The Premcor Refining Group Inc. Valero has no relationship to Motiva.

This history has important ramifications.  First, Texaco no longer has any ownership interest in the Refinery, and has had none since 2002.  Second, Texaco has no operational control at the Refinery, and therefore could not implement any monitoring plan even if one were ordered.  Third, Texaco is no longer the NPDES permit-holder at the Refinery, and will have no obligations regarding any future releases.  Four, Motiva likewise has had no ownership interest, operational control or permit obligation at the Refinery since 2004, and likewise could not be responsible for future exceedances.

The purpose of performing the five studies regarding *future* noncomplying discharges was "to provide Texaco with the necessary background information to devise an appropriate monitoring program."  *NRDC v. Texaco Refining and Marketing Inc*., 20 F. Supp. 700, 715 (D. Del. 1998); *aff'd*, 182 F.3d 904 (3d Cir. 1999).  That assumed that Texaco would be in a position to implement a monitoring program at the Refinery.  Clearly, that assumption has not borne out.

Nevertheless, Texaco or, more accurately in recent years, Motiva, was obligated to complete the studies ordered by the Court, and it did so.  NRDC's complaints to the contrary are without merit.

## THE NATURE AND STAGE OF THE PROCEEDING

In February 2000, this Court entered a Stipulated Order negotiated between NRDC and Texaco[1] that resolved the parties' dispute as to the elements of a study that Texaco was required to perform pursuant to the Court's September 1, 1998 Order regarding potential impacts from Texaco's refinery into the Delaware River that exceeded the limits of its NPDES permit. *See* Stipulated Order, February 23, 2000, Ex. A (hereafter "2000 Order").  The September 1, 1998 Order was issued in response to a motion to enforce a November 6, 1993 Injunction issued by this Court, which came on remand after a ruling by the Third Circuit Court of Appeals (*NRDC v. Texaco Refining and Marketing, Inc,*, 2 F.3d 493 (3d Cir. 1993) on appeal of this Court's ruling imposing civil penalties against Texaco for violations of its permit and enjoining future violations.  *NRDC v. Texaco Refining and Marketing, Inc.*, 800 F. Supp. 1 (D. Del. 1992).  While the present motion is brought to enforce the 1993 Injunction, Texaco's compliance with the terms of the September 1998 Order and the subsequent 2000 Order are at issue here.

Specifically, the 1998 Order and the subsequent 2000 Order ordered the study of two discrete issues:

*First*, Texaco was to study the possible impact of *future* noncomplying discharges.  More specifically, Texaco was required to conduct certain aspects of the study as set forth in the 2000 Order that would establish a baseline of conditions at the site and "enable Texaco to design a monitoring program capable of determining the impact of future noncomplying discharges." *NRDC v. Texaco Refining and Marketing Inc*., 20 F. Supp. 700, 703 (D. Del. 1998).

*Second*, Texaco was to study the possible effect of *past* noncomplying discharges.  This involved a single aspect of the study called long-core sampling.  Put simply, sample cores of

---

[1]    Because the named party is "Texaco Refining and Marketing Inc.," this brief refers to the defendant as "Texaco;" however, as noted, Texaco has had no ownership interest in the Refinery since 2002.

sediment were to be taken and analyzed through radioisotope dating and chemical analysis. 20 F. Supp. at 706.

In 2000, in consultation with NRDC, Texaco developed a Scope of Work consistent with the 2000 Order in order to comply with the 1998 Order, and therefore the 1993 Injunction. Texaco completed the studies required by the Court as set forth in the Scope of Work, in collaboration with NRDC's scientist, with modifications as required by circumstances as found in the field, and without substantial objection by NRDC. (Hall Dec. Ex. A, ¶¶ 20-28.)

In December 2003, Texaco presented NRDC the draft report titled "A Baseline Study Report for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach." Six months later, NRDC wrote Texaco raising a series of questions concerning the draft report. (Pl. App. IV at A00330.) Texaco answered each of NRDC's questions. (Hall Dec., Ex. A, ¶ 34; Sept. 1, 2004 Ltr. from Kampman to Bernard, Pl. App. IV at A00334.)

Although Texaco had complied fully with the 2000 Order, NRDC filed a Motion to Enforce the Judgment on July 18, 2005.

## SUMMARY OF ARGUMENT

1.      A motion to enforce a judgment requires the moving party to demonstrate that the defendant has not complied with the judgment. *E.g.*, *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004), *aff'd Heartland Reg'l Med. Ctr. v. Leavitt*, No. 04-5366, 2005 WL 1630814 (D.C. Cir. July 13, 2005).  Thus, NRDC has the burden in the first instance of demonstrating that Texaco has violated the terms of the injunction.

2.      NRDC's brief raises five specific objections to the aspects of the study dealing with possible future noncomplying discharges.  (NRDC Brief at 15-20.)  None of these claims have any merit.  In each instance, NRDC is either simply mistaken about the basic facts or has failed to provide the Court with the full history of Texaco's compliance with the 2000 Order and NRDC's knowledge of and/or acquiescence in that compliance.  In some minor respects, as the 2000 Order anticipated, and as is common in scientific studies of this sort, unforeseen circumstances arose in the field; when that occurred, Texaco took reasonable steps to carry out the purpose of the studies with the knowledge and either active or tacit approval of NRDC's scientist.  Moreover, the 2000 Order states:  "In the event disputes arise concerning the conduct of the Court-ordered studies, the parties will confer and try to resolve them," and Texaco did so.  At bottom, NRDC has failed to carry its burden of proof to demonstrate by a preponderance of the evidence that Texaco has not complied with the judgment.  The Court should exercise its authority under Fed. R. Civ. P. 60(b)(5) and terminate the injunction as to Texaco's study of possible future noncomplying discharges.

3.      As for the requirement that Texaco study the possible effect of *past* noncomplying discharges, this involved a single aspect of the study called long-core sampling. Sample cores of bottom sediment were to be taken and analyzed through radioisotope dating and chemical analysis.  This long-core sampling process was determined by the Court in the 1998 Order and 2000 Order to be the sole method to determine the effect of past noncomplying discharges.

The long-coring work was conducted by the Skidaway Institute of Oceanography, the organization identified in the 2000 Order. NRDC does not challenge the Court's protocol or the Skidaway plan; nor does it argue that, upon completion of the Skidaway work, Texaco would not have satisfied its obligations under the Injunction as to determining the impact of past exceedances. Thus, the only legitimate issue before the Court is whether Skidaway complied with the Skidaway plan.

The record is clear and compelling that Skidaway not only followed its plan, but did so with commendable diligence. Over the course of three excursions, Skidaway visited nearly 85 sites to try and take suitable samples; ultimately, seven samples were suitable for analysis, two samples yielded the full range of useful information and two other samples yielded corroborative information. The record is indisputable that, given conditions at the site, Skidaway collected as many usable samples as it could, and NRDC has no credible evidence to the contrary.

Skidaway's results, which show that PAHs detected in the cores are likely the result of transportation related activities on the river rather than from the Refinery are scientifically valid, and are confirmed by similar studies conducted in the Delaware River estuary by the University of Delaware. But the salient point here is that Texaco has done what it was required to do – and all anyone could have done – to satisfy the 2000 Order and the September 1, 1998 Order as to studying the possible effect of past noncomplying discharges. NRDC cannot reasonably dispute that. NRDC can say only that Texaco should have done the impossible, for no purpose whatsoever. This Court should exercise its power under Rule 60(b)(5) and terminate the portion of the injunction regarding past noncomplying discharges.

4.     Besides the specific claimed violations NRDC sets forth in its brief, NRDC also submits a "critique" by its expert Dr. Livingston and asks this Court to refer this matter to Dr. Means or "in the first instance" (NRDC Brief at 20), casting this motion as one of "competing conclusions of the parties' experts." (NRDC Brief at 23.) NRDC's attempt to open a general scientific inquiry of the Texaco study is a wholly inappropriate use of a motion to enforce an injunction. This is most certainly not a matter of "competing conclusions of the parties' experts."

7.

This is a matter of whether NRDC has met its burden to prove an actual violation of the injunction.

On that point, there is no need for referral to any expert "in the first instance" or at any time. The issues actually before the Court are straightforward, and are certainly no more complex than those commonly reviewed by federal courts in cases involving expert issues. The circumstances that led to Dr. Means' appointment in 1998 were completely different: there, the Court was faced with finding the answers to three open-ended stipulated scientific questions from the parties that clearly required a detailed technical analysis. Here, the question is merely whether NRDC has proved that Texaco did not comply with a court order. That is the sort of issue courts decide every day.

