# EXHIBIT A

## STIPULATED ORDER RESOLVING PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

### FEBRUARY 23, 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE )
COUNCIL, INC., and DELAWARE )
AUDUBON SOCIETY, )
)
)   Civil Action No.
Plaintiffs, )   88-263-SLR
)
v. )
)
)
TEXACO REFINING AND MARKETING, )
INC., )
)
)
Defendant. )

STIPULATED ORDER RESOLVING PLAINTIFFS'
MOTION TO ENFORCE JUDGMENT

Plaintiffs Natural Resources Defense Council and Delaware Audubon Society ("Plaintiffs") filed a motion against Defendant Texaco Refining and Marketing, Inc. ("Defendant"), to enforce the Court's September 1, 1998 Opinion and Order ("Court Order"). The Court heard trial testimony on January 26 and 27, 2000, and on January 27, at the request of the parties, suspended the trial proceedings. Plaintiffs and Defendant now stipulate and agree as follows:

1. Defendant will revise and modify its studies implementing the Court Order in the following ways:

a. <u>Sampling Site Selection</u>. During the spring/summer of 2000, approximately 30 to 50 sites will be sampled in the midfield area off the refinery for total PAHs, grain size, and TOC. In addition to a review of the PAH analyses

of the preliminary ten-station analysis conducted during the summer of 1999, these data will be used in the site selection process for final sample sites in the area. Site selection will be conducted after the dye study is completed (see subparagraph c below), and will be evaluated in conjunction with the results of the chemical characterization of the refinery's effluent. Plaintiffs' expert, Dr. Livingston, will be involved in the selection of appropriate sites for triad sampling.

   b. <u>Sampling Duration</u>. Defendant will conduct triad sampling (sediment toxicity tests, benthic community assessments, and chemical characterizations) during the spring and summer of 2001 and 2002, after the site selection process has been completed.

   c. <u>Fate and Transport</u>. Defendant will conduct the following studies: (1) a dye study to verify the near-field plume model; (2) a sedimentation study (via sediment traps) in the near-field and mid-field receiving areas, with total PAH measurement of sediment collected from the traps; and (3) an estimate of dissolved, particulate, and colloidal (three-phase) PAHs on selected water samples from the near- and mid-field areas. Protocols for the sediment trap analyses (number (2) above) will be developed by the various investigators involved in the study, in consultation with Dr. Livingston. With regard to study number (3) above, ultrafiltration will be carried out in conjunction with total PAH analyses. Dr. Livingston will provide a protocol for the three-phase analysis.

   d. <u>Bioavailability</u>. Defendant will conduct a caged bivalve study at selected sample sites in the study area, with concurrent PAH, metals, and PCB

2

analyses. This study will be conducted after the field site selection process has been completed, and station arrays for the bivalve study will be based on the results of the various studies associated with site selection. Dr. Mike Salazar will be involved in this process.

e. <u>Replicate Chemistry Measurements</u>. All five replicates will be analyzed for PAHs and metals at appropriate sites. Other contaminants, such as pesticides and PCBs, will be analyzed as appropriate based on data collected during 1999.

f. <u>Reference Sites</u>. Defendant will conduct additional sampling to determine if a reference site in tidal creeks above the refinery is suitable. At present, sampling stations DR-10 and DR-6 appear to be potentially promising sites based on selected chemical analysis from 1999. Habitat stratification will be carried out in these areas to adjust the final placement of the reference area, after which reference station locations will be determined for a comparison with the potential impact areas. Reference stations should approximate the range of habitats encompassed by the impact site stations. Dr. Livingston will be involved in the selection of appropriate reference sites.

g. <u>Sediment Toxicity Tests</u>. Defendant will consider replacement of the sediment toxicity test species <u>Streblospio</u> with another species, as well as the need for bioassay organisms of different trophic levels and in both the sedimentary and pelagic environments. Defendant will confer with Dr. Livingston on these issues before study decisions are made.

