Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Not Reported in F.Supp., 1997 WL 33479029
(M.D.Fla.)
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida.
Andrew L. MANNING, et al., Plaintiffs,
v.
THE SCHOOL BOARD OF HILLSBOROUGH
COUNTY, FLORIDA (formerly Board of Public
Instruction of Hillsborough County, Florida), et al.,
Defendants.
**No. 58-3554-CIV-T-17C.**

Aug. 26, 1997.


*REPORT AND RECOMMENDATION*

JENKINS , Magistrate J.
**\*1** Before the Court is the issue of whether the public
school system of Hillsborough County has attained
unitary status and should be released from court
supervision. This issue has been referred to the
undersigned Magistrate Judge for evidentiary hearing
and a report and recommendation.


*BACKGROUND*

When this lawsuit was filed in 1958 on behalf of
black school children, the public school system of
Hillsborough County maintained racially segregated
schools and black and white pupils were not
permitted to attend the same schools. During the next
thirteen years various methods were employed to
desegregate the schools, at the Court's direction, and
appeals from those orders consumed much of that
time.

In May 1971 the Court found that these methods had
failed to desegregate the schools and ordered the
School Board to immediately implement a plan to
bring the school system in compliance with the
Constitution. Since July 1971, the Hillsborough
County School Board ("School Board") has operated
under this Court's desegregation orders. The
desegregation plan implemented by defendants and
approved by the court and plaintiffs shifted focus in
1991 when the School Board adopted a middle
school plan and the Court, with the consent of the
parties, entered a Consent Order which modified the

1971 Order particularly as to student assignments
within a group or "cluster" of schools.

In 1994, plaintiffs filed a motion contending that
defendants had violated the terms of the July 1971
Order and 1991 Consent Order by allowing certain
schools to become "racially identifiable." The motion
was referred for a report and recommendation.
Following an evidentiary hearing, the undersigned
Magistrate Judge recommended denial of plaintiffs'
motion to enforce court order for failure to establish a
violation of the Court's orders.

On November 17, 1995, this Court deferred ruling on
the report and recommendation, noting that the
dispute involved in plaintiffs' motion to enforce
focused on student assignment. The Court found that
the parties' discussion of the issue "demonstrates the
need to expand the scope of the inquiry to a full
fledged determination of whether the Hillsborough
county school system has in fact achieved unitary
status." (Order Recommitting Matter to Magistrate,
Dkt. 709, at 3) ("Order of Referral") The Court
ordered:

> a showing by Defendants as to whether they have
> complied with this Court's 1971 Order regarding
> the factors set forth by the United States Supreme
> Court in *Green v. New Kent County School Bd.,*
> *391 U.S. 430 (1968).* In addition to student
> assignments, *Green* and *Freeman* require that
> faculty and staff assignments, transportation,
> extracurricular activities, facilities and resource
> allocation all be free from racial discrimination. In
> each of these areas, the school board bears the
> burden of showing that any current imbalance is
> not traceable, in a proximate way, to the prior
> constitutional violation of Plaintiffs' rights.
> *Freeman,* 503 U.S. at 494. The quality of education
> being received by all students and the good faith
> commitment by the School Board must be shown.

**\*2** Following the referral order, the undersigned
Magistrate Judge set a hearing on the unitary status
determination and thereafter conducted monthly
status conferences with counsel for the parties. The
parties exchanged discovery and retained expert
witnesses.

After the evidentiary hearing was transcribed, the
parties filed proposed findings of fact and
conclusions of law (Dkts. 796 and 797) which were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

supplemented after the filing of the 6th Annual Report to the Consent Order. (Dkts. 803 and 805) Closing arguments were presented on May 22, 1997.

For the following reasons, it is recommended that this Court find that the public school system of Hillsborough County has attained unitary status in that defendants have eliminated, to the extent practicable, the vestiges of the prior *de jure* segregated school system and have complied in good faith with this Court's orders.

Pursuant to the referral order, the following proposed findings of fact and conclusions of law are submitted. FN1

> FN1. Some of the findings set forth in this Report and Recommendation have been stipulated to by the parties (Dkt.767) or are taken from the prior Report and Recommendation ("prior R and R") dated June 23, 1995 (Dkt.699) which addressed plaintiffs' Amended Motion to Enforce Court Order (Dkts.601, 602). Record cites are not provided for stipulations.

### FINDINGS OF FACT

1. This action was filed on December 12, 1958 on behalf of plaintiff Andrew Manning FN2 and others alleging that defendants, acting under color of state law, had operated the public schools of Hillsborough County on a racially segregated basis. (Complaint at 3).

> FN2. At the unitary status hearing, Mr. Manning revealed that his name had been misspelled as "Mannings" in court documents.

2. The Court initially dismissed the complaint for the plaintiffs' failure to exhaust administrative remedies, but the dismissal was reversed by the court of appeals, which remanded the case for further proceedings. *See Mannings v. Board of Public Instruction, 277 F.2d 370, 375 (5th Cir.1960)* ("Mannings I").

3. Following remand, the Court conducted a non-jury trial, after which, on August 21, 1962, the Court entered an order finding that the defendants were in fact maintaining an unlawfully segregated system of public schools. To remedy the violation, the Court

enjoined the defendants from operating a racially discriminatory school system and allowed them until October 30, 1962, in which to file a comprehensive plan for the desegregation of the schools.

4. For approximately the next nine and one-half years, this Court issued various orders and the School Board devised various desegregation plans, none of which successfully and fully desegregated Hillsborough County's schools. *See Mannings v. Board of Public Instruction of Hillsborough County, 306 F.Supp. 497 (M.D.Fla.1969)* ("Mannings II"), rev'd, *Mannings v. Board of Public Instruction, 427 F.2d 874, 875 (5th Cir.1970)* ("Mannings III").

5. On May 11, 1971, the Court entered an order directing the School board to prepare and implement a comprehensive plan for desegregating the Hillsborough County School system. (May 1971 Order, Dkt. 636 at 43) (hereafter "May 1971 order").

6. The Court's May 1971 Order (at 43-44) directed that:
> (a) The plan shall have as its primary objective the abolition of segregation in all schools in the county, and in particular it shall aim at desegregation of all schools in the county now having a school population at least 50% black.
> **\*3** (b) In preparing the plan the school board shall begin with the proposition that a white-black ratio of 86%/14% in the senior high schools, 80%/20% in the junior high schools, and 79%/21% in the elementary schools would be the most acceptable and desirable form of desegregation.

7. On July 2, 1971, this Court approved for implementation the plan of desegregation developed and submitted by the School Board (hereafter "July 1971 Order") In the July 1971 Order, the Court expressly retained jurisdiction "for such further action as may be necessary and required."

8. The 1971 plan was designed to desegregate student enrollment in grades 1-12, as required by the Court; it did not include kindergarten classes, to which students continue to be assigned on a neighborhood basis, nor did it include pre-school (early childhood education) classes.

9. The 1971 plan required the conversion of twelve formerly all-black elementary schools in the "inner city" area of Tampa FN3 to single-grade attendance centers serving the 6th grade.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

FN3. Bryan, Carver, College Hill, Cuesta, Dunbar, Jackson Heights, Lomax, Meacham, Orange Grove, Potter, Shore and Williams.

10. Under the 1971 plan, each elementary grade-level (1-5) attendance area of each of these formerly all-black elementary schools was subdivided into between two and three "satellite areas"; students residing in each of these "satellite areas" FN4 were assigned to attend a formerly white school, to which they were transported for grades 1-5.

FN4. A satellite zone is an area which is not contiguous with the main attendance zone for a school. May 11, 1971 Order, p. 29, n. 41. Thus, the references throughout the record to a satellite denotes a group of students within a given geographic area in a school boundary zone who are transported or assigned to a school outside the boundary zone primarily for desegregation purposes.

11. Under the 1971 plan, Lee Elementary School was to serve grades 1-5. The attendance area established for Lee Elementary School in the 1971 plan was not modified by the School Board prior to the 1975-1976 school year.

12. On January 14, 1975, this Court entered an Order which recited that:
The latest of [the annual enrollment] reports was filed with the Court December 10, 1974. It indicates that because of changes therein there is a need for, and the Board is directed to file with the Court on or before March 21, 1975, a supplemental plan designed to insure that the requirements of the Court's previous orders insofar as they relate to Lee Elementary School will be complied with as of the beginning of the 1975-76 school year.

13. The Court also directed the defendants' attention to Cleveland, DeSoto, and Gary Elementary Schools "in the event changes for other schools are required...." Edison Elementary, which was 41% black at that time, was not mentioned.

14. On March 21, 1975, the School Board submitted to this Court a supplemental plan. This plan proposed to convert Lee to a 6th-grade center replacing the Meacham facility and to reassign the former attendance area of the Lee School under the 1971 plan among seven different elementary schools for grades 1-5. The plan also projected racial enrollments

for Cleveland, DeSoto, and Gary Elementary.

15. This Court, by Order of June 3, 1975, directed implementation of the supplemental plan for Lee Elementary School commencing with the 1975-76 school year.

16. The 1975 annual report filed by the defendants reflected no majority black schools. Five out of 128 schools had black student enrollments of 40% or more-Cleveland, Edison, Gary, Graham, and Palm River Elementary. (DX 7) Neither the Court nor the plaintiffs took any action as a result of those racial enrollments.

*4 17. The following year, Cleveland experienced an increase to 55% black enrollment. (DX 7)

18. At least since January 14, 1975, the Court has not directed the School Board to prepare a supplemental plan or to take any action with respect to the racial composition of any of its schools, including but not limited to schools whose enrollments were more than 50% black.

19. Subsequent annual reports filed by the defendants reflected increased black enrollment at several schools. These reports were served upon the plaintiffs each year. No motion seeking relief or enforcement of any obligation imposed by the Court was ever filed by the plaintiffs until June 1994.

20. The 1993 annual report for the 151 schools operated by defendants indicated that there were nine elementary schools and one junior high school with black student enrollments of 50% or more; FN5 there were five elementary schools and two junior high schools with black student enrollments of 40% or more. FN6

FN5. The elementary schools were Cleveland (59%), Edison (74%), Foster (57%), Graham (63%), Meacham (50%), Oak Park (66%), Robles (90%), Sulphur Springs (70%), and Witter (56%). The junior high school was Van Buren (50%).

FN6. The elementary schools were Cahoon (47%), Clair Mel (48%), DeSoto (40%), Shaw (48%), and West Tampa (41%). The junior high schools were Dowdell (46%) and Sligh (43%).

21. Each year following initial implementation of the

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

1971 plan, the School Board filed at least two reports with the Court, copies of which were served upon counsel for the plaintiffs. The first report (usually submitted in the fall) provided enrollments (by race and grade) and faculty assignments (by race) at each school facility operated for grades 1-12 in the system. The second report enumerated changes in student assignment (if any) proposed to become effective in the following school year.

22. The reports of proposed student assignment modifications included, but were not limited to, boundary changes in response to overcrowding and student assignment modifications necessitated by the construction of new schools. The reports included projections of anticipated enrollments, by race, at schools affected by the proposed changes.

23. At least since January 14, 1975, this Court has not directed the School Board to prepare a supplemental plan or to take any action with respect to the racial composition of any of its schools, including but not limited to those schools in which the percentage of black students attending those schools exceeded 50%.

24. For more than 22 years after the 1971 desegregation plan was implemented, plaintiffs filed no written objections with this Court concerning the actual or projected enrollments of any schools in Hillsborough County, including schools whose enrollments were more than 50% black. In June 1994 plaintiffs filed their first written objections to projected racial enrollments for the 1994-95 school year.

25. Plaintiffs did object in 1980 (for reasons other than anticipated racial composition of enrollments) to the closing of George Washington Junior High School and Glover Elementary School, proposed actions which were approved by this Court after a hearing on plaintiffs' objections.

26. Plaintiffs also objected in 1990 (for reasons other than anticipated racial composition of enrollments) to the proposed conversion of the Blake 7th-grade center to a magnet high school, a proposal which this Court disapproved (without prejudice to its subsequent resubmission as part of a comprehensive restructuring plan) by Order of January 23, 1991.

**\*5** 27. In November 1989, Dr. Walter L. Sickles, then Superintendent, appointed a "Task Force to Modify Single Grade Centers" to investigate and make recommendations for reorganizing the Hillsborough County school system to establish middle schools

consistent with the goal of retaining a desegregated school system.

28. Beginning in early 1991 a series of meetings was held between the Superintendent and other School Board representatives and plaintiffs' counsel and desegregation expert, Dr. Leonard Stevens. The purpose was to discuss the proposed middle school plan.

29. In early 1991, then-Assistant Superintendent James D. Randall had an initial meeting with counsel for plaintiffs. A more extensive meeting took place on March 15, 1991, attended by counsel for the parties, Superintendent Sickles, Mr. Randall and other staff members of the school district, as well as by plaintiffs' educational and desegregation consultant, Dr. Stevens.

30. On March 15, 1991 plaintiffs' representatives were furnished a copy of the "Proposed Cluster Plan," which described working concept of middle school reorganization then being considered by the Task Force.

31. Further meetings were held between May and July 1991 regarding the plan. Following the July 16, 1991 meeting, a formal report entitled "Middle School Task Force Report 3, July 1991," was submitted to and approved by the School Board and subsequently transmitted to plaintiffs' counsel on August 20, 1991.

32. The Middle School Task Force Report 3 was attached to and made a part of the Consent Decree executed by counsel for the parties, which was approved and entered by this Court on October 24, 1991 as a Consent Order.

33. The "cluster plan" is currently beginning its sixth and final year of implementation. Of the 17 clusters, eleven have been implemented so far. There are six remaining clusters to be implemented at the beginning of the 1997-1998 school year. FN7

> FN7. A more detailed description of the middle school plan and discussions between the parties concerning the proposed plan is contained in the Prior R and R at 29-31.

34. Prior to the Court's 1995 Order of Referral, the School Board had not requested a finding of partial or full unitary status by the Court and/or the vacating, in whole or in part, of the previous Orders of the Court.

35. The Court has therefore not had occasion to make, nor has it made, a determination whether all vestiges of the prior racially discriminatory dual school system in Hillsborough County have been eliminated to the extent practicable.

