IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC. )<br>)<br>and DELAWARE AUDUBON SOCIETY, )<br>)<br>    Plaintiffs, )<br>)<br>v. )<br>)<br>TEXACO REFINING AND MARKETING, INC. )<br>)<br>    Defendant. ) | Civil Action No.<br>88-263-SLR |

## DECLARATION OF DR. CLARK ALEXANDER

I, DR. CLARK ALEXANDER, declare as follows:

### A. *Qualifications*

1. I am Clark Alexander, Jr., PhD, Director of the Applied Research Laboratory, Georgia Southern University, and Professor of Marine Geology at the Skidaway Institute of Oceanography. I have been employed at the Skidaway Institute of Oceanography since 1989. My specific area of expertise concerns the sedimentary processes that occur in coastal marine and estuarine environments. I hold a BA in Geology and a BS in Oceanography from Humbolt State University, as well as an MS in Marine Geology and a PhD in Marine Sedimentology from North Carolina State University.

2. My work has encompassed 20 years of diverse experience conducting field research and studies, frequently involving the collection and analysis of sediments from estuarine and marine environments to identify both the temporal and spatial distributions of environmental contaminants. I have authored or co-authored 34 peer-reviewed publications, and I have also authored or co-authored 8 reports of my research that have been published by either the National Ocean and Atmospheric Administration, the U.S. Department of Energy, or the Georgia Geologic Survey.

3. I was retained by the law firm of Wallace King Domike and Branson, PLLC to summarize for the Court through this affidavit the findings from the research I conducted

for Motiva Enterprises ("Motiva") beginning in the fall of 1999 in the Delaware River Estuary near the form Motiva refinery ("Refinery") in Delaware City Delaware.

4. I have attached as Exhibit A my *curriculum vitae* for further reference.

### B. *The Skidaway Statement Of Work*

5. In the summer of 1999, the Skidaway Institute of Oceanography ("Skidaway") was retained by Motiva Enterprises (then the owner of the Refinery) to undertake a study ordered by this Court in part II of its 1998 Opinion and Order to determine the potential extent and effect of violations of the Refinery's water discharge permit that occurred on or after March 1993. *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg.*, Inc., 20 F. Supp. 700 at 706 (D. Del. 1998).

6. The Court's 1998 Order requires a retrospective analysis of samples of sediment from within cores. More specifically, the study would be accomplished by collecting cores of bottom sediments from locations in the Delaware River near the Refinery. The cores would then subjected to dating techniques that involve measuring the radioisotope activities of isotopes of certain elements in the collected sediments, including Lead, Cesium and Beryllium. The cores would then also be analyzed for the specific types of pollutants that were the subject of the investigation.

7. As directed by Motiva, Skidaway prepared a Statement of Work that described in detail a study entitled "High Resolution Coring Study in the Delaware River Estuary near the Delaware City Refinery". The Statement of Work incorporated the protocols described in Part III of the 1997 Means Report, and called for the use of field and laboratory techniques that are appropriate for the type of investigation to be conducted, and which to my knowledge, are universally accepted by scientists who study sedimentary processes in coastal marine and estuarine environments. Motiva directed Skidaway to implement the tasks called for by the Statement of Work, and the work began in November 1999.

8. The methods described generally in Part II of the Court's Opinion are frequently used by scientists to study sediments. If conditions allow, the methods will provide significant information that can be used to calculate the rates at which sediments accumulate at a location being studied, and to reconstruct a history that describes the input of contaminants of interest as preserved in sediments at the location being studied. I have conducted successfully many studies in marine environments using such methods.

9. However, it is important to note that not all conditions encountered in marine and estuarine environments will allow these pollutant history reconstruction methods to be successful. For example, the location to be sampled must be accumulating sediment in a way that maintains, as separate layers, the sediments being deposited. If the accumulation process results in separate sediment layers being buried over time, a core can provide a preserved radiochemical record that can be used to date the approximate time period when the sediment layers were deposited. Stated differently, the location

cannot be an area of erosion, or an area that is intensely mixed by biological organisms. In addition, the types of sediment encountered must also be suitable. Fine-grained sediments are ideal whereas sand is less suitable. Very stiff or hard materials such as old marsh muds will reflect no sediment accumulation at all. Finally, the radioisotopes that will be the subject of analysis must be present at sufficient concentrations to provide a "signal" strong enough to be accurately measured. Without such a signal, dating even an otherwise complete historical record is not possible. I note that the Court observed that "there are complexities and uncertainties attendant to the mission" of determining past impacts. *Id.* I fully agree with this statement and made sure to point out that conditions might not allow us to satisfy the requirements of the Court in my January 11, 2000 deposition.

