IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC. | ) | |
| | ) | |
| and DELAWARE AUDUBON SOCIETY, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | 88-263-SLR |
| v. | ) | |
| | ) | |
| TEXACO REFINING AND MARKETING, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF MR. MICHAEL H. SALAZAR

I, MICHAEL H. SALAZAR, hereby declare the following:

1.     I am the principal of Applied Biomontioring, an environmental consulting firm with an emphasis on aquatic habitats. I have held this position since 1996. I received a Bachelor of Science Degree in Biology from San Diego State University in 1968. I have more than 37 years of experience and expertise in aquatic toxicology, aquatic ecology, and ecotoxicology. I have particular experience and expertise in designing and conducting studies using caged bivalves, such as oysters, mussels, and clams ("bivalves").

2.     My specific areas of expertise include bioaccumulation and associated affects in marine, estuarine, and freshwater bivalves. I have conducted more than 65 caged bivalve studies. I have conducted research or consulting in this or related areas for over 30 different government, academic, environmental, and industry organizations since 1996. Prior to that time while working at a U.S. Naval Research Lab and the National Oceanic and Atmospheric Administration ("NOAA"), I served as the principal investigator on a number of projects using bivalves, developed a consensus-based methodology for conducting such studies, and served as a principal liaison between the U.S. Navy Environmental Program, the NOAA program, and various regulatory agencies.

3.     Ms. Sandra Salazar and I wrote the American Society for Testing and Materials ("ASTM") *Standard Guide for Conducting In-Situ Field Bioassays with Marine, Estuarine and Freshwater Bivalves*, a section of *Standard Methods for Examination of Water and Wastewater* that deals with caged bivalve studies, as well as a recent book

chapter in *Techniques in Aquatic Toxicology (Volume 2),* pertaining to caged bivalve studies.

4.      A copy of my *curriculum vitae* is attached for reference. ***Exhibit 1.***

## BACKGROUND

5.      In 2000, I was contacted by Mr. Lenwood Hall from the University of Maryland with regard to conducting a caged bivalve study that was being planned for an area of the Delaware River located near a refinery in Delaware City ("Refinery"). The caged bivalve study was to be a component of a larger study that would assess the potential ecological effects of effluent from the Refinery ("Motiva Study").

6.      I submitted a proposal dated October 29, 2000 for a caged clam study. The proposal called for deploying cages of a certain estuary-dwelling species of clam called *Rangia cuneata ("Rangia"),* at 11 sites in the Delaware River. This included sites immediately adjacent to, as well as both upriver and downriver of, the point where water from the Refinery is discharged to the Delaware River.

7.      Prior to submitting the proposal, I discussed with Mr. Hall the scientific requirements of the order dated February 22, 2000, issued by this Court (the "Court Order").

8.      I have also reviewed a document dated July 2005, submitted by the plaintiffs in this matter entitled *Review of Motiva study and Independent Analysis of Study Data* ("Livingston Review") prepared by Dr. Robert J. Livingston.

## BIVALVE BIOAVAILABILITY STUDIES

9.      Prior to beginning the work called for in the October proposal, I was informed by Dr. Dennis Burton of the University of Maryland that a source of *Rangia* had been located that could supply the number of test organisms needed for the caged bivalve study. However, the Delaware Department of Natural Resources and Environmental Control ("DNREC") had denied permission to use the organisms because of the presence of disease. It was my understanding from Dr. Burton that a source of non-diseased *Rangia* could not been located. Based on my own experience, as well as confirmed by literature reviews, internet searches, and a number of phone calls, *Rangia* are generally not used commercially, infrequently used in scientific experiments, and not readily available on a commercial basis. Thus, the inability to locate other *Rangia* was not surprising to me.

10.    Dr. Burton also informed me that all of the *Rangia* samples they had collected and analyzed had very high concentrations of petroleum hydrocarbons and other chemicals of concern for the Motiva study.

11.    To overcome this problem, I consulted with Dr. Burton about using native *Rangia* found in the study area ("Resident Clams") instead of importing and transplanting non-native *Rangia*. I understood from Dr. Burton that using resident clams was suggested by DNREC. I suggested that the use of resident, instead of transplanted, clams for the study was appropriate provided clam beds were present over sufficient spatial areas to adequately characterize the bioavailability of the contaminants from the Refinery. In fact, I also suggested that using clams that had been exposed over their entire lifetime would eliminate some uncertainties associated with exposing caged clams for a relatively short period of time. In this respect, using the Resident Clams would provide bioavailability data with fewer uncertainties than using caged clams because the organisms are not being manipulated in the field before chemical analysis.

