IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE COUNCIL, INC. )
)
and DELAWARE AUDUBON SOCIETY, )
)
    Plaintiffs, ) Civil Action No.
) 88-263-SLR
v. )
)
TEXACO REFINING AND MARKETING, INC. )
)
    Defendant. )

### DECLARATION OF DR. DENNIS BURTON

I, Dr. Dennis Burton, hereby declare as follows:

#### *QUALIFICATIONS AND EXPERIENCE*

1. I am currently a Senior Research Scientist at the University of Maryland, Wye Research and Education Center. I have held this position since 1991. I received a B.S. degree in Applied Science from Virginia Commonwealth University in 1965; a Ph.D in Zoology from Virgina Tech in 1970; followed by a year of post-doctoral study of environnemental contamination issues at Virginia Tech. I have over 35 years of experience conducting ecotoxicity studies in various media.

2. My specific areas of expertise include: toxicological effects on aquatic organisms of surface and subsurface water quality changes induced by utility and industrial facilities; impact of various pollutants (single as well as mixtures of chemicals) on aquatic sediment organisms and terrestrial soil organisms; and aquatic and terrestrial risk assessments at Superfund sites. I have conducted research and/or written position documents for over 60 different governmental, academic, industrial, and legal organizations.

3. I have published more than a 100 scientific papers in peer-reviewed journals, including "Uptake, elimination, and metabolism of $^{14}$C-picric acid and $^{14}$C-picramic acid in the American oyster (*Crassostrea virginica*)", *Arch. Environ. Contam. Toxicol.* 13:653-663; "Gathering danger: the urgent need to regulate toxic substances that can bioaccumulate", *Ecol. Law Quart.* 20:605-720; "Bioaccumulation of total and monomethylmercury in earthworms and the

ecological risk to birds and mammals at the Northeast Test Hut, Graces Quarters, Aberdeen Proving Ground, Maryland", *DAMD17-92-2066,* U.S. Army Center for Environmental Health Research, Fort Detrick, MD. "Comparison of two U.S. Environmental Protection Agency species sensitivity distribution methods for calculating ecological risk criteria", *Human Ecol. Risk Assessment* 9:675-690. I have also published 3 books; 27 book chapters; 45 published technical reports; 77 published abstracts of presentations; and 77 unpublished technical reports.

4. I have attached my resume for further reference. ***Exhibit 1.***

## *BACKGROUND*

5. I was retained by Motiva Enterprises (then owner of the refinery located on the Delaware River in Delaware City) as a co-principal investigator with my colleague, Lenwood Hall, to assess the potential ecological effects from Motiva's effluent using the sediment Triad approach. Specifically, I coordinated the fate and transport studies, Triad toxicity studies, and assisted Mr. Michael Salazar (the Court recognized bivalve expert) in the logistics of the bivalve bioavailability study. The results of the studies are presented in a December 2003 report entitled "A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach" (the "Study"). See Plaintiffs' App.I &II

6. Dr. Robert "Skip" Livingston, the scientist for plaintiff National Resource Defense Counsel ("NRDC"), suggested in his June 8, 2000 review of the Scope of Work that the study be conducted using specimens of brackish water clams (*Rangia cuneata*) ("*Rangia*") rather than the American oyster (*Crassostrea virginica*). This suggestion was followed.

7. In collaboration with Mr. Salazar, I was responsible for obtaining the *Rangia* to be used for the bivalve tissue study to determine if PAHs, pesticides, PCBs and metals were bioavailable, and thus causing adverse effects on *Rangia* in the study area.

8. The resident *Rangia* were a good species to study in this ecosystem because they are well established, and are more abundant than other bivalves in the study area. The use of another non-bivalve resident species would not have provided as accurate results regarding the potential impact of PAHs on bivalves in the study area.

## *PROCESS OF OBTAINING RANGIA FOR THE CAGED STUDY*

9. A number of sources were originally considered for obtaining *Rangia* for the caged bivalve study because the 1999 preliminary Motiva study showed that PAHs were present in the sediment at all stations in the study area and thus *Rangia* in the study area would most likely have PAHs present in their tissue.

