IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE COUNCIL, INC. )
)
and DELAWARE AUDUBON SOCIETY, )
)
    Plaintiffs, ) Civil Action No.
) 88-263-SLR
v. )
)
TEXACO REFINING AND MARKETING, INC. )
)
    Defendant. )

## DECLARATION OF LENWOOD HALL, JR.

I, Lenwood Hall Jr., hereby declare the following:

### *QUALIFICATIONS AND EXPERIENCE*

1. Currently, I am Program Manager of Aquatic Toxicology at the University of Maryland Agricultural Experiment Station, Wye Research and Education Center. I have held this position since 1989. I received a B.S. in Biology from East Carolina University in 1974, and a M.S. in Fisheries Management from Frostburg State College (University of Maryland, Appalachian Environmental Laboratory) in 1978. I have more than 26 years of experience conducting ecotoxicity studies in freshwater and saltwater environments.

2. My specific areas of expertise include: aquatic toxicology; ecological risk assessment of pesticides, metals, and organometallics; exposure characterization of pesticides; development of biological/physical habitat indicators and bioassessments. I have conducted research or consulting for 43 different government, academic and industrial organizations.

3. I have published more than one hundred scientific papers in peer-reviewed journals, including: "The effects of a simulated refinery effluent on the grass shrimp, *Palaemonetes pugio*," *Arch. Environ. Contam. and Toxicol*, 7 : 23-35 ; "Mortality of striped bass larvae in relation to contaminants and water quality conditions in a Chesapeake Bay tributary," *Trans. Am. Fish. Soc.*, 114: 861-868; "Simultaneous butyltin determinations in the microlayer, water column and sediment of a northern Chesapeake Bay marina and receiving system," *Applied*

*Organometallic Chemistry*, 2: 547-552; and "Ambient toxicity testing in the Chesapeake Bay watershed using freshwater and estuarine water column tests," *Environ. Tox. and Chem.*, 11: 1409-1425. I have also published four books; 24 book chapters/monographs (some are peer-reviewed) and 103 technical reports.

4. I have attached my *curriculum vitae* for further reference. ***Exhibit 1.***

### BACKGROUND

5. Following the Court's decision on September 1, 1998, I was retained by Motiva Enterprises (then owner of the refinery located on the Delaware River in Delaware City) with my colleague, Dr. Dennis Burton, to conduct a Study ("Study") designed to assess the impacts of the Motiva oil refinery's (the "Refinery") effluent on aquatic life in the Delaware River. Specifically, we were directed to develop and complete a study program that would implement the requirements set forth in this Court's 1998 Opinion and Order. *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg.*, Inc., 20 F. Supp. 700 (D. Del. 1998).

6. While a pilot Study was underway to implement these five studies, the parties returned to court in August 1999 to resolve disputes over the specifics of the Study. I was involved in drafting a document that became the Stipulated Order issued by this Court on February 23, 2000 (the "Order"), and communicated with plaintiff National Resource Defense Counsel's ("NRDC") scientist, Dr. Robert "Skip" Livingston, regarding the specifics of the Study upon which the parties agreed. ***Exhibit 2*** (emails from R. Livingston to L. Hall proposing changes to the draft order, dated January 23, 2000 and February 2, 2000).

### THE SCOPE OF WORK

7. In satisfaction of paragraph 1(k) of the Order we developed a "Scope of Work" for the Study. The Scope of Work describes, in approximately 150 pages of detail, all components of the studies specified in the Order.

8. In May 2000, I presented a draft of the Scope of Work to Dr. Livingston. ***Exhibit 3*** (letter from L. Hall to Livingston attaching the proposed Scope of Work and requesting comments, dated May 3, 2000).

9. After Dr. Livingston's initial assessment that the Scope of Work was largely satisfactory, and that only a few small matters needed to be addressed, we began preliminary work on the issues that were settled. ***Plaintiffs' App.IV at A00282*** (letter from R. Livingston to L. Hall noting approval of the Scope of Work and providing suggestions, dated June 8, 2000).

10. I incorporated the majority of Dr. Livingston's suggestions to the Scope of Work, and we further discussed remaining issues. ***Exhibit 4*** (email from L. Hall to R. Livingston discussing suggestions and their incorporation, dated August 25, 2000).

11. During this time, there was extensive correspondence between Dr. Livingston and me to finalize the Scope of Work. *Plaintiffs' App.IV at A00297* (letter from R. Livingston to L. Hall providing suggestions to Scope of Work, dated September 29, 2000).

