# Exhibit
# 2

Wed Feb 09 14:11:37 2000                                    Means Livingston Proposal

Date: Sun, 23 Jan 2000 10:40:27 -0500
From: "R.J.Livingston" <skipliv@EARTHLINK.NET>
Reply-To: skipliv@EARTHLINK.NET
Subject: Means Livingston Proposal
To: lh43@umail.umd.edu
Message-ID: <388B20EA.4FD5@earthlink.net>


Lynwood- Enclosed is our response to your update of the proposed work on
the Delaware River. Hope to see you soon.

Skip L.

RESEARCH OUTLINE: STUDY OF PAST, PRESENT, AND FUTURE IMPACTS OF
DISCHARGES BY MOTIVA ENTERPRISES, LLC, INC. ON THE DELAWARE
RIVER-ESTUARY

Robert J. Livingston, Ph. D.
Jay C. Means, Ph. D.

January 2000

I. Background

    The outline of the Means study plan accepted by the Judge Longobardi as
the basis for the study of the Motiva refinery includes the following:
1) a detailed characterization of the composition of refinery effluents
using modern analytical methods and an appropriate scope of analyses; 2)
the interactions of petroleum hydrocarbons with receiving waters,
natural particulates and biota as related to the fate and transport of
discharged materials; 3) the quantification of the distribution of
sediment-bound PAHs at sites associated with refinery discharges or
related petroleum discharges with depth and spatial area; 4) the
bioavailability of discharged hydrocarbons in the solution phase; 5) the
bioavailability of sediment-bound PAH in sediments near the discharge
both in terms of present discharges as well as an estimation of past
impacts of exceedances based upon analysis of sediment cores and a
site-specific model of bioavailability for Delaware River sediments.
Concomitant study of the potential toxicity of bioaccumulated
contaminants would be integrated into study elements 4 and 5, using

Printed by: Koralleen Stavish                     Page:  1

Wed Feb 09 14:11:37 2000                                    Means Livingston Proposal

relevant endpoints and test species. The Court ordered that such
studies be performed in a manner consistent with the scientific
rationale presented in the Means report and subsequent court testimony.

The following research outline is in response to the memo from Dr. L.
Hall to R. Livingston (14 January 200) regarding additional information
concerning the Motiva study. The complete characterization of all
replicates is commendable, as is the addition of a third year of field
sampling. The addition of new consultants is also a positive response as
is the various review processes that have been added to the research.
The bioassay program is still in need of an evaluation of water column
toxicity tests, and this subject will also be addressed below. It
remains that these additions and changes still do not address our
central concerns regarding the preliminary analyses during the first
year (10 station transect; lack of an adequate reference site; lack of
sufficient background for transport/fate analyses; questions regarding
bioavailability of toxicants associated with the refinery effluent
loading to the Delaware River-estuary). We feel that if the plan
continues along the course outlined in the research proposals proffered
to date, at the end of the study, there will be considerable uncertainty
regarding the environmental impact of the Motiva discharge on the
Delaware River-estuary. The research goals and the stated intent of the
court ruling will not be fulfilled. The current distribution of sampling
stations is unsatisfactory, and it is not clear how the various
approaches to the transport and fate issues will not be resolved in a
satisfactory manner should the research be carried out as presently
planned. Based on our collective experience in performing studies of
this kind, it is our opinion that continuation on the present course of
action will result in a waste of research funds and incomplete answers
to the research questions. We therefore offer the following research
outline, as our response to the research needs for a successful
conclusion to the Motiva study.

II. Overall Approach

The basic research elements and order of analysis for a suitable end
product that answers the research questions will require a carefully
integrated effort. The timed execution of research priorities is crucial
to this research. This would include an early characterization of the
chemical constituents (polynucleated aromatic hydrocarbons [PAHs],

Ved Feb 09 14:11:37 2000                                    Means Livingston Proposal

netals) in the discharge; the determination of the primary impact area
nat includes delineation of the depositional environment; the
stablishment of adequate sampling stations based on the transport and
ate of the released PAHs; determination of the bioavailability of
oxicants released from the refinery; integrated descriptive community
tudies and experimental work (i.e., bioassays) to determine potential
iological response to plant discharges; and an analytical component
nat integrates the various phases of effluent characterization,
etermination of sediment/water/organism concentrations of toxic agents,
nd long-core analyses for an evaluation of the impacts of past, present
nd future effluent loading from the Motiva plant.

II. Suggested Plan of Action

A. Station Placement

. Preliminary Transects

The primary purpose of the initial studies should be to establish a
eries of sampling stations that encompass the maximal extent of the
ffluent dilution limits. This can be done through a series of
reliminary transects that include approximate north and south axes and
t least two transect lines across the shallow mudflat just off the
ffluent discharge area. Sediment samples should be taken and analyzed
or particle size distribution, percent organics, and sediment total PAH
ontent. A reference area should be established. During this preliminary
hase, a series of sediment traps should be placed at representative
tations in both impact and reference areas over 1-2-week periods to
stablish sediment deposition rates. Depending on depth, 2-3 traps
hould be mounted on floats and bottom anchors (rebar mounts).
Representative samples should be taken for total PAH analysis.

