IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY, | ) ) ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | 88-263-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| TEXACO REFINING AND MARKETING, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
MOTION TO ENFORCE JUDGMENT
AND ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

Mitchell S. Bernard
Nancy S. Marks
Amelia E. Toledo
NATURAL RESOURCES DEFENSE COUNCIL, INC.
40 West 20th Street
New York, New York 10011
(212) 727-2700

C. Scott Reese (2036)
COOCH & TAYLOR
824 Market Street
Suite 1000
Wilmington, Delaware 19899

Attorneys for Plaintiffs

October 12, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     iii

INTRODUCTION          . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

ARGUMENT              . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

I.     TEXACO REMAINS LIABLE FOR VIOLATION
       OF THE 1998 JUDGMENT WITH RESPECT
       TO DEFICIENCIES IN ALL ASPECTS OF
       THE STUDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

       A.     Texaco Remains Responsible for
              Determining and Mitigating Damage
              from Its Past Noncomplying Discharges  . . . .     3

       B.     Assessment of the Effects of Past
              Noncomplying Discharges Requires
              Proper Performance of All Elements
              of the Study  . . . . . . . . . . . . . . . . . . . . . . . . .     4

II.    TEXACO FAILS TO REBUT PLAINTIFFS'
       DEMONSTRATION THAT IT MISINTERPRETED
       DATA TO REACH FAULTY CONCLUSIONS . . . . . .     6

       A.     The Study's Conclusions Are of
              Consequence In Texaco's Performance
              of the Study  . . . . . . . . . . . . . . . . . . . . . . . . .     6

       B.     Texaco's Conclusions Are Unsupported
              By the Data It Collected  . . . . . . . . . . . . . . . .     8

              1.     Plaintiffs did not call for a "PAH
                     loadings study" instead of a "PAH
                     fingerprinting study"  . . . . . . . . . . . . . .     8

              2.     Texaco misrepresented the refinery
                     fingerprint in drawing conclusions
                     about refinery impacts  . . . . . . . . . . . . .     10

              3.     The long core data provide no
                     scientific basis for the conclusions
                     Texaco drew from those data . . . . . . . .     12

i

III.    TEXACO IMPROPERLY OMITTED THE
BIOAVAILABILITY COMPONENT OF THE
STUDY AND DREW UNSUPPORTED
CONCLUSIONS FROM THE BIVALVE WORK
IT SUBSTITUTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

IV.    TEXACO DOES NOT SATISFY THE LEGAL
STANDARD UNDER FED. R. CIV. P. 60(B)(5)
FOR RELIEF FROM JUDGMENT . . . . . . . . . . . . . . . .    17

CONCLUSION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

<u>TABLE OF AUTHORITIES</u>

CASES

*Bldg. & Constr. Trades Council of Philadelphia & Vicinity v. NLRB*,
        64 F.3d 880 (3d Cir. 1995)        . . . . . . . . . . . . . . . . . . . . . .        17-18

*GTE Sylvania, Inc. v. Consumers Union of the United States*,
        445 U.S. 375 (1980)        . . . . . . . . . . . . . . . . . . . . . .        3

*Natural Res. Def. Council, Inc. v. Southwest Marine, Inc.*
        236 F.3d 985 (9th Cir. 2000)        . . . . . . . . . . . . . . . . . . . . . .        4

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
        20 F. Supp. 2d 700 (D. Del. 1998) . . . . . . . . . . . . . . . . . . . . .        3, 5, 7-8,
                                                                                            9, 14

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
        800 F. Supp. 1, 28 (D. Del. 1992)        . . . . . . . . . . . . . . . . . . . . . .        7

*Rufo v. Inmates of Suffolk County Jail*,
        502 U.S. 367 (1992)        . . . . . . . . . . . . . . . . . . . . . .        18

*United States v. Witco Corp.*,
        76 F. Supp. 2d 519 (D. Del. 1999) . . . . . . . . . . . . . . . . . . . . .        18

*U.S. Pub. Interest Res. Group v. Atl. Salmon of Me.*,
        339 F.3d 23 (1st Cir. 2003)        . . . . . . . . . . . . . . . . . . . . . .        3, 4

*Weinberger v. Romero-Barcelo*,
        456 U.S. 305 (1982)        . . . . . . . . . . . . . . . . . . . . . .        4

RULES

Fed. R. Civ. P. 60(b)        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        3, 18

Fed. R. Civ. P. 60(b)(5)        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        17

## INTRODUCTION

Plaintiffs Natural Resources Defense Council, Inc. and Delaware Audubon Society ("plaintiffs") respectfully submit this Reply Brief and accompanying declarations in support of their motion to enforce this Court's judgment of September 1, 1998 (the "1998 Judgment") and Stipulated Order of February 23, 2000 ("Stipulated Order"). This brief also serves as an opposition to the related motion for relief from judgment filed by defendant Texaco Refining and Marketing, Inc. ("Texaco").

