IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., and DELAWARE         )
AUDUBON SOCIETY,                    )
                                    )    Civil Action No.
        Plaintiffs,                 )    88-263-SLR
                                    )
    v.                              )
                                    )
TEXACO REFINING AND MARKETING,      )
INC.,                               )
                                    )
        Defendant.                  )

REPLY DECLARATION OF ROBERT J. LIVINGSTON IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

        I, ROBERT J. LIVINGSTON, declare as follows:

Introduction

        1. I respectfully submit this declaration in reply to the six declarations

proffered by defendant Texaco in opposition to plaintiffs' motion to enforce this

Court's prior judgments.  The Texaco declarations were signed by Lenwood Hall,

Jr. ("Hall Decl."), Dennis Burton ("Burton Decl."), Michael Salazar ("Salazar

Decl."), Allen Uhler ("Uhler Decl."), Clark Alexander ("Alexander Decl."), and

Christopher Sommerfield ("Sommerfield Decl.").

        2. Prior to the filing of plaintiffs' motion, and at their request, I reviewed in

detail the two-volume study report (App.I & II) Texaco's consultants prepared

pursuant to the Court's Order.  My review (App.III), which includes an

independent analysis of study data, exposes fundamental flaws in Texaco's methods and conclusions. In particular, I found that Texaco's primary conclusion -- that biological degradation downriver of the Delaware City refinery is not associated with PAHs released by Texaco -- is incorrect. Rather, based on Texaco's own data, I found the opposite: PAHs loaded to the Delaware River by the refinery have accumulated in downriver depositional areas where biological damage is occurring.

3. None of the Texaco declarations opposing plaintiffs' motion refutes or addresses in any specific way the results of my analysis of the study data.

4. In this declaration, I will respond to various assertions contained in the Texaco declarations. The subject matter falls into the following categories: bioavailability, including my communications with Mr. Hall on this subject; PAH loadings and fingerprinting; and long core analyses. In addition, I address some miscellaneous issues raised in Texaco's opposition papers.

Bioavailability

5. Bioavailability experiments are an explicit and fundamental element of the Court-ordered study program. These studies relate concentrations of pollutants in water or sediments to concentrations of the same pollutants in experimental organisms. This is critical in research like this, because it is the only scientific way to determine the actual effects on biota of specific contaminants in water or sediment. This is necessary, in turn, to determine the biological impact of PAHs released by the Texaco refinery.

2

6. Pursuant to the Means research program, which the Court adopted and directed Texaco to undertake, there were two principal methods to determine bioavailability. First, Dr. Means prescribed chemical analyses of toxic agents in tissues of experimental subjects in the Triad studies. Dr. Means provided a protocol for conducting such analyses, but Texaco's consultants (Mr. Hall, Dr. Burton) did not believe the work could be done. They engaged Dr. David Page to decide the issue, and Dr. Page agreed with Texaco. Texaco did not attempt to analyze toxics in the Triad experimental subjects.

7. This left caged bivalve studies as the sole means to link particular contaminants in sediments (or water) and organisms. The February 2000 Stipulated Order (D.I. 296 ¶ 1d) mandates caged bivalve experiments. Both before the Texaco study and during its early phase, I pointed out to Mr. Hall the central importance of carrying out complete caged bivalve experiments in order to determine bioavailability.

8. Texaco did not conduct any caged bivalve experiments. In its declarations, Texaco offers a few explanations for this failure. First, it claims that barriers erected by the State of Delaware precluded a caged bivalve study. Burton Decl. ¶ 20. Second, it claims that the resident clams it tested for tissue toxic agents were from sites identical or sufficiently close to Triad sampling sites to provide comparable data. Hall Decl. ¶ 39; Burton Decl. ¶¶ 33, 35; Salazar Decl. ¶¶ 13, 17, 19. Third, it asserts that caged bivalve experiments were not necessary from a scientific or legal perspective. Burton Decl. ¶ 35; Salazar Decl.

3

¶ 20. Finally, Texaco argues that it informed me of the change in this part of the study and that I did not object. Hall Decl. ¶ 36; Burton Decl. ¶ 29. Each of these explanations is either untrue or unavailing.

### Barriers to Study

9. In his declaration, Dr. Burton recites a number of steps he took to find clams to cage for the bioavailability experiments required by the Court Order. But there are a number of steps he did not take. For example, there is no evidence that, when only a slight incidence of disease was revealed in the tests of Louisiana *Rangia* (one out of 30 clams, *see* Burton Decl. ¶ 17), Dr. Burton or anyone on the Texaco team pressed Delaware authorities to permit the caged studies to go forward. Nor is there evidence that Dr. Burton tried to test a new set of specimens, either *Rangia* or another suitable bivalve species, to see whether they would be disease-free.

