IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE )
COUNCIL, INC., and DELAWARE )
AUDUBON SOCIETY, )
                 )
    Plaintiffs, )  Civil Action No.
                 )  88-263-SLR
                 )
  v. )
                 )
TEXACO REFINING AND MARKETING, )
INC., )
                 )
    Defendant. )


REPLY DECLARATION OF MITCHELL S. BERNARD IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

    I, Mitchell S. Bernard, declare as follows:

Introduction

    1. I am plaintiffs' counsel, and respectfully submit this declaration in reply to various assertions defendant (or "Texaco") makes in its September 9, 2005 response to plaintiffs' pending motion to enforce this Court's prior judgments. Texaco's response includes an answering brief ("Texaco Brief") and supporting declarations from an array of paid consultants.

Nature, Purpose, and Context of Study

    2. Texaco's papers betray a basic misunderstanding of both the purpose and nature of the Court-ordered study. It was designed by the Court's expert, Dr. Means, as an integrated set of inquiries to accomplish two essential purposes.

First, Texaco was to determine whether its repeated and egregious excess discharges of toxic pollutants cause ongoing harm in the Delaware River. Second, the data were meant to serve as a baseline for monitoring the effects of future unlawful discharges from the refinery.

3. Both these purposes stem from the Clean Water Act permit term that required Texaco to "take affirmative steps to ascertain and mitigate any adverse impact of its nonconforming discharges." *Natural Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 800 F. Supp. 1, 25 (D. Del. 1992) ("*NRDC v. Texaco I*"). Texaco "ignored" this basic requirement for more than eight years, during which it violated Clean Water Act discharge limits on thousands of days. *See id.* at 21, 22.

4. Defying this Court's 1993 injunction, Texaco devised a monitoring plan that was neither designed nor equipped to measure impacts. *Natural Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 20 F. Supp. 2d 700, 706 (D. Del. 1998) ("*NRDC v. Texaco II*"). Following prolonged litigation, the Court directed Texaco to carry out the specific studies prescribed by Dr. Means, whom Texaco itself had nominated to be the Court's expert. *Id.* at 703. The Court ruled that the "only valid measurement of impacts is a program like that proposed by Dr. Means." *Id.* at 712.

5. Despite this further directive, Texaco's handpicked consultants, Mr. Hall and Dr. Burton, prepared a scope of work in 1999 that departed substantially from the Means-prescribed (and Court-ordered) research program. This

necessitated further enforcement proceedings, which were settled in February 2000 when Texaco agreed, under pressure of a further adverse judgment, to modify its study plan.

6. The instant motion arises against this background of defendant's repeated failure, during more than 22 years, to account for the effects of its unlawful pollutant discharges to the Delaware River. Plaintiffs' primary claim is that Texaco's study report disregards or obfuscates pertinent data, drawing an unsupported conclusion that exonerates the refinery from responsibility for significant and harmful contamination downriver.

7. Texaco objects to what it characterizes as plaintiffs' "attempt to open a general scientific inquiry of the Texaco study." Texaco Brief at 6. Plaintiffs do not request a "general scientific inquiry." Rather, they seek answers to two basic questions. First, do PAHs that emanated from the refinery cause ongoing harm in the River? Second, did Texaco carry out each essential element of the Court-ordered studies? Based on Dr. Livingston's extensive, independent review, plaintiffs believe the answer to the first question is yes, and the answer to the second question is no.

8. Given the purposes of the Clean Water Act, and the long history of Texaco's failure to confront the environmental consequences of its excess pollutant discharges, the questions plaintiffs pose are more than appropriate; they are unavoidable.

3

Bioavailability

9. Texaco contends that it carried out, as much as possible, the Court-ordered studies. This is not true. *See* Livingston Decl. ¶¶ 14-17, 21-22; Livingston Reply Decl. ¶¶ 9-11, 15-16, 20-21, 36-37, 42, 44, 71, 74.

10. The key departure from the Court-mandated study plan is Texaco's failure to conduct caged bivalve experiments to determine bioavailability. Judge Longobardi's 1998 Opinion and Order expressly required Texaco to conduct the bioavailability work described by Dr. Means. *NRDC v. Texaco II*, 20 F. Supp. 2d at 704, 715. But in its 1999 scope of work, Texaco did not propose to expend any such effort. After plaintiffs brought their second motion to enforce, the parties stipulated as follows: "Defendant will conduct a caged bivalve study at selected sample sites in the study area, with concurrent PAH, metals, and PCB analyses." D.I. 296 ¶ 1d. Texaco violated this express and unambiguous requirement.

