IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC. and DELAWARE         )
AUDUBON SOCIETY,                   )
                                   )
            Plaintiffs,            )
                                   )
       v.                          )    Civ. Action No. 88-263-SLR
                                   )
TEXACO REFINING AND                )
MARKETING, INC.,                   )
                                   )
            Defendant.             )

## DEFENDANT'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION FOR RELIEF FROM JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL
Richard D. Allen (#469)
Megan Ward Cascio (#3785)
1201 North Market Street
P. O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
*Attorneys for Defendant*

OF COUNSEL:

Anthony F. King
Julie M. Domike
John W. Kampman
Wallace King Marraro
 & Branson, PLLC
1050 Thomas Jefferson St., N.W.
Washington, DC 20007
(202) 204-1000

October 26, 2005

TABLE OF CONTENTS

Page

TABLE OF CITATIONS ii

INTRODUCTION 1

I.    THE PORTION OF THE INJUNCTION MANDATING A PAH FINGERPRINTING STUDY SHOULD BE TERMINATED. 3

II.   THE PORTION OF THE INJUNCTION MANDATING A STUDY OF BIOCONCENTRATION LEVELS OF TOXIC AGENTS IN BENTHIC ORGANISMS SHOULD BE TERMINATED. 6

III.  THE PORTION OF THE INJUNCTION MANDATING A STUDY OF LONG CORE SAMPLING SHOULD BE TERMINATED. 6

IV.   THE PORTION OF THE INJUNCTION MANDATING    A BIOAVAILABILITY STUDY SHOULD BE TERMINATED. 9

V.    THE RULE 60(B)(5) STANDARD HAS BEEN MET AS TO ALL SIX STUDIES. 14

VI.   THE PORTION OF THE INJUNCTION MANDATING THAT TEXACO DEVELOP AND IMPLEMENT A PROGRAM TO MONITOR FUTURE DISCHARGES SHOULD BE TERMINATED. 17

CONCLUSION 19

ii.

## TABLE OF CITATIONS

Page(s)

Cases

*Building and Constr. Trades Council of Phila. and Vicinity v.*
    *National Labor Relations Bd.*,
    64 F.3d 880 (3d Cir. 1995)                            2, 14, 15, 16

*NRDC v. Texaco Ref. and Mktg. Inc.*,
    20 F. Supp. 2d 700  (D. Del. 1998);
    *aff'd*, 182 F.3d 904 (3d Cir. 1999)                    8, 9, 15, 17

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992)                                      15

*United States v. Swift & Co.*,
    286 U.S. 106 (1932)                                      15

*United States v. Witco Corp.*,
    76 F. Supp. 2d 519 (D. Del. 1999)                      15

Rules

Fed. R. Civ. P. 60(b)(5)                                 passim

Defendant Texaco Refining and Marketing, Inc. submits this reply to plaintiffs' Answering Brief in Opposition to Defendant's Motion for Relief from Judgment.[1]

## INTRODUCTION

Texaco's opening brief demonstrated that each of the five specific issues raised by plaintiffs' motion to enforce this Court's November 6, 1993 Injunction – and the February 23, 2000 and the September 1, 1998 Orders implementing that Injunction – can and should be resolved in the normal course by applying Rule 60(b)(5) of the Federal Rules of Civil Procedure.

To summarize, the Injunction and Orders required Texaco to perform five studies regarding the possible impact of future noncomplying discharges at its former Delaware Refinery under its NPDES permit, and one study regarding the possible effect of past noncomplying discharges at the Refinery. Texaco completed all six studies, and fully complied with the terms of the Orders as to five of the six studies. As to the sixth study regarding bioavailability, Texaco complied with the relevant aspects of the Stipulated Order, February 23, 2000 (hereinafter "2000 Order") as closely as scientifically and practically possible, and was able to complete the bioavailability study and answer the relevant question in a scientifically valid manner.

Given that Texaco complied with the Injunction terms as to five of the studies, and given that (1) Texaco attempted to comply in good faith with the bioavailability mandate; and (2) changed conditions unforeseen by the parties made

_____

[1]     Plaintiffs also submitted an 11-page Declaration from Mitchell S. Bernard, lead counsel for plaintiffs in this action. Portions of it appear to be evidentiary assertions, and even expert opinion. (*See, e.g.*, paragraphs 18-22.) Texaco reserves both its right to challenge the admissibility of this Declaration and its right to make further inquiries of the declarant in discovery

precise compliance with the decree unworkable as to the bioavailability study, relief from the Injunction is appropriate under Rule 60(b)(5) and the factors enunciated in *Building and Constr. Trades Council of Phila. and Vicinity v. National Labor Relations Bd.*, 64 F.3d 880, 888 (3rd Cir. 1995). (*See* Defendant's Answering Brief in Opposition to Plaintiffs' Motion to Enforce Judgment and In Support of Defendant's Motion for Relief from Judgment, September 9, 2005, at 28-31, 38 (D.I. 309) (hereinafter "Texaco Brief").)

