IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY,<br><br>    Plaintiffs,<br><br>v.<br><br>TEXACO REFINING AND MARKETING, INC.,<br><br>    Defendant. | Civil Action No. 88-263-SLR |

DECLARATION OF MITCHELL S. BERNARD IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

Mitchell S. Bernard declares as follows:

Introduction

1. As their lead counsel, I submit this declaration in support of plaintiffs' motion to recover reasonable attorneys' fees and costs incurred in litigating their Third Motion to Enforce this Court's judgments. The parties recently settled the motion, obviating the need for a trial the Court had scheduled for October 1. *See* Exhibit 1 (Settlement Agreement dated September 30, 2007).

2. Pursuant to the Settlement Agreement, Texaco concedes plaintiffs' entitlement to recover reasonable fees and costs. Exhibit 1 ¶ 5. The sole issue raised by plaintiffs' motion is the appropriate amount.

3. In this declaration, I will sketch pertinent background facts; explain plaintiffs' request for attorneys' fees, including the billing judgment I have exercised; set forth plaintiffs' request for reimbursement of expert witness fees and other necessary expenses; describe Texaco's bad faith conduct, which spurred both the filing of plaintiffs' motion and the need for thorough discovery; and discuss the result plaintiffs achieved.

Background Facts

4. While the history of this 19-year Clean Water Act citizen suit is rich in complexity, a single thread runs through it: Texaco's stubborn failure to comply with the clear requirements of law.

5. In particular, Texaco has repeatedly refused, despite this Court's explicit orders, to determine the environmental impact on the Delaware River of its excessive discharges of highly toxic effluent. Texaco's Clean Water Act permit, which provided the only legal basis for defendant to discharge *any* pollutant from its Delaware City refinery, required Texaco to "take affirmative steps to ascertain and mitigate any adverse impact of its nonconforming discharges." *Natural Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 800 F. Supp. 1, 25 (D. Del. 1992) (*"NRDC v. Texaco I"*). Although Texaco's unlawful discharges were plentiful, having occurred on the equivalent of thousands of days, *id.*, 800 F. Supp. at 21, 22, Judge Roth ruled, after trial, that Texaco had "ignored its responsibility to" determine adverse impact. *Id.* at 25.

6. In her 1992 Order, Judge Roth directed Texaco to perform "additional monitoring as necessary to determine the nature and impact of" its

noncomplying discharges. *NRDC v. Texaco I*, 800 F. Supp. at 24, 28. The Third Circuit affirmed this injunctive relief, see *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 507 n.12 (3d Cir. 1993), and it remained intact in the Order Judge Longobardi entered on November 16, 1993. (D.I. 195 ¶ 3).

7. In defiance of this Court's Order, Texaco devised a monitoring program that was neither designed nor equipped to measure adverse impact. As a result, plaintiffs filed their first motion to enforce the judgment (D.I. 212-215), which Judge Longobardi granted in March 1996 (D.I. 222). The Court then appointed an expert nominated by Texaco, Dr. Jay Means, to help design an adequate scientific monitoring program. After trial in 1998, the Court commanded Texaco to undertake a comprehensive set of studies outlined by Dr. Means, ruling that such studies were the "only valid measurement of impacts." *Natural Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 20 F. Supp. 2d 700, 703-07, 712 (D. Del 1998) *("NRDC v. Texaco II")*.

8. Again Texaco failed to comply. The scope of work prepared by its paid consultants, Dennis Burton and Lenwood Hall, omitted key elements of the studies the Court had directed Texaco to sponsor. This prompted plaintiffs to file a second motion to enforce, leading to a trial in January 2000. After two days of testimony, the Court made clear that Texaco would have to enhance its monitoring effort. Judge Robinson endorsed a Stipulated Order in February 2000 (D.I. 296) ("Stipulated Order"), which added a number of specific, mandatory elements to the Texaco study.

