Exhibit 2

Confidential

 

GLEAMS
Great Lakes Environmental
and Molecular Science Center

January 31, 2007

The Honorable Judge Sue L Robinson
United State District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 King St.
Wilmington, DE 19801

Dear Judge Robinson:

Enclosed please find my report to you as contain in your Order of August 31, 2006. The report covers my analysis of the issues regarding the completeness, validity and conclusions of the studies carried out by Motiva and it's various contractors pursuant to the Order and Opinion of Judge Longobardi of 1998 and your Stipulated Order of 2000. In some cases, I found other issues which I felt it was appropriate to draw Your Honor's attention to in the evaluation of the conflicting arguments raised by the Plaintiffs and the Motiva and it contractors as embodied in the exhibit documents I received along with the Motiva report and appendices that I received for review.

As stated in the report, I refrained from reviewing Dr. Livingston's critique of the Motiva work until I had drawn my own conclusions as to it quality, validity and compliance of the work presented in the Motiva Report with the Court's Orders of 1998 and 2000. I did not feel that it was part of my scope of work to comment on the validity of Dr. Livingston's criticisms point for point in my report. Should Your Honor wish such an analysis, I would happy to provide it.

I have taken the liberty of submitting with my report an invoice for the work that I completed to date for the Court in this matter.

I am happy to provide all additional assistance that the Court desires in the future.

Sincerely,

Jay C. Means
Gwen Frostic Professor of Toxicology
    and Environmental Chemistry,
Department of Chemistry
Associate Director, Environmental Research Cente

# REPORT

## TO

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

## FOR

## JUDGE SUE L. ROBINSON

## IN THE MATTER OF:

## NATURAL RESOURCES DEFENSE COUNCIL and DELAWARE AUDUBON SOCIETY

## VS.

## TEXACO REFINING AND MARKETING, INC.
## (MOTIVA ENTERPRISES, LLC)

## BY

## DR. JAY C. MEANS, Ph. D.
## GWEN FROSTIC PROFESSOR OF TOXICOLOGY AND ENVIRONMENTAL CHEMISTRY

## JANUARY 30, 2007

# SUMMARY

This report details the technical, scientific and practical issues related to conduct of the research carried out by Motiva and it's contractors under the Order of 1998 and THE STIPULATED ORDER of 2000 in the above mentioned case issued February 22, 2000 by the Honorable Judge Sue L. Robinson, Judge of the United States District Court, District of Delaware.

The report is divided into three main sections dealing with each of the stipulated issues. In the first part (PART I) of the report, the legal and scientific framework for establishing a baseline assessment of current impacts of refinery operations is presented as mandated in the Opinion and Order of 1998 and then expanded upon in detail in the Stipulated Order of 2000. In the second part of the report (PART II), a review of the specific work plans, research products and the interpretation of the data as identified in Judge Robinson's Order of August 31, 2006 as performed by Motiva and its contractors are evaluated for their appropriateness and scientific rigor for assessing impacts in receiving waters is addressed. In the third part of the report (PART III), my recommendations to the Court with regard to deficiencies found in the Motiva Enterprises, LLC. Inc. (hereafter referred to as "Motiva") sponsored studies as they relate to the original order of the District Court issued by the Honorable Judge Joseph Longobardi, Chief Judge of the United States District Court, District of Delaware September 3, 1998 and upheld upon appeal by the Third Circuit Court of Appeals, May 20, 1999 and the Honorable Judge Sue Robinson's order of Feb. 2000 and the Stipulated Agreement with respect to the Scope of Work, based in part upon my recommendations to the Court, to be carried out by Motiva and its contractors (and sub-contractors) to satisfy the Court's orders.

My two previous reports to the Court are included here by reference and will be referred to as Judge Report I and Judge Report II. Further, the disclosures presented in those two reports remain valid and unchanged.

## INTRODUCTION

My first report to the Court (Judge report I Nov. 3, 1997), outlined the reasons for and the scientific basis underlying five studies which needed to be performed to adequately assess the impact of the refinery discharge upon the receiving environment of the Delaware River estuary.  These studies included investigations of: 1) the composition of refinery effluents using modern analytical methods and an appropriate scope of analytes; 2) the interactions of petroleum hydrocarbons with receiving waters, natural particulates and biota as related to the fate and transport of discharged materials; 3) the quantification of the distribution of sediment-bound PAHs at sites associated with refinery discharges or related petroleum discharges with depth and spatial area; 4) the bioavailability of discharged hydrocarbons in the solution phase; 5) the bioavailability of sediment bound PAH in the sediments near the discharge both in terms of present discharges as well as an estimation of past impacts of exceedances based upon analysis of sediment cores and a site-specific model of bioavailability for Delaware River sediments.  Concomitant study of the potential toxicity of bioaccumulated contaminants would be integrated into studies 4 and 5, using relevant endpoints and test species.  The Court ordered that such studies be performed in a manner consistent with the scientific rationale presented in my report and subsequent court testimony.

In a subsequent report to the Court (Judge Report II), I further outlined the necessity and feasibility of conducting such studies and I outlined how the research data sets would represent an interdependent and interlocking picture of the potential for present, past and future impacts of the refinery discharges and exceedances of their discharge permitted waste streams.  As the result of a trial in January 2000 the Court ordered that the studies I recommended be carried out in compliance with a Stipulated Order issued by the Honorable Judge Sue L. Robinson on Feb. 22, 2000.  I should state that, contrary to assurances I received at that time from both parties to the case in 2000, I was never again consulted on any issue regarding the conduct or outcomes of any of the studies until I received the order of Judge Robinson dated August 31st of 2006.

In compliance with the Order of the Court, I have reviewed the information provided to me by both parties as they relate to the Stipulated Order

Sections 1 (c) (2); 1 (c) 3; 1 (d); 1 (i); 1 (j) and 1 (l). The following is an analysis of the issues covered in those sections of the Stipulated Order. In addition, in cases where I feel critical studies were omitted and/or that design flaws were made that compromise the overall validity of the studies, I will state these as well.

PREFACE:

In performing this critique, I first returned to the language used by Chief Judge Longobardi in his Opinion and Order of September 3, 1998 that was upheld upon appeal by the Third Circuit Court of Appeals, May 20, 1999. This was the basis on which I originally made my recommendations to Judge Sue L. Robinson in the trial occurring in January 2000 and upon which (in part) her Honor based the language of the Stipulated Order rendered on February 22, 2000. This is important because Motiva was ordered to carry out studies which would allow for the assessment of current, past and future impacts on the receiving waters of the Delaware estuary. This in my mind raises the bar for performance above that required by the typical research contract or grant. In short, under order of law Motiva is required to design and conduct studies that have the highest possible probability of yielding scientifically defensible data and then to interpret that data conservatively to develop honest and unbiased conclusions that favor the protection of the public and public receiving waters that are used by Motiva for waste discharges. In his Order of September, 1998 Chief Judge Longobardi states that <u>"Texaco shall develop and implement a program to adequately measure the adverse impact of its future discharges as discussed in Part II of this Opinion. Furthermore, Texaco shall determine the impact of its non-complying discharges since March 1993 using the protocol discussed in Part II of this Opinion."</u>

In my testimony before Judge Robinson in 2000, I emphasized the inter-connections between the studies I recommended and the inter-dependence of certain types of data sets in order to meet the criteria of establishing [or dismissing] the occurrence of adverse impacts on the receiving environment of the Delaware estuary. **Some of these critical data sets were not produced nor were the inter-connections of the various studies fully considered thus invalidating the balance of the research work performed and therefore any**

4

conclusion that could be drawn from them using legitimate and time tested principles of the scientific method.

**Specific Areas of Review:**
<u>Sections 1 (c) (2):</u>

Recalling that Judge Longobardi's Order requires that a protocol be developed and applied which could assess both current and future impacts as well as past impacts of non-compliant discharges, I recommended that a dye study be performed to determine the fate of the contaminant substances contained (dissolved, colloidal-bound and particulate-bound) in the discharge plume be determined. Without this information, it is impossible to develop a rational and scientifically defensible sampling scheme and design to determine the fate and transport characteristics of the contaminant plume.

Motiva contracted with Narajian Associates to perform such as dye study as part of sub-contract to Ocean Survey, Inc. and it was performed according to the records provided to me <u>once</u> during the month of May 22, 2000 over the course of a <u>single</u> tidal cycle (6:57 to 17:38 hrs). Since, as has been pointed out in previous testimony, this is a tidal dominated estuary, the dynamics of plume distribution and dilution will be dominated by the tidal magnitude and energy as well as seasonal river discharge variations. The Ocean Survey report makes no mention of any consideration of average tidal conditions in the receiving waters nor does it put the tidal information gathered into a historical context. **A complete and scientifically defensible design for these studies should have included a period of minimal dilution potential (occurring during the winter months)**

Figure R1 shows a eight-month record of daily predicted and measured tidal ranges at Delaware City from the NOAA National Ocean Service station # 8551762. The ranges for May 2002 show tides consistent with those present at the time of the Ocean Survey study (~+1ft to ~+7ft.). Figure R2 shows a five-year mean water level record for the same NOAA NOS station. Note that in the time period from late December 2001 until March 2002 the tides and mean water levels are much lower indicating that a scenario of sustained reduced dilution and transport potential exist during this period. **This demonstrates that the**

**period selected for the Ocean Survey represents a period of high dilution rather than a period of low dilution potential for the Motiva effluent. This is relevant to the goals set out by Judge Longobardi's Order and the Stipulated Order because documents from the 1998 trial showed that that a high proportion of permit violations occurred during the winter months.**

The results of the Ocean Survey study suggest that the effluent plume from the refinery is transported northward and southward along the western shore of the Delaware River. In the near-field region, this plume enters waters with depths of 1-3 ft relative to MLLW. In spite of the fact that the study was performed during a tidal cycle that increased these depths to 7-9ft relative to MLLW, the plume did not extend outward from the banks by more than 3000 ft (1000yd, .48 Nm) at the 1:200 dilution contours. This observation suggests that much of the near-field impacts would be expected to occur in and on the shallow mud flats adjacent to the discharge canal. During seasonal periods of low tidal range and energy, this impact would further be restricted to these mud-flat areas. Subsequent selection and sampling of sediments for chemical analyses and for sediment toxicity as well as the site selection for bioavailability studies should have included this information but apparently did not.

**An interesting piece of information that is verified by the dye studies is the recycling of potential contaminants through re-uptake by the Motiva facility in the intake to the cooling water system.** This means that during weak ebb tidal event a significant portion of the effluent will be recycled through the plant and discharge system but with increasing higher contaminant loads. On subsequent stronger tidal cycles this (super-loaded) effluent water will be distributed to the receiving environment as a pulse of highly contaminated water and suspended particulates.

**The placement of stations for the conduct of subsequent studies appeared to have been made in the absence of consideration of the Dye study results. The vast majority of sample locations for subsequent aspects of the Motiva study were outside of the zones of most immediate impact of the refinery discharge plume. While I did not calculate a specific number, I estimate the 80-90% of all stations sampled and studied were <u>outside of this zone.</u>**

This raises a set of issues that I think must be addressed in consideration of the sum of all data presented in the Motiva report. There are vast differences in the spatial scales of the studies presented in the Motiva report. The interpretation of data in a spatial context is critical to the understanding and discernment of effects of the refinery discharges upon the receiving environment. Virtually every component of the Motiva study data were presented using different scales and units of distance. Some in meters, some in feet, some in yards, some in miles and none in modern Geographical Information System (GIS) data compliance. The use of vast numbers of tabular data rather than informative maps of parameters mask many important trends in the data sets gathered. **The lack of consideration of and presentation of critical data sets in a common geographical context masks much of the utility of the data as presented in the report.**

**Sedimentation Studies:**

The dye studies were to have provided a scientific framework for the design and conduct of sedimentation studies that would confirm the extent of impact of the refinery effluent upon benthic communities in the near and mid-field range. However, the sedimentation studies conducted by another sub-contractor (Versar, Inc.) were designed and conducted largely without consideration of the dye study data (Figure R3). One site was placed within the discharge canal itself, which is a logical starting point, however, the other two (and only two) sediment trap stations were placed by the contractor at sites which are on the fringes of the primary impact area indicated by the dye study. **While these may be considered as being in the mid-field zone, two stations are not representative of the sedimentation patterns and there were no sedimentation studies done in the near-field depositional areas as indicated by the dye study.**

**Sections 1 (c) (2):**

The Stipulated Order of 2000 called for studies of the fate and transport of discharge contaminants (metals, PAHs and other substances such as PCBs and pesticides) in the dissolved, colloidal bound and particulate phases in the near-

field and mid-field areas adjacent to the Motiva discharge. The report submitted by Dr. Uhler contains data for several near-fields and mid-field on water samples collected and then fractionated as I suggesting in my testimony in the 2000 trial and in my Judge Report II to the Court. [The issue raised by Dr. Livingston in his review of these data concerning the use of concentration data vs. loading data is a valid one.]

