Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


NATURAL RESOURCES DEFENSE        )
COUNCIL, INC., and DELAWARE      )
AUDUBON SOCIETY,                 )
                                 )         Civil Action No.
        Plaintiffs,              )          88-263-SLR
                                 )
        v.                       )
                                 )
TEXACO REFINING AND MARKETING,   )
INC.,                            )
                                 )
        Defendant.               )


<u>DECLARATION OF GREG J. ABBOTT</u>

I, Greg J. Abbott, declare as follows:

1.  I am Deputy Director of the Delaware Division of Parks and Recreation
("the Parks Department").  I have held my position as Deputy Director for three
and a half years, and have worked with the Division for twelve years.  I am
responsible for policy development, the operation of budgets and endowments,
human resources, and the volunteer program.  The mission of the Parks
Department is to provide Delaware residents and visitors with safe, enjoyable
recreation opportunities, to impart responsible stewardship of public lands, to
protect cultural and natural resources that we have been entrusted to manage,
and to provide educational programming on the natural resources of Delaware.

2.  The Pea Patch Island Heronry, owned and managed as part of a State
Nature Preserve by the Parks Department, is located less than one mile from the
refinery formerly owned by Texaco.  A large part of the Island is an artifact of

human activity, created indirectly from erosion upstream and directly from the deposition of dredge spoil.  Over time, it gradually became inhabited by trees and shrubs, and eventually various forms of wildlife.  In the mid-1950's birds, specifically herons, egrets, and ibis, chose the Island as a convenient nesting area due to its close proximity to food and fresh water.  Over the years, these birds have endured the perils of a severely polluted river.  For instance, in the 1960's the Delaware River was so polluted that a lack of dissolved oxygen prevented the upstream migration of fish, thereby limiting the food supply for herons, bald eagles, osprey, and other birds.  Ever since Texaco owned the Delaware City refinery, there has been a petrochemical shadow over Pea Patch Island.  The health of the herons is closely linked to the wetlands that are on, and within a twenty mile radius of, the Island.  These wetlands capture upland run-off and filter tidal and fresh waters, trapping nutrients, sediments, and toxins.  If the sediments are polluted, as they have been for many years, the herons can easily take up the harmful chemicals through their prey, or even directly through their skin while wading in the wetlands.  Due to government diligence and the work of environmental organizations, the health of the River has been gradually improving over the last few years.

3.    The Heronry on Pea Patch Island is complex, with 9 different species of colonial wading birds, the largest of which is the Great Blue Heron, and the smallest of which is the Green Heron.  The Parks Department has monitored the heronry for more than six years, and the number of nesting heron pairs has remained stable at 3,000 since the year 2000.  Each pair usually has two to three

chicks, so we estimate that there are approximately 12,000 individual herons on Pea Patch Island at the peak of breeding season each year.

4.   Because the herons are sensitive to human activity and disturbance, the Parks Department does not allow bird watchers inside the Heronry.  However, the funds given to the Pea Patch Island Heronry Project ("the Heronry Project") as a result of the settlement of the Texaco case will be used in part to install a remote camera and video display system to allow people to "see" inside the Heronry.  Courtship displays, incubation of eggs, and the feeding of young will all be visible to the public.  The Heronry Project intends to install a video display within Fort Delaware, located approximately a half mile south of the Heronry on the tip of Pea Patch Island.  Another video display will be located across from the Island in Delaware City itself.  We will also provide signage and printed material to create a valuable educational experience for the public about the Heronry and natural resources in the area.

5.   The funding will also focus on reforestation and invasive species control. As mentioned previously, herons are very sensitive to human activity, and in order to nest properly, they need a significant barrier between their nesting grounds and areas of human activity.  The Heronry Project will restore their buffer by removing harmful invasive plants that form the current barrier, primarily Tree of Heaven and Mile-a-Minute Weed, and replacing them with native trees and shrubs.  Phragmites, Japanese Knotweed, and Purple Loosestrife will be controlled within portions of the marsh where the birds forage, although some Phragmites will be retained as it provides an important supplemental nesting

habitat for the birds directly adjacent to the Heronry.  In addition, native tree seedlings such as Pin Oak, Black Gum and Bald Cypress will be planted within the Heronry itself to help replace some of trees that the birds use, but that are dying from the heavy annual concentration of fecal deposits from the birds.  The Parks Department has been studying the use of trees by the birds for nesting on Pea Patch Island for the past six years.