## STATEMENT OF FACTS

### A.    The 2000 Stipulated Order

The February 2000 Order that is at the heart of the present dispute arose from an Order entered by this Court on September 1, 1998. The 1998 Order ordered Texaco to perform a study to accomplish two objectives: (1) to develop a monitoring program capable of determining the impact of *future* noncomplying discharges from the refinery into the Delaware River, and (2) to assess the potential impact of *past* noncomplying discharges:

> In order to comply with the adverse impact provision of its NPDES permit and the Court's injunction, Texaco shall develop and implement a program to adequately measure the adverse impact of its future noncomplying discharges as discussed in Part II of this Opinion. Furthermore, Texaco shall determine the impact of its noncomplying discharges since March 1993 using the protocol discussed in Part II of this Opinion.

20 F. Supp. at 715.

The protocol discussed in Part II of the Opinion was developed by the Court in response to three stipulated questions presented by the parties:

> 1.    In order to comply with paragraph 4 of the Court's November 6, 1993 Order and Section II.A.4 of the NPDES permit, what steps does [Texaco] have to take to determine the nature and impact of future noncomplying discharges by the Delaware City Refinery?...
>
> 2.    Is Texaco's "NPDES Permit Exceedance Response Plan" dated June 15, 1993 . . . which was prepared . . . by ENTRIX Inc., adequate to determine the nature and impact of future noncomplying discharges . . .? In what way(s), if any, is the Response Plan inadequate?
>
> 3.    With respect to discharges by the Delaware City Refinery in excess of NPDES permit limits from March 1993 to the present, is it scientifically possible to determine now the impact, if any, of such discharges? Assuming it is scientifically possible to determine the impact of such discharges, what specific steps would Texaco have to take to do so?

20 F. Supp. at 703.

Under these particular circumstances, it was reasonable to appoint an expert to assist the court in answering these questions. Each was essentially an open-ended, complex scientific inquiry that required significant original work. Therefore, not surprisingly, the parties were asked to nominate experts and the Court selected Dr. Jay C. Means to prepare a report addressing the

stipulated issues.  Ultimately, the 1998 Order ordered Texaco to perform five studies that were meant to enable Texaco to design a monitoring program capable of determining the impact of future noncomplying discharges, and one study – long-core sampling – to determine the impact of past noncomplying discharges.  20 F. Supp. at 715.

A dispute then arose over the adequacy of the scope of work prepared by Texaco and delivered to NRDC in 1999, and NRDC filed a motion to enforce the September 1, 1998 Order. After two days of evidentiary proceedings, the Court suspended the trial at the request of the parties in an effort to reach an agreement about how to conduct the court-ordered study.  The Court subsequently entered an Order titled "STIPULATED ORDER RESOLVING PLAINTIFFS' MOTION TO ENFORCE JUDGMENT" on February 23, 2000 that set forth terms in paragraphs 1(a) through 1(n) that specified how Texaco's proposed Scope of Work would be modified in order to complete the study.  (2000 Order, Ex. A.)  The text of the 2000 Order explicitly reaffirmed that all issues raised in plaintiffs' motion to enforce had been resolved:

> All claims Plaintiffs raised in their motion to enforce the Court Order are resolved by the terms of this Stipulation.  The trial proceedings that were suspended on January 27, 2000, are closed.

(2000 Order ¶4, Ex. A.)

## B. The Scope Of Work

Contrary to the implication left by NRDC's brief, the story of the development of the Scope of Work that governed implementation of the Court-ordered studies, and indeed the history of the work itself, is one of cooperation and collaboration between the scientists engaged by Texaco and NRDC's scientist, Robert Livingston.  At every significant step, Dr. Livingston was kept informed and involved, and either actively or tacitly approved Texaco's activities and choices.

Following the 1998 Order, Texaco engaged Lenwood Hall, Jr. and his colleague Dr. Dennis Burton to develop and complete a study program that would implement the five studies described in the Court's 1998 Opinion.  (Hall Dec. ¶ 5.)  Mr. Hall is Program Manager of Aquatic

Toxicology at the University of Maryland Agricultural Experiment Station, Wye Research and Education Center, and has been since 1989.  He has more than 26 years of experience conducting ecotoxicity studies in freshwater and salt water environments.  His specific areas of expertise include: aquatic toxicology; ecological risk assessment of pesticides, metals, and organometallics; exposure characterization of pesticides; development of biological/physical habitat indicators and bioassessments.  He has published more than one hundred scientific papers in peer-reviewed journals; 4 books; 24 book chapters/monographs (some peer-reviewed) and 103 technical reports. (Hall Dec. ¶¶ 1-3.)

 While work was underway on a pilot study to implement the five studies, the court challenge began that led to the 2000 Order.  Consistent with paragraph 1(k) of the 2000 Order, Texaco developed a Scope of Work specifying how the study would be completed, including which protocols the researchers would follow in completing the study.  This Scope of Work describes in approximately 150 pages of detail all elements of the Study and the methodology to be used, and was designed to meet the Court-ordered studies specified in the 2000 Order.  (Hall Dec. ¶¶ 6-7.)

 In May 2000, Mr. Hall presented a draft Scope of Work to NRDC's scientist, Dr. Livingston requesting comments.  Dr. Livingston's initial assessment was that the Scope of Work was largely satisfactory and that only a few small matters needed to be addressed.  (Pl. App. IV at A00282.)  The researchers then began preliminary work on the issues that had been resolved. (Hall Dec. ¶ 9.)

 As for the few other issues, Mr. Hall incorporated the majority of Dr. Livingston's suggestions to the Scope of Work, and he and Dr. Livingston further discussed the remaining issues.  (Hall Dec ¶ 10; Aug. 25, 2000 e-mail from Hall to Livingston, Ex. 4 to Hall Dec.)  During this time, there was extensive correspondence between Dr. Livingston and Mr. Hall to finalize the Scope of Work.  (Pl. App. IV at A00297.)  After receiving Dr. Livingston's final comments on the Scope of Work, Mr. Hall issued a final version of the Scope of Work on November 6, 2000. (P. App. IV at A00120.)

### C.     The Studies

As the coordinator for the studies, Mr. Hall was responsible for assembling the team of scientists that would conduct the individual studies.  There appears to be no dispute about the qualifications of those scientists.  The scientists and researchers who participated in this study, including Dr Ray Alden (statistical analysis of study components), Dr. Al Uhler (PAH chemistry and fingerprinting and analysis of other chemical constituents),  Mr. Mike and Mrs. Sandra Salazar (bivalve bioavailability studies), Dr. Dan Dauer (benthic community assessments), Dr. Clark Alexander and Dr. Richard Lee (long term coring), Dr. Robert Llanso (sediment trap studies), Dr. Joe DiLorenzo (fate and transport studies), and Dr. Dennis Burton (aquatic toxicologist and co-principal investigator), are known experts in their fields who performed the individual components of this study using valid, scientifically defensible techniques.  (Hall Dec. ¶ 18.)

Mr. Hall directed the researchers, who followed the terms of the Scope of Work in collecting study data, and ensured that all elements of the Scope of Work were followed.  The various component studies (such as the coring, PAH fingerprinting, and *rangia* tissue analysis) were performed by the independent scientists, who worked with Mr. Hall as he compiled the results of these studies into a draft report.  (Hall Dec. ¶ 13.)

Texaco kept Dr. Livingston, NRDC's scientist, firmly in the loop during the conduct of the studies.  The written record is clear that Mr. Hall communicated with Dr. Livingston several times regarding the status of the study, and the initial assessments that the researchers had made.  Hall Dec. ¶¶ 35-37, *see also*, *e.g.*, letters and emails from Hall to Livingston dated February 8, 2001; May 16, 2001; August 16, 2001; April 5, 2002; August 13, 2002; September 24, 2002; and October 2, 2002; and October 7, 2002; attached as Ex. 7 to Hall Dec.).