3

h. <u>Tissue Analyses</u>. Defendant will carry out tissue analyses for PAHs to try to determine the effective concentrations leading to potential adverse biological effects in its sediment toxicity test species. Dr. Livingston will provide Defendant with appropriate protocols. If a question arises concerning the feasibility of such analyses, the parties' experts will confer and attempt to resolve that issue.

i. <u>Consistency of Metals Analysis</u>. Concurrent with PAH analysis, Defendant will analyze effluent samples for a suite of metals. All associated chemical characterizations, including field sediment monitoring, organisms taken in the caged bivalve study, and long-core determinations, will cover the same list of PAHs and metals. If the sediments or caged bivalves have high, potentially toxic levels of metals, Defendant will use best efforts to measure metals in the sediment toxicity (bioassay) tests. If the metals are not tested in the sediment toxicity organisms, and if there is a toxic response, Defendant will not attribute the response to metals.

j. <u>Long Cores</u>. The long-coring work proposed by Skidaway will be conducted after the final sample selection site process has been completed. Metals will be analyzed on core samples concurrently with PAH analysis at appropriate sites. Dr. Livingston will be involved in the site selection for long cores. The Skidaway operation will be coordinated with the preliminary field operations in the establishment of the likely zones of impact and depositional areas.

4

k. <u>Written Program Management Plan</u>. Defendant will develop a written program management plan to demonstrate how all components of the studies will be conducted, scheduled, and integrated to answer the original research questions. The written plan will include proposed statistical analyses and analytical tools to be used in the integration of the various project components. At a minimum, the program management plan will include definition of the chemical aspects of the effluent; the appropriate determination of fate and transport questions relating to establishment of appropriate sampling plans in space and time; the use of caged animals for chronic as well as acute bioassay approaches; the coordinated chemical analyses of the various aspects of the study related to bioavailability and fate and effects; the predetermined coordination of these efforts to define the long-core effort; and the overall determination of the statistical analysis of data collected during the project. The written plan will be developed no later than May 1, 2000.

l. <u>PAH Fingerprinting</u>. Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments.

m. <u>Tiered Approach</u>. A tiered approach will be used, and stations and/or chemical tests may be dropped if it does not materially affect the outcome of the project. The parties will confer and attempt to agree on any such reductions.

n. <u>Dispute Resolution</u>. In the event disputes arise concerning the conduct of the Court-ordered studies, the parties will confer and try to resolve them. The parties will explore the possibility of arbitrating such disputes before individuals with expertise in the relevant scientific subject matter area.

2. By involving Dr. Livingston in consultations concerning various aspects of the ongoing studies, Defendant does not relinquish its primary authority or responsibility to carry out the terms of the Court Order, and make decisions on all aspects of the studies.

3. By agreeing to involve Dr. Livingston in consultations concerning various aspects of the ongoing studies, Plaintiffs do not relinquish their right to raise or to litigate in this Court any appropriate claim regarding Defendant's conduct of the Court-ordered studies.

4. All claims Plaintiffs raised in their motion to enforce the Court Order are resolved by the terms of this Stipulation. The trial proceedings that were suspended on January 27, 2000, are closed.

5. The Court retains jurisdiction to enforce this Stipulated Order and its prior Opinion and Order of September 1, 1998.

Dated: February 22, 2000

C. Scott Reese (#2036)
COOCH & TAYLOR
824 Market Street Mall
P.O. Box 1680
Wilmington, DE 19899
(302) 984-3811

6

_Mitchell S. Bernard_
Mitchell S. Bernard
Nancy S. Marks
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
New York, NY 10011
(212) 727-4469

Attorneys for Plaintiffs


_Richard D. Allen_
Richard D. Allen (#469)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

Attorneys for Defendant


So ordered this 24 day of February, 2000:


_Sue L. Robinson_
Hon. Sue L. Robinson
United States District Judge