STUDENT ASSIGNMENTS

*Background*

36. The Hillsborough County school system, one of the largest school districts in the country, enrolled approximately 120,000 students in the 1995-1996 school year. FN8 DX 7 at 28. FN9

> FN8. Although the Court now has the benefit of the 6th Annual Report filed on April 15, 1997 providing data for the 1996-1997 school year, this data was not available for the most part at the October 1996 unitary status hearing. The 6th Annual Report is addressed in the parties' supplemental submissions. (Dkts.80, 805)

> FN9. Reference to the parties' exhibits at the unitary status hearing are indicated by the letters "PX" or "DX" followed by the exhibit number. References to the seven-volume transcript are indicated by the letter "T" followed by the volume number and page number, e.g., T7 at 107.

37. As of October 30, 1995, there were a total of 148 public schools operated by the School Board: 108 elementary schools, 27 junior high (or middle) schools, and 15 senior high schools. 5th Annual Report, April 15, 1996 at 54-82.

38. There is no dispute that all of the schools in Hillsborough County were desegregated as of the 1971-1972 school year.

**\*6** 39. Plaintiffs acknowledge that most of the schools currently operated by defendants reflect the relative percentages of black and white residents in Hillsborough County. (Dkt. 796 at 12)

40. The controversy centers on what factors have caused some of the schools-particularly the elementary schools-to have an increasing number of black students enrolled over the years.

41. None of the Court's prior orders have expressly or implicitly FN10 directed defendants to maintain a particular student race ratio at any school, or to take any action in response to increased black enrollments in the schools.

> FN10. See Prior R and R at pages 15, 34-38.

42. In determining the degree of racial imbalance in individual schools, both Dr. Stevens, plaintiffs' desegregation expert, as well as Dr. Armor, defendants' desegregation expert, applied a working definition of plus or minus 20 basis points over the district-wide race ratios, using the 80/20 ratio outlined in the May 1971 Order as a benchmark. (DX 1 at 7; PX 1 at 5) FN11

> FN11. This Court's 1995 referral order declined to adopt a specific figure in determining racial identifiability and instead stated that the determination is dependent on local conditions. (Order of Referral at 5) This is discussed further in the proposed conclusions of law, *infra*. However, for the purpose of addressing the evidence, the 20 basis points variance shall be used as both parties' testimony and exhibits use this measure.

43. Plaintiffs' 1994 motion to enforce focused on sixteen schools, mostly elementary, with a black student enrollment of 40% or more. Those schools and the percentage of black students attending those schools as of the 1995-96 school year FN12 are Robles Elementary (90%), Edison Elementary (75%), Sulphur Springs Elementary (74%), Oak Park Elementary (70%), Graham Elementary (67%), Foster Elementary (61%), Cleveland Elementary (57%), Shaw Elementary (56%), Witter Elementary (54%), Cahoon Elementary (52%), Clair Mel Elementary (49%), West Tampa Elementary (47%), DeSoto Elementary (43%), Van Buren Junior High (53%), Sligh Junior High (50%), and Dowdell Junior High (49%). FN13

> FN12. Data from the 1995-96 school year was utilized at the evidentiary hearing conducted in October, 1996.

> FN13. The student population statistics for all of these schools are taken from data set

Case 1:88-cv-00263-SLR    Document 309-3    Filed 09/09/2005    Page 6 of 33

Not Reported in F.Supp.                                                                Page 6
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

forth in DX 7, which consists of the annual student assignment reports filed by the School Board. The information about boundary and other attendance changes, discussed in the next section, is taken from data set forth in DX 6, which consists of the annual reports on boundary and other attendance changes filed by the School Board. The information about demographic changes is taken from the report of Dr. William A.V. Clark, the defendants' demographics expert, which report was introduced as DX 2.

The data for the boundary and other attendance changes, including their effect on the racial composition of student populations, along with the data on demographic changes, for the sixteen schools about which the plaintiffs complained in 1994 (with the exceptions of DeSoto Elementary and Sligh Junior High) are summarized in Appendix A submitted by the defendants with their proposed findings of fact and conclusions of law. This same data (with the exception of demographic data) is summarized for all other schools (including DeSoto and Sligh) in Appendix B submitted by the defendants. An exhibit introduced at the hearing, the defendants summarized the boundary and other attendance changes made to the sixteen schools about which the plaintiffs complained in 1994 and the projected and actual effects of those changes on student race ratios within the schools. (DX 2; T1-21)

44. Each of the sixteen schools named by the plaintiffs was predominantly white in 1971 following implementation of the desegregation order. (T1 at 33) FN14

FN14. The 1972-73 school year is the earliest year after the 1971 Order for which complete figures are available.

45. In the intervening twenty-five years since the 1972-1973 school year, the percentage of black students attending these schools has increased to 40% or more.

46. The percentage of black students in each school as of the 1972-73 school year was as follows: Robles Elementary (24%), Edison Elementary (36%), Sulphur Springs Elementary (19%), Oak Park

Elementary (23%), Graham Elementary (35%), Foster Elementary (21%), Cleveland Elementary (26%), Shaw Elementary (15%), Witter Elementary (18%), Cahoon Elementary (21%), Clair Mel Elementary (18%), West Tampa Elementary (14%), DeSoto Elementary (35%), Van Buren Junior High (17%), Sligh Junior High (20%), and Dowdell Junior High (14%).

47. These sixteen schools were also the primary focus of the testimony at the unitary status hearing.

*Boundary Changes In General* FN15

FN15. Most of the findings in this section have been stipulated to by the parties. (Dkt. 767 at 18-20).

48. Since the 1977-1978 school year, the School Board has made more than 300 modifications in student assignments to relieve overcrowding, to accommodate the opening of newly constructed facilities, or for other reasons. With a few exceptions, none of these boundary changes were made solely for the purpose of affecting the racial ratio of a school. FN16

FN16. As the record demonstrates, on some occasions the School Board changed student assignments at certain of the schools which now have black student enrollments of 40% or more in order to improve racial balances. (See DX 3) (Dkt.796, App.A) However, these changes were infrequent and were usually made in conjunction with some other factor such as relieving overcrowding or when a new school was opened.

*7 49. In addition, the School Board has accommodated enrollment increases, overcrowding, kindergarten classes, and special program needs by locating or relocating portable classrooms on individual school campuses. Between the school years from 1985-1986 through 1993-1994, the number of portable classrooms used in the Hillsborough County school system increased from approximately 800 to approximately 1200.

50. When making assignment changes to relieve overcrowding or to accommodate new construction, the School Board has taken into account the racial enrollments within the new boundary and the effect

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

of the boundary changes on the enrollment ratios at the affected schools.

51. In addition, in making assignment changes to deal with problems of overcrowding or with new school construction, the district where practicable reassigned or divided and partially reassigned existing satellite zones (those originally created in 1971) in a manner that moved enrollments toward the system-wide ratio.

52. In particular, when the School Board constructed a new facility in a suburban area having a small resident black student population within the contiguous zone created surrounding the facility, it would utilize the reassignment of pre-existing

1977-78
1980-81

1983-84
1984-85
1986-87
1992-93

54. The School Board has never created a new non-contiguous or satellite zone solely for the purpose of altering the racial enrollment ratio at a school, including schools that had majority-black enrollments. FN18

> FN18. This stipulation is understood to refer to satellite attendance zones created subsequent to the desegregation of the Hillsborough public schools which was achieved during the school year 1971-1972. Those created for that year were at the express direction of the Court when the formerly black schools were closed and the students attending those schools were reassigned to other schools.

55. Since 1986, the School Board has not initiated boundary changes (not otherwise being considered for reasons such as overcrowding or the opening of a newly constructed school facility) for the purpose of altering the racial enrollment ratio at a school, including at schools that had majority-black enrollments.

56. In summary, the School Board's goal since 1971 has been to maintain a desegregated school system. This goal included having the ratios at individual schools come as close to the district-wide ratios as possible. For those

satellite zones to increase the number of black students assigned to the new facility.

53. In modifying student assignments to relieve overcrowding or in connection with the opening of a new facility, the School Board has since the 1975-1976 school year created non-contiguous zones or satellites in at least seven instances. FN17 In most, but not all of these instances, students reassigned on a non-contiguous basis were being transported to their former school of assignment before the change.

> FN17. These seven instances, and the schools involved, are:

Cahoon and Temple Terrace

Mort and Cahoon

Bellamy and Dickenson

Dickenson and Bay Crest

Dickenson and Town & Country

Greco Jr. High and Burns Jr. High

Mort/Tampa Palms and Hunter's Green

schools which experienced increases in the numbers of black students attending the schools, the School Boards would remove a satellite assigned to those schools if it was no longer necessary to maintain racial balance. However, the School Board did not create new satellites for schools with increasing black enrollment as a way to reduce the racial imbalances because of the disruption that would have on the families and children attending those schools. (T7 at 219-21)

*Student Enrollments and Demographics*

**\*8** 57. Each of the sixteen schools named by the plaintiffs was predominantly white in 1971 following implementation of the July 1971 order. (T1 at 33)

58. The parties have examined demographic data for Hillsborough County to determine whether changes in residential housing patterns may explain why there is a higher percentage of black students at certain schools than existed in the past.

59. The most recent demographic data available for this inquiry is derived from the Decennial United States Census conducted in 1990. Since the Census is conducted only every 10 years and no special census has been taken in the interim, the 1990 Census figures provide the most up-to-date data available.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 8
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

60. From 1970 to 1980 the total population of Hillsborough County, Florida, rapidly increased from 490,265 persons in 1970 to 626,960 persons in 1980. The total population in 1990 increased substantially again to 834,054. (DX 2 table 1) The percentage increase of the total county population was approximately 30 percent during 1970-1980; the percentage increase during 1980-1990 was approximately 26 percent. (T2 at 19) This represents an increase of almost two-thirds of the total population of Hillsborough County between 1970 and 1990. (PX 2 at 8)

61. The percentage of all county residents who were black, regardless of age group, did not change substantially during that time period. In 1970, approximately 17.4% of the county residents in the age group 0 to 17 were black; this percentage increased to approximately 19.4% in 1990. (PX 2 at 3)

62. Although the increase in the general population of Hillsborough County has been fairly constant over the past twenty years, defendant's demographic expert, Dr. W.A.V. Clark, noted significant differences in growth rates among the 0 to 17 age group.

63. Between 1970 and 1980 the number of whites in the 0 to 17 age group increased by approximately 3%; among blacks the increase was 16%. During the next decade, the growth rate of the black population was almost double that of the white population. (T2 at 20-22.)

64. Also, the growth in population has not been consistent in all areas of the county. An area identified by Dr. Clark, described as a "reverse L" or "upside-down L" shaped area, exists south of Tampa International Airport, west of Interstate 275, north of 22nd Street between Florida Avenue and 40th Street and south of the Hillsborough River. This area has experienced significant changes in the racial compositions of its neighborhoods. Comprising what Dr. Clark and other witnesses refer to as the "inner city" neighborhoods, this area experienced a loss of about 21,000 white persons and a gain of about 4,000 black persons between 1970 and 1990. (DX 2 at Table 4; T2 at 23)

65. Census data shows that the number of tracts in Hillsborough County with black populations of 95 percent or more decreased substantially from seven in 1970 to two in 1990. At the same time, the number of tracts with populations of 25% to 50% black residents more than doubled from 1970 to 1990. (T4 at 61; PX 2 at 18) Tracts with populations of 50% or more black residents have expanded about 40 percent over the twenty-year period. (T2 at 34)

*9 66. During the period 1971 to the fall of 1995, the percentage of black high school students increased from 14% to 21%. During the same period the percentage of black junior high students increased from 20% to 23%. At the elementary level, the increase was from 21% to 24% black students. (PX 1 at 4-5)

67. Census information for the tracts having public schools with black student enrollments of 40% or more (thirteen elementary schools and three junior high schools) generally shows these schools as located within areas where the number of black residents is increasing relative to the number of white residents of those tracts. (T2 at 56) FN19

> FN19. Appendices 1,2 and 3 to this Report and Recommendation incorporate demographic data contained in Dr. Clark's report for Hillsborough County and the sixteen schools with black student enrollment of 40% or more. (DX 2, Tables 1, 4 and 5)

68. While noting that in 1970 it "was possible to maintain a large number of schools with black enrollments of less than 40 percent," Dr. Clark concluded that the increased proportion of black residents "in the neighborhoods north of the Hillsborough River and east of 22nd Street after 1980 and the continuing overall white student losses from inner city areas made it impracticable or impossible to make further attendance zone adjustments in order to maintain racial balance within the plus or minus 20 percent band." (DX 2 at 9)

69. The evidence indicates, among other things, that for the school year 1990-1991 the disparity between census information and enrollment was not substantial at most of the schools identified at the hearing which have black student enrollments of 40% or more. Shown below is the percentage of black enrollment at a school, followed by the 1990 census information of black residents age 0 to 17 living in the attendance zone (shown in bold): Robles Elementary (86%, 71%), Edison Elementary (69%, 70.5%), Sulphur Springs Elementary (62%, 51.6%), Oak Park Elementary (61%, 56.8%), Graham Elementary (68%, 42.9%), Foster Elementary (46%, 52.4%), Cleveland Elementary (52%, 41.4%), Shaw Elementary (38%, 33.8%), Witter Elementary (45%, 41.1%), Cahoon Elementary (38%, 33.5%), Clair Mel Elementary (41%, 55.1%), West Tampa Elementary (44%, 31.6%), Van Buren Junior High, (42%, 39.6%), and Dowdell Junior High (42%, 39.6%). (Dkt.796, App.A) FN20

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

FN20. DeSoto Elementary and Sligh Junior High School were not included in Dr. Clark's demographic study of 1990 census information. (DX 2) Black student enrollment for the 1990-1991 school year was 50% at DeSoto Elementary and 35% at Sligh Junior High. (Dkt. 796, App. A and B)

70. Dr. David Armor, a well recognized expert in school desegregation cases, FN21 studied the sixteen schools with a black student population of 40% or more against the background of post-1972 boundary changes effected for those schools and the census data gathered by Dr. Clark. (T3 at 33-48; DX 1) He noted that only a "handful" of schools (15 out of a total of 135 schools) have been or are currently out of balance. (T3 at 54)

FN21. Dr. Armor has always testified in favor of school boards at unitary status hearings. (T3 at 118)

71. None of the current or past racial imbalances in county schools are attributable to school board action, including boundary changes, but rather are attributable to demographic changes, according to Dr. Armor. (T3 at 53)

72. Dr. Armor concluded that defendants have implemented "a highly effective desegregation plan that virtually desegregated the entire district to a very high degree of desegregation, as high as I've seen anywhere in this country but especially in the south, and that it maintained that plan for a very long time." (T3 at 49)