### C. *Completion Of The Skidaway Work*

10.     To identify locations where the sediments were suitable for the study to reconstruct the necessary history of contaminant input, I participated in two preliminary field trips. The first trip occurred in November 1999. During that trip, I collected 9 bottom sediment samples from 14 sampling locations covering the region north of, in front of and south of the Refinery. Five of the sites exhibited a hard bottom and no useable samples were retrieved.

11.     The second field trip took place in August 2000. During the second trip I visited 70 widespread sites from which I collected an additional 14 bottom sediment samples from areas appropriate for analysis. Dr. Livingston, NRDC's scientist, accompanied me on this sampling trip. Where locations appeared unsuitable for further sampling or samples appeared unsuitable for further analysis, I discussed these issues with Dr. Livingston during this trip. Dr. Livingston never expressed any dissatisfaction with either the sampling locations or the choices of samples for analysis, or indeed any dissatisfaction with Skidaway's work until his "Critique" that accompanied NRDC's present motion.

12.     Each sample was examined in the field for obvious biological or physical mixing, high sand content, or signs of very stiff or hard bottom materials. The 61 locations from which samples exhibited such characteristics could not be used for purposes of dating, *i.e.*, developing a historical record, and were rejected for further sampling or analysis. Samples that did not exhibit negative characteristics and which were judged to be possible candidates for more detailed analyses were immediately sent to the Skidaway Institute of Oceanography for further preliminary analysis.

13.     Following receipt at Skidaway, the samples were analyzed to determine grain size and the radionuclide activities of Lead, Cesium and Beryllium of each sample. The results of these analyses indicated that only seven locations were appropriate for further study.

14.     In October 2000, I led a third and final field trip to collect sediment cores for historical studies at locations that my previous research indicated were appropriate for

3

further study. The coring was conducted from either a large research vessel (the University of Delaware Research Vessel Cape Henlopen), a shallower-draft ship, or a zodiac navigated and anchored at specific coordinates that I specified. The zodiac was used at locations were the depth of water was less than 2 feet, prevented access by either of the ships. At 3 of the locations, cores were collected using a "single-spade boxer" that collected a 20" x 20" x 25" piece of the riverbed in a stainless steel box. This large box brought an undisturbed piece of the riverbed onboard the ship and allowed for the collection of 3 "subcores" and a slab of sediment for x-ray examination from a single core at each location. One subcore was to be used for analysis of the contaminants of concern. The second subcore was to be used for measuring radionuclide activity and other sediment characteristics. The third subcore was to provide extra material if needed for the analytical work. At two of the locations, a shallower-draft ship and smaller box coring device was used; therefore four separate cores were taken at each sampling location to provide sufficient material. At these locations different cores were used for the radionuclide activity analyses and sediment characterization. I collected cores from the remaining two sites by hand from the zodiac.

15.     Cores from each of the seven locations were analyzed for grain size and the radioisotopes called for in the Statement of Work. The result of these analyses demonstrated that primarily because of the absence of the necessary radionuclide activity, 5 of the 7 locations from which cores had been collected could not be used for purposes of establishing a historical record of sediment accumulation. Cores from two of the locations provided some dating-related information, but only on a "100-year" timescale, and, therefore, those cores could not provide meaningful information related to discharges from the Refinery after March 1993.

16.     The cores from the two locations that were found to be appropriate were subjected to all analyses called for by the scope of work. The type and age of accumulated sediments, as well as certain metals and petroleum related contaminants, were determined. Sections of the remaining five cores were also analyzed to provide additional regional sediment information.

### D.     *Conclusions and Opinions*

17.     All protocols and associated work called for by the Statement of Work were implemented and completed during the study.

18.     The number and location of preliminary sediment samples were more than adequate to identify potential coring sites for the purposes of the study, and the geographical size and location of the area being studied. Further, because of the characteristics of the samples that I observed, in my opinion the samples collected were representative of the study area, and identified the areas suitable for collecting long core sediment samples, although these were few in number. Therefore, the fact that only two cores, one near the Refinery and one approximately 7 miles downstream, provided useful dating information, was the result of the conditions present in the Delaware estuary, including significant and ongoing dredging, strong tides, changing river morphology,

4

severe weather events, sea level rise and other activities that disrupt the steady accumulation of sediment; it is not related to either the number or location of sediment samples collected, or the field or laboratory analyses that were used. In other words, in most areas near the Refinery, conditions in the estuary do not provide for, and in fact hinder, the rapid, steady accumulation of sediment that would be necessary for the development of a meaningful age dating framework and the preservation of contaminant input histories.