12.    I suggested to Dr. Burton that Resident Clams be sampled in the Spring and Fall. In my opinion this temporal scale would provide data that could be used to estimate annual variability in the concentrations of petroleum hydrocarbons and other chemicals of concern that accumulated in the clam tissue.

13.    During the study, I consulted closely with Dr. Burton with regard to the locations where the Resident Clams were collected, and I was satisfied the sampling locations were representative of River sites selected for other studies required by the Court Order, including the Sediment Toxicity Tests ("Triad Studies"). In fact, four of the Resident Clam collection sites were exactly the same sites as used for the Sediment Toxicity Tests, while the remaining five collection sites were either in close proximity, or between two of such sites.


## CONCLUSIONS

14.    In my opinion a survey of Resident clams in the study area conducted on March 27 and 28, 2001, clearly demonstrated that sufficient densities were present to use the Resident Clams for the bivalve bioavailability study. The results of the survey also indicated that *Rangia* were able to survive, grow, and reproduce in the study area.

15.    Based on the data developed during my analysis, I looked for evidence of potential effects caused by certain types of petroleum hydrocarbons ("PAHs") and other contaminants in the Resident Clam tissue. Mrs. Sandra Salazar and I calculated an estimate for total PAH concentrations in water using the results of analysis of PAHs in the tissue of the collected Resident Clams. The results were well below water quality thresholds suggesting effects from these chemicals. Further, the concentrations of PAHs measured in tissue were below levels developed by regulatory agencies such as the U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency and generally

accepted by the scientific community as predicted effects levels. Finally, the densities of *Rangia* found in the field showed that the Resident Clams were able to survive, grow and reproduce in the study area. Unlike the *Rangia* population in the study area, *Rangia* populations significantly affected by chemical stressors such as PAHs would not be expected to have been so prolific because of chemical effects on survival, growth, and reproduction. I concluded, based on the weight of the evidence, from estimated water concentrations, measured tissue concentrations, and field observations that the Resident Clams were not significantly impaired.


### THE LIVINGSTON REVIEW

16.    The Livingston Review states that the Motiva Study did not develop bioavailability data, and a bioavailability study was not conducted. The author specifically states that "bioavailability has to do with which compounds in the sediments eventually gets in the associated food webs, and this can only be found through experiments and tissue concentrations of experimental organisms". This characterization of bioavailability is erroneous.

17.    The term "bioavailability" is generally considered a measure of whether a chemical is taken up by an organism following exposure of the organism to that chemical and is not restricted to controlled experiments or chemicals in sediments (as stated in the Livingston Review). In other words, for purposes of the Motiva Study, the collection of Resident Clams was an appropriate method for estimating bioavailability in the study area. Bioavailability can be estimated by measuring chemicals of concern in tissues of organisms whether they are exposed in place, transplanted in the field, or in laboratory test tanks.

18.    Filter-feeding bivalves, like *Rangia*, capture bioavailable PAHs and other chemicals of concern as they filter the water for food. As a result, the organism is exposed to (and captures) all bioavailable PAHs, including bioavailable PAHs in water, on food, and in suspended sediments. Thus, a filter-feeding organism such as *Rangia* can be used to determine bioavailability from all pathways of exposure (from water, sediment, and food).

19.    I strongly believe that the locations where the Resident Clams were collected were representative of locations in the River selected for the Triad Studies. Therefore, I also believe that the results of the bivalve study provided estimates of bioavailability at the locations where the Triad Studies were conducted. In my opinion, the statement in the Livingston Review that "the bivalve studies were carried out with organisms taken at stations that were totally different from the Triad stations" is incorrect.

20.    In my opinion, the study we conducted on native *Rangia* as part of the comprehensive Motiva Study provided all the information that the Court Order required from Motiva regarding bioavailabilty.

## VERIFICATION

I, Michael H. Salazar, declare under penalty of perjury that the foregoing is true and

correct.  Executed on  _7 September 2005_    _Michael H. Salazar_

Michael H. Salazar

## CERTIFICATE OF SERVICE

I Meagan Ward Cascio, hereby certify that on September 9, 2005 I electronically filed **DECLARATION OF MR. MICHAEL H. SALAZAR** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE  19899-1680

I also certify that copies were caused to be served on September 9, 2005 upon the following in the manner indicated:

**BY HAND DELIVERY:**

C. Scott Reese, Esquire
Cooch & Taylor
824 N. Market Street
Suite 1000
P.O. Box 1680
Wilmington, DE  19899-1680

**BY FEDERAL EXPRESS**

Mitchell S. Bernard, Esquire
Nancy S. Marks, Esquire
Amelia Toledo, Esquire
Natural Resources Defense Council
40 West 20th Street
New York, New York  10011

_/s/ Megan Ward Cascio_
Megan Ward Cascio (#3785)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
mcascio@mnat.com
Attorneys for Defendant