10. On July 6, 2000, I consulted with Don Webster, a University of Maryland Area Specialist, Marine Science, for recommendations about locating *Rangia* specimens with low PAH tissue concentrations. He stated that we might find *Rangia* from local sources, but that availability varies from year to year, as we are located at the northern extreme of *Rangia's* natural habitat. He suggested several possible sources further south, specifically:

    - Dr. Mory Roberts, Virginia Institute of Marine Science;
    - Dr. Geoffrey Scott, National Ocean Services Center, Charleston, SC; and
    - Dr. Mike Poirrier, University of New Orleans.

11. Additionally, I called Dr. Don Meritt at the University of Maryland Horn Point Laboratory Aquaculture Facility. Dr. Meritt agreed with Don Webster about the sources for *Rangia*. He also knew where local *Rangia* beds were located, from which samples could be collected. He did not know about the possible PAH tissue concentrations for those samples. Dr. Meritt also told me that we may have to get permission from DNREC to move Maryland clams into Delaware waters.

12. On July 12, 2000, I spoke with Dr. Fred Pickney of the U.S. Fish and Wildlife service about local sources of *Rangia*. Dr. Pickney stated that he had previously used *Rangia* collected from the James River, and suggested I contact Dr. Eugene Maurakis at the Science Museum of Virginia. Dr. Maurakis was not able to provide any information about the PAH tissue concentrations of *Rangia* collected from the James River. I also contacted Dr. Geoffrey Scott in South Carolina about *Rangia;* however, Dr. Scott could provide no information about PAH concentrations in South Carolina *Rangia*.

13. On July 13, 2000, I spoke with Hank Lloyd at Motiva about whom I should call in Delaware to receive permission to bring into Delaware out-of-state *Rangia* that would most likely have lower PAH tissue concentrations than *Rangia* found in Delaware. Hank Lloyd suggested Roy Miller at the Delaware Division of Fish and Wildlife, who then referred me to Rick Cole (who works with shellfish). Rick Cole referred me to Charles Lesser, of the Fisheries Administration of the Delaware Division of Fish and Wildlife, who stated that any out-of-state *Rangia* must first be certified as disease free before being introduced into the Delaware River for a cage study. He stated Delaware would accept certification from the Maryland Department of Natural Resources Cooperative Oxford Laboratory in Oxford, Maryland.

14. At this point, I contacted Mike Poirrier again at the University of New Orleans because he had previously stated that the *Rangia* used in his laboratory had low concentrations of PAHs in their tissues, and that they were disease ("Dermo") free. Since Dermo is found in almost all *Rangia* populations on the East and Gulf Coasts, I ordered a sample of *Rangia* from Mike Poirrier for Dermo testing.

15. On August 9, 2000, I arranged with Stephanie Abadie to send a forty (40) animal sample of *Rangia* from the University of New Orleans to Dr. Carol McCollough of the Oxford Laboratory for disease certification.

16. On August 18, 2000, I was involved in communications with Mike Salazar, regarding the size and condition parameters that were required of *Rangia* specimens for the caged study. On this same day, Dr. McCollough at the Oxford Laboratory confirmed that the *Rangia* samples were received and in good condition for the disease certification analysis.

17. On August 24, 2000, I received Dr. McCollough's diagnostic report concerning the *Rangia* disease assay for Dermo in the University of New Orleans clams. Dr. McCollough found that "*Perkinsus marinus* (Dermo) was detected in one (1) animal from a 30 animal sub-sample. **Exhibit 2** (letter from Dr. McCollough, Maryland Department of Natural Resources noting that the clams submitted for sampling were infected, dated August 22, 2000).

18. On September 1, 2000, I wrote a letter to Charles Lesser, Fisheries Administrator for the Delaware Natural Resource and Environmental Control ("DNREC"), Division of Fish and Wildlife, explaining the study approach of the caged bivalve study at Motiva and requested permission to use *Rangia* from Louisiana that had a very low prevalence (3.3%) of Dermo, as based on the Oxford analysis of the *Rangia* he had requested. **Exhibit 3** (letter from D. Burton to DNREC Division of Fisheries and Wildlife seeking permission to use clams from Louisiana, dated September 1, 2000).