12. After receiving Dr. Livingston's final comments, I issued a final version of the Scope of Work on November 6, 2000. *Plaintiffs' App.IV at A00120* (copy of Scope of Work, dated November 6, 2000).

### *SUMMARY OF CONCLUSIONS AND FINDINGS*

13. I directed the researchers in collecting Study data, and ensured that all elements of the Scope of Work were followed. The various component studies (such as the coring, PAH fingerprinting, and clam tissue analysis) were performed by independent scientists, who worked with me as I compiled the results of these studies into a draft report.

14. In December 2003, I presented to Motiva and NRDC the draft report, titled "A Baseline Study for Assessing the Potential Aquatic Ecological Effects from Motiva Enterprises LLC Delaware City Refinery Effluent Using the Sediment Triad Approach" ("Study Report"). *Plaintiffs' App.I&II..*

15. As set forth in the Study Report, and as explained more fully below, my conclusions regarding the Study Report are as follows:

    A. All Study components indicated that the Delaware River, in the vicinity of the Motiva Refinery, displayed some degree of sediment contamination, chronic sediment toxicity, and benthic community impacts.

    B. As determined through PAH fingerprinting, all Study components indicated that the aforementioned environmental effects did not appear to be related to the Refinery effluent.

    C. The magnitude of any potential impact due to the Refinery effluent was dwarfed by the other sources of pollution in this urbanized/industrialized estuary and, as is common with these ecosystems elsewhere, the sources of these adverse impacts appear to be diverse and diffuse.

16. In my opinion, the Study fully executed the five studies required by the Order, and expanded on these studies by specifically including the Sediment Quality Triad approach.

17. The data and conclusions of the Study Report have been subjected to and have passed vigorous peer review, as I along with the other scientists working on the Study reorganized the data into a series of scientific papers submitted and accepted for publication in the scientific journal Human and Ecological Risk Assessment ("HERA"). These papers, titled "An Integrated Case Study for Evaluating the

3

Impacts on an Oil Refinery Effluent in the Delaware River, - including various Study components", were published August of 2005. ***Exhibit 5.***

18. In my opinion, the scientists and researchers who participated in the Study, including Dr. Ray Alden (statistical analysis of Study components), Dr. Al Uhler (PAH chemistry and fingerprinting and analysis of other chemical constituents), Mr. Mike and Mrs. Sandra Salazar (bivalve bioavailability studies), Dr. Dan Dauer (benthic community assessments), Dr. Clark Alexander and Dr. Richard Lee (long term coring), Dr. Robert Llanso (sediment trap studies), Dr. Joe DiLorenzo (fate and transport studies), and Dr. Dennis Burton (aquatic toxicologist and co-principal investigator), are known experts in their fields who performed the individual components of the Study using valid, scientifically defensible techniques.

19. In total, the four year Study involved more than a dozen scientists and researchers whom I consider to be preeminent in their respective fields, and cost approximately $4 million dollars, well exceeding the $700,000 estimate previously discussed by this Court. *See* Sept. 1, 1998 *Opinion and Order* (20 F. Supp. 2d 700 at 713).

### ***COMPLIANCE WITH SCOPE OF WORK***

20. In my opinion, the studies performed substantially complied with the terms of the Scope of Work and the Order. However, two modifications were necessary as the result of unforeseen conditions encountered in the field during the course of the Study. These changes were inconsequential with regard to the scientific validity and thoroughness of the Study, as well as the conclusions presented in the Study Report.

21. First, the Scope of Work called for tissue analysis in sediment toxicity test species to determine the bioavailability of certain toxic agents, including PAHs. I and the other researchers determined that the tissue analysis for sediment toxicity test species specified in the Scope of Work could not be conducted in a scientifically defensible manner on the organisms selected for the sediment toxicity tests. However, Dr. Livingston did not agree about whether the analysis specified in the Scope of Work may produce misleading results.

22. Pursuant to Paragraphs 1(h) and 1(n) of the Order, and with the agreement of Dr. Livingston, we employed an independent expert, Dr. David Page, to address the issue of tissue analysis in sediment toxicity test species. ***Plaintiffs' App.IV at A00305*** (letter from L. Hall to D. Page requesting an expert opinion regarding the scientific validity of the proposed tissue analysis, with a hand written note to R. Livingston, dated October 5, 2000). Notably, Paragraph 1(h) of the Order states that, with respect to the tissue analysis of sediment toxicity test species for PAHs, "[i]f a question arises concerning the feasibility of such analysis, the parties' experts will confer and attempt to resolve that issue." Furthermore, Paragraph 1(n) of the Order states that in the event that a dispute arises regarding the conduct of a study, "[t]he parties will explore the possibility of arbitrating such disputes before individuals with expertise in the relevant scientific subject matter area."