. Establishment of Reference Site

The choice of an adequate reference site cannot be made based on last
ear's transect information. A site should be found that has similar
nicrohabitat characteristics (sediment/water quality) as the potential
npact area, but without the influence of the refinery. There are a
eries of small tidal creeks north of the effluent canal that could be
ppropriate for the establishment of the reference site. Reference
tations should approximate the range of habitats encompassed by the

rinted by: Koralleen Stavish                    Page: 3

Wed Feb 09 14:11:37 2000                                    Means Livingston Proposal

mpact site stations. Establishment of the reference area should be
carried out at the beginning of the study, corresponding in time with
the determination of field station locations.

B. Sample Replication

Replicate chemistry samples should not be combined; all replicates
should be analyzed.

C. Chemical Analyses: Effluent, Sediments, and Organisms

Characterization of effluent chemistry should be part of the initial
screening effort for the project. The Batelle effluent chemistry should
be carried out for metals and PAHs. All associated chemical
characterizations, including field sediment monitoring, organisms taken
in experimental (bioassay) work, and long-core determinations, should
follow the same list of target compounds. Background chemistry for
reference stations can be compared to the results of the chemical
characterization of the postulated impact areas to establish a baseline
for both PAH and metal contamination (i.e., all sources other than the
refinery). The sediments and bioassay organisms should be tested for
known effluent compounds as well as known background contamination
(metals and PAHs). <u>Without such information, determination of</u>
<u>cause-and-effect relationships is not possible.</u> Without coordination of
all three research groups concerning the chemical analyses and
biological concentrations of toxic agents, it will be virtually
impossible to isolate the effects of the refinery on the Delaware system
relative to the effects of ambient conditions in the study area. No
statistical analyses have been suggested in the research proposals;
without a detailed statistical analysis of the data, process-related
cause-and-effect relationships will remain undetermined.

D. Timing of Field Operations

Based on the preliminary analyses and determination of station placement
in impact and reference areas, field operations (physico-chemical,
biological) should be carried out at quarterly intervals during the
second year and during spring and summer of the third year. Spring
(recruitment) sampling is particularly important since juvenile
organisms are usually more susceptible to toxic agents than adults.

Wed Feb 09 14:11:37 2000                                    Means Livingston Proposal

—

E. Long-core Analyses

Preliminary sediment samples should be taken for the long-core work.
This sampling should be carried out in conjunction with the sediment
trap work and establishment of the sampling sites. Preliminary Beryllium
analyses should be carried out using the bottom trap data and the
determination of sedimentation rates so that appropriate long-core slice
intervals can be ascertained. This part of the analysis is part of the
preliminary operations described above. It is essential that the
Skidaway operation be coordinated with the preliminary field operations
in the establishment of the likely zones of impact and depositional
areas. By establishing a data base of the screening analyses of total
PAH in sediments and sediment trap samples, a preliminary model can be
determined concerning sediment input based on shear forces contributing
to the import/export conditions of the immediate receiving area. The
preliminary estimate of slice depths should be tested with several
long-core samples taken during the second year so that full-scale
long-core work can be carried out during the final year.

F. Bioassay Organisms and the Bioavailability Question

The use of Streblospio as a bioassay organism is problematic as this
species is well adapted to stress- (natural and anthropogenous), and has
been shown to be insensitive to various forms of toxic agents (Means,
unpublished data). The choice of more sensitive organisms for the
bioassay work would provide a better test of impact. The need for
bioassay organisms of different trophic levels and in both the
sedimentary and pelagic environment remains operative. Field caging
experiments with bivalves and fishes represent an important supplement
to the field screening effort. Adverse PAH effects on fish immune
systems has been well established in the literature and these simple
experiments would give information on chronic effects of sediment PAHs
that would supplement the less informative acute tests that are
currently planned for the project. The bivalve tests would test for
potential effects on filter feeders at the important sediment-water

Wed Feb 09 14:11:37 2000                                   Means Livingston Proposal

interface that is a known area of accumulation of PAHs associated with fine particulates. We suggest consultation with Dr. M. Salazar (west coast) for advice on how to continue with the field bioassay program.

The bioassay program as it is currently designed (i.e., without tissue analyses for PAHs and metals) will not answer questions concerning compound-specific effects. Therefore, it is necessary to carry out tissue analyses for metals and PAHs to determine the effective concentrations leading to adverse biological effects. The response of the organism by itself does not provide such information, and response data cannot be used for determination of cause-and-effect relationships that are central to the research questions. Only through the coordinated use of bioassay, caging, and tissue analysis of metals and PAHs can a determination be made concerning the overall impact of refinery effluent on the receiving system.