Texaco's Answering Brief ("Texaco Brief") fails to refute plaintiffs' primary criticism of Texaco's study: The data collected for the study do not support the exculpatory conclusions Texaco purports to extract from those data. By contrast, a straightforward analysis of the data reveals that Texaco's past noncomplying discharges from its Delaware City oil refinery (the "refinery") are linked to ongoing ecological impairment of the Delaware River. Texaco's faulty data *analysis*, unaddressed in its response, is a discrete concern from its flawed data *collection*, and separately constitutes a fundamental violation of the 1998 Judgment and Stipulated Order.

Texaco improperly conflates plaintiffs' concerns about PAH loading information with distinct concerns about fingerprinting. Both parties (and the Court) understood that determining PAH loading rates from the refinery was central to the study. The parties never contemplated a comprehensive "loading study," and plaintiffs do not complain about the absence of such a study. Texaco's neglect of loading data, as well as its misuse of fingerprint information,

1

led it to conclude – falsely – that there was no evidence of continuing harm to the River from the refinery's past excess discharges.

Texaco also cannot show that its collection of data satisfies the Court's directives. Texaco's arguments on this point misrepresent plaintiffs' claims and are otherwise misleading.

First, Texaco incorrectly argues that the long cores are the only element of the study needed for an assessment of harm from past discharges. But as contemplated by the Court, Dr. Means, and even Texaco's consultants, the analysis of long cores cannot occur in isolation from the rest of the study. Thus, while plaintiffs properly seek relief only with respect to continuing harm from Texaco's *past* noncomplying discharges, this relief implicates all elements of the study.

Second, with regard to those other study elements, Texaco failed most egregiously to perform the crucial task of assessing the bioavailability of refinery PAHs. The work it substituted for a bioavailability study did not fulfill the purposes of such a study. Texaco inaccurately portrays the nature and extent of Dr. Livingston's participation and acquiescence in the performance of work purporting to measure bioavailability.

## ARGUMENT

I.    TEXACO REMAINS LIABLE FOR VIOLATION OF THE 1998 JUDGMENT WITH RESPECT TO DEFICIENCIES IN ALL ASPECTS OF THE STUDY.

While plaintiffs seek to hold Texaco accountable only for continuing harm from its past noncomplying discharges, all aspects of the Court-ordered study are implicated in assessing that harm.

A.    Texaco Remains Responsible for Determining and Mitigating
      <u>Damage from Its Past Noncomplying Discharges.</u>

Plaintiffs recognize that Texaco no longer owns or operates the refinery,

so Texaco will not be using the study to develop a monitoring program for use in

the event of future noncomplying discharges.  Texaco must complete the study

as ordered, however, because it is necessary to assess and mitigate any

persistent harm resulting from its past noncomplying discharges.  *See Natural*

*Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 20 F. Supp. 2d 700, 715 (D.

Del. 1998) ("*NRDC v. Texaco II").*[1]

Texaco appears to concede that it remains legally obligated to complete

the studies ordered by the Court, though it highlights changed circumstances.

Texaco Brief at 2.  Notwithstanding those changed circumstances, the Court

retains power under the Clean Water Act to remedy Texaco's harm to the River.

*See U.S. Pub. Interest Research Group v. Atl. Salmon of Me.*, 339 F.3d 23,

31-34 (1st Cir. 2003) ("*Atlantic Salmon*").

In *Atlantic Salmon*, citizen groups sued coastal salmon farms for illegal

pollutant discharges without a Clean Water Act permit.  After the district court

issued an injunction, defendants received a permit covering all their facilities.

Some of the terms of the injunction required more of the companies than the

terms of the permit.

---

[1] As a legal matter, of course, Texaco remains bound to fulfill all aspects of the injunction unless
relieved under Fed. R. Civ. P. 60(b).  *See GTE Sylvania, Inc. v. Consumers Union of the United
States, Inc.*, 445 U.S. 375, 386 (1980) ("persons subject to an injunctive order issued by a court
with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have
proper grounds to object to the order").  As a practical and public policy matter, however, plaintiffs
seek further relief only to the extent it can, going forward, meaningfully implement the goals of the
Clean Water Act.