10. Dr. Burton calls Mr. Salazar "the Court recognized bivalve expert," Burton Decl. ¶ 5, but that is not the case. The February 2000 Stipulation, which was endorsed by the Court, merely states that Mr. Salazar would "be involved in th[e] process" of the caged bivalve studies. D.I. 296 ¶ 1d. In any event, from his declaration it appears that Mr. Salazar simply relied on Dr. Burton to find appropriate test organisms: "It was my understanding from Dr. Burton that a source of non-diseased *Rangia* could not been [sic] located." Salazar Decl. ¶ 9. There is no evidence in the Texaco declarations that Mr. Salazar made, or

4

prompted Texaco to make, any further attempt to find suitable bivalves with
which to conduct the Court-mandated caged study.

11. And Dr. Burton nowhere suggests that he or his colleagues
considered caging the indigenous *Rangia* collected from the sides of the River.
While those clams were contaminated, they were, in Texaco's own description,
"able to survive, grow, and reproduce." Salazar Decl. ¶ 14. How would they
have fared in the River-interior, especially in the depositional areas where PAHs
released by the refinery accumulated? Such an experiment could have allowed
us to see whether relatively healthy Delaware River clams accumulated more
PAHs in these sites of concern, and, if they did, whether the additional
contamination affected their capacities to grow, reproduce, and survive. This
would have been consistent with the spirit of the Court Order, and with other
scientific studies of this sort. Clams could have been set out along transects
through the downstream depositional areas, so that PAHs loaded by the refinery
could be evaluated for bioavailability and acute/chronic effects.

### Location of Resident Clams

12. As Mr. Salazar points out, "[t]he caged bivalve study was to be a
component of a larger study that would assess the potential ecological effects of
effluent from the Refinery." Salazar Decl. ¶ 5. As such, it was critical to study
bioavailability in the places where the Triad analyses were carried out, to
produce comparable data. Texaco's consultants' claim that they collected

5

resident clams from Triad sites, or sufficiently nearby, defies the data they themselves present.

13. In the Texaco study, *Rangia* sampling sites were based on the presence of clams, not proximity to Triad locations. As Texaco concedes, only four of the 15 Triad sites yielded a sufficient number of clams for the study. Burton Decl. ¶ 28. All four of those sites were in non-depositional areas of the River.

14. Texaco claims that an additional five sites at which *Rangia* were gathered were "within close proximity of a Triad station or between two Triad sampling stations." Burton Decl. ¶ 33; *see also* Salazar Decl. ¶ 13. However, the Table included in Exhibit 4 of Dr. Burton's declaration reveals that, of the nine sites that did not correspond to a Triad site, one was more than two kilometers (1.2 miles) from a Triad location, an additional five were more than one kilometer away from the corresponding Triad station, and one more was .99 kilometers away. The figures following the table show that the sites where *Rangia* were collected are near the western shore of the River, which is both distant in space and different in conditions from the depositional areas of concern. This invalidates use of the *Rangia* data for the purpose employed by Texaco.

15. Mr. Salazar claims that the studies he carried out (*i.e.*, measurement of toxic agents in clams collected in areas distant from depositional parts of the River) "provided estimates of bioavailability at the locations where the Triad Studies were conducted." Salazar Decl. ¶ 19. This illustrates a basic error on

6

the part of Texaco with respect to what qualifies as a bioavailability determination. The term bioavailability is self-defining:  Bioavailability experiments are supposed to determine those pollutants that are "available" to biological systems, as distinct from those pollutants that exist in the habitat of the organism used for the test.  Since Texaco did not adequately document the pollutants available to the clams "in water, on food, and in suspended sediments," *id.* ¶ 18, the tests for contaminants in the bivalves were inadequate to determine bioavailability.

16.  Dr. Means specified that bioavailability experiments should be carried out to determine if refinery-derived PAHs were getting into experimental organisms.  Texaco did not follow the appropriate (and prescribed) experimental procedure.  The substitution of descriptive biomonitoring for experimental bioavailability analyses was unacceptable from a scientific perspective.  Thus, the Texaco clam data do not measure bioavailability, and they certainly do not measure bioavailability of contaminants at the depositional Triad locations where refinery-loaded PAHs have accumulated.