11. Texaco offers a number of hollow excuses for its violation of the 1998 and 2000 Orders. First, Mr. Hall asserts that abandoning the Court-mandated bioavailability study is "inconsequential." Hall Decl. ¶ 20. Essentially, Texaco claims that it was able to "answer the relevant question in a scientifically valid manner," Texaco Brief at 18, without carrying out the caged bivalve work. This is precisely what Mr. Hall and Dr. Burton asserted in 1999, when they prepared a scope of work that omitted the Means-prescribed bioavailability work. Their derelictions prompted two days of trial testimony in January 2000, and the

4

resulting Stipulation, so ordered by the Court, that explicitly required Texaco to modify its plans. Texaco did not have authority to disobey this Court's Orders.

12. Mr. Hall states that it is not unusual in a study to encounter unexpected conditions in the field. Hall Decl. ¶ 28; *see also* Texaco Brief at 5. That may be true. But the Court Orders controlling the Texaco study did not expressly or by implication grant Texaco the right to depart from their explicit terms.

13. This is not an ordinary study. Its genesis is this Court's ruling that Texaco violated the law. The Court ordered specific studies because Texaco *violated two prior Orders* to conduct an adequate study. Perhaps Texaco had discretion to devise its own study before Judge Roth's 1992 decision, or before Judge Longobardi's rulings in 1996 and 1998. But its repeated defiance of this Court's Orders deprived Texaco of any such discretion by 1999.

14. Mr. Hall writes that Dr. Burton's efforts to carry out caged bivalve studies "went above and beyond what was originally contemplated in the Order." Hall Decl. ¶ 26. The Court Order contemplated what it explicitly required: that Texaco would conduct caged bivalve studies in appropriate parts of the receiving system. Dl. 296 ¶ 1d. Texaco did not comply.

15. Besides, Dr. Burton's efforts were far less heroic than Texaco claims. In his reply declaration, Dr. Livingston identifies a number of productive avenues Texaco could have pursued, but did not pursue, to comply with the Court Order. Livingston Reply Decl. ¶¶ 9-11, 13-16.

5

16. Texaco seeks refuge in the false claim that it "kept Dr. Livingston . . . firmly in the loop during the conduct of the studies." Texaco Brief at 11; *see also id.* at 9, 18; Hall Decl. ¶ 35. But Texaco did not inform Dr. Livingston of regulatory or other hurdles, or seek his advice, even though it knew Dr. Livingston believed the caged bivalve work was crucial to the overall scientific validity of the study. *See* Livingston Reply Decl. ¶¶ 7, 22-33. Had he known, Dr. Livingston would not have approved Texaco's abandonment of these critical experiments. *Id.* ¶ 34.

17. The August 2001 communication Texaco highlights to demonstrate the "cooperation and collaboration between the scientists engaged by the parties," Texaco Brief at 9, was a response to an explicit inquiry from plaintiffs' counsel for a study update. *See* App.IV-A326 (letter dated August 24, 2001 from Richard D. Allen to Mitchell S. Bernard: "In response to your request earlier this week, Lenwood Hall prepared the enclosed memo summarizing the status of the work to date."). Moreover, Mr. Hall's memo merely reports that Mr. Salazar "has been hired to conduct the bivalve studies to address bioavailability." App. IV-A328. He mentions that, five months earlier, resident clams had been collected, and that a *Rangia* depuration study had been conducted six months earlier. *Id.*

18. Even an educated reader would not have assumed from the text of Mr. Hall's memorandum that Texaco had abandoned the caged studies the Court Order required. I read Mr. Hall's memo, and I did not read it to say or imply that.

19. I participated in drafting and editing the 2000 Stipulation. Except on those matters explicitly set out in the Stipulation, I do not believe (or argue) that Texaco was required to confer with Dr. Livingston during the course of the study. Dr. Livingston was not Texaco's colleague or collaborator. He was available to play a limited, conferring role on some issues. His role was designed with the knowledge that Texaco would exercise full control over, and would retain full responsibility for, all aspects of the study. Plaintiffs explicitly reserved their right to object to the study precisely because they knew Texaco retained full decisionmaking authority. D.I. 296 ¶¶ 2, 3.

20. The fact is that, with regard to the major issues – the problems encountered in doing the bioavailability work, the decision to abandon those experiments, the problem obtaining substantial long core information, the interpretation of study data – Texaco did not collaborate or communicate with plaintiffs. In my view, Texaco's *post hoc* attempt to appear collegial is a cynical, transparent attempt to avoid responsibility for its own disobedience of the Court's unambiguous commands.