Plaintiffs' Opposition, in large part, confirms Texaco's argument. Indeed, the most striking aspect of plaintiffs' Opposition is the extent to which plaintiffs now admit or concede that Texaco did, in fact, comply with the Injunction.

Moreover, NRDC now concedes that the portion of the Injunction that would have required Texaco to use five of the six studies it performed to develop a monitoring program for use in the event of future noncomplying discharges is no longer applicable, as no Texaco entity or successor owns or operates the Refinery.    In short, now is the appropriate time to bring the entire matter to a close.

But before addressing plaintiffs' specific complaints and how they are resolved by Rule 60(b)(5), Texaco will address NRDC's general complaint that Texaco somehow violated the Injunction by, in NRDC's view, "misinterpreting" the data or reaching conclusions from the data that differ from Dr. Livingston's conclusions. (Plaintiffs' Reply Brief in Support of Motion to Enforce Judgment and Answering Brief in Opposition to Defendant's Motion for Relief from Judgment, October 12, 2005 at 6-8 (D.I. 317) (hereinafter "NRDC Reply").)  Texaco vigorously challenges the notion that this sort of vague allegation could support a finding that it violated an Injunction.

More to the point, if NRDC's request that this Court decide whether Texaco's conclusions are right is to be taken seriously, one would have to assume that there is an objectively correct answer that the Court could compare with Texaco's answer.  NRDC would have this Court use Dr. Livingston as the authority, but Dr.

Livingston is simply the hired expert of an interested party. Even if he were objective, all he would be able to do would be to give his interpretation of the data. No court could ever reasonably require a party to determine the objectively "correct" answer to a scientific question, and this Court did not do so here. Instead, the Court required Texaco to conduct a scientifically valid study, where "scientific validity" was determined by the terms of the 1998 and 2000 Orders. The question before the Court now is whether Texaco completed five of the studies according to those terms, and whether its substantial compliance with the terms of the sixth study (and the practical impossibility of doing more) means that it completed the sixth. The record is clear that Texaco has met its obligations, and should be granted relief under Rule 60(b)(5).

I.     THE PORTION OF THE INJUNCTION MANDATING A PAH
       FINGERPRINTING STUDY SHOULD BE TERMINATED.

Plaintiffs' opening brief argued "Texaco emphasized concentrations of PAHs rather than actual loadings of PAH compounds to the [Delaware] River" (Plaintiffs' Opening Brief in Support of Motion to Enforce Judgment, July 18, 2005 at 15 (D.I. 300) (hereinafter "NRDC Brief").).

Texaco pointed out that the 2000 Order specifically required not a loadings study but a *fingerprinting* study, which relies upon the comparison of PAH concentration patterns from suspected sources – i.e., the source "fingerprint" – to the PAH concentration patterns measured in potentially impacted environmental samples. Despite NRDC's complaints about reliance on concentrations of PAHs, they are at the heart of the required fingerprinting study. Texaco further pointed out that the fingerprinting study mandated by the Order is fundamentally different from a loadings study, which does not yield a "fingerprint." (Texaco Brief at 15-17.)

In its Reply Brief, NRDC agrees. NRDC states that a loadings study instead of fingerprinting "would have been contrary to the Court's commands," and "concur that fingerprinting and loading are distinct from one another, and that chemical

fingerprinting can not be established solely by reference to loadings." (NRDC Reply at 10.)

NRDC's PAH claims now are so narrow and unfounded that they can readily be disposed of by the Court on their face.  As discussed below, NRDC's remaining two complaints are that (a) Texaco should have taken samples of Refinery effluent from somewhere other than the Refinery effluent discharge stream; and (b) even though no Order of this Court required Texaco to do a loadings study, it was somehow a violation of the Injunction for Texaco not to do one.

Plaintiff's first argument is simply bizarre.  It is elementary that, to determine the PAH fingerprint of effluent, the sample should be taken at the effluent's most unaltered point — specifically the effluent discharge stream coming directly out of the Refinery.  That is what the researchers did.  It is nonsensical for plaintiffs to say that an accurate sample of Refinery effluent could be collected only after the effluent had mixed with seven miles of Delaware River water.  (NRDC Reply at 11.)