9. Texaco provided plaintiffs with a study report in January 2004. We were stunned to find that, notwithstanding the Court's rulings in plaintiffs' favor in two prior motions to enforce, Texaco had failed to carry out critical elements of the Stipulated Order. After extensive review, communication between the parties, and an ill-fated attempt at arbitration, in July 2005 plaintiffs filed their Third Motion to Enforce. D.I. 300-305.

10. The parties argued the motion on March 1, 2006. On August 31, 2006, the Court issued an Order setting the matter down for trial. The Court asked Dr. Means to review relevant materials and testify. It also ordered Texaco to pay the costs of the proceedings because defendant had failed to carry out an essential element of the Stipulated Order, and had neglected to notify plaintiffs or the Court of this omission. D.I. 328 ¶ 2: "Defendant shall bear all expenses and costs associated with the hearing because defendant did not conduct a caged bivalve study as mandated by the . . . Stipulated Order (D.I. 296), nor did defendant confer with the court or opposing counsel before conducting tests not specifically mandated in said order."

11. Dr. Means issued a written report in late January 2007. Exhibit 2. The Texaco-nominated expert found that defendant had departed substantially from the Court-ordered study that he had helped design, in ways that undermined the scientific validity of the study. Dr. Means's critique provided strong scientific support for the allegations set forth in plaintiffs' motion papers.

12. Texaco retained eight experts to try to refute plaintiffs' charges. Plaintiffs retained one expert, Dr. Robert Livingston. After intensive discovery,

4

including depositions of Dr. Means and all the experts from both sides, the parties settled the motion on September 30, 2007. Exhibit 1. Based on the settlement, on October 18, 2007, the Court entered an Order dismissing the matter, retaining jurisdiction solely to adjudicate plaintiffs' instant motion for attorneys' fees and costs. D.I. 368.

Overview of Plaintiffs' Motion

13. Plaintiffs seek to recover reasonable (1) attorneys' fees, (2) expert witness fees and related costs, and (3) out-of-pocket expenses. Plaintiffs have recovered their fees and costs for all phases of the litigation through the end of the second motion to enforce. This motion covers time spent and costs incurred since entry of the Stipulated Order in February 2000.

Attorneys' Fees

14. As fully described below, plaintiffs commenced their fee calculation by gathering hours NRDC attorneys had recorded on contemporaneous time sheets. I then applied billing judgment to remove recorded hours I deemed to be excessive, deriving a substantially reduced number of "billed" hours. I then applied a ten percent further reduction, to assure I had removed all excessive time. Finally, I multiplied attorney hours by hourly rates to calculate the proposed and "reasonable" lodestar fee.

Hours

15. I was the principal NRDC attorney litigating the Third Motion to Enforce. At various times since 2004, six NRDC attorneys and one paralegal have assisted me. In descending level of seniority, the assisting attorneys are

5

Nancy Marks, Aaron Colangelo, Benjamin Longstreth, Amelia Toledo, Thomas Cmar, and Dimple Chaudhary. The paralegal is Kathryn Boudouris.

16.   While a number of NRDC lawyers worked on this phase of the litigation, the allocation of tasks was focused and efficient. In general, I assigned to an individual lawyer discrete tasks that did not require knowledge of all the technical or factual issues involved in the motion. For example, two of the Texaco experts Mr. Colangelo deposed possess isolated areas of expertise (dye studies, chemical fingerprinting). Delegating these tasks saved me a great deal of time.

17.   From contemporaneous time sheets, we prepared a chart of NRDC attorney time expended on this phase of the litigation, organized by attorney. Exhibit 3. The chart shows the name of the lawyer and the number of hours he or she recorded. We added a column, called "billed hours," which reflects specific downward adjustments I think are appropriate as a matter of billing judgment. For example, I reduced recorded hours when more than two attorneys attended the deposition of a Texaco witness, when more than one attorney attended the deposition of plaintiffs' one witness, and in selected other circumstances where I believe the hours expended were primarily for training purposes, were duplicative, were for mundane tasks, or, in my view, were excessive relative to the work produced. This resulted in a reduction of 136.3 attorney hours.