The science behind the validity of the fate and transport studies fall into two primary areas of concern: 1) the ability of water insoluble chemicals (such as the aromatic hydrocarbons in Motiva effluent) to bioconcentrate in the tissues of both sessile and mobile aquatic organisms in the receiving environment and 2) the fact that the transport rates of particulate-bound contaminants will be far less than in the general discharge plume thus retarding and concentrating bioavailable contaminants in the sediments in depositional areas near the effluent discharge canal.

The potential for bioaccumulation and bioconcentration of hydrophobic (water insoluble) contaminants in aquatic systems has been well documented in the scientific literature since the early 1980s and therefore should have been part of Motiva's contractors considerations in planning and conducting the studies carried out in the Delaware River as well in the interpretation of the data gathered. This is a key issue when it comes to the dispute concerning the lack of chemical measurements in the sediment toxicity studies carried out by Motiva's contractors. (This issue will be addressed later in this report.) Environmental impact can only be assessed fully when consideration of both concentrations and loading of contaminants are included in the assessment. Concentrations describe the levels of individual contaminants at points in time. However, these are highly variable depending upon operating conditions at the facility, river discharge as compared to effluent volume, tidal conditions, the degree of recycling of contaminants through the discharge, cooling water intake, discharge loop discussed in the dye study section of this report.

Contaminant loadings describe the total mass of each contaminant being added to the receiving environment over a discrete period of time. This is a far more valid measure of potential impact than instantaneous measurements of concentrations. The receiving environment has a finite capacity to dilute,

transport, degrade and tolerate the presence of every individual contaminant in the effluent. Since most of the toxicants of concern in this effluent are non-degradable or have very slow degradation rates, the factors of dilution, transport and tolerance (or susceptibility) become primary. Because of the hydrophobicity of the toxic hydrocarbons being discharged, those contaminants that are present in the dissolved phase of the effluent will rapidly associate with suspended particles in the effluent and the receiving environment. Thus, dilution in the system will be reduced and deposition of the effluent toxics will become the controlling vector for contaminant transport. Sediment deposition, resuspension and transport therefore should have been major components of the Motiva contractor's research plan, data gathering and interpretation of results. This was not completed. Loading calculations of the contaminants were not performed by the contractors, no near-field sediment transport/deposition studies were conducted, the placement and number of the mid-field sediment trap studies were inadequate and the bioaccumulation potential of the effluent contaminants (relating to tolerance/susceptibility of the receiving environment) were not carried out.

With respect to the original issues in this case, those of NPDES permit exceedances and their potential impacts on the receiving environment, no complete assessment can be made without calculations of loadings to the receiving environment in combination with adequate investigation of the sediment dynamics, and a complete assessment of bioavailability and biological effects. These were my recommendations to the Court in 2000 and they were not fulfilled in the Motiva studies as conducted. Further, the conclusions drawn by the contractors in their report are not supported by the structure of the studies, the data collected and analyzed nor the rationales they applied to reach their conclusions.

## Sediment Toxicity Studies:

A basic principle in the field of toxicology is the establishment of dose-response relationships. This principle is even more important when applied in environmental toxicology studies because of the presence of uncontrolled and uncontrollable variables inherent in environmental effects assessments.

Recognizing this critical factor, I recommended to the Court in 2000 that the impact assessment methods used by Motiva and its contractors to assess the present, future and potential past impacts of NPDES permit violations include not only bioavailability/bioaccumulation studies (caged bivalve studies) but also chemical measurement of the residues of toxicants found in the tissues of sediment toxicity organisms.  Without the specific link between a suite of measurable toxicants and the effects data in these studies, no conclusions can be drawn with regard to the impact or lack of impact of the Motiva refinery effluent upon the receiving environment.

Early in the study process, a series of correspondence between Motiva, its contractors, Dr. Livingston and others regarding that ability to perform chemical measurements on the bioassay organisms occurred.  Ultimately, Motiva sought the opinion of one Dr. Page, who without performing any measurements himself concluded that the method that I had recommended to the contractors was not useable.

He states:

1. Monitoring programs carried out under Court order must use standard, tested analytical methods consistent with standard Federal EPA and NOAA methodologies in order to produce reliable, credible and defensible data. Research analytical methods, as proposed by Dr. Means, have not been subjected to the rigorous testing and validation that standard Federal EPA and NOAA methods have been subjected to. Employing non-standard methodologies in litigation-related studies carries a very real risk of producing data that cannot survive intense scientific/legal scrutiny.

2. Analyses of very small, sub-gram wet-weight, sample sizes generally yield poor method detection limits (MDL), thus limiting the ability to discriminate different PAH sources by failing to detect minor PAH components. In small analytical samples, the effects of lab and field contaminants are amplified, thus leading to errors and in extreme cases, mis-attribution of PAH sources.

3. The proposed amphipod tissue analyses are unnecessary because of the triad-based study design adopted in this project. The dose-response relationships between PAH and the test species in the standard bioassays used in this project are well-documented. Sediment bioassays are employed as part of any triad-based study to obviate the need to analyze the small amphipod test organisms for PAH. The known response of the test organism reflects the PAH concentration in the tissues, thus making separate tissue analyses superfluous.

**His conclusions are erroneous both in theory and in practice.**

Theory:

The ability to measure the concentrations of substances in any analytical method are a function of the sensitivity, selectivity, precision and accuracy of the measurement method and the ability to quantitatively transfer the substance(s) to be measured into the measurement instrument. The latter is sometime referred to as extraction and recovery efficiency. The limit of detection of a contaminant is therefore a function of the extraction efficiency, the ability to concentrate the analytes prior to measurement and the absolute detection limit of the instrument being used. The question of whether Dr. Page conclusions are valid then rest upon whether in theory the measurements I recommended are possible.

I stated that valid measurements could be made on as little as 0.5g wet weight of exposed biological tissue from the bioassay studies. In order for the

measurement to be toxicologically relevant, the detection limit would need to be in the low part-per-billion concentration range on a wet weight basis.

The detection limits and selectivity of the mass spectrometer systems used in my laboratory and those of the contractor's laboratories are similar if not identical and their ability to perform high quality, reproducible extraction procedures is not questioned. Detection limits are calculated using accepted methods outlined in definitive texts by Dr. Taylor of the National Institute of Standards and Testing and others and are accepted practice in EPA methods as well as other regulatory agencies. The detection limit is calculated using the standard deviation (STD) of the calibration curve generated by repeated (5 to 7X) at the intercept of the curve on the mass vs. instrument response axis of the calibration. Three-times (3X STD) this value for each analyte is the instrumental detection limit. Typically automated injectors and the use of an injection internal standard minimize the standard deviations and lower the detection limits. These common practices are presumably used in the contractor's laboratories.

**However, it should be noted here that the Motiva contractors used a value of 10X STD in their studies and in their argument that the measurements could not be made. This is an overly stringent criterion for instrumental detection limit that allows Motiva in some cases to designate certain substances as Non-Detects (ND) when in fact they are readily detectable.**

The detection limit of the overall method then depends upon the ability to extract, concentrate and quantitatively transfer analytes on to the mass spectrometer system. Good laboratory practice applies the use of deuterated internal standards added to each sample to verify the degree to which quantitative recovery of the analytes from the sample, concentration (if any) and quantitative transfer to the instrument are accomplished. The internal standards also provide for corrections of losses that may occur during these steps due to operator, sample or reagent variations. When the recoveries and reproducibility of those recoveries are near 100%, the combined result for a typical sample size is calculated as the Minimum Detectable Limit (MDL) for the method for each analyte.

Table R1 shows the MSD values for a list of analytes that I recommended be performed on the tissues of exposed organisms in the bioassay studies, using

the methods I recommended and my instruments. These data are derived from thousands of analyses performed routinely in my laboratory. The data for sediment, water, colloid fractions, etc. are also presented along with the typical sample masses/volumes used. Clearly the data show that measurements in the range of 4-8 ppb (ng/g wet weight) can reliably and reproducibly be made in small samples of biological tissue contrary to the unfounded conclusions of Motiva's expert, Dr. Page.

Practice:

Further, these are not recent developments in the application modern mass spectrometers to the types of samples in question here. Table R2 shows results of analyses on 24 tissues performed in my laboratory in 1996 (prior to any involvement in this case) made during an investigation of the impacts of a petroleum spill into the environment made at the request and under the aegis of the Louisiana Department of Environmental Quality. These data were collected on ~0.5g samples of tissues from fish and crustaceans exposed to the spilled material. These data were generated with a newer mass spectrometer system than the MDLs in Table R1 and these MDLs calculated on a sample specific basis were between 0.5 and 2 ng/g wet weight for sample masses of 0.5 to 1 g wet weight of tissue.

Since these data were produced literally thousands of samples have been analyzed using these tissue methods in my laboratory and several peer-reviewed papers have been published using these methods for PCB, PAH and other compound classes. **Again, in common field studies, the methods I recommended to the Court were being performed on a routine basis by my laboratory in a regulatory context over a decade ago further invalidating Dr. Page's expert opinion.**

Dr. Page states that research analytical methods as proposed by me have not been subjected to rigorous testing and validation that standard Federal EPA and NOAA have been subjected to. First, EPA regulations allow for non-standard methods to be applied in any situation where the method can be demonstrated to have comparable or better analytical parameters of accuracy, precision, selectivity and specificity. **The methods I proposed have been utilized in both research AND regulatory measurements for EPA, MMS, the**

13

State of Louisiana, and they were found to be comparable or better than with EPA methods in a round-robin inter-laboratory exercise carried out by the EPA. It would be interesting for Dr. Page and Motiva to note that my participation in that round-robin inter-laboratory exercise was sponsored by the American Petroleum Institute and that my report to them is on file there.

Dr. Page's third, conclusion is perhaps the most erroneous of all. He states that analysis of the tissues of the exposed organisms is "superfluous". On the contrary this is the key step in establishing a concrete scientifically defensible connection between exposure to refinery effluent and adverse effects in organisms. The fact that Motiva and its contractors did not perform the analyses of the exposed bioassay tissues that showed impacts on the organisms is a critical and avoidable flaw in the conduct of the studies and this flaw invalidates any of their conclusions derived from the sediment toxicity studies on the sources and degree of refinery impacts. Yet they conclude in their report that trace metals and pesticides are the cause of any toxicity observed. This conclusion is scientifically indefensible. The use of a "weight of evidence" method for interpreting toxicity data cannot be used when selective data are excluded from the evidence.

**Bioavailability/Bioconcentration/Bioaccumulation Studies**

There are numerous misuses of three terms in both the Motiva report and it's conclusion as well as in the review and critique by Dr. Livingston in his report (Plaintiffs doc. #22). Since this is a critical issue related to the completeness of the Motiva studies, their conclusions regarding refinery impact and the overall design that I recommended to the Court in 2000, I will clarify these terms for the Court. Then, I will describe the degree to which the studies Ordered to have been performed have been completed.

In the field of toxicology the term **bioavailability** refers to <u>the ability of a chemical to cross biological membranes from the external environment and enter the tissues of an exposed organism. The route of exposure may vary.</u> In aquatic systems exposure is typically considered to occur through water exposure (respiration or ingestion), through exposure to contaminated particles (sediments and colloids) through exposure to contaminated food and to some degree

exposure through body surfaces in contact with contaminated materials (sediments, sludges, etc.).

The term **bioconcentration** refers to <u>the form of bioavailability which occurs when organisms are exposed to hydrophobic contaminants such as aromatic hydrocarbons, PCBs, certain pesticides, etc. in which tissue concentrations of the contaminants far exceed the exposure medium concentrations (typically air or water)</u>.    This process is thought to be controlled by the water insolubility of the chemicals themselves relative to the high lipid solubility of the same chemicals.  Bioconcentration factors (BCFs) are calculated from experimental data collected in laboratory or field studies or estimated from solvent/water partition coefficients such as the octanol/water partition coefficient.  BCFs for many of the aromatic hydrocarbon compounds at issue in the refinery effluent can range from 100 to over 1,000,000.  Thus, even though the concentrations of contaminants in the Motiva effluent are low (ppb range), they may be concentrated in biological tissues to levels 100X to a millionX higher in exposed organisms than in the exposure medium and thus are capable of causing adverse biological effects.  It was for this reason that assessments of bioavailability were recommended to the Court in the form of caged bivalve studies <u>and in the form of analyses of tissues collected in the sediment toxicity studies.</u>  **Neither of these studies was completed.**

The third term **bioaccumulation** refers to the process that occurs when organisms that live in close physical contact with highly contaminated media (suspended sediments, bedded sediments or contaminated food) are exposed through these media.  This type of bioavailability does not imply a specific state of the ratio of the tissue concentrations to medium concentrations as is the case with bioconcentration studies but rather reflects a combination of the bioavailability due to exposure to both contaminated water <u>and</u> contaminated sediment and food.  Bioaccumulation factors (BAFs) [sometimes referred to as <u>B</u>iologically <u>S</u>ignificant Accumulation Factors or BSAFs] refer to the ratio of the concentrations of contaminants in exposed organism tissues relative to the concentrations in the exposure medium.  These types of BAF or BSAF factors can again be determined through laboratory and field studies or may be estimated from sediment partitioning data (or model estimates) and bioaccumulation data

(or model estimates).  The USEPA and the Army Corp of Engineers have been using these approaches to estimate aquatic organisms exposures since the mid-1980s and this approach is also part of the USEPA Sediment Quality Criteria development process.