6.  Finally, we will also use the funding to continue Heronry monitoring projects, and to conduct research and data collection that directly support this natural resource, which is highly significant to Delaware and the region.

7.  The Parks Department, and specifically the Heronry Project, is grateful to have this opportunity to extensively rehabilitate and preserve the unique features of the Heronry, and provide the opportunity for public education at this extraordinary national site.  The Department has been planning this project for the twelve years that I have worked here; the project simply would not have happened without the aid of this funding.

8.  We feel honored to have been chosen as a recipient of funds, and we consider the funds to serve as a form of compensation for the damage done to our local environment due to the illegal pollution that was released by the refinery when it was owned by Texaco.  We are especially thankful for the committed plaintiffs, who pursued this case for nearly 20 years, and arrived at a settlement that directly benefits the citizens of Delaware.  This outcome will enhance the local environment for many years to come.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  October 31, 2007
        Dover, Delaware

/s/ Greg J. Abbott
Greg J. Abbott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE           )
COUNCIL, INC., and DELAWARE         )
AUDUBON SOCIETY,                    )
                                    )          Civil Action No.
        Plaintiffs,                 )           88-263-SLR
                                    )
        v.                          )
                                    )
TEXACO REFINING AND MARKETING,      )
INC.,                               )
                                    )
        Defendant.                  )

DECLARATION OF WILLIAM MCAVOY

I, William McAvoy, declare as follows:

    1.  I am President of the non-profit Delaware Native Plant Society ("DNPS").  I have served as President since 2001.  I am responsible for running our business meetings; planning field trips, lectures, and symposiums; coordinating our annual plant sale; promoting the organization; encouraging and maintaining membership; and ensuring our publications go out on time.

    2.  DNPS was founded in 1998 by a group of 15 Delawareans who felt there was a profound need for an organization that would promote the use of native plants in landscaping and gardening, as well as the conservation and preservation of native plants and their habitats.  DNPS is composed of federal, state, and local government employees; professional and amateur botanists; conservationists; landowners; and others.  We have more than 150 members throughout the State of Delaware.

3.  DNPS's mission is to provide information to state and local government officials, educators, business people, private conservation groups, and the general public on the preservation and use of Delaware's native plant species both in the landscape and in the garden.  DNPS educates citizens through events, workshops, symposiums, and publications.  DNPS manages a nursery associated with the Saint Jones Estuarine Research Reserve ("the Reserve"), a state and federally funded area designated for research of the Delaware Bay Estuary.  The Reserve gave DNPS a space to build and maintain a nursery dedicated to the propagation of native plants of Delaware.  The nursery now serves as an educational asset and a visual reminder of the natural beauty inherent to this area.  Additionally, DNPS participates on the Delaware Invasive Species Council to help control the spread of invasive species in Delaware.

4.  DNPS's sole sources of income are annual membership dues and proceeds from its yearly native plant sale.  It has received grant funding in the past to finance reforestation projects.

5.  As a not-for-profit organization, DNPS serves its local community through educational efforts by promoting the use of native plants in the garden and landscape.  We always welcome non-members to attend workshops, community planting efforts, seminars and other events, as we believe the more information we spread, the more people will want to be stewards of the land.  We produce a booklet for landowners and gardeners containing information on native plants, and, through our plant sale, we provide people with the physical materials to

2

maintain indigenous gardens.  We also provide consultation to the restoration community in Delaware on restoring and rebuilding degraded habitats.