The August 13, 2001 communication to Dr. Livingston is typical, yet telling.  It is a "brief update on the various tasks for the Motiva study" from Mr. Hall to Dr. Livingston.  It happens to cover several of the issues NRDC complains of in its brief:

*First*, under the heading "PAH Fingerprinting," it states clearly the "PAH fingerprinting analysis has been initiated…." This follows the language of Section 1(i)(l) of the 2000 Order, which reads "Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments." There is no mention in the August 13, 2001 communication of "PAH loading," which, as described below, NRDC argues Texaco should have done instead. NRDC had no reason to think Texaco was going to do a "loading study," and had ample time to object;

*Second*, under the heading "Bivalve Study," the August 13, 2001 communication states: "Rather than using caged bivalves, resident clams (*Rangia cuneata*) were collected at various sites near the Motiva refinery during March and November of 2001." Dr. Livingston expressed no concerns about the use of resident clams instead of caged clams;

*Third*, under the heading "Long Term Coring," the August 13, 2001 communication states: "Dr. Livingston was involved with the sampling [of] candidate coring sites in August 2000." As explained in Section III below, one of NRDC's claims is that Texaco did not analyze enough core samples from the "right" locations. But NRDC fails to mention that Dr. Livingston, its scientist, participated in the process of selecting sampling locations. Indeed, this was explicitly contemplated by the 2000 Order, which states: "Dr. Livingston will be involved in the site selection for long cores" – another fact NRDC neglects to mention; and

*Fourth*, under the heading "Tissue Analysis of PAHs in Sediment Toxicity Test Species," the August 13, 2001 communication summarizes the entire resolution of NRDC's claim at page 20 of its brief that "Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured." (NRDC Brief at 20.) That issue is fully addressed in Section II below. In brief summary, the parties disagreed as to whether tissue analysis of benthic (bottom-dwelling) organisms could be done; pursuant to the 2000 Order, an independent scientist was appointed to arbitrate the matter, who concluded it could not be done to produce scientifically sounds results. That entire history is stated in the August 13, 2001 communication. It is befuddling that NRDC claims that failure to do the analysis is in any way a violation of the injunction. Dr. Livingston never expressed any concerns with the methods Texaco's scientists

used in any of these respects.  Indeed, Dr. Livingston offered no specific comments prior to the

critique attached to NRDC's motion.  (Hall Dec. ¶ 41.)

D.        The Study Report

In December 2003, Mr. Hall presented to Motiva and NRDC the draft report, titled "A

Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises

LLC Delaware City Refinery Effluent Using the Sediment Triad Approach."  (Hall Dec. ¶ 14; Pl.

App. I & II.)  Although the conclusions of the report are not material to Texaco's compliance

with the Injunction, they are worth stating here::

A.  All Study Report components indicated that the Delaware River, in the vicinity
of the Motiva Refinery, displayed some degree of sediment contamination,
chronic sediment toxicity, and benthic community impacts.

B   As determined through PAH fingerprinting, all Study Report components
indicated that the aforementioned environmental effects did not appear to be
related to the Refinery effluent.

C.  The magnitude of any potential impact due to the Refinery effluent was dwarfed
by the other sources of pollution in this urbanized/industrialized estuary and, as is
common with these ecosystems elsewhere, the sources of these adverse impacts
appear to be diverse and diffuse.

(Hall Dec ¶ 15)

The data and conclusions of the Study Report have been subjected to and have passed

vigorous peer review.  The scientists working on this study reorganized the data into a series of

scientific papers submitted and accepted for publication in the scientific journal Human and

Ecological Risk Assessment ("HERA").  These papers, titled "An Integrated Case Study for

Evaluating the Impacts on an Oil Refinery Effluent in the Delaware River, - including various

study components", were published August of 2005.  (Hall Dec ¶ 17; Ex. 5 to Hall Dec.)

It is also worth noting that the cost estimates for these studies turned out to be badly

underestimated.  In the 1998 Opinion, the cost of the studies was estimated to be $700,000.  20 F.

Supp. at 713.  The actual cost of the studies amounted to more than $4 million, more than *five*

*times* the estimate.  (Hall Dec. ¶ 19)

<u>**ARGUMENT**</u>

A motion to enforce a judgment requires a prevailing party to demonstrate that the defendant has not complied with the judgment. *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004), *aff'd* , 415 F.3d. 24 D.C. Cir. 2005); *Manning v. School Bd. Of Hillsborough County*, No. 58-3554-CIV-T-17C, 1997 WL 33479029, *27 n47 (M.D. Fla. Aug. 26, 1997) (attached hereto as Ex. B) ("Of course, the burden is on plaintiffs in their motion to enforce to demonstrate that defendants have violated the Court's orders"), *modified in part on other grounds*, 24 F. Supp. 2d 1277 (M.D.Fla. 1998), *rev'd on other grounds*, 244 F.3d 927 (11th Cir. 2001); *Youngblood v. Dalzell*, 777 F. Supp. 1382, 1386 (S.D. Ohio 1991) (applying preponderance of the evidence standard to a motion to enforce decree). Thus, NRDC has the burden of demonstrating that Texaco has violated the terms of the injunction.

NRDC's specific claims that Texaco has violated the injunction can be grouped into two categories: five claims involving aspects of the study dealing with possible *future* noncomplying discharges, and a single claim involving that portion of the study addressing the possible effect of *past* noncomplying discharges. The five claims regarding the study of future noncomplying discharges are that:

(1) "Texaco emphasized concentrations of PAHs rather than actual loadings of PAH compounds to the [Delaware] River" (NRDC Brief at 15), that

(2) "Texaco … wrongly used sampling stations near the refinery's effluent canal to identify the PAH fingerprint it would later use to downplay Texaco's contribution to downriver contamination" (NRDC Brief at 16), and that

(3) "Texaco's failure to analyze PAH loading from the refinery compromised the detailed characterization of fate and transport processes that were a central feature of the Court-mandated research program." (NRDC Brief at 20);

(4) "Bioavailability" – in other words, Texaco did not conduct studies to determine the possible impact of Refinery effluent on caged bivalves, i.e., clams (NRDC Brief at 17-19); and

(5)  "Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured" (NRDC Brief at 20).

The sole claim regarding the study of past noncomplying discharges is:

(1) "Long Core Analysis", according to NRDC, Texaco "failed to complete successfully the long core experiments the Court prescribed" (NRDC Brief at 15).  None of these claims has merit.

## I.     NRDC HAS FAILED TO MEET ITS BURDEN TO PROVE ANY VIOLATION OF THE INJUNCTION REGARDING FUTURE NONCOMPLYING DISCHARGES

### A.     NRDC Has Not Met Its Burden Of Proving That Texaco Violated the Injunction

NRDC's first three claims that Texaco violated that injunction stem from Section 1(l) of the 2000 Order, which provides for "PAH fingerprinting" as part of the study of the possible impact of future noncomplying discharges.  The 2000 Order stated in Section 1(l): "Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments."

PAH "fingerprinting" relies upon the comparison of PAH concentration patterns from suspected sources to the PAH concentration patterns measured in potentially impacted environmental samples.  That is precisely what Texaco did.  NRDC, on the other hand, wants Texaco to conduct a "loading" study, which is a measure of the total amount of PAHs entering the Delaware River in a given period of time.  That was simply not the study required by the injunction.

NRDC's arguments to the contrary are unavailing.  Nor do they require reference to an expert "in the first instance" to resolve.  In fact, NRDC has misinterpreted Texaco's obligation under the 2000 Order.  At a minimum, NRDC has fallen short of its burden to prove a violation of the injunction.

### 1.    The 2000 Order Required The Fingerprinting Study Texaco Performed, Not A Loadings Study

NRDC's complaint that Texaco should have performed a "PAH loadings" study instead of a "PAH fingerprinting study" is most easily answered by the 2000 Order itself, which explicitly required a PAH fingerprinting study:

> Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments.

(2000 Order, Ex. A, Section 1(l))    The fingerprinting study mandated by the Order is fundamentally different from the loadings study NRDC now seeks.    Finally, NRDC has had ample time to object to the fingerprinting study, and should not be heard to complain at this late date.

Allen D. Uhler, Ph.D. is a senior scientist at Newfields Company LLC who was primarily responsible for conducting the PAH fingerprinting analysis. His particular area of expertise is environmental forensics - the application of advanced chemical analyses to determine the nature, sources, and fate of hydrocarbons and industrial chemicals in the environment.  He has over 20 years of experience working in the field of environmental chemistry.  In the past 20 years, he has authored or co-authored over 150 professional papers, text book chapters, and presentations, regarding the analysis, occurrence, distribution and fate of chemicals in the environment.  Among these works are over 25 on the subject of identifying the nature and sources of PAHs in the environment, including a recent peer reviewed journal article that describes the chemical "fingerprinting" of PAHs carried out to comply with the February 22, 2000 order issued by this Court.   He was founding co-editor and now serves on the editorial board of the journal *Environmental Forensics*.  He is the founding member of the American Society for Testing and Materials ("ASTM") International Subcommittee E50.06, *Forensic Environmental Investigation*, and has extensive technical experience in matters pertain to PAH contamination in waterways. (Uhler Dec. ¶ 1-4)  His qualifications have never been and cannot be seriously questioned.