*10 73. Dr. Fred Shelley, plaintiffs' demographics expert, did not conduct any demographic studies of his own, but relied on Dr. Clark's data in drawing some differing conclusions. (T4 at 50-56) Dr. Shelley agreed that both the inner-city areas identified by Dr. Clark and the neighborhoods surrounding those areas had experienced an increase in the percentage of black residents over the past twenty years. (T4 at 81-83) But he did not think that demographics could totally explain the dramatic increases in black student enrollment at some schools. (T4 at 51-56; 56-58)

74. Dr. Shelley concluded that "it is perhaps difficult to conclude that increase in racial imbalance is attributable solely to the processes of natural demographic change." (T4 at 56, 66) While agreeing that the most recent demographic data available is from the 1990 census, Dr. Shelley had reservations about drawing conclusions about present student enrollments based on that data. (T4 at 106)

75. Despite differing with the conclusions drawn by Dr. Armor, Dr. Shelley was unable to provide an alternate hypothesis for the increased black enrollment at the sixteen schools targeted by plaintiffs and studied by Dr. Armor. (T4 at 95) Dr. Shelley conceded that only ten boundary changes had occurred after the schools became imbalanced. In some of the schools there were no boundary changes for quite a long time. (T4 at 88-89) FN22

FN22. Defendants' Appendix A and B (Dkt.796) summarize evidence as to boundary changes and the race ratios before and after the boundary changes for each school in Hillsborough County during the period of court supervision. Many of the sixteen schools identified by plaintiffs as racially imbalanced have not had many boundary changes in recent years. For example, Cahoon has had no boundary changes since 1989 when its black student enrollment was 34%. Edison's last boundary change was 1982 when it was 50% black. Foster's last boundary change was in 1984 when it was 29% black. Oak Park has had no changes since 1978 when it was 41% black. Robles last had a boundary change in 1976 when it was 30% black. Shaw and Sulphur Springs have not had boundary changes since 1989 when they were 37% black and 59% black, respectively. (App.A)

76. Also, Dr. Shelley apparently erroneously assumed that Dr. Clark's demographic data included children attending a school as part of a satellite attendance zone. (T4 at 91) The presence of a satellite could cause that school to have a racial balance which might seem disproportionate to the racial balance in the school attendance area. (T4 at 91-92) He also agreed that in a highly segregated area it is more difficult to adjust boundaries or make other changes without substantial disruption including transportation. (T4 at 78)

77. Evidence presented at the hearing by the School Board included the percentage of black students at the schools before each attendance change and the percentage of black students at the schools after the change. However, it is undisputed that whenever the School Board proposed an attendance change, it estimated the *projected* attendance figures, including the percentage of black and white students for these schools. (DX 3, 7; T1 at 23) In most instances when an attendance change was made, the School Board expected the change to improve the race ratio at the affected school and, those times when the change did not improve the ratio, the School Board expected the ratio to change by only a few percentage

Not Reported in F.Supp.                                                      Page 10
Not Reported in F.Supp., 1997 WL 33479021 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

points. (DX 3, DX 7) Occasionally, the projection did not hold because the demographics of the affected area changed unpredictably. (T1-23)

78. If demographic factors explain the racial imbalances at those schools, it is unnecessary to reach the issue of what further desegregative techniques could be employed as this Court has never required defendants to adjust racial enrollments at Hillsborough County schools on an annual basis.

**\*11** 79. Notwithstanding the evidence pointing to demographic change as the most likely explanation for the increased black enrollment at thirteen elementary schools and three junior or middle schools, certain factual issues raised by plaintiffs should be addressed.

80. Dr. Shelley examined five of what he called the "long unbalanced" schools-Cleveland, Edison, Graham, Robles, and Oak Park-and noted that the attendance areas for these schools do not adjoin each other. He testified that it was at least "plausible to be able to make some slight adjustments in the boundaries of these attendance areas and reassign some students such that the degree of racial imbalance is lessened in those schools." (T4 at 64)

81. It must be remembered that the disparity in racial enrollments was also present, albeit to a lesser degree, when plaintiffs and the School Board approved the clusters as part of the middle school plan adopted by this Court in the 1991 Consent Order. (Prior Report and Recommendation at 29, 32 and n. 22) Since the implementation of the clusters, actual black enrollment has exceeded projected enrollment for some schools. FN23

 FN23. A chart prepared by Dr. Stevens compares the race ratios projected by the 1991 middle school plan and actual race ratios in 1995 for the schools having black student enrollments of 40% or more. (PX 1, Ex. 1e)

82. Testimony received at the 1994 hearing on plaintiffs' motion to enforce court order demonstrated that at least as to West Tampa Elementary, reassignment of students according to suggestions made by plaintiffs' desegregation expert, Dr. Stevens, was not practicable. FN24

 FN24. See Prior R & R at 38-40.

83. Plaintiffs have presented proposed findings addressing some of the sixteen schools which currently have 40% or more black student enrollments in terms of their location

in clusters with other schools which have a much lower percentage of black student enrollments. (Dkt. 796 at 18-19)

*Edison Elementary*

84. Edison Elementary School (75% black) FN25 is in a cluster with Morgan Woods (10% black), Town & Country (27% black) and Woodbridge (21% black). (PX 7 at 2)

 FN25. The racial enrollments listed in plaintiffs' exhibit are based on the 1995-96 school year.

85. However, these elementary schools are not in the area immediately adjoining the Edison attendance zone. Rather, the schools which immediately adjoin the Edison attendance zone are Foster (64% black), Broward (35% black), and Seminole (40% black). (DX 8 at 4) FN26

 FN26. The racial enrollments shown on defendants' exhibit are from the first month attendance figures for the 1996-97 school year and so they differ somewhat from the percentages shown in PX 7 as well as other exhibits which may be in evidence, including the 6th Annual Report which is the most current data in the record for the 1996-1997 school year.

*Cleveland Elementary*

86. Cleveland Elementary School (52% black) is in a cluster with Carrollwood (15% black), Forest Hills (27% black) and Lake Magdalene (12% black). (PX 7 at 2) Forest Hills does adjoin the Cleveland attendance zone at the northwest corner but its boundaries include a portion of Florida Avenue and Busch Boulevard, major city streets. The other schools do not. The other schools surrounding Cleveland are Seminole (40% black), Sulphur Springs (80% black), and Foster (64% black).

*Sulphur Springs Elementary*

87. Sulphur Springs (74% black) is in a cluster with Twin Lakes (17% black). (PX 7 at 2; DX 7 at 18, 20) FN27 However, Twin Lakes does not adjoin the Sulphur Springs attendance zone. The elementary schools which do adjoin the Sulphur Springs attendance zone are: Shaw (59% black), Cahoon (55% black), Foster (64% black and Cleveland (53% black).

Not Reported in F.Supp.                                                                          Page 11
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

FN27. Students who attend Sulphur Springs and Cleveland also attend Adams Middle School. (PX at 7)

### Graham Elementary and Foster Elementary

**\*12** 88. Plaintiffs also point out that Graham (67% black) and Foster (61% black) are in a cluster with Broward (34% black), Egypt Lake (22% black), Mendenhall (30% black), and Seminole (37% black). (PX 7 at 3; DX 7 at 3, 7-9, 13, 17)

89. With the exception of Seminole, which is to the southwest of the Foster attendance zone (divided by 12th Street), none of the other schools which adjoin Foster are under 40% black. Instead, Foster is bordered by Sulphur Springs (80% black), Cahoon (55% black), and Edison (78% black). (DX 8 at 5) Also, the dividing line between the attendance zones for Graham and Broward is Indiana Street. Graham is also divided from Tampa Bay Boulevard Elementary (27% black) by the Hillsborough River. (DX 8 at 6)

### Robles Elementary

90. Robles (90% black) is in a cluster with Folsom (29% black). (PX 7 at 3; DX 7 at 8). While the Folsom attendance area adjoins Robles to the east, the two zones are separated by a CSX railroad track. Also, the other attendance areas surrounding Robles are Riverhills (45% black) and Cahoon (55% black). (DX 8 at 9) FN28

FN28. In 1975 or 1976 the School Board considered converting Robles to a sixth-grade center as a way to reduce the increased black enrollment at the school. However, after talking to the parents in the Robles neighborhood, the School Board dropped that idea because the parents who lived in that area were opposed to it. (T7 at 220)

### Cahoon Elementary

91. Cahoon (52% black) is in a cluster with Hunter's Green Elementary School (19% black). (PX 7 at 3; DX 7 at 9) Hunter's Green is not an adjoining school zone, however. Instead, Cahoon is adjacent to Witter (55% black), Temple Terrace (34% black), Riverhills (45% black), Robles (88% black), Foster (64% black), Sulphur Springs (80% black) and Shaw (59% black). (DX 8 at 1)

### Shaw Elementary and Witter Elementary

92. Shaw (56% black) and Witter (54% black) are in a cluster with Tampa Palms Elementary School and two other elementary schools to be built after the 1995-1996 school year. (PX 7 at 3) Tampa Palms Elementary School is 14% black. (DX 7 at 19) Although a satellite attendance zone for Hunter's Green adjoins both the Shaw and Witter attendance zones (DX 8 at 9, 12), there is no indication that the Hunter's Green attendance zone adjoins either Shaw or Witter and that would be unlikely since, by definition, a satellite attendance zone is a non-contiguous attendance zone.

### Oak Park Elementary

93. Plaintiffs' proposed findings do not address Oak Park. Its attendance zone is adjoined by the attendance zones for Palm River, DeSoto, and Kenly, all of which had a black enrollment of 35% or more for the first month of the 1996-1997 school year. (DX 8 at 8)

94. Dr. Stevens testified at the unitary status hearing that he had "not drawn any plan for any particular school" for reducing the percentage of black students at the schools which have a black student enrollment of 40% or more. (T4 at 206) FN29

FN29. Dr. Stevens is also an expert in school desegregation cases. He has never testified on behalf of a school system, however, or in favor of a declaration of unitary status as to student assignment. (T4 at 154)

### Magnet Schools and Programs

95. Magnet programs are one of the most effective desegregation techniques employed by school boards today.

96. When the Court approved the Consent Order in 1991, a key objective of the Middle School Plan was to locate magnet programs in the inner city schools where the greatest number of black students reside. Today, all ten elementary school programs are located in neighborhoods which consist primarily of black residents. (T1 at 177)

**\*13** 97. As suggested by its name, the magnet program or school offers a special curriculum which is designed to attract students based on their special interests. Students who attend magnet programs are provided transportation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:88-cv-00263-SLR    Document 309-3    Filed 09/09/2005    Page 12 of 33

Not Reported in F.Supp.                                                                                     Page 12
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

if needed. (T1 at 173-74) For the 1996-1997 school year, defendants offered twelve magnet programs. Three additional magnet programs will be offered for the 1997-1998 school year. (T1 at 143)

98. Mary Ellen Elia, director of the School Board's magnet school program, estimated that by the time the program is fully implemented, almost 90,000 students will be participating in magnet programs in Hillsborough County. (T1 at 170) All of the magnet programs and schools opened so far have been successful. (T1 at 154)

99. The School Board actively markets its magnet programs, including advertising in the media. The staff responsible for the magnet programs also meet with community groups across the county. (T1 at 144-50)

100. As there are more applicants than openings in the programs, lists of students are made by computer random draw. Students are then selected based on gender, ethnicity, and grade level. Gender and ethnicity are used as selection criteria to achieve a balanced population. (DX at 10) Also, applicants living closest to the school are given priority in at least some situations.  FN30 (T1 at 162)

> FN30. Hillsborough County has both magnet programs and magnet schools. It is not clear from the testimony whether students applying for magnet programs also receive first priority if the live closest to the schools. (T1 at 161-64)

101. In order to obtain federal funding for the magnet school program, the School Board had to establish that it would foster desegregation and attract substantial numbers of students of different racial backgrounds. FN31 Under the School Board's plan, students who are members of a minority group can comprise up to 40% of the students participating in the magnet programs or attending magnet schools. (T1 at 166) That percentage was chosen because it represents the total percentage of students within the school system who belong to a minority group. (Dkt. 808, Affidavit of Mary Ellen Elia) ("Elia affidavit")

> FN31. *See* 34 C.F.R. § 280.1 et. seq. (1996).

102. The magnet school plan also specifies the percentage of particular minority groups within the 40% cap who may be admitted under the plan: 23% Black; 14% Hispanic; 2% Asian Pacific Islanders; and .02% American Indians. (T1 at 166)

103. The percentage figure of 23% for black student enrollment was part of the Middle School Task Force Plan. Plaintiffs and defendants agreed to this figure as part of their negotiations. However, the Plan also provides that if students from other minority groups do not apply for the magnet programs, black students may be accepted into the programs as long as total black enrollment does not exceed 40%. (Elia affidavit at 3-4)

*Special Transfer Requests Including Majority to Minority Transfers*

104. The Court's July 1971 Order set out specific criteria the School Board was to follow in handling requests to transfer students from one school to another. (July 1971 Order, at 11, Ex. 2) The Court has not altered the School Board's obligations since that time.

**\*14** 105. The only grounds authorized for transfers are: (1) majority to minority transfers; (2) transfers recommended by the juvenile court; (3) transfers for exceptional children; (4) transfers for children of School Board teachers and staff to their parents' place of employment; (5) transfers to attend Tampa Bay Vocational-Technical High School; and (6) transfers in cases of severe hardship after determination of each case by the School Board.

106. Transfers under (3),(5), and (6) can be approved by the School Board only after considering recommendations from the BiRacial Committee. They are to be considered without regard to race except transfers are not to be approved if made for the purpose of avoiding desegregation. Transfers under (1) and (4) are to be reported to the Bi-Racial Committee.

107. Majority to minority ("M to M") transfers allow a student to transfer from a school in which his race is in the majority to attend the closest school to his residence in which his race is in the minority. Transportation is to be provided if the school to which a student is transferred is more than two miles from the student's home.