19. The laboratory analyses of the two cores that did provide information for purposes of dating sediment accumulation, *i.e.*, cores 50 and 66, detected polycyclic aromatic hydrocarbons ("PAHs"), the type of chemical substance that was of particular interest in the study. In the core taken near the Refinery, core 50, peaks in certain PAHs were noted in 1993 and 1997. However, the peak values were similar to concentrations in sediments corresponding to the early 1980s. Further, the accumulation of PAHs in the 2000 to 1993 time period (the time period of particular interest in this study) was essentially identical to the 1992 to 1984 time period. Importantly, the reported concentrations of the second core, core 66, collected approximately 7 miles downstream from the Refinery, were quite similar to the concentrations reported for the core taken near the Refinery. In my opinion, these patterns strongly suggest that the PAHs detected are likely the result of the transportation related activities on the Delaware River, and the Chesapeake-Delaware Canal.

20. The concentrations of PAHs detected in cores 50 and 66 are also less than what has been reported in the literature in core studies conducted at other areas with industrial activities. Historical core studies conducted on the Savannah River (Alexander et al., 1999), the St. Lawrence River estuary (Coakley et al., 1993), and in the Breen Bay estuary (Zhang et al., 1993) all reported PAH concentrations greater that what was found in the study of the Delaware River that I participated in for Motiva. In my opinion, this comparison supports my conclusion that PAHs detected in cores 50 and 66 are likely the result of transportation related activities, and not a significant point source.

21. The results of laboratory analyses of two other cores are consistent with non-Refinery related sources of the detected PAHs. As stated in paragraph 14, cores from two locations, *i.e.*, 9A and 68, provided some dating related information, but only on a "100-year" timescale. Therefore, these cores could not provide meaningful information related to discharges from the Refinery after March 1993. However, the *highest* PAH concentrations our study reported were detected in cores 9A and 68, and the time periods corresponding to the highest concentrations indicated that the PAHs detected were from sediments *more than* 100 years old. In my opinion, these results demonstrate that non-Refinery related sources of PAHs, probably associated with transportation activities on the Delaware River, have been a significant source of PAHs for over 100 years.

22. I have reviewed a document prepared by Dr. Robert J. Livingston entitled *Review of Motiva Study and Independent Analysis of Study Data* ("Livingston Analysis"). The Livingston Analysis, in a very brief discussion states that the Study was inconsistent with "sound scientific practice" because the study "ignored the proven depositional areas that

were the subject of the Triad analyses." *See* Livingston Analysis at A00036. The basis for Dr. Livingston's conclusion is not correct. As stated above in paragraphs 10 and 11, my samples were collected from all suitable locations, including *all* of the locations used for the Triad analyses. Sampling in what he refers to as "proven depositional sites" was done in our preliminary site surveys and the sediments were not suitable for further analysis. Because he was present and observed the sediment sampling that took place in August 2000, Dr. Livingston should have been aware of the extensive sampling effort that I participated in to identify locations suitable for collecting long cores.

23. Although only cores 50 and 66 provided data for purposes of dating sediments for the time periods of interest to this study, chemical analyses were conducted on all seven cores, and limited dating information was obtained from two additional cores, 9A and 68. As stated in paragraph 18, the fact that only two cores provided useful dating information was the result of the conditions I encountered in the Delaware estuary.

24. The results of this study in finding widespread areas where core samples could not provide meaningful age dating information are comparable to the recently published findings of similar subsequent studies conducted in the Delaware River estuary by the University of Delaware (Scileppi, 2004 and Sommerfield and Madsen, 2003). (Published Masters Thesis titled "Patterns Of Fine-Grained Sediment Accumulation in the Delaware Estuary From Pb-210 And Cs-137 Distributions", University of Delaware, dated Summer 2004; published study titled "Sedimentological and Geophysical Survey of the Upper Delaware Estuary, University of Delaware Sea Grant Publication DEL-SG-04-04, dated October 2003).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 7, 2005        _____
                                       Clark Alexander

6

## CERTIFICATE OF SERVICE

I Meagan Ward Cascio, hereby certify that on September 9, 2005 I electronically filed **DECLARATION OF DR. CLARK ALEXANDER** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE 19899-1680

I also certify that copies were caused to be served on September 9, 2005 upon the following in the manner indicated:

### BY HAND DELIVERY:

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE 19899-1680

### BY FEDERAL EXPRESS

Mitchell S. Bernard, Esquire
Nancy S. Marks, Esquire
Amelia Toledo, Esquire
Natural Resources Defense Council
40 West 20th Street
New York, New York 10011

　　　　　　　　　　　　　　　　/s/ Megan Ward Cascio
　　　　　　　　　　　　　　　Megan Ward Cascio (#3785)
　　　　　　　　　　　　　　　1201 N. Market Street
　　　　　　　　　　　　　　　P. O. Box 1347
　　　　　　　　　　　　　　　Wilmington, DE 19899-1347
　　　　　　　　　　　　　　　mcascio@mnat.com
　　　　　　　　　　　　　　　Attorneys for Defendant