19. On September 11, 2000, Jeff Tinsman, a shellfish disease specialist from the Delaware Division of Fish and Wildlife, called and stated that he would not allow out-of-state *Rangia* infected with Dermo to be introduced to Delaware waters, as he was concerned about introducing a possible new strain of Dermo to Delaware shellfish.

20. On September 13, 2000, I received a letter from Charles Lesser, of the Delaware Division of Fish and Wildlife, denying permission to use the Louisiana *Rangia* in a caged study in the Delaware River. ***Plaintiffs' App.IV at A00296*** (letter from DNREC denying permission to use the clams, dated September 13, 2000). Mr. Lesser recommended one of two approaches:

> "The first is to follow the ICES [International Convention for Exploration of the Seas] guidelines for introductions which would involve holding the Louisiana *Rangia* in quarantine, spawning them and placing the disease-free $F_2$ *Rangia* in situ the next summer. This could be done at Horn Point Lab or elsewhere. The second is to work with Delaware Bay *Rangia* by characterizing their background PAHs and using sufficient numbers to statistically estimate temporal and spatial changes in PAHs near the Motiva refinery. In summary, [our] position is not to permit the transfer of $F_1$ Louisiana *Rangia* and

recommend the $F_2$ or local *Rangia* be used. In the latter case, we would issue you a collecting permit."

21. On September 18, 2000, I spoke with Don Webster, about the DNREC letter, and the ICES guidelines for producing Dermo-free *Rangia*. Don stated that he was doubtful that we could use the ICES procedure and still guarantee that the *Rangia* would be free of Dermo. I also discussed this issue with Dr. Meritt, of the University of Maryland Horn Point Lab, which DNREC had recommended for the procedure. Mr. Meritt agreed that the procedure would not guarantee Dermo-free *Rangia* and that he thought it was a "high risk" undertaking.

22. On September 18, 2000, I applied for a permit to collect *Rangia* from the Delaware River. The permit was granted, via fax, on September 20, 2000. I received the "official" paper copy of the permit on September 28, 2000.

23. In collaboration with Mike Salazar, I initiated a pilot study to determine if, based on the level of PAHs in tissue, *Rangia* from the Delaware river were suitable for use in a caged study. *Rangia* were collected at several locations and sent to Battelle for PAH, lipid, and percent water content analyses.

24. On December 22, 2000, I received the PAH analyses from Battelle. The results showed that PAH concentrations were not acceptable for a caged study. Based on these findings, Lenwood Hall and I discussed placing the *Rangia* in "clean" Delaware water and determining whether the clams could depurate sufficient PAHs from their tissues to be used in caged studies.

25. On January 17, 2001, I reported to DNREC the numbers of clams used in the pilot study, as required by the terms of the permit. I also applied for a renewal of the permit to collect clams during 2001. On January 25, 2001, I received the new permit dated 01-19-2001.

26. From the end of January to the beginning of February 2001, I discussed the depuration study with Mike Salazar and Lenwood Hall. Drawyers Creek in Delaware, which was one of two sites suggested by DNREC's Craig Shirey, was visited by our technical personnel and selected for the study.

27. On February 19, 2001, *Rangia* were collected for the depuration study. The study lasted 28 days. The results showed that after 14 days the *Rangia* had depurated approximately 50% of the total PAHs in their tissues. However, no further elimination had occurred by day 28. We concluded that the PAH tissue concentrations were still too high to use for the caged bivalve studies. *See Plaintiffs' App.I at A00643* (Section 8.1 of the Study)

28. Because of the results of the depuration study, we decided to use resident clams for the bioavailability study. Accordingly, we attempted to locate clam beds within the 100 x 100 meter grid station established for each of the fifteen (15) Triad sampling sites, or as close a possible to each site. However, sufficient densities of clams were present at or near only nine (9) of the fifteen (15) Triad

5

sites; thus, only nine (9) clam stations were established. Four (4) of the clam stations were at exactly the same stations as the Triad stations. The remaining five (5) stations were within close proximity of the Triad stations, or located between two (2) Triad sites. The nine stations were grouped according to physical location relative to the Refinery discharge (three stations near the Refinery, three stations far north of the Refinery, and three stations far south of the Refinery).