4

23. Dr. Page ultimately issued a written opinion to both parties that concluded, in part, "The method for the analysis of amphipod tissue samples...for PAH proposed by Dr. Means is not appropriate to the current project and carries the risk of yielding misleading data." Additionally, as the sediment toxicity test species are very small, "the effects of lab and field contaminants are amplified, thus leading to errors and in extreme cases, miss-attribution of PAH sources." Finally, "The proposed amphipod tissue analyses are unnecessary because of the triad-based Study design adopted in this project." *Exhibit 6* (letter from D. Page to L. Hall, dated December 7, 2000).

24. Notably, the use of the Triad-based approach was a step above and beyond the specifics contemplated by the Order, and was conducted to assess the overall ecological effects of Refinery PAHs in the River. The Triad-based approach of the Study was specified in detail in the Scope of Work, and Dr. Livingston did not express any concerns or problems with this methodology. As confirmed by Dr. Page's analysis, the use of this approach ultimately addressed any potential scientific gaps resulting from the inability to perform accurate tissue analysis of the sediment toxicity test species.

25. The second modification that was necessary related to the use of caged clams. Paragraph 1(d) of the Order called for the researchers to "conduct a caged bivalve study at selected sample sites in the Study area, with concurrent PAH, metals, and PCB analyses....Dr. Mike Salazar will be involved in this process."

26. However, samples of clean clams ("*Rangia*") were not available for placing in cages in the Study area, as all samples found either already contained high levels of PAHs in their tissues, or were not disease free. The researchers in this Study, specifically Dr. Burton, explored all possible avenues to procure the *Rangia* required for this caged bivalve Study. I believe the measures taken by Dr. Burton went above and beyond what was originally contemplated in the Order when attempting to obtain acceptable samples.

27. As required by the Order, Mr. Mike Salazar was closely involved in this process, and approved of the researchers' decision to account for the changed circumstances by collecting resident *Rangia* from the Study area instead of placing pristine samples in cages.

28. In my experience, it is not unusual to encounter unexpected conditions or circumstances when conducting large scale field and laboratory studies which can require an alteration in the original Study or work plan. In the case of the Study, unforeseen conditions required the researchers to modify two components of the Scope of Work. However, these modifications had no effect on the scientific validity, or the conclusions presented in the Study Report.

### *"WEIGHT OF THE EVIDENCE" ANALYSIS AND CONCLUSIONS*

29. After all the studies were completed, we integrated all the data under a "weight of evidence" approach to answer the following questions:

5

- Are there sediment contaminant concentrations of potential ecological concern found anywhere in the Delaware River Study area?

- Are historical or current patterns of sediment contaminations (*i.e.*, PAHs) inferentially related to the Refinery's effluent?

- Are contamination-associated biological impacts (*i.e.*, sediment toxicity or benthic community impairment) indicated?

- Are biological effects correlated with sediment contamination related to the Refinery's effluent?

30. PAH concentrations in the River sediments, water and tissue samples were consistently dominated by a combination of PAH chemicals attributable to the Delaware River's urban background (i.e., storm runoff, automobile exhaust, domestic heating, forest fires, etc.), and exhibited little to no contribution from the Refinery. In fact, the combination of PAH chemicals unique to the Refinery was only evident at moderate to low levels in five sites near the Refinery, in clams collected from four sites near the Refinery, and the effluent canal of the Refinery. Of the fifty-three (53) sediment sites sampled, only one site in the effluent canal showed moderate concentration levels of the Refinery's signature PAH.

31. My final conclusion, based on analysis of results from all Study components, indicated that the Delaware River Study area in the vicinity of the Refinery displayed some degree of sediment contamination, chronic sediment toxicity, and benthic health impacts. However, after reviewing the PAH fingerprinting conducted by Dr. Al Uhler, which showed a limited spatial scale of influence, and comparing it to PAHs found in the Delaware River, these environmental effects did not appear to be directly attributable to the Refinery's effluent. Rather, the sources appear to be the innumerable sources of intentional and unintentional pollutants commonly found in an urbanized/industrialized estuary.