The Triad approach is a conceptual model that is adequate only if the various processes involved in transport, fate, bioavailability, and effects are determined in a coordinated manner. Without appropriate chemical analyses, the bioassay data and descriptive community determinations cannot be definitive in the determination of how pollutant loading from the refinery is affecting the receiving area over and above what is already in the impact area from other sources. The use of community indices for this effort will not compensate for the lack of such chemical information.

G. Proposed Modeling Efforts

The far-field modeling will give minimal support to a project based on localized effects. This modeling should be abandoned. Near-field modeling should be conjoined with the field screening analysis as described above with the addition of dye studies that would be useful in the definition of plume migration in the water column after discharge. The dye study is an economical addition that would supplement the sediment trap data in the establishment of the zone of influence of the effluent and the determination of the position and number of field sampling sites and the long-core effort. The overall dye studies would supplement the initial modeling efforts and are critical for the fate and transport determinations. The river-estuarine environment at the outfall represents a heterotrophic system dominated by suspended solids

Printed by: Koralleen Stavish                    Page:  6

Ved Feb 09 14:11:37 2000                                          Means Livingston Proposal

s the transport mechanism involved in the fate of discharged PAHs.
River flow, tidal action, wind and physiography of the receiving system
combine to complicate the fate and transport processes. Based on a
preliminary field trip to the area, the mudflat immediately offshore of
he Motiva outfall is a prime area of concern. No stations have been
placed in this region in the preliminary studies which is further
indication that the current modeling effort and assumptions underlying
his effort are flawed. Without appropriate site selection for the field
analyses, the study will not achieve the stated goals as outlined by
ecent court order.

I. Additional Chemical Analyses

The proposed dye study should be carried out as part of the initial
screening effort. In addition, several large volume water quality
samples should be taken and analyzed for rapid determination of the
relative importance of dissolved, colloidal, and particulate states of
he PAH compounds.  Ultrafiltation should be carried out in conjunction
with total PAH analyses for such determinations. It is anticipated that
he particulate phase of transport of PAHs will predominate in the
receiving area. However, the above analyses would give important
information regarding determination of the primary zone of pollution
from the refinery discharges. This information, in conjunction with the
results of the other chemical analyses (sediment traps, sediment PAH
analyses, biotic concentration of PAHs), would allow definitive answers
o the transport, fate and effects questions that are central to this
study. By running total PAH for the preliminary screening efforts, this
part of the project could be carried out at minimal cost. The transport
and fate questions can be resolved with a minimal sampling effort and
all of the associated parts of the study could thus be based on a
realistic assessment of the potential impact area with realistic
placement and adequate numbers of the sampling stations.

I. Final Analyses of Project Data

The suggestions to review the publications of R. Schwartz is related to
the still-undefined analytical process whereby the various parts of this
project are to be brought together to answer the research questions.
There is no explanation of how the information gained by the study will
address remediation plans for future exceedances. As it currently

Printed by: Koralleen Stavish                      Page:  7

Means Livingston Proposal

stands, there is no effective response plan for such exceedances and this part of the court-ordered research plan is not even discussed in the current proposals. It is highly likely that, without the needed information based on a realistic sampling strategy, serious and ongoing impacts will go unnoticed into the indefinite future.

IV. Conclusions

The above proposed plan addresses the various concerns and criticisms outlined in our written reviews and previous testimony. Definition of the chemical aspects of the effluent, the appropriate determination of fate and transport questions relating to establishment of appropriate sampling plans in space and time, the use of caged animals for chronic as well as the acute bioassay approaches, the coordinated chemical analyses of the various aspects of the study related to bioavailability, fate and effects, the predetermined coordination of these efforts to define the long-core effort, and the overall determination of the statistical analysis of data collected during the project should all be addressed if this project is to meet the objectives outlined in the court order. The above-suggested plan of action has already been field-tested in similar (previous) studies by both authors. It is our opinion that unless the current proposed plans of studies are modified to address the issues contained in this suggested plan, there is very high likelihood that there will be no conclusive end product regarding the question of impact of the refinery discharges (past, present and future) on the Delaware River-estuary.

u Feb 03 08:51:50 2000                                    Re: Settlement

hexane.  Activated fine granular copper was added to reduce sulfur
terferences.  The extracted membranes were then forwarded for
gestion for inorganic analysis.  Note that concentrations of
nstituents in the colloidal phase were reported on a volumetric basis
g/ml) rather than a gravimetric basis (pg/g).