Finding that these injunctive terms (requiring, for example, that certain salmon pens remain fallow for several years to allow the site to recover) had a remedial purpose, *id.* at 32, the court of appeals upheld these stricter requirements on the ground that the district court had equitable power to remedy harm caused by past violations. This was true, the court ruled, even though, as in the case at bar, the statutory basis for the original claims had been eliminated by changed circumstances. *Id.* at 31, 33 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 318 (1982)). *See also NRDC v. Southwest Marine, Inc.*, 236 F.3d 985, 999-1001 (9th Cir. 2000) (holding in a Clean Water Act citizen suit that a district court had equitable authority to remedy a past wrong, beyond its statutory authority to enforce compliance with terms of a discharge permit). This Court retains the power to order Texaco to remedy harm from its past illegal discharges. This power supplements the Court's inherent authority, and, indeed, its duty, to enforce its prior judgments. *See* plaintiffs' Opening Brief at 13-15.

B.     Assessment of the Effects of Past Noncomplying Discharges
       Requires Proper Performance of All Elements of the Study.

Texaco identifies the long core work as the sole study component necessary to determine the continuing effects of Texaco's past noncomplying discharges. Texaco Brief at 32. But, as Texaco well knows, data from long cores is meaningless in isolation from related study elements, including refinery fingerprint, pollutant fate and transport, and bioavailability. The long core study was never intended as a stand-alone exercise. Its findings depend on the proper performance of all other aspects of the comprehensive study ordered by the Court.

At the 1998 trial, Dr. Means testified that all components of the study were required to assess impacts from past noncomplying discharges:

> Q.    Now, would any of the work that you are proposing in terms of assessing prior noncompliant discharges overlap with either in terms of time or actual effort the work you're proposing in the part of the program that addresses future noncompliant discharges?
>
> A.    Yes.  All of the five studies we've been talking about in terms of establishing baseline impacts and the ability to discriminate between other events that might occur in the future would create part of the – the baseline necessary to interpret the information on past impacts.

Tr. of Apr. 13, 1998 Mot. Hr'g, D.I. 248 at 109:20-110:5.  Judge Longobardi acknowledged Dr. Means's discussion of "the overlap between the proposed studies integral to monitoring the impact of future noncomplying discharges with the protocol to measure past impacts."  *NRDC v. Texaco II*, 20 F. Supp. 2d at 706.  Texaco's November 2000 Scope of Work similarly states that "data [from the long core sampling] will be integrated with the other components of this study in the final analysis of all the data."  App.IV-A129.  Figures 2a and 2b in the Scope of Work, which map out "Integration and Management of Study Components,"  show this interdependence of study elements.  App.IV-A191-192.  This makes sense, because data from the long cores cannot be tied to Texaco's discharges without information on the characteristics of that discharge and the likely path of the pollutants.  Nor can the persistent effects of past discharges be assessed without bioavailability and other data demonstrating the impacts of refinery pollutants on biota in the River.  *See* Livingston Reply Decl. ¶¶ 54-55.

5

Accordingly, Texaco cannot look solely to its performance of the long core study to demonstrate compliance with its obligation to assess effects of past excess discharges. While plaintiffs dispute the validity of Texaco's conclusions from the long core work, *see* Part II.B.3 below, Texaco has further failed in assessing effects of past noncomplying discharges on account of shortcomings in several other aspects of the study ordered by the Court, including faulty data interpretation and omission of bioavailability experiments. All of these factors bear on Texaco's current responsibility to remedy harm from past violations.

II.    TEXACO FAILS TO REBUT PLAINTIFFS' DEMONSTRATION THAT
       IT MISINTERPRETED DATA TO REACH FAULTY CONCLUSIONS.

A.    The Study's Conclusions Are of Consequence
      In Texaco's Performance of the Study.

Texaco contends that "the conclusions of the report are not material to Texaco's compliance with the Injunction." Texaco Brief at 13. To the contrary, it is hard to imagine what is *more* material to compliance with the Court's judgment. While Texaco argues that merely performing the study tasks is sufficient, this argument contravenes the purposes of the Order. The point of the study is not to amass data or to generate academic publications. It is to answer a specific scientific question that the Clean Water Act and this Court's prior decisions require Texaco to answer. As Dr. Livingston states, the idea that a scientist could carry out research tasks, and then draw conclusions at odds with the data generated from those tasks, violates the scientific method. Livingston Reply Decl. ¶ 71.