17.  Mr. Salazar states that he "was satisfied the sampling locations were representative of River sites selected for" the Triad studies.  Salazar Decl. ¶ 13. Other than supposed physical proximity, he includes no discussion of site conditions that would render the clam sites "representative" of Triad sites.  The data I reviewed refute his contention:  The fact that the vast majority (11 out of 15) of Triad sites did not yield even the paltry number of clams Texaco deemed

7

necessary for study indicates that even *Rangia*, who can (and in other parts of the River apparently do) survive considerable contamination, *do not exist* in the depositional reaches most affected by refinery-released PAHs. Indeed, the raw community data Texaco collected as part of the Triad work revealed an absence of such organisms. Texaco did not mention this in its study report; I had to dig into the background data (which Texaco produced at my request in 2004) to discover this salient scientific fact. App.III-A7, 37-38.

18. The paucity of clams in depositional areas undercuts Mr. Salazar's stated basis for endorsing the use of resident rather than transplanted clams. He supported this radical alteration of the Court-ordered study only if "clam beds were present over sufficient spatial areas to adequately characterize the bioavailability of the contaminants from the Refinery." Salazar Decl. ¶ 11. Texaco did not find clam beds over such areas.

19. Mr. Salazar argues that the clams Texaco collected in reaches of the River removed from the depositional areas of primary concern did not contain PAH concentrations exceeding regulatory thresholds. Salazar Decl. ¶ 15. But in making his point, Mr. Salazar inadvertently makes mine: "*Rangia* populations significantly affected by chemical stressors such as PAHs would not be expected to have been so prolific because of chemical effects on survival, growth, and reproduction." *Id.* That is precisely my point. The absence of *Rangia* in the downstream depositional areas influenced by refinery-released PAHs is

8

consistent with the adverse refinery-induced impacts I found in my review of the study data.

Necessity of Caged Experiments

20. Dr. Burton claims that "[c]lams do not have to be in cages in order to determine bioavailability." Burton Decl. ¶ 35. Cages are used for bioavailability tests to eliminate variables such as predation. They are part of an experimental method that is defined by specific hypothesis tests that were not carried out here. The pertinent questions in the Court-ordered study are whether PAHs loaded by the refinery are getting into clams, and, if they are, to what effect.

21. Dr. Burton further states that the Triad method integrates bioavailability. Burton Decl. ¶ 36. Given the elimination of tissue analyses for toxic agents in the experimental animals, and the failure of the clam bioavailability analyses, this statement is inaccurate. The sediment concentrations of toxic agents in depositional areas should have been compared to what was in caged bivalve mollusks in order to see which of the sediment toxics were getting into the clams. When carried out at the Triad sites, these tests would have helped in our understanding of whether PAHs loaded by the refinery were implicated in the noted toxicity at these sites. Instead, the analyses of the clams were simply like those of the Mussel Watch Program, which is not an analysis of bioavailability but is simply an analysis of what bivalves collect over time.

9

Communications with Texaco

22. Mr. Hall and Dr. Burton claim they informed me of the "change" in the bioavailability work. That is not true. None of Texaco's representatives told me of the change, of which I was unaware until I read Texaco's final study report early in 2004.

23. Even before the February 2000 Stipulation was entered, I made clear to Mr. Hall repeatedly that bioavailability experiments were prerequisite to a legitimate scientific answer to the Court's questions. On February 9, 2000, I wrote: "Only through the coordinated use of bioassay, caging, and tissue analysis of metals and PAHs can a determination be made concerning the overall impact of refinery effluent on the receiving system." Hall Decl. Ex. 2 at 6.

24. On June 8, 2000, I wrote: "Without tissue analyses of the experimental subjects, we would be more dependent on the cage studies for such information. To this end, we need to make sure that the caging studies are carried out in the most complete way that is possible so that the bioavailability issue can be resolved . . . ." App.IV-A288. I added: "This part of the study will be extremely important as it is the primary data that addresses the question of bioavailability and its relationship to refinery effluents." *Id.* at 289. I stated further: "Because of the problems associated with tissue analyses for metals and PAHs, it is very important that the caged bivalve studies be carried out in a definitive fashion." *Id.* at 289a.

10

25.  In September 2000, I wrote to Mr. Hall, referring to the caged bivalve study:  "This remains as the only part of the study to address bioavailability . . . . Therefore, this part of the study is very important to the overall interpretation of final results."  App.IV-A301.