21. In light of their behavior in 1999, which included preparing a scope of work for the Court-ordered studies before reading the Court's September 1, 1998 Opinion and Order, it is not surprising to me that Dr. Burton and Mr. Hall departed from the Court-prescribed studies. But it is remarkable to me that Texaco's lawyers never approached plaintiffs or asked the Court to modify defendant's obligation to conduct caged bivalve experiments. If Texaco really

7

believed it was physically impossible to carry out the mandated experiments, then it could have and should have approached the Court to explain and seek relief. See Fed. R. Civ. P. 60(b). That would have permitted plaintiffs to propose alternative means to satisfy this essential study requirement.

22. I do not believe Texaco's lawyer at that time, who was fully familiar with the prior proceedings, would have permitted his client to depart from the Court-mandated study without seeking an amended Order or another appropriate accommodation. I suspect he did not raise the issue because he did not know of the consultants' actions or decisions. He certainly would not have known from the content of the memo Mr. Hall sent him in August 2001, in response to plaintiffs' request for information. See ¶¶ 17-18 above.

Peer Review

23. Texaco defends its study by stating that a series of papers reporting study results have been accepted for publication, after "vigorous" peer review. Hall Decl. ¶ 17; Texaco Brief at 13. Texaco did not include the manuscripts in its otherwise voluminous submission in opposition to plaintiffs' motion.

24. When I reviewed the papers, which Texaco promptly produced at my request in mid-September, I noticed that the "peer review" had been performed by two people who apparently benefited financially from the Texaco study. One of the two reviewers is from Battelle, which did considerable work on the Texaco study and was remunerated accordingly. The second reviewer is David Page, who, at Texaco's request, had reviewed the Means protocol for analyzing tissue

8

samples of Triad organisms. Texaco's consultants opposed conducting such analyses. Dr. Page rendered an opinion favorable to Texaco, and presumably was paid for that review.

25. On its face, peer review like this is not entitled to any deference from the Court. In addition, the peer-reviewed articles merely reprint the methods and findings contained in the Texaco study report. They do not address any of the contrary conclusions reached by Dr. Livingston.

Failure to Respond to Substance of Dr. Livingston's Critique

26. When I reviewed Texaco's opposition papers, I was surprised to find not a single word analyzing or disputing on its own terms the extensive analysis Dr. Livingston provided of the study data. Texaco had more than seven weeks within which to respond to plaintiffs' motion. It retained the services of at least six experts to respond. Yet not one of them addressed Dr. Livingston's analysis, which is directly opposed to the central findings in the Texaco study report.

27. Dr. Livingston has been involved in this matter for 15 years. This Court has found him to be a credible scientist, and has repeatedly referred to and relied on his expert testimony. See *NRDC v. Texaco I*, 800 F. Supp. at 6 & n.2, 10, 23, 24, 25, 27; *NRDC v. Texaco II*, 20 F. Supp. 2d at 703, 705-06, 709, 712, 714, 715.

Need for Judicial Intervention

28. Plaintiffs were prepared to accept the Texaco study report, and not quibble about small variations in study methods or interpretations of data.

9

However, when Dr. Livingston reviewed the report in detail, the problems he found were fundamental. After a detailed, independent analysis, he reached a conclusion contrary to Texaco's on the central issue of concern. After lengthy and extensive negotiations with defendant, plaintiffs asked the Court to intervene.

29. We have proposed that the Court seek the advice of Dr. Means, which seems logical to us. Notwithstanding Texaco's claims to the contrary, plaintiffs' motion raises highly technical issues, every bit as complex as the ones that moved the Court to seek Dr. Means's guidance previously. See Texaco Brief at 8 (seeking to distinguish prior questions from these). Texaco opposes this, saying plaintiffs should present their evidence to the Court. *Id.* at 39. That is precisely what plaintiffs have done.

30. It is for the Court alone to decide whether expert advice of the kind it has solicited before would be helpful. Texaco no doubt feels betrayed by Dr. Means, whom it nominated and who turned out to be more of an independent scientist than defendant may have preferred. But defendant's animus should not keep the Court from procuring whatever advice it deems constructive.

Conclusion

31. To plaintiffs, the questions embedded in the instant motion implicate the integrity of this Court's remedial Orders, the meaning of the Clean Water Act, and the principle of polluter accountability. After these many years, plaintiffs and

the public deserve a legitimate, trustworthy answer to the question the Court ordered Texaco to answer. Through this motion, that is what plaintiffs seek.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
October 12, 2005

*Mitchell S. Bernard*
Mitchell S. Bernard