In fact, the only logical explanation for plaintiffs' argument is that NRDC is trying to use the 2000 Order requirement that Texaco sample the Refinery effluent to insert a new requirement that Texaco sample and measure levels of PAHs throughout the Delaware River – in effect, the loadings study NRDC now admits is not required by the Injunction.  NRDC says that "Texaco erred in defining the refinery's chemical fingerprint by sampling near the discharge canal to establish the PAH signature for water concentrations" for this reason:

> Because PAHs are transported downriver, where they accumulate in depositional areas, the fingerprint in the water does not accurately reflect *what is present in the study area over time*.

(NRDC Reply at 11; emphasis added.)  But the purpose of determining the Refinery fingerprint, of course, was not to determine "what is present in the study area over time." Instead, it was to determine what was present in the Refinery effluent.  The 2000 Order

specifically states that "[f]ingerprinting of PAHs *from refinery effluent* will be compared to PAHs in the sediments." (2000 Order, Section 1(I), Texaco Brief Ex. A.) NRDC's suggestion that one would equate the unique fingerprint of the Refinery effluent to a fingerprint of "the study area over time," makes no sense.

In fact, we need not guess at what Texaco was required to do, for the 2000 Order is clear on this score. It states: "Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments." *Id.* That is what the Court required, not a loadings analysis slipped in under the guise of PAH fingerprinting.

Perhaps more to the point, NRDC appears dissatisfied with the 2000 Order on this score, and would rather it provided that Texaco not sample Refinery effluent for the fingerprinting analysis, or do other sampling and analysis instead or in addition. But that was a matter to bring before the Court during the 2000 proceedings.

That seems to be at the root of NRDC's second argument. NRDC simply cannot point to any provision of the Injunction or any Court Order that required Texaco to do a loadings study. Most significantly, the parties and the Court have already addressed the issue of what studies were necessary to satisfy the Injunction. Indeed, the entire purpose of the 2000 proceedings was to resolve all issues regarding NRDC's objections as to the elements of the studies. The parties entered into a Stipulated Order dated February 23, 2000 that did just that.

Texaco believes, for the reasons stated in its brief, that NRDC's scientific arguments would have no merit in any event. But the salient point is that if NRDC truly believed that a loadings study was scientifically mandated, the time to insist that it be required was in 2000. If NRDC truly believed that the Refinery's PAH fingerprint must come from samples taken of something other than the Refinery's effluent– an argument Texaco still cannot fully comprehend – the time to insist on that point was in 2000. Instead, NRDC agreed to the Stipulated Order, and Texaco completed the studies

pursuant to the Injunction. Texaco is entitled to discharge of the Injunction upon satisfaction of its obligations, and NRDC's attempt to add additional obligations after the fact should be rejected.

II.   THE PORTION OF THE INJUNCTION MANDATING A STUDY OF BIOCONCENTRATION LEVELS OF TOXIC AGENTS IN BENTHIC ORGANISMS SHOULD BE TERMINATED.

Plaintiffs' opening brief argued that "Texaco failed to analyze bioconcentration levels of toxic agents in the benthic (bottom-dwelling) organisms it captured." (NRDC Brief at 20.)

Texaco's Brief thoroughly disposed of this argument. As Texaco pointed out, the 2000 Order explicitly recognized on its face that such analysis may not be feasible and required in such an event that the parties' experts confer and attempt to resolve the issue. Pursuant to the general "Dispute Resolution" section of the 2000 Order, the parties engaged an independent expert to decide the issue; the independent expert concluded on December 7, 2000 that the proposed tissue analysis was not appropriate, carried the risk of yielding misleading data and was unnecessary given the study design. (Texaco Brief at 26-27.) Texaco fully complied with the 2000 Order implementing the Injunction, with the full knowledge and participation of NRDC.

NRDC does not defend its argument in its Opposition, and apparently now agrees that Texaco has fully satisfied the requirements of the Injunction with regard to the study of benthic organisms. The charge that Texaco had violated this portion of the Injunction should never have been made in the first place; the fact that it was made with no basis whatsoever should lead to increased scrutiny of NRDC's other charges.

III.   THE PORTION OF THE INJUNCTION MANDATING A STUDY OF LONG CORE SAMPLING SHOULD BE TERMINATED.

Plaintiffs' opening brief argued that "Texaco ... failed to complete successfully the long core experiments the Court prescribed;" and that, "(w)hile Texaco gathered long cores at a number of stations, it analyzed only two, neither of which was in

a depositional area where one would expect to find a historical record of refinery releases." (NRDC Brief at 19.)