18.   We have billed for one-half the recorded hours spent on travel, except for travel time spent working. This resulted in a reduction of 23.9 hours.

We have billed three-quarters of the time we expended preparing this fee motion, which does not require the same expertise as litigating the substantive motion to enforce. This resulted in a reduction of 34.3 hours. Because we propose two different sets of hourly rates, we present discounted hours for travel and fee litigation by simply reducing (by one-half for travel, by one-quarter for fee motion-related time) the recorded hours in these categories. Exhibit 3.

19. Beyond these specific hour reductions, I applied a blanket additional reduction of ten percent of all attorney and paralegal billed hours, resulting in a further reduction of 153.4 hours. In my judgment, this is justified due to the number of attorneys who worked on the case. Any time that happens, there is start-up time required, and certain communications have to be made to more than one person, creating some inefficiency. That said, I believe the ten percent reduction, on top of the specific hour reductions, more than accounts for any redundant or inefficient work.

20. In all, in exercising billing judgment, I cut NRDC's recorded attorney hours by twenty percent. *See* Exhibit 3.

21. One factor I considered in exercising billing judgment is that, despite the highly technical and varied nature of the evidence, plaintiffs retained only one expert. While Dr. Livingston's expertise is far-ranging, he could not run down every relevant scientific issue. Texaco itself retained eight experts to cover the necessary technical ground. NRDC lawyers had to digest diverse expert opinions and a great deal of complex background material (not limited to the voluminous Texaco study report) in order to take meaningful discovery and

prepare for trial. We did not have the luxury of a stable of paid experts to rely on; our lawyers had to perform that essential work.

22. Another consideration I deemed relevant in exercising billing judgment is the fact that Texaco's knowing violation of this Court's Order necessitated the filing of plaintiffs' motion. In addition, Texaco's denials and dissembling required plaintiffs to pursue discovery with special diligence and vigor. See below, ¶¶ 43-70.

23. Finally, I considered the exceptional and useful result plaintiffs achieved. See below, ¶¶ 71-76.

24. The total number of attorney hours for which NRDC seeks to recover fees is set forth in Exhibit 3. I believe it is a reasonable number.

Hourly Rates

25. NRDC is a nonprofit institution, and does not charge fees for its legal work. When we apply for fees, we refer to the market rate in the relevant forum, as established by published rates and information from for-profit practitioners.

26. For purposes of this fee request, the relevant market is either Wilmington, where the Court is located, or Washington, D.C., where Texaco's lawyers practice. Up until plaintiffs' Third Motion to Enforce, Texaco employed a prominent (and excellent) Wilmington firm. For this motion, however, it elected to employ a D.C. firm. We think the fairer forum is D.C., which has slightly higher hourly rates. If Texaco paid Washington, D.C. rates, then we believe it is fair for plaintiffs to recover fees based on rates in that market.

27.     The resume of each NRDC lawyer and paralegal for whom plaintiffs seek to recover fees appears in Exhibit 4. I believe that, by reason of their education and experience, the NRDC staff who billed time on the case would bill at the top of any market.

28.     Plaintiffs' proposed hourly rates, by attorney and paralegal, and based on the Washington, D.C. market, are set forth in Exhibit 5. I believe these rates are reasonable. A partner in a D.C.-based law firm concurs. *See* Exhibit 6, Declaration of Michael B. Gerrard, dated October 30, 2007.

29.     Corresponding rates based on the Wilmington market are also set forth in Exhibit 5, in the event the Court selects Wilmington as the appropriate forum for setting rates. I believe these rates, too, are reasonable. An experienced local lawyer agrees. *See* Exhibit 7, Declaration of F. Michael Parkowski, dated October 31, 2007.