The sediment toxicity studies carried out in the Stipulated Order experiments were specifically intended to include an assessment of the bioaccumulation of PAHs from sediments used in the toxicity experiments to establish a link between effects and bioaccumulated chemicals regardless of their origin.  By avoiding these analyses (which I have shown are both technically and practically feasible) the Motiva contractors broke the critical experimental and scientific link that could have established or refuted the impacts of their effluent on the receiving environment of the Delaware River as they were ordered to do by the Court.   Instead, they misapplied the 'weight of evidence" methods in an inappropriate manner as a substitute for real data.  **I have reviewed the information and data used by the Motiva contractors to draw their conclusions in the report and I found that their conclusions could not be supported by the data.**

The USEPA approach to the development of sediment quality criteria focuses upon the use of chemical contaminant analyses normalized to sediment organic carbon mass to estimate the bioaccumulation potential of organism (on a lipid normalized basis) exposed to contaminated sediments.  This approach combines elements of sediment/water partitioning behavior and water/tissue bioconcentration behavior of chemicals.  From these estimated tissue contaminant burden data both potential adverse biological effects may be assessed using bioassay data to calibrate these effects assessments and further, maximum exposures through dietary uptake to higher trophic level organisms (like man) feeding on these benthic associated organisms may also be assessed.  Using data from the Motiva data sets which contain chemical concentrations and TOC measurements, it would be possible to estimate the tissue burdens for the benthic organism in the Delaware River system for an organism of average lipid content living in contact with sediments in depositional areas adjacent to the Motiva refinery.   I have performed such analyses on some of the data from the Sediment Toxicity Tests section of the Motiva report using an assumed 2% lipid

content for the exposed benthic and epi-benthic invertebrate organisms. Tables R3 shows the results of these calculations.

The documents provided to me contain a litany of excuses why the caged bivalve studies were not performed. The availability of *Rangia cuneata* that could or would be utilized in caged studies appears to center around the inability of the Motiva contractors to identify a population of *Rangia* that did not contain a specific parasite. They also claimed that no organisms could be found in the entire Delaware River systems that were not contaminated. They sought sources of *Rangia* as far way as Louisiana but these were rejected due to the parasitic infestation. Having worked in the Chesapeake Bay system for a decade, I recall finding numerous beds of *Rangia* in the upper bays and tributaries of the Chesapeake system. Since the Chesapeake system and the Delaware estuary are connected through the Chesapeake and Delaware Canal, there would be populations of *Rangia* in the Chesapeake that would be genetically similar to those in the Delaware system and because the two systems are in hydraulic communication the prohibitions against transplantation of organisms should have been reduced if not eliminated. Yet nowhere in the documents provided did I see reference to attempts to evaluate Chesapeake *Rangia* as candidates for the bivalve studies.

As an alternative to the Stipulated Order for caged bivalve studies, the Motiva contractors settled upon the approach of collecting and analyzing indigenous *Rangia* from sites in the Delaware system. **This strategy is flawed in a number of ways and is not an adequate or scientifically defensible substitute for the Caged bivalve studies contained in the Stipulated Order of 2000.**

The purpose of the caged studies is to establish the bioavailability of refinery effluent contaminants. Caged organisms transplanted from clean sites will respond to exposure to a contaminated environment by accumulating bioavailable contaminants that are in the system over a typical 30 to 90day period. Laboratory studies suggest that such organisms come to steady-state with the external environment within approximately 30 days and then begin to integrate and average subsequent exposures (including variations therein). This provides critical information for an assessment of impacts of a particular source in the receiving water system.

Indigenous sessile organisms (*Rangia*) collected from the environment differ from transplanted organisms in several crucial ways that preclude their substitution for caged organism studies.   First, these organisms will have been exposed to all river contaminants for their entire life spans. Because they have been thus exposed, their tissues will have integrated contaminants exposures over years instead of weeks and they will contain toxic materials that have been transported from sources at great distances upstream.  While refinery effluent specific chemicals will be represented in their tissues, the relative proportions of near-field sources will be diluted and masked by far-field sources. This makes the analysis and interpretation of their tissue residues useless for refinery impact assessment, especially in the context of compliance with the 1998 and 2000 Court Orders.

Second, organisms such as sessile invertebrates and bivalves, will respond to both short-term exposures and long-term exposures to toxic chemicals by changes in population density, physiological state and survival.  Indigenous organisms are known to export contaminants from their tissues during periods of spawning and thus the use of indigenous species for any type of bioavailability studies must take into consideration the spawning cycle of the organisms and the associated recovery period following spawn in which tissue lipid pools are restored in the tissues of the bivalves.  Dr. Salazar in his report clearly demonstrates that there is a significant seasonal component to the body burdens of the organisms he collected at both near and far-field station for nearly all of the contaminant groups analyzed.  He notes that tissue lipid levels in organisms nearest to the significantly lower than at far-field stations in the Spring when organism condition should be maximal.  Depressed lipid stores in such invertebrates are often associated with severe physiological stress from contaminants.  I also note that much of this data never appears in the Motiva report as data used in the final interpretation.

Third, when indigenous organisms are not present at sites in a particular region associated with a discharge under study or are not collected in depositional areas where discharge contaminants are likely to be found, then their value in assessing the impacts of the discharge are nullified.  Such was the case in this study.

In summary, Judge Longobardi's Order of 1998 instructed Motiva to conduct studies that would allow the refinery to assess the impact of the refinery upon the ecosystem in the receiving waters of the Delaware River at the present time, and potentially in the past. This original Order was restated in the Stipulated Order of 2000 in the form of a specific set of defined studies to be designed and conducted by Motiva. A further aspect of the Judge Longobardi's 1998 Order is that Motiva was to design and develop studies and information that would allow them to assess future impacts of NPDES permit violations should they occur. **The studies that Motiva has carried out to establish the present impacts were not completed with respect to the BioavailabilityStudies, the Sediment Toxicity studies and in certain aspects of the Fate and Transport Studies. The lack of these data sets and proper data base interpretation renders the portion of Judge Longobardi's Order relating to the preparation for assessment of future impacts of the refinery moot and impossible to fulfill. Thus, this critical aspect of the 1998 Order as restated and reinforced by the 2000 Stipulated Order has also been ignored by Motiva and it's contractors.**

### Section 1 (i) Consistency of Metals Analysis:

The 1998 Order while focusing upon PAHs in the discharge from the refinery required that the Motiva refinery develop a design and study design that would allow them to assess present and future impacts of their permitted discharge into the Delaware River as well as the potential impacts of future exceedances of their permit. Since the permit regulates a select list of trace metals, the plans developed by the refinery were to include assessment of the present future and potentially past exceedances of their permit. The Stipulated Order of 2000 contained explicit language stating that a suite of metals were to be analyzed in the effluent concurrent with the PAH measurements and that "all associated chemical characterizations, including field sediment monitoring, organisms taken in the caged bivalve study, and long core determinations". And further, "that if sediments or caged bivalves have high, potentially toxic levels of metals, Defendant will use best efforts to measure metals in the sediment toxicity (bioassay) tests. If metals are not tested in the sediment toxicity organisms, and if there is a toxic response, Defendant will not attribute the response to metals."

19

**This clear language was not followed by the Motiva contractors in the performance of their studies nor was it followed in the interpretation of the results that they did collect.**

Metals were measured in the refinery effluent demonstrating that they are present in the loading to the receiving environment. Metals were also measured in the sediments surrounding the refinery discharge. They were also measured in the sediments used for sediment toxicity bioassays. Some of these levels of selected metals associated with the refinery exceeded NOAA ERL and ERM levels and thus contribute to the overall adverse impacts of the refinery on the receiving water system. However, metals <u>were not</u> measured in the sediment toxicity organisms. Again, the issue of the ability to make such measurements on small organisms was raised as a rationale for not making these measurements.

Trace metals associated with the refinery discharges (permitted and non-permitted) have properties similar to PAHs in that many bind to sediments and are therefore retained near the refinery in deposited sediments. They issues of bioavailability and bioaccumulation and/or bioconcentration phenomena are more complicated than for hydrophobic PAHs, since different metals have vastly different capacities to cross biological membranes through passive and active transport. It is therefore critical to evaluate the actual amounts of these toxic substances actually entering organisms in order to assess their potential effects and to assess exposure concentrations in sediments or water for potential effects. Other environmental factors such as salinity, temperature, pH, the nutritional status of receptor organisms, oxygen availability, and feeding strategies of the organisms will influence the amounts of metals accumulated from external media with the same metal concentrations.

**For these reasons, loading to the receiving environment must be considered in order for any valid impact assessment to be made - not just concentrations. Bioavailability must be established unequivocally on a site-specific and organism-specific basis and a definitive link between exposure concentrations and accumulated trace metal concentrations must be determined on a site and organisms specific basis.**

The issue of delectability of trace metals using available instrumental methods is again an issue here. However, the same analytical criteria of

selectivity, sensitivity, precision and accuracy principles apply. The contractors have available to them inductively coupled plasma-mass spectrometer systems which are among the most powerful instruments available which meet each of these analytical criteria for making measurements. Commonly accepted MDLs for trace metals associated with the Motiva refinery effluent are in the low ppb (5-10) to high ppt (100-1000 part-per-trillion) range (ng/ml to pg/ml) in the analyte solution. The issue then is again whether (0.5-1g wet weight samples) from sediment toxicity studies can be analyzed. Assuming that one ml of water has a mass of 1 g, the detection limits for a 0.5-1.0g tissue sample dissolved in 10 ml of acid digest would be between 2 and 200ng/g of tissue (ppb). Since most toxic effects of metals are exhibited in the part-per-million concentration range for trace metals, it is clear that such trace metal determinations are technically feasible. **The Motiva studies failed to perform caged bivalve studies so no samples were available for analyses. The sediments toxicity organism could have been analyzed but were not. By failing to do so, the Motiva contractor failed again to establish a critical link that would establish or refute the presence of impacts of trace metals upon the Delaware River ecosystem.**

**Further, in their report, the Motiva contractors violated the provisions of the Stipulated Order by attributing toxicity observed in the sediment toxicity studies to trace metals in the sediments.**

## Section 1 (j) Long Core Experiments:

The long core experiments were included in the Stipulated Order with the specific goal of meeting the portion of Judge Longobardi's Opinion and Order of 1998 that Motiva must design and conduct studies to assessment potential impacts of <u>past</u> NPDES permit violations as established in previous litigation. Motiva engaged Dr. Alexander of the Skidaway Oceanographic Institution through their primary contractors to conduct these studies. As an expert in sediment biogeochemistry with specific experience in studies on Delaware River sediment dynamics, Dr. Alexander seemed to be the most qualified and experienced investigator available. The proposal submitted by Dr. Alexander was satisfactory in design and, if it had been carried out, could have accomplished the goals of the 1998 Order and the Stipulated Order of 2000.

However, the proposed studies and the work actually conducted were greatly different. An initial reconnaissance of the region seemed to indicate that he could take and analyze cores from depositional areas in the near-, mid- and far-field areas of the receiving environment that were in depositional areas where the scientific criteria for performing the studies would have predicted the highest degree of success. However, when the final stations were selected and sampled, a number of issues that doomed the validity of the studies from the beginning occurred. First, the distribution of the sampling sites where cores were taken seemed to have little or no relationship with the depositional sites identified in the fate and transport studies and modeling effort and for sediment toxicity studies. Second, although a large number of cores were collected, several cores were judged by Dr. Alexander in the field to be unusable and discarded. Of the cores that he judged in the field to be usable and returned to the laboratory, **only two** were ultimately analyzed in compliance with the Stipulated Order. The criteria and data used by Dr. Alexander for excluding the vast majority of cores from analysis were not clearly presented.

**The two cores that were analyzed had no connection with the other scientific studies contained in the Stipulated Order because of their locations relative to other study components and the fact that they were not located at sites associated with probable deposition of sediments from the refinery. Yet, in the final report, the Motiva contractors use the data from these two cores to conclude that there were no past impacts from prior refinery discharge violations. The number, location and incompleteness of these long core studies fail to meet both the scientific standard as well as the legal standard for compliance with either Judge Longobardi's Order and/or the Stipulated Order.**

## Section 1 (l) PAH Fingerprinting

The purpose of the fingerprinting of the PAHs in the refinery effluent was to establish through commonly used scientific methods a way to identify and trace the path of refinery associated toxic chemicals being continuously discharged from the facility as they move from the point of the discharge to points where some of the contaminants may be deposited and retained in sediments at depositional sites in the Delaware River. As I established in

22

testimony before Judge Longobardi in 1997, this is both theoretically feasible and scientifically possible. I cited studies conducted in my laboratory in the Gulf of Mexico in which contaminants from the Mississippi River plume could be traced for hundred of kilometers using the methods I recommended to be used in the Motiva fate and transport investigations. It appears that the methods worked for the Motiva contractors in that they produced set of analyses showing detectable quantities of refinery effluent-associated PAHs in the suspended particulate, colloidal and dissolved phases in Delaware River receiving waters, thus establishing that these components were present and traceable in the system.