6.  As a recipient of funds from the settlement of the *NRDC and Delaware Audubon Society v. Texaco* case, DNPS has been given the invaluable opportunity to undertake several major projects vital to the continuation and enhancement of its mission.  DNPS will use part of the funding for the upkeep, maintenance, and renovation of its native plant nursery, which has been in need of repairs for several years.  Native plant material will be purchased, to be sold at DNPS's yearly plant sale, hopefully generating additional funding and enabling more Delawareans to keep their gardens filled with native species.

7.  The funding will also make it possible for DNPS to renovate its website. DNPS's website is a fundamental means of reaching a broader audience and keeping our members updated.

8.  Finally, DNPS has long wanted to improve its newsletter, update and print additional copies of our booklet (*Native Plants for the Landscape*), and to expand its publications to include calendars and more educational materials, which it will now be able to do as a direct result of receiving these funds.

9.  DNPS is extremely grateful for the funding it has received—this is something we never expected to come our way.  We are particularly excited about all that this funding enables us to do for the organization, and therefore for the surrounding environment and community.  We now feel more capable of properly informing Delaware communities on the native flora of the state, how it is being stressed, how it is declining, and the need to conserve habitats.

Through educational efforts that, thanks to the funding we have received, will now be more widespread, we will continue to promote the conservation and protection of native plants and their habitats.  Thanks to the plaintiffs who persisted in this case, and insisted on arriving upon a settlement that would directly benefit the people of Delaware, we at DNPS are now further on our way to achieving our goals as environmental educators and conservationists.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 26, 2007
        Dover, Delaware


                                    /s/ William McAvoy
                                    William McAvoy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY, | ) ) ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | 88-263-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| TEXACO REFINING AND MARKETING, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF PAUL H. MORRILL, JR.

I, Paul H. Morrill, Jr., declare as follows:

1.    I am the appointed City Manager for the City of Delaware City ("the City").

I am the City's chief administrative officer, and I am responsible for day-to-day

operations, which include budgeting, land use planning, and zoning.  I have held

my position as City Manager for ten years.

2.    The City is a municipal corporation that operates under a charter granted

by the Delaware General Assembly, and is therefore a political subdivision of the

State.  Our offices are located at 407 Clinton Street, Delaware City, Delaware.

The City has full home rule powers, within the limitations of the General

Assembly, and can therefore enact laws, sue, and be sued.

3.    The City is responsible for overseeing public property, the City's parks, the

self-sustaining municipal water system, the police department, street

maintenance, garbage collection, and a comprehensive curbside recycling program.

4.  Though the City has limited opportunities to conserve and protect natural resources, we strongly believe in high environmental standards, and we work hard to maximize our positive impact on natural resources through our recycling program, strict stormwater regulations, conservation pricing on municipal water, and various environmental restoration projects.  We work aggressively to obtain state and federal grants on a regular basis to undertake our large environmental projects, which would otherwise be beyond our financial capacity as a town of only 1,500 people.

5.  One of our most extensive long-term environmental projects is the restoration of the wetlands area along the Branch Canal that composes one of the larger marsh areas within the City limits.  On May 22, 2006 the city council passed Resolution 06-0522-04 to approve an application to the Community Environmental Project Fund ("CEPF"), which was established by the State of Delaware to protect and improve communities that have been negatively impacted by permit violations, and to begin raising the funds necessary to carry out the Branch Canal Project.

6.  Through the Branch Canal Project, the City has conducted environmental analyses on how to best restore and preserve the natural area along the Branch Canal, and build a walking path along the Canal to provide for public enjoyment of the natural resources in this area.   We are collaborating with the much larger Chesapeake and Delaware Canal ("C & D Canal") Project, to which our Branch

Canal connects, to create a recreational walking path that will connect downtown Delaware City with the C & D Canal. Additionally, the African Union Cemetery, a small historic cemetery that dates back to 1835 and houses the graves of seven African-American Civil War veterans, is currently inaccessible. The Branch Canal Project will offer an opportunity to preserve and interpret this important historical landmark, and will provide outdoor recreational enjoyment for our residents while restoring and protecting the valuable wetlands and riparian habitats that lie within our City limits.