Dr. Uhler explains the difference between a PAH "fingerprinting" study and a PAH "loading" study.  A "fingerprinting study" relies upon the comparison of PAH concentration

patterns from suspected sources – i.e., the source "fingerprint"-- to the PAH concentration patterns measured in potentially impacted environmental samples. In the case of the Texaco study, the PAH fingerprinting process compared the PAH fingerprint of the Refinery effluent against the residual PAH concentration patterns in sediments in the area being studied near the Refinery. Thus, the PAH "fingerprint" is the pattern formed by the concentration of the individual PAHs detected. (Uhler Dec. ¶ 9b)

Loading of PAHs, on the other hand, is a measure of the total amount (mass) of PAH compounds that enter a receiving environment (*i.e.*, the Delaware River) in a given period of time. This, as Dr. Uhler explains, is obviously quite different from a fingerprinting study. (Uhler Dec. ¶ 9c)

None of this was surprising to NRDC. As Mr. Hall explains, a "mass balance analysis" and "loadings analysis" are the same thing. The Scope of Work clearly states that "a mass balance chemical fate and sediment flux transport model of PAHs will not be conducted." (Pl. App. At A00131.) As noted, Dr. Livingston was kept informed of the progress of work pursuant to the Scope of Work. (*E.g*., Aug. 12, 2002 Ltr. from Hall to Livingston ("PAH fingerprinting analysis has been initiated…."), (Ex. 7 to Hall Dec.)

There are good reasons why a loading study would make little sense under these circumstances. For example, Dr. Uhler points out that loading studies in large complex river systems are remarkable daunting undertakings because contributions of chemicals of concern such as PAHs from *all* point and non-point sources must be identified and measured if the relative contribution contributed to a river system by a particular source (such as the Refinery) is to be measured. Because of the complexities involved, river loading studies can take years to complete. In the Delaware River, a loading study for polychlorinated biphenyls ("PCBs") required more than a decade to finish, and continues to undergo revision. A rigorous loading study of PAHs to the Delaware River has yet to be undertaken, but the multitude and complexity of sources of PAHs of the Delaware River suggests that such undertaking would be equally, if not more complex, in the lengthy PCB study. (Uhler Dec. ¶ 9f.)

The question of which study would have been better, however, need not be resolved on NRDC's motion to enforce. Texaco was ordered to do a PAH fingerprinting study. That is what it did. NRDC has no cause to complain.

### 2. The 2000 Order Required Taking Samples From The Refinery Effluent

NRDC's complaint that Texaco somehow "wrongly used sampling stations near the refinery's effluent canal to identify the PAH fingerprint" is simply difficult to understand. As Mr. Hall points out in his declaration, the 2000 Order specifically states that "[f]ingerprinting of PAHs *from refinery effluent* will be compared to PAHs in the sediments." (Hall Dec. ¶ 38.) The Scope of Work, which Dr. Livingston reviewed on behalf of NRDC, also states that the samples will be taken of Refinery effluent. (Hall Dec. ¶ 38; Pl. App. A00129.) Texaco complied with the 2000 Order and the Injunction.

### B. NRDC Has Not Met Its Burden Of Proving That Texaco Violated The Injunction With Regard To The Bioavailability Study

NRDC next argues that Texaco did not conduct studies to determine the possible impact of Refinery effluent on caged bivalves, i.e., clams. (NRDC Brief at 17-19.) In fact, Texaco complied with the relevant aspect of the 2000 Order as closely as scientifically and practically possible, and was able to complete the study and answer the relevant question in a scientifically valid manner. The researchers in this study explored all possible avenues to procure the clean clams ("*rangia*") required for this caged bivalve study. However, samples of *rangia* were not available for placing in cages in the study area, as all samples found either already contained high levels of PAHs in their tissues or were not disease free. Texaco encountered regulatory roadblocks from Delaware and Louisiana in its search for suitable *rangia*. As required by the Order, Mr. Mike Salazar was closely involved in this process, and approved of the researchers' approach of collecting resident *rangia* from the study area instead of using caged clams in response to these changed circumstances. Moreover, NRDC knew that Texaco had made reasonable scientific adaptations and raised no objections.

The 2000 Order states, in relevant part:

d.   <u>Bioavailability</u>.  Defendant will conduct a caged bivalve study at selected sample sites in the study area, with concurrent PAH, metals, and PCB analyses.  This study will be conducted after the field site selection process has been completed, and station arrays from the bivalve study will be based on the results of the various studies associated with site selection.  Dr. Mike Salazar will be involved in this process.

(2000 Order, Ex. A.)

Dr. Dennis Burton, Senior Research Scientist at the University of Maryland, previously described as a co-coodinator of the overall studies with Mr. Hall, assisted Mr. Salazar as to the logistics of the bivalve study.  In collaboration with Mr. Salazar, Dr. Burton was responsible for obtaining the *Rangia*.  (Burton Dec. ¶ 7.)

Dr. Burton recounts in detail the tremendous efforts spent trying to locate *Rangia* in the Delaware River and other rivers outside of the State that had sufficiently low concentrations of tissue PAHs for use in the cage studies.  Mr. Salazar agrees.  Because NRDC states in its brief that "the written record plaintiffs have reviewed does not reveal any substantial effort by Texaco to overcome [regulatory] obstacles," Texaco is compelled to set the record out at length.

### 1.   Dr. Burton Confirms That Texaco Did Everything Reasonably Possible to Use Caged Bivalves

Dr. Burton states that a number of sources were originally considered for obtaining *Rangia* for the caged bivalve study because a 1999 preliminary Texaco study showed that PAHs were present in the sediment at all stations in the study area and thus *Rangia* in the study area would most likely have PAHs present in their tissue.  (Burton Dec. ¶ 9.)  On July 6, 2000, he consulted with Don Webster, a University of Maryland Area Specialist, Marine Science, for recommendations about locating *Rangia* specimens with low PAH tissue concentrations.  Mr. Webster stated that *Rangia* might be found from local sources, but that availability varies from year to year, as the study area is located at the northern extreme of *Rangia's* natural habitat.  He suggested several possible sources further south, specifically Dr. Mory Roberts, Virginia Institute

of Marine Science; Dr. Geoffrey Scott, National Ocean Services Center, Charleston, SC; and Dr. Mike Poirrier, University of New Orleans. (Burton Dec. ¶ 10.)

Additionally, Dr. Burton called Dr. Don Meritt at the University of Maryland Horn Point Laboratory Aquaculture Facility. Dr. Meritt agreed with Don Webster about the sources for *Rangia*. He also knew where local *Rangia* beds were located, from which samples could be collected. He did not know about the possible PAH tissue concentrations for those samples. Dr. Meritt also told Dr. Burton that permission from DNREC may be needed to move Maryland clams into Delaware waters. (Burton Dec. ¶ 11.)

On July 12, 2000, Dr. Burton spoke with Dr. Fred Pickney of the U.S. Fish and Wildlife service about local sources of *Rangia*. Dr. Pickney stated that he had previously used *Rangia* collected from the James River, and suggested Dr. Burton contact Dr. Eugene Maurakis at the Science Museum of Virginia. Dr. Maurakis was not able to provide any information about the PAH tissue concentrations of *Rangia* collected from the James River. Dr. Burton also contacted Dr. Geoffrey Scott in South Carolina about *Rangia;* however, Dr. Scott could provide no information about PAH concentrations in South Carolina *Rangia*. (Burton Dec. ¶ 12.)

On July 13, 2000, Dr. Burton spoke with Hank Lloyd at Motiva about whom he should call in Delaware to receive permission to bring into Delaware out-of-state *Rangia* that would most likely have lower PAH tissue concentrations than *Rangia* found in Delaware. Mr. Lloyd suggested Roy Miller at the Delaware Division of Fish and Wildlife, who then referred him to Rick Cole (who works with shellfish). Rick Cole referred Dr. Burton to Charles Lesser, of the Fisheries Administration of the Delaware Division of Fish and Wildlife, who stated that any out-of-state *Rangia* must first be certified as disease free before being introduced into the Delaware River for a cage study. He stated Delaware would accept certification from the Maryland Department of Natural Resources Cooperative Oxford Laboratory in Oxford, Maryland. (Burton Dec. ¶ 13.)