108. It appears that no M to M transfers have ever been sought from the School Board. (T1 at 90-91) Although parents were generally familiar with the special transfer requests, they did not seem familiar with M to M requests. Dr. Miliziano, the Superintendent's Administrative Assistant, testified that not until recently did the School Board start evaluating special assignment requests made on other grounds to determine whether the children seeking the transfer would be eligible for an M to M transfer. The transfer request forms now have a request for the race of the student to be listed. The transfer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 13
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

requests sought on other grounds are granted if the request would qualify as an M to M request. (T1 at 90-92)

109. The M to M transfer program is now publicized as a result of a recommendation by School Board staff in July 1995. (PX 14) Since the policy has been publicized there have been no specific M to M transfer requests. (T1 at 106)

110. Dr. Stevens, plaintiffs' desegregation expert, would like to see the School Board do more marketing of the M to M transfer program but agreed that use of the M to M transfers would not make a big difference in alleviating racial imbalances. (T4 at 195)

111. Dr. Stevens studied other types of special transfers and concluded that defendants' granting other transfer requests had increased the racial imbalances at seven of the imbalanced elementary schools for the year 1995. His study indicated that the percentage of black students enrolled in those schools (Cahoon, Cleveland, Foster, Graham, Robles, West Tampa, and Witter) experienced increases ranging from five to seven percent as a result of special assignments allowing students to attend those schools who are not really assigned to them. (T 4 at 129-30) (PX 1 at 13)

112. This issue was addressed at the prior hearing on plaintiffs' motion to enforce court order. In effect, Dr. Stevens believes the Court should reconsider its prior directive to the School Board to grant transfers for extreme hardship "without regard to race" if the effect of that policy would be to contribute to racial imbalance. (PX 1 at 12-13) For the reasons stated previously, for this Court to order defendants to deny black parents severe hardship transfers for their children because the transfers would adversely impact race ratios is neither practical nor wise. (Prior R and R at 24-26)

**\*15** 113. No evidence was presented that the School Board has failed to follow the Court's directives as to special assignments.

## FACULTY AND STAFF ASSIGNMENTS

114. For the 1993-1994 school year, 14% of the teachers in Hillsborough County were black. For the same year, blacks constituted 17% of the principals, 22.2% of the assistant principals, and 7.9% of the district administrators (at the main school board office). Of the noninstructional permanent personnel, 16.1% were black. Black teacher aides comprise 25.3% of the total teacher aides employed by the county. FN32 (T2 at 132-135)

FN32. Defendants used district-wide employee data from the 1993-1994 school year at the unitary status hearing. (T2 at 134)

115. According to Marilyn Whittner, Director of Human Resources, the School Board has "a dearth of minority applicants for our teaching positions and we are constantly seeking minority teachers." (T2 at 105) The School Board focuses recruitment efforts at colleges with a substantial percentage of black graduates.

116. Additionally, a mentoring program has been instituted for black teachers who aspire to be administrators. More than one-half of the graduates of that program have been placed in administrative or teacher resource positions. (T2 at 108-09; PX 14)

117. For instructional and non-instructional personnel, the principal at an individual school interviews prospective applicants and is authorized to make offers contingent on approval by School Board and staff. Principals are given criteria for open positions. If Human Resources determines that a new hire would adversely affect the racial ratio at a particular school it will disapprove the offer unless no qualified candidates are available. (T2 at 112-16)

118. Instructional personnel employed by the School Board are represented by a union which negotiates salaries based on the level of service and academic degree held by the employee. These salary levels are applied across-the-board to all teachers. (T2 at 114-15)

119. There are currently no schools in which black teachers or staff constitute a majority at any school nor has that situation existed in the past since the 1971 Order was entered. (DX 7)

120. The parties' experts differ on whether some schools are racially identifiable due to their faculty and staff compositions. Using a 15% deviation standard, Dr. Stevens identified twelve elementary schools which are not in compliance with the district-wide ratio. However, Dr. Armor, defendants' expert, did not find any schools which fit into this category. This is because Dr. Armor used only faculty data; Dr. Stevens used data from the annual reports which aggregate faculty and staff and include non-certified personnel. (T4 at 139) However, the 14% figure cited by defendants referred only to black faculty, not staff. (T2 at 130, 132)

121. None of the Court's Orders have ever required the School Board to provide racial balance at the upper management level. However, plaintiffs note the paucity of

Not Reported in F.Supp.                                                                         Page 14
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

upper-level black administrators during the time the School Board has operated under court supervision. During this period, only one of the six Assistant Superintendent positions has been held by a black individual: Assistant Superintendent of Support Services. (T7 at 145-47)

**\*16** 122. Defendants have never been found liable for racial discrimination in employment based on records which have been maintained since at least 1977. Some complaints have been resolved at the administrative stage. (T7 at 199-200)

123. The School Board has in place grievance procedures which can be utilized by parents and students as well as employees and includes various levels of review, including a public hearing before the School Board. Student handbooks distributed to every student at the start of the school year outline these procedures. (T7 at 201-04)

124. Dr. Samuel Horton, an educator with the School Board between 1977 and 1991, served as General Director of Secondary Education where he helped develop guidelines for the gifted program among other programs. He noted the absence of any blacks in assistant superintendent positions during that time. Dr. Horton, who is African American, stated that he applied twice for the position of Assistant Superintendent for Instruction but was not selected either time. While he did not file a grievance, Dr. Horton testified that he believed he was not selected due to his race. (T6 at 88-96; 103)

125. Ann Porter, head of the Tampa branch of the NAACP, testified about concerns about black males being denied employment opportunities and other complaints she receives. FN33 Ms. Porter, who is African American, meets with the Superintendent and staff on the average of once or twice a month. This working relationship has become stronger with the current Superintendent, Dr. Earl Lennard. Although she is opposed to a declaration of unitary status at this time, Ms. Porter admitted that many complaints are resolved through these informal meetings. (T6 at 139-41)

FN33. Ms. Porter was not asked about a venture between the University of South Florida and the School Board launched in August 1995 to place black male teachers with the School Board after graduation. (DX 14, "Project PILOT" documents)

TRANSPORTATION

126. With regard to transportation of students, the School Board's obligation has been to insure that bus routes and assignment of students to buses "assures the transportation of all eligible students on a non-segregated and otherwise non-discriminatory basis" and to regularly re-examine its transportation system. (July 1971 Order at 10)

127. In 1996, the School Board transported approximately 80,000 students daily. It is the fifth largest school district in the nation in terms of the numbers of students transported. (T1 at 123) For the 1994-95 school year, the School Board received over $17 million in state funding for transportation. (DX 24)

128. As required by Florida law, any student attending a school two or more miles from his residence must be furnished transportation by the school district. (DX 21) The School Board has always complied with this requirement. (T1 at 122-25)

129. The School Board provides transportation for all students who qualify and no distinctions are drawn as to race. (T1 at 131-33)

130. The desegregation technique adopted in the 1971 Order involved closing the formerly all-black schools and assigning them to "satellite" attendance zones. (T4 at 135-36)

**\*17** 131. The School Board has maintained data on the number of students transported annually and their race. For the 1995-96 school year, approximately 18,400 students were transported for desegregation purposes including students attending magnet schools. (PX 1 at 20)

132. Of this number, more black students than white students were transported at each of the three school levels: elementary, middle, and high school. (PX 1 at 20) FN34

FN34. Of the elementary students transported 23% were black and 10% were white. At the middle school level 26% were black and 18% were white. Of the high school students, 24% were black and 8% were white. (PX 1 at 20)

133. At no time after the 1971 Order was entered did plaintiffs raise any objection about the number of students bused, including when the desegregation plan was modified in the 1991 Consent Order due to implementation of the middle school plan.

134. Part of the reason for adopting the Middle School

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 15
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Plan was to allow students to attend schools close to their homes as much as possible. (T1 at 65)

135. Although the 1971 Order did not require provision of transportation for after-school activities, the School Board provides "activity buses" for after-school activities to afford students living in satellite areas (a non-contiguous attendance zone area) the opportunity to participate in those activities if they were not able to provide their own transportation. Because the junior high schools are being phased into middle schools which are "self-contained" in their activities, the activity buses are primarily used at the high schools. (T1 at 123-30) Activity buses are provided for any students who need to stay after school for any reason, and are not limited to athletics or clubs. (T1 at 138-41)

136. In 1989 the School Board examined whether providing only one activity bus per satellite area met the needs of the students. The Superintendent and his staff determined that more than one activity bus per school might be needed on certain days due to the number of activities and events scheduled at the schools. (DX 23)

137. This policy was implemented and remains in effect today. The School Board supervisor of transportation surveys schools on a weekly or daily basis to determine the number of buses needed. (T 131-36; 138-41)

## EXTRACURRICULAR ACTIVITIES

138. Under this Court's desegregation plan the School Board has been ordered to regularly re-examine its extra curricular activities to insure that they are maintained and operated on a non-segregated and non-discriminatory basis. (July 1971 Order at 10)

139. In the fall of 1971 the Hillsborough County school system was integrated in its athletic programs and all students, regardless of race, were given an equal opportunity to participate in athletics. (T1 at 112-13)

140. Since that time, a committee composed of the athletic director and assistant school principals has regularly reviewed proposed changes in the athletic programs pursuant to policies adopted by the School Board. The School Board offers a number of athletic programs, ten for females and ten for males. (T1 at 113-15)

141. Athletic activities are offered at each senior high school and existing junior high school. They have been eliminated at the middle schools as part of the restructuring program and due to funding. The director of

athletics hopes to provide athletic programs at the middle schools in the future. (T1 at 114-15; 119-20)

**\*18** 142. Of total student participation in athletics, approximately 23% of the athletes were black and approximately 77% were white for the school year 1996-97. Participation varied from school to school and sport to sport. For example, total participation in basketball for black students was 54% (males) and 49% (females). On the other hand, participation by blacks on high school swim teams was very low. Only three black students (one female, and two males) participated on high school swim teams. Over 18% of the cheerleaders were black. (DX 28; T1 at 115-19)

143. The School Board also offers a variety of other extracurricular activities at senior high schools, including: drama, choral program, string and instrumental music programs, honor clubs, service clubs and various interest clubs. (T2 at 127-28)

144. Defendants do not maintain data on a school by school basis for extracurricular activities but do track overall participation by race. In 1995, black students accounted for 11% of the honor society memberships, 12% of drama clubs, 27% of student councils, 20% of marching bands, 14% of orchestras, and 19% of choral groups. (PX 1 at 27)

145. These activities are open to all students and no students are denied the opportunity to participate because of their race. FN35

> FN35. Mae King, mother of an Armwood High School student, testified that she observed cheerleading try-outs at Armwood recently because she was concerned that there were not enough black cheerleaders. As a result of the try-outs, however, three blacks were chosen for the varsity squad and three were chosen for the junior squad. (T4 at 17-27) Ms. King also recounted an incident where a suggestion was made at a PTA meeting to have a black disc jockey at a school dance and some of the people at the meeting got upset and walked out. (T4 at 20-21; 27-28)

## FACILITIES AND RESOURCE ALLOCATION

*Site Selection and School Openings and Closings*

146. The School Board's duty as to facilities under this Court's order is the same as with transportation and

Not Reported in F.Supp.                                                         Page 16
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

extracurricular activities. As required by prior orders of the Court, the School Board was to make sure that school construction, school consolidation and site selection (including the location of any temporary classrooms) should be "done in a manner which will prevent the recurrence of the dual school structure." (July 1971 Order at 11).

147. The School Board has reported to this Court the opening and closing of schools and the impact of these actions on the race ratios at the schools. (T1 at 24) It has also presented proposed plans to the Biracial Committee for input. (T1 at 64)

148. Between 1971 and 1993 the School Board has constructed 25 new schools. In most cases, the percentage of black students attending these schools the first year was brought closer to the 80/20 ratio. (DX 4) FN36 By 1995, five additional schools were built. (PX 2 at 8) None of the new schools has been opened with an all-white population or a black population of close to 40 percent. (T1 at 26)

> FN36. The School Board's exhibit does not address schools opened after the 1993 school year.

149. As a general rule, the School Board has approved construction of new schools in areas of increasing population growth and where the greatest amount of overcrowding exists. (T1 at 25) During the past twenty-five years, most new schools have been opened in the suburbs. In every case of a new school opening, the School Board took into account the projected race ratios at the new schools and assigned satellite attendance areas if necessary to maintain a racial balance at those schools. (T1 at 33) Especially with the elementary schools, the School Board tried to assign students to a school near their residence so they could walk to school. (T1 at 43)

*19 150. A total of nine schools have been closed since the 1971-1972 school year. (DX 5) When those schools were closed the School Board took into account the race ratios at the closed school and the schools to which the pupils were reassigned. (T1 at 30-31) In most cases, the closing of the schools brought the schools the students were reassigned to closer to the 80/20 ratio. (DX 5)

151. Plaintiffs have been notified of all school construction through the reports filed with the Court as to boundary changes. Plaintiffs have never objected to the location of new schools. Although most of the new schools have been opened in the suburbs, Blake High School, which is a magnet high school opens in the 1997-

98 school year near downtown Tampa. Defendants have also opened several magnet schools in predominantly black, inner-city areas: Lee, Phillip Shore, and Dunbar Elementary Schools as well as Young and Middleton Middle Schools. (T1 at 155; 174-177)

*Overcrowding*

152. During the past ten to twelve years, overcrowding has become a problem for most Hillsborough County schools and double sessions a reality at some. (T1 at 61)

153. Plaintiffs introduced evidence that the schools having a black student enrollment of 40% or more are more likely to be overcrowded in terms of their Florida Inventory of School Houses (FISH) capacity. Plaintiffs' demographics expert, Dr. Shelley, testified that schools with a 40% or more black enrollment are more likely to have enrollments significantly over their FISH capacities than schools which are racially balanced. (T4 at 37; PX 2 at 11-13, 22-23)

154. Dr. Shelley's data also shows that in 1995, a total of 102 public schools in Hillsborough County were more than 25% over their FISH capacity: 88 were racially balanced schools and 14 were unbalanced FN37 schools. Only 8 of the 88 balanced schools were more than 50% over their FISH capacity but 4 of the 14 unbalanced schools fell into this category. (PX 2 at 23)

> FN37. Dr. Shelley used the same measure of racial imbalance used by Dr. Armor and Dr. Stevens.