29. Although not called for by the Scope of Work, the use of resident clams was necessary because appropriate non-resident clams could not be located. As these conditions were unforeseen when we developed the Scope of Work, the plaintiffs' expert Dr. Livingston was kept informed of the necessary changes. *Plaintiffs' App.IV at A00325* (email to R. Livingston from L. Hall describing the progress in the study, including the need to use resident clams instead of introducing caged specimens, dated May 16, 2001). Although Dr. Livingston was informed about using resident clams rather than caged clams, no written or verbal communication about the change was received.

30. *Rangia* were collected from these stations on April 3, 2001 for the spring study and on November 1 & 2, 2001 for the fall study to address potential seasonal variation in PAH (and other nonionic organic compounds, e.g., PCBs and chlorinated pesticides) bioavailability that can result from *Rangia's* annual reproductive cycle.

31. Notably, the timing of this sampling was conducted to coincide with the clams' spawning, a time when the organism is most susceptible to "bioconcentration of lipid-seeking PAHs", as suggested by Dr. Livingston. *Plaintiffs' App.IV at A00282* (Livingston's review of the draft Scope of Work, dated June 8, 2000).

### *FACTUAL INACCURACIES IN DR. LIVINGSTON'S REVIEW*

32. I have reviewed a document prepared by Dr. Livingston dated July 2005, entitled, "Review of Motiva Study and Independent Analysis of Study Data" (the "Livingston Review"). The Review presents many unfounded and inappropriate criticisms of the Study.

33. For example, the Livingston Review misrepresents the validity of the resident clam study by stating that the nine clam stations were totally different than the Triad sites. (*Livingston Review*, p. 36ff). Four (4) of the stations were exactly the same stations as the Triad sites; the remaining five (5) clam stations were within close proximity of a Triad station or between two Triad sampling stations. *See Exhibit 4* (map showing locations of Triad sites and clam sites).

34. Further, the Livingston Review repeatedly states that no bioavailability studies were conducted. (*Livingston Review, e.g., pp. 2, 7, 9, 29, 36-38, 40, and 50).* This is false. The clam study assessed the bioavailability of PAHs, PCBs, and

6

chlorinated pesticides, as well as heavy metals in the study area. The clam study clearly demonstrated that total PAHs were bioconcentrated above background concentrations particularly in the spring near-field stations; thus, total PAHs were shown to be bioavailable.

35. Moreover, the Livingston Review states that "experimental aspects of the original plan for the bioavailability [tests] were simply ignored". This is also not correct. Clams do not have to be in cages in order to determine bioavailability. It is well established that organisms in their natural habitat bioaccumulate many types of chemicals without being placed in cages. In fact, the USEPA Mussel Watch Program is based on this well established fact.

36. Similarly, the statement in the Livingston Review that we did not consider bioavailability in the Triad species is also not correct. We used the Triad approach because it is well established that bioavailability is integrated in the Triad "weight of evidence" approach.

37. Attached are true and correct copies of the following:

- Letter from Dr. McCollough, Maryland Department of Natural Resources (Aug. 24, 2000);

- Letter from Dr. Burton to DNREC Division of Fisheries and Wildlife (Sept.1, 2000);

I, Dr. Dennis Burton, declare under penalty of perjury that the foregoing is true and correct.

Executed on: 9-8-05                                   _____
                                                      Dr. Dennis Burton

## CERTIFICATE OF SERVICE

I Meagan Ward Cascio, hereby certify that on September 9, 2005 I electronically filed **DECLARATION OF DR. DENNIS BURTON** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE 19899-1680

I also certify that copies were caused to be served on September 9, 2005 upon the following in the manner indicated:

> **BY HAND DELIVERY:**
>
> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE 19899-1680
>
> **BY FEDERAL EXPRESS**
>
> Mitchell S. Bernard, Esquire
> Nancy S. Marks, Esquire
> Amelia Toledo, Esquire
> Natural Resources Defense Council
> 40 West 20th Street
> New York, New York 10011

                              /s/ Megan Ward Cascio
                              Megan Ward Cascio (#3785)
                              1201 N. Market Street
                              P. O. Box 1347
                              Wilmington, DE 19899-1347
                              mcascio@mnat.com
                              Attorneys for Defendant