### *PRESENTATION OF THE STUDY TO NRDC*

32. On December 9, 2003, the completed Study Report was presented to NRDC with a request for comments by April 1, 2004. On June 15, 2004, counsel for NRDC provided a letter presenting a series of questions, but no comments, about certain aspects of the Study Report. *Plaintiffs' App.IV at A00330* (letter from NRDC to Motiva, dated June 15, 2004). Specific comments from NRDC's scientist, Dr. Livingston were not available for Motiva's review until NRDC filed their recent Motion to Enforce Judgment.

33. In my view, NRDC's June 2004 letter suggested that NRDC did not read or at least did not understand the Study Report. For example, NRDC claimed that the Study Report was missing information on naphthalenes, although a CD with extensive data regarding naphthalenes was included with the Study Report. Naphthalenes were also used in the PAH fingerprinting analysis conducted by Dr. Uhler (Section

7 of Draft December 2003 report). NRDC also claimed the Study was incomplete for not having conducted a "loadings" analysis of the Study area. However, such an analysis was never contemplated by the Study, and the Scope of Work specifically stated that "a mass balance chemical fate study will not be conducted." *Plaintiffs' App.IV at A00120* (Scope of Work at page 5). Notably, such a study would have required a survey and accounting of all PAHs entering the estuary from all sources, including the city of Philadelphia, urban runoff and PAHs from the numerous other industrial facilities along the Delaware River. Finally, NRDC questioned the validity of the "fingerprinting" of the PAHs discharged in the Refinery's effluent based on the scientists' method of analyzing chemical concentrations. However, measuring chemical concentrations is a well established approach used for chemical fingerprinting with abundant precedent in published literature. *See Declaration of Dr. Allen Uhler.*

34. I, along the other scientists working on the Study, assisted counsel for Motiva in answering fully each question presented by the NRDC letter. *Plaintiffs' App.IV at A00334* (letter from J. Kampman to M. Bernard, dated September 1, 2004).

### *FACTUAL INACCURACIES IN DR. LIVINGSTON'S REVIEW*

35. I am surprised by the general criticism of the scientific validity of the Study raised in Dr. Livingston's July 2005 analysis titled "Review of Motiva Study and Independent Analysis of Study Data" (the "Livingston Review"), as Dr. Livingston was consulted extensively throughout the Study, and the Study was based on the Order which Dr. Livingston helped author. Further, the criticisms raised in the Livingston Review are contradicted by the facts of the Study that was conducted.

36. During the spring and summer of 2001 and 2002, I communicated with Dr. Livingston several times regarding the status of the Study Report, and the initial assessments that the researchers had made. *Exhibit 7* (letters and emails from L. Hall to Livingston, dated February 8, 2001; May 16, 2001; August 16, 2001; April 5, 2002; August 13, 2002; September 24, 2002; October 2, 2002; and October 7, 2002 discussing status of Study). Notably, Dr. Livingston did not express any concerns with the methods we were using or the initial findings.

37. One of the central tenants of the Livingston Review is that the Study failed to conduct PAH loading to fingerprint the Refinery effluent. This type of analysis would require considering all sources of PAH to the Study area, otherwise known as a "mass balance analysis" or "loadings analysis". *Plaintiffs' App.III at A00002, A00004, and A00018* (Livingston Review at, for example, pages 2, 4, and 18). Such an analysis would require a survey and accounting of all PAHs entering the estuary from all sources, including the city of Philadelphia, urban runoff and chemicals from the numerous other industrial facilities along the Delaware River. A mass balance analysis for PAHs in the Study area was never contemplated. In fact, the Scope of Work clearly states that "a mass balance chemical fate and sediment flux transport model of PAHs will not be conducted". *Plaintiffs' App.IV at A00131* (Scope of Work at page 10). A detailed discussion of why loading can

not be used to fingerprint a PAH source is addressed in detail in Dr. Al Uhler's Declaration.

38. Livingston's Review questions the scientific validity of taking samples for the PAH fingerprinting from the Refinery effluent. *Plaintiffs' App.III at A00004* (Livingston Review at 4). Such a criticism ignores Paragraph L of the Order which specifies "[f]ingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments." *Court Order at page 5*. The scientists were following the letter of the Order, as well as the Scope of Work in taking these effluent samples.

39. Livingston's Review uniformly misrepresents the validity of the resident clam study by stating that the clam collection sites were totally different than the Triad sites. *Plaintiffs' App.III at A00036* (Livingston Review at page 36, section H). In fact, four (4) of the clam collection sites were exactly the same sites as the Triad sites, while the remaining five (5) clam collection sites were within close proximity of Triad sites, or between two Triad sampling sites. *See Exhibit 8* (map showing locations of Triad sites and clam sites).