    Dissolved Phase:  An additional laboratory surrogate standard (120 ng
ch of DBOFBP, 1,3-dimethyl-2-nitrobenzene, and triphenylphosphate in
ethanol) was added to the vials containing SPE disks to monitor
poratory performance.  The disks were extracted three times with 20
L, 10 mL, and 10 mL of added DCM and using a sonicating bath for 1
inute per extraction.  The extracts were combined in a separatory
nnel and the DCM separated from methanol (storage solvent) and
sidual water by adding excess water (>25 mL) and decanting the DCM
yer over clean sodium sulfate.  Concentration steps were similar to
lloidal samples. Concentrations of constituents were reported on a
lumetric basis (pg/ml).

strumental Analysis:
    A Hewlett-Packard 5890 Gas Chromatograph equipped with a 30 m by 25 mm
), 0 25μ film DB-5 capillary column (J&W Scientific, Inc.) was directly
to     d to a Hewlett-Packard 5970B Mass Selective Detector.  The GC
as temperature programmed from 50° to 300°C using a series of linear
mperature ramps to optimally separate the isomers of alkylated PAH's,
ile keeping analysis time to 60 min.  The Mass Spectrometer was
erated in Selected Ion Mode, using a dwell time of 30 ns/mass.  The
ass spectrometer was tuned daily prior to calibration using
rfluorotributylamine (PFTBA) and normalization to EPA criteria.

rent and alkylated PAH were analyzed using authentic standards using
e methods of Means (1998).

ie quantitative standard, containing all target compounds and
uterated surrogate standards was used for daily calibration of the
strument prior to and following samples.  An internal standard,
fluorobiphenyl, was added to each sample aliquot just prior to
alysis to monitor performance of the instrument, but is not used in
e calculations of analyte final concentrations.

reagent blank, duplicate, and spiked sample were prepared for every

inted by: Koralleen Stavish                    Page:  9

hu Feb 03 08:51:50 2000

Re: Settlement

t of samples (up to 10 samples per set) where sufficient sample was
vailable or using clean filters or purified water for blanks and
pikes. The spike standard was a dilution of the quantitation standard,
ontaining all analytes, in methanol. Samples were spiked to a
oncentration averaging 0.5 ng/µl in the final extract volume.

ecovery was calculated for the surrogate and spiked standards using the
quation: Recovery = 100*(Amt. detected/Amt. expected) using ng values
lculated using the External Standard method. The mean response of
agent blanks for an analysis set (i.e., one phase from one cruise set)
as subtracted from data for each analyte, where necessary, prior to
rrection for surrogate recovery and dilution factors. The sample
tection limit (DL) was estimated for each target analyte using the
intercept (in ng) from a 5-point standard curve and correcting for
mple size and extract concentration. The average DL for organics in
e three phases was 0.16 and 5.3 ng/g (0.27 ng/g/L), respectively, for
diments and the particulate phase, and 1.4 and 10 pg/ml, respectively,
e dissolved and colloidal phases.

ferences:

acLeod, W.D., and Brown, D.W.  1985.  Standard Analytical Procedures of
e NOAA National Analytical Facility 1985-1986.  NOAA Technical
emorandum NMFS F/NWC-92.

cMillin, D.J. and Means, J.C. Spatial and temporal trands of pesticide
sidues in water and particulates in the Mississippi River plume and
e Northwestern Gulf of Mexico.  J. Chromatog.A 754: 169-185.

eans, J.C. 1998. Compound-specific Gas Chromatographic/Mass
ectrometric analysis of alkylated parent polycyclic aromatic
drocarbons in water, sediments and aquatic organisms.  J. Assoc. Off.
alyt. Chem. 81: 657-672.

ited States Environmental Protection Agency (USEPA).  1994. USEPA
ntract Laboratory Program National Functional Guidelines for Organic
ta Review.  Office of Solid Waste and Emergency Response, USEPA Publc.
40.1-05 EPA540/R-94/012, PB94-963501.

ιu Feb 03 08:51:50 2000                                              Re: Settlement

ιte.   .ed, 02 Feb 2000 17:09:44 -0500
om: "R.J.Livingston" <skipliv@earthlink.net>
:ply-To: skipliv@earthlink.net
ιbject: Re: Settlement
ι: lh43@umail.umd.edu
essage-ID: <3898AB25.6BCC@earthlink.net>


  Lenwood:

tached (and included in this e-mail) is the revised version of the
ttlement agreement. I am also attaching a file version (Word 6.1) of
e document.

ιu did an excellent job and I have just beefed up some areas without
anging the intent or the meaning of the document you sent to me. Also,
itch Bernard changed some of the words to allow the agreement to be
nsistent as a legal document. I have included the protocols from Dr.
eans for the tissue analyses and the three phase chemistry analyses. We
;o folded the unresolved issues into the body of the text.

ιε.    t me know what you think.

:st Regards,

ip

:TTLEMENT AGREEMENT

 Sampling Site Selection.  During the spring/summer of 2000,
proximately 30 to 50 sites will be sampled in the midfield area off
e refinery for total PAHs, grain size, and TOC.  In addition to a
/iew of the PAH analyses of the preliminary ten-station analysis
nducted during the summer of 1999, these data will be used in the site
ection process for final sample sites in the area.  Site selection
ll be conducted after the dye study is completed (see paragraph c
low), and will be evaluated in conjunction with the results of the
emical characterization of the refinery's effluent.  Plaintiffs'
pert, Dr. Livingston, will be involved in the selection of appropriate
es for triad sampling.


nted by: Koralleen Stavish                      Page:  1

iu Feb 03 08:51:50 2000                                    Re: Settlement

Sampling Duration.  Defendant will conduct triad sampling during the
ring and summer of 2001 and 2002, after the site selection process has
en completed.