Resolving the question whether Texaco's past noncomplying discharges continue to harm the River serves at least two essential goals of the Clean Water Act. First, if the answer is yes, then the Court may require Texaco to mitigate the harm:

> If the impact of the [past] noncomplying discharge . . . is persistent in the environment then Texaco must take steps now to mitigate its effect. Only then will Texaco fully bear its responsibilities under the permit.

*NRDC v. Texaco II*, 20 F. Supp. 2d at 715. *See also* Part I.A. above (discussing Court's power to remedy past harm).

Second, this Court has consistently noted that ordering Texaco to provide the information on the impact of its noncomplying discharges by itself serves important public purposes under the Act. *See, e.g.*, *NRDC v. Texaco II*, 20 F. Supp. 2d at 714:

> By granting a NPDES permit, the citizens of Delaware have trusted Texaco to implement a self-monitoring program. As the Court previously explained, "the public interest would be vindicated by compliance with the permit and implementation of a monitoring program." [*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 800 F. Supp. 1, 28 (D. Del. 1992)] Texaco must carry out this responsibility with care to determine the impact of its noncomplying discharge on the River, the lifeblood of the region. By studying the environment using well-grounded scientific principles, Texaco will fulfill its obligation.

For many years, Texaco has resisted informing the public about the impacts of its pollution on the Delaware River. Texaco remains obligated to provide that information – and to provide it candidly – as part of having been

granted the privilege of discharging its wastes into public waterways.  This is

consonant with the purposes of the Act.  As the Court has stated previously:

> It has taken decades of pollution for the River to reach
> its current state.  We cannot be deterred from
> understanding the impact of unlawful discharge
> merely because the ultimate goal may not be
> achieved until some time into the next century.  We
> must look at these opportunities as a step by step
> approach, carefully and prudently finding our way to
> the ultimate goal of the [Clean Water Act].

*NRDC v. Texaco II*, 20 F. Supp. 2d at 714.  To date, Texaco has not furnished

the insights demanded by the Court.

### B.    Texaco's Conclusions Are Unsupported By the Data It Collected.

Texaco's study found toxic effects from PAHs downriver of the refinery.

But Texaco claims that the study data exonerate the refinery of responsibility for

these effects.  When Dr. Livingston performed an independent analysis of the

raw data collected by Texaco's consultants, he concluded the opposite:  that

specific PAHs associated with the refinery are major contributors to severe

biological impairments observed downriver.  *See* Livingston Decl. ¶¶ 18-19;

Livingston Reply Decl. ¶ 2.  In its answering papers, Texaco does not even

attempt to refute Dr. Livingston's conclusions, instead muddying the waters with

a series of confusing arguments that mischaracterize plaintiffs' claims.

### 1.    Plaintiffs did not call for a "PAH loadings study" instead of a "PAH fingerprinting study."

Texaco makes the baseless claim that Dr. Livingston would have Texaco

perform a "PAH loadings study" instead of a "PAH fingerprinting study."  Texaco

Brief at 16.[2]  Texaco expends many pages of its brief and expert declarations explaining why a mass balance analysis of loadings from all PAH sources is neither feasible nor required, but plaintiffs do not quarrel with that contention.  Dr. Livingston's actual objection is much more basic:  In analyzing the data, Texaco improperly emphasized concentrations of PAHs, rather than total amounts of PAHs discharged from the refinery.  Livingston Decl. ¶ 11; Livingston Reply Decl. ¶¶ 36-42.

As the Court itself acknowledged, biological harm is more a function of how many pounds of PAHs end up in the River (loadings) than how diluted those PAHs are (concentrations).  *NRDC v. Texaco II*, 20 F. Supp. 2d at 714-15.  According to Dr. Livingston, the gathering and interpretation of such loading data are key to completing the studies prescribed by Dr. Means and ordered by the Court.  Livingston Reply Decl. ¶¶ 36-37.  Texaco itself properly incorporated the measurement of refinery PAH loading rates into its November 2000 Scope of Work.  App.IV-A130.

Having failed to integrate loading data into its study conclusions, Texaco now protests that such a task would require an impossible "mass balance" analysis that takes into account all sources to the Delaware River system.  Texaco Brief at 17.  This is a false alarm; a determination of loading simply requires a calculation of how much of each PAH compound is discharged from the refinery.  Livingston Reply Decl. ¶ 41.  It does not require the determination of PAH inputs from all sources to the Delaware River.  *Id.* ¶ 38.