26.  I was not aware in the summer of 2000 that there were issues concerning the viability of caged bivalve studies.  Mr. Hall wrote to me on August 25, 2000 (Hall Decl. Ex. 4), but he did not mention the bioavailability studies.  It now appears that this was one day after Dr. Burton had received results concerning the disease level of the Louisiana clams.  Burton Decl. ¶ 17.  I knew nothing about this.

27.  On February 8, 2001, Mr. Hall wrote that the "Rangia tissue experiments . . . are on schedule."  Hall Decl. Ex. 7 at 1.  This was around the time of the depuration study, Burton Decl. ¶¶ 26-27, which Mr. Hall did not mention.  None of the interactions, inquiries, or deliberations now described by Dr. Burton, see Burton Decl. ¶¶ 10-28, was disclosed to me contemporaneously by Texaco.

28.  On May 16, 2001, Mr. Hall wrote an "update," in which he revealed that there had been a depuration study "to determine the loss of PAHs in tissues over time for Rangia collected in the Delaware River and placed in a relatively clean creek in Delaware."  App.IV-A325.  The depuration study had been carried out three months earlier, see Burton Decl. ¶ 27, in contemplation of caging depurated clams to comply with the Court Order.  In the same memo, Mr. Hall

pointed out that resident, not caged, *Rangia* had been collected and were being analyzed, with results expected "within a month." App.IV-A325. He wrote further that Mr. Salazar had recommended "using resident species collected from the area of interest if these species can be collected on an adequate spatial scale." *Id.* This belated "update" was not definitive, omitted any specific information on the difficulties of carrying out the caged bivalve work, and did not rule out the caged studies the Court directed Texaco to conduct.

29.  On August 12, 2001, Mr. Hall wrote to me but did not mention the bivalve work, except to state that "[a]ll ... studies outlined in our scope of work are on schedule." Hall Decl. Ex. 7 at 4.

30.  On August 23, 2001, Mr. Hall wrote a status memo in response to a request from plaintiffs' counsel. App.IV-A326. *See also* Bernard Reply Decl. ¶ 17. In that update, Mr. Hall states, for the first time: "*Rather* than using caged bivalves, resident clams . . . were collected at various sites near the Motiva refinery during March 2001." App.IV-A328 (emphasis added). This was almost five months after such sampling began.

31.  One year later, in August 2002, Mr. Hall referred to the depuration study that had been conducted in February 2001, stating that Mr. Salazar had submitted a draft report, but that the draft required additional analysis and data interpretation "for an acceptable final report." Hall Decl. Ex. 7 at 7. Even then, a final report on the depuration study (which presumably could have led to caged

12

studies), as well as data analysis and interpretation concerning resident clam contaminant levels, were still in process.

32. One further communication, in September 2002, was prompted by my written request of Mr. Hall. Hall Decl. Ex. 7 at 10. Regarding the bivalve studies, Mr. Hall wrote: "Mike Salazar is still working on the draft report."

33. Texaco's claim that it kept me informed of the events leading to its decision to abandon caged experiments contradicts the written record. Given the importance plaintiffs (and Dr. Means and the Court) consistently placed on such experiments, and Mr. Hall's prior assurances that bivalve experiments would address the bioavailability issue, and that I would "be in the loop" (App.IV-A318, A367), I find it inexplicable that Mr. Hall and his colleagues were not more forthcoming as events unfolded.

34. While I recognize that I did not have decision-making authority, I certainly would have objected to Texaco's abandonment of this critical study element, for the same reasons I object to it now. The failure to carry out this work remains, in my opinion, a fundamental flaw in defendant's study, and a clear violation of the Court's commands. Further, despite the difficulties involved in the caged clam studies, it would have been possible, with clearly defined experiments, to carry out the Court's mandates for this part of the study. The results of these studies would have gone a long way toward clearing up the ambiguities in the final Texaco study report.

13

PAH Loadings and Fingerprinting

35.  The Texaco declarations misstate my opinions concerning the study's treatment of PAH loadings and chemical fingerprinting.  Simply stated, I believe that Texaco (1) improperly avoided loading data, (2) used the wrong locations in the River to define the refinery's PAH signature, and (3) employed its faulty fingerprint analysis to mask the obvious implications of the loading and other pertinent ecological data.

Loading

36.  In my initial declaration supporting plaintiffs' motion ("Livingston Decl."), I pointed out Texaco's failure to consider PAH loading data.  Livingston Decl. ¶ 11.  In my opinion, the gathering and interpretation of loading data is essential to understanding the impacts of refinery-released PAHs on the Delaware River environment.  Such analysis has been an integral part of many studies on the impacts of toxic agents on aquatic systems.