Texaco fully disposes of these arguments in its Brief. In summary, the long-core sampling process was determined by the Court in the 1998 Order and 2000 Order to be the sole method to determine the effect of past noncomplying discharges. In that work, sample cores of bottom sediment were to be taken and analyzed through radioisotope dating and chemical analysis.

The long-coring work was conducted by the Skidaway Institute of Oceanography, the organization identified in the 2000 Order. The record is clear and compelling that Skidaway not only followed its plan, but did so with commendable diligence. Over the course of three excursions, Skidaway visited nearly 85 sites to try and take suitable samples; ultimately, seven samples were suitable for analysis, two samples yielded the full range of useful information and two other samples yielded corroborative information. The record is indisputable that, given conditions at the site, Skidaway collected as many usable samples as it could, and NRDC has no credible evidence to the contrary.

Skidaway's results, which show that PAHs detected in the cores are likely the result of transportation related activities on the river rather than from the Refinery are scientifically valid, and are confirmed by similar studies conducted in the Delaware River estuary by the University of Delaware. But the salient point here is that Texaco has done what it was required to do – and all anyone could have done – to satisfy the Injunction as to studying the possible effect of past noncomplying discharges. (*See* Texaco Brief at 32-38.)

***NRDC now agrees with Texaco's central point***. NRDC states in its Opposition: "[P]laintiffs' quarrel is not the methodologies employed by Texaco's consultant to gather data. Plaintiffs do not challenge the selection of sampling sites or the

small number of usable cores." (NRDC Reply at 12.) In other words, plaintiffs do not dispute that Texaco complied with the Skidaway plan, and thus the 2000 Order and the Injunction, in conducting the long-core sampling study. That should be the end of this dispute, and the Court should accordingly exercise its authority under Fed. R. Civ. P. 60(b)(5) and terminate the portion of the Injunction regarding past noncomplying discharges.

NRDC does have one remaining complaint about the long-core study, but it has nothing to do with the Injunction. NRDC states: "No scientifically valid conclusions may properly be drawn from [the 'sparse' long core] data." (NRDC Reply at 12.) Later, NRDC objects to "Texaco's comments on the long core work...." (NRDC Reply at 13.) Of course, as Texaco pointed out in its Brief, even the Court agreed that "there are complexities and uncertainties attendant to the mission" of determining past impacts." *NRDC v. Texaco Ref. and Mktg. Inc.*, 20 F. Supp. 2d 700, 706 (D. Del. 1998); *aff'd*, 182 F.3d 904 (3d Cir. 1999). But even though Skidaway did derive some useful analysis from even the limited data it was able to acquire, NRDC wants this Court to suppress the results.

However, whether NRDC's odd suppression request is entertained or not, it cannot dispute that, given NRDC's conclusion that "(n)o scientifically valid conclusions may properly be drawn from [the 'sparse' long core] data," the portion of the Injunction mandating the long-core sampling should be terminated. The 1998 Order required Texaco to determine the impact of past noncomplying discharges using an approach that involved the following three steps:

> First, long core samples of the sediment would be taken. Second, radioisotope dating would be conducted to narrow the range of sediment within the time frame of a year. Finally, to further refine the time frame, chemical analysis of the sediment would be conducted.

20 F. Supp. 2d at 706.

It was fundamental to the Court's analysis, and undisputed by Plaintiff's reply, that it would not be possible to determine the impact of past noncomplying discharges without the results of radioisotope dating of the long core samples. Plaintiffs cannot avoid this result by arguing that Texaco improperly "identifies the long core work as the sole study component necessary to determine the continuing effects of Texaco's past noncomplying discharges." (NRDC Reply at 4.) Texaco agrees that the impact of past noncomplying discharges on living organisms were to be determined by other elements of the study. However, as explained in the 1998 Order, the long-core sampling was intended to determine how the specific contaminants from noncomplying discharges that occurred after March 1993 may have been distributed in the area of the Delaware River near the Refinery. 20 F. Supp. 2d at 706-07. Without this information, no determination about the impact of past noncomplying discharges was possible.