30.     All rates are for 2007, consistent with the current rate method described in plaintiffs' Memorandum of Law.

Attorneys' Fees Request

31.     The total attorneys' fees award plaintiffs seek is $606,477.50 (Washington, D.C. rates), or, alternatively, $555,380.00 (Wilmington rates), *see* Exhibit 8.

Expert Witness Fee

32.     Plaintiffs seek to recover the expert witness fee it paid to Dr. Livingston. His charges are set forth in detail in Exhibit 9. They total $105,883.

33.     Dr. Livingston played a pivotal role in the case. He handled subject matter that, collectively, eight Texaco experts covered. A rigorous scientist, with deep and broad knowledge of aquatic ecosystems, he has conducted ecosystem research (and taught and published) for four decades. His prior involvement in the case (since its inception in 1988) provided specific background that enabled him to work efficiently.

34.     The Court has repeatedly found Dr. Livingston to be a credible scientist, and has referred to and relied on his expert testimony. *See NRDC v. Texaco I*, 800 F. Supp. at 6 & n.2, 10, 23, 24, 25, 27; *NRDC v. Texaco II*, 20 F. Supp. 2d at 703, 705-06, 709, 712, 714, 715.

35.     Dr. Livingston spent some time in 2000 and 2001 helping to set up aspects of the study and reviewing preliminary data. He resumed work on the case in March 2004, when he reviewed in detail the final Texaco study report. The report's omissions warranted the extensive independent critique Dr. Livingston prepared. The report's numerous flaws and limitations required him to analyze raw study data in order to draw his own conclusions.

36.     After a substantial hiatus while the parties discussed their differences, Dr. Livingston reviewed Dr. Means's report to the Court in 2007. He then assisted me in all technical aspects of the case, helping me to analyze scientific data and prepare for depositions. He himself was deposed for two days.

37.     Dr. Livingston's hourly rate is a modest $185, except for his deposition time, for which he charged $250 per hour. Several of Texaco's

10

experts, who possess far less expertise than Dr. Livingston, charged more per hour.

38. As plaintiffs' sole expert, Dr. Livingston's work on the case was invaluable. He literally performed the work of eight Texaco experts. I believe the fee plaintiffs paid him is reasonable, and we seek to recover it in full.

39. Plaintiffs also paid for necessary travel and related expenses Dr. Livingston incurred in working on the motion, and now seek to recover them. They total $6,525.98, see Exhibit 9.

Out-of-Pocket Expenses

40. The out-of-pocket expenses plaintiffs seek to recover are itemized in Exhibit 10. They consist of deposition transcripts costs, necessary travel costs, and related expenditures for NRDC attorneys. The total is $23,859.54, nearly three-quarters of which is for deposition transcripts.

41. Consistent with the reductions we applied to recorded attorney time, we do not seek reimbursement for expenses, for travel or otherwise, associated with more than two lawyers at a deposition of a Texaco expert, or more than one lawyer at the deposition of Dr. Livingston. We also do not seek reimbursement for local counsel fees or NRDC attorney meals.

42. I believe the out-of-pocket expenses plaintiffs seek to recover are reasonable, and were necessary to conduct the litigation.

Texaco's Bad Faith Conduct

43. Texaco's conscious failure to comply with this Court's commands prompted plaintiffs to file their Third Motion to Enforce. As the Court has already

11

found, defendant did not conduct the caged bivalve experiment that was a crucial element of the Means-designed study program, and never informed plaintiffs or the Court of this departure from the dictates of the Stipulated Order.

44.   In addition, litigating the motion was made more complex, difficult, and time-consuming by Texaco's disingenuous assertions and obfuscations, many of which, discovery revealed, were without basis in science or fact.