This is, however, only the first step in the fingerprinting process as I recommended it to the Court. What needed to follow was the consideration of the loadings of these traceable contaminants as they moved through the system in order to assess potential and real impacts of the refinery on the receiving environment. This was not done by the Motiva contractors and represents a significant deviation from the language and intent of both the 1998 and 2000 Court Orders. Instead of examining the loading issue and the impact issue, the Motiva contractors embarked on a series of data set manipulations and statistical analyses which tended to mask the unique mix of components contained in the refinery effluent and then proceed to "show" using inappropriate statistical methods that these components disappeared into the background of the overall river chemical load. Then, they proceeded to erroneously conclude in their report that the refinery effluent had no definable impact on the river system.

Fingerprinting as it relates to a specific source loading identification and impact assessment requires consideration of the variations in the effluent composition that relate to production cycles, product mix changes, repair and maintenance cycles, all of which can significantly alter both the composition of and loadings of various components over time. Nowhere in the Motiva report did I find any discussion of these variable and yet there are clear trends of declining PAH loading from the refinery over the two-year study period. This is critical because the sampling cycle of effluents and sample collections performed to meet the fate and transport and fingerprinting portions of the Order appeared to be at regular time intervals rather than considering operational changes and

their potential influence upon refinery discharge loading and ultimately environmental impacts.

The issue of loadings versus concentrations is central to the interpretation and application of fingerprinting methodology. Fingerprinting methodology as applied in this context of environmental source assessment and source impact assessment, is analogous to the forensic analysis of human fingerprints. It focuses upon the distinct and unique characteristics rather than the similarities between potential sources. In complex systems such as industrialized river system, the challenge is to establish though sufficiently detailed chemical and physical analysis the relative contributions of one source (in this case the Motiva refinery) to the overall chemical milieu of the receiving waters. With substances that are readily degraded, volatilized or readily metabolized such as components of the normal hydrocarbons present in the Motiva discharge, this task is virtually impossible. However, the more persistent chemical components (and I should point out more toxic components) such as the aromatic, alkylated and heterocyclic hydrocarbons present in the effluent discharge retain their composition and ratios of composition in a way that allows for them to be traced as they mix into the other contaminants coming downstream. It is this approach that allowed my laboratory to establish and trace the signature of petroleum discharges from individual production platforms in the Gulf of Mexico for distances of kilometers as they mixed into the complex chemical mixture of the Mississippi River plume in the vast areas of the Gulf of Mexico. It seems that a parallel set of results could be achieved using the same methods in the highly confined reaches of the Delaware River adjacent to the Motiva refinery which has a far more unique fingerprint mixture of PAHs in it's discharges.

First of all, the focus of the Motiva contractors upon concentrations places the emphasis upon dilution of the effluent. This is simply an application of the non-scientific industrial polluters saw of "the solution to pollution is dilution". The facts that partitioning (and therefore concentration) of contaminants onto suspended **but sedimenting** particles and the occurrence of **bioconcentration** in the receptor biota in the receiving environment <u>invalidate the assumptions of dilution</u> and the concomitant conclusions of lack of impact upon the environment drawn by the Motiva contractors.

The second deviation from a fingerprinting approach that would have a chance of success was that the Motiva contractors artificially grouped classes of chemicals in tier analysis thus artificially destroying the unique characteristics and component ratios that exist in the effluent. This in effect diluted out the unique aspects of the numerical data by mixing in numerical data with little or no distinctive nature to it. Then the Motiva contractor used the "diluted data" to perform statistical analyses to conclude that refinery effluent disappeared into the mix of chemicals in the river which have their origins in a variety of upstream sources, urban runoff and atmospheric deposition.

A third way in which deviation from rigorous fingerprinting approach was to ignore their own dye study data which showed that there was feedback from the refinery effluent back into the cooling water intake system. It appears that in their assessment of data and fingerprinting methodology they attributed the presence of certain PAHs in the intake system as being from upstream riverine sources. This then allowed them to further obscure the unique characteristics and ratios of the effluent PAH chemistry and to conclude using their statistical methods that the refinery "fingerprint" was not distinct from the river with respect to these contaminants.

The fourth way in which the methods deviated from a rigorous fingerprinting approach was the type and application of the statistical analyses applied by the Motiva contractors. In their analyses, the authors of the Motiva report relied heavily upon Principle Component Analysis (PCA) of data grouped artificially as described above. PCA analysis is a method that clusters data into groups based upon the degree of similarity between data sets. While in theory this methods can discriminate between widely varying groups of data with very different variable intensities (amounts), the method becomes useless when applied to data groups which have been manipulated to dilute out the weight of differences within components of the group (unique refinery effluent components) with components which show little difference with other groups (components common to both effluent and upstream receiving waters). The conclusions drawn from such analyses are inherently flawed and scientifically unusable to draw any conclusions about impact or the lack thereof on the Delaware River system. In spite of this the Motiva contractors conclude that

based upon their flawed methodology the Motiva refinery has no discernable impact on the river.

There are other types of discriminant analyses and spatial pattern analysis that could better have been applied to these data sets to more accurately assess the impact of the refinery effluent on the receiving water system, however, these were not applied or discussed as alternatives in the decision to use PCA analysis process selected. Among these would be spatial and temporal analysis using geographical information system technology and mass balance calculations.

One alternative that would have been available to the Motiva contractors is so-call receptor analysis. This method would however have depended upon the gathering and interpretation of data on chemicals accumulating in the tissues of "receptor organisms" such as the caged bivalve studies and/or the analyses of tissues from the sediment toxicity assays. This receptor analysis was rendered impossible by the scrupulous avoidance of gathering such data on the part of Motiva contractors.

**Other issues discovered during review process:**

In the course of reviewing the reports and appendices provided with the reports, I checked the calculations used by the Motiva contractors to generate the final tabular data presented and utilized to draw their conclusions from the data. A majority of the data generated for the Motiva report is based upon chemical analyses performed by sub-contractor to the University of Maryland. It appears that the University of Maryland investigators failed to notice that certain aspects of the analyses had been reported in a way that would consistently under-estimate the concentrations of PAHs in the report. The error occurred though the following process. As discussed in the section above on basic principles of analytical chemistry, one of the key components of any reliable analytical method is the accuracy of the method. Simply stated, this is the ability of the method to report values that represent the "true mass" or amount of a substance present in a sample. This requires that the individual analytes be quantitatively extracted, concentrated and purified and further, that they be quantitatively transferred on to the analytical instrument. Since all extraction methods are inherently incomplete, particularly with sediment and biological tissue samples,

surrogate standards are added to the matrix before extraction and are analyzed by the same methods that are used for the target analytes. In GC/MS methods these surrogates are typically deuterated analogues of the compounds being analyzed. The contractor used three such surrogates in the methods presented: $d_8$-naphthalene, $d_{10}$-phenanthrene and $d_{12}$-chrysene. These surrogates once quantified allow the analyst to correct the data for target analytes for extraction efficiencies from the matrix. The tables of mass spectral quantitative data found in the appendices to the report clearly indicate that the data are not corrected for surrogate recoveries. This has the effect that **all analytes reported are between 5-45% lower than the accurate value for that compound in that sample (actually all samples).**

I attempted to determine if correction factors had been applied in the transition of these raw data sets into tabular data presented in tables in the Motiva report. For certain values in the report tables, it is clear that no correction was applied yielding a consistent negative bias to the data used in the report. In other cases, it appears that some type of correction factor was applied but there is not logical basis for the use of the corrections as some appear to be unrelated to surrogate recoveries for the sample and some actually lower the final values for certain compounds in the report, when surrogate recoveries would dictate an increase in the value.

**This deviation from formal accepted practice in the field of analytical chemistry has introduced a consistent negative bias (reduced concentrations measured in all samples by significant percentages >10 to as much as ~50%) in all of the analytical data treated in this fashion (which appears to be all of the PAH data) and places into question all of the conclusions drawn by Motiva and its contractors. The Court may wish to consider whether this was an intentional act or some other type of error. In any case, I must recommend that all conclusions utilizing these data be re-evaluated with the proper correction factors and transparent documentation as to how those corrections are applied.**

### Review of Dr. Livingston's Critique of the Motiva Report

In performing the review of the work performed by Motiva and it's contractors, I refrained from reading or using Dr. Livingston's detailed critique

of the Motiva work and report. My review of Motiva's compliance with the Court Orders of 1998 and 2000 was conducted independently and focuses upon the several issues contained in Judge Robinson's Order of 2006 and contained issues not raised by Dr. Livingston. However, upon review of this document (Plaintiff's #22), I found several points of agreement that I can and will detail upon request. Since I was not asked to critique the content of his report as part of Judge Robinson's Order of August 31, 2006, I will not comment here on that report in this document. I was encouraged however, that Dr. Livingston undertook GIS analyses of the data in order to demonstrate some of his points. This demonstrates clearly the utility of what I stated earlier in my analysis of the Motiva work regarding the need for such analysis and re-presentation of the data.

**Recommendations:**

1. Motiva should be compelled to re-present all data in a GIS mapping system that clearly elucidates trends in data sets collected in both time and spatial contexts. Focus should be placed in this re-presentation of the data on retaining the unique characteristics of the refinery effluent chemistry and avoiding artificial grouping of compounds.

2. Motiva should be compelled to re-calculate all data sets using proper numerical methods to correct for recovery of surrogates and to demonstrate in a transparent fashion the ways in which all correction factors, blank subtractions, etc. have been applied to the final re-calculated data sets.

3. Since Motiva has failed to comply with the Order of 1998 by design and conduct studies that would allow Motiva to assessment the present and future impacts of its NPDES permitted discharges and any exceedances of that permit, I recommend that such a design be completed by Motiva.

4. The fate and transport studies carried out by Motiva were in partial compliance with the Stipulated Order of 2000 but failed in the interpretation of those data to consider the critical issues of loadings to the receiving environment. I recommend that Motiva be compelled to perform such an analysis on their current data sets and to gather all

necessary additional data to complete such an analysis should that be necessary. This re-analysis of the data must include a consideration of the re-uptake of refinery effluent contaminants and recycling of these contaminants through the cooling water system.

5. The absence of the conduct of a caged bivalve study in compliance with the Stipulated Order of 2000 is a critical flaw in the Motiva study. I recommend that such as study be carried out.

6. The technical and practical feasibility of performing chemical analyses for PAHs, PCBs, pesticides and trace metals in exposed bioassay (sediment toxicity samples) has been demonstrated. The fact that Motiva failed to perform such analyses based simply upon the opinion of a "so-called expert" represents a critical flaw in the performance of the studies ordered as components of the Stipulated Order of 2000. I recommend that such studies be carried out.

7. The failure of the long-core studies to generate useable data from geographically relevant areas in the receiving environment represents a failure to comply with the Court Orders of 1998 and 2000. I recommend that these studies be carried out.

8. The disturbing pattern of Motiva's failure to perform many of those critical study components that could link it's discharge (compliant or non-compliant) to any impact in the receiving environment of the Delaware River estuary or that would allow for valid interpretations of the data gathered in compliance with both Judge Longobardi's Opinion and Order and/or Judge Robinson's Order needs to be assessed by the Court. In my opinion the studies performed and the interpretation of the results from those studies are seriously flawed. The studies fail to reach either the scientific standard or the legal standard required in this matter. The Court may wish to inquire into the failure of the Motiva studies to meet these standards and to direct that remedial actions be taken in order to reach compliance in the future.