7.   The exciting addition of the funds received from the settlement of *NRDC and Delaware Audubon Society v. Texaco* has brought us very close to the 2.7 million dollars needed to complete the Branch Canal Project. Before receiving the funds from the Texaco settlement, the City did not expect to begin the Branch Canal Restoration Project for several years. I have been working on the project for the entire ten years I have held my position as City Manager, and the amount and timing of this funding have proven critical to this environmentally and historically valuable project. It allows us to begin Phase I of the project immediately, which entails restoration of a berm, a necessary precursor to restoration of the recreational walking path and adjacent wetlands.

8.   As a neighbor, the City tries to maintain positive relations with the refinery. However, we expect the refinery to abide by applicable laws and regulations, and to operate within the boundaries of its permits. We strongly believe that if a corporation acts outside the law, or violates its permits, it must be held responsible to mitigate the damages it has caused. The completion of such legal

processes is essential to maintain the integrity of communities and the ecosystems on which they rely.

9.   We would never have been able to achieve this result on our own, and we are grateful to the Natural Resources Defense Council and Delaware Audubon Society, both of which worked for nearly 20 years to uphold the rights of the citizens of Delaware City.  As the nearest neighbor to the offender, the City believes that the funding of environmental projects is an appropriate form of reparation.  While we would rather the refinery had not violated the law in the first place, we appreciate settlement compensation for an area impacted by Texaco's disregard for the law.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 19, 2007
          Delaware City, Delaware


                                        /S/ Paul H. Morrill, Jr.
                                        Paul H. Morrill, Jr.
                                        City Manager

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., and DELAWARE        )
AUDUBON SOCIETY,                   )
                                   )       Civil Action No.
         Plaintiffs,               )        88-263-SLR
                                   )
         v.                        )
                                   )
TEXACO REFINING AND MARKETING,     )
INC.,                              )
                                   )
         Defendant.                )


## DECLARATION OF DEREK STONER

I, Derek Stoner, declare as follows:

1.   I am President of the Delmarva Ornithological Society ("DOS").

2.   DOS was founded in 1963 by a group of concerned bird watchers and
scientists who believed there was a need for a regional bird study organization.
DOS includes over 280 members from Delaware and nine other states.  Our
members come from diverse backgrounds but share a love of birds and an
interest in protecting the habitats on which they depend.  We sponsor many bird-
related activities and trips around the region for birders of any skill level.

3.   The objects and purposes of DOS include the promotion of the study of
birds, the advancement and diffusion of ornithological knowledge, and the
conservation of birds and their environment.  DOS's activities are focused in
three primary areas:  conservation, research, and education.  Our active
members range from recreational bird watchers to professional ornithologists.

DOS is strongly rooted in the science of ornithology, and works to educate its members and the public on birds and related environmental issues through monthly meetings and workshops where we present information on recent bird research, bird migration, bird distribution, birding destinations, and studies conducted by DOS.  We encourage both members and non-members to attend our monthly meetings and field trips.

4.   There are three main projects for which DOS will use the funds it has received from the Texaco settlement.  The Ashland Hawk Watch is a three-month study that will be conducted for the first time this fall.  It is the first full-time fall hawk watch study ever to occur in northern Delaware.  The magnitude of raptor migration through northern Delaware is significant.  The Ashland area is a funnel for raptors making their way down the Eastern Seaboard, and birds passing through the area are either headed for the Chesapeake Bay or the Delaware Bay region.  Over 4,000 raptors have been counted in the Ashland area just this fall.  DOS was in need of funding to continue the Ashland Hawk Watch study in fall 2008, and with the help of the Texaco funds we are now able to conduct another three-month study next year.  The results of this study will be published in the National Database of Raptor Migration and become part of the Hawk Migration Association of North America's research.

5.   The second project to be funded by Texaco settlement fees is the Osprey Nesting Platform Project.  Scientists for the State of Delaware and the U.S. Fish and Wildlife Service have been working for many years on this project, which provides nesting sites for osprey.  In addition to the work of these groups, DOS

volunteers have been building and installing dozens of osprey nesting platforms for the past fifteen years.  A high percentage of the platforms need repair work, more space is needed to build new platforms, and additional platforms need to be built.  The funding came at a critical time for this project, as the osprey populations are finally beginning to increase in number.  While the stabilization of the osprey population is exciting news in the bird community, the continuation and expansion of this project is necessary to ensure the continued viability of these populations.