At this point, Dr. Burton contacted Mike Poirrier again at the University of New Orleans because he had previously stated that the *Rangia* used in his laboratory had low concentrations of

PAHs in their tissues, and that they were disease ("Dermo") free.  Since Dermo is found in almost all *Rangia* populations on the East and Gulf Coasts, Dr. Burton ordered a sample of *Rangia* from Mike Poirrier for Dermo testing.  (Burton Dec. ¶ 14.)  In addition, on August 9, 2000, Dr. Burton arranged with Stephanie Abadie to send a forty (40) animal sample of *Rangia* from the University of New Orleans to Dr. Carol McCollough of the Oxford Laboratory for disease certification. (Burton Dec. ¶ 15.)

On August 18, 2000, Dr. Burton was involved in communications with Mr. Salazar regarding the size and condition parameters that were required of *Rangia* specimens for the caged study.  On this same day, Dr. McCollough at the Oxford Laboratory confirmed that the *Rangia* samples were received and in good condition for the disease certification analysis.  (Burton Dec. ¶ 16.)

On August 24, 2000, Dr. Burton received Dr. McCollough's diagnostic report concerning the *Rangia* disease assay for Dermo in the University of New Orleans clams.  Dr. McCollough found that "*Perkinsus marinus* (Dermo) was detected in one (1) animal from a 30 animal sub-sample.  (Burton Dec.  ¶ 17; Aug. 24, 2000 Ltr. from McCollough to Burton, Ex. 2 to Burton Dec.)

On September 1, 2000, Dr. Burton wrote a letter to Charles Lesser, Fisheries Administrator for the Delaware Natural Resource and Environmental Control ("DNREC"), Division of Fish and Wildlife, explaining the study approach of the caged bivalve study at Motiva and requested permission to use *Rangia* from Louisiana that had a very low prevalence (3.3%) of Dermo, as based on the Oxford analysis of the *Rangia* he had requested.  (Burton Dec.  ¶ 18; Sept. 1, 2000 Ltr. from Burton to DNREC, Ex. 3 to Burton Dec.)

On September 11, 2000, Jeff Tinsman, a shellfish disease specialist from the Delaware Division of Fish and Wildlife, called and stated that he would not allow out-of-state *Rangia* infected with Dermo to be introduced to Delaware waters, as he was concerned about introducing a possible new strain of Dermo to Delaware shellfish.  (Burton Dec. ¶ 19.)

On September 13, 2000, Dr. Burton received a letter from Charles Lesser, of the Delaware Division of Fish and Wildlife, denying permission to use the Louisiana *Rangia* in a caged study in the Delaware River.  Mr. Lesser recommended one of two approaches but stressed that permission to use Louisiana *Rangia* would be denied:

> The first is to follow the ICES [International Convention for Exploration of the Seas] guidelines for introductions which would involve holding the Louisiana *Rangia* in quarantine, spawning them and placing the disease-free $F_2$ *Rangia* in situ the next summer.  This could be done at Horn Point Lab or elsewhere.  The second is to work with Delaware Bay *Rangia* by characterizing their background PAHs and using sufficient numbers to statistically estimate temporal and spatial changes in PAHs near the Motiva refinery.  In summary, [our] position is not to permit the transfer of $F_1$ Louisiana *Rangia* and recommend the $F_2$ or local *Rangia* be used.  In the latter case, we would issue you a collecting permit.

(Burton Dec. ¶ 20; Sept. 13, 2000 Ltr. from Lesser to Burton, Pl. App. IV at A00296.)

On September 18, 2000, Dr. Burton spoke with Don Webster, about the DNREC letter, and the ICES guidelines for producing Dermo-free *Rangia*.  Mr. Webster stated that he was doubtful that we could use the ICES procedure and still guarantee that the *Rangia* would be free of Dermo.  Dr. Burton also discussed this issue with Dr. Meritt, of the University of Maryland Horn Point Lab, which DNREC had recommended for the procedure.  Dr. Meritt agreed that the procedure would not guarantee Dermo-free *Rangia* and that he thought it was a "high risk" undertaking.  (Burton Dec. ¶ 21.)

On September 18, 2000, Dr. Burton applied for a permit to collect *Rangia* from the Delaware River.  The permit was granted, via fax, on September 20, 2000.  Dr. Burton received the "official" paper copy of the permit on September 28, 2000.  (Burton Dec. ¶ 22.)

In collaboration with Mr. Salazar, Dr. Burton initiated a pilot study to determine if, based on the level of PAHs in tissue, *Rangia* from the Delaware River were suitable for use in a caged study.  *Rangia* were collected at several locations and sent to Battelle for PAH, lipid, and percent water content analyses.  (Burton Dec. ¶ 23.)

On December 22, 2000, Dr. Burton received the PAH analyses from Battelle.  The results showed that PAH concentrations were not acceptable for a caged study.  Based on these findings,

Mr. Hall and Dr. Burton discussed placing the *Rangia* in "clean" Delaware water and determining whether the clams could depurate, or eliminate, sufficient PAHs from their tissues to be used in caged studies. (Burton Dec. ¶ 24.)

On January 17, 2001, Dr. Burton reported to DNREC the numbers of clams used in the pilot study, as required by the terms of the permit. Dr. Burton also applied for a renewal of the permit to collect clams during 2001. On January 25, 2001, Dr. Burton received the new permit dated 01-19-2001. (Burton Dec. ¶ 25.)

From the end of January to the beginning of February 2001, Dr. Burton discussed the depuration study with Mr. Salazar and Mr. Hall. Drawyers Creek in Delaware, which was one of two sites suggested by DNREC's Craig Shirey, was visited by the technical personnel and selected for the study. (Burton Dec. ¶ 26.)

On February 19, 2001, *Rangia* were collected for the depuration study. The study lasted 28 days. The results showed that after 14 days the *Rangia* had depurated approximately 50% of the total PAHs in their tissues. However, no further elimination had occurred by day 28. It was concluded that the PAH tissue concentrations were still too high to use for the caged bivalve studies. (Burton Dec. ¶ 27; Pl. App. I at A00643.) Because of the results of the depuration study, the researchers decided to use resident clams for the bioavailability study. (Burton Dec. ¶ 28.).

### 2. Mr. Salazar Confirms That Texaco's Decision To Use Resident Clams Was Reasonable And Scientifically Valid

The 2000 Order required that Michael Salazar be involved in the bioavailability study. (2000 Order at Section 1(d); Ex. A.) In fact, he designed the study itself, and should be the best judge of whether alterations due to changed circumstances affected its validity. (Salazar Dec. ¶ 6.) Mr. Salazar finds it reasonable that Dr. Burton was unable to locate undiseased *Rangia*. Moreover, Mr. Salazar agrees with Dr. Burton that using resident clams was a scientifically appropriate substitute.

Mr. Salazar has more than 37 years of experience and expertise in aquatic toxicology, aquatic ecology, and ecotoxicology, and has particular experience and expertise in designing and conducting studies using caged bivalves, such as oysters, mussels, and clams ("bivalves"). His specific areas of expertise include bioaccumulation and associated affects in marine, estuarine, and freshwater bivalves. He has conducted more than 65 caged bivalve studies. He co-wrote the American Society for Testing and Materials ("ASTM") *Standard Guide for Conducting In-Situ Field Bioassays with Marine, Estuarine and Freshwater Bivalves*, a section of *Standard Methods for Examination of Water and Wastewater* that deals with caged bivalve studies, as well as a recent book chapter in *Techniques in Aquatic Toxicology (Volume 2),* pertaining to caged bivalve studies. (Salazar Dec. ¶¶ 1-3.) It is safe to say that he is the preeminent expert in caged bivalve studies.

Mr. Salazar states that *Rangia* are generally not used commercially, infrequently used in scientific experiments, and not readily available on a commercial basis. Thus, the inability of Dr. Burton to locate other *Rangia* suitable for a caged study was not surprising. (Salazar Dec. ¶ 9.) He further states that, to overcome this problem, he consulted with Dr. Burton about using native *Rangia* found in the study area ("Resident Clams") instead of importing and transplanting non-native *Rangia*. (Salazar Dec. ¶ 11.)

Mr. Salazar states that the use of resident, instead of transplanted, clams for the study was appropriate provided clam beds were present over sufficient spatial areas to adequately characterize the bioavailability of the contaminants from the Refinery. Additionally, in his view, using clams that had been exposed over their entire lifetime would eliminate some uncertainties associated with exposing caged clams for a relatively short period of time. In this respect, according to Mr. Salazar, using the resident clams would provide bioavailability data with fewer uncertainties than using caged clams because the organisms are not being manipulated in the field before chemical analysis. (Salazar Dec. ¶ 11.)

The salient point is that, as both Dr. Burton and Mr. Salazar make clear, Texaco did everything reasonably possible to perform the caged bivalve study, and in fact performed a

bioavailability study using resident clams that was scientifically valid.  NRDC simply cannot show either that the caged bioavailability study was reasonably possible to perform in the face of the overwhelming evidence to the contrary, or that the study conducted was not scientifically valid.