155. However, the FISH capacity of a school does not include portable classrooms. Use of portables does not necessarily mean that a school is overcrowded. (T4 at 101-03) FN38

> FN38. Defendants have provided a 46-page list entitled "Relocatable Classroom Inventory" which listing all portable classrooms placed in use between 1949 and 1995 and their locations. (DX 29)

156. Some classes, particularly those which are federally funded, provide an opportunity for a lower/pupil teacher ratio. Thus, a classroom built for 25 or 30 children may hold only 20 children. (T1 at 63-64) Most, if not all, of the sixteen schools with black student enrollments of 40% or more are included in the sixty-one "Title 1" schools in Hillsborough County which received additional funding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 17
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

per pupil for the school year 1996-97. (DX 37)

157. The School Board recognizes that overcrowding is a serious problem and that the entire community is concerned about it. Last year, voters approved a sales tax increase. The School Board appointed an Overcrowded Schools Task Force. The Superintendent and his staff compiled data for all Hillsborough County public schools including FISH capacity, number of portables, as well as the acreage of each school site. The Percentage of Capacity Report (DX 32) generated for the Task Force and the School Board is being used to determine what measures need to be taken to relieve overcrowding. (T7 at 222-24)

*20  158. Although no testimony was provided interpreting the Percentage of Capacity Report in terms of individual schools, it appears that of the 105 elementary schools surveyed, the ten elementary schools with the highest number of points include Edison, Witter, DeSoto, Shaw and Cleveland, all of which have black student enrollments of 40% or more. (DX 32, Elementary Schools, at 1)

### Teacher Resources

159. For the 1992-93 and 1994-95 school year, schools with a black student enrollment of 40% or more had a lower teacher-student ratio than the other schools with fewer than 40% black students. (DX 1, charts 33 and 36)

160. For this two-year period, there was also no discernable difference in terms of educational degrees and experience of the teachers at the over 40% schools and those which were under 40% in terms of black student enrollment. (DX 1, charts 33-36)

### Expenditures

161. In 1995, the School Board had a budget of $1.2 billion. (T7 at 150)

162. Funding is received from three separate sources: federal, state, and local. Funds for operating expenses come from the Florida Educational Finance Program (FEFP), a state program that funds school district based on the needs of students and the costs to provide education in the school district as opposed to other Florida school districts. The FEFP funds come from three sources: state revenue based on sales tax, local property tax revenue, and revenue from the state lottery. (T1 at 185-88)

163. The School Board also receives funding from the federal government for educating handicapped students and funding based on the socioeconomic needs of the students. Capital outlay expenses for new schools and other capital expenses come from local taxes. The School Board also receives some state funds generated from gross receipts on utilities. (T1 at 188)

164. Various agencies of the federal and state government regularly audit the School Board to insure expenses meet the program requirements and that funds are allocated on an equitable basis. (T1 at 190-91; 195-97)

165. There is no difference in the per capita expenditures of the School Board on instructional salaries for teachers districtwide regardless of the racial composition of the schools. (DX 1, charts 37, 40) As stated in the preceding discussion of faculty and staff, instructional salaries are set by the collective bargaining agreement between the teacher's association and the School Board. The federal government also prescribes comparability standards for employees paid by federal funds. (T1 at 199)

166. Funding for instructional resources is allocated by the School Board on a pupil by pupil basis without regard to race, ethnicity, gender, or other limits such as the FISH capacity for the school. When a group of schools is converted to the middle school plan, those schools receive additional resources due to the conversion. (T7 at 191-93)

167. A comparison of expenditures for instructional supplies and equipment for fiscal years 1993 and 1995 showed that elementary and junior high schools which were more than 40% black received slightly less funding than schools which were less than 40% black. (DX 1, charts 38 and 41)

*21  168. The School Board attributes this difference to "conversion funds distributed to schools which were newly constructed or reconfigured pursuant to the Middle School plan" and notes that "[m]ost of the over 40% schools [are] not scheduled for conversion until the 1996-1997 and 1997-1998 school years." (Dkt. 797 at 83) The record supports this argument. (T1 at 97)

169. In addition, a study of total capital expenditures for fiscal years 1993 and 1995 indicates that there was essentially no difference between schools which were over or under 40% black. During the latter year, elementary schools which were over 40% black received more funding. (DX 1, charts 39 and 42)

170. A review of capital expenditures during the period 1991 to 1995 by Dr. Armor revealed that expenditures for inner city elementary schools (which comprise most if not

Not Reported in F.Supp.                                                                                                    Page 18
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

all of the more than 40% black schools) were slightly higher than those of the other elementary schools. FN39 Spending for the inner city junior high schools was substantially higher than other junior high schools. (DX 1, chart 43)

FN39. Darrell Daniels, one of the witnesses called by plaintiffs, is employed with the Urban League and operates youth development programs at Robles and 31 other schools. One of his children attends Robles. While commending the principal of Robles, Mr. Daniels, who is African American, criticized the lack of commitment to education which he saw in the other personnel at the school. He also felt that Robles did not have the equipment such as computers which other schools have. However, he agreed that a school's commitment to education can vary regardless of the racial make-up of the school. (T6 at 58-77)

## QUALITY OF EDUCATION

171. Several witnesses called by plaintiffs, including plaintiff Andrew Manning and School Board Chair Doris Reddick, testified poignantly about the differences between black and white schools in the era of *de jure* segregation. Mr. Manning and Ms. Reddick attended public schools in Hillsborough County. Ms. Joanna Tokley taught in the public schools, both before and after the Court's 1971 desegregation order. All three are African American. (T3 at 163-68; T5 at 20-23; T6 at 103-110)

172. Orders entered in this case have not required the School Board, in dismantling the dual school system, to attain specified levels of student achievement or any other standard to evaluate quality of education. However, this Court's referral order directed that the quality of education, along with the other *Green* factors be evaluated as well as the School Board's good-faith commitment in determining whether the public schools of Hillsborough County have attained unitary status.

173. Evidence presented by the parties concerning the quality of education today focused on academic achievement, enrollment in gifted programs, and suspension and dropout rates. Other factors bearing on quality of education such as facilities and resources as well as magnet programs have been addressed in the preceding sections.

*Achievement Tests*

174. Since 1977 the School Board has examined the results of achievement tests by students of different races on a regular basis. (T2 at 147)

175. Dr. John Hilderbrand, who has supervised testing for the Hillsborough County school system since about 1977, testified that there are an increasing number of state-mandated tests for students that are administered and evaluated by the School Board. (T2 at 138-40)

176. On the Stanford Achievement Test, Hillsborough County students scored slightly below the 50th percentile in reading and slightly above the 50th percentile in math and language which is the average rank for a national population. (T2 at 139-140) A standardized writing exam given to students in the fourth, eighth and tenth grades demonstrates that Hillsborough County students score higher than any of the other large school districts in the state. (T 2 at 140) Similar results are obtained on the High School Competency Test (HSCT). (T2 at 141) Scores for black students on the writing exam and HSCT show that Hillsborough County students outperform state averages for those tests. (T2 at 141)

**\*22** 177. A voluntary test taken by about 47% of seniors in high school-the Scholastic Assessment Test-has consistently produced results that place Hillsborough County students above national and state averages. When the scores are analyzed by race, the same result is shown. Black students in Hillsborough County outperform state and national norms. (T2 at 141)

178. In attempting to evaluate how well the school system is educating all of its students, Dr. Armor examined standardized tests (the Stanford Achievement Test) given to fifth grade students in Hillsborough County in the spring of 1994 and the spring of 1995. Overall, black students scored 16 to 17 points lower than white students in reading and math. (T3 at 88-89; DX 1, chart 44) This represents approximately three-fourths of a standard deviation. (DX 1 at 21)

179. A nationwide study conducted in 1992 found that similar differences exist between blacks and whites at all grade levels in math and reading; the achievement gap ranges from two-thirds to four-fifths of a standard deviation depending on the grade and test level. (DX 1 at 21)

180. However, when performing a regression analysis which used socioeconomic factors relating to family income, single or two parent families, and the educational background of the parents, the gap in scores between black and white students narrows considerably. (T3 at 90-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 19
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

101; DX 1, chart 45) Dr. Armor concluded that about 60% of the gap in the reading scores for black and white students and about 66% of the math scores can be explained by socioeconomic factors. (DX 1, chart 46)

181. Additionally, when the first grade test scores for the same group of students are added as an additional variable, almost 75% of the reading gap and 90% of the math gap is explained by these variables. FN40 (DX 1 at 22-23, chart 47)

> FN40. First grade test scores are used as a predictor of student achievement or skills before entering school. (T3 at 96) However, the tests are given in the spring of the school year rather than the fall and therefore are the product of the first grade curriculum to an extent. (T6 at 253; 283; T7 at 186-87)

182. An analysis of Stanford Achievement Tests taken by eighth grade students revealed similar results. About 71-72% of the gap in reading scores and about 84-86% of the gap in math scores between black and white students in Hillsborough County for the same years was attributable to a combination of socioeconomic factors and first grade test scores. (DX 1 at 23, charts 48 and 49; T4 at 98-100)

183. Dr. Robert Crain, a witness called by plaintiffs, criticized some of the assumptions and methodology employed by Dr. Armor in arriving at his conclusions. (T6 at 157-207)

184. Dr. Crain disagreed with Dr. Armor's use of first grade test scores as predictors of student achievement entering first grade because the tests are given in the spring rather than in the fall. (T6 at 162-63) He did agree that a student's entry-level skills are important predictors of how well a student will perform on the fourth and eighth grade tests. (T6 at 253-53)

185. Dr. Crain also disagreed with Dr. Armor's use of neighborhood data to determine the variables of family income and educational level of parents because that data reflected averages rather than actual figures for a neighborhood and therefore would presumably include both black and white families. (T6 at 168-73; 236) However, Dr. Crain uses neighborhood income in the studies he conducts. (T6 at 236) Dr. Crain also questioned whether family income and educational background could be remnants of the prior segregated school system. (T6 at 174-76)

**\*23** 186. Overall, Dr. Crain thought that Dr. Armor had overestimated the effects of socioeconomic factors on

achievement test scores. (T6 at 192) Although he disagreed with some variables used by Dr. Armor, Dr. Crain did agree that the socioeconomic factors of free lunch and the number of parents at home were relevant and important variables. (T6 at 266) Using these factors, he obtained a line of regression similar to Dr. Armor's study. Dr. Crain did not determine the statistical significance of the differences between his study and Dr. Armor's (T6 at 270) FN41

> FN41. Dr. Crain disagreed with Dr. Armor's use of a "two-tailed" statistical model and felt that he should have used a "single-tailed" analysis. (T6 at 274) His preference for the single-tailed analysis was that "no one ... would expect blacks to score better in higher black schools." (T6 at 274) The reasons cited by Dr. Armor for use of the two-tailed analysis are more persuasive and refute Dr. Crain's assumption that black students in schools with a higher black enrollment will always score lower than those students in schools with a lower black enrollment. (T7 at 161-69)

187. Dr. Crain's study showed that fifth-grade black students attending the schools with over 40 percent black enrollment performed less well in than their counterparts at the schools with under 40 percent black enrollment. (T6 at 206-07) However, these differences occurred only with reading. There were no differences in math. (T6 at 281-82)

188. However, when Dr. Crain used the same variables as Dr. Armor he reached substantially the same results. (T6 at 265-66)

*Academic Outcome*

189. To evaluate how well the school system is doing in educating high school students, Dr. Armor examined grade averages and college plans as no standardized tests are taken by twelfth graders. White students have a 2.9 grade average; black students have a 2.3 grade average. Fifty-six percent of the high school seniors who were white planned to attend college as compared to forty-five percent of black students. (DX 1 at 24-25, chart 54)

190. When adjustment is made for socioeconomic factors and tenth grade achievement tests, Dr. Armor concluded that the grade average gap for black and white seniors would be only about .15 grade point. (DX 1 at 25, chart 55) After adjusting for socioeconomic factors, the difference between black seniors and white seniors in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 20
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

terms of college plans is practically negligible. (DX 1 at 25, chart 55)

### Gifted Programs

191. As of October 1996, approximately 75% of the students enrolled in Hillsborough County gifted programs were white and approximately 9% were black. The remaining 16% were from other minority groups: 11% Hispanic, 4% Asian, and Indian and multi cultural, less than 1% each. (T2 at 151-52) While the number of black students in the gifted program is disproportionate to the number of black students enrolled in public schools, students must both apply to the gifted program and meet minimum criteria including attainment of a minimum score on a standardized test.

192. Until 1991, admission into gifted programs was set by state standards requiring an IQ test of 130 or higher. That year, the state adopted a plan to increase the number of minority gifted students and invited school districts to submit alternate criteria for admission. Hillsborough County elected to participate and submitted criteria under this program (referred to as "Plan B") which includan an IQ score of 115 or higher together with demonstrated academic achievement and other characteristics typical of gifted individuals. (T 153-56)

**\*24** 193. Implemented in 1993, the "Plan B" program continues to this day. Dr. Stevens noted that the school district's implementation of "Plan B" had increased the proportion of black pupils in the gifted program. (PX 1 at 31)

194. Ronnie King, number two in his class at Armwood High School, moved to Tampa from Colorado. He had been enrolled in gifted programs in Colorado. He missed a year of participation in gifted programs in seventh grade due to the transfer and having to be retested. His mother was later told that he did not need to be retested. Mr. King, who is African-American, was placed in gifted programs in the eighth grade and has participated in those programs since that time. (T6 at 43-55).

### Dropout Rates

195. Defendants monitor dropout rates and have a program designed to minimize dropouts. In the elementary schools, the program relies on enhancing reading, math, and skills development in small groups of students. (T7 at 206-07)

196. In the junior and middle schools, the School Board

focuses on students who may be at risk of dropping out and provides those students with additional academic experiences with a low teacher to student ratio. At the senior high schools, defendants provide additional counselors and teachers in a graduation enhancement program. (T7 at 207)

197. Additionally, the School Board provides a monthly report of prospective dropouts to the principals of each school. The principals are expected to follow-up with each student on an individual basis to give specific suggestions on how to stay in school or participate in alternate programs such as the GED program or adult education which meets the needs of the student. (T7 at 207)

198. The dropout rates for Hillsborough County public schools are the lowest in the state for similar large urban school districts. In the past five years dropout rates have averaged about 31/2%. (T7 at 208-09)

199. Dr. Armor examined data for the high school graduating class of 1995 beginning when those graduates were in the eighth grade. The difference in dropout rates for blacks (15%) and whites (9%) is not significant. When adjusted for socioeconomic factors, that difference is negligible. (DX 1 at 24, charts 52, 53)

### Suspension Policies and Rates

200. The School Board also tracks suspensions and expulsions by sex, race, and age. The suspension rates for Hillsborough County are lower than state-wide averages in some areas and for some groups. (T7 at 234) The School District has out-of-school suspension programs as well as seven alternative school sites. Individual schools can elect to run an in-school suspension program; that decision is left up to the administration at each school. (T7 at 234-36)

201. Dr. Armor did not examine suspension rates but Dr. Stevens did. After examining four years of data (1990-1994), Dr. Stevens concluded that black students are suspended from school at disproportionately high rates. He found that in 1994-95 the suspension rate for black students was two to four times higher than the rate for white students depending upon grade level and the type of suspension. This data did not lead Dr. Stevens to infer racial discrimination, however. His criticism was that the School Board had not examined this data more closely on a school-by-school basis "to verify that disparities are not race-related." (PX 1 at 29-30)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 21
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

GOOD-FAITH COMPLIANCE WITH COURT
ORDERS

**\*25** 202. The parties disagree as to defendants' history of good-faith compliance with court orders and what factors are relevant to this determination.