40. Livingston's Review questions the validity of the statistical analysis on the basis that the Study purportedly failed to use summary statistical analysis for data analysis. *Plaintiffs' App.III at A00027* (Livingston Review at 27). In fact, Section 10 of the Study Report includes an extensive section on multivariate analysis entitled "Integration and analysis of Study components", that Dr. Livingston appears to ignore. *Plaintiffs' App.IV at A00717 – A00829* (Section 10 of the Study Report).

41. Livingston's Review questions the validity of using Principal Components Analysis ("PCA") to draw conclusions when determining the source of PAH contamination in the Study area. *Plaintiffs' App.III at A00034* (Livingston Review at page 34). However, the PCA methodology was clearly specified in the Scope of Work as the methodology that would be used for this PAH analysis. *Plaintiffs' App.IV at A00156* (Scope of Work at page 37). Dr. Livingston did not express any concerns with the scientific validity of this method at that time. Notably, despite his criticisms, Dr. Livingston used PCA for his reanalysis of the Study data. *Plaintiffs' App.III at A00042* (Livingston Review at page 43).

42. Livingston's Review questions the validity of the sediment samples collected for PAH fingerprinting, stating that the sediment at all stations near and in the effluent canal are composed predominately of sand, and would therefore not be areas where PAHs from the Refinery effluent would deposit and accumulate. *Plaintiffs' App.III at A00043* (Livingston Review at page 43). Dr. Livingston is incorrect about the sediment composition, as the sediment at two sites, DR23 and DR26, close to the Refinery has a *lower* percentage of sand (24 – 29% sand sites means) than the average composition of the fifteen Triad sites. *Plaintiffs' App.IV at A00451* (Table 6.37, page 6-227 of the Study Report). In fact, the percentage of sand in the sediment at the sites Dr. Livingston appears to find acceptable, the "downstream depositional sites DR67 and DR68" (26 – 35% sand site means), is

similar to, if not slightly higher than, the percentage of sand in the sediment at sites DR23 and DR26 that were used. As such, Dr. Livingston's criticism is baseless.

43. Attached are true and correct copies of the following:

- Email from R. Livingston to L. Hall (Jan. 23, 2000);

- Email from R. Livingston to L. Hall (Feb. 2, 2000);

- Letter from L. Hall to R. Livingston, attaching the draft Scope of Work (May 3, 2000);

- Email from L. Hall to R. Livingston (Aug. 25, 2000);

- "An Integrated Case Study for Evaluating the Impacts on an Oil Refinery Effluent in the Delaware River, - including various Study components", *HERA*, Aug. 2005;

- Letter from D. Page to L. Hall (Dec. 7, 2000);

- Letter from L. Hall to Livingston (Feb. 8, 2001);

- Email from L. Hall to Livingston (May 16, 2001);

- Letter from L. Hall to Livingston (Aug. 16, 2001);

- Letter from L. Hall to Livingston (April 5, 2002);

- Email from L. Hall to Livingston (Aug. 13, 2002);

- Email from L. Hall to Livingston (Sept. 24, 2002);

- Letter from L. Hall to Livingston (Oct. 2, 2002);

- Letter from L. Hall to Livingston (Oct. 7, 2002);

- Map showing locations of Triad sites and clam sites.

I, Lenwood Hall Jr., declare under penalty of perjury that the foregoing is true and correct.

Executed on  9/8/05 .         *[signature: Lenwood Hall, Jr.]*

                                              Lenwood Hall Jr.

# **CERTIFICATE OF SERVICE**

I Meagan Ward Cascio, hereby certify that on September 9, 2005 I electronically filed **DECLARATION OF LENWOOD HALL, JR.** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE  19899-1680

I also certify that copies were caused to be served on September 9, 2005 upon the following in the manner indicated:

> **BY HAND DELIVERY:**
>
> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE  19899-1680
>
> **BY FEDERAL EXPRESS**
>
> Mitchell S. Bernard, Esquire
> Nancy S. Marks, Esquire
> Amelia Toledo, Esquire
> Natural Resources Defense Council
> 40 West 20th Street
> New York, New York  10011

>             */s/ Megan Ward Cascio*
> Megan Ward Cascio (#3785)
> 1201 N. Market Street
> P. O. Box 1347
> Wilmington, DE 19899-1347
> mcascio@mnat.com
> Attorneys for Defendant