Fate and Transport.  Defendant will conduct the following studies:
) a dye study to verify the near-field plume model; (2) a
dimentation study (via sediment traps) in the near-field and mid-field
ceiving area, with total PAH measurement of sediment collected from
e traps; and (3) an estimate of dissolved, particulate, and colloidal
iree-phase) PAHs on selected water samples from the near- and
id-field areas.  Protocols for the sediment trap analyses (number (2)
ove) will be developed by the various investigators involved in the
idy, in consultation with Dr. Livingston.  With regard to study number
) above, ultrafiltration will be carried out in conjunction with total
\H analyses.  Dr. Livingston will provide a protocol for the
ree-phase analysis.

Bioavailability.  Defendant will conduct caged bivalve studies at
lected sample sites in the study area, with concurrent PAH, metals,
d PCB analyses.  These studies will be conducted after the field site
lection process has been completed, and station arrays for the bivalve
idies will be based on the results of the various studies associated
ith site selection.

Replicate Chemistry Measurements.  All five replicates will be
alyzed for PAHs and metals at appropriate sites.  Other contaminants,
ch as pesticides and PCBs, will be analyzed as appropriate based on
ta collected during 1999.

Reference sites.  Defendant will conduct additional sampling to
termine if a reference site in tidal creeks above the refinery is
itable.  At present, sampling stations DR-10 and DR-6 appear to be
tentially promising sites based on selected chemical analysis from
99.  Habitat stratification will be carried out in these areas to
just the final placement of the reference area, after which reference
ition locations will be determined for a comparison with the potential
ipact areas.  Reference stations should approximate the range of
bitats encompassed by the impact site stations. Plaintiffs' expert,
:. Livingston, will be involved in the selection of appropriate
ference sites.

Sediment Toxicity Tests.  Defendant will confer with Dr. Mike
ilazar with regard to design and implementation of the field bioassay
ogram.  Defendant will consider replacement of the sediment toxicity
it species Streblospio with another species, as well as the need for

inted by: Koralleen Stavish                    Page: 2

hu Feb 03 08:51:50 2000                                    Re: Settlement

oa....y organisms of different trophic levels and in both the
:dimentary and pelagic environments. In addition to Dr. Salazar, Dr.
ivingston will be involved in these consultations before study
:cisions are made.

   Tissue Analyses. Defendant will carry out tissue analyses for
etals and PAHs to determine the effective concentrations leading to
lverse biological effects in its sediment toxicity test species. Dr.
ivingston will provide Defendant with appropriate protocols. If a
1estion arises concerning the feasibility of such analyses, the
irties' experts will confer and attempt to resolve that issue. Absent
ich resolution, the parties may seek resolution from the Court.
   Consistency of Metals Analysis. Concurrent with PAH analysis,
efendant will analyze effluent samples for a suite of metals. All
:sociated chemical characterizations, including field sediment
onitoring, organisms taken in experimental (bioassay) work, and
ng-core determinations, will cover the same list of target compounds.
   Long Cores. The long-coring work proposed by Skidaway will be
>nducted after the final sample selection site process has been
>mpleted. Metals will be analyzed on core samples concurrently with PAH
1alysis at appropriate sites. Dr. Livingston will be involved in the
te selection for long cores. The Skidaway operation will be
>c    .ted with the preliminary field operations in the establishment
: the likely zones of impact and depositional areas.
   Written Program Management Plan. Defendant will develop a written
'ogram management plan to demonstrate how all components of the studies
ill be conducted, scheduled, and integrated to answer the original
search questions. The written plan will include proposed statistical
1alyses and analytical tools to be used in the integration of the
irious project components. At a minimum, the program management plan
ill include definition of the chemical aspects of the effluent; the
ipropriate determination of fate and transport questions relating to
:tablishment of appropriate sampling plans in space and time; the use
' caged animals for chronic as well as acute bioassay approaches; the
>ordinated chemical analyses of the various aspects of the study
lated to bioavailability and fate and effects; the predetermined
>ordination of these efforts to define the long-core effort; and the
'erall determination of the statistical analysis of data collected
iring the project.

ETHOD OF TISSUE ANALYSIS FOR SEMI-VOLATILE AROMATIC HYDROCARBONS

inted by: Koralleen Stavish                    Page: 3

Re: Settlement

Samples are necropsied and immediately stored at -200C when received. amples for semi-volatile analysis are prepared for extraction within 14 iys after receipt. The extraction method employed for semi-volatiles a matrix solid phase dispersion (MSPD) method which combines the ssue extraction and clean-up steps into one procedure thus minimizing sses of semi-volatiles due to volatilization, adsorption and transfers Barker et. al, 1993). This method has been used extensively by our lab ith excellent results for a series of hydrocarbons, pesticides and erbicides. We have recently adapted this method to encompass the nalysis of a number of petrogenic alkylated PAHs, which increases the formation developed in each data set.