---

[2] Texaco here conflates Dr. Livingston's concerns about loading with his entirely separate criticism of Texaco's fingerprinting methodologies, discussed below.

Texaco's failure to consider PAH loading data fundamentally skews the study's conclusions. For example, the dilution of discharges from refinery outfall 001 lowers PAH concentrations without reducing PAH loadings. Livingston Reply Decl. ¶ 41. As Dr. Livingston explains, the processes governing PAH distribution in the River depend more on long-term loading trends than on concentrations of PAHs in the water. *Id.* ¶ 42. Thus, sediment PAH levels in downriver depositional areas are correlated with highly-loaded, but not necessarily highly-concentrated, PAHs at the refinery outfalls. *Id.* Ex. A. In diverting the focus of the study away from the loading and accumulation of PAHs in depositional areas, Texaco and its consultants ignored the primary mechanism bearing on harm to the River from refinery discharges. *Id.* ¶ 42.

2.  Texaco misrepresented the refinery fingerprint
    in drawing conclusions about refinery impacts.

As an initial matter, Texaco inexplicably contends that Dr. Livingston called for a loadings study *instead of* fingerprinting, Texaco Brief at 16, which plaintiffs agree would be contrary to the Court's commands. Recognizing the importance to the study of determining the refinery's chemical signature, plaintiffs concur that fingerprinting and loading are distinct from one another, and that chemical fingerprinting cannot be determined solely by reference to loadings. Livingston Reply Decl. ¶ 45. But there are two basic problems with Texaco's treatment of fingerprinting. First, Texaco used the wrong locations in the River to identify the refinery's fingerprint. Second, Texaco used its flawed fingerprint analysis to mask the obvious effects of the refinery's discharge. *Id.* ¶ 35.

Texaco erred in defining the refinery's chemical fingerprint by sampling near the discharge canal to establish the PAH signature for water concentrations. Because PAHs are transported downriver, where they accumulate in depositional areas, the fingerprint in the water does not accurately reflect what is present in the study area over time.   Livingston Reply Decl. ¶ 43.  Texaco further distorted the fingerprint by analyzing PAH compounds in generalized groups, rather than taking the simple and direct approach of measuring loadings of individual PAH compounds.  *Id.*

Dr. Livingston's independent analysis of raw data from the study reveals that Texaco misused its fingerprinting analysis to reach conclusions that are contradicted by the actual data.  *See* App.III; Livingston Decl. ¶¶ 18-19; Livingston Reply Decl. ¶¶ 45-53.  Texaco does not confront the substance of Dr. Livingston's analysis.  Livingston Reply Decl. ¶ 3.  That analysis revealed a strong association between individual refinery-loaded PAHs and PAHs deposited in downstream sediments.  Livingston Reply Decl. ¶ 46.  It also showed a temporal correlation between loading patterns from the refinery and PAHs in downstream sediments.  *Id.* ¶ 47.  These data contradict Dr. Uhler's conclusions that most PAHs in the estuary are attributable to background, rather than to the refinery.  *Id.*

Texaco's misuse of fingerprinting data, as with its failure to account for loadings, ignores the real-world behavior of PAHs in the environment.  PAHs at low levels are transported downriver to depositional areas, where they accumulate over time to attain the higher concentrations that are associated with

11

ecological disturbances.  *Id.* ¶¶ 48-50.  Only by purposefully obscuring the

patterns fairly revealed by the data they collected could Texaco and its

consultants paper over the refinery's contribution to PAH-related problems in the

River.  *See id.* ¶¶ 48-53.  Texaco has failed to refute this charge.

3.    The long core data provide no scientific basis for
the conclusions Texaco drew from those data.

Texaco devotes pages of its brief and expert declarations to an

extraneous defense of its consultant's performance of the long core studies.

Texaco Brief at 34-38; Alexander Decl.; Sommerfield Decl.  But plaintiffs' quarrel

is not with the methodologies employed by Texaco's consultant to gather data.

Plaintiffs do not challenge the selection of sampling sites or the small number of

usable cores.  Livingston Reply Decl. ¶¶ 56, 58.  Rather, plaintiffs' objections lie

solely with the expedient conclusions purportedly derived from the sparse long

core data.  No scientifically valid conclusions may properly be drawn from those

data.  Livingston Reply Decl. ¶¶ 56, 61-66.