37.  Loading analyses are an indispensable element of the Means-prescribed fate and transport studies, notwithstanding Mr. Hall's statement that a loadings analysis "was never contemplated by the Study . . . ." Hall Decl. ¶ 33.  Texaco itself wrote in its November 2000 Scope of Work: "Loading rates for Motiva [refinery] PAHs will also be determined at the two outfalls [001 and 601]." App.IV-A130.  I presumed Texaco would use the loading data in its analyses.  Aspects of the study design required this.  For example, the bioavailability

14

studies were premised on determining toxicants *loaded by the refinery* that were available to biota.

38. Texaco's claim that, to be valid, loading studies would have to be performed on the entire Delaware system (Uhler Decl. ¶ 9c, Hall Decl. ¶ 37) is not true. I disagree with Dr. Uhler's statement that, in the Delaware River, "the loading from any one particular source to the river can be meaningfully interpreted only if the PAH input from all sources have been identified and measured." Uhler Decl. ¶ 9c. If Dr. Uhler's premise were correct, then very few loading studies would ever be undertaken.

39. The Court-ordered study is limited to the area of the Delaware River affected by refinery loadings. The determination of PAH loading from all sources would be impractical, but it is not needed to evaluate the effects of the refinery's releases. A loadings analysis is necessary to identify what *this* facility has contributed in the way of toxic agents. Determination of the distribution of PAHs in the sediments of the receiving area would then allow a review of what the refinery loaded relative to PAHs derived from other parts of the River. This is what I did in my re-analysis of the study data.

40. The Texaco study data demonstrate that stations outside the refinery's influence had relatively low concentrations of PAHs, and that the distribution of PAHs through the receiving area points to the refinery as a major source.

15

41. Loading is not, as Texaco asserts, a "mass balance" analysis. Hall Decl. ¶¶ 33, 37. It simply requires a calculation of how much of each individual PAH compound is released from the refinery to the River. Using effluent concentration data is misleading because such data depend on dilution effects that distort the contribution of PAHs from the refinery. For example, refinery outfall 001 was diluted by non-contact cooling water from the River, which reduced the concentrations of PAHs in the discharge but did not affect the loading of such compounds. See Ex. A (comparing average sediment PAH concentrations to average PAH loadings from refinery outfalls 001 (diluted by River water) and 601 (undiluted by River water)).

42. The distribution of PAHs in the environment depends on specific chemical characteristics that include rapid attachment to particulates, accumulation of such particulates (with attached PAHs) in sediments of depositional areas, and long-term existence of PAHs in such sediments with accompanying adverse impacts on benthic biota. These processes have less to do with the concentration of PAHs in the water than they do with long-term trends of loading from the refinery to the River. Thus, PAH loading from the refinery is a critical part of the analysis, but it was all but ignored in the Texaco study. By emphasizing PAH concentrations rather than loading and accumulation in depositional areas, Texaco and its consultants neglected the primary processes governing the impacts of PAHs from a point source such as the refinery.

Fingerprinting

43. In a separate subsection of my initial declaration, I criticized Texaco's definition of the refinery's PAH fingerprint or signature. Livingston Decl. ¶¶ 12-13. Specifically, I objected to Texaco's use of sampling stations proximate to the refinery's effluent canal to establish the PAH signature for water concentrations. If refinery-derived PAHs attach to particles and drift downriver, accumulating in depositional areas downstream, the fingerprints for water would not be representative of what was actually happening in the study area over time. By ignoring the loading of the individual PAH compounds, and using a convoluted method of generalized PAH groupings instead of the actual compounds loaded by the refinery, Texaco ignored the obvious potential of refinery loadings accumulated in depositional areas.

44. Chemical fingerprinting depends on defining the correct "signature of the Refinery effluent." *See* Uhler Decl. ¶ 9. The entire premise of fingerprinting is defeated if the relevant source's signature is derived from the wrong location. I do not contest the validity of chemical fingerprinting *per se*. I recognize that it is an element in the Court-ordered study, as it should be. But fingerprinting cannot serve a useful analytic function if the fingerprint is not, in fact, the signature of the source you are studying. That is the crux of my criticism of Texaco's fingerprinting effort.