NRDC says it has no quarrel with "the methodologies employed by Texaco's consultants to gather data." It goes on to say that "(n)o scientifically valid conclusions may properly be drawn from [the 'sparse' long core] data" (NRDC Reply at 12.). This leads inexorably to one result: the long core sampling did not provide necessary information that could be used to determine the impact of past noncomplying discharges from the Refinery. In short, the impact of past noncomplying discharges cannot be determined, and continuing an Injunction ordering a study of them is pointless. For all the above reasons, that aspect of the Injunction should be terminated.

IV.    THE    PORTION    OF    THE    INJUNCTION    MANDATING
       A BIOAVAILABILITY STUDY SHOULD BE TERMINATED.

Plaintiffs' opening brief argued that Texaco did not conduct studies to determine the possible impact of Refinery effluent on caged bivalves, i.e., clams. (NRDC Brief at 17-19.)

Texaco's Brief explains in extended detail that, in fact, Texaco complied with the relevant aspect of the 2000 Order as closely as scientifically and practically

possible, and was able to complete the study and answer the relevant question in a scientifically valid manner. The researchers in this study explored all possible avenues to procure the clean clams ("*Rangia*") required for this caged bivalve study. However, samples of *Rangia* were not available for placing in cages in the study area, as all samples found either already contained high levels of PAHs in their tissues or were not disease free. Texaco encountered regulatory roadblocks from Delaware in its search for suitable *Rangia*. As required by the Order, Mr. Mike Salazar was closely involved in this process, and approved of the researchers' approach of collecting resident *Rangia* from the study area instead of using caged clams in response to these changed circumstances. Moreover, NRDC knew at the time that Texaco had made reasonable scientific adaptations and raised no objections. (Texaco Brief at 18-25.)

NRDC's responses actually support lifting the Injunction. NRDC's first argument is that the Order said that caged clams would be used, and that was that -- as if the courts had no power to modify injunctions under Rule 60(b)(5). (NRDC Reply at 13-14.)

NRDC's second argument is that, despite Dr. Burton's detailed explanation of the lengths to which Texaco went to obtain caged clams for the experiment, Dr. Livingston feels as if Dr. Burton could have done more. (NRDC Reply at 14.) The examples that Dr. Livingston gives, however, are so weak that they bolster Texaco's argument:

*First*, Dr. Livingston asserts that, after the Delaware Natural Resource and Environmental Control ("DNREC"), Division of Fish and Wildlife stated that it would not allow out-of-state *Rangia* infected with Dermo to be introduced to Delaware waters, due to concerns about introducing a possible new strain of Dermo to Delaware shellfish, Texaco should nevertheless have pressed Delaware authorities to reverse this decision. (Livingston Reply Dec. ¶ 9.) Dr. Livingston does not explain what good this would have

done given the definitiveness of DNREC's rejection, or how he would have mitigated the damage done to the Delaware shellfish population by the introduction of diseased clams. The argument does demonstrate, however, that NRDC really has no evidence that Texaco could have done more; instead, it has only empty accusations that the same things should have been done again.

*Second*, Dr. Livingston states that "there [is no] evidence that Dr. Burton tried to test a new set of specimens, either *Rangia* or another suitable bivalve species, to see whether they would be disease-free." (Livingston Reply Dec. ¶ 9.)  If Dr. Livingston means that Dr. Burton should have conducted serial tests of *Rangia* until he found a set that were completely disease-free, that is completely refuted by Dr. Burton's detailed declaration in which he sets forth both the extent of contamination both in resident and out-of-state *Rangia*, and DNREC's refusal to allow even slightly contaminated clams to be imported.  (Burton Dec. ¶ 28.)  If Dr. Livingston means that another species should have been used, he overlooks that the *Rangia* were selected on his recommendation after he had rejected another choice – the eastern oyster – that would have been certified disease free.  The Scope of Work that was sent to Dr. Livingston on May 3, 2000 stated that Texaco would use "the eastern oyster *Crassostrea virginia*." (Scope of Work at 37, Pl. App. IV at A00156.)  It further stated:  "Eastern oysters will be grown for the project at the University of Maryland….This approach is preferable to using wild oysters because the animals will be **certified disease free**; the tissues will be uncontaminated…" (Scope of Work at 39, Pl. App. IV at A00158; emphasis added).  In his June 8, 2000 comments, Dr. Livingston stated:

> I would have to question the choice of the eastern oyster since the relatively low salinities in the area of potential impact would place considerable stress on these organisms. Oysters of the species *Crassostrea virginia*, are stressed by low salinity and respond to such stress by closing their valves. This does not enhance concentration of PAHs and may interfere with realistic results concerning how representative the caged bivalve studies will be concerning bioconcentration of PAHs in the refinery effluent …. Low –salinity species such as *Rangia cuneata*,

> or its equivalent in the Delaware system, should also be
> considered as subjects for this part of the project.