45.   My principal purpose in discussing specific evidence plaintiffs uncovered during discovery is to indicate the degree of attorney and expert effort required to peel away the layers of Texaco's deceit. In addition, Texaco's bad faith behavior provides a third basis, in addition to the Clean Water Act and this Court's August 31, 2006 Order, for awarding plaintiffs their fees and costs. *See* plaintiffs' Memorandum of Law at 3-4.

Bioavailability

46.   Perhaps the clearest (though not the only) example of Texaco's misconduct concerns the bioavailability studies prescribed by the Court. The existence of a pollutant in the environment does not necessarily mean the pollutant is harming biota. Biological harm occurs only if the pollutant is bioavailable, that is, if it moves from the environment into an organism.

47.   In Dr. Means's view, adopted by the Court, it is essential to answer the bioavailability question in order to determine the impact of Texaco's discharges. Without the specific experimental link between a contaminant in water or sediment and a contaminant in an organism, it is impossible to assign responsibility for any observed biological harm in the Delaware River.

48.     Pursuant to the Means approach, bioavailability was to be examined in two ways: by measuring contaminant burdens in tissues of sediment organisms, and by conducting a caged bivalve experiment in relevant locations in the River.

49.     Texaco carried out neither element of this mandatory, critical work.

Tissue Analyses

50.     Mr. Hall and Dr. Burton did not include tissue analysis in their initial (1999) scope of work. However, the February 2000 Stipulated Order required Texaco to "carry out tissue analyses" in sediment test species unless such analyses were not feasible. D.I. 296 ¶ 1(h).

51.     Dr. Means provided Texaco with a protocol for conducting the requisite analyses, which he had used repeatedly and successfully in his own laboratory. Still, Texaco's lead consultants were skeptical of the efficacy of the tests, due primarily to the difficulty of amassing sufficient tissue from tiny benthic organisms. They posed the question to a professional oil industry consultant, who opined in their favor, citing the lack of necessity for such analyses and the purported need to use EPA-tested methods for any litigation-related task.

52.     Neither Texaco nor the paid oil industry expert ever bothered to call Dr. Means to inquire about his protocol. They did not find that the method was not feasible, which is the operative term in the Stipulated Order. Whether these analyses were necessary, or had to be blessed by EPA, was for the Court, not Texaco, to determine. Texaco did not even attempt to conduct the tissue analyses the Court had directed it to conduct.

### Caged Bivalve Experiment

53. This left caged bivalves as the sole method for determining bioavailability.

54. Texaco's 1999 scope of work did not include caged bivalve work. In the 2000 Stipulated Order, however, plaintiffs insisted on and obtained an explicit commitment to study bioavailability by conducting a caged bivalve study: "Defendant will conduct a caged bivalve study at selected sample sites in the study area, with concurrent PAH, metals, and PCB analyses." D.I. 296 ¶ 1(d).

55. The Court endorsed the Stipulated Order, giving it the force of law.

56. Texaco did not conduct a caged bivalve study.

### Failure to Notify Plaintiffs or Court

57. After plaintiffs first noticed this omission, in 2004, Texaco claimed it had informed Dr. Livingston of the change in study plans. Discovery revealed the hollowness of defendant's self-serving claim.

58. To support its notice-to-Livingston defense, Mr. Hall relied exclusively on a memo he wrote on May 16, 2001, see Exhibit 11. While the memo states that resident *Rangia* (the bivalve Texaco had targeted for study), not caged *Rangia*, had been collected and were being analyzed (¶ 4), it also states that a *Rangia* depuration study had been initiated, with results not yet available (¶ 3). The sole purpose of the depuration study was to determine whether Delaware River *Rangia* could purge themselves sufficiently of PAHs so that they could be caged for the bioavailability experiments. Thus, a reader of Mr. Hall's memo would have no way of knowing that Texaco had abandoned the

Court-mandated caged bivalve studies. When we deposed the evasive Mr. Hall, he testified that Texaco had decided to dispense with the caged study more than two months before the date of his May 16, 2001 memo, a fact he did not disclose to Dr. Livingston.