Respectfully submitted,

Dr. Joel Mean

## Table R-1
### MDL's CALCULATED ON LOD** for DIFFERENT MEDIA

| SAMPLE | SEDS. ng/g | PARTS. ng/g | COLLOID. pg/ml | DISSOLV. pg/ml | Tissues ng/g (ww |
|---|---|---|---|---|---|
| d8-NAPHTHALENE | 2.2 | 4.2 | 79.9 | 11.3 | 4.5 |
| Naphthalene | 2.2 | 4.3 | 81.4 | 11.5 | 4.6 |
| 2-Methylnaphthalene | 2.0 | 3.9 | 74.3 | 10.5 | 4.2 |
| 1-Methylnaphthalene | 2.1 | 4.1 | 78.6 | 11.1 | 4.5 |
| 2-Ethylnaphthalene | 2.0 | 3.9 | 74.7 | 10.6 | 4.2 |
| 1-Ethylnaphthalene | 2.0 | 4.0 | 75.8 | 10.7 | 4.3 |
| 2,6/2,7-Dimethylnaphthalene | 4.1 | 8.0 | 152.4 | 21.6 | 8.6 |
| 1,3/1,7-Dimethylnaphthalene | 4.1 | 8.0 | 153.1 | 21.7 | 8.7 |
| 1,6-Dimethylnaphthalene | 1.9 | 3.8 | 72.0 | 10.2 | 4.1 |
| 1,4/2,3-Dimethylnaphthalene | 4.2 | 8.2 | 156.6 | 22.2 | 8.9 |
| 1,5-Dimethylnaphthalene | 2.0 | 3.8 | 72.3 | 10.2 | 4.1 |
| Acenaphthylene | 2.1 | 4.0 | 77.0 | 10.9 | 4.4 |
| 1,2-Dimethylnaphthalene | 2.1 | 4.0 | 77.0 | 10.9 | 4.4 |
| 2-Isopropylnaphthalene | 1.9 | 3.6 | 69.2 | 9.8 | 3.9 |
| 1,8-Dimethylnaphthalene | 2.1 | 4.0 | 76.6 | 10.9 | 4.3 |
| d10-ACENAPHTHENE | 2.0 | 4.0 | 75.9 | 10.8 | 4.3 |
| Acenaphthene | 2.2 | 4.2 | 80.9 | 11.5 | 4.6 |
| 1,6,7-Trimethylnaphthalene | 2.0 | 4.0 | 75.8 | 10.8 | 4.3 |
| Fluorene | 2.0 | 3.9 | 74.3 | 10.5 | 4.2 |
| Dibenzothiophene | 0.9 | 1.7 | 33.1 | 4.7 | 1.9 |
| d10-PHENANTHRENE | 1.8 | 3.6 | 68.0 | 9.6 | 3.9 |
| Phenanthrene | 1.9 | 3.7 | 70.6 | 10.0 | 4.0 |
| Anthracene | 2.0 | 3.8 | 72.4 | 10.3 | 4.1 |
| 4-Methyldibenzothiophene | 1.0 | 1.9 | 35.3 | 5.0 | 2.0 |
| 2/3-Methyldibenzothiophene | 1.5 | 2.9 | 55.3 | 7.8 | 3.1 |
| 3-Methylphenanthrene | 1.9 | 3.7 | 70.3 | 10.0 | 4.0 |
| 1-Methyldibenzothiophene | 1.2 | 2.4 | 45.8 | 6.5 | 2.6 |
| 2-Methylphenanthrene | 2.7 | 5.3 | 100.2 | 14.2 | 5.7 |
| 4/9-Methylphenanthrene | 2.7 | 5.2 | 99.4 | 14.1 | 5.6 |
| 1-Methylphenanthrene | 1.8 | 3.5 | 66.5 | 9.4 | 3.8 |
| 3,6-Dimethylphenanthrene | 1.0 | 1.9 | 36.1 | 5.1 | 2.0 |
| 3,5-Dimethylphenanthrene | 0.9 | 1.7 | 32.4 | 4.6 | 1.8 |
| 2,6-Dimethylphenanthrene | 0.9 | 1.8 | 35.0 | 5.0 | 2.0 |
| 2,7-Dimethylphenanthrene | 0.3 | 0.7 | 12.9 | 1.8 | 0.7 |
| 3,9-Dimethylphenanthrene | 0.9 | 1.8 | 34.0 | 4.8 | 1.9 |
| 1,6/2,5/2,9-Dimethylphenanthren | 2.3 | 4.4 | 84.3 | 12.0 | 4.8 |
| 1,7-Dimethylphenanthrene | 0.9 | 1.8 | 34.4 | 4.9 | 2.0 |
| 1,9/4,9-Dimethylphenanthrene | 1.3 | 2.6 | 48.9 | 6.9 | 2.8 |
| 1,2-Dimethyldibenzothiophene | 1.3 | 2.6 | 49.4 | 7.0 | 2.8 |
| Fluoranthene | 1.8 | 3.5 | 66.5 | 9.4 | 3.8 |
| 1,5-Dimethylphenanthrene | 0.7 | 1.4 | 25.8 | 3.7 | 1.5 |
| 1,8-Dimethylphenanthrene | 0.8 | 1.6 | 29.8 | 4.2 | 1.7 |
| 1,2-Dimethylphenanthrene | 0.9 | 1.8 | 34.4 | 4.9 | 2.0 |
| 9,10-Dimethylphenanthrene | 0.9 | 1.7 | 32.3 | 4.6 | 1.8 |
| Pyrene | 1.8 | 3.6 | 67.8 | 9.6 | 3.8 |
| 1,2,8-Trimethylphenanthrene | 1.9 | 3.6 | 68.7 | 9.7 | 3.9 |
| Benzanthracene | 2.0 | 3.9 | 74.9 | 10.6 | 4.2 |
| d12-CHRYSENE | 1.5 | 3.0 | 56.6 | 8.0 | 3.2 |
| Chrysene | 1.5 | 2.9 | 56.2 | 8.0 | 3.2 |

**MDL's CALCULATED ON LOD** for DIFFERENT MEDIA**

| SAMPLE | SEDS. ng/g | PARTS. ng/g | COLLOID. pg/ml | DISSOLV. pg/ml | Tissues ng/g (ww |
|---|---|---|---|---|---|
| Benzo(b)fluoranthene | 1.6 | 3.1 | 58.4 | 8.3 | 3.3 |
| Benzo(k)fluoranthene | 1.7 | 3.3 | 63.1 | 8.9 | 3.6 |
| Benzo(a)pyrene | 1.7 | 3.4 | 64.1 | 9.1 | 3.6 |
| d12-PERYLENE | 1.5 | 2.9 | 54.9 | 7.8 | 3.1 |
| Indenopyrene | 1.5 | 2.9 | 55.4 | 7.9 | 3.1 |
| Dibenz(a,h)anthracene | 1.6 | 3.0 | 57.6 | 8.2 | 3.3 |
| Benzo(g,h,i)perylene | 1.6 | 3.0 | 57.5 | 8.2 | 3.3 |
| | | | | | |
| **MEANS** | **1.8** | **3.5** | 65.8 | **9.3** | **3.7** |
| **MIN** | **0.3** | **0.7** | 12.9 | **1.8** | **0.7** |
| **MAX** | **4.2** | **8.2** | 156.6 | **22.2** | **8.9** |

**Based on 5 injections of .05ng/ul to 200 ng/ul**
**LOD =3x Std Dev.**
**\*\*MDL caculations:**
**Sed. =LOD calculated for average sample size of 20g dw**
**Part.=LOD claculated for average sample size of 0.5g dw**
**Colloid. =LOD calculated for average sample size of 570 ug/L**
**Dissolv.=LOD calculated for average sample size of 2000 ml**
**Tissues LOD calculated for average sample size of 0.5g ww**

| Table R-2<br>Analyses of Small Tissue Samples using the Method Prescribed In Stipulated Order | | | | | |
|---|---|---|---|---|---|
| SAMPLE | S1 F2 | S1 F2 DUP | S5 F36 | S4 F26 | S3 F23 |
| FILE ID | 6172C05 | 6172C06 | 6172C07 | 6172C08 | 6172C09 |
| SAMPLE WT (Wet) | 0.57 | 0.49 | 0.45 | 0.47 | 0.54 |
| Naphthalene | 74.89 | 85.89 | 68.34 | 94.52 | 69.97 |
| Hexachlorobutadiene | nd | nd | nd | nd | nd |
| 2-Methylnaphthalene | 25.40 | 28.00 | 20.35 | 44.77 | 22.65 |
| 1-Methylnaphthalene | 10.96 | 11.18 | 6.94 | 26.44 | 9.86 |
| 2-Ethylnaphthalene | 2.97 | 4.12 | 2.35 | 5.10 | 3.49 |
| 1-Ethylnaphthalene | nd | nd | nd | nd | nd |
| 2,6/2,7-Dimethylnaphthalene | 6.52 | 7.72 | 4.02 | 11.58 | 8.40 |
| 1,3/1,7-Dimethylnaphthalene | 3.13 | 4.63 | 3.76 | 7.36 | 3.68 |
| 1,6-Dimethylnaphthalene | 2.39 | 2.98 | 1.92 | 5.53 | 2.28 |
| 1,4/2,3-Dimethylnaphthalene | 2.37 | 2.48 | 1.70 | 2.60 | 2.06 |
| 1,5-Dimethylnaphthalene | nd | nd | nd | nd | nd |
| Acenaphthylene | nd | nd | nd | nd | nd |
| 1,2-Dimethylnaphthalene | nd | nd | nd | nd | nd |
| 2-Isopropylnaphthalene | nd | nd | 3.18 | 2.91 | 3.81 |
| 1,8-Dimethylnaphthalene | nd | nd | nd | nd | nd |
| Acenaphthene | 10.73 | 12.76 | 9.77 | 11.81 | 10.74 |
| 1,6,7-Trimethylnaphthalene | nd | nd | nd | nd | nd |
| Fluorene | 19.84 | 21.22 | 17.47 | 15.96 | 20.56 |
| Trifluralin | nd | nd | nd | nd | nd |
| CL2-PCB | nd | nd | nd | nd | nd |
| Hexachlorobenzene | nd | nd | nd | nd | nd |
| Simazine | nd | nd | nd | nd | nd |
| Dibenzothiophene | 5.74 | 6.58 | 4.60 | 6.10 | 6.43 |
| Atrazine | 55.88 | 52.47 | 40.93 | 48.51 | 46.55 |
| Phenanthrene | 79.01 | 93.65 | 93.92 | 71.73 | 103.95 |
| Anthracene | 1.30 | 1.68 | 1.20 | nd | 1.34 |
| CL3-PCB | 6.27 | 8.50 | 7.72 | 5.22 | 9.39 |
| 4-Methyldibenzothiophene | 1.20 | 1.09 | 1.22 | 1.49 | 1.23 |
| 2/3-Methyldibenzothiophene | 0.85 | 0.48 | nd | nd | 0.91 |
| CL4-PCB | nd | nd | nd | nd | nd |
| 3-Methylphenanthrene | 4.15 | 4.95 | 5.34 | 3.67 | 6.29 |
| 1-Methyldibenzothiophene | nd | 0.22 | nd | nd | nd |
| 2-Methylphenanthrene | 6.95 | 8.79 | 9.55 | 5.54 | 11.48 |
| Alachlor | nd | nd | nd | nd | nd |
| 4/9-Methylphenanthrene | 1.74 | 1.59 | 2.60 | 1.38 | 2.54 |
| 1-Methylphenanthrene | 2.13 | 2.43 | 2.85 | 1.97 | 3.41 |
| Metolachlor | nd | nd | nd | nd | nd |
| Cyanazine | nd | nd | nd | nd | nd |
| 3,6-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 3,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 2,6-Dimethylphenanthrene | 0.61 | 0.51 | 0.71 | 0.62 | 0.79 |
| 2,7-Dimethylphenanthrene | 0.61 | 0.52 | 0.75 | 0.61 | 0.59 |
| 3,9-Dimethylphenanthrene | 0.96 | 0.88 | 1.50 | 0.91 | 1.19 |
| 1,6/2,5/2,9-Dimethylphenanthren | 0.84 | 0.75 | 0.75 | 0.99 | nd |
| 1,7-Dimethylphenanthrene | 0.56 | 0.71 | 0.72 | 0.81 | 0.93 |

| SAMPLE | S5 F34 | S4 F32 | S2 F20 | S4 F29 | S5 F6 |
|---|---|---|---|---|---|
| FILE ID | 6172C10 | 6172C11 | 6172C12 | 6172C13 | 6172C14 |
| SAMPLE WT (Wet) | 0.46 | 0.52 | 0.52 | 0.56 | 0.47 |
| 1,9/4,9-Dimethylphenanthrene | 0.23 | nd | nd | nd | nd |
| 1,2-Dimethyldibenzothiophene | nd | nd | nd | nd | nd |
| Fluoranthene | 19.08 | 17.85 | 12.54 | 12.38 | 20.48 |
| 1,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,8-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 9,10-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| Pyrene | 6.24 | 4.64 | 3.84 | 3.74 | 6.06 |
| o,p'-DDE | nd | nd | nd | nd | nd |
| Chlordane | 0.28 | nd | nd | nd | nd |
| t-Nonachlor | 0.51 | nd | nd | nd | nd |
| CL5-PCB | nd | nd | nd | nd | nd |
| Dieldrin | nd | nd | nd | nd | nd |
| p,p'-DDE | 1.74 | 1.23 | 0.41 | 2.25 | 0.99 |
| o,p'-DDD | 1.35 | 0.71 | 2.16 | 1.53 | 0.79 |
| CL6-PCB | nd | nd | nd | nd | nd |
| 1,2,8-Trimethylphenanthrene | nd | nd | nd | nd | nd |
| p,p'-DDD/o,p'-DDT | nd | nd | nd | nd | nd |
| CL7-PCB | nd | nd | nd | nd | nd |
| p,p'-DDT | nd | nd | nd | nd | nd |
| Benzanthracene | nd | nd | nd | nd | nd |
| Chrysene | nd | nd | nd | nd | nd |
| Benzo(b)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(k)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(a)pyrene | nd | nd | nd | nd | nd |
| Indenopyrene | nd | nd | nd | nd | nd |
| Dibenz(a,h)anthracene | nd | nd | nd | nd | nd |
| Benzo(g,h,i)perylene | nd | nd | nd | nd | nd |
| C3-Naphthalenes | 13.15 | 21.15 | 16.51 | 14.99 | 8.54 |
| C4-Naphthalenes | nd | 14.16 | nd | nd | nd |
| C2-Dibenzothiophenes | nd | nd | nd | nd | nd |
| C3-Phenanthrenes | nd | nd | nd | nd | nd |