6.   The third project to be funded by the Texaco settlement fees is the Youth Birding Program, which we believe is vital to our mission, and critical to keeping today's youth informed and involved in environmental issues.  The program will enroll between 10 and 30 youths, and will educate them on the joys of birding and conservation in a supportive, social setting.  The students will receive a packet of information, and will be able to use our website as an additional educational tool.  The students will be encouraged to take part in periodic bird surveys, bird outings, and the yearly Christmas Bird Count, the largest and longest-running ornithological study in the world.  Our overarching goal is to empower youth by allowing them to realize their potential to make a difference in the environment.

7.   While DOS had plans to carry out all three projects before receiving the settlement funds from the Texaco case, we had planned for a long process of very slowly building these programs.  Now we are able implement all of them soon, for the benefit of the public.

8.  DOS is honored to have been considered as a recipient of these funds. Birds suffer extreme adverse effects from toxins in the environment because they are near the top of the food chain.  We are highly appreciative that the plaintiffs in the Texaco case were successful in providing the means to help remediate the effects of the pollutants unlawfully released into the environment by the Texaco refinery.  We are excited to help make Delaware a destination for ecotourism, to help promote the bird diversity in the region, and to be able to educate the public on the birds and ecosystems of this region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 29, 2007
          Hockessin, Delaware

                                   /s/ Derek Stoner _____
                                   Derek Stoner

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC., and DELAWARE        )
AUDUBON SOCIETY,                   )
                                   )        Civil Action No.
        Plaintiffs,                )         88-263-SLR
                                   )
        v.                         )
                                   )
TEXACO REFINING AND MARKETING,     )
INC.,                              )
                                   )
        Defendant.                 )

DECLARATION OF ROBERT A. WOOD

I, Robert A. Wood, declare as follows:

1.  I am President of the Board of Directors of the non-profit Tri-State Bird

Rescue and Research, Inc. ("Tri-State").  Tri-State is located at 110 Possum

Hollow Road, Newark, Delaware.

2.  Tri-State was founded following a major regional oil spill.  In December

1976, the Liberian oil tanker Olympic Games ran aground in the Delaware River.

This was the sixth major spill in three years, and despite the efforts of many

people, tens of thousands of animals died in these spills.  In response, local

Delaware Audubon Society founder Lynne Frink and other concerned individuals

formally began the organization known today as Tri-State Bird Rescue &

Research, Inc.  The purpose was to establish a multi-disciplinary team of wildlife

biologists, veterinarians, pathologists, scientists and concerned citizens to study

the effects of oil on birds and implement necessary measures to deal with

affected wildlife.  In response to community need, Tri-State began operating a full-time wildlife rehabilitation and research center in Delaware in 1982.  The Frink Center for Wildlife is one of the largest rehabilitation facilities in the country, and handles a diverse avian caseload.  Tri-State also cares for birds that have been harmed or traumatized in non-oil related accidents, such as collision with telephone wires or habitat destruction due to human development.  At times, Tri-State assists in international oil spill responses, the largest of which occurred in South Africa where Tri State, in partnership with other organizations from around the world, cleaned and released 20,000 rehabilitated birds.

3.  Tri-State has developed working relationships with oil industries and government agencies so that if an oil spill occurs, the responsible party will immediately contact us.  Tri-State places staff on alert, and dispatches a team to assess the need for and, if indicated, to implement a wildlife response.  Tri-State responds to oil spills and environmental contamination in the Delaware Bay and River (the second largest oil-importing waterway in the lower 48 states), along the Atlantic coast, and in local tributaries, as well as throughout the world.