> **3.      NRDC Knew Years Ago That Texaco Was Using Resident Clams And Stood Silent Until Now**

Dr. Burton confirms that, as the unavailability of caged clams was unforeseen when the Scope of Work was developed, Dr. Livingston was kept informed of this necessary change in protocol.  (Burton Dec. ¶ 29.)  Indeed, as noted, the record is replete with communications to Dr. Livingston reflecting his knowledge of this changed condition.  E.g.,  May 16, 2001 e-mail from Hall to Livingston, Pl. App. IV at A00325, ("Resident Rangia (not caged Rangia) have been collected from various sites in the Delaware River this spring and tissue is presently being analyzed for PAHs, pesticides, PCBs and metals"); Aug. 12, 2002 Ltr. from Hall to Livingston, Ex. 7 to Hall Dec.,  ("Rather than using caged bivalves, resident clams (*Rangia cuneata*) were collected at various sites near the Motiva refinery during March and November of 2001." )  Livingston never expressed any objection to Texaco's adaptation of the bioavailability study.

> **C.      NRDC Has Not Met Its Burden Of Proving That Texaco Violated The Injunction With Regard To Analyzing Bioconcentration Levels Of Toxic Agents In Bottom-Dwelling Organisms**

NRDC next claims that "Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured."  (NRDC Brief at 20)  This may be NRDC's oddest complaint.  The record is crystal-clear that NRDC's scientist was intimately involved in every aspect of this issue, and so was fully aware of the changed circumstances that made the proposed analysis impossible.  More importantly, the 2000 Order explicitly recognizes on its face that such analysis may not be feasible and requires in such an event that the parties' experts confer and attempt to resolve the issue.  Pursuant to the general "Dispute Resolution" section of the 2000 Order, the parties engaged an independent expert to decide the issue; again, NRDC's expert *agreed to this*.  The independent expert concluded on December 7, 2000 that the

proposed tissue analysis was not appropriate, carried the risk of yielding misleading data and was unnecessary given the study design, yet NRDC asks this Court five years later to find a violation of the Injunction.  That is absurd.

"Benthic" organisms live at the river or sea bottom.  As Mr. Hall recounts, the Scope of Work called for the collection of benthic organisms for tissue analysis to determine the bioconcentration levels of certain toxic agents, including PAHs.  The researchers determined that the benthic organism tissue analysis specified in the Scope of Work could not be conducted in a scientifically defensible manner on the organisms selected for the sediment toxicity tests.  However, Dr. Livingston did not agree about whether the analysis specified in the Scope of Work may produce misleading results.

Pursuant to Paragraphs 1(h) and 1(n), and with the agreement of Dr. Livingston, the parties employed an independent expert, Dr. David Page, to address the issue of benthic organism tissue analysis.  (Hall Dec. ¶ 22.)   Paragraph 1(h) of the Order states that, with respect to the tissue analysis of benthic organism tissue for PAHs, "[i]f a question arises concerning the feasibility of such analysis, the parties' experts will confer and attempt to resolve that issue."  Furthermore, Paragraph 1(n) of the Order states that in the event that a dispute arises regarding the conduct of a study, "[t]he parties will explore the possibility of arbitrating such disputes before individuals with expertise in the relevant scientific subject matter area."

Dr. Page ultimately issued a written opinion to both parties that concluded, in part, "The method for the analysis of amphipod tissue samples…for PAH proposed by Dr. Means is not appropriate to the current project and carries the risk of yielding misleading data."  Additionally, as the benthic organisms are very small, "the effects of lab and field contaminants are amplified, thus leading to errors and in extreme cases, miss-attribution of PAH sources."  Finally, "The proposed amphipod tissue analyses are unnecessary because of the triad-based study design adopted in this project."  (Hall Dec. ¶ 23; Dec. 7, 2000 Ltr. from Page to Hall, Ex. 7 to Hall Dec.)

27.

That should be the end of the matter: Texaco fully complied with the 2000 Order implementing the Injunction, with the full knowledge and participation of NRDC. NRDC's request for a finding that Texaco has violated the Injunction is mystifying.

II.     **THE PORTION OF THE INJUNCTION MANDATING A STUDY OF FUTURE NONCOMPLYING DISCHARGES SHOULD BE TERMINATED AS SATISFIED**

Federal Rule of Civil Procedure 60(b)(5) empowers a court to relieve a party from an injunctive judgment when it is no longer equitable for the injunction to remain in force. *Building and Constr. Trades Council of Phila. and Vicinity v. National Labor Relations Bd.*, 64 F.3d 880, 888 (3d Cir. 1995). Rule 60(b)(5) provides:

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.
>
> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:…(5) the judgment has been satisfied, released, or discharged, or…it is no longer equitable that the judgment should have prospective application…

Fed. R. Civ. P. 60(b)(5).

While the Third Circuit has stated that an exercise of equitable powers requires flexibility, several considerations should be considered in ruling upon a Rule 60(b)(5) motion for relief from an injunction, including the following significant factors:

> (1)     whether the party subject to its terms has complied or attempted to comply in good faith with the injunction
>
> (2)     whether changed conditions unforeseen by the parties have made compliance substantially more onerous or have made the decree unworkable
>
> (3)     the length of time since entry of the injunction, and
>
> (4)     whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest.

*Building and Constr. Trades Council*, 64 F.3d at 888.

It should be recognized that any prospective order contains elements of uncertainty, and a party's good faith attempt to comply with an injunction may demonstrate that absolute compliance with a particular component of the injunction is unachievable. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 385 (1992) ("Litigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree") and *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1120 (3rd Cir. 1979):

> Any injunction imposing mandatory affirmative duties for the future involves elements of prediction. Whether the prediction as to achievability is made as a result of litigation or, as here, in a negotiated settlement, it will always be speculative to some degree....  Even where the decree is litigated, if the power to modify were too closely curtailed the defendants might seek, and the courts might tend to impose, minimum affirmative obligations, perhaps less than realistically achievable, for fear of becoming bound by unreasonable but unchangeable requirements.  Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in the light of experience....

602 F.2d at 1120.  Thus, as the United States Supreme Court stated in *Board of Educ. of Oklahoma City Pub. Schools v. Dowell*, 498 U.S. 237, 249-59 (1991), the goal of an injunction is to ensure compliance to the extent practicable.  498 U.S. at 249-59 (1991); *see also*, *e.g.*, *Davis v. School Dist. of The City of Pontiac*, 95 F. Supp. 2d 688, 696-97 (E.D.Mich. 2000) (*de minimus* deviations from dictates of decree prevented "absolute compliance" but were insufficient to defeat motion to dissolve injunction).

As noted, the 1993 Injunction Order, as interpreted by the 1998 and 2000 Orders, required Texaco to conduct studies that would establish a baseline of conditions at the site and "enable Texaco to design a monitoring program capable of determining the impact of future noncomplying discharges."  *NRDC v. Texaco Refining and Marketing Inc*., 20 F. Supp. 700, 703 (D. Del. 1998).  Texaco engaged independent scientists who did the work and completed the studies.  NRDC's brief failed to carry its burden of proving by a preponderance of the evidence that Texaco failed to do so.

Moreover, viewed under the *Building and Constr. Trades Council* factors, it is clear that Texaco is entitled to relief in any event. Again, those factors are:

(1)    whether the party subject to its terms has complied or attempted to comply in good faith with the injunction

(2)    whether changed conditions unforeseen by the parties have made compliance substantially more onerous or have made the decree unworkable

(3)    the length of time since entry of the injunction, and

(4)    whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest.

*Building and Constr. Trades Council*, 64 F.3d at 888.

NRDC's first issue – that Texaco should have conducted a PAH loadings study rather than a PAH fingerprinting study – is just wrong.  In that regard, Texaco complied with the injunction and should be relieved of its requirements under factor (1).  Likewise, NRDC's complaint that Texaco violated the injunction by using "sampling stations near the refinery's effluent canal to identify the PAH fingerprint" is directly contradicted by the 2000 Order, which implements the Injunction.  Texaco has therefore complied with the terms of the injunction as to this issue, and is entitled to termination.

NRDC's next objection that Texaco did not use caged clams for its bioavailability study, this decision falls squarely within factors (1) and (2).  The Burton and Salazar declarations make clear that Texaco did everything possible to try to procure caged clams for the bioavailability analysis, and thus "attempted to comply in good faith with the" strict language of the "injunction" but that "changed conditions unforeseen by the parties" made "compliance "the decree unworkable."  Instead of not conducting the study, Texaco adapted the study to collect resident *rangia* from the study area – an approach that was approved by Mr. Salazar.