203. Defendants point out that for more than 25 years, defendants have complied with this Court's Orders to desegregate the public schools of Hillsborough County and to eradicate the previous illegal dual school system previously maintained. The record establishes that not once during that period of time have defendants been found in violation of any Court orders. FN42

> FN42. There is, of course, the plaintiffs' motion to enforce court order filed in 1994 which remains pending before the Court following entry of the June 1995 Report and Recommendation recommending that the motion be denied. However, the Court noted in its subsequent referral order that the motion and recommendation "would be rendered moot upon a finding of unitary status." (Dkt. 709 at 3)

204. During this period of time, the parties have regularly conferred, through their respective attorneys and desegregation experts, to ensure that the school system was moving forwards, not backwards, toward compliance with the Court's orders. (Prior R and R at 29 and n. 21)

205. At some point in the mid-1970's there were apparently several *ex parte* discussions between School Board staff and the District Judge formerly assigned to this case concerning whether the School Board needed to adjust boundaries at certain schools when racial enrollments changed. Plaintiffs learned of these conversations during a 1995 hearing on plaintiffs' motion to enforce court order when the School Board sought to admit testimony from John Heuer, former Assistant Superintendent, concerning these conversations. The undersigned ruled this testimony inadmissible on the basis of plaintiffs' objections. FN43

> FN43. *See* Prior R and R at 22 n. 15.

206. However, during the unitary status hearing, plaintiffs sought to introduce this testimony on the issue of defendants' good-faith compliance. Dr. Heuer testified that on a couple of occasions between 1972 and 1974 he received guidance from the Court, or the Court's law clerk, concerning what to do about schools where the boundaries had not changed but the racial composition of

the school had changed. He was told that "if [the school board] had not created the problem, [the school board] did not have to go back necessarily and correct it." (T7 at 17) Notwithstanding this advice, defendants did their best to try to improve the race ratios when possible, taking into consideration the distance factor for transportation and the burden it placed on the students. (T7 at 18-22)

207. Although the testimony on this point is not entirely clear, it appears that these discussions consisted of (1) one or two face-to-face meetings with the Court, Mr. Heuer, possibly Raymond Shelton, then Superintendent, FN44 and Crosby Few, counsel for defendants, and (2) a couple of telephone conversations between Mr. Heuer and the Court's law clerk. These discussions were initiated by the Court or the law clerk, not defendants. (T7 at 11-16, 50)

> FN44. Mr. Shelton is now deceased.

208. Both the former and the current Superintendent of Schools testified at the unitary status hearing. Dr. Walter Sickles served as Superintendent from 1989 to July 1996 when he was replaced by Dr. Earl Lennard. Dr. Sickles had been employed by the School Board in various capacities beginning in 1969. Although he believed that the school system had become unitary in the early 1990's he did not suggest moving in that direction at that time because he felt that the obtaining court approval for the middle school plan should have priority. Dr. Sickles also believed that a move to end court supervision at that time would be opposed by plaintiffs and instead aimed at working with plaintiffs towards adoption of the middle school plan in the 1991 Consent Order. (T7 at 99-124)

**\*26** 209. Dr. Lennard, appointed Superintendent in July 1996, has been employed by the School Board since approximately 1964. He previously served as Deputy Superintendent and Assistant Superintendent for Administration. He testified that he strongly feels a "moral and legal obligation on the school system to continue a desegregated school system." (T7 at 238-39) However, he has not developed any specific plans regarding what transportation policies he would recommend if unitary status were found other than continuing the activity buses. (T7 at 239-40)

210. Doris Reddick, the only black School Board member, was elected Chair by her colleagues. All seven of the School Board members run from districts but are elected county-wide. Ms. Reddick testified that the School Board had never taken a formal vote or held public hearings on whether to seek unitary status. When the Court's Referral Order was entered, School Board members discussed the issue with counsel in terms of the

Not Reported in F.Supp.                                                                      Page 22
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

unitary status issues. Ms. Reddick testified that she did not think that the School Board should be released from supervision now or at "any other time that I see in the future." She explained that "I am not sure we have actually crossed over the wall, and I mean the wall of equal distribution of everything that the unitary system calls for." (T5 at 27-30) However, when asked whether the School Board had developed any contingency plan to operate if unitary status is granted, Ms. Reddick indicated that any plan would maintain a system in which "all children will receive equal education." (T5 at 26)

211. The other School Board members who testified at the hearing, Carolyn Bricklemyer, Candy Olson, Yvonne McKitrick, Glenn Barrington, and Carol Kurdell, expressed no misgivings about whether Hillsborough County schools are unitary or the intent and ability of the School Board to continue a desegregated school system while receiving input from all members of the community. (T5 at 10-12, 16, 32, 39-40)

212. Mr. Manning, the lead plaintiff in the case, agreed with Ms. Reddick that the School Board had not yet completely eliminated the vestiges of segregation. He was concerned about the schools with increased black enrollments FN45 as well as the fact that black students were bused more often than white students. Mr. Manning did not think that there should not be any schools in the county with black student enrollments of 80% or more. He stated that there was a feeling of distrust and unhappiness with the School Board in the black community, and referred to reading two years ago about "secret meetings that were held between the School Board and the judges," an apparent reference to Mr. Heuer's testimony discussed above. However, Mr. Manning stated that he was consulted about the middle school plan proposed to the court and that he agreed with it as it was fully endorsed by counsel, the Legal Defense Fund. (T6 at 113-33)

> FN45. Mr. Manning agreed that some parents of black students do not want their children transported out of schools which are majority black but he felt that those parents were concerned more with convenience rather than the quality of education. (T6 at 126)

213. Joanna Tokley, a 22-year member of the Urban League who is currently President and CEO, testified on behalf of plaintiffs that she did not feel that the School Board was ready to be released from court supervision. (T3 at 187-89) She expressed concern that the inner-city schools might be passed over in terms of renovation projects and that low enrollments might cause the loss of

instructional or library staff. Ms. Tokley thought that there were still some employees who were insensitive and made improper comments to children who qualified for free lunches. She recounted a incident involving her godson who played basketball against East Bay High School in 1995 and was subjected to a racial epithet from someone in the audience. FN46 (T3 at 180-89)

> FN46. Ms. Tokley also testified about other incidents involving family members in the mid to late 1970's which she felt indicated disparate treatment. (T3 at 178-81)

*27 214. Ms. Tokley served on the Biracial Advisory Committee for ten years beginning in 1974 but resigned because she disagreed with its limited role. She felt that sometimes boundary changes were "rubber stamped" by the Committee and the School Board despite the fact that she and a minority of the Committee members voiced disagreement with those recommendations at the School Board hearings. (T3 at 182-84)

215. Ms. Tokley continues to be involved with the school system, however. She served on the Education Committee of the Chamber of Commerce and the Goals 2000 committee. She presently serves on the School Board's Overcrowded Schools Task Force. Additionally, she directs Urban League programs in about 32 Hillsborough County schools which provide self-esteem and behavioral modification programs for students of all races as well as tutoring and other programs. (T3 at 170-77)

*CONCLUSIONS OF LAW*

Plaintiffs submit that the Court must resolve four legal issues: (1) outstanding legal issues regarding defendants' prior compliance with existing orders; (2) whether a finding of unitary status is appropriate, absent modification of the 1991 Consent Order; (3) whether defendants have demonstrated that no remaining vestiges of the prior *de jure* segregated school system exist; and (4) whether defendants have demonstrated good-faith compliance with both the 1971 Orders and the 1991 Consent Order.

Defendants submit that all these issues are subsumed within the unitary status inquiry. However, these issues will be evaluated as suggested by plaintiffs.

Plaintiffs' 1994 Motion To Enforce Court Order Should
Be Denied As No Violations Have Been Shown

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 23
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Plaintiffs have only once alleged that defendants violated this Court's orders, in 1994. Those allegations were fully addressed in the Prior Report and Recommendation dated June 23, 1995 and the proposed findings and conclusions made therein are incorporated here by reference.

This is a threshold issue which remains pending before the Court and should be resolved prior to a determination of unitary status. Cf. *Bradley v. Pinellas County,* 961 F.2d 1554, 1558 n. 9 (11th Cir.1992). FN47 Therefore it is recommended that the Court conclude that defendants have not violated either of the 1971 Orders or the 1991 Consent Order as alleged by plaintiffs in their prior motion to enforce court order. No subsequent developments, either factual or legal, justify reconsideration of those recommended findings and conclusions.

> FN47. Of course, the burden is on plaintiffs in their motion to enforce to demonstrate that defendants have violated the Court's orders. In a unitary status determination, the School Board has the burden of establishing it has eliminated the vestiges of the prior *de jure* segregated school system and has complied in good faith with the Court's orders.

A Finding of Unitary Status Is Not Barred By the 1991 Consent Order

Plaintiffs contend that it is premature for the Court to make a determination of unitary status because the terms of the 1991 Consent Order have not been fully met.

The 1991 Consent Order approved and incorporated the Report of the Middle School Task Force. (Consent Order at 2-5) The Task Force Report addressed a restructuring of Hillsborough County schools to establish middle schools serving grades 6-8 to be implemented over a seven-year period.

**\*28** In agreeing to the terms of the Consent Order, counsel for the parties "represented to the Court that in their opinion, the modifications set forth in this Agreed Order meet applicable constitutional standards and will continue the progress of the Hillsborough County public schools toward a unitary system from which all vestiges of past discrimination have been eliminated." (Consent Order at 2)

A district court unquestionably has the inherent power to grant a modification of a consent decree in a desegregation case. Modification may be considered when (1) a significant change in facts or law warrants change and the

proposed modification is suitably tailored to the change; (2) significant time has passed and the objectives of the original agreement have not been met; (3) continuance is not longer warranted; and/or (4) continuance would be inequitable and each side has legitimate interests to be considered. *See Jacksonville Branch NAACP v. Duval County Sch. Bd.,* 978 F.2d 1574, 1578 (11th Cir.1992) (citations omitted).

Attainment of unitary status is a material change in circumstance which could justify termination of court supervision over the School Board.

There are No Remaining Vestiges of the De Jure Segregated System

In a school desegregation case, "the court's end purpose must be to remedy the violation and in addition to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman v. Pitts,* 503 U.S. 467, 489 (1992) (citation omitted). A school system has fulfilled its constitutional duty when it has complied in good faith with the court's desegregation decree since it was entered and has "eliminated the vestiges of past discrimination to the extent practicable." *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell,* 498 U.S. 237, 248 (1991) (citation omitted).

A dual school system is one which has engaged in intentional segregation of students by race; a unitary system is one which has been brought into compliance with the Constitution. *See id.* at 246 Thus, the court must examine all facets of a school district that was once a dual system, both when ordering a remedy and when the later question is whether the district courts' remedial control should be modified, lessened, or withdrawn. *See Freeman,* 503 U.S. at 486.

In 1968, the Supreme Court identified those factors relevant to the unitary status inquiry as: student assignment, faculty and staff, transportation, extracurricular activities, and facilities. *See Green v. County Sch. Bd. of New Kent County,* 391 U.S. 430, 435 (1968). These *Green* factors must be considered in light of the school district's specific obligations under the Court's orders, in this case the 1971 Order and the 1991 Consent Decree. *See Missouri v. Jenkins,* 515 U.S. 70, 100 (1995).

In addition, the school district must demonstrate its "good-faith commitment to the entirety of a desegregation plan so that parents, students and the public have assurance against further injuries or stigma." *Freeman,*

Not Reported in F.Supp.                                                                                              Page 24
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

503 U.S. at 498. Further, the district court, in its discretion, may consider other facets of the school operations, such as the quality of education. *Lockett v. Bd. of Educ. Of Muscogee County School,* 111 F.3d 839, 843 n. 1 (11th Cir.1997).

**\*29** This Court has directed defendants in this case to address all of the *Green* factors, including the "quality of education being received by all students," as well as the "good faith commitment by the School Board." (Order of Referral at 4)

STUDENT ASSIGNMENTS

Where a school board has a history of practicing segregation, a district court must presume that substantially disproportionate racial compositions within the schools are constitutionally violative. To overcome this presumption, a school board must prove that the imbalances are not the result of present or past discrimination. *See Lockett,* 111 F.3d at 843 (citing *Swann v. Charlotte-Mecklenburg Bd. Of Educ.,* 402 U.S. 1 (1974)).

However, the "constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann,* 402 U.S. at 24. Nor is a school board required to make adjustments in student attendance zones for racial imbalances caused by demographic factors. *See Freeman,* 503 U.S. at 494. "The Constitution does not prevent individuals from choosing to live together, to work together, or to send their children to school together, so long as the State does not interfere with their choices on the basis of race." *Missouri v. Jenkins,* 515 U.S. 70, 121 (1995) (Thomas, J., concurring).

Although the *Swann* Court did not further define what measure a court is to use in determining whether the racial composition of a school is "substantially disproportionate," the expert witnesses for both sides in this case have used the standard of a plus or minus twenty percent (20%) deviation from the county-wide percentage of black and white school age children.

According to 1990 census data, twenty-three percent (23%) of Hillsborough residents between the ages of zero and seventeen are black; seventy-seven percent (77%) are white. As stated previously, the 1990 Census is the most recent data available. Both sides' experts have used schools with 40% or higher black student enrollment as the focus of any inquiry into substantially disproportionate race ratios although, in actuality, a 43%

or higher figure would be more appropriate given the most recent census data.

There is no dispute that most Hillsborough County students attend public schools in which the percentage of black and white students is generally proportionate to the percentage of white and black school age residents of Hillsborough County. It is also evident that most of the county's schools have been racially balanced since 1971 when the Court ordered the School Board to dismantle the dual school system. The year following the 1971 Order, all of the public schools of Hillsborough County had been desegregated.