One-half to one gram of frozen tissue, excluding bone or shell, is eighed into a clean, solvent rinsed glass mortar. Two grams of e-cleaned C-18 reverse phase silica support is added and the tissue acerated thoroughly into the C-18. A surrogate standard, the PA-deuterated internal standard, is added at this time. After mixing ell, the homogenized tissue/C-18 mixture is transferred, using a ainless steel spatula, to a 10 ml plastic syringe body containing two 5·cm Whatman filter papers to retain the mixture. After transfer of e mixture two Whatman filter papers are placed on top of the sample d the mixture is compressed into a continuous bed in the syringe irrel using the syringe plunger. Approximately 8 ml of (1:1, v/v) cetonitrile/dichloromethane is allowed to soak into the sample for 30 in. A small sample vial is used to collect the effluent from the olumn. The remaining liquid is forced through the sample under positive essure and then the contents of the vial are placed under a stream of trogen to reduce the final volume to 200 ul. The final GC/MS analyses e carried out using methods developed and applied in our laboratories several investigations (Means, 1998).

strumental Analysis:

The GC is a Hewlett-Packard (HP) 5890 with the capillary column rectly interfaced to a HP 5970B Mass Selective Detector (MSD). The GC temperature programmed from 500 to 3000C using a series of linear mperature ramps to optimally separate the analytes. The mass ectrometer is tuned prior to calibration analyses and after 16 hours sing Perfluorotributylamine (PFTBA), and manually fined-tuned to

hu Feb 03 08:51:50 2000                                        Re: Settlement

:hi..,.. 50-75% abundance of ion 219 and at least 3% abundance of ion
)2.

-    The standards utilized in our analyses include alkylated PAH that have
:en extensively studied in our laboratory in relation to petroleum
illution in the environment.  The calibration standard, containing all
kylated PAH, parent PAH compounds (Ultra Scientific #106), and
:uterated surrogate standards (Ultra Scientific #108) is prepared at
5 ppm by dilution with 50:50 DCM/hexane and is analyzed with
fluorobiphenyl as an internal standard.

    The analysis includes screening ions for estimating totals of C3 and
4-naphthalenes (m/z 184 and 169), C2-dibenzothiophenes (m/z 212 and
.1), and C3-phenanthrenes (m/z 200 and 205) in the retention window or
indows necessary as determined by the scanning-mode analysis of a
ference South Louisiana Crude Oil (U.S. EPA-API).  Reference oils are
alyzed periodically, especially after changing columns or any column
inditions, to verify that the retention time windows were correct.

    Additional information concerning the  methods used are detailed in the
ferences supplied.  All raw data related to each sample and all
ic       ssurance samples are provided in paper format and, to the
gree possible, in electronic format (primarily Excel spreadsheets).
ie analytical data from the analyses of fish, invertebrate and mussel
sues along with data on blanks, matrix spikes, duplicates, standards,
ning files, surrogate recoveries and calibrations along with
ain-of-custody forms, sample logs and sample notes are reported.

1ality Assurance/ Quality Control:

    All relevant quality control and quality assurance data as required by
e US Environmental Protection Agency (USEPA, 1994) are provided to the
gree those requirements relate to the methods applied in this work.
iis data will include: reagent (method) blanks, duplicates and
atrix-spiked samples are processed with each group of samples to
initor laboratory technique and extraction efficiency.  Matrix spikes
insist of duplicate samples to which ~30ng/g for tissues of the
antitative calibration standard, containing the deuterated surrogates
xture, is added.  Matrix spike recoveries are calculated for each
alyte and surrogate recoveries are calculated for each sample.

inted by: Koralleen Stavish                    Page: 5

hu Feb 03 08:51:50 2000                                    Re: Settlement

urrogate internal standard retention times and areas are reported with
ach sample. The mass spectrometer is tuned daily with PFTBA prior to
ach run of samples, and calibration standards are run with each set of
amples at the beginning (initial) and end (continuing) of each analysis
eries.

    An instrument log of the analyses is maintained for all samples
nalyzed. Chain-of-custody forms are maintained for all samples. A
ritten record of problems encountered in the analyses is also
aintained.