As discussed in more detail by Dr. Livingston, there are multiple flaws in

Texaco's data analysis.  First, the two cores that yielded useful dating information

do not even speak to the question of the effects of refinery discharges, because

they were not taken in depositional areas where Texaco found high

concentrations of PAHs.  *Id.* ¶¶ 60-61.  Second, the existence of data peaks in

the cores is insignificant without any information on the sources or biological

effects of such peaks.  *Id.* ¶ 62.  Third, no conclusions may be drawn from a

comparison of PAH levels in the long cores to levels in other studies' cores

without information on the particulars of those studies.  *Id.* ¶ 63.  Fourth, the fact

that there were high PAH concentrations 100 years ago, even if true, has no

bearing on harm resulting from the refinery's excess discharges of PAHs.  *Id.*

¶¶ 64-65.  In sum, the long core work did not produce data susceptible to *any*

relevant conclusions about harm to the River, let alone the self-serving claims

made by Texaco.  *Id.* ¶¶ 65-66.[3]

Texaco's comments on the long core work are emblematic of its cavalier

attitude toward the study as a whole and its disingenuous approach to the

conclusions it drew from the study:

> …Texaco performed the long core study.  It acquired
> the samples that could be acquired and performed the
> analyses that could be performed.  There is nothing
> more to do.

Texaco Brief at 38.  But there *was* something more to do.  Texaco was obligated

to interpret the data honestly and scientifically, and to report only those

conclusions that were fairly supported by the data.  This it failed to do.

III.    TEXACO IMPROPERLY OMITTED THE BIOAVAILABILITY
        COMPONENT OF THE STUDY AND DREW UNSUPPORTED
        CONCLUSIONS FROM THE BIVALVE WORK IT SUBSTITUTED.

Texaco claims it exercised all reasonable diligence in attempting the

Court-ordered caged bivalve studies and then conducted a sufficient substitute.

Neither assertion is true.  *See* Livingston Decl. ¶¶ 14-16, 21-27; Livingston Reply

Decl. ¶¶ 5-34.  Texaco's  failure to perform this critical work violates both the

letter and purposes of the Court's Orders.

---

[3] Texaco tries to buttress the scientific integrity of its study by highlighting its "vigorous peer review."  Texaco Brief at 13; Hall Decl. ¶ 17.  In fact, the reviewers were not independent scientists, but were individuals who had benefited financially from the Texaco study.  Bernard Reply Decl. ¶ 24.  Moreover, the peer-reviewed articles do not address any of the issues raised in Dr. Livingston's extensive critique.  *Id.* ¶ 25.

Judge Longobardi's 1999 Opinion and Order expressly required Texaco to conduct the bioavailability work described by Dr. Means. *NRDC v. Texaco II*, 20 F. Supp. 2d at 704, 715. The Stipulated Order is equally unambiguous: "Defendant will conduct a caged bivalve study at selected sample sites in the study area, with concurrent PAH, metals, and PCB analyses." D.I. 296 ¶ 1d. There is good reason for this degree of specificity. Without scientifically valid bioavailability studies, there is no way to determine the biological impacts of PAHs from the refinery. Livingston Reply Decl. ¶ 5.

Texaco offers a number of excuses for its violation of the 1998 and 2000 Orders, none of which is sufficient.

First, it claims the State of Delaware erected regulatory roadblocks to the caged bivalve studies. Texaco Brief at 18-22; Burton Decl. ¶ 20. Mr. Hall writes that Dr. Burton's efforts to clear regulatory hurdles "went above and beyond what was originally contemplated in the Order." Hall Decl. ¶ 26. But what the Court Order contemplated was exactly what it said: that Texaco would conduct caged bivalve studies in appropriate parts of the receiving system. D.I. 296 ¶ 1d. Besides, Dr. Burton's efforts to obtain suitable test subjects were far less impressive than Texaco claims, and he failed to exhaust reasonable options. Livingston Reply Decl. ¶¶ 9-10. Even if full, good-faith efforts had ultimately failed, Texaco could have conducted caged experiments on indigenous bivalves, which would have at least provided some useful bioavailability information, consistent with the purposes of the Stipulated Order. *Id.* ¶ 11.