### Fingerprinting as an Avoidance or Mask

45. I agree that fingerprinting and loading are distinct from one another. *See* Uhler Decl. ¶ 9g. Contrary to Texaco's claim, *see* Uhler Decl. ¶ 8, I did not state that loading analyses should replace chemical fingerprinting, or that chemical fingerprinting can be accomplished solely by reference to loadings. Rather, I believe that loading is an important variable in determining what the refinery contributed to the River through time, and that Texaco used its faulty fingerprinting analysis to avoid or mask the import of loading and other significant ecological information.

46. Texaco relied on its fingerprinting analysis to conclude that sources other than the refinery are responsible for ongoing adverse ecological effects downriver. Most of the study's conclusions are based on Texaco's interpretation of the fingerprinting results. However, my independent analyses of raw study data revealed a strong relationship between refinery-loaded PAHs and the PAHs in sediments of downstream depositional areas. *See* Ex. A. Various compounds that were loaded from outfall 601 (refinery-derived) were noted in high concentrations in sediments of depositional areas, but these compounds were not present in high concentrations at stations just offshore of the effluent canal. *Id.*

47. In addition, my temporal analyses of loading data revealed that concentrations of PAHs in downstream sediments followed loading patterns from the refinery. App.III-A13, 44-48. (Texaco did not perform any temporal analyses

18

of loading data.)    These data implicate the refinery as a contributing source.

This directly contradicts Dr. Uhler's statement that urban background and other

sources "account for the vast majority of PAHs to the Delaware River estuary."

Uhler Decl. ¶ 9e.

48.  The cumulative nature of PAHs in the aquatic environment precludes

the weight Texaco places on the fingerprinting analyses.  Low concentrations of

PAHs attach to particulates and accumulate over time to form relatively high

concentrations in depositional parts of the ecosystem.

49.  The Texaco study overlooked the high concentrations of refinery-

loaded PAHs in depositional areas.  A summary analysis of the data averaged

over the study period indicates that total PAHs and individual compounds

associated with refinery loadings (C2-Fluoranthenes/Pyrenes, C3-

Fluoranthenes/Pyrenes) were highest in sediments of depositional areas.  *See*

Ex. B (stations DR53, DR55, DR67, DR68, DR83).  These concentrations were

also high in sediments of the effluent canal.  *Id.* (station DR1).  PAH

concentrations in depositional areas were significantly correlated with PAH/TOC

ratios, but not with %sand or %TOC.  *Id.*  Areas with high PAH sediment burdens

and high concentrations of refinery-loaded PAH compounds were also

associated with effects-range median designations, and were negatively

correlated with survival and reproductive capabilities of Triad test organisms

(*Hyalella, Leptocheirus*).  *Id.*

19

50.  These summary data are consistent with more detailed analyses set forth in my re-evaluation of the Texaco data.  The results illustrate that, in depositional areas downstream, there were high concentrations of PAHs associated with compounds loaded from the refinery, and that such concentrations were highly correlated with reductions in survival, egg production, and numbers of offspring of Triad organisms.

51.  The close association of total PAH and PAH/TOC ratios with refinery-associated PAHs (C2-Fluoranthenes/Pyrenes, C3-Fluoranthenes/Pyrenes) refutes Dr. Uhler's statement, *see* Uhler Decl. ¶ 11b, that study results in the Delaware system are consistent with urban background or other nonrefinery sources, and not with refinery effluents.  The relatively high concentrations of refinery-loaded PAH compounds in sediments of the effluent canal undermines Dr. Uhler's contention, *see id.* ¶ 11a, that PAH profiles and concentrations in sediments near oil refineries are consistent with urban background.

52.  The data also rebut Dr. Uhler's contention, *see* Uhler Decl. ¶10h, that no single PAH compound can be directly linked to a particular source.  The distribution of PAHs in the study area is not random, and is consistent with the hypothesis that loading of PAHs from the refinery over time has contributed significant concentrations of specific compounds to the sediments downstream.  However, due to the lack of adequate bioavailability data, it is not possible to attribute the noted toxicity of the sediments in depositional areas to any given toxic agent.

20

53. Texaco used elaborate methods of fingerprinting that avoided or obscured the most basic data concerning the distribution of PAHs in the study area. Sometimes complexity hides rather than reveals scientific truth. In my opinion, Dr. Uhler's method is precise but inaccurate, and his conclusions ignore compelling and pertinent ecological data.

Long Core Analyses

54. Before addressing the content of the Alexander and Sommerfield declarations, I wish to address a claim Texaco apparently makes to the effect that the long core studies were somehow divorced from the rest of the Court-ordered research program. That is not the case. The long core work was designed for the limited purpose for which it is useful: to reconstruct a history of contaminant accumulation in sediment at relevant locations.