(June 8, 2000 Letter from Livingston to Hall, Pl. App. IV at A00289 to A000289A.) Having recommended the use of *Rangia*, Dr. Livingston cannot credibly criticize Texaco for trying its hardest to implement his recommendation.

*Third*, Dr. Livingston says that Mr. Salazar should not have relied on Dr. Burton's extensive efforts, but should have done something himself. (Livingston Reply Dec. ¶ 10.) What efforts, Dr. Livingston does not say. He does not, because he cannot. Dr. Burton exhausted every reasonable possibility.

NRDC next argues that "Texaco could have conducted caged experiments on indigenous bivalves." (NRDC Reply at 14.) Texaco thoroughly addressed this issue in its opening brief at page 23 and in Dr. Burton's declaration at paragraphs 24, 26-28. Texaco explained that *Rangia* were collected from the Delaware River, and the levels of PAHs were found to be too high to be suitable for study animals in a caged study. Therefore, Dr. Burton oversaw efforts to make the Delaware *Rangia* suitable subjects for a caged study by placing them in a relatively PAH-free creek in Delaware for 28 days. (Burton Dec. ¶ 26.) The results showed that after 14 days the Delaware *Rangia* had purged only 50% of the total PAHs from their tissues, even in this cleaner environment. However, as no further PAHs were eliminated during the next two weeks of the study, it was concluded that the PAH tissue concentrations of Delaware *Rangia* were still too high to use for the caged bivalve studies. (Burton Dec. ¶ 27; *see also* Pl. App. I at A00643.) Simply put, the researchers took every effort to make samples of Delaware *Rangia* suitable for a caged study, but all the samples collected already contained high levels of PAHs in their tissues that could not be sufficiently eliminated, so *Rangia* from the study area were collected for the bioavailability study. (Burton Dec. ¶ 28, Texaco Brief at 23.)

NRDC's next argument both misses the point and commits the classical logical error of *ergo hoc, ergo prompter hoc*. Dr. Burton described in his declaration

supporting Texaco's opening brief that, after attempting to reduce PAH levels in Delaware *Rangia* for a caged study, a decision was made to collect *Rangia* from the study area for the bioavailability study. Accordingly, Dr. Burton and his team attempted to locate clam beds within the 100 x 100 meter grid station established for each of the fifteen (15) Triad sampling sites (*i.e.*, sites identified in the Scope of Work), or as close a possible to each site. However, sufficient densities of clams were present at only 9 stations at or near the 15 Triad sites; thus, only 9 clam stations were established. Four of the clam stations were at exactly the same stations as the Triad stations, while the remaining 5 stations were within close proximity of the Triad stations, or located between 2 Triad sites. (Burton Dec. ¶ 28.)

NRDC first attacks the choice of locations of the stations (NRDC Reply at 15), but offers no evidence that other locations were available or feasible. That is the salient point: Texaco did the best it could given the changed conditions. Other than tossing brickbats, NRDC cannot reasonably dispute that point. Moreover, NRDC exaggerates this issue: as noted, 4 of the 9 clam stations were actually at Triad sites. Overall, the *Rangia* collection sites averaged only three-quarters of a kilometer from a Triad site – and, as Mr. Salazar explains in his supplemental declaration, this was in an overall study area that encompassed more than twenty (20) linear kilometers. (Salazar Supp. Dec. ¶ 5.) But of course, NRDC's complaint does not change the basic fact that conditions were what they were, and Texaco reasonably adapted accordingly.

The logical error comes with NRDC's criticism that "Texaco fails to connect the dots between the absence of clams at most Triad locations and the impacts of high levels of PAHs at those locations." (NRDC Brief at 15.) NRDC offers absolutely no scientific basis for this conclusion. Instead, its reasoning is: If B follows A, then A caused B – at least, if NRDC likes the outcome. So much for the study; according to NRDC, there is no reason even to do the caged bivalve experiment. All one need do is to look for the absence of clams; that is enough to conclude that the Refinery is responsible.

In fact, Dr. Livingston's unsupported conclusion is simply wrong. As Mr. Salazar explains in his supplemental declaration, as a scientist experienced with bivalves, he would not expect an even distribution of *Rangia*, even under pristine conditions. Furthermore, Mr. Salazar would expect that *Rangia* would be absent from many different areas within the study area due to natural factors alone. These factors would include, but are not limited to, temperature, salinity, dissolved oxygen, pH, current speed, turbidity, sediment grain size, and sediment compactness. (Salazar Supp. Dec. ¶ 3.) Dr. Livingston apparently did not consider these, or indeed any, natural factors in making his conclusory statement. This argument exemplifies what this case is really about, and why this Court should use its power under Rule 60(b)(5) to restore order and logic to this situation.