59.    Texaco never informed plaintiffs or the Court of its fundamental departure from the terms of the Stipulated Order.

### Impossibility

60.    Texaco's next line of defense was that it was impossible to carry out a caged bivalve study, because Dr. Burton could not find bivalves that were sufficiently free of contaminants and disease. The impossibility assertion turned out to be hollow as well. For example, Dr. Burton confined his search to a single bivalve, when the published literature, including a standard method developed by Texaco's own bivalve consultant, Mr. Michael Salazar, indicates that many bivalve species could have been candidates for the Court-mandated caged experiment. Mr. Salazar conceded this during his deposition.

61.    Dr. Burton's excuse for confining his search was that Dr. Livingston suggested using *Rangia*. But Dr. Livingston did not know that suitable *Rangia* were hard to find for purposes of the experiment, because Texaco and its consultants did not tell him. Had he known, Dr. Livingston would have suggested caging a different bivalve.

### Resident *Rangia* Study

62.    Texaco's final excuse for violating the Court Order was that an indigenous (or resident) bivalve study its consultants conducted was the scientific

equivalent of the caged experiment the Court had explicitly required of Texaco. Extensive deposition testimony revealed the emptiness of Texaco's claim.

63.     Texaco set out to sample resident *Rangia* at the 15 sites (called Triad sites) it had used for other study experiments. The reason for this was to generate data comparable to data gathered during other parts of the study, as was contemplated by section 1(d) of the Stipulated Order. However, Texaco could not find *Rangia* at 11 of the 15 Triad sites: They were not there. One obvious interpretation of this fact is that the sediments, especially in depositional areas downstream of the refinery and subject to the refinery's influence, were too polluted to accommodate the bivalves. Both Dr. Means and Dr. Livingston pointed this out. Texaco did not mention it in its study report.

64.     Dr. Burton testified that he did not find *Rangia* at most of the Triad sites because the water was too deep. Mr. Salazar, the expert on whom Dr. Burton said he relied, dismissed that assertion, stating that depth was irrelevant because *Rangia* dwell in sediment, not in water. Mr. Salazar hypothesized that *Rangia* were absent due to various physical and chemical factors, not one of which he examined before writing his final report (April 2003), filing his expert report (June 2007), or submitting to a deposition (July 2007).

65.     The scientific legitimacy of substituting resident for caged bivalves depends in part on the proximity of the resident sites to the corresponding Triad locations. Texaco ranged far from the Triad sites to find *Rangia* beds. Five of the sites were more than one kilometer from the supposedly comparable Triad location, a sixth site was .99 kilometers away, and a seventh site was more than

two kilometers away. Dr. Neff, another Texaco expert, testified that a distance of more than a few hundred meters would disqualify any such site as comparable. Other than the four Triad sites at which Texaco found *Rangia*, none of the resident sites was within that distance.

66.    To be comparable, the Triad and resident sites would also have to share various physical and chemical characteristics, such as sediment grain size, dissolved oxygen levels, temperature, and salinity. Texaco did not examine any of these habitat data on which a legitimate scientific comparison depends.

67.    All the experts agree that one primary advantage of caging bivalves is that you can place the cages where you want to in the environment, to generate data in the locations or habitats you need to study. The experience in this study underscores that advantage, reinforcing the validity and importance of the explicit Stipulated Order requirement with which Texaco failed to comply.

68.    In addition, while defending the validity of the indigenous bivalve work he carried out, Mr. Salazar acknowledged, under oath, that in many salient respects his Texaco work failed to meet the standards set forth in the published method he himself wrote for bivalve bioavailability studies. Further, he repeatedly disavowed his own prior written statements that tended to contradict or call into question Texaco's litigation position. Some of the statements he disavowed appear in a draft report he prepared in February 2003, less than two months before he submitted his final (and more Texaco-friendly) work product. He had no plausible scientific explanation for the changes.