| SAMPLE | S1 F2 | S1 F2 DUP | S5 F36 | S4 F26 | S3 F23 |
|---|---|---|---|---|---|
| FILE ID | 6172C05 | 6172C06 | 6172C07 | 6172C08 | 6172C09 |
| SAMPLE WT (Wet) | 0.57 | 0.49 | 0.45 | 0.47 | 0.54 |
| 1,9/4,9-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethyldibenzothiophene | nd | nd | nd | nd | nd |
| Fluoranthene | 13.00 | 15.34 | 16.72 | 13.80 | 19.45 |
| 1,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,8-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 9,10-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| Pyrene | 3.75 | 4.41 | 4.71 | 5.04 | 4.91 |
| o,p'-DDE | nd | nd | nd | nd | nd |
| Chlordane | nd | nd | nd | nd | nd |
| t-Nonachlor | nd | nd | nd | nd | nd |
| CL5-PCB | nd | nd | nd | nd | nd |
| Dieldrin | nd | nd | nd | nd | nd |
| p,p'-DDE | 0.62 | 0.70 | 1.38 | nd | 0.94 |
| o,p'-DDD | nd | nd | nd | 0.90 | nd |
| CL6-PCB | nd | nd | nd | nd | nd |
| 1,2,8-Trimethylphenanthrene | nd | nd | nd | nd | nd |
| p,p'-DDD/o,p'-DDT | nd | nd | nd | nd | nd |
| CL7-PCB | nd | nd | nd | nd | nd |
| p,p'-DDT | nd | nd | nd | nd | nd |
| Benzanthracene | nd | nd | nd | nd | nd |
| Chrysene | nd | nd | nd | nd | nd |
| Benzo(b)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(k)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(a)pyrene | nd | nd | nd | nd | nd |
| Indenopyrene | nd | nd | nd | nd | nd |
| Dibenz(a,h)anthracene | nd | nd | nd | nd | nd |
| Benzo(g,h,i)perylene | nd | nd | nd | nd | nd |
| C3-Naphthalenes | 9.09 | 12.27 | 8.08 | 14.90 | 7.96 |
| C4-Naphthalenes | nd | nd | nd | nd | nd |
| C2-Dibenzothiophenes | nd | nd | nd | nd | nd |
| C3-Phenanthrenes | nd | nd | nd | nd | nd |

| Figure R-2 Analyses of Small Tissue Samples using the Method Prescribed In Stipulated Order | | | | | |
|---|---|---|---|---|---|
| SAMPLE | S5 F34 | S4 F32 | S2 F20 | S4 F29 | S5 F6 |
| FILE ID | 6172C10 | 6172C11 | 6172C12 | 6172C13 | 6172C14 |
| SAMPLE WT (Wet) | 0.46 | 0.52 | 0.52 | 0.56 | 0.47 |
| Naphthalene | 2.21 | 77.32 | 81.13 | 74.76 | 68.66 |
| Hexachlorobutadiene | nd | nd | nd | nd | nd |
| 2-Methylnaphthalene | 5.00 | 66.73 | 30.21 | 41.56 | 20.23 |
| 1-Methylnaphthalene | 2.68 | 40.14 | 12.31 | 27.03 | 6.66 |
| 2-Ethylnaphthalene | 1.15 | 12.47 | 4.78 | 5.18 | 2.34 |
| 1-Ethylnaphthalene | 0.56 | 3.55 | nd | 1.50 | nd |
| 2,6/2,7-Dimethylnaphthalene | 3.49 | 22.10 | 9.71 | 12.58 | 6.45 |
| 1,3/1,7-Dimethylnaphthalene | 2.64 | 15.79 | 5.80 | 8.24 | 2.72 |
| 1,6-Dimethylnaphthalene | 1.86 | 11.01 | 3.87 | 4.63 | 2.47 |
| 1,4/2,3-Dimethylnaphthalene | 1.82 | 6.90 | 3.63 | 2.98 | 1.93 |
| 1,5-Dimethylnaphthalene | nd | 2.10 | nd | 1.65 | nd |
| Acenaphthylene | nd | nd | nd | nd | nd |
| 1,2-Dimethylnaphthalene | nd | 2.24 | nd | 1.96 | nd |
| 2-Isopropylnaphthalene | 4.99 | nd | 5.49 | 3.58 | 2.91 |
| 1,8-Dimethylnaphthalene | nd | nd | 6.65 | nd | nd |
| Acenaphthene | 19.71 | 9.90 | 8.18 | 13.74 | 10.63 |
| 1,6,7-Trimethylnaphthalene | nd | 3.26 | nd | nd | nd |
| Fluorene | 48.67 | 20.65 | 17.62 | 20.12 | 19.63 |
| Trifluralin | 7.52 | 2.77 | nd | 2.68 | nd |
| CL2-PCB | nd | nd | nd | nd | nd |
| Hexachlorobenzene | nd | nd | nd | nd | nd |
| Simazine | nd | nd | nd | nd | nd |
| Dibenzothiophene | 23.10 | 6.95 | 5.09 | 6.53 | 6.45 |
| Atrazine | 197.93 | 69.88 | 2.93 | 59.60 | 58.69 |
| Phenanthrene | 98.91 | 96.11 | 71.41 | 79.81 | 111.94 |
| Anthracene | 1.09 | 0.91 | nd | 1.02 | 2.13 |
| CL3-PCB | 10.17 | 8.41 | 4.50 | 5.26 | 12.53 |
| 4-Methyldibenzothiophene | 1.48 | 1.35 | 1.51 | 1.01 | 1.30 |
| 2/3-Methyldibenzothiophene | 0.62 | 1.28 | 0.45 | nd | 0.76 |
| CL4-PCB | 9.38 | nd | nd | nd | 10.79 |
| 3-Methylphenanthrene | 4.99 | 5.89 | 3.82 | 3.61 | 6.10 |
| 1-Methyldibenzothiophene | 0.49 | nd | 0.43 | nd | nd |
| 2-Methylphenanthrene | 7.98 | 10.45 | 7.17 | 5.75 | 10.30 |
| Alachlor | nd | nd | nd | nd | nd |
| 4/9-Methylphenanthrene | 2.46 | 2.06 | 1.64 | 1.77 | 2.56 |
| 1-Methylphenanthrene | 2.63 | 2.86 | 2.11 | 1.85 | 3.19 |
| Metolachlor | nd | nd | nd | nd | nd |
| Cyanazine | nd | nd | nd | nd | nd |
| 3,6-Dimethylphenanthrene | 0.38 | 1.22 | nd | nd | 0.73 |
| 3,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 2,6-Dimethylphenanthrene | 0.70 | 0.76 | nd | 0.42 | 0.67 |
| 2,7-Dimethylphenanthrene | 0.80 | 0.69 | nd | 0.39 | 0.92 |
| 3,9-Dimethylphenanthrene | 1.48 | 1.16 | 1.35 | 1.08 | 1.30 |
| 1,6/2,5/2,9-Dimethylphenanthren | 1.13 | 0.61 | 0.81 | 0.77 | 0.76 |
| 1,7-Dimethylphenanthrene | 0.79 | 0.89 | 0.64 | 0.57 | 0.64 |

| Figure R-2 Analyses of Small Tissue Samples using the Method Prescribed In Stipulated Order | | | | | |
|---|---|---|---|---|---|
| SAMPLE | S2 F14 | S2F17 | S1F8 | S1F4 | S2F12 |
| FILE ID | 6172C15 | 6173A03 | 6173A04 | 6173A05 | 6173A06 |
| SAMPLE WT (Wet) | 0.55 | 0.43 | 0.52 | 0.50 | 0.47 |
| Naphthalene | 76.48 | 108.44 | 72.17 | 91.82 | 89.36 |
| Hexachlorobutadiene | nd | nd | nd | nd | nd |
| 2-Methylnaphthalene | 26.55 | 27.47 | 24.17 | 26.07 | 26.93 |
| 1-Methylnaphthalene | 12.20 | 12.22 | 9.83 | 12.74 | 12.00 |
| 2-Ethylnaphthalene | 4.02 | 3.10 | 2.78 | 3.83 | 4.04 |
| 1-Ethylnaphthalene | nd | 1.25 | nd | nd | nd |
| 2,6/2,7-Dimethylnaphthalene | 10.02 | 7.17 | 6.06 | 7.08 | 8.86 |
| 1,3/1,7-Dimethylnaphthalene | 6.15 | 5.39 | 4.81 | 4.50 | 5.26 |
| 1,6-Dimethylnaphthalene | 5.16 | 3.04 | 3.26 | 2.98 | 3.44 |
| 1,4/2,3-Dimethylnaphthalene | 3.48 | 2.61 | 1.97 | 1.85 | 2.81 |
| 1,5-Dimethylnaphthalene | 1.46 | nd | nd | nd | 0.91 |
| Acenaphthylene | nd | nd | nd | nd | nd |
| 1,2-Dimethylnaphthalene | nd | nd | nd | 0.91 | nd |
| 2-Isopropylnaphthalene | 3.63 | 4.50 | nd | 2.54 | 3.39 |
| 1,8-Dimethylnaphthalene | nd | nd | nd | nd | nd |
| Acenaphthene | 15.13 | 13.84 | 12.49 | 12.94 | 15.13 |
| 1,6,7-Trimethylnaphthalene | 2.04 | 1.79 | 1.75 | 2.33 | 3.00 |
| Fluorene | 23.16 | 14.68 | 17.79 | 15.53 | 21.83 |
| Trifluralin | nd | nd | nd | 8.52 | nd |
| CL2-PCB | nd | nd | nd | nd | nd |
| Hexachlorobenzene | nd | nd | nd | 1.23 | nd |
| Simazine | nd | nd | nd | nd | nd |
| Dibenzothiophene | 7.37 | 4.88 | 4.80 | 5.07 | 6.05 |
| Atrazine | nd | nd | 53.97 | 90.14 | nd |
| Phenanthrene | 93.66 | 53.60 | 82.94 | 64.82 | 99.84 |
| Anthracene | nd | 0.97 | 0.86 | 1.00 | nd |
| CL3-PCB | 7.80 | 5.75 | 7.36 | 10.32 | 12.54 |
| 4-Methyldibenzothiophene | 1.15 | 0.98 | 0.96 | 1.26 | 1.19 |
| 2/3-Methyldibenzothiophene | nd | nd | nd | nd | nd |
| CL4-PCB | nd | nd | nd | 22.25 | nd |
| 3-Methylphenanthrene | 4.41 | 1.86 | 4.01 | 2.75 | 5.06 |
| 1-Methyldibenzothiophene | nd | nd | nd | nd | nd |
| 2-Methylphenanthrene | 7.81 | 2.79 | 6.54 | 4.25 | 7.95 |
| Alachlor | nd | nd | nd | nd | nd |
| 4/9-Methylphenanthrene | 1.90 | 1.44 | 1.76 | 1.56 | 2.36 |
| 1-Methylphenanthrene | 2.24 | 0.80 | 2.01 | 1.40 | 2.56 |
| Metolachlor | nd | nd | nd | nd | nd |
| Cyanazine | nd | nd | nd | nd | nd |
| 3,6-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 3,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 2,6-Dimethylphenanthrene | 0.61 | nd | 0.51 | nd | 0.62 |
| 2,7-Dimethylphenanthrene | 0.53 | nd | 0.41 | nd | 0.68 |
| 3,9-Dimethylphenanthrene | 1.32 | 0.80 | 1.27 | 0.99 | 1.31 |
| 1,6/2,5/2,9-Dimethylphenanthren | 1.01 | nd | 0.76 | 0.64 | 1.30 |
| 1,7-Dimethylphenanthrene | 0.79 | 0.32 | 0.62 | 0.31 | 0.88 |