4.  Tri-State's spill-dedicated staff is available 24 hours a day for oil spill response.  When contacted to respond to an oil spill, Tri-State sends in trained Oil Spill Response Coordinators to engage with the people who are managing the spill to determine where Tri-State's expertise can be most helpful.  Coordinators may participate in assessment overflights to identify populations of migratory birds at risk, and assist with field retrieval and/or dispersal efforts.  Tri-State keeps detailed records on both live and dead birds that are retrieved:

identifying tags are placed on each animal, and feather samples are collected for contaminant analysis and evidence purposes.  Each bird receives a physical examination and emergency care.  A cleaning center is set up and volunteers are trained in safety protocols as well as handling and washing techniques.

5.   The cleaning of each bird takes between 4 and 6 person hours, followed by several days of rehabilitation, so it is vital the work begin as quickly as possible.  This can be risky work, as rehabilitators must handle animals contaminated with potentially hazardous substances, and wash water must be heated to 104 degrees Fahrenheit in order to lift the oil from feathers. Rehabilitators work in a ventilated area, and wear Tyvek suits, goggles, and nitrile gloves, which further limit the number of birds that can be cleaned at one time.  Once a bird has been fully cleaned, and the oil and surfactant (Dawn) have been removed from its feathers, the bird is kept in a warm area until dry. Controlled access to a pool is made available so birds may swim and preen until they have had a chance to realign their feathers and restore waterproofing.  At this point the bird's health is evaluated and its release readiness assessed.  The process from retrieval to release is extremely time, energy, and resource intensive.

6.   Tri-State was instrumental in developing many of the basic treatment protocols now widely used for oiled wildlife and has earned an international reputation for its success in rehabilitating oiled wildlife.

7.   As a non-profit organization, Tri-State has made itself available as an outlet for community service activities.  Youth offenders may carry out their

3

community service requirements at Tri-State.  Scouting, educational and

corporate organizations have volunteer projects with Tri-State.  Tri-State hosts

intern- and externship programs for undergraduate and veterinary students.  Tri-

State also coordinates a wildlife medicine course at the University of

Pennsylvania School of Veterinary Medicine, and works with other organizations

to collect data for West Nile virus, Avian Influenza, and Mycoplasma

conjunctivitis surveillance.  Finally, we provide various forms of community

outreach to inform the public of our mission and ways in which the public can

participate.

8.  Tri-State will use the funds it has received from the settlement of *NRDC

and Delaware Audubon Society v. Texaco* to help build its new oil spill annex, a

10,000-square-foot facility to be used expressly for the rehabilitation of wildlife

during oil spills, and for educating government and industry participants in

preventing and mitigating the effects of oil spills on wildlife.  Consistent with Tri-

State's efforts to uphold environmental standards in all areas, this will be a state

of the art "green" building.

9.  The building will enhance Tri-State's ability to recover birds and other

wildlife harmed by oil spills, particularly by increasing the capacity of the

organization in situations where survival of the wildlife depends on a timely

response.  Tri-State's hope is that its new facility will further help prevent oil spills

from becoming an ecological hazard to the community.  Tri-State's enhanced

presence in the community will raise awareness of the dangers of oil and oil

spills, and help to educate people on the surrounding ecosystems, habitats, and wildlife, as well as what can be done to make oil spills less dangerous.

10. Tri-State is highly appreciative of the plaintiffs who worked to secure an outcome that would serve the local communities that have for many years been affected by Texaco's illegal pollution of the Delaware River.  The community and surrounding wildlife will benefit greatly from the results of this funding.  Because of these funds, Tri-State will be able to continue and improve the high quality services it has provided for over 30 years.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 24, 2007
        Newark, Delaware


                              /s/ Robert A. Wood
                              Robert A. Wood

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., and DELAWARE AUDUBON SOCIETY, | ) ) ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | 88-263-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| TEXACO REFINING AND MARKETING, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF MARIAN YOUNG

I, Marian Young, declare as follows:

1.  I am the former President of Main Street Delaware City, Inc. ("Main Street"), and the current Manager of Main Street's Ecotourism Program.  As the Ecotourism Program Manager, and with approval of the Board of Directors, I am responsible for procuring funding for ecotourism projects; hiring appropriate consultants to advise on design, program management, and research guidelines; building advisory committees for individual projects; and recruiting people to help achieve our goals.  The work I do for Main Street is all volunteer.  I have a paying job outside of my volunteer work at Main Street.