Moreover, NRDC had actual notice of this change, and stood mute.  It should not be heard to complain now.  NRDC will no doubt make much of the fact that the 2000 Order states in Section 3 that "[b]y agreeing to involve Dr. Livingston in consultations concerning various aspects of the ongoing studies, Plaintiffs do not relinquish their right to raise or to litigate in this Court any appropriate claim regarding Defendant's conduct of the Court-ordered studies," but the issue here is not NRDC's right to bring a motion, appropriate or otherwise.  The question under Rule 60(b)(5) is whether it is equitable to relieve Texaco from the judgment under these circumstances, and NRDC's conduct is certainly one of the circumstances that must be considered.  This Court has the equitable power to grant Texaco relief from NRDC's arbitrary and unfair interpretation of the 2000 Order.

NRDC's third complaint – that Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured – is simply wrong.  As explained, Texaco followed the procedure set forth in the 2000 Order to review the feasibility of performing that analysis, and a finding was made by an independent expert that it was not feasible.  There simply was no violation.

Texaco has completed its work under that portion of 2000 Order, and therefore the Injunction, addressing the impact of future noncomplying discharges.  NRDC's objections to that work are ill-founded.  This long-running chapter of this case should close.

**III.    NRDC HAS FAILED TO SHOW ANY VIOLATION OF THE INJUNCTION ORDER AS TO STUDYING THE IMPACT OF PAST NONCOMFORMING DISCHARGES**

Texaco's other task under the 2000 Order and Injunction was to study the possible effect of *past* noncomplying discharges.  This involved a single study called long-core sampling.  Put simply, sample cores of sediment were to be taken and analyzed through radioisotope dating and chemical analysis.  This long-core sampling process was mandated by the Court in the 1998 Order as the sole method to determine the effect of past exceedances; it was agreed to by the parties and ordered by the Court in the 2000 Order; and it was implemented under to the Work Plan developed pursuant to the 2000 Order.  Moreover, the 2000 Order specifies that "Dr. Livingston [NRDC's scientist] will be involved in the site selection for long cores," and he was so involved.

The long-coring work was conducted by the Skidaway Institute of Oceanography, the organization identified in the 2000 Order.  Skidaway surveyed nearly 85 sites for suitable samples; ultimately, seven samples were suitable for analysis, two samples yielded the full range of useful information and two other samples yielded corroborative information.  The record is indisputable that, given conditions at the site, Skidaway collected as many usable samples as it could, and NRDC has no evidence to the contrary.

Skidaway's results are scientifically valid.  The critical point, however, is that Texaco conducted the study.  NRDC cannot reasonably dispute that.  NRDC can say only that Texaco should have done the impossible, for no purpose whatsoever.  This Court should exercise its power under Rule 60(b)(5) and terminate the portion of the injunction regarding past noncomplying discharges.

**A.    Texaco's Performance Of The Long Core Study Fully Satisfied The Injunction As To Past Noncomplying Discharges**

As noted, one of the stipulated issues presented to the Court posed the question of whether it was possible to assess the potential impact of *past*, rather than future, noncomplying discharges:

3. With respect to discharges by the Delaware City Refinery in excess of NPDES permit limits from March 1993 to the present, is it scientifically possible to determine now the impact, if any, of such discharges? Assuming it is scientifically possible to determine the impact of such discharges, what specific steps would Texaco have to take to do so?

20 F. Supp. 2d at 715. Part II of the Court's 1998 Opinion concluded that a particular study, long-core sampling, would be the appropriate study to assess past impact. The opinion sets out the protocol:

The proposed approach to determine the impact of past exceedances would be undertaken in three steps. First, long core samples of the sediment would be taken. Second, radioisotope dating would be conducted to narrow the range of sediment within the time frame of a year. Finally, to further refine the time frame, chemical analysis of the sediment would be conducted.

20 F. Supp. at 706.

In the summer of 1999, Texaco hired the Skidaway Institute of Oceanography to undertake the long core study. Skidaway prepared a Statement of Work that described in detail a study entitled "High Resolution Coring Study in the Delaware River Estuary near the Delaware City Refinery." The Statement of Work incorporated the protocols described in Section B, "Impact of Past Noncomplying Discharges" of Part II of the Court's 1998 Opinion & Order and in Part III of the 1997 Means Report, and called for the use of field and laboratory techniques that are appropriate for the type of investigation to be conducted and universally accepted by scientists who study sedimentary processes in coastal marine estuarine environments. Texaco directed Skidaway to implement the tasks called for by the Statement of Work, and the work began in November 1999. (Alexander Dec. ¶ 7.)

The 2000 Order confirmed that Skidaway's proposed Statement of Work for the long coring study was appropriate. It also ordered Dr. Livingston to be involved in site selection for the long core samples:

The long-coring work proposed by Skidaway will be conducted after the final sample selection site process has been completed. Metals will be analyzed on core samples concurrently with PAH analysis at appropriate sites. Dr. Livingston will be involved in the site selection for long cores. The Skidaway operation will be coordinated with the preliminary field operations in the establishment of the likely zones of impact and depositional areas.

(2000 Order, Section 1(j), Ex. A.)

NRDC does not challenge the Court's protocol or the Skidaway plan.  It does not argue that, upon completion of the Skidaway work, Texaco would have satisfied its obligations under the Injunction as to determining the impact of past exceedances.  Thus, the only issue before the Court is whether Texaco has complied with the Skidaway plan.

**B.     NRDC Cannot Prove Any Injunction Violation By Texaco With Regard to the Long Core Study**

NRDC's problem with the outcome of the long core sampling appears to be that only a few samples yielded usable data.  NRDC makes the conclusory statement that Texaco violated the Injunction because, NRDC says, "(w)hile Texaco gathered long cores at a number of stations, it analyzed only two, neither of which was in a depositional area where one would expect to find a historical record of refinery releases."  (NRDC Brief at 19.)  That is not really an argument, unless it is meant to imply that Texaco deliberately decided not to analyze certain samples.  That is, of course false.  NRDC could not meet its obligation to prove an Injunction violation merely by claiming a failure to analyze more samples than NRDC would want, but that is not what happened here.  The true facts are that Skidaway analyzed all the samples that could be analyzed.

NRDC does not even have its basic numbers right.  Skidaway analyzed seven samples, not two.  Over the course of three excursions, Skidaway visited nearly 85 sites to try and take suitable samples; ultimately, seven samples were suitable for analysis, two samples yielded the full range of useful information and two other samples yielded corroborative information.

Moreover, the record is indisputable that, given conditions at the site, Skidaway collected as many usable samples as it could and still derived a scientifically valid answer to the question posed by the Court, and NRDC has no credible evidence to the contrary.  What is more, NRDC should be well aware of the true facts, as Dr. Livingston was part of the process and kept informed at every significant stage.

The record is clear that Skidaway diligently carried out the study.  As Dr. Clark Alexander of Skidaway states, Texaco directed Skidaway to implement the tasks called for by the

Statement of Work, and the work began in November 1999.  To identify locations where the sediments were suitable for the study to reconstruct the necessary history of contaminant input, Dr. Alexander participated in two preliminary sampling field trips.  The first trip occurred in November 1999.  During that trip, Dr. Alexander collected 9 bottom sediment samples from 14 sampling locations covering the region north of, in front of and south of the Refinery.  Five of the sites exhibited a hard bottom and no useable samples were retrieved.  (Alexander Dec. ¶ 10.)

The second field trip took place in August 2000.  During the second trip Dr. Alexander visited 70 widespread sites from which he collected an additional 14 samples of bottom sediment appropriate for analysis.  Dr. Livingston. NRDC's scientist, accompanied Dr. Alexander on this sampling trip.  Where locations appeared unsuitable for further sampling or samples appeared unsuitable for further analysis, Dr. Alexander discussed these issues with Dr. Livingston during this trip.  Dr. Livingston never expressed any dissatisfaction with either the sampling locations or the choices of samples for analysis, or indeed any dissatisfaction with Skidaway's work until his "Critique" that accompanied NRDC's present motion.  (Alexander Dec. ¶ 11.)

Each sample was examined in the field for obvious biological or physical mixing, high sand content, or signs of very stiff or hard bottom materials.  The 61 locations from which samples showed such characteristics could not be used for purposes of dating, *i.e.,* developing a historical record, and were rejected for further sampling or analysis.  Samples that did not exhibit negative characteristics and which were judged to be possible candidates for more detailed analyses were immediately sent to the Skidaway Institute of Oceanography for further preliminary analysis.  (Alexander Dec. ¶ 12.)