However, approximately ten percent of the 159 public schools, mostly elementary schools, reflect student enrollments in which the percentage of black students is substantially higher than the percentage of black children under age seventeen shown by the 1990 census data. All of these schools were racially balanced immediately following implementation of the Court's 1971 Order. A few of the schools crossed the 40% line in the five to ten years following the Court's 1971 Order. Most of the schools were balanced until about ten years ago and have become out of balance since then. FN48

> FN48. Also, most of the schools that plaintiffs point to as evidence of the prior dual school system had black student enrollments that were over 40% or approaching 40% when plaintiffs and defendants sought court approval to implement the middle school concept by modifying the desegregation plan outlined in the 1991 Consent Order. (Prior R and R, at 27, 32-35, 40)

**\*30** This Court, in its referral order, declined to adopt a specific percentage figure of what constitutes a racially identifiable school and concluded that "the better procedure is to consider that this determination is entirely dependent upon local conditions." (Order of Referral at 5) If, by this, the Court meant the racial make-up of the neighborhoods surrounding the schools, then the Court may find that none of the sixteen schools in question are racially imbalanced, at least when comparing the race ratios for the 1990-91 school year and census figures for 1990 for the tracts surrounding those schools, as noted previously. FN49

> FN49. *See supra* paragraph 68.

The evidence strongly points to residential housing patterns as the explanation for the change in racial

Not Reported in F.Supp.                                                                                    Page 25
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

composition of these schools. This explanation is especially persuasive when the racial enrollments of the schools are compared to the changing racial make-up of the neighborhoods in which these schools are located. The expert testimony and evidence supports the conclusion that the schools with the largest black student populations are located within attendance areas that have had the greatest increases in the number of black school-age residents.

The School Board has never, since the 1971 Order, drawn school boundaries or assigned students to separate schools on the basis of race. For those schools with current racial imbalances, changes in attendance areas have generally resulted in improving the racial balance, at least for the year immediately following the boundary change. FN50 Those few instances in which the boundary changes have not improved the racial balance cannot be viewed as any effort by the School Board to return to the prior dual school system.

> FN50. Notwithstanding defendants' withdrawal of Dr. Clark's testimony addressing the effect of boundary changes (T2 at 57-64; 74-80), Dr. Miliziano's testimony, as well as Dr. Armor's supports this conclusion. (T1 at 43-61; 100-103; T3 at 33-49; 53)(DX 3) Dr. Shelley, plaintiffs' expert, found that about one-half of the boundary changes improved the racial balances the following year. (DX 2 at 9)

The School Board's evidence on this issue was essentially unrebutted by plaintiffs. Dr. Shelley, the demographic expert called by plaintiffs, did not perform any independent demographic studies but relied on the data assembled by Dr. Clark, the School Board's demographic expert. Dr. Shelley's testimony does not undermine the finding that demographic changes in the surrounding areas are the most likely cause for the racial imbalances present at about ten percent of the schools.

It is true that plaintiffs are not required to show that School Board action caused the racial imbalances at some of the schools. The burden was and is on the School Board to establish that the imbalances are not proximately traceable to past or current discriminatory School Board policies or actions. However, the School Board has met its burden with the testimony of Dr. Clark and Dr. Armor which is supported by reasonable assumptions and census data.

The School Board has met its burden of establishing that the current racial imbalance in these schools is not proximately caused by any unlawful School Board action,

past or current, that assigns students to separate schools on the basis of race. *See Freeman, 503 U.S. at 494.*

The location of certain schools with below 40% black enrollment in the same cluster as the elementary schools with black enrollment of 40% or more is not evidence of any discriminatory motive or practice on the part of the School Board. Although plaintiffs have pointed in conclusory terms to the possibility of intra-cluster assignments to alleviate the racial imbalances of some of these schools, in most cases the attendance zones for the other schools are not immediately adjacent. Where they are adjacent, there is a natural barrier such as a road or railroad track. Most of the sixteen schools in question are surrounded by schools with black enrollments of close to or over 40% of the total student population. Moreover, although plaintiffs have alleged that the school system is not unitary as to student assignment, they have not proposed specific solutions to remedy what is alleged to be an on-going constitutional violation.

**\*31** A school board's affirmative duty to desegregate does not require adoption of the most desegregative alternative available. Practicalities such as transportation (and funding) may properly be considered by a court in determining the scope of desegregation plans even though more ambitious plans might achieve greater desegregation. *See generally Lee v. Anniston City Sch. Sys., 737 F.2d 952, 957 (11th Cir.1984).*

Further,
> [W]here resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once de jure segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

*Freeman, 503 U.S. at 495.*

The Court must also consider the parties' prior representations in this case. One of the stated goals of the Middle School Plan approved by both plaintiffs and the School Board and adopted by this Court in 1991 was to retain a desegregated school system (emphasis added). Plaintiffs have stipulated to this fact. (Prior R and R at 2, nn. 3 & 6) A major objective of the cluster plan was to have neighborhood schools while maintaining a desegregated school system. (Prior R and R at 30) (citing Task Force Report) (T7 at 116)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 26
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

In determining proposed attendance zones for the clusters, the School Board projected that the plan would improve the racial balance for some schools but cause racial imbalances to increase at others. Overall, however, the proposed attendance areas would increase the number of schools within the school system with student populations that were racially balanced. This plan was adopted by the School Board only after a series of public hearings, meetings with community leaders and organizations, and the full participation and approval of plaintiffs' counsel and their desegregation expert, Dr. Stevens. (Prior R and R at 6-7, 29-33)

Neither the 1971 Order nor the 1991 Consent Order required the School Board to periodically adjust the racial enrollment at particular schools on an annual or less frequent basis once the initial goal of desegregation of student attendance patterns was achieved. (Prior R and R at 15, 29-38)

Thus, although the School Board has not been obligated to maintain a particular racial balance at each school, it has utilized the ratios outlined in the 1971 Order as the "most acceptable and desirable form of desegregation" as a guide in formulating student attendance zones and in evaluating the impact of other School Board decisions on its mandate from this Court.

The School Board has also adopted a magnet school program, a favored desegregative technique, and has devoted substantial resources to implementing and publicizing this program to students, their parents, and the community. It is true that some aspects of the magnet program remain to be implemented as this coming school year is the final year of implementation for the plan approved by the Court in the 1991 Consent Order. However, the magnet programs and schools are located in the inner city areas and are expressly designed to be racially balanced. The percentage of black students who may participate in magnet programs is 23% but this percentage may increase to 40% if an insufficient number of other minority students apply for the programs. Plaintiffs' contention that defendants are continuing to discriminate because of the policy that caps black enrollment at 23% ignores the federal requirement that magnet schools reflect the ethnic backgrounds of all minority groups within the county.

**\*32** The Court in its 1971 order continued the requirement imposed in prior orders as to Majority to Minority (M to M) transfers permitting any student whose race constitutes the majority of students at a school to voluntarily transfer to the school closest to his home in which his race is a minority of the students, with transportation provided if necessary. According to the School Board, no student has ever applied for a transfer under the M to M policy. Plaintiffs do not refute this evidence but contend that the School Board has not understood its obligations under this policy. To the extent that the School Board has not in the past publicized this policy, that was rectified more than a year ago. FN51 If transfers are sought for other reasons, the School Board staff now takes the affirmative step of reviewing the application to see if the student would be eligible for an M to M transfer.

FN51. There is nothing in the record to indicate whether the School Board would continue the M to M transfer program if court supervision were lifted. The School Board may wish to address this issue in a supplemental filing with the Court.

Although the absence of M to M transfer applications is troubling, the Court's 1971 Order did not require the defendants to solicit M to M transfers; they were only required to grant them if requested. There has been no violation of the Court's Order as to the M to M transfer policy. Also, Dr. Stevens testified that M to M transfers would not be statistically significant in reducing the racial imbalances at the sixteen schools in question.

On the whole, the School Board has demonstrated that its schools are unitary as to student assignment policies and practices and that the increased black enrollments at about 10% of the schools which are substantially disproportionate to the district-wide racial ratios are due to increased number of black school-age children residing in those neighborhoods. *See, e.g., Freeman, 503 U.S. at 494* (court's 1969 desegregation decree was designed to achieve maximum practicable desegregation and achieved its goal in the first year of operation "before dramatic demographic changes altered residential patterns"; "[f]or the entire 17 year-period the respondents raised no substantial objection to the basic student assignment system, as the parties and District Court concentrated on other mechanisms to eliminate the de jure taint"); *Morgan v. Nucci, 831 F.2d 313, 320-21 (1st Cir.1987)* (finding of unitary status upheld despite existence of 13 schools in Boston school district with enrollments of one race comprising 80% or more of total enrollment at school); *Stell v. Bd. of Pub. Educ. for the City of Savannah, 860 F.Supp. 1563, 1583* (school district unitary despite the fact that 11 of 44 schools were 20 percentage points or more outside district-wide race ratios).

FACULTY AND STAFF ASSIGNMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 27
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

The testimony presented by the School Board indicates that the faculty and staff at Hillsborough County public schools have been and remain desegregated.  FN52

> FN52. In July 1971 the Court noted that faculty desegregation had been accomplished "at every school location in the 1970 school year ." (July 1971 order at 8)

Plaintiffs have not disputed defendants' statistics or the evidence of vigorous recruitment of minorities but contend that certain schools exceed the system-wide race ratios by a significant percentage. The conclusions of Dr. Stevens and Dr. Armor differ as to whether the any schools deviate more than 15% from the district-wide faculty average. Dr. Stevens identified twelve elementary schools that fit this category; Dr. Armor identified none. This difference is largely due to the fact that Dr. Stevens included non-certified staff within his calculations and Dr. Armor included only faculty. However, the School Board's 14% black faculty figure did not include staff. For this reason, Dr. Armor's conclusion is more reliable. Given the absence of any schools which have a 15% deviation from the district-wide average, racial identifiability in faculty and staff assignments has not been demonstrated. *See, e.g., Stell,* 860 F.Supp. at 1576; *see also Flax v. Potts,* 915 F.2d 155, 163 (5th Cir.1990) (unitary status achieved by school board despite six schools with faculty and staff 20 percentage points or more from system-wide ratio).

**\*33** Admittedly, the School Board has not achieved the goals it has pursued of having the same ratio of black and white teachers as the student body. Black student enrollment in the district is about 23%. However, there is no dispute that recruitment of minority teachers has been and remains an important goal for the School Board.

Additionally, the percentage of principals and assistant principals who are black exceeds the percentage of black teachers and the School Board has an active mentoring program designed to provide support for instructional staff seeking advancement. About one of every six principals is black; more than one out of every five assistant principals is black.

The School Board has established by a preponderance of evidence that it has eliminated racial discrimination in hiring and assigning of faculty and staff. The public schools of Hillsborough County are unitary as to this *Green* factor.

TRANSPORTATION AND EXTRACURRICULAR

ACTIVITIES

All public school students are entitled to transportation to and from school if they live two miles or more from their school. Race has no bearing on a student's right to transportation.

Although it is under no legal obligation to do so, the School Board also provides "activity buses" for students needing later transportation who participate in after-school activities.

There is no evidence of discrimination in providing transportation to students, including activities buses. Defendants have complied with this Court's orders regarding transportation of students.

It is true, as plaintiffs contend, that proportionately more black students are bused for desegregation than white students. By its very nature, the desegregation plan adopted by the Court imposed a greater transportation burden on black students. While recognizing this fact, the Court found that its plan would result in busing fewer students, among other factors. (July 1971 Order at 74)

As for extracurricular activities, there is also no evidence of discrimination due to race. Extracurricular activities are provided primarily at the high school level. The School Board places no racial restrictions on a student's ability to participate in extracurricular activities. The testimony of Ms. King demonstrates her concern as the mother of a black high school student about cheerleader selection at one high school. However, the try-outs she attended resulted in several black students being invited to join the cheerleading squad.

Plaintiffs' desegregation expert, Dr. Stevens, did not point to any instances of discrimination in the extracurricular programs offered by defendants. Instead, Dr. Stevens suggested that sufficient data was not maintained to enable defendants to ensure that this aspect of the school system was free from discrimination, such as records from individual schools instead of district-wide data about extracurricular participation.  FN53 However, there is nothing in the Court's orders which required information of this sort to be maintained and speculation about what such records might reveal is insufficient ground to preclude a finding of unitary status.

> FN53. Apparently, the School Board tracks participation in athletic activities at individual schools by race but does not do this with other extracurricular activities.

Not Reported in F.Supp.                                                                                          Page 28
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.)

**\*34** The testimony shows that defendants have eliminated discrimination based on race in the areas of transportation and extracurricular activities and the court should so conclude. The Hillsborough County school system is unitary as to these two *Green* factors.

### FACILITIES AND RESOURCE ALLOCATION

Although most new schools have been built in the suburbs, this is consistent with the county's growth patterns. When assigning students to a new school, the School Board has taken into account the projected race ratios. No new schools have been built with projected black enrollment of greater than 40%. Furthermore, when closing or converting schools, the School Board has taken into account the impact on race ratios and tried to improve the racial balance when reassigning students to other schools.

The School Board has also established that its allocation of funds and teacher resources is free from racial discrimination. Much of the budget comes from state and federal sources and the School Board is regularly audited to determine that it is in compliance with standards for use of those funds. Individual schools are funded on a per-pupil basis and the race of the student has no bearing on how funds are spent. Schools that are brought into the middle school cluster plan receive additional funds for that year. In recent years, total per capita expenditures have actually been higher at schools with a 40% or higher black enrollment. These are among the schools that receive additional funds from the federal government (known as Title I funds) due to the number of students who come from families who meet poverty-level guidelines.

To the extent that overcrowding is included in the calculus of resource allocation, it is evident that overcrowding is an unfortunate reality at most schools in Hillsborough County. The total population of Hillsborough County increased by almost two-thirds between 1970 and 1990. The number of public schools grew from 129 in 1971 to 159 in 1995. The degree of overcrowding varies at individual schools across the county. Plaintiffs introduced evidence that proportionately more of the schools that are racially imbalanced are above their FISH capacity when compared to the racially balanced schools. The evidence submitted by defendants shows how capacity is extended with portables but the School Board's evidence also suggests that five of the ten most overcrowded elementary schools are among the schools with a higher percentage of black students enrolled. This evidence is disturbing, but it does not demonstrate discriminatory conduct or policy on the part

of the School Board. Evidence presented by defendants also indicated that the teacher-student ratios are lower at the schools having black student enrollments of 40% or more.

Defendants have demonstrated that the Hillsborough County school system is unitary as to the *Green* factors of facilities and resource allocation.