EFERENCES

arker, S.A., Long, A.R. And Hines, M.E., 1993. The Disruption And
actionation Of Biological Materials By Matrix Solid Phase Dispersion.
 Chromatog., 629:23-34.

eans, J.C. 1998. Compound-specific Gas Chromatographic/Mass
pectrometric analysis of alkylated parent polycyclic aromatic
ydrocarbons in water, sediments and aquatic organisms. J. Assoc. Off.
nalyt. Chem. 81: 657-672.

nited States Environmental Protection Agency (USEPA). 1994. USEPA
ontract Laboratory Program National Functional Guidelines for Organic
ata Review. Office of Solid Waste and Emergency Response, USEPA Publc.
40.1-05 EPA540/R-94/012, PB94-963501.

ree-Phase Sampling and Analysis Methods

mple Collection and Preparation on Ship:

ater samples (20 L) were collected in 25L Niskin bottles at discrete
pths and transferred to 20L cubitainers at the surface. Samples were
rigerated until transferred to a stainless steel nitrogen-pressurized
ssel to facilitate filtration through a 149 mm, 0.4 μm Nucleopore
mbrane filter with glass fiber (Whatman GFC) pre-filter. This
ncentrated the particulate phase (WP) on the membrane filters, which
re stored in small glass jars held at 5°C until analyzed. The entire
rate was then ultrafiltered using an Amicon Model DC10 equipped with
piral-wound cartridge (MW cutoff 3000 daltons) to separate dissolved

nted by: Koralleen Stavish                    Page: 6

Re: Settlement

...d ᴇⁿⁱched colloidal phases. The colloidal fraction was concentrated
<240 ml and stored in amber glass jars at 5°C. In the laboratory,
is enriched colloidal fraction was then transferred to a pressure
ssel and the colloidal phase collected on an Amicon UM05 ultrafilter
embrane. The colloids collected on the membrane may be extracted
rectly from the membrane after addition of the EPA surrogate
uterated standards. An alternative method of collection of this
ıction is to place the entire filtrate into a pre-cleaned stainless
ıel nitrogen-pressurized vessel to facilitate ultrafiltration of the
tire 20L filtrate through an Amicon UM05 ultrafilter membrane. The
rafilter membranes were stored in pre-cleaned specimen jars at 5 C
til analyzed. Prior to SPE extraction of the dissolved phase
ltrafiltrate) 20 μl of the deuterated surrogate standard at 40 ppm in
ethanol was added to 4L of the ultrafiltrate (dissolved phase)
llected from the output line of the DC-10 ultrafiltration apparatus or
ᵉ ultrafilter membrane filtration apparatus. A two liters aliquot was
mped through an SPE disk (Empore™, C18) housed in a Teflon filter
lder attached in line with a MasterFlex pump set for a flow rate of
5 ml/min. The SPE disk was removed from the filter holder and stored
a small glass vial covered with 10 ml of methanol at -20°C until
alyzed. A 10 ml aliquot of ultrafiltrate is collected in a pre-cleaned
ıs           and acidified to pH ~2 with nitric acid. This sample is
rigerated until analyzed for trace metals.

dded surficial sediments were collected during cruises along crossing
nsects adjacent to the refinery area. Sediments (0-10 cm) were
lected using an Eckman dredge and placed in pre-cleaned specimen
s, sealed with tape in the field and packed on ice for transport to
 laboratory. Once in the laboratory, the samples were stored at
ı°C.

:GANICS

tailed descriptions of laboratory extraction and instrumental analysis
 organic pollutants can be found in McMillin and Means (1996), for
bicides, pesticides and PCBs, and Means (1998) for PAH.

ınple Extraction (on shore laboratory):
liments: The extraction method was a modification of that described
MacLeod et al. (1985). Excess water was decanted from sample jars
ɔr to thorough mixing of the sediment sample, and 35 g was weighed
ɔ an amber bottle with a Teflon-lined cap. The sediment was covered

Re: Settlement

ith 125 ml of dichloromethane (DCM) and 65 g sodium sulfate
corporated until the sediment mixture was free-flowing.  A suite of
x deuterated PAH (800 ng each in hexane) was added with the first
lvent aliquot as a surrogate standard to monitor extraction
ficiency.  The jars were sealed and placed on a roller for 16, 6, and
ı hours, for a total of three extractions using the modified rock
mbler and rolling times specified by MacLeod et al. (1985).  The DCM
ɔm each jar was decanted into an amber jar and refrigerated until 3
tracts were collected.  The decanted DCM was filtered through
hydrous sodium sulfate, and concentrated by rotoevaporation and a
trogen stream to a final volume of 200 μl, with solvent exchange to
xane.  Activated fine granular copper was added to reduce sulfur
terferences.

    Particulate Phase:  The membrane and glass fiber pre-filters were
aced together in tared Teflon digestion bombs.  The first extraction
lvent was 45 ml of 2:1 hexane:acetone.  A surrogate standard was added
20 ng in methanol of six deuterated PAH and dibromooctafluorobiphenyl)
the same time as the first extraction solvent, and the bombs placed
an ice-cooled sonicating bath for 6 min.  After decanting, two more
tractions were performed using 45 ml of hexane only.  The extracts
ɛre combined and acetone removed by adding >75 ml of purified water.
ıe top layer of hexane was removed by pipette and filtered through
ɛan anhydrous sodium sulfate.  Subsequent concentration steps were the
me as for sediment extracts, including the addition of copper.  In
der to obtain the particulate fraction weight, the Teflon bombs
ntaining the filter sets were dried at 60°C overnight in an oven
ɔdified to exchange the atmosphere with charcoal-filtered air.  The
ɛight of the filters and bombs was recorded and the samples sent to the
ɔrganics sample preparation laboratory for acid digestion.
ɔncentrations of constituents may be reported on a gravimetric basis
ɡ/g) or a volumetric basis (ng/g/L).