Second, Texaco argues that the resident clams it tested were from the same sites as Triad sampling locations, or sufficiently close to provide comparable data.  Texaco Brief at 23-25; Hall Decl. ¶ 39; Burton Decl. ¶¶ 33-35; Salazar Decl. ¶¶ 13, 17, 19.  This is untrue, and reveals Texaco's basic misapprehension of the role of bioavailability experiments.  Most of the clams Texaco used were unsuitable for assessing bioavailability because they came from locations both geographically remote and, perhaps more salient, different in conditions, from the Triad sites representing depositional areas of concern.  Livingston Reply Decl. ¶¶ 12-17.  Significantly, Texaco neglects to connect the dots between the absence of clams at most Triad locations and the impacts of high levels of PAHs at those locations.  *Id.* ¶¶ 17-19.  Texaco was unlikely to find clams containing higher levels of PAHs because of the adverse effects of PAHs on bivalve survival, growth, and reproduction. Texaco's observation that the clams it tested contain relatively low levels of PAHs is thus not a reliable indicator of PAH bioavailability.  *Id.*

Third, Texaco asserts that caged bivalve experiments were not required from a scientific or legal perspective, and that abandoning them is "inconsequential."  Hall Decl. ¶ 20; *see also* Texaco Brief at 18; Burton Decl. ¶ 35; Salazar Decl. ¶¶ 11, 20.  From a scientific standpoint, Texaco's argument ignores the purposes for prescribing these experimental methods, Livingston Reply Decl. ¶ 20, and relies on an inaccurate definition of bioavailability, *id.* ¶ 21. Furthermore, once Texaco abandoned efforts to measure toxics in tissues of Triad subjects, this left the caged bivalve studies as the only means to link

15

particular contaminants in sediments or water to organisms in the River.  *Id.* ¶¶ 6-7.  Failure to perform this work, or a scientifically defensible substitute, thus frustrated the central goals of the study.

From a legal standpoint, Texaco conveniently erases the entire history of this litigation.  Indeed, plaintiffs' second motion to enforce resulted in no small part from Mr. Hall's and Dr. Burton's resistance to incorporating caged bivalve experiments in the first instance.  Bernard Reply Decl. ¶¶ 5-6, 10-11.  Having been a hotly-contested aspect of the study, this work was explicitly required by the Stipulated Order.  D.I. 296 ¶ 1d.  Especially in light of this history, Texaco did not have the authority to substitute its judgment for that of the Court.  If Texaco believed it was impossible to carry out the Court's instructions, it should have sought relief from the Court, rather than unilaterally consider its obligations to have been reduced.

Finally, Texaco asserts that it "kept Dr. Livingston . . . firmly in the loop during the conduct of the studies."  Texaco Brief at 11; *see also id.* at 9, 18; Hall Decl. ¶ 35.  Citing the "cooperation and collaboration between the scientists engaged [by the parties]," Texaco Brief at 9, Texaco avers:  "At every significant step, Dr. Livingston was kept informed and involved, and either actively or tacitly approved Texaco's activities and choices."  *Id.*  But Texaco did not inform Dr. Livingston of Dr. Burton's actions or decisions regarding the caged bivalve work.  Livingston Decl. ¶ 27.  Indeed, at the very time Texaco encountered difficulties finding suitable specimens for study, Mr. Hall wrote to Dr. Livingston on other,

less important matters without mentioning this critical issue.  Livingston Reply
Decl. ¶ 26.

Texaco never sought Dr. Livingston's advice on ways to overcome
regulatory or other hurdles, notwithstanding Dr. Livingston's explicit written
statements on more than one occasion that the caged bivalve work was crucial to
the overall scientific validity of the study.  *See* Livingston Reply Decl. ¶¶ 7, 22-33,
68-69.  Had he been aware of it, Dr. Livingston would not have approved
Texaco's abandonment of these mandated experiments.  *Id.* ¶ 34.  There was no
"collaboration," *see id.* ¶ 67; nor was Dr. Livingston responsible for Texaco's
compliance with the Order.  Texaco's attempt to shift the blame to Dr. Livingston
for its own shortcomings is unwarranted and deceitful.

## IV.    TEXACO DOES NOT SATISFY THE LEGAL STANDARD UNDER FED. R. CIV. P. 60(B)(5) FOR RELIEF FROM JUDGMENT.

Pursuant to Fed. R. Civ. P. 60(b)(5), Texaco asks to be relieved from the
Stipulated Order by virtue of its efforts to comply.  Under the applicable legal
standard, the Court is directed to balance equitable factors including:  (1) the
circumstances leading to entry of the injunction; (2) the length of time since entry
of the injunction; (3) whether the party subject to its terms has complied or
attempted to comply in good faith with the injunction; (4) whether changed
conditions unforeseen by the parties have made compliance substantially more
onerous or have made the decree unworkable; and (5) whether the objective of
the decree has been achieved and whether continued enforcement would be
detrimental to the public interest.  *Bldg. & Constr. Trades Council of Philadelphia
& Vicinity v. NLRB*, 64 F.3d 880, 888 (3d Cir. 1995) (hereafter "*BCTC*").  A fair

balancing of these factors leads to the inescapable conclusion that Texaco cannot be relieved of its obligations.