55. Long core information, by itself, cannot answer the Court's question concerning ongoing impacts from the refinery's prior pollutant discharges. Even if such data are meaningful (that is, in showing a traceable pattern of pollution over time), they must be integrated with the other Court-mandated studies in order to determine impact. The fact that contaminants may exist in sediments does not mean that those contaminants are causing harm. The questions of ecological and biological harm, and their sources, can only be considered with reference to the chemical characterization, fate and transport, bioavailability, and other studies prescribed by Dr. Means.

56. Texaco appears to misunderstand my critique of the long core studies. My point is not that Texaco's consultant used improper methods or dating techniques. Rather, it is that the long core data the study generated did not provide any scientific basis for drawing the conclusions Texaco drew, and that such conclusions are invalid.

57. Dr. Alexander reports that Texaco found only seven locations where cores could be studied in depth. Alexander Decl. ¶ 13. Of these, five cores "could not be used for purposes of establishing a historical record of sediment accumulation." *Id.* ¶ 15.

58. I do not dispute Texaco's finding that only two cores provided useful dating information. Nor do I challenge the initial selection of sites for sampling. Nor do I challenge Dr. Sommerfield's declaration concerning the challenges presented by taking long cores in the Delaware River. Sommerfield Decl. ¶ 6.

59. What I strenuously challenge is what Dr. Alexander and Texaco seek to make of the paltry long core data they produced.

60. Dr. Alexander notes that, in a core taken near the refinery, PAH peaks in 1993 and 1997 were similar to concentrations corresponding to the early 1980s, and that accumulation from 1993 to 2000 mirrored concentrations from 1984 to 1992. Concentrations in a downriver core were similar to those in the core taken near the refinery. From these data, Dr. Alexander deduces that "these patterns strongly *suggest* that the PAHs detected are *likely* the result of transportation related activities on the Delaware River . . . ." Alexander Decl.

22

¶ 19 (emphasis supplied).

61. As a scientific matter, the data do not support, suggest, or even relate to the conclusions Texaco's consultant draws. In the first instance, the two cores Texaco analyzed, 50 and 66, were collected, respectively, near the refinery and seven miles downstream. Neither location was depositional. Neither location contained the high concentration of PAHs Texaco found in degraded depositional areas. The limited coring results are thus incapable of shedding light on the historical record in the location that matters for purposes of the Court-ordered study.

62. Beyond this, by Dr. Alexander's own account, the data show peaks at various points in time. How does he know what caused those peaks, or whether the concentrations found during any particular time period, including 1993-2000, caused biological harm? Given the terribly limited data, the fact that contaminant concentrations during two periods of time were similar does not answer or even seriously address the questions of impact and source.

63. The fact that PAH concentrations detected in the two cores are less than what has been reported in some other studies sheds no scientific light on the issues the Court directed Texaco to study, and certainly do not support a "conclusion" that Delaware River PAHs are not the result of a point source. Dr. Alexander includes no information on the other studies or locations. See Alexander Decl. ¶ 20.

64. Dr. Alexander's use of cores 9A and 68, which provided "*some* dating *related* information, but only on a '100-year' timescale," Alexander Decl. ¶ 21 (emphasis supplied), is similarly misguided. He states: "[T]hese cores could not provide meaningful information related to discharges from the Refinery after March 1993." *Id.* I concur with that statement; it is scientifically valid. But then he goes on to interpret the data (which he already and correctly asserted "could not provide meaningful information" on the relevant issues), reporting that there were higher PAH concentrations more than 100 years ago. This, he says, "demonstrate[s] that the non-Refinery sources of PAHs . . . have been a significant source of PAHs for over 100 years." *Id.*

65. Even if it is true that non-refinery sources, including transportation sources, have contributed PAHs to the Delaware River for more than a century, the refinery's excess (and massive) discharges of PAHs during the years it exceeded its Clean Water Act permit limits could cause significant ongoing harm where those PAHs have accumulated in sediments. This fact exposes the unsupported, self-serving nature of Texaco's contentions.

66. Dr. Sommerfield states that his studies show that the conditions prerequisite to collecting interpretable long core data "are not generally met within the main channel of the Delaware River." Sommerfield Decl. ¶ 6. Presumably, this is meant to explain the failure of the Texaco long core experiments to produce useful data. Nevertheless, in its study and in its declarations, Texaco draws erroneous, misleading conclusions that the data do

not justify. In my view, the proper scientific analysis of the long core work is that, in terms of the relevant research question regarding the impact of the refinery's releases to the River, it did not produce data susceptible to meaningful interpretation.