## V.     THE RULE 60(B)(5) STANDARD HAS BEEN MET AS TO ALL SIX STUDIES.

As discussed in Texaco's opening brief, Federal Rule of Civil Procedure 60(b)(5) empowers a court to relieve a party from an injunctive judgment when it is no longer equitable for the injunction to remain in force. *Building and Constr. Trades Council of Phila. and Vicinity v. National Labor Relations Bd.*, 64 F.3d 880, 888 (3d Cir. 1995). The parties largely agree on the factors that the Court should consider in ruling upon Texaco's request for relief from the Injunction. Texaco identified the following factors:

(1)     whether the party subject to its terms has complied or attempted to comply in good faith with the injunction;

(2)     whether changed conditions unforeseen by the parties have made compliance substantially more onerous or have made the decree unworkable;

(3)     the length of time since entry of the injunction; and

(4)     whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest.

*Id.* Plaintiffs add "the circumstances leading to entry of the injunction" as an additional relevant factor, and Texaco agrees. Of course, these factors are not exclusive in any

event; as with any exercise of equitable power, the decision to modify or vacate an injunction necessitates consideration of all relevant circumstances. *Id.* ("A court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or vacate an injunction.")[2]

Application of Rule 60(b)(5) should be routine as to five of the six studies, because Texaco has completed the work ordered by the 2000 Order, and thereby mandated by the Injunction. The six studies were mandated by the 1998 Order. 20 F. Supp. 2d 700, 703-07. NRDC's brief does not dispute that Texaco has completed work regarding two of the studies regarding future noncomplying discharges, the fate and

---

[2]     NRDC attempts to impose the higher hurdle of a "heavy burden" on Texaco with respect to the second factor, citing *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 528 (D. Del. 1999), but that is inappropriate here. First, as discussed below, the "changed conditions" factor is not applicable to five of the six studies; Texaco simply completed those studies and should be relieved from the Injunction. The only study to which the "changed conditions" factor has any relevance is the bivalve bioavailability study. As to that study, NRDC cites *Witco* as supporting the proposition that Texaco has a "heavy burden" with respect to whether changed conditions warrant relief from the Injunction because, according to NRDC, "(t)his Court has ruled that the 'generalized standard of *BCTC* is at least as strict as the *Rufo* rule that the parties must have based their agreement on a misunderstanding of the governing law in order to warrant a modification under Rule 60(b)'". (NRDC Reply at 18). But Texaco's request for relief pursuant to Rule 60(b)(5) is not based upon a misunderstanding of the governing law, and nothing in *Witco* indicates that all requests for relief under Rule 60(b) must be predicated upon a misapprehension of the law. Moreover, the implication that Texaco is faced with a heightened standard of proof under Rule 60(b) conflicts with the central point of both *Rufo* and *Building and Constr. Trades Council* that such relief is governed by a flexible exercise of a Court's equitable powers rather than by more restrictive standards such as a "clear showing of a grievous wrong" that was attributed previously to Justice Cardozo's opinion in *United States v. Swift & Co.*, 286 U.S. 106 (1932). *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992); *see also Building and Constr. Trades Council*, 64 F.3d at 888 ("the generally applicable rule for modifying a previously issued judgment is that set forth in Rule 60(b)(5), *i.e.,* 'that it is no longer equitable that the judgment should have prospective application'").

transport study and the effluent outfall model study. As for three other studies, it should now be clear that Texaco is done:

1.  **PAH Fingerprinting**: NRDC agrees that Texaco was ordered to do a PAH fingerprinting study, not a loadings study. Texaco completed the study. The 2000 Order is clear that Texaco was required to sample Refinery effluent (2000 Order, Section 1(1)), which logically can only be done at the Refinery effluent discharge stream, and Texaco did that. Section 1(l) of the 2000 Order directed that "Fingerprinting of PAHs from refinery effluent will be compared to PAHs in the sediments." Texaco did that. The fingerprinting study is complete.

2.  **Bioconcentration Levels in Benthic Organisms**: NRDC apparently now agrees that Texaco completed this study according to the 2000 Order. This study is complete.

3.  **Long-Core Sampling**: NRDC admits that Texaco's methodology was correct – in other words, that Texaco completed the study correctly. This study is complete.