69. For its part, Texaco provided no meaningful check on its paid consultants. The lone Texaco liaison to the consultants, Henry Lloyd, is an honest man who has no scientific background. He was not in a position to hold the consultants to the terms of the Court Order. The failure of Texaco to exert control (or any meaningful influence) over its consultants was irresponsible, especially in light of Mr. Hall's and Dr. Burton's history of disregard of this Court's orders, and the limited scientific depth of the malleable Mr. Salazar.

70. It took a great deal of attorney and expert effort to uncover these and other pertinent facts. Plaintiffs conducted extensive, productive discovery in order to prepare for trial. Although we did not to proceed to trial, I believe the evidence revealed during discovery substantially enhanced the financial and environmental value of the settlement the parties ultimately reached.

Result Achieved

71. One factor for the Court to consider is the substantive result plaintiffs achieved. In my view there are two companion, and equally important, elements in plaintiffs' success: benefiting the local environment and holding Texaco accountable.

72. The settlement provides $2.25 million in funds for local environmental benefit projects. These projects will enhance the environment proximate to the Delaware City refinery, which, given Texaco's history of pollution, is just. Each of the six recipients of settlement funds attests to the beneficial local effect of the settlement. *See* Exhibit 12, Declarations of Greg J. Abbott, dated October 31, 2007; William McAvoy, dated October 26, 2007; Paul

H. Morrill, Jr., dated October 19, 2007; Derek Stoner, dated October 29, 2007; Robert A. Wood, dated October 24, 2007; and Marian Young, dated October 30, 2007. *See also* Exhibit 13, Declaration of Nicholas DiPasquale, dated October 24, 2007 (regarding value of settlement to Delaware Audubon Society and local environment). None of these funds would have been available for these uses but for plaintiffs' success in litigating the motion to enforce.

73. In addition, plaintiffs' motion vindicates a core purpose of the Clean Water Act citizen suit provision, by holding a recalcitrant polluter accountable for its actions. Had plaintiffs not brought suit in 1988, Texaco would have polluted the Delaware River, beyond the limits imposed by its discharge permit, with impunity. Had plaintiffs not brought their first motion to enforce, Texaco would have escaped responsibility for the skeletal "monitoring program" it knew, contrary to this Court's direction, was incapable of determining adverse effects. Had plaintiffs not brought their second motion to enforce in 1999, defendant would have carried out a study that departed in basic respects from the Means-prescribed program the Court commanded Texaco to carry out. And had plaintiffs not initiated their Third Motion to Enforce in 2005, and pursued it vigorously, Texaco could have escaped responsibility for failing to adhere to express requirements embedded in this Court's Stipulated Order.

74. The essential purpose of the Clean Water Act is to restore the ecological integrity of the nation's waters, including the Delaware River. One core purpose of the citizen suit provision is to empower groups like the Delaware Audubon Society and NRDC to hold polluters accountable to the dictates of law

when government, for whatever reason, declines to do so. This underlying principle applies with equal force whether the legal requirement at issue is a discharge limit or a Court Order specifying a scientific inquiry to determine adverse impact.

75. By their Third Motion to Enforce, plaintiffs have pursued and vindicated these good principles, and as a result – and only as a result – Texaco has paid a substantial and justified price for its errant conduct, providing some measure of justice for the environment and people it has harmed.

76. Without fee-shifting, as prudently provided for in the Clean Water Act and the bad-faith exception to the common law rule, and as suggested by this Court's August 31, 2006 Order, litigation like this would not be possible.

Summary of Plaintiffs' Request

77. For the reasons set forth above, plaintiffs respectfully request to recover $606,477.50 in attorneys' fees (or, alternatively, $555,380, if the Court applies Wilmington rates); $112,409.98 in expert witness fees and costs; and $23,859.54 in additional expenses. See Exhibit 14.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
       November 6, 2007

/s/ Mitchell S. Bernard
Mitchell S. Bernard, Esquire