| SAMPLE | S2 F14 | S2F17 | S1F8 | S1F4 | S2F12 |
|---|---|---|---|---|---|
| FILE ID | 6172C15 | 6173A03 | 6173A04 | 6173A05 | 6173A06 |
| SAMPLE WT (Wet) | 0.55 | 0.43 | 0.52 | 0.50 | 0.47 |
| 1,9/4,9-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethyldibenzothiophene | nd | nd | nd | nd | nd |
| Fluoranthene | 14.71 | 9.34 | 13.52 | 9.42 | 19.93 |
| 1,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,8-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 9,10-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| Pyrene | 4.40 | 3.64 | 4.46 | 4.16 | 7.10 |
| o,p'-DDE | nd | nd | nd | nd | nd |
| Chlordane | nd | nd | nd | 5.33 | nd |
| t-Nonachlor | nd | nd | nd | 6.22 | nd |
| CL5-PCB | nd | nd | nd | 5.61 | nd |
| Dieldrin | nd | nd | nd | 2.52 | nd |
| p,p'-DDE | nd | nd | 0.88 | 5.85 | nd |
| o,p'-DDD | 0.71 | nd | 1.67 | 1.35 | 2.31 |
| CL6-PCB | nd | nd | nd | 14.17 | nd |
| 1,2,8-Trimethylphenanthrene | nd | nd | nd | nd | nd |
| p,p'-DDD/o,p'-DDT | nd | nd | nd | 1.37 | nd |
| CL7-PCB | nd | nd | nd | 8.50 | nd |
| p,p'-DDT | nd | nd | nd | nd | nd |
| Benzanthracene | nd | nd | nd | nd | nd |
| Chrysene | nd | nd | nd | nd | nd |
| Benzo(b)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(k)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(a)pyrene | nd | nd | nd | nd | nd |
| Indenopyrene | nd | nd | nd | nd | nd |
| Dibenz(a,h)anthracene | nd | nd | nd | nd | nd |
| Benzo(g,h,i)perylene | nd | nd | nd | nd | nd |
| C3-Naphthalenes | 17.79 | 12.50 | 11.51 | 8.96 | 10.52 |
| C4-Naphthalenes | nd | nd | nd | nd | nd |
| C2-Dibenzothiophenes | nd | nd | nd | nd | nd |
| C3-Phenanthrenes | nd | nd | nd | nd | nd |

| Figure R-2 Analyses of Small Tissue Samples using the Method Prescribed In Stipulated Order | | | | | |
|---|---|---|---|---|---|
| SAMPLE | S5F42 | S3F21 | S4F33 | S5F35 | S1F1 |
| FILE ID | 6173A07 | 6173A08 | 6173A09 | 6173A10 | 6173A11 |
| SAMPLE WT (Wet) | 0.54 | 0.50 | 0.46 | 0.48 | 0.47 |
| Naphthalene | 79.60 | 179.51 | 76.91 | 74.72 | nd |
| Hexachlorobutadiene | nd | nd | nd | nd | nd |
| 2-Methylnaphthalene | 25.37 | 60.82 | 43.34 | 25.39 | 1.86 |
| 1-Methylnaphthalene | 9.75 | 26.05 | 23.41 | 9.93 | 1.15 |
| 2-Ethylnaphthalene | 3.08 | 8.43 | 6.01 | 2.90 | 0.66 |
| 1-Ethylnaphthalene | 0.63 | 2.59 | 1.42 | nd | nd |
| 2,6/2,7-Dimethylnaphthalene | 7.64 | 18.59 | 11.26 | 7.17 | 2.19 |
| 1,3/1,7-Dimethylnaphthalene | 4.52 | 9.25 | 7.62 | 3.62 | 1.95 |
| 1,6-Dimethylnaphthalene | 3.15 | 8.07 | 4.24 | 3.04 | 0.92 |
| 1,4/2,3-Dimethylnaphthalene | 2.75 | 5.88 | 3.97 | 2.19 | 0.91 |
| 1,5-Dimethylnaphthalene | 0.70 | nd | nd | nd | nd |
| Acenaphthylene | nd | nd | nd | nd | nd |
| 1,2-Dimethylnaphthalene | 1.11 | 3.00 | 0.94 | nd | nd |
| 2-Isopropylnaphthalene | 2.42 | 6.10 | 4.46 | nd | nd |
| 1,8-Dimethylnaphthalene | nd | nd | nd | nd | nd |
| Acenaphthene | 13.33 | 22.12 | 10.54 | 11.12 | 22.01 |
| 1,6,7-Trimethylnaphthalene | 1.92 | nd | nd | nd | nd |
| Fluorene | 21.40 | 29.11 | 13.94 | 12.42 | 38.58 |
| Trifluralin | 2.35 | nd | 1.99 | nd | nd |
| CL2-PCB | nd | nd | nd | nd | nd |
| Hexachlorobenzene | nd | nd | nd | nd | nd |
| Simazine | nd | nd | nd | nd | nd |
| Dibenzothiophene | 6.07 | 9.40 | 4.81 | 3.93 | 15.65 |
| Atrazine | 59.96 | 79.44 | 61.52 | 45.46 | 152.57 |
| Phenanthrene | 103.49 | 102.28 | 61.93 | 48.72 | 97.18 |
| Anthracene | 1.32 | nd | 1.38 | 1.09 | 1.13 |
| CL3-PCB | 10.62 | 9.40 | 9.83 | 4.40 | 9.48 |
| 4-Methyldibenzothiophene | 1.76 | 1.39 | 1.15 | 0.87 | 1.35 |
| 2/3-Methyldibenzothiophene | 1.00 | 0.80 | nd | nd | nd |
| CL4-PCB | 13.90 | nd | nd | nd | nd |
| 3-Methylphenanthrene | 6.16 | 5.21 | 4.10 | 3.04 | 4.62 |
| 1-Methyldibenzothiophene | nd | nd | nd | nd | nd |
| 2-Methylphenanthrene | 10.73 | 8.71 | 5.15 | 3.67 | 7.32 |
| Alachlor | nd | nd | nd | nd | nd |
| 4/9-Methylphenanthrene | 2.50 | 2.59 | 2.09 | 1.41 | 2.37 |
| 1-Methylphenanthrene | 3.49 | 2.87 | 1.77 | 1.26 | 2.14 |
| Metolachlor | nd | nd | nd | nd | nd |
| Cyanazine | nd | nd | nd | nd | nd |
| 3,6-Dimethylphenanthrene | 0.52 | nd | nd | nd | nd |
| 3,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 2,6-Dimethylphenanthrene | 0.67 | 0.53 | 0.50 | nd | 0.55 |
| 2,7-Dimethylphenanthrene | 0.87 | 0.54 | 0.35 | nd | 0.57 |
| 3,9-Dimethylphenanthrene | 1.19 | 1.70 | 1.44 | 0.81 | 1.47 |
| 1,6/2,5/2,9-Dimethylphenanthren | 0.90 | 1.09 | 0.88 | 0.77 | 1.19 |
| 1,7-Dimethylphenanthrene | 0.85 | 0.99 | 0.44 | 0.36 | nd |

| SAMPLE | S5F42 | S3F21 | S4F33 | S5F35 | S1F1 |
|---|---|---|---|---|---|
| FILE ID | 6173A07 | 6173A08 | 6173A09 | 6173A10 | 6173A11 |
| SAMPLE WT (Wet) | 0.54 | 0.50 | 0.46 | 0.48 | 0.47 |
| 1,9/4,9-Dimethylphenanthrene | 0.32 | nd | nd | nd | nd |
| 1,2-Dimethyldibenzothiophene | nd | nd | nd | nd | nd |
| Fluoranthene | 19.05 | 16.64 | 12.72 | 10.06 | 15.70 |
| 1,5-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,8-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 1,2-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| 9,10-Dimethylphenanthrene | nd | nd | nd | nd | nd |
| Pyrene | 5.20 | 5.41 | 5.13 | 4.06 | 5.44 |
| o,p'-DDE | nd | nd | nd | nd | nd |
| Chlordane | nd | nd | nd | nd | nd |
| t-Nonachlor | nd | nd | nd | nd | nd |
| CL5-PCB | nd | nd | nd | nd | nd |
| Dieldrin | nd | nd | nd | nd | nd |
| p,p'-DDE | 0.86 | 1.03 | 0.75 | 1.14 | 0.98 |
| o,p'-DDD | nd | 1.92 | nd | 1.51 | 1.87 |
| CL6-PCB | nd | nd | nd | 2.05 | nd |
| 1,2,8-Trimethylphenanthrene | nd | nd | nd | nd | nd |
| p,p'-DDD/o,p'-DDT | nd | nd | nd | nd | nd |
| CL7-PCB | nd | nd | nd | nd | nd |
| p,p'-DDT | nd | nd | nd | nd | nd |
| Benzanthracene | nd | nd | nd | nd | nd |
| Chrysene | nd | nd | nd | nd | nd |
| Benzo(b)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(k)fluoranthene | nd | nd | nd | nd | nd |
| Benzo(a)pyrene | nd | nd | nd | nd | nd |
| Indenopyrene | nd | nd | nd | nd | nd |
| Dibenz(a,h)anthracene | nd | nd | nd | nd | nd |
| Benzo(g,h,i)perylene | nd | nd | nd | nd | nd |
| C3-Naphthalenes | 12.96 | 25.35 | 9.83 | 7.53 | 8.50 |
| C4-Naphthalenes | nd | nd | nd | nd | nd |
| C2-Dibenzothiophenes | nd | nd | nd | nd | nd |
| C3-Phenanthrenes | nd | nd | nd | nd | nd |

| Figure R-2 Analyses of Small Tissue Samples using the Method Prescribed In Stipulated Order | | | |
|---|---|---|---|
| SAMPLE | S5F37 | S4F25 | S2F19 |
| FILE ID | 6173A12 | 6173A13 | 6173A14 |
| SAMPLE WT (Wet) | 0.54 | 0.53 | 0.48 |
| Naphthalene | 84.46 | 87.90 | 115.82 |
| Hexachlorobutadiene | nd | nd | nd |
| 2-Methylnaphthalene | 27.87 | 256.69 | 37.74 |
| 1-Methylnaphthalene | 11.56 | 166.36 | 16.31 |
| 2-Ethylnaphthalene | 4.09 | 44.78 | 4.85 |
| 1-Ethylnaphthalene | 0.71 | 16.18 | nd |
| 2,6/2,7-Dimethylnaphthalene | 9.29 | 71.76 | 10.23 |
| 1,3/1,7-Dimethylnaphthalene | 3.96 | 65.37 | 7.19 |
| 1,6-Dimethylnaphthalene | 2.65 | 33.11 | 5.46 |
| 1,4/2,3-Dimethylnaphthalene | 2.36 | 23.08 | 3.52 |
| 1,5-Dimethylnaphthalene | 1.03 | 8.33 | 1.00 |
| Acenaphthylene | nd | nd | nd |
| 1,2-Dimethylnaphthalene | 1.05 | 9.97 | 1.33 |
| 2-Isopropylnaphthalene | 4.34 | 3.00 | 3.47 |
| 1,8-Dimethylnaphthalene | nd | nd | nd |
| Acenaphthene | 10.67 | 12.95 | 22.46 |
| 1,6,7-Trimethylnaphthalene | 1.83 | 6.93 | 2.96 |
| Fluorene | 18.84 | 14.78 | 27.78 |
| Trifluralin | 9.82 | 3.09 | nd |
| CL2-PCB | nd | nd | nd |
| Hexachlorobenzene | nd | nd | nd |
| Simazine | nd | nd | nd |
| Dibenzothiophene | 5.20 | 3.98 | 8.49 |
| Atrazine | 67.72 | 55.46 | 3.16 |
| Phenanthrene | 94.04 | 60.10 | 113.45 |
| Anthracene | nd | nd | 1.52 |
| CL3-PCB | 11.81 | 7.44 | 8.07 |
| 4-Methyldibenzothiophene | 1.42 | 1.26 | 1.42 |
| 2/3-Methyldibenzothiophene | 0.65 | nd | 0.74 |
| CL4-PCB | 13.89 | nd | nd |
| 3-Methylphenanthrene | 5.79 | 3.47 | 5.15 |
| 1-Methyldibenzothiophene | 0.32 | nd | nd |
| 2-Methylphenanthrene | 10.29 | 4.99 | 7.68 |
| Alachlor | nd | nd | nd |
| 4/9-Methylphenanthrene | 1.81 | 2.16 | 2.06 |
| 1-Methylphenanthrene | 3.09 | 1.69 | 2.22 |
| Metolachlor | nd | nd | nd |
| Cyanazine | nd | nd | nd |
| 3,6-Dimethylphenanthrene | 0.63 | nd | nd |
| 3,5-Dimethylphenanthrene | nd | nd | nd |
| 2,6-Dimethylphenanthrene | 0.68 | 0.54 | 0.56 |
| 2,7-Dimethylphenanthrene | 0.71 | 0.50 | 0.73 |
| 3,9-Dimethylphenanthrene | 1.15 | 1.36 | 1.10 |
| 1,6/2,5/2,9-Dimethylphenanthren | 0.72 | 0.89 | 0.78 |
| 1,7-Dimethylphenanthrene | 0.73 | 0.48 | 0.47 |