2.  Main Street was founded in 1995.  Main Street's offices are located at 60 Clinton Street in Delaware City, Delaware.  Main Street is dedicated to the revitalization of Delaware City.  It was founded under the National Trust for Historic Preservation's National Main Street Program, which was formed to help

revitalize small towns or the main streets of larger towns that have undergone a period of economic depression following the departure of industrial, commercial, and retail businesses.  Main Street's Ecotourism Program is a part of the effort to revitalize Delaware City's economy through recognition, restoration, and marketing of the natural beauty and wildlife habitat of this area.

3.  Delaware City is located at the confluence of the Delaware River and the old Chesapeake and Delaware Branch Canal.  Many acres of wetlands, forest, and farmland, some of which are degraded and in need of restoration, are located within and immediately adjacent to the City limits.  The Ecotourism Program is designed to catalogue and evaluate all ecological resources within and directly surrounding Delaware City, preserve and restore these ecological resources, and provide access to wild lands and nature education for residents of Delaware and visitors.

4.  The Ecotourism Program works to acquaint itself with businesses and industries in the area, and to bring representatives from these companies onto the advisory committees of the Program as a means of procuring funding and keeping them abreast of local environmental issues and concerns.  We believe this is an extremely important aspect of our work because Delaware City exists in an area with both abundant industries and natural resources.  As a result, many of our town's residents are concerned for the health of their families and the environment due to pollution from these industries.  Our goal is to evaluate the quality and safety of our local forests, meadows, marshes, and waterways, and to team with other stakeholders to clean them up so that wildlife will thrive and

residents will feel safe swimming, boating, walking, recreating, and enjoying the wildlife.  Through its Ecotourism Program, Main Street serves as an identifier of problem areas, and collaborates with other organizations to carry out necessary environmental restoration work.

5.  The Ecotourism Program will utilize the funding received from the settlement of the *NRDC and Delaware Audubon Society v. Texaco* case on several specific projects.  Dragon Run Park will receive a portion of the funds for restoration of wetlands, reforestation, and invasive species control.  Management of the invasive phragmites plant in the waterways is extremely important.  As phragmites is removed, native plants can regrow, and, in turn, increase the diversity of birds and other wildlife now displaced by invasive species.  A portion of the funds will be allocated to the reforestation and control of invasive species in the Branch Canal, a project that has been underway for many years and until now was in great need of additional funding.  The Grassdale Center will receive some of the funds for invasive species control, meadow management, and scrub-shrub management.  Additionally, the funds will allow us to develop trails, procure signage, and create printed materials to serve as educational resources for the public.

6.  The projects listed above were identified before Main Street, and the Ecotourism Program in particular, was awarded funding from the settlement of the Texaco case.  The fee award has allowed us to shave at least ten years off our fundraising and implementation timeline, and we are now able to immediately start on our top five priorities, consisting of the projects listed above.

3

Furthermore, the Ecotourism Program is now better able to make the projects meaningful and successful in the long term because the additional funding will be used to leverage matching grants and will allow more to be done on each project.

7.  Main Street is thankful to the Natural Resources Defense Council and the Delaware Audubon Society, who had the vision and flexibility to arrive at a settlement that would benefit the local community affected by the pollution released into the Delaware River by the Texaco refinery.  Main Street would have had to work very hard for ten to fifteen years in order to raise the funds we needed for these projects.  We have no paid employees, but we are now able to hire a consultant and project manager to ensure the viability of these projects.

8.  There is a large team of organizations, of which Main Street is a part, working together to protect and restore the valuable wetlands and other natural areas around Delaware City, and this funding enhances the positive impact we will have on our local communities and ecosystems.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 30, 2007
          Wilmington, Delaware


                              /S/ Marian Young
                              Marian Young