Following receipt at Skidaway, the samples were analyzed to determine grain size and the radionuclide activities of Lead, Cesium and Beryllium of each sample.  The results of these analyses indicated that only seven locations were appropriate for further study.  (Alexander Dec. ¶ 13.)

In October 2000, Dr. Alexander led a third and final field trip to collect sediment cores for historical studies at locations that his previous research had indicated were appropriate for

further study.  Cores from each of the seven locations were analyzed for grain size and the radioisotopes called for in the scope of work.  The result of these analyses demonstrated that primarily because of the absence of the necessary radionuclide activity, 5 of the 7 locations from which cores had been collected could not be used for purposes of establishing a historical record of sediment accumulation.  Cores from two of the locations provided some dating-related information, but only on a "100-year" timescale, and, therefore, those cores could not provide meaningful information related to discharges from the Refinery after March 1993.  (Alexander Dec. ¶ 14.)

The cores from the two locations that were found to be appropriate were subjected to all analyses called for by the scope of work.  The type and age of accumulated sediments, as well as certain metals and petroleum related contaminants, were determined.  Sections of the remaining five cores were also analyzed to provide additional regional sediment information.  (Alexander Dec. ¶ 16.)

Dr. Alexander explains why gathering a large number of cores for analysis can be so difficult.  He states that, while the methods described by the Court in the 1998 Opinion are frequently used by scientists to study sediments if conditions allow, it is important to note that not all conditions encountered in marine and estuarine environments will allow such these pollutant history reconstruction methods to be successful.  For example, the location to be sampled must be accumulating sediment in a way that maintains, as separate layers, the sediments being deposited. The location cannot be an area of erosion, or an area that is intensely mixed by biological organisms.  In addition, the types of sediment encountered must also be suitable.  Fine-grained sediments are ideal whereas sand is less suitable.  Very stiff or hard materials such as old marsh muds will reflect no sediment accumulation at all.  Finally, the radioisotopes that will be the subject of analysis must be present at sufficient concentrations to provide a "signal" strong enough to be accurately measured.  Without such a signal, dating even an otherwise complete historical record is not possible.  (Alexander Dec. ¶ 9.)  Dr. Alexander thus echoes this Court's

statement that "there are complexities and uncertainties attendant to the mission" of determining past impacts."  20 F. Supp. at 706; Alexander Dec. ¶ 9.

Although not relevant to the question of whether Texaco completed the Skidaway study, Dr. Alexander does confirm that the number and location of sediment samples were more than adequate for the purposes of the study.  Among the findings were that the reported concentrations of the second core, core 66, collected approximately 7 miles downstream from the Refinery, were quite similar to the concentrations reported for the core taken near the Refinery, core 50.  All concentrations reported in cores 50 and 66 were less than the commonly referenced sediment quality guidelines established by the National Oceanic and Atmospheric Administration.  These patterns strongly suggest that the PAHs detected are likely the result of the transportation related activities on the Delaware River, and the Chesapeake-Delaware Canal.  (Alexander Dec. ¶ 19.)

In addition, the concentrations of PAHs detected in cores 50 and 66 are also less than what has been reported in the literature in core studies conducted at other areas with industrial activities.  Historical core studies conducted on the Savannah River (Alexander et al., 1999), the St. Lawrence River estuary (Coakley et al., 1993), and in the Breen Bay estuary (Zhang et al., 1993) all reported PAH concentrations greater that what was found in the study of the Delaware River that Skidaway directed for Texaco.  This comparison supports the conclusion that PAHs detected in cores 50 and 66 are likely the result of transportation related activities.  (Alexander Dec. ¶ 20.)

Interestingly, there is independent validation of both the results found by Skidaway and the difficulties it encountered in the field.  The results of the long core study, including the results of PAH analyses and finding widespread areas where core samples could not provide meaningful age dating information, are comparable to the findings of a similar studies conducted in the Delaware River estuary by the University of Delaware (Scileppi, 2004 and Summerfield and Madison, 2003.  (Alexander Dec. ¶ 24.)

As with all of NRDC's claims, none of this should be a surprise to NRDC.  Dr. Livingston was an integral part of the long-core process.  The 2000 Order ordered him to be

involved in site selection for the long core samples. In fact, he personally accompanied Dr. Alexander of Skidaway in August 2000 on a sampling trip; during that trip, 70 samples were taken from 53 locations, by far the greatest number of samples and sites. (Alexander Dec. ¶ 11.)

But most importantly for purposes of this motion, Texaco performed the long core study. It acquired the samples that could be acquired and performed the analyses that could be performed. There is nothing more to do. NRDC has no argument that Texaco violated the Injunction in any way. To the contrary, Texaco has satisfied the Injunction.

### C.    The Portion Of The Injunction Mandating A Study Of Past Noncomplying Discharges Should Be Terminated As Satisfied

Texaco's right to relief under Rule 60(b)(5) with regard to that portion of the Injunction mandating a study of past exceedances is straightforward. The first *Building and Constr. Trades Council* factor asks whether the party seeking relief has complied or attempted to comply in good faith with the injunction. 64 F.3d at 888. Here, once NRDC's meritless objection is resolved, it should be undisputed that Texaco has complied with the Injunction. The sole study regarding past exceedances was the long core study, and Texaco completed the study. Put simply, Texaco's work is done, and that aspect of the Injunction should be terminated.

**IV.    NRDC'S REQUEST TO REFER THIS MATTER TO DR. MEANS "IN THE FIRST INSTANCE" IS UNNECESSARY AND INAPPROPRIATE**

Because NRDC bears the burden of proof to demonstrate that Texaco has violated the Injunction, Texaco has addressed those issues that NRDC has specifically addressed in its brief and shown that NRDC has not carried its burden. But Texaco cannot ignore the fact that NRDC's motion might be read as a general invitation to the Court to ignore that burden, ignore the briefs, and turn over the record since 2000 to an expert named in NRDC's papers for consideration of any and all issues "in the first instance." (NRDC Brief at 20.)

That, unfortunately, is no exaggeration. NRDC states that this case is one of "competing conclusions of the parties' experts." (NRDC Brief at 23.) NRDC repeats this concept throughout its brief. That is simply wrong. This is a motion to enforce an injunction, and NRDC bears the burden of demonstrating by a preponderance of the evidence that Texaco has not complied with the injunction. *E.g.*, *Heartland Hosp. v. Thompson*, *supra*. NRDC cannot shift that burden by casting this case as an expert toss-up. NRDC's unbriefed attachment of a report and an invitation to the Court to refer this matter to an expert "in the first instance" is a misuse of the motion-to-enforce vehicle.

It is also unnecessary. If NRDC has complaints about the conduct of the studies, it should be required to present them to the Court just like any other litigant. The Court can address them in due course.

## **CONCLUSION**

Accordingly, for the reasons stated, Texaco respectfully requests that the Court:

(1)    deny plaintiffs' motion to enforce; and

(2)    terminate that portion of the November 6, 1993 Injunction ordering Texaco to develop a monitoring program capable of determining the impact of *future* noncomplying discharges from the Refinery into the Delaware River, and

(3)    terminate that portion of the November 6, 1993 Injunction ordering Texaco to develop a monitoring program capable of assessing the potential impact of *past* noncomplying discharges.


MORRIS, NICHOLS, ARSHT & TUNNELL


_____/s/ Megan Ward Cascio_____
Richard D. Allen (#469)
Megan Ward Cascio (#3785)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200

OF COUNSEL:                               *Attorneys for Defendant*

Anthony F. King
Julie M. Domike
John W. Kampman
WALLACE KING MARRARO
 & BRANSON, PLLC
1050 Thomas Jefferson St., N.W.
Washington, DC 20007
(202) 204-1000


September 9, 2005

## <u>CERTIFICATE OF SERVICE</u>

I Megan Ward Cascio, hereby certify that on September 9, 2005 I electronically filed **DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE  19899-1680

I also certify that copies were caused to be served on September 9, 2005 upon the following in the manner indicated:

**<u>BY HAND DELIVERY:</u>**

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE  19899-1680

**<u>BY FEDERAL EXPRESS</u>**

Mitchell S. Bernard, Esquire
Nancy S. Marks, Esquire
Amelia Toledo, Esquire
Natural Resources Defense Council
40 West 20th Street
New York, New York  10011

_/s/ Megan Ward Cascio_
Megan Ward Cascio (#3785)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
mcascio@mnat.com
Attorneys for Defendant