### QUALITY OF EDUCATION

Quality of education, while "admittedly an amorphous concept", is a fundamental concern in any desegregation case. *Freeman v. Mills,* 942 F.Supp. 1449, 1461 (N.D.Ga.1996), *aff'd,* 118 F.3d 727 (11th Cir.1997). "If there is one common thread in [*Brown* ] and its progeny, it is the assumption by the federal judiciary of a role in which it can, by exercise of its equitable jurisdiction, compel school districts which were once segregated by law to offer each of their children, irrespective of race, a quality of education which is substantially similar to that offered to all other children." *Id.* At the same time, "[e]nshrined in the Constitution is the promise of equal opportunity, not equal outcome." *Id.*

**\*35** As stated previously, none of this Court's prior orders have required defendants to implement specific programs addressing quality of education. The evidence presented indicates that the School Board has in the past regularly evaluated several areas of student performance in attempting to gauge its success in providing a quality education. It continues to do so at the present time, and there is every reason to expect that it will continue to monitor performance in the future and make adjustments in its programs where necessary.

The evidence on quality of education at the unitary status hearing focused on achievement tests, gifted programs, dropout and suspension rates and programs, and grade-point averages and college plans for graduating seniors, with reference to results achieved according to the race of the student.

Defendants regularly monitor dropout and suspension rates and have implemented programs to prevent dropouts which include providing extra counselors and teachers at the high school level. Although there is a disparity between dropout and suspension rates for whites and blacks, dropout rates for this school district are the lowest in the state for similar urban school districts (about three and one-half percent). Much of the gap in dropout rates can be explained by socioeconomic factors, according to Dr. Armor.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 29
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Although not required by state law to do so, defendants increased minority participation in the gifted program by adopting "Plan B" as soon as the state permitted school districts to devise alternate admission criteria by lowering the minimum score applicants needed to attain on a standardized test. Dr. Stevens stated that this policy had increased black enrollment in the gifted program in recent years.

On the high school seniors who planned to attend college, 56% were white and 45% were black. The average grades for black and white students varied by six-tenths of a point. Black students in Hillsborough County meet or exceed state and national norms for several standardized tests.

Achievement tests for fourth and eighth graders show a gap between white and black students but these differences occur nationwide and are not confined to the Hillsborough County school district. Dr. Armor concluded that most of the difference was due to socioeconomic factors (poverty level, family income, one or two parent families, and the educational background of the parents). Plaintiffs' expert, Dr. Crain, disagreed with some of Dr. Armor's methodology and assumptions but ultimately agreed that socioeconomic factors probably explained most of the gap in math, but not in reading.

The evidence indicates that any disparity in achievement among students is not due to the effects of the prior segregated school system but rather to a myriad of other factors, largely socioeconomic. To require the School Board to obtain equal outcomes for all students is unrealistic. This Court's equitable powers are limited to remedying past constitutional violations.

**\*36** The School Board is doing a reasonably good job of providing equal educational opportunities for all students. More importantly, it is evident that the School Board and Superintendent and staff candidly recognize that there are deficiencies that need to be addressed and that input and involvement from all members of the community are needed to remedy these deficiencies. Any disparities that exist are not the result of the prior segregated system.

"[N]umerous external factors beyond the control of the [School board] and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure in the remedial calculus." *Jenkins,* 515 U.S. at 102 (fact that Kansas City school district was at or below national norms of achievement in some grades was not justification for court in desegregation case to require defendant school board to continue to fund quality education programs); *see also Keyes v. Congress of Hispanic Educators,* 902 F.Supp.

1274, 1299 (D.Colo.1995) (racial/ethnic differences in discipline, participation in gifted programs, dropout rates and achievements, among other facets of school operation, not vestiges of dual school system existing 25 years ago; "[t]here are too many variables, including societal and socioeconomic factors, to infer causation from prior unconstitutional conduct"), *appeal dismissed,* 1997 WL 408050 (10th Cir. July 18, 1997).

GOOD-FAITH COMPLIANCE

In *Freeman,* the Supreme Court explained the importance of good faith in evaluating whether a school board should be released from court supervision:

[A] school district [must] show its good-faith commitment to the entirety of a desegregation plan so that parents, students, and the public have assurance against further injuries or stigma.... [T]he good-faith compliance of the district with the court order over a reasonable period of time is a factor to be considered in deciding whether or not jurisdiction [can] be relinquished.... A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.

*Freeman,* 503 U.S. at 498 (citations omitted).

The Court must consider the testimony of various witnesses called on behalf of plaintiffs who testified that the School Board is not ready to be released from the Court's supervision. One of those witnesses was the School Board Chair, Doris Reddick, as well as the lead plaintiff in this case, Andrew Manning. Although they did not point to any specific examples, both Ms. Reddick and Mr. Manning voiced concern about what might happen in the future if Court supervision ended.

However, these opinions and the anecdotal evidence offered by plaintiffs are outweighed by the long history of compliance with the Court's Orders and the substantial evidence presented by defendants in support of unitary status.

**\*37** Plaintiffs also contend that Dr. Heuer's testimony about the alleged *ex parte* conversations between the Court and defendants in the 1970's demonstrate defendants' lack of good-faith compliance in that "major decisions about school desegregation are based on one-time conversations, which are not clearly articulated and memorialized in court orders." (Dkt. 796 at 65) According to Dr. Heuer, the Court advised that it was not necessary to do anything in response to changes in racial

Not Reported in F.Supp.                                                                                                    Page 30
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

enrollments at individual schools if defendants had not caused the imbalances. It is evident that the defendants tried to improve the racial balances when making boundary changes and opening and closing schools. If this advice was indeed given, there is no inconsistency between the advice and the Court's orders. These *ex parte* conversations, while unfortunate, were not initiated by defendants and do not demonstrate a lack of good faith on the part of defendants in complying with the Court's orders.

Plaintiffs also take issue with the fact that the School Board did not initiate the unitary status determination by taking a formal vote or holding public hearings but instead responded to this Court's Order directing the parties to present evidence on the unitary status issue. The fact that this inquiry was initiated by the Court, instead of defendants, is not indicative of a lack of good faith on the part of defendants. If anything, it indicates defendants' commitment to this Court's prior orders and the duties imposed by those Orders. Further, after the Court's Order was entered, defendants filed a Statement of Position which showed a readiness to seek unitary status. (Dkt.728) FN54

> FN54. Defendants stated that after reviewing the history of the case, the relevant court decisions, and aspects of the operations of the school system relevant to unitary status, "[d]efendants represent to the Court that the Hillsborough County School system is, and for some time, has been unitary. The Defendants therefore ask the Court to treat this Response as their request for a declaration that the system of public schools operated by the [School Board] is unitary under governing legal standards...."

The School Board has complied in good faith with this Court's desegregation orders for quite a long period of time. The testimony of the most School Board members, as well as the current Superintendent and those responsible for various facets of school operation demonstrates that defendants have accepted the principle of racial equality and will not revert back to a dual school system. FN55

> FN55. Plaintiffs contend that the defendants have failed to establish unitary status as to any *Green* factor as well as quality of education and good-faith compliance. Efforts to mediate the issues raised in the 1994 motion to enforce were unsuccessful. The Court's ruling on the unitary status issue, whatever that may be, will likely

trigger another round of appellate litigation. It is unfortunate that the parties have been unable to resolve-or at least narrow-the legal issues in dispute. They may not be as far apart as their court filings suggest. (*See, e.g.,* Dkt. 796 at 85)

*CONCLUSION*

From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination. *See Dowell*, 498 U.S. at 247. This precept was underscored by Justice Anthony Kennedy who authored the majority opinion in *Freeman*:

> Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course.... [O]ne of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution. Yet it must be acknowledged that the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* desegregation have been eliminated. It is the duty of the State and its subdivisions to ensure that such forces do not shape or control the policies of its school systems. Where control lies, so too does responsibility.

**\*38** 503 U.S. at 490 (emphasis added).

The Hillsborough County public school system is by no means perfect, but it is in reasonably good hands. No one can predict with certainty what lies ahead if the School Board is released from court supervision. However, "a fear that a system may resegregate in the future, absent credible evidence to support those fears, does not justify a federal court's continued monitoring of the system." *Stell*, 860 F.Supp. at 1583 (citation omitted). FN56

> FN56. However, if the Court has concerns about whether defendants have desegregated the elementary schools to the maximum extent practicable, continued court supervision over student assignment could be retained while relinquishing jurisdiction over the other aspects of school operation as long as remedial action in the other areas is not necessary to achieve unitary status in the area of school assignments. A finding of the School Board's good-faith

Case 1:88-cv-00263-SLR    Document 309-3    Filed 09/09/2005    Page 31 of 33

Not Reported in F.Supp.                                                                            Page 31
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

commitment to the entirety of a desegregation plan would also have to be made. *See Freeman, 503 U.S. at 496-97* (incremental declaration of unitary status may be appropriate in certain circumstances).

The question remains whether this court must or should maintain jurisdiction over this case pursuant to *Youngblood v. Bd. of Public Instruction, 448 F.2d 770 (5th Cir.1971).* In *Youngblood,* the district court, *sua sponte,* dismissed a school integration case after finding that the school system was desegregated and unitary. Plaintiffs urged on appeal that rather than dismissing the case the court should have maintained the case on the inactive docket and required the school district to file status reports. The former Fifth Circuit agreed and vacated the dismissal order. It remanded the case to the district court which was ordered to (1) reinstate the action and retain jurisdiction for not less than three school years; (2) require the school district to file semi-annual reports; and (3) not dismiss the action again without providing notice to plaintiffs and an opportunity to show cause why dismissal of the case should be further delayed. *See id.*

*Youngblood,* which is binding authority in this circuit, FN57 has been interpreted to require a "three-year transitionary period" after a declaration of unitary status. *Flax v. Potts, 725 F.Supp. 322 (N.D.Tex.1989), aff'd and remanded, 915 F.2d 155 (5th Cir.1990).* In *Lee v. Etowah County Bd. Of Educ., 963 F .2d 1416 (11th Cir.1992)* , the Eleventh Circuit interpreted *Youngblood* more narrowly and held that after a school system has implemented a desegregation plan the district court must retain jurisdiction for a sufficient time-not less than three years-after which it may hold a hearing to determine if unitary status has been achieved. *See id. at 1421.*

> FN57. *See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc) (adopting as precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

Appendix 1 *

Due to what may be an ambiguity in the law, FN58 and because the parties have not briefed the issue of whether a transition phase is necessary after unitary status is attained, the parties shall do so within the time period for filing objections to the Report and Recommendation.

> FN58. *Compare Dowell, 498 U.S. at 248* ("[A] federal court's regulatory control of [public school] systems [should] not extend beyond the time required to remedy the effects of past intentional discrimination.") (citations omitted) *with Freeman, 503 U.S. at 490* ("[S]o too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradual way is an appropriate means to this end.") Arguably, the showing of a good-faith commitment to the entirety of a desegregation plan would make a transition phase unnecessary. *See Freeman, 503 U.S. at 498.*

It is therefore RECOMMENDED:

(1) For the reasons previously stated, this Court should find that the defendants have demonstrated that the public school system of Hillsborough County has attained unitary status and should be released from Court supervision pursuant to such further Orders as may be appropriate under the circumstances.

*NOTICE TO PARTIES*

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

POPULATION IN HILLSBOROUGH COUNTY 1970-1990
All Persons

| Year | Total | White | Black | Other | Spanish Origin (any race) |
|------|-------|-------|-------|-------|---------------------------|
| 1970 | 490,265 | 422,119 | 66,648 | 1,498 | 38,717 |
| 1980 | 646,960 | 546,575 | 86,464 | 13,921 | 64,199 |

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 32

| | | | | | |
|---|---|---|---|---|---|
| 1990 | 834,054 | 690,352 | 110,283 | 33,419 | 106,908 |

Persons Age 0-17

| | | | | | |
|---|---|---|---|---|---|
| 1970 | 164,278 | 135,344 | 28,527 | 407 | ** |
| 1980 | 176,030 | 138,945 | 33,007 | 4,078 | 17,762 |
| 1990 | 202,274 | 152,900 | 39,163 | 10,211 | 28,806 |

* Taken from DX 2 at 13, W.A.V. Clark's report on Demographic Change And School District Impacts In Hillsborough County (June 1996).

* * no data

Appendix 2 [*]
TABLE OF
SCHOOL
ATTENDANCE
ZONE 0-17 AGE
RESIDENTIAL
POPULATION
COMPOSITION
FROM CENSUS
TRACT AND
BLOCK
STATISTICS,
1970-1990

| School area | 1970 | | 1980 | 1990 [**] | | |
|---|---|---|---|---|---|---|
| Cleveland | 1657/46 | (2.8) | 1544/639 | (41.3) | 1578/654 | (41.4) |
| Edison | 1788/343 | (19.2) | 1463/584 | (39.9) | 836/590 | (70.5) |
| Graham | 1687/347 | (22.2) | 1288/462 | (35.9) | 1220/523 | (42.9) |
| Oak Park | 1649/117 | (7.1) | 1703/664 | (39.0) | 1580/897 | (56.8) |
| Robles | 2247/292 | (13.0) | 2496/781 | (31.3) | 2875/2054 | (71.4) |

* Taken from DX 2 at 16, W.A.V. Clark's report on Demographic Change And School District Impacts In Hillsborough County (June 1996).

* * Total, black and percent black resident population

Appendix 3 [*]
TABLE OF SCHOOL
ATTENDANCE ZONE
0-17 AGE
RESIDENTIAL
POPULATION
COMPOSITION
FROM CENSUS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

TRACT AND BLOCK
STATISTICS, 1980-
1990

| School area | 1980 | | 1990 ** | |
|---|---|---|---|---|
| Cahoon | 1882/396 | (21.0) | 2015/677 | (33.5) |
| Clair Mel | 3211/523 | (16.3) | 2832/1112 | (55.1) |
| Foster | 1397/438 | (31.3) | 1215/637 | (52.4) |
| Shaw | 2330/312 | (13.4) | 2696/911 | (33.8) |
| Sulphur Sprgs | 1600/242 | (15.1) | 2771/1431 | (51.6) |
| Witter | 1523/267 | (17.5) | 1809/743 | (41.1) |
| West Tampa | 1465/305 | (20.8) | 1379/436 | (31.6) |
| Dowdell Jr | 7494/2070 | (27.6) | 6572/2584 | (39.3) |
| Van Buren Jr | 10998/1613 | (14.7) | 12583/4983 | (39.6) |

Note: Van Buren
includes all of the area
of Sligh but only junior
high students attend
Van Buren.

* Taken from DX 2 at 17, W.A.V. Clark's report on Demographic Change And School District Impacts In Hillsborough County (June 1996).

* * Total, black and percent black resident population

M.D.Fla.,1997.
Manning v. School Bd. of Hillsborough County, FL
Not Reported in F.Supp., 1997 WL 33479029 (M.D.Fla.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.