ılloidal Phase:  Sample membranes were extracted in a fashion similar
 the particulate filter membranes.  Surrogate standards were added
10 ng in methanol of six deuterated PAH and
ɔromooctafluorobiphenyl-DBOFBP) and extracted with solvents as with
ɛ particulate phase. The combined solvent extracts were filtered
·ough anhydrous sodium sulfate, and concentrated by rotoevaporation
d a nitrogen stream to a final volume of 200 μl, with solvent exchange

Re: Settlement

hexane. Activated fine granular copper was added to reduce sulfur
terferences. The extracted membranes were then forwarded for
gestion for inorganic analysis. Note that concentrations of
·nstituents in the colloidal phase were reported on a volumetric basis
g/ml) rather than a gravimetric basis (pg/g).

Dissolved Phase: An additional laboratory surrogate standard (120 ng
ch of DBOFBP, 1,3-dimethyl-2-nitrobenzene, and triphenylphosphate in
ethanol) was added to the vials containing SPE disks to monitor
ɔoratory performance. The disks were extracted three times with 20
L, 10 mL, and 10 mL of added DCM and using a sonicating bath for 1
inute per extraction. The extracts were combined in a separatory
nnel and the DCM separated from methanol (storage solvent) and
sidual water by adding excess water (>25 mL) and decanting the DCM
yer over clean sodium sulfate. Concentration steps were similar to
·lloidal samples. Concentrations of constituents were reported on a
ɔlumetric basis (pg/ml).

strumental Analysis:

A Hewlett-Packard 5890 Gas Chromatograph equipped with a 30 m by 25 mm
), 0·25µ film DB-5 capillary column (J&W Scientific, Inc.) was directly
te      d to a Hewlett-Packard 5970B Mass Selective Detector. The GC
ıs temperature programmed from 50° to 300°C using a series of linear
mperature ramps to optimally separate the isomers of alkylated PAH's,
ɦile keeping analysis time to 60 min. The Mass Spectrometer was
ɔerated in Selected Ion Mode, using a dwell time of 30 ns/mass. The
ass spectrometer was tuned daily prior to calibration using
·rfluorotributylamine (PFTBA) and normalization to EPA criteria.

ırent and alkylated PAH were analyzed using authentic standards using
e methods of Means (1998).

ıe quantitative standard, containing all target compounds and
·uterated surrogate standards was used for daily calibration of the
strument prior to and following samples. An internal standard,
fluorobiphenyl, was added to each sample aliquot just prior to
ɑalysis to monitor performance of the instrument, but is not used in
e calculations of analyte final concentrations.

reagent blank, duplicate, and spiked sample were prepared for every

hu Feb 03 08:51:50 2000                                                    Re: Settlement

:t of samples (up to 10 samples per set) where sufficient sample was
railable or using clean filters or purified water for blanks and
)ikes. The spike standard was a dilution of the quantitation standard,
ontaining all analytes, in methanol. Samples were spiked to a
oncentration averaging 0.5 ng/μl in the final extract volume.

ecovery was calculated for the surrogate and spiked standards using the
¡uation: Recovery = 100*(Amt. detected/Amt. expected) using ng values
ılculated using the External Standard method. The mean response of
agent blanks for an analysis set (i.e., one phase from one cruise set)
as subtracted from data for each analyte, where necessary, prior to
orrection for surrogate recovery and dilution factors. The sample
:tection limit (DL) was estimated for each target analyte using the
intercept (in ng) from a 5-point standard curve and correcting for
mple size and extract concentration. The average DL for organics in
e three phases was 0.16 and 5.3 ng/g (0.27 ng/g/L), respectively, for
diments and the particulate phase, and 1.4 and 10 pg/ml, respectively,
e dissolved and colloidal phases.

:ferences:

acLeod, W.D., and Brown, D.W. 1985. Standard Analytical Procedures of
e NOAA National Analytical Facility 1985-1986. NOAA Technical
emorandum NMFS F/NWC-92.

cMillin, D.J. and Means, J.C. Spatial and temporal trands of pesticide
iidues in water and particulates in the Mississippi River plume and
e Northwestern Gulf of Mexico. J. Chromatog.A 754: 169-185.

eans, J.C. 1998. Compound-specific Gas Chromatographic/Mass
ectrometric analysis of alkylated parent polycyclic aromatic
drocarbons in water, sediments and aquatic organisms. J. Assoc. Off.
ialyt. Chem. 81: 657-672.

ited States Environmental Protection Agency (USEPA). 1994. USEPA
ntract Laboratory Program National Functional Guidelines for Organic
ta Review. Office of Solid Waste and Emergency Response, USEPA Publc.
40.1-05 EPA540/R-94/012, PB94-963501.