The circumstances leading to entry of the Stipulated Order are characterized by Texaco's perennial reluctance to obey the Court's commands. Texaco violated two prior Orders to conduct an adequate study. Bernard Reply Decl. ¶¶ 4-6, 10-11, 13. Even now, Texaco has failed to comply with significant aspects of the Stipulated Order that are unrelated to the bioavailability work it claims it could not reasonably perform. *See* Part II above.

Texaco has the burden to establish that a significant change in circumstances warrants relief from judgment. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). The burden is a heavy one.[4] While Texaco encountered some unforeseen conditions in pursuing the bioavailability work, it failed to avail itself of several workable routes to compliance and did not seek relief from the Court at the time it experienced difficulties.[5] *See* Part III above. Instead, Texaco simply acted on its own, as it had in the past, to define its own duties in contravention of the Court's explicit mandates.

As detailed above, the objectives of the Court's Orders – to determine and mitigate harm to the River from Texaco's noncomplying discharges – have not remotely been achieved. And continued enforcement would not be detrimental to

---

[4] This Court has ruled that the "generalized standard of *BCTC* is at least as strict as the *Rufo* rule that the parties must have based their agreement on a misunderstanding of the governing law in order to warrant a modification under Rule 60(b)." *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 528 (D. Del. 1999). In *BCTC* itself, the court found unpersuasive the movant's entreaties that it should be relieved from the "vexatious harassment and undue hardship" of a judgment after six continuous years of compliance with it. *BCTC*, 64 F.3d at 889.

[5] Rule 60(b) requires that a motion for relief from judgment be made "within a reasonable time." Texaco knew years ago that it would not be carrying out aspects of the injunction, but inexcusably waited until now to request a reprieve.

the public interest; to the contrary, it would directly promote important public benefits under the Clean Water Act.  That the Stipulated Order was entered into several years ago is of no consequence.  Texaco's duties are no less pressing today than they were in 2000.

## CONCLUSION

Throughout the 17 years of this litigation, plaintiffs have had a single goal: to protect and restore the Delaware River from the damaging effects of Texaco's illegal pollution.  Plaintiffs' belief that this can be achieved only through a scientifically based study has been borne out by repeated Orders of this Court. There is no conceivable benefit to plaintiffs in continuing to press Texaco to complete such a study, beyond ensuring the health of the River.  Plaintiffs have demonstrated that Texaco violated both the letter and purposes of the Court's express instructions.  Texaco's protestations that it has done all it can reasonably be expected to do are belied by Dr. Livingston's critique, which reveals that Texaco had no scientific basis for reporting to plaintiffs and this Court that the refinery's past unlawful discharges are not harming the River.  For all the reasons set forth above, plaintiffs respectfully urge the Court to remedy Texaco's ongoing violation of its Orders.

Dated:  October 12, 2005

Respectfully submitted,


Mitchell S. Bernard
Nancy S. Marks
Amelia E. Toledo
Natural Resources Defense Council
40 West 20th Street
New York, New York 10011
(212) 727-2700

C. Scott Reese (2036)
Cooch & Taylor
824 Market Street
Suite 1000
Wilmington, Delaware 19899
(302) 984-3811

Attorneys for Plaintiffs

20

Certificate of Service

I hereby certify that on October 12, 2005, I electronically filed Plaintiffs' Reply Brief in Support of Motion to Enforce Judgment and Answering Brief in Opposition to Defendant's Motion for Relief from Judgment, Reply Declarations of Mitchell S. Bernard and Robert J. Livingston, and Request for Oral Argument with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> Richard D. Allen
> Morris, Nichols, Arsht, & Tunnell
> 1201 North Market Street
> PO Box 1347
> Wilmington, Delaware 19899
> rallen@mnat.com

I hereby certified that on October 12, 2005, I have caused the documents to be mailed by United States Postal Service, to the following non-registered participant:

> John F. Kampman, Esq.
> Wallace King Domike & Branson
> 1050 Thomas Jefferson St. NW
> Washington, D.C. 20007

> _s/_____
> C. Scott Reese
> Cooch and Taylor
> 824 Market Street
> Suite 1000
> Wilmington, Delaware 19899
> (302) 652-3641
> creese@ctlaw.org