Miscellaneous Comments

67. Texaco mischaracterizes my role in the Court-ordered study. Mr. Hall lists various occasions on which we communicated about the study plan or preliminary results. Hall Decl. ¶¶ 8-11. I did participate in discussions of sampling locations and a few other issues, consistent with the terms of the February 2000 Stipulation (see D.I. 296 ¶¶ 1a, 1c, 1f, 1g, 1h, 1j). But in no way was I a co-investigator or active collaborator in the Texaco study, and I never intended to be such.

68. While I was open to discussing issues as they arose, Mr. Hall initiated little contact after the early parts of the study. As I detailed above in the bioavailability section (¶¶ 22-34), Mr. Hall did not advise me of the critical departures from the Court-ordered program. He did not keep me in touch with the depuration problems, nor did he seek my advice regarding alternatives to the radical changes in the bioavailability protocols. I express no opinion on whether Mr. Hall had a legal duty to inform me of this. But I think it is unfair for Texaco to have communicated as little as it did and then to feign surprise that I did not express concerns. See Hall Decl. ¶ 36; Burton Decl. ¶ 29.

69.  The fact is that I did not know of problems relating to the bioavailability experiments or long core analyses, or Texaco's unfortunate interpretation of study data, until early 2004, when I received the final study report.

70.  In his declaration, Mr. Hall states that "use of the Triad-based approach was a step above and beyond the specifics contemplated by the [Court] Order . . . ." Hall Decl. ¶ 24.  This is not true.  The Triad approach was contemplated by all parties since before 2000, and was the subject of testimony during the 2000 trial by Dr. Means, Dr. Dorn (Texaco's in-house expert in charge of the scientific aspects of the study), and myself.  Before the trial, in reviewing Texaco's initial scope of work, Dr. Means commented on the Triad assessment as part of the study.  See App.IV-A96.

71.  In its opposition to plaintiffs' motion, Texaco apparently argues that merely executing the Means studies constitutes compliance with the Court Order.  I offer no legal perspective on this, but from a scientific vantage point the argument is hollow.  The Court-ordered research aimed to answer specific scientific questions.  The research results were to be integrated into an analysis of the refinery's impact on the receiving environment.  The idea that a scientist could technically conduct a series of experiments, and then draw conclusions that the data contradict, is, from my point of view, a violation of the scientific method.  In addition, Texaco did not carry out essential elements of the Court-ordered study.  See Livingston Decl. ¶¶ 20-22.

Concluding Comments

72. I have been involved in every phase of this case since the 1991 trial. There has been a continuous attempt to compel Texaco to determine, in a scientifically legitimate way, the environmental impacts of its unlawful pollutant discharges. At first, Texaco failed entirely to monitor such impacts. It then produced a plan that was not designed to measure impacts. (Its author conceded this, under oath, during the 1998 enforcement trial.) It then produced a scope of work (in 1999) that did not faithfully reflect the studies Dr. Means prescribed and the Court had ordered. Finally, Texaco conducted a study, but the conclusions its consultants drew from the data are incorrect and misleading.

73. The study data demonstrate that PAHs loaded by the refinery exist in high concentrations in sediments of depositional areas downstream (stations DR53, DR55, DR67, DR68, DR83), distant from the refinery. These sediments are characterized by relatively low concentrations of sand and high PAH/TOC ratios, which is consistent with what we know about PAH distributions in river-estuarine systems. The higher the PAHs relative to TOC, the more bioavailable the PAHs tend to be.

74. By ignoring loading, employing false assumptions in its fingerprinting analyses, and carrying out bivalve and long core studies in non-depositional areas, Texaco avoided what its own data reveal: refinery-released PAHs are responsible for downstream sediment degradation and are correlated with toxic effects. Although correlations are not proof of impact, the lack of bioavailability

27

data precluded any measure of which toxic agents in the sediments caused the adverse effects observed in the Triad experiments.

75.  Occam's Razor, or the Principle of Parsimony, states that one should not make more assumptions than necessary in a given scientific inquiry.  When presented with a series of explanations of a given cause-and-effect relationship, choose the simplest.  The data from the Court-ordered studies present a straightforward, obvious explanation for harmful, ongoing PAH contamination downriver of the refinery, which Texaco has ignored.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  Tallahassee, Florida
        October 7, 2005

Robert J. Livingston, Ph.D