When a party has complied with the terms of an injunction, the injunction should be lifted. *See Building and Constr. Trades Council*, 64 F.3d at 888 (court should consider "whether the party subject to its terms has complied … with the injunction….").

As for the bivalve bioavailability study, this decision falls squarely within *Building and Constr. Trades Council* factors (1) and (2). The Burton and Salazar declarations make clear that Texaco did everything possible to try to procure caged clams for the bioavailability analysis, and thus "attempted to comply in good faith with the" strict language of the "injunction" but that "changed conditions unforeseen by the parties" made "compliance substantially more onerous or have made the decree unworkable." Instead of not conducting the study, Texaco reasonably adapted the study to collect resident *Rangia* from the study area, and conducted a bioavailability study.

NRDC's arguments to the contrary miss the point. NRDC largely ignores the impressive record of attempted compliance by Texaco, as demonstrated by the declarations of Dr. Burton and Mr. Salazar. It is that record that establishes Texaco's good faith attempt to comply with the Injunction, and it stands essentially unrebutted.

The 1993 Injunction imposed obligations on Texaco that were clarified by the 1998 and 2000 Orders. Texaco has now satisfied those obligations, at least insofar as they involve studying the possible impact of past and future noncomplying discharges at the Refinery. Relief from judgment is the expeditious and fair course.

VI.    THE PORTION OF THE INJUNCTION MANDATING THAT TEXACO DEVELOP AND IMPLEMENT A PROGRAM TO MONITOR FUTURE DISCHARGES SHOULD BE TERMINATED.

The parties agree that the portion of the Injunction that would have required Texaco to develop a monitoring program to determine the extent of future noncomplying discharges is no longer applicable, as no Texaco entity or successor owns or operates the Refinery. In light of that agreement, the remainder of the Injunction should be vacated.

As noted, the purpose of requiring Texaco to conduct the five studies regarding the possible impact of *future* noncomplying discharges was to establish a baseline of conditions at the site to "enable Texaco to design a monitoring program capable of determining the impact of future noncomplying discharges." 20 F. Supp. 700, 703. As Texaco detailed in its opening brief, however, as a result of intervening events, neither Texaco nor Motiva has any ownership interest, operational control or permit obligation at the Refinery, nor does any entity related to either. Neither will have any responsibility for future exceedances. (Texaco Brief at 2-3.)

NRDC agrees. It concedes that Texaco will not be using the studies to develop a monitoring program. (NRDC Reply at 3.) Interestingly, NRDC notes that, "[a]s a legal matter, of course, Texaco remains bound to fulfill all aspects of the

Injunction unless relieved under Fed. R. Civ. P. 60(b)." (NRDC Reply at 3, n.1.)  Thus, it appears that NRDC would concede that relief under Rule 60(b)(5) is appropriate without applying some "heavy burden."  This would be particularly appropriate where, as is the case here, the affected party can show that the need for the injunction has passed.

19.

## CONCLUSION

Accordingly, for all the reasons stated, and for the reasons stated in Texaco's opening brief, Texaco respectfully requests that the Court:

(1)     deny plaintiffs' motion to enforce; and

(2)     terminate the November 6, 1993 Injunction.


MORRIS, NICHOLS, ARSHT & TUNNELL

Richard D. Allen (#469)
Megan Ward Cascio (#3785)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
*Attorneys for Defendant*

OF COUNSEL:

Anthony F. King
Julie M. Domike
John W. Kampman
WALLACE KING MARRARO
  & BRANSON, PLLC
1050 Thomas Jefferson St., N.W.
Washington, DC 20007
(202) 204-1000


October 26, 2005

## CERTIFICATE OF SERVICE

I, Samuel T. Hirzel, II, hereby certify that on October 26, 2005 I electronically filed **DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR RELIEF FROM JUDGMENT** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE  19899-1680

I also certify that copies were caused to be served on October 26, 2005 upon the following in the manner indicated:

### BY HAND DELIVERY:

> C. Scott Reese, Esquire
> Cooch & Taylor
> 824 N. Market Street
> Suite 1000
> P.O. Box 1680
> Wilmington, DE  19899-1680

### BY FEDERAL EXPRESS

> Mitchell S. Bernard, Esquire
> Nancy S. Marks, Esquire
> Amelia Toledo, Esquire
> Natural Resources Defense Council
> 40 West 20th Street
> New York, New York  10011

Samuel T. Hirzel, II (#4415)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
mcascio@mnat.com
Attorneys for Defendant