| SAMPLE | S5F37 | S4F25 | S2F19 |
|---|---|---|---|
| FILE ID | 6173A12 | 6173A13 | 6173A14 |
| SAMPLE WT (Wet) | 0.54 | 0.53 | 0.48 |
| 1,9/4,9-Dimethylphenanthrene | nd | nd | nd |
| 1,2-Dimethyldibenzothiophene | nd | nd | nd |
| Fluoranthene | 17.77 | 10.53 | 16.40 |
| 1,5-Dimethylphenanthrene | nd | nd | nd |
| 1,8-Dimethylphenanthrene | nd | nd | nd |
| 1,2-Dimethylphenanthrene | nd | nd | nd |
| 9,10-Dimethylphenanthrene | nd | nd | nd |
| Pyrene | 5.16 | 3.60 | 4.73 |
| o,p'-DDE | nd | nd | nd |
| Chlordane | nd | nd | nd |
| t-Nonachlor | 1.32 | nd | nd |
| CL5-PCB | nd | nd | nd |
| Dieldrin | nd | nd | nd |
| p,p'-DDE | 2.23 | 3.73 | 0.65 |
| o,p'-DDD | nd | 1.24 | 0.90 |
| CL6-PCB | 2.77 | nd | nd |
| 1,2,8-Trimethylphenanthrene | nd | nd | nd |
| p,p'-DDD/o,p'-DDT | 0.88 | nd | nd |
| CL7-PCB | nd | nd | nd |
| p,p'-DDT | nd | nd | nd |
| Benzanthracene | nd | nd | nd |
| Chrysene | nd | nd | nd |
| Benzo(b)fluoranthene | nd | nd | nd |
| Benzo(k)fluoranthene | nd | nd | nd |
| Benzo(a)pyrene | nd | nd | nd |
| Indenopyrene | nd | nd | nd |
| Dibenz(a,h)anthracene | nd | nd | nd |
| Benzo(g,h,i)perylene | nd | nd | nd |
| C3-Naphthalenes | 9.75 | 36.68 | 14.75 |
| C4-Naphthalenes | nd | 22.88 | nd |
| C2-Dibenzothiophenes | nd | nd | nd |
| C3-Phenanthrenes | nd | nd | nd |

| Table R3 | | | | |
|---|---|---|---|---|
| **Mean Estimated Tissue content based upon BSAF Model** | | | | |
| | Client ID: | STATION 23-01 | STATION 9B-05 | STATION 45-05 |
| | **Assumes 2% average lipid content per organisms** | | | |
| | Battelle ID: | V3519 | V3488 | V3493 |
| | Batch ID: | 02-206 | 02-206 | 02-206 |
| | Matrix: | Sediment | Sediment | Sediment |
| | % Moisture: | 46.6 | 44.9 | 63.1 |
| | Sample Dry Weight (g): | 16.5 | 16.6 | 11.4 |
| | Units: | ng/g, wet weight | ng/g, wet weight | ng/g, wet weight |
| | TOC% | 0.028 | 0.023 | 0.040 |
| | Parent PAHs and Alkyl Homologues | | | |
| DC | Decalin | | | |
| DC1 | C1-Decalins | 2.5 | 2.3 | 1.8 |
| DC2 | C2-Decalins | 7.8 | 7.3 | 8.8 |
| DC3 | C3-Decalins | 0.0 | 0.0 | 0.0 |
| DC4 | C4-Decalins | 0.0 | 0.0 | 0.0 |
| BT | Benzo(b)thiophene | 1.9 | 2.1 | 2.0 |
| BT1 | C1-Benzo(b)thiophenes | 1.9 | 0.6 | 0.8 |
| BT2 | C2-Benzo(b)thiophenes | 2.4 | 2.4 | 3.4 |
| BT3 | C3-Benzo(b)thiophenes | 3.4 | 2.4 | 1.9 |
| BT4 | C4-Benzo(b)thiophenes | 0.0 | 0.0 | 0.0 |
| N | Naphthalene | 37.4 | 53.1 | 48.8 |
| N1 | C1-Naphthalenes | 30.8 | 31.4 | 33.6 |
| N2 | C2-Naphthalenes | 55.6 | 55.9 | 66.7 |
| N3 | C3-Naphthalenes | 37.6 | 41.7 | 39.7 |
| N4 | C4-Naphthalenes | 21.4 | 23.0 | 29.0 |
| BI | Biphenyl | 6.2 | 6.7 | 8.3 |
| ACY | Acenaphthylene | 6.4 | 11.2 | 7.0 |
| ACE | Acenaphthene | 5.1 | 7.6 | 4.4 |
| DI | Dibenzofuran | 8.3 | 10.3 | 9.0 |
| F | Fluorene | 10.8 | 15.2 | 11.6 |
| F1 | C1-Fluorenes | 7.0 | 11.3 | 9.1 |
| F2 | C2-Fluorenes | 14.1 | 20.1 | 19.1 |
| F3 | C3-Fluorenes | 15.7 | 21.8 | 22.0 |
| D | Dibenzothiophene | 5.1 | 6.7 | 5.9 |
| D1 | C1-Dibenzothiophenes | 10.7 | 13.0 | 11.7 |
| D2 | C2-Dibenzothiophenes | 16.9 | 16.1 | 22.2 |
| D3 | C3-Dibenzothiophenes | 23.2 | 19.9 | 30.9 |
| D4 | C4-Dibenzothiophenes | 19.1 | 16.7 | 26.4 |
| A | Anthracene | 19.5 | 34.4 | 19.7 |
| P | Phenanthrene | 53.8 | 89.3 | 48.5 |
| P1 | C1-Phenanthrenes/Anthracenes | 47.8 | 92.6 | 46.8 |
| P2 | C2-Phenanthrenes/Anthracenes | 40.3 | 114.1 | 76.7 |
| P3 | C3-Phenanthrenes/Anthracenes | 57.9 | 82.9 | 83.3 |
| P4 | C4-Phenanthrenes/Anthracenes | 40.3 | 60.7 | 63.0 |
| FL | Fluoranthene | 98.4 | 195.2 | 70.4 |
| PY | Pyrene | 98.8 | 187.5 | 81.3 |
| FP1 | C1-Fluoranthenes/Pyrenes | 68.6 | 137.1 | 72.6 |
| FP2 | C2-Fluoranthenes/Pyrenes | 63.9 | 85.9 | 67.4 |
| FP3 | C3-Fluoranthenes/Pyrenes | 41.4 | 46.3 | 42.6 |
| BA | Benz[a]anthracene | 54.4 | 123.3 | 43.3 |
| C | Chrysene | 68.4 | 138.0 | 56.3 |
| C1 | C1-Chrysenes | 52.1 | 75.4 | 43.7 |
| C2 | C2-Chrysenes | 51.2 | 54.3 | 45.0 |
| C3 | C3-Chrysenes | 34.2 | 26.1 | 27.6 |
| C4 | C4-Chrysenes | 17.1 | 11.8 | 11.2 |
| BB | Benzo[b]fluoranthene | 56.8 | 106.9 | 48.5 |
| BJ/K | Benzo[j/k]fluoranthene | 65.1 | 126.4 | 53.4 |
| BE | Benzo[e]pyrene | 51.0 | 84.8 | 45.1 |
| BAP | Benzo[a]pyrene | 58.8 | 115.3 | 50.9 |
| PER | Perylene | 117.3 | 133.2 | 125.1 |

| Table R3 | | |
|---|---|---|
| **Mean Estimated Tissue content b** | | |
| | Client ID: | STATION 26-05 |
| | **Assumes 2% average lipid con** | |
| | Battelle ID: | V3503 |
| | Batch ID: | 02-206 |
| | Matrix: | Sediment |
| | % Moisture: | 60.8 |
| | Sample Dry Weight (g): | 11.8 |
| | Units: | ng/g, wet weight |
| | TOC% | 0.036 |
| | Parent PAHs and Alkyl Homologues | |
| DC | Decalin | |
| DC1 | C1-Decalins | 5.0 |
| DC2 | C2-Decalins | 14.5 |
| DC3 | C3-Decalins | 0.0 |
| DC4 | C4-Decalins | 0.0 |
| BT | Benzo(b)thiophene | 2.5 |
| BT1 | C1-Benzo(b)thiophenes | 1.5 |
| BT2 | C2-Benzo(b)thiophenes | 3.5 |
| BT3 | C3-Benzo(b)thiophenes | 3.2 |
| BT4 | C4-Benzo(b)thiophenes | 0.0 |
| N | Naphthalene | 44.6 |
| N1 | C1-Naphthalenes | 38.6 |
| N2 | C2-Naphthalenes | 68.2 |
| N3 | C3-Naphthalenes | 45.2 |
| N4 | C4-Naphthalenes | 34.7 |
| BI | Biphenyl | 7.2 |
| ACY | Acenaphthylene | 6.6 |
| ACE | Acenaphthene | 5.0 |
| DI | Dibenzofuran | 9.4 |
| F | Fluorene | 11.8 |
| F1 | C1-Fluorenes | 9.0 |
| F2 | C2-Fluorenes | 20.3 |
| F3 | C3-Fluorenes | 23.2 |
| D | Dibenzothiophene | 6.1 |
| D1 | C1-Dibenzothiophenes | 14.8 |
| D2 | C2-Dibenzothiophenes | 29.9 |
| D3 | C3-Dibenzothiophenes | 43.8 |
| D4 | C4-Dibenzothiophenes | 39.4 |
| A | Anthracene | 17.5 |
| P | Phenanthrene | 50.3 |
| P1 | C1-Phenanthrenes/Anthracenes | 45.6 |
| P2 | C2-Phenanthrenes/Anthracenes | 73.0 |
| P3 | C3-Phenanthrenes/Anthracenes | 72.0 |
| P4 | C4-Phenanthrenes/Anthracenes | 57.7 |
| FL | Fluoranthene | 76.7 |
| PY | Pyrene | 80.5 |
| FP1 | C1-Fluoranthenes/Pyrenes | 61.3 |
| FP2 | C2-Fluoranthenes/Pyrenes | 67.0 |
| FP3 | C3-Fluoranthenes/Pyrenes | 50.6 |
| BA | Benz[a]anthracene | 41.0 |
| C | Chrysene | 58.6 |
| C1 | C1-Chrysenes | 31.2 |
| C2 | C2-Chrysenes | 56.0 |
| C3 | C3-Chrysenes | 42.1 |
| C4 | C4-Chrysenes | 21.9 |
| BB | Benzo[b]fluoranthene | 48.4 |
| BJ/K | Benzo[j/k]fluoranthene | 49.4 |
| BE | Benzo[e]pyrene | 46.1 |
| BAP | Benzo[a]pyrene | 37.7 |
| PER | Perylene | 113.4 |

| | Client ID: | STATION 26-05 |
|---|---|---|
| | **Assumes 2% average lipid con** | |
| | Battelle ID: | V3503 |
| | Batch ID: | 02-206 |
| | Matrix: | Sediment |
| | % Moisture: | 60.8 |
| | Sample Dry Weight (g): | 11.8 |
| | Units: | ng/g, wet weight |
| | TOC% | 0.036 |
| IP | Indeno[1,2,3-c,d]pyrene | 32.4 |
| DA | Dibenz[a,h]anthracene | 7.6 |
| GHI | Benzo[g,h,i]perylene | 30.2 |
| | | |
| | Total PAH | 1726.6 |
| | | |
| | PAH Isomers | |
| | 2-Methylnaphthalene | 26.5 |
| | 1-Methylnaphthalene | 11.1 |
| | 2,6-Dimethylnaphthalene | 21.3 |
| | 2,3,5-Trimethylnaphthalene | 3.6 |
| | 2-Ethylnaphthalene | 5.9 |
| | 1-Ethylnaphthalene | 1.8 |
| | 1,3/1,7-Dimethylnaphthalene | 11.8 |
| | 1,6-Dimethylnaphthalene | 6.8 |
| | 1,4/2,3-Dimethylnaphthalene | 5.8 |
| | 1,5-Dimethylnaphthalene | 1.9 |
| | 2-Isopropylnaphthalene | 0.6 |
| | 1,2-Dimethylnaphthalene | 3.1 |
| | 1,8-Dimethylnaphthalene | 0.0 |
| | 1-Methylphenanthrene | 7.7 |
| | 3,6-Dimethylphenanthrene | 5.5 |
| | 4-Methyldibenzothiophene | 7.0 |
| | 2/3-Methyldibenzothiophene | 6.4 |
| | 3-Methylphenanthrene | 13.9 |
| | 1-Methyldibenzothiophene | 2.3 |
| | 2/4-Methylphenanthrene | 29.2 |
| | 9-MethylPhenanthrene/1-Methylanthrace | 18.5 |
| | 2,6/3,5-Dimethylphenanthrene | 8.5 |
| | 2,7-Dimethylphenanthrene | 6.5 |
| | 3,9-Dimethylphenanthrene | 17.1 |
| | 1,6/2,5/2,9-Dimethylphenanthrene | 10.5 |
| | 1,7-Dimethylphenanthrene | 6.1 |
| | 1,9/4,9-Dimethylphenanthrene | 2.8 |
| | 1,2-Dimethyldibenzothiophene | 0.0 |
| | 1,5-Dimethylphenanthrene | 0.0 |
| | 1,8-Dimethylphenanthrene | 1.9 |
| | 1,2-Dimethylphenanthrene | 2.4 |
| | 9,10-Dimethylphenanthrene | 0.0 |
| | 1,2,8-Trimethylphenanthrene | 3.0 |



Figure R7 NOAA Predicted vs. Actual Tidal Water Levels At Delaware City Station During Sampling Period



Figure R2. NOAA Tidal Water Levels (Five Year Record)



Figure ... showing Sediment Trap Stations with USGS bathymetry contours

USGS
science for a changing world

The National Map
http://nationalmap.gov/

